**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel.<br>ANDREW SCOLLICK<br>1505 N. Rhodes Street #4<br>Arlington VA 22209 | No. ___________________ |
| Plaintiff-Relator, | |
| BRINGING THIS ACTION ON BEHALF<br>OF THE UNITED STATES OF AMERICA<br><br>c/o | **COMPLAINT**<br>**FILED UNDER SEAL**<br>**PURSUANT TO**<br>**31 U.S.C. § 3730(b)(2)** |
| RONALD C. MACHEN, JR.<br>UNITED STATES ATTORNEY<br>United States Attorney's Office<br>555 4th Street, NW<br>Washington, DC 20530 | **JURY TRIAL DEMANDED** |
| and | SEALED -- DO NOT PUBLISH |
| ATTORNEY GENERAL OF<br>THE UNITED STATES<br>U.S. Department of Justice<br>10th and Constitution Ave. NW<br>Washington, DC 20530 | |
| v. | |
| VIJAY NARULA<br>8403 Driscoll Drive<br>Bowie MD 20720 | |
| NEIL PAREKH<br>8321 Old Courthouse Rd, Suite 260<br>Vienna, VA 22182 | |
| DILIP PAREKH<br>10038 Edge Water Terrace,<br>Ft. Washington, MD, 20744 | |

AMAR GOGIA )
650 Garbers Church Road )
Harrisonburg, VA 22801-8412 )
)
MELVIN G. GOODWEATHER )
820 Emerald Dr. )
Alexandria, VA 22308 )
)
AJAY K. MADAN )
4621 24th Rd N )
Arlington, VA 22207-3514 )
)
OPTIMAL SOLUTIONS AND )
TECHNOLOGIES, INC. )
2001 M Street, NW )
Suite 3000 )
Washington, DC 20036, )
)
CSG, LLC )
650 Garbers Church Road )
Harrisonburg, VA 22801-8412 )
)
CITIBUILDIERS SOLUTIONS GROUP, LLC )
1111 19th Street North, Suite 2001 )
Arlington, VA 22209 )
)
CB CONSTRUCTION GROUP, INC. )
1410 35th Street NW )
Washington, DC 20007, )
)
SHOBHA N. METHA, MD )
5021 Seminary Road )
Alexandria, VA 22311 )
)
CENTENNIAL SURETY ASSOCIATES, INC. )
1514 Jabez Run, Suite 100 )
Milersville, MD 21108 )
)
MICHAEL SCHENDEL )
1514 Jabez Run, Suite 100 )
Milersville, MD 21108 )
)
HUDSON INSURANCE CO. )
17 State Street, 29th Floor )
New York, NY 10004 )
)

| | |
|---|---|
| HANOVER INSURANCE CO.<br>440 Lincoln Street<br>Worcester, MA 01653 | ) |
| KCGI, Inc.<br>999 Broadway, Suite 300<br>Saugus, MA 02131 | ) |
| Guatam Chitnis<br>717 Summer Street<br>Lynnfield, MA 01940 | ) |
| Anita Chitnis<br>717 Summer Street<br>Lynnfield, MA 01940 | ) |
| Defendants. | ) |

This is an action commenced by *qui tam* relator Andrew Scollick ("Plaintiff-Relator") on behalf of himself and in the name of the United States of America to recover from the above-named Defendants damages and civil penalties arising from false claims presented to the federal government, conspiracy, and other violations of the federal False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as amended. This action seeks to recover damages sustained by and penalties owed to the United States as a result of an ongoing and continuing fraudulent scheme or schemes by Defendants in violation of the FCA, as alleged herein.

## JURISDICTION AND VENUE

1. Plaintiff-Relator Andrew Scollick ("Relator") hereby alleges causes of action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq.*, arising from the Defendants' actions to defraud agencies of the United States government, including but not limited to, the U.S. Department of Veterans Affairs ("Veterans Affairs" or "VA"), and the Small Business Administration ("SBA").

2. The Plaintiff-Relator has not made any public disclosures of the allegations contained herein.

3. Pursuant to the requirements of 31 U.S.C § 3730(b), Plaintiff-Relator has voluntarily provided the federal government with a written disclosure statement, containing substantially all of the allegations made herein.

4. Pursuant to the requirements of the False Claims Act, 31 U.S.C. § 3729, *et seq*., Plaintiff-Relator has also voluntarily provided the government with confidential written disclosures including exhibits prior to filing this Complaint.

5. Plaintiff-Relator has direct and independent knowledge of the allegations stated herein.

6. Plaintiff-Relator is an original source of all the allegations contained herein as defined by the False Claims Act, 31 U.S.C. § 3730(e)(4)(B), he has direct and independent knowledge of the information contained herein and he has voluntarily provided such information to the government prior to brining this action.

7. Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3729 and 3732 and 28 U.S.C. § 1331 and 1345, in that this action arises under the laws of the United States.

8. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732, because this Court has jurisdiction over at least one Defendant who can be found in, resides, transacts business, or has performed acts proscribed by 31 U.S.C. § 3729 in the District of Columbia, and the False Claims Act provides for nationwide jurisdiction of such claims under 31 U.S.C. § 3732(a). Each Defendant also caused false claims to be made or falsely certified in this jurisdiction.

9. Plaintiff-Relator has complied with all conditions precedent to bringing this action.

## PARTIES

10. Plaintiff-Relator Andrew Scollick ("Scollick" or "Relator") is an adult who resides at 1505 N Rhodes St., unit 4, Arlington, VA 22209. Relator was hired by Defendant Neil Parekh in December 2008 and was transferred in July 2010 to a newly formed company established known as CB Construction Group, Inc. Relator was on CB Construction Group Inc.'s payroll until April 2012, when he was transferred to Citibuilders Solutions Group LLC'a payroll. Relator's employment with Citibuilders terminated in August 2012.

11. Defendant Optimal Solutions Technologies, Inc., ("**OST**") is a corporation with its principal place of business located at 2001 M Street, NW, Suite 3000, Washington, DC 20036. OST has satellite offices across the United States, including Virginia, Maryland, Pennsylvania, and Texas. OST also has components in India.

12. Defendant CB Construction Group, Inc., ("**CB**") claims as its corporate address 1410 35th Street NW, Washington, DC 20007. However, CB's actual principle place of business was OST office space located at 2001 M Street, NW, Washington, DC, 20036. In January 2012 OST relocated its offices to 1676 International Drive, Suite 1100, McLean VA, 22102, with CB. The McLean office became functional in January 2012 at which time it became CB's principle place of business until May 2012. Commencing in May 2012 CB's business operations were moved to 4620 Lee Highway, Suite 206, Arlington, VA, 22207. CB is owned by defendant Neil Parekh and his father, Defendant Dilip Parekh.

13. Defendant Centurion Solutions Group, LLC ("**CSG**") is falsely registered as a HUBZone, service-disabled-veteran-owned, minority-owned small business. CSG's registered

agent is Amar Gogia. CSG was established in or around March 2010 by defendants Narula, Madan, Parekh and Gogia for the purpose of bidding on and obtaining HUBZone, service-disabled veteran owned, minority-owned and small business government contracts. Defendant CSG listed its principal place of business as 650 Garbers Church Road, Harrisonburg, VA 22801, which is Gogia's home address. Gogia's home address is identified as CSG's principal place of business because it falls within a HUBZone; however, CSG's real principal place of business was located within office space OST rented at 2001 M Street, NW, Washington, D.C. In January 2012 CSG's principal place of business was relocated to OST's offices located at 1676 International Drive, Suite 1100, McLean, VA, 22102.

14. Defendant Citibuilders Solutions Group LLC ("**Citibuilders"**) is falsely registered as a service-disabled-veteran-owned, small business with its principle place of business located at 1111 19th Street North, Suite 2001, Arlington, VA, 22209. Goodweather is listed as the CEO of Citibuilders, however the actual principle office and chief executive is Neil Parekh. Citibuilders was created for the purpose of bidding and obtaining service-disabled-veteran owned, minority-owned and small business government contracts.

15. Defendant Vijay Narula ("**Narula**") is sued in his personal and official capacities and resides at 8403 Driscoll Drive, Bowie, MD, 20720. He is the president and CEO of OST.

16. Defendant Neil Parekh ("**Parekh**") is sued in his personal and official capacities and resides at 2001 19th street North suite 2001, Arlington VA 22209. He is identified as the president and 45% owner of CB Construction.

17. Defendant Dilip Parekh (**"Dilip Parekh"**) is sued in his personal and official capacities and resides at 10038 Edge Water Terrace, Ft. Washington, MD, 20744. He is the father of defendant Neil Parekh and 55% owner of CB Construction.

18. Defendant Amar Gogia ("**Gogia**") is sued in his personal and official capacities and resides at 650 Garbers Church Road, Harrisonburg, VA 22801-8412. He is a disabled veteran. Gogia was falsely identified in government contracting solicitations as the president, founder and 100% owner of CSG. However, Gogia never exercised control of daily operations of CSG. Instead, Gogia at all times was subordinate to Neil Parekh, Vijay Narula and Ajay Madan. Gogia often functioned as a CSG site supervisor reporting to Neil Parekh, and from time to time to Defendants Maden and Narula.

19. Defendant Melvin G. Goodweather ("**Goodweather**") is sued in his personal and official capacities and resides at 820 Emerald Dr., Alexandria, VA, 22308. He is a disabled veteran. He is falsely identified as the sole owner and CEO of Citibuilders Solutions Group. Goodweather, however, never controlled the day-to-day operations of Citibuilders Solutions Group and never functioned as its sole owner or CEO. Instead, Goodweather reported to and was subservient to Neil Parekh.

20. Defendant Ajay K. Madan **("Madan")** is sued in his personal and official capacities and resides at 4621 24th Rd N, Arlington, VA 22207-3514. He is identified as a 49% owner of CSG. He is also the chief operating officer of OST.

21. Defendant Shobha M. Mehta, MD **("Dr. Mehta**") is sued in her personal and official capacities and conducts business out of 5021 Seminary Road, Alexandria, VA, 22311. She is the aunt to defendant Parekh.

22. Defendant Centennial Surety Associates, Inc. **("Centennial"**), resides at 1514 Jabez Run, Suite 100, Milersville, Maryland, 21108. Centennial is an insurance broker the agent of and attorney-in-fact for Hudson and Hanover insurance companies. Centennial helped secure the bonding the Defendants required to bid and obtain government construction contracts.

23. Defendant Michael Schendel **("Schendel")** is sued in his personal and official capacities and is the president of Centennial Surity Assocaites, Inc. **("Centennial")**. His office resides at 1514 Jabez Run, Suite 100, Milersville, Maryland, 21108.

24. Defendant Hudson Insurance Company (**"Hudson"**), resides at17 State Street, 29th Floor, New York, NY, 10004. Hudson, with the assistance of its agency Centennial, provided surety bonds the Defendants required to bid and obtain government construction contracts.

25. Defendant Hanover Insurance Company (**"Hanover"**) resides at 440 Lincoln Street, Worcester, MA, 01653. Hanover, with the assistance of its agent Centennial, provided surety bonds the Defendants required to bid and obtain government construction contracts.

26. Defendant KCGI, Inc. ("**KCGI**") is a Massachusetts corporation with a principal place of business located at 999 Broadway, Suite 300, Saugus, MA, 02131.

27. Defendant Guatam Chitnis ("**Chitnis**") is sued in his personal capacity and is an individual residing at 717 Summer Street, Lynnfield, MA, 01940.

28. Defendant Anita Chitnis ("**Anita Chitnis**") is sued in her personal capacity and is the wife of Guatam Chitnis, also residing at 717 Summer Street, Lynnfield, MA, 01940.

29. Narula is the alter-ego of OST. He is sued in his personal and official capacities and is the owner, founder and president and at all times controlled the business structure and personnel of OST. They have such a unity of interest and ownership that the individuality of each entity ceased and they functioned as a single entity.

30. Defendants Neil and Dilip Parekh, CB Construction and Citibuilders Solutions Group are alter-egos of each other. The owner, founder, president, business, business structure, and personnel remain materially the same with Neil and Dilip Parekh in control of CB

Construction and Citibuilders Solutions Group. They have such a unity of interest and ownership that the individuality of each entity ceased and they functioned as a single entity.

31. Defendants Narula, Parekh, Madan, OST and CB Construction are joint alter-egos of CSG. Narula, Parekh, Maden, OST and CB Construction conducted business at the direction and in the interest of Narula, Parekh, Madan, OST and CB Construction. This created such a unity of interest and ownership that the individuality of each entity ceased and they functioned as a single entity. Narula, Parekh, Madan, OST and CB Construction and are thus jointly and severally liable for CSG's conduct with respect to any and all violations of the False Claims Act committed by any of these entities in this action. OST, CB Construction, and CSG are thus jointly and severally liable for each other's conduct with respect to any and all violations of the False Claims Act committed by any of these entities in this action.

32. Defendants Parekh, Goodweather and Citibuilders are joint alter-egos. Parekh precludes Citibuilders Solutions Group and Goodweather from conducting business other than that which is directed by Parekh. This created such a unity of interest and ownership that the individuality of each entity ceased and they functioned as a single entity. Parekh, Goodweather and Citibuilders are thus jointly and severally liable for Citibuilders' conduct with respect to any and all violations of the False Claims Act committed by any of these Defendants.

33. Defendants participated in, controlled, and had an ownership interest in, and control of, various partnerships and/or joint ventures to obtain and profit from government contracts. All Defendants also took profits from the proceeds that these partnerships/joint ventures generated or, alternatively, the profits were reported to shareholders, partners or owners under one or more corporate entities of one or more of the Defendants. In each case, one or more of the members of each of these partnerships or joint ventures violated the False Claims Act in

the course of doing business on behalf of the partnership/joint venture. Accordingly, all Defendants are jointly and severally liable in this action for any and all violations of the False Claims Act committed by each other.

34. All of the Defendants conspired with one another to defraud the government by submitting false information to the government in contract bids, executing on contracts without the requisite skill, knowledge, and ability, and violating material contract terms in the execution of the contracts. Defendants conspired with one another to knowingly present, and/or cause to be presented, false claims to the government related to past performance, employee knowledge and skills, experience, education, hours worked, work completed, business relationships, false certification as to service-disabled veteran status, false certification as to small business status, false certification as to HUBZone status, and ownership and control of Narula and Parekh.

35. Defendants conspired to protect the profits of all Defendants by ensuring that violations of the False Claims Act continued to occur. Defendants agreed to conceal all information that would reveal Defendants' fraud to the government. Defendants also agreed to make false statements to the government regarding the Defendants' compliance with government regulations and laws in order for Defendants to qualify to receive government payments related to government contracts.

## FACTUAL PREDICATE

36. Defendants Parekh, Madan, Narula, OST, CSG, Citibuilders, Gogia and Goodweather conspired to and did obtain service-disabled veteran-owned small business ("SDVOSB") set-aside contracts through fraudulent means. The fraudulent SDVOSB contracting activity was done in the name of two separate entities. CSG's and Citibuilders' claimed SDVOSB status was based on fraud and material false statement. Proposals submitted

on behalf of CSG and Citibuilders separately contained other material false statements, including gross misrepresentations as to past performance and employee credentials.

**Falsification of SDVOSB Status**

37. In order for a limited liability company ("LLC") to qualify for service-disabled veteran-owned small business concern ("SDVOSB") it must be owned, controlled and under day-to-day management by a service-disabled qualified individual. Ownership of a LLC means that one or more service disabled veterans must directly own at least 51% of each class of membership making up the LLC, and that "the long-term decisions making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans." 13 C.F.R. §§125.9(a) and 125.10(a); *also see* 48 C.F.R. § 852.219-10 (a)(1).

38. A service-disabled veteran must likewise hold the highest officer position and must have the managerial experience of the extent and complexity needed to run the concern, *see* 13 C.F.R. § 125.10(b), with one or more service-disabled veterans serving as the managing member with "control over all decisions of the limited liability company," 13 C.F.R. § 125.10(d).

39. Defendant Neil Parekh entered the construction business in or about 2006 with little experience. In or about 2010 he, along with his father, Dilip Parekh, established CB. CB was at all times under the direction and control of Neil and Dilip Parekh.

40. Defendant Narula is the founder of OST and serves as its president and chief executive officer ("CEO"). Defendant Madan is OST's Chief Operating Officer.

41. By 2010 Defendants Narula and Madan were well versed in government contracting through their involvement with OST's government contracting activity.

42. In or about 2010 CB's business operations were relocated to OST's corporate

office space located at 2001 M Street, N.W., Washington D.C. With Parekh's knowledge of the construction business and Narula's and Madan's knowledge of government contracting, the three of them conspired to defraud the government by seeking out and bidding on SDVOSB construction contracts when none of them were service disabled veterans and none of the company's they controlled or owned qualified as a SDVOSB.

43. The fraud was carried out by a front company, CSG, which Parekh, Narula and Madan established for the purpose of allowing them to bid and obtain SDVOSB set-aside contracts.

44. Defendant Gogia is a service-disabled veteran. Gogia did not have the finances, managerial experience, or knowledge of government contracting needed to seek, obtain or qualify for the SDVOSB set-aside contracts at issue in this matter.

45. At all times relevant to this matter OST did not qualify as a small business enterprise for the purposes of bidding on small business government contracts.

46. At all times relevant to this matter OST did not qualify for HUBZone status.

47. At all times relevant to this matter OST did not qualify as a service-disabled veteran-owned business.

48. At all times relevant to this matter, CB did not qualify as a service-disabled veteran-owned business.

49. Defendants Narula, Parekh and Madan are neither veterans nor disabled.

50. Defendants Parekh, Narula, Madan established CSG with the intent to falsely identify CSG as a SDVOSB. To this end, Gogia was falsely identified as a 100% service-disabled owner of CSG. However, at all times relevant to this complaint, Gogia neither controlled nor exercised ownership over CSG.

51. Defendants Parekh, Narula, Madan and Gogia falsely identified that CSG's business operated out of a "HUBZone" located in Gogia's home residence, 650 Garbers Chruch Road, Harrisonburg, VA, 22801-8412. In reality, CSG's business operations occurred out of OST's corporate headquarters located at 2001 M Street, N.W., Washington D.C., which was later relocated to 1676 international drive, suite 1100 McLean VA 22102.

52. Defendants engaged in all necessary activity to have CSG identified and listed as a qualified SDVOSB.

**VIP Record Certification**

53. A SDVOSBC prospective contractor must complete an application package consisting of representations, certifications, and personal documents as required by the Department of Veterans Affairs ("VA"). The VA will then review the application and determine whether the prospective contractor qualifies for SDVOSBC status. The Vendor Information Pages database ("VIP database") is a collection of records prepared by businesses eligible to participate as a Veteran-owned or Service Disabled Veteran Owned Small Business Programs.

54. After the VA determines that a contractor meets the SDVOSBC that contractor must register as a SDVOSBC in the VIP database maintained on the VetBiz website. Registration entails creating an electronic record (a "VIP record"). In so doing, the registrant must certify that all of the information contained in its VIP record is true. 38 C.F.R. § 74.2. Thereafter, the participant must submit a new application each year certifying its accuracy in order to remain eligibile. 38 C.F.R. § 74.1.

55. CSG's certified VIP record falsely claims that Defendant Amar Gogia was both 100% owner of CSG and the person in control of CSG's daily operations. This false certification was both relied upon by the government and material to the government's decision to award

CSG all of the SDVOBC contracts it obtained. Therefore, on each and every such occasion, CSG knowingly or purposely made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

**CCR Database Certification**

56. Any sole proprietor, corporation, partnership or other entity desiring to do business with the federal government ("prospective contractor") must be registered in the Central Contracting Registry ("CCR") database prior to award of a contract or agreement. FAR § 4.1102. The contractor is thereafter responsible for ensuring the accuracy of all information on its CCR record, and must renewed it at least annually. A prospective contractor must remain active in the CCR to avoid discontinuation of payments.

57. CSG knowingly and purposefully created a CCR record containing a false representation and certification that it was a SDVOSBC. Every time CSG submitted or updated its CCR profile it therefor knowingly and purposely falsely certify that it was a SDVOSBC. Therefore, on each and every such occasion, CSG knowingly or purposely made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

**ORCA Certification**

58. The Online Contractor Representation and Certification Application ("ORCA") is a component module of the Business Partnership Network ("BPN"). In addition to the information provided to the government by a prospective contractor when it registers with the CCR, the prospective contractor must provide an answer to each component question of the ORCA. Certain information contained in the prospective contractor's CCR information and all representations and certifications constituting the prospective contractor's ORCA answers are

compiled into the prospective contractor's ORCA record in the form of a table.

59. Included among the certifications and representations attested to by a business submitting an ORCA record is a field, into which the prospective contractor may input "Yes" or "No," asking whether the prospective contractor is a SDVOSBC. A "Yes" response is a statement that the declarant prospective contractor is a SDVOSB, as defined in 13 C.F.R. § 125.8. Only business concerns which meet the criteria set forth in 13 C.F.R. § 125.8 are qualified to input "Yes" in this field, for only they meet the necessary criteria of a SDVOSBC.

60. At no time did a service-disabled veteran both own and control at least 51% of CSG. Therefore, CSG's statement that it met the necessary criteria for a SDVOSBC set forth in 13 C.F.R. § 125.8 is false. This false statement appears on the ORCA record which is prepared, made, or caused to be made by the CSG. Each and every time CSG verified or updated CSG's ORCA record by clicking either submission button on the ORCA website, CSG attested to the truth of the certification or representation that CSG was at that particular time of submission a SDVOSBC as defined by 13 C.F.R. § 125.8. Therefore, on each and every such occasion, CSG knowingly or purposely made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B).

61. With respect to CSG, the ORCA, CCR and VIP certifications were based of Defendant Amar Gogia, who qualifies as a disabled veteran, as holding 100% owner of CSG and as being in control of CSG's day-to-day business activity. These false assertions were needed to allow defendants Parekh, Narula and Madan to bid on and obtain SDVOSM contracts.

62. At all relevant times, real majority ownership, operational and financial control and the decision as to the distribution of CSG profits, remained under the direct control of Parekh and/or Madan and/or Narula.

63. Defendant Gogia was subservient to Narula, Madan and Parekh. Gogia did not have an office at OST headquarters where CSG's day-to-day business decisions were carried out by Parekh, Madan and Narula.

64. Defendant Gogia did not control the allocation of CSG profits.

65. Defendants Narula, Madan and Parekh controlled the likeness of Gogia's signature which they affix to documents to their liking.

66. Defendants Narula, Madan and Parekh were directly responsible for preparing all of the CSG bid proposals transmitted to the government.

67. All decisions as to the content, and when and what contracts would be solicited were made by Parekh, Narula and Madan working out of OST's office space.

68. Hundreds of bids and/or technical proposals seeking SDVOSBC contract awards were submitted in the name of CSG. All of these proposals:

a. falsely certifying service-disabled veteran-owned status;

b. falsely certifying small business status;

c. falsifying claims of past performance;

d. hiding Narula's, Madan's and Parekh's direct control over CSG;

e. hiding the fact that CB employees worked the CSG contracts;

f. hiding the fact that Parekh, Narula and Madan with the support of other OST staff employees were responsible for preparing all of the bids and the technical proposals submitted in the name of CSG;

g. made material false statements about the knowledge and experience of CSG employees;

h. falsifying OSHA certifications for certain employees; and

i. falsifying the number of employees ready and available to staff a project.

69. The initial financing needed to launch CSG government contracting operations was in the form of an August 4, 2010 wire transfer in the amount of $211,612.34 from a Bank of America checking account held in Madan's name. This sum was wired into the newly established CSG checking account (Bank of America, Account No. 4350 0183 3728).

70. A checking account was established in the name of CSG (Bank of America, Account No. 4350 0183 3728). Neil Parekh was a signatory to the CSG bank account and freely executed checks on behalf of CSG and freely engaged in the electronic transfer of funds from CSG's account into a CB account.

71. An example of Parekh's signature authority over CSG's check account is CSG check No. 1006, a payroll check, Parekh issued to Gogia.

72. The over-arching day-to-day management and oversight over all of CSG's SDVOSB construction contracts was done by performed by Parekh and CB Construction.

73. Evidence of Parekh's control and domination over CSG includes Parekh's signing CSG's August 22, 2010 federal tax form 8655 (Reporting Agent Authorization). Parekh hand-writes at the bottom of the form that he is CSG's "Managing Director/Principal."

74. Instead of controlling CSG, Gogia predominately functioned as a local CSG site manager reporting to and was otherwise under the control of Parekh, Madan and Narula. A prime example of Gogia's subservient role appears in a May 31, 2011 email Parekh sends to Gogia, threatens to remove Gogia as a site supervisor from a CSG contract if Gogia's job performance did not improve. Parekh's email states in part: "If there is not significant improvement on [the 587A7-10-105 Witchia Msc Proj #1] over the next couple of weeks I will have no choice but to replace you on this project."

75. Additional examples of Parekh's control over CSG's operations is an email dated February 15, 2012 exchange between Parekh and Gogia in which Gogia seeks Parekh's approval to pay CSG employees ("Neil – we are now 3 weeks behind on payment to Philadelphia workers, and 2 weeks behind on payment to Chillcothe workers. You still refuse to approve any payments. . . Checks are ready to go. We cannot hold our site laborers hostage, especially when we still need them to continue working. We also cannot afford any other complaints with DOL or the VA. Please approve immediately"). Another example is an August 6, 2010 email from Parekh to Gogia and relator "requiring you both" to make sure that the CSG proposals going out were full and complete.

76. Examples of the involvement Narula, Parekh and Madan had in the management of CSG projects is evidenced in a January 17, 2012 email chain among and between these individuals, and a June 1, 2012 email chain between such defendants, subject: Wichita Status Request.

77. Gogia did not control CSG financial decisions nor did he dispose of CSG's profits. Financial control was instead limited to Parekh, Madan and Narula.

78. Parekh controlled and routinely transferred electronically large sums of money from the CSG checking account into a CB checking account in which Neil and Dilip Parekh controlled. This is demonstrated by comparing CB bank statements with the wire transfers identified in the CSG checking account statements. By way of example, a comparison between CSG's and CB's checking account statements demonstrates that between November 2010 and November 2011 Parekh transferred over $1,000,000 from CSG's Bank of America checking account into CB's Chevy Chase/Capital One checking account as follows:

| Date | Amount of Transfer |
|---|---|

| | |
|---|---|
| 11/18/2011 | $12,500 |
| 11/17.2011 | $35,000 |
| 10.27.2011 | $22,700 |
| 10.14.2011 | $25,000 |
| 9.8.2011 | $25,000 |
| 9.5.2011 | $38,500 |
| 9.2.2011 | $7,500 |
| 9.1.2011 | $35,000 |
| 8.15.2011 | $25,000 |
| 8.1.2011 | $15,000 |
| 7.28.2011 | $35,000 |
| 7/10/2011 | $30,000 |
| 6/4/2011 | $25,000 |
| 5/11/2011 | $15,000 |
| 5/6/2011 | $15,000 |
| 5/2/2011 | $12,500 |
| 4/26/2011 | $20,000 |
| 4/20/2011 | $15,000 |
| 4/15/2011 | $50,000 |
| 4/4/2011 | $25,000 |
| 3/28.2011 | $25,000 |
| 3/23/2011 | $15,000 |
| 3/22/2011 | $25,000 |

| | |
|---|---|
| 3/22/2011 | $20,000 |
| 3/21/2011 | $25,000 |
| 3/7/2011 | $5,000 |
| 3/4/2011 | $15,000 |
| 3/2/2011 | $15,000 |
| 2/26/2011 | $10,000 |
| 2/25/2011 | $10,000 |
| 2/23/2011 | $10,000 |
| 2/23/2011 | $5,000 |
| 1/24/2011 | $10,000 |
| 1/6/1011 | $20,000 |
| 1/2/2011 | $15,000 |
| 12/20/2010 | $50,000 |
| 12/19/2010 | $25,000 |
| 12/19/2010 | $20,000 |
| 12/17/2010 | $15,000 |
| 12/16/2010 | $25,000 |
| 12/15/2010 | $20,000 |
| 12/13/2010 | $25,000 |
| 12/13/2010 | $25,000 |
| 12/9/2010 | $15,000 |
| 12/6/2010 | $15,000 |
| 12/3/2010 | $10,000 |

| | |
|---|---|
| 12/3/2010 | $10,000 |
| 12/1/2010 | $10,000 |
| 11/23/2010 | $10,000 |
| 11/17/2010 | $10,000 |
| 11/13/2010 | $10,000 |
| 11/12/2010 | $10,000 |
| TOTAL $ | $1,013,700.00 |

79. CSG utilized credit cards issued to CB (Capital One Bank Visa, account Number 4802-1378-6413-7940) to conduct CSG business. The primary cardholder on the CB account was identified as Dilip Parekh. The CB Visa cards used to conduct CSG business were issued in the names of Dilip Parekh (card ending in 7940), Neil Parekh (card ending 1119); Martin Tubb (card ending in 0054), Amar Gogia (card ending in 6186) and several others. Construction supplies, travel, lodging and other costs directly pertaining to CSG's government contracting activity were charged against these credit cards.

80. Additionally, an American Express credit card issued to Dilip Parekh (ending in 73007) was used to bill CSG costs, and a Home Depot credit card in the name of CB was also used to conduct CSG business.

81. Parekh signings all of the awarded CSG SDVOSB contracts as CSG's "Managing Director." Yet, Parekh was not a CSG paid employee in 2010. In the second quarter of 2011 Parekh became a paid CSG employee. That year, according to Parehk's 2011 Form W-2, he received $67,884.62 in wages from CSG.

82. Neil Parekh's established CSG's Go Daddy account and possessed and controlled

CSG's Go Daddy user name and password.

83. Gogia did not decide what bids CSG would submit, did not have final say over the content of the bids that were submitted to the government. Instead, defendants Parekh, Madan and Narula controlled what bids would be submitted by CSG, and they controlled the content and preparation of the bids CSG submitted.

84. The drafting and submission of CSG's bids occurred out of OST's Washington, D.C., office location and later out of 1676 international drive, suite 1100 McLean VA 22102 when OST moved its offices to that location. These bids were routinely signed by Neil Parekh as CSG's "Managing Director."

85. The contracts pursued in the name of CSG claiming Gogia to be the 100% owner of CSG. Contrary to this claim, in a December 22, 2011bid proposal submitted in response to a FBI Office Renovation Project Solicitation (GS-05P-11_FB-C-0049), a financial statement from CSG's accountant, J F Kearney & Associates, P.A., was attached identifying two separate CSG stockholders, "Member One" holding $18,668 in stockholder equity, and "Member Two" holding $210,000 in stockholder equity.

**Falsification of CSG's Past Performance**

86. The manner and method in which the bids were prepared demonstrates fraudulent intent. The Defendants would cut and paste into a newly minted bid proposal materially altered information appearing in a prior proposal. A comparison of the bid proposals at issue in this case evidences the obvious falsity of the cutting and pasting activity.

87. Defendants materially altered the scope and cost of various projects depending on the specific bid requirements necessary to compete for the contract.

88. Upon information and belief, every CSG bid or technical proposal that included a

description of past performance is materially false with respect to the scope and cost of the descried past performance identified therein.

89. The falsified past performance concerns CSG's false claims that it was the prime contractor of various projects, including the Metha Project, the OST renovations project, the CVENT Project, and the FBR interior renovations project. The claim that CSG performed any of these projects as the prime contractor is false. None of these projects were undertaken by CSG.

90. The Defendants claimed as past performance in CSG bids that CSG had completed a project titled "CVENT Suite 600" or "Suite 600, Suite 400" ("CVENT Project"). The CVENT project was completed by Citibuilders, Inc., a company established by Parekh in or about 2005.

91. Andrew Scollick, was the CVENT site supervisor from the beginning to the end of the project. He has first hand knowledge of the size and cost of that project and that the CVENT project was contracted with and performed by Citibuilders in 2009 before CSG came into existence. The cost of the CVENT Project was $120,000 and consisted of renovating less than 3,000 square feet. Relator has direct personal knowledge that false claims were made in federal government bid submissions concerning CSG's alleged performance on the CVENT Project. These false claims were material to the bids submitted and obtained by CSG.

92. In the solicitation No.VA-255-10-RP-0476; (Construct misc projects Witchita KS), the government required proof of past performance of CSG function as the "prime contractor" in a contract with a "dollar magnitude equal to, or greater than $1,00,000.00." In order to meet this solicitation requriement, CSG's manufactured the existence of a CVENT project that cost $1,477,000. This claim is materially false because: (a) CSG was not the prime

contractor (Citibuilders was the prime contractor); (b) the CVENT project was under 3,000 square foot at a total cost of $120,000 making the assertion that is was a 3,000 square foot $1,477,000 renovation project materially false; (c) the claim that the CVENT Project included the construction of a sliding partition to minimize disruption is made up in its entirety (Relator has firsthand knowledge that this claim is false as the project actually used an ineffective plastic sheet barrier); (d) the claim that CSG brought in "our HEPA air purifier with an extra carbon filter which took the device to stage 4 and eliminated any noxious glue fumes" is materially false because a HEPA filtration system was never used on project. To the contrary, the failure to use appropriate air purification resulted in illness to CVENT employees and the evacuation of other CVENT employees. The illnesses were reported to CVENT's HR department, and several employees were sent home due to the inhalation of noxious fumes.

93. In response to Solicitation No. VA-244-10-RP-0390 (Renovate 17-2B, Primary Care, Lebanon, PA), the technical proposal is worded essentially identical to the Witcha KS proposal, however, because the technical requirements state that "work of a dollar amount that falls within the exact same estimated magnitude of this project, which is between $500,000 and $1,000,000." The CSG Lebanon, PA technical proposal's discussion of the CVENT project was a cookie-cutter version of the Witchita KS proposal with the exception the dollar amount altered to $896,500 so that it fit within the past-performance magnitiude requirement.

94. In response to Solicitation No. VA-259-10-RP-0172 (bid but not awarded) the CSG proposal claimed that CVENT project cost $896,500.

95. Defendants' false statements regarding their experience with HEPA air filters and the CVENT Project are material because the Department of Veterans Affairs specifically sought experience with HEPA air filtration in solicitation No.VA-255-10-RP-0476; (Construct misc

projects Witchita KS) its contract solicitations).

96. Another example of Defendants falsified past performance includes the "Medical Office Renovations" project located at the medical office of Dr. Shobha N. Mehta, 5021 Seminary Road, Alexandria, Virginia ("Mehta Project").

97. Defendants used the Mehta Project as a key credential of past performance that was necessary to bid and win contracts for medical centers, including Veterans Affairs medical building contracts.

98. Dr. Mehta is the aunt of Defendant Parekh.

99. Relator observed that Dr. Mehta's office that made up the Metha Project consists of a single medical office approximating 200 square feet in size. The office consists of a medical examination table in the center with side desks and medicine cabinets against the four walls of the office.

100. The reliance on the Mehta Project is entirely false as that space was built in the 1980's and was never renovated. The defendants manufactured the Metha Project and cut and pasted reference to the Metha Project in various solicitations and bid proposals with differing size and costs of that project to fit the particular contract requirements under bid. Examples of the falsification of the Mehta Project include altering the scope and cost of the project as follows:

a. In response to solicitation No.VA-255-10-RP-0476; (Construct misc projects Witchita KS), the CSG technical submission claims that the Metha Project cost $1,150,000 for renovating 2,300 square feet.

b. In response to Solicitation No. VA-244-10-RP-0390 (Renovate 17-2B, Primary Care, Lebanon, PA), the CSG proposal claims that the Metha Project was a 2,300 sqare foot renovation costing $263,000.

c. The VA issued Solicitation No. VA-255-11-RP-0378 (Woman's Health and Privacy Corrections, Kansas City, MO). The CSG response to this solicitation claims that the Metha Project cost $235,000.

d. In response to Solicitation No. VA-259-10-RP-0172 (bid but not awarded) the CSG proposal claimed that Mehta Project cost $568,000.

101. The Mehta Project was also used to support CSG's claim that they were experienced with "negative air machines" and high efficiency particulate air ("HEPA") filters. This experience was necessary to bid and win large building projects where exposure to airborne hazardous materials was a concern. The Mehta Project did not involve negative air machines or HEPA filters.

102. The CSG response to solicitations and bid proposals also include material false statements pertaining to work alleged to have been completed at defendant OST's corporate headquarters located at 2001 M Street NW in Washington, DC ("OST Renovations"). CSG never performed any such construction activity. The space located at 2001 M Street, NW, was actually subletted, fully furnished office space that OST occupied and never renovated. Narula would personally provide past performance survey responses to the government. He would do so by completing and signing past performance surveys, through email verification, and telephone correspondence with contract officers who follow-up on past performance verification following award of a SDVOSB contract to CSG. As with other projects, Defendants claimed various amounts for the size and scope of the OST Renovations:

a. $3,100,000 for renovating 16,000, 12,000, and 2,500 square feet for three different office spaces in response to solicitation No. VA-255-11-RP-0378.

b. In response to Solicitation No. VA-256-10-RP-0333 (bid but not awarded) the CSG

proposal claimed that the OST renovation cost was $1,296,500.

c. In response to Solicitation No. VA-259-10-RP-0172 (bid but not awarded) the CSG proposal claimed that the OST renovation cost was $750,000.

103. Defendants also made false claims in various responses to solicitations concerning "FBR interior renovations." CSG did not perform this work. An example of the false citation to FBR interior renovations occurred in CSG's response to Solicitation No. VA-244-10-RP-0390 (Renovate 17-2B, Primary Care, Lebanon, PA), claiming that the cost of that renovation was $537,000. In response to Solicitation No. VA-256-10-RP-0333 (bid but not awarded) the CSG proposal states that the FBR renovation cost $837,000.

104. Defendants continue to falsely claim the Mehta Project, the CVENT Project, OST Renovations and FBR interior renovations as relevant past performance in ongoing and future contract bids.

105. The defendants conspired with Dr. Mehta to allow her medical office space located at 5021 Seminary Road, Alexandria, VA, to be identified and used as an example of CSG's past performance. Dr. Mehta would provide past performance survey information to the government falsely attesting to work CSG never performed.

106. The false statements and claims made about the CVENT, Mehta Project, OST Renovations and FBR interior renovations were used to falsely demonstrate that CSG had experience in the construction of facilities similar to the projects they bid on and were awarded. The falsification of past medical facility and other construction experience constituted material falsification on every bid and technical proposals CSG submitted that included a past performance requirement.

**False Representations Concerning CSG's Employees**

107. The CSG bids falsely claime that CSG employed people who were not employed by CSG. Defendants also falsified the background, knowledge and experience of employees who were employed by CSG.

108. CB formally issued separate letters of hire to David Rubando, relator Andrew Scollick and Martin Tubb. The formal start date of employment for all three individuals is September 27, 2010. Unlike Rubando and relator, Mr. Tubb was eventually placed on CSG's payroll, however in December 2010 Mr. Tubb left CSG's employ in less than favorable terms and had no intention of ever returning to work for CSG or the defendants. In essense, Mr. Tubb leaving CSG's employ was final and there was no expectation on the part of CSG or the defendants that he would ever return.

109. Mr. Tubb was employed by the defendants for only a few months between from September and December 2010. Following Mr. Tubb's departure both the CSG and Citibuilders response to solicitations continued to list Tubb as the site supervisor or other site management position on the proposals submitted, and did so in at least 50 separate responses to VA contract solicitations. For example, in VA-255-11-RP-0378 (Kansas City, MO) (Women's Health and Privacy Corrections) was submitted on June 13, 2011 listing Mr. Tubb as the proposed "Site Superintendent/Quality Control Officer" knowing that Mr. Tubb was unwilling to work for CSG.

110. Defendants knew that following Tubb leaving that the continued submission of Mr. Tubb's name constituted a material misrepresentation to the government that was undertaken for the purpose of obtaining government contracts under false pretenses.

111. CSG also submitted Mr. Tubb's name as a proposed site manager when he was already function as such on an existing awarded contract. For example, Mr. Tubb was selected as the site supervisor for Solicitation No. VA-256-10-IB-0291 (Biloxi, MS), which was awarded

on September 17, 2010. However, right before Thanksgiving, 2010, Parekh falsely stated to Mark Wesson, the VA contracting officer in Biloxi, and to the Contract Officer's Technical Representative, Brandon Oneal, that Mr. Tubb had experienced a "family emergency" requiring him to leave the project. In fact, CSG had identified Mr. Tubb as the site supervisor in a separate VA contract, Solicitation No. VA-258-10-RA-0191 (Albuquerque, New Mexico), and he was dispatched to that project after Thanksgiving, 2010.

112. CSG submitted a bid on Solicitation No. VA-255-10-RP-0476 (Wichita, KS) in September 2010 listing Tubb as the "Safety Compliance" project officer, where he never functioned as such after the contract was awarded.

113. Mr. David Rubando is falsely identified as a CSG employee on all bid proposals submitted by and awarded to CSG. At all times Mr. Rubando worked for and was paid by CB Construction Group.

114. For example, with respect to bid proposals on VA-255-10-RP-0476 and VA-244-10-RP-0390, David Rubando is claimed to have been employed as the Overall Project Manager of CSG for the past 1.5 years. Both statements are false as Mr. Rubando was never employed by CSG and because he was not hired even by CB until September 2010. Mr. Rubando remained exclusively employed by CB until he left the company in or about December 2013.

115. Defendants claimed that the Relator, Andrew Scollick, was as employee of CSG. The Relator was never employed by CSG. The claim that the Relator was employed by CSG is a known material false statement submitted to the government for the purposes of securing government contracts.

116. The fraudulent scheme and acts identified herein resulted in CSG obtain millions of dollars in government SDVOSB contracts, including but not limited to over $6.4 million in

federal government contracts from the Veteran Affairs Administration with respect to at least the following contracts:

| **Centurion Solutions Group ("CSG")** | **Contract Award Date** | **Contract Price** | **Final Price** |
|---|---|---|---|
| Solicitation Number: VA25810RA0191<br>Agency: Department of Veterans Affairs<br>Office: VA New Mexico Health Care System<br>Location: Department of Veterans Affairs New Mexico Health Care System<br>Contract Number: VA258-C-0436 | 8/24/10 | $517,397.00 | $503,774.00 |
| Solicitation Number: VA786A10IB0081<br>Agency: Department ofVeterans Affairs<br>Office: VA National Cemetary Administration Construction Support Division<br>Location: VA National Cemetery Administration<br>Contract Number: VA786A-C-0355 | 8/31/10 | $377,000.00 | $400,042.00 |
| Solicitation Number: VA25610IB0291<br>Agency: Department of Veterans Affairs<br>Office: VA Gulf Coast Veterans Health Care System<br>Location: Department of Veterans Affairs Gulf Coast Veterans Health Care System<br>Contract Number:VA256-C-0984 | 9/17/10 | $122,599.00 | $139,579.00 |
| Solicitation Number: VA26310IB0325<br>Agency: Department of Veterans Affairs<br>Office: VA Nebraska Western Iowa Health Care System (Omaha Division)<br>Location: Department of Veterans Affairs Nebraska Western Iowa Health Care System<br>Contract Number: VA263-C-1066 | 9/22/10 | $57,000.00 | $65,155.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA25510RP0476<br>Agency: Department of Veterans Affairs<br>Office: VA Heartland Network<br>Location: Department of Veterans Affairs Heartland Network<br>Contract Number: VA255-C-1536 | 9/24/10 | $1,277,000.00 | $1,287,005.00 |
| Solicitation Number: VA24410RP0390<br>Agency: Department of Veterans Affairs<br>Office: Lebanon VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Contract Number: VA244-C-1556 | 9/29/10 | $672,236.00 | $68,598.00 |
| Solicitation Number: VA25610RP0445<br>Agency: Department of Veterans Affairs<br>Office: Oklahoma City VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Contract Number: VA256-C-1169 | 10/29/10 | $731,727.00 | $731,727.00 |
| Solicitation Number: VA25011IB0093<br>Agency: Department of Veterans Affairs<br>Office: Chillicothe VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Chillicothe Ohio (Womens Clinic)-VA-250-11-IB-0093 | 6/21/11 | $731,910.00 | $741,588.00 |
| Solicitation Number: VA25011IB0114<br>Agency: Department of Veterans Affairs<br>Office: Chillicothe VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Chillicothe Ohio (East Entry)- VA-250-11-IB-0114 | 6/22/11 | $167,000.00 | $166,557.00 |
| Solicitation Number: VA26311IB0345<br>Agency: Department of Veterans Affairs<br>Office: VA Central Iowa Health Care System (Des Moines)<br>Location: Department of Veterans Affairs Central Iowa Health Care System, Des Moines IA-Remodel Dom Phase II-Contract Number: VA-263-11-IB-0345 | 6/30/11 | $179,800.00 | $185,482.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA25511RP0378Z<br>Agency: Department of Veterans Affairs<br>Office: VA Heartland Network<br>PROJECT 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 - WOMEN'S HEALTH RESTROMM 7 PRIVACY, CONST.<br>Location: Department of Veterans Affairs Heartland Network<br>Kansas City MO- Womens Health and Privacy Corrections- VA-255-11-RP-0378 | 7/25/11 | $187,942.00 | $187,942.00 |
| Solicitation Number: VA24611IB0278<br>Agency: Department of Veterans Affairs<br>Office: Durham VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Durham NC- Renovate CLC Restrooms<br>Contract Number: VA-246-11-IB-0278 | 9/23/11 | $77,100.00 | $78,116.00 |
| Solicitation Number: VA24410IB0398<br>Agency: Department of Veterans Affairs<br>Office: Philadelphia VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Philladelphia PA- Upgrade CLC Courtyards and Corridors- Contract No. VA-244-10-IB-0398 | 9/30/10 | $837,107.00 | $850,229.00 |
| Solicitation Number: VA246-12-B-2478<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Fire Damper Repairs<br>Contract Number: VA24612C0085 | 8/30/12 | $78,830.00 | $78,830.00 |
| Solicitation Number: VA246-12-B-1975<br>Agency: Department of Veterans Affairs<br>Office: Beckley WV VAMC<br>Title: Ceiling Tile Replacement Bldg 1<br>Contract Number: VA24612C0077 | 8/29/12 | $139,212.00 | $139,212.00 |
| Solicitation Number: VA246-13-B-0242<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Improvements to Building 6 Theatre<br>Contract Number: VA24613C0047 | 3/19/13 | $176,981.00 | $176,981.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA246-12-B-2719<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Hospice CLC Improvements<br>Contract Number: VA24612C0090 | 8/27/13 | $303,256.00 | $303,256.00 |
| Solicitation Number: VA246-13-B-0512<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Exterior Masonry and Tuck Pointing<br>Contract Number: VA24613C0113 | 6/27/13 | $349,249.00 | $348,493.00 |
| | | | |
| ***CSG Total Revenue to Date 7/29/14*** | | | ***$6,452,566.00*** |

117. Fraud in the name of CSG remains ongoing and continuous.

**Fraud Committed in the Name of Citibuilders**

118. Defendant Parekh branched out his fraudulent SDVOSB contracting activity by establishing a second contracting entity known as Citibuilders Solutions Group LLC (“Citibuilders”).

119. Parekh utilized defendant Goodweather’s service-disabled veteran status to establish Citibuilders as a SDVOSB entity. However, Citibuilders at all times was under the direct control of Parekh who was likewise the *de facto* owner and at all times in control of Citibuilders.

120. Defendant Parekh utilized Citibuilders as the vehicle to obtain SDVOSB set-aside contracts by falsely certifying Citibuilders as a service-disabled veteran-owned entity, and by materially misrepresenting Citibuilders’ past performance and project personnel that were necessary to qualify for the contract award. The Citibuilders contract proposals are “cookie cutter” versions of the CSG proposals issued in the name of Citibuilders instead of CSG.

121. Defendant Parekh prepared and controlled the submission of Citibuilders’ SDVOSB set-aside contracts solicitations. In so doing, he knowingly made multiple materially

false statements by:

a. Falsely certifying service-disabled veteran status;

b. Hiding that the real owner of the company Parekh;

c. Hiding Parekh's direct control;

d. Hiding the fact that CB controlled and paid employees Citibuilders claimed as their own;

e. Making materially false statements about the knowledge and experience of employees;

f. Manufacturing past performance experience;

g. Falsifying OSHA certifications for certain employees; and

h. Falsifying the number of employees who were ready and available to staff a project.

122. Defendant Goodweather did not exercise real control over Citibuilders' operations or finances. Instead, at all time relevant to this complaint, domination and control over Citibuiliders was in the hands of Parekh and his father, Dilip Parekh.

123. Defendant Goodweather was not in control of the filing and reporting of taxes. Control over such rested with Parekh.

124. Defendant Goodweather did not prepare or control any of the contract solicitations made in the name of Citibuilders. Control over such rested with Parekh.

125. Defendant Goodweather did not control the allocation of company profits. Control over Citibuilder profits was at all times in the hands of Parekh.

126. At all times Goodweather was subservient to Parekh with respect to Citibuilders operations, finances and daily management.

127. Government contracting funds awarded to Citibuilders were funneled into company and/or accounts controlled by defendants Neil and/or Dilip Parekh.

128. The fraud conducted in the name of Citibuilders is ongoing and continuous.

129. By way of example, between 2012 and 2014, Citibuilders obtained through fraudulent means at least $5.864 million in federal government contracts awarded from Veteran Affairs Administration and the Small Business Administration. During this time period Citibuilders received payments of at least $6 million against those contracts. A listing of Citibuilders' fraudulently awarded contracts known to have been awarded between 2010 and 2014 are as follows:

| ***Citibuilders Solutions Group*** | **Contract Award Date** | **Original price** | **Final price** |
|---|---|---|---|
| Program Source: 14-4556 Department/Agency: Department of the Interior: Geological Survey Product/Service: Z1AA: MAINTENANCE OF OFFICE BUILDINGS Description: MILL&PAVE PARKING LOTS&ROAD Herndon VA- Mill and Pave Parking Lots and Road- ING12PX01800 (Award 9/13/12) | 9/13/12 | $128,741.00 | $135,705.00 |
| Solicitation Number: VA246-14-B-0071 Agency: Department of Veterans Affairs Location: Salisbury NC VAMC Title: Replacement of Windows Stationwide Contract Number: VA24614C0033 | 6/30/14 | $2,144,000.00 | $2,144,000.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA244-12-B-1357 Agency: Department of Veterans Affairs Location: Philadelphia PA VAMC<br>Renovate Laboratory and Ac 19<br>Contract Number: VA24412C0529 | 9/27/12 | $1,777,000.00 | $1,790,568.00 |
| Solicitation Number: VA24612B2836<br>Agency: Department of Veterans Affairs<br>Office: Salisbury VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Salisbury NC- Building 21 Basement Improvments Contract Number: VA24612C0126 (Award 9/24/12) | 9/24/12 | $279,000.00 | $279,000.00 |
| PIID/MOD: VA786A12C0082 / 0<br>Program Source: 36-0129<br>Department/Agency: Department of Veterans Affairs<br>Product/Service: Y1PZ: CONSTRUCTION OF OTHER NON-BUILDING FACILITIES<br>Richmond VA- Remove Underground Service Tank<br>Contract Number: VA786A12C0082 (Award 9/26/12) | 9/26/12 | $23,005.00 | $23,005.00 |
| PIID/MOD: VA24612C0125 / 0<br>Program Source: 36-0162<br>Department/Agency: Department of Veterans Affairs<br>Product/Service: Z1DA: MAINTENANCE OF HOSPITALS AND INFIRMARIES<br>Description: TUNNEL RENOVATIONS<br>Salisbury NC- Tunnel Renovations<br>Contract Number VA24612C0125 (Award 9/26/12) | 9/26/12 | $278,384.00 | $306,338.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA25012B0639<br>Agency: Department of Veterans Affairs<br>Office: Brecksville (Cleveland) VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Cleveland OH - Renovate Dietetics Admin Space Project 541-12-113<br>Contract Number: VA25012C0107 (Award 9/28/12) | 9/28/12 | $627,000.00 | $650,947.00 |
| Y--RECONSTRUCT/EXPAND SOUTH PARKING LOT<br>Solicitation Number: VA26313B1756<br>Agency: Department of Veterans Affairs<br>Office: Fargo VAMROC<br>Location: Department of Veterans Affairs Medical and Regional Office Center<br><br>Fargo ND- Reconstruct and Expand South parking Lot- VA26313C0153 (Award 6/26/13) | 6/26/13 | $447,000.00 | $664,600.00 |
| Solicitation Number: VA24413Q0801<br>Agency: Department of Veterans Affairs<br>Office: Erie VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Erie PA- Replace Canteen Floor<br>Contract Number: VA24413C0359 (Award 7/19/2013) | 7/19/13 | $72,000.00 | $88,540.00 |
| | | | |
| ***Citibuilders Solutions Group- Total Revenue to Date 7/29/2014*** | | | ***$6,082,703.00*** |

130. Fraud in the name of Citibuilders remains ongoing and continuous.

**Narula's and Madan's Reaction to the Formation of Citibuilders**

131. The creation of Citibuilders caused a rift between Parekh on the one hand and Narula and Madan on the other. The rift was manifested in Madan seizing Parekh's computer after he and Narula learned of Parekh's creation of Citibuilders. Emails transmitted between Parekh, Narual and Madan on December 28, 2011 and January 31, 2012, include discussion concerning Madan's confiscation of Parekh's computer appear.

132. According to an email dated December 27, 2011, Parekh's computer was returned.

133. In a December 27, 2011 email communication Parekh pleads with Narula that he "urgently need[s] a payment from CSG to CB" that "last week when we met I put in another $35,000 of my own money because Ajay [Madan] took over all the accounts meaning we never received any payments for Nov or Dec. CSG has since received over $250,000 in payments from the government and there has been no payments to CB even though CB covers the payroll and up to Nov was also paying the credit cards."

134. On January 6, 2012 Narula acknowledges to Parekh that "I did not put in the request" for CSG to pay CB." Narula's ability to withhold CSG payments to Parekh evidences his control and domination over CSG. This email chain further reflects a January 16, 2012 communication from Narula to Parekh advising Parekh that there "are payments upto $1M from CSG to CB" and that they needed "to tally the books on both sides" before Narula would approve payments from CSG to CB.

135. On January 18, 2012 Madan emails Gogia, Parekh and Narula explaining that Gogia and Parekh would perform the "front end review" and that Madan and Gogia would "perform a backend review." On January 20, 2012 Parekh, with the knowledge and approval of Narula and Madan, initiated payroll and other payments electronically from CSG's account to

CB’s checking account.

136. Payroll and payments disputes continued to erupt between Parekh, Madan and Narula. On February 15, 2012, Gogia emailed Parekh seeking Parekh’s approval of CSG payrolls. Gogia states to Parekh “You still refuse to approve any payments” and further states “[w]e cannot hold our site laborers hostage, especially when we still need them to continue working” and closes by asking Parekh to “[p]lease approve immediately.”

137. Parekh, Narula and Madan worked towards reaching an agreement as to how CSG’s projects and profits would be handled moving forward.

138. A “one pager” memo was prepared outlining some of the accounting, operations, outstanding debts, bonding, loan repayments, project close out and how CB and CSG would separate.

139. On March 1, 2012 Narula, Parekh and Madan exchanged emails discussing the reconciliation of issues outlined in the “one pager.” The email includes multiple recommendations demonstrating that the control and operation of CSG was for the benefit of Parekh, Madan and Narula, and the CSG was a front organization in which “surplus income [was to] be distributed equally [between Parekh, Madan and Narula] after [CSG] projects are complete.” Gogia’s was not copied on this email.

140. In an email dated March 8, 2012, Parekh advised Gogia that he could not pay expenses to a CSG employee “without my approval” and he further authorized Gogia to continue using CB credit cards until CSG got its own cards.

141. On March 22, 2012 Parekh emailed Madan complaining that files were removed and placed under Madan’s “lock and key” and that this was the”second time” Madan confiscated CSG property without notification.

142. Parekh, Narula and Madan agreed that Parekh would prepare a monthly update on CSG projects that he would share with them.

143. On April 9, 2012 Narula, Madan and Parekh exchanged an email concerning the resumption of Gogia's CSG salary. Gogia was not copied on the email.

144. On April 12, 2012 Parekh prepared a governance document asking Narula's and Madan's to reinstate access to CSG's check wiring and bank transactions and further proposing that "CB to use CSG's qual[ification]s and pay CSG a fee based on receivables."

145. On May 22, 2012 Parekh emailed Narula concerning the immediate short term financial needs pertaining to CSG, OST and CB.

146. On June 13-14, 2012 Narula, Parekh and Gogia exchange emails concerning CSG's Wichita project and the processing of a payment of $170,000 to Madan.

147. On July 16, 2012 Parekh signed a check in the amount of $25,000 directly paying a CSG subcontractor for work performed on the Chillicothe contract previously awarded to CSG.

**Bonding**

148. The Miller Act is a federal statute enacted to protect subcontractors and suppliers who provide goods and services for construction contracts on federal property. In accordance with the Miller Act, contractors bidding for government construction contracts are required to post bid bonds, performance bonds and payment bonds. The bid bond accompany is required to ensure that a contractor will in fact undertake the contract if its bid is accepted; "performance bonds" guarantee that the contractor will complete the project in accordance with the specifications; and "payment bonds" ensure that those who furnish labor and materials for the project will be paid.

149. Pursuant to the FAR, construction bonds must also be submitted on standard

government forms: Standard Form 24 (bid bond), Standard Form 25 (payment bond) and Standard Form 25A (performance bond).

150. All of the government contracts obtained by the Defendants required bid bonds and performance bonds.

151. All of the fraudulent bid proposals initiated by the Defendants were dependent upon the issuance of surety bid bonds and performance bonds by Defendant Centennial Surety Associates, Inc., as the agent and attorney-in-fact for Hudson Insurance Company and Hanover Insurance Company.

152. Centennial, by and through Michael E. Schendel, Debra L. Stewart, Catherine M. Mathews, Belinda M. Ferclot and/or Anthony J. Pung, were the lawful agents of and were otherwise designated as attorney-in-fact for Defendants Hanover and Hudson.

153. Defendant Michael Schendel is the president of defendant Centennial Surety Associates, Inc. ("Centennial"). He was responsible for causing Hudson Insurance Company and Hanover Insurance Company to issue bid bonds and performance bonds to CSG and Citibuilders.

154. Centennial representative, including Michael Schendel, had developed a long-standing relationship with Neil Parekh. He and other representatives of the insurance companies toured the facilities located at 2001 M Street, NW, Washington, D.C.

155. Centennial knew that OST, CSG, CB Construction shared a single corporate office and that Parekh and Narula were in functional control of CSG.

156. All of the set-aside government contracts at issue in this matter required Citibuilders and CSG to obtain bid bonds and performance bonds. Without obtaining such bonding the fraudulent activity could not have been carried out.

157. All of the bid and performance bonds issued against the fraudulent contracting activity engaged in by CSG and Citibuilders were written by Defendant Centennial Surety Associates, Inc., as the agent and attorney-in-fact for Hudson Insurance Company and Hanover Insurance Company.

158. Defendant Schendel and Centennial Surety Associates, Inc., knew the details of each and every bid proposal submitted by the Defendants OST, CSG and CB. They were provided with copies of the bidding proposals as well as all of the contracts awarded against in connection with their bonding.

159. A single bonding agreement was entered into between Hudson Insurance Company and OST, CSG, and Citibuilders.

160. Defendants Hudson and Hanover, by and through its agent and attorneys-in-fact Centennial, understood that OST, CSG, CB Construction shared common ownership. To this end, Hudson and Hanover required Narula, Parekh, and Gogia to execute corporate resolutions acknowledging this fact. Gogia on behalf of CSG, Parekh on behalf of Citibuilders, and Narula on behalf of OST Inc., executed company resolutions acknowledging that the respective company was "materially interested through common ownership" and that each entity "authorizes, affirms, ratifies and approves the acts" of the other entities.

161. The OST bonding agreement securing the CSG bonding included personal indemnity of Narula and [his wife] Nishi Narula in the amount of "One Million Dollars ($1,000,000.00)."

162. On January 13, 2012 a Centennial representative (Cortney Seed) emailed Madan, Narula, Gogia and Parek and with a copy going to Schendel, recapped what was discussed in a meeting held on January 9, 2012. The email documents that CSG was unable to "stand on their

own merits for a bond" and that CSG's bonding was "based on OST's financial support" and that the bonding would not be executed unless the bonding company obtained "written indemnity" from OST.

163. Defendant Schendel and Centennial Surety Associates, Inc., understood that Parekh, Narula and Madan had ownership interests in CSG and deliberately disregarded this fact when issuing bonds in connection with the false certifications contained in the bidding proposals submitted to the government.

164. Defendants Hudson and Hanover, by and through their agents and attorneys-in-fact Centennial, knew that surety bid bonds were required with the submission of a bid proposal and that performance bonds were required before the contract could be awarded.

165. But for Defendant Schendel, Centennial Surety Associates, Inc., acting as agents and attorney-in-fact to Hudson Insurance Company and Hanover Insurance Company for the purpose of issuing bid bonds and performance bonds, the fraudulent bid submissions made by CSG and Citibuilders would not have been awarded.

**Fraud in the name of KCGI**

166. In or about 2010, Narula, Gyatam Chitnis, Anita Chitis, Parekh and Madan schemed to use the KGCI contracting entity to defraud the government by seeking Small Business Administration ("SBA") section 8(a) set aside contracts and/or service disabled contracts.

167. To qualify a business must be owned by socially or economically disadvantaged individuals, in business for at least 2 years with the owners having a net worth of under $250,000.

168. As the scheme to defraud the government was underway, a "Teaming Arrangement" memo was prepared and shared with Parekh. Therein, the memo proposes that on a project-by-project basis, 8(a) set-aside construction projects would be divided such that 60% of the profits would go to KCGI and 40% to OST, with SDVOSB contracts to be divided such that 40% would go to KCGI and 60% to OST.

169. As a result of this and other discussions, OST, through the hands of Narula, agreed to indemnify Merchants Bonding Company on contracts entered into by KGCI, The bonding indemnification was executed on or about August 17, 2010.

170. Parekh was involved with KCGI contracting activity. He possessed a copy of "Teaming Arrangement" document and flew up to Boston to help price KCGI contracts and, upon information and belief, helped oversee KCGI projects.

171. KCGI, Guatam Chitnis, Anita Chitnis, OST and Narula teamed together and conspired with one another to seek and obtain 8(a) set aside contracts by fraudulently concealing OST's and Narula's involvement.

172. KGCI's, Guatam Chitnis' and Anita Chitnis' involvement with Narula and OST allowed KCGI to obtain bonding from the Merchants Bonding Company.

173. As a result of the relationship between KCGI, Guatam Chitnis, Anita Chitnis, OST and Narula these defendants were able to extend KCGI's bonding for the purpose of obtaining contracts for which KCGI was not entitled.

174. With this bonding in place KCGI sought and obtained 8(a) set-aside contracts including but not limited to the following:

| ***KGCI*** | **Contract** | **Original Price** | **Final Price** |
|---|---|---|---|

| | Award Date | | |
|---|---|---|---|
| Recipient: KGCI INC<br>999 BROADWAY STE 302, SAUGUS, Massachusetts<br>Program Source: 14-1039<br>Department/Agency: Department of the Interior: National Park Service<br>Product/Service: Z199: MAINT-REP-ALT/MISC BLDGS<br>Description: BOST 16306 DRYDOCK AND REHABILITATE HISTORIC SHIP<br><br>Boston MA- Drydock and Rehabilitate historic ship USS Cassin Young Boston National Historic Park-INPC2011100224 (Awarded 6/1/2010) | 6/1/10 | $3,406,186.00 | $2,708,311.00 |
| Recipient: KGCI INC<br>999 BROADWAY STE 302, SAUGUS, Massachusetts<br>Program Source: 14-1036<br>Department/Agency: Department of the Interior: National Park Service<br>Product/Service: C119: OTHER BUILDINGS<br>Description: EAGLE CONDITION SURVEY, FORT JAY, GOVERNOR'S ISLAN<br><br>Staton Island NY- Eagle Condition Survey- Governors National Monument- Construction of Scaffolding, Condition Survey and Masonry Probes- INPC1766100050 (Awarded 9/18/2010) | 9/18/10 | $187,250.00 | $189,392.00 |
| Boston MA- Improvements Building 5 and Quarters B, Boston National Historic Park, Boston MA-C1720100416 (Awarded 9/24/2010) | 9/24/10 | $591,603.00 | $717,387.00 |
| | | | |
| ***KGCI Total Revenue to Date*** | | | ***$3,615,090.00*** |

175. Merchants Bonding Company was eventually forced to initiate a claim against OST as the indemnifier of KCGI.

## COUNT I

### VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)
### (Submitting or Causing to Be Submitted False or Fraudulent Claims to the United States)

176. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

177. In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Government.

178. Defendants obtained service-disabled veteran-owned small business ("SDVOSB"), and/or 8(a) and/or HUBzone set-aside contracts through fraudulent means and false certifications.

179. The fraudulent contracting activity was done in the name of CSG and Citibuilders and KGCI and other unknown co-conspirators.

180. By virtue of the false statements, false certifications and fraudulent conduct described herein, Defendants knowingly made, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly made or caused to be made false and fraudulent statements, and/or created false records, in order to obtain contracts through fraudulent means and in order to get a false and fraudulent claim against such contracts paid.

181. Unaware of the false and fraudulent nature of the bids and technical proposals, the United States – in reliance on the claims and certifications submitted therewith, – awarded contracts to Defendants and was damaged thereby. The amount of damages would include the total sum paid out and disbursed on each and every contract in which the Defendants submitted or caused to be submitted bid proposals that were awarded on behalf of the United States based

on false claims of services-disabled, and/or veteran-owned small business and/or HUBZone and/or Section 8(a) status.

182. Defendants' false statements and certifications claiming CSG or Citibuilders was a services-disabled, and/or veteran-owned small business and/or Hub-Zone entity diverted government funds intended to be provided and which by law could only be provided to small businesses and/or service-disabled veteran-owned and/or entities located in a Hub-Zone.

183. Defendants' false statements as to KCGI's 8(a) status diverted government funds intended to be provided and which by law could only be provided to 8(a) qualified entities.

184. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

185. Defendants engaged in fraud in the inducement such that the Untied States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

186. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

187. Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

188. Defendants are jointly and severally liable for all damages.

189. As a result of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

## <u>COUNT II</u>

### VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(B)
### (Causing to Be Made Or Used False Records to Submit False or Fraudulent Claims to the United States Or to Avoid Obligations)

190. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

191. In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made or used false records to submit false or fraudulent claims for payment or approval by the Government, or to avoid obligations to the Government. In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made, used or caused to be made or used, the false records and statements described above to obtain payments from federal government agencies under government contracts, with knowledge they were false and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

192. Defendants obtained service-disabled veteran-owned small business ("SDVOSB"), and/or 8(a) and/or HUBzone set-aside contracts through fraudulent means, false certifications and by making or using false records. By virtue of the false statements, false records, false certifications and fraudulent conduct described herein, Defendants knowingly made, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly made or caused to be made false and fraudulent statements, and/or created false records, in order to obtain contracts through fraudulent means and in order to get a false and fraudulent claim against such contracts paid.

193. Unaware of the false and fraudulent nature of the bids and technical proposals, the United States – in reliance on the claims and certifications submitted therewith, – awarded contracts to Defendants and was damaged thereby. The amount of damages would include the total sum paid out and disbursed on each and every contract in which the Defendants submitted or caused to be submitted bid proposals that were awarded on behalf of the United States based

on false claims of services-disabled, and/or veteran-owned small business and/or HUBZone and/or Section 8(a) status.

194. Defendants' false statements, false records and false certifications claiming CSG or Citibuilders was a services-disabled, and/or veteran-owned small business and/or Hub-Zone entity diverted government funds intended to be provided and which by law could only be provided to small businesses and/or service-disabled veteran-owned and/or entities located in a Hub-Zone.

195. Defendants' false statements as to KCGI's 8(a) status diverted government funds intended to be provided and which by law could only be provided to 8(a) qualified entities.

196. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

197. Defendants engaged in fraud in the inducement such that the Untied States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

198. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

199. Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

200. Defendants are jointly and severally liable for all damages.

201. As a result of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

## COUNT III

### VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(G)
### (Knowingly Avoiding or Decreasing Obligations to the United States)

202. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

203. In violation of 31 U.S.C. § 3729(a)(1)(G), Defendants knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay established duties through the aforementioned violations and any fines resulting from Defendants' violations.

204. By virtue of the conduct described above, Defendants made or used false records and statements to conceal, avoid or decrease obligations to pay or transmit money to the United States, with knowledge that they were false, and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity. Additionally, for years Defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government.

205. Had the United States known that these records, statements and certifications were false, it would have imposed on Defendants fines and penalties.

206. By knowingly, willfully or recklessly making false records, statements and certifications, and causing others to make records, false statements and certifications, for the purpose of improperly avoiding and/or decreasing an obligation to pay or transmit money to the United States, Defendants have defrauded the United States in contravention of the False Claims Act, 31 U.S.C. §3729(a)(1)(G), to the damage of the treasury of the United States of America, by failing to pay money owed to the United States. In carrying out these wrongful acts, Defendants have engaged in a protracted and continuing course and pattern of fraudulent conduct that deceived the United States into believing it was not owed this money.

207. As a direct and proximate result of Defendant's fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has failed to collect money that Defendants were obligated to pay.

208. Damages to the United States include, but are not limited to, three times the full value of all funds that Defendants failed to pay.

209. Civil fines under the False Claims Act of five to eleven thousand dollars ($5,500 - 11,000) per violation and three times the amount of damages the United States have been sustained because of Honeywell's actions pursuant to 31 U.S.C. § 3729(a).

**COUNT IV**

**(Conspiracy to Violate the False Claims Act, 31 U.S.C. §3729(a)(1)(C))**

210. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

211. Defendants conspired with each other to commit the violations of 31 U.S.C. § 3729(a)(1) (A), (B), and (G) described above.

212. As described throughout this Complaint, all Defendants knew about the scheme to defraud the United States by making false records, statements and certifications in violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (G). By participating in this scheme, Defendants implicitly agreed to form a conspiracy to violate 31 U.S.C. § 3729(a)(1)(A), (B), (D) and (G).

213. Each of the Defendants committed one or more overt acts in furtherance of the conspiracy to violate 31 U.S.C. §§3729(a)(1)(A), (B), and (G), including but not limited to each time they made false records, false statements, and/or false certifications to conceal from the United States the Defendants' fraudulent scheme and false claims, and each time false claims were submitted or caused to be submitted to the United States.

214. Defendants conspired with each other to and did obtain service-disabled veteran-owned small business ("SDVOSB"), and/or 8(a) and/or HUBzone set-aside contracts through fraudulent means in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

215. The fraudulent contracting activity was done in the name of CSG and Citibuilders and KGCI and other unknown co-conspirators.

216. Defendants knowingly conspired with each other to make, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly conspired to make or caused to be made false and fraudulent statements, and/or created false records, in order to obtain contracts through fraudulent means and in order to get a false and fraudulent claim against such contracts paid.

217. Unaware of the Defendants' conspiracy or the false and fraudulent nature of the bids and technical proposals, the United States – in reliance on the claims and certifications submitted therewith, – awarded contracts to Defendants and was damaged thereby. The amount of damages would include the total sum paid out and disbursed on each and every contract in which the Defendants submitted or caused to be submitted bid proposals that were awarded on behalf of the United States based on false claims of services-disabled, and/or veteran-owned small business and/or HUBZone and/or Section 8(a) status.

218. Defendants' false statements and certifications claiming CSG or Citibuilders was a services-disabled, and/or veteran-owned small business and/or Hub-Zone entity diverted government funds intended to be provided and which by law could only be provided to small businesses and/or service-disabled veteran-owned and/or entities located in a Hub-Zone.

219. Defendants' false statements as to KCGI's 8(a) status diverted government funds intended to be provided and which by law could only be provided to 8(a) qualified entities.

220. As a direct and proximate result of Defendants' conspiracy resulting in fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

221. Defendants engaged in fraud in the inducement such that the Untied States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

222. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

223. Each and every such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

224. Defendants are jointly and severally liable for all damages.

225. As a result of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator, on behalf of himself and the United States, requests:

a. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, including but not limited to the full value of all economic benefits obtained by Defendants through their illegal conduct, plus a civil penalty of between $5,500 and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each and every violation of 31 U.S.C. § 3729;

b. That Plaintiff-Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the United States does not intervene;
c. That Plaintiff-Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees, with interest, including expert witness fees;
d. That Plaintiff-Relator and the United States be awarded pre-judgment interest on all monies awarded;
e. That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds awarded to the United States from any alternate remedies under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), 3730(c)(5), (d), including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;
f. That Plaintiff-Relator be granted any and all other relief set forth in the False Claims Act which was not specifically referenced above; and
g. That the Court order such other relief as is appropriate.

## JURY TRIAL DEMANDED

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a jury trial.

Respectfully submitted,

/s/ Michael D. Kohn
Michael D. Kohn
DC BAR # 425617
mk@kkc.com

/s/ David K. Colapinto
David K. Colapinto
DC BAR # 416390
dc@kkc.com

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007
Phone: 202-342-6980
Fax: 202-342-6984

Attorneys for Plaintiff-Relator

August 6, 2014