**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex. rel.** ) | |
| **ANDREW SCOLLICK,** ) | |
| ) | |
| **Plaintiff-Relator,** ) | |
| ) | |
| v. ) | **Case No: 14-cv-01339-RCL** |
| ) | |
| **VIJAY NARULA, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Plaintiff-relator Andrew Scollick originally brought this case against eighteen defendants for violations of the False Claims Act ("FCA") in connection with a scheme to obtain certain set-aside government contracts through fraudulent means.  Plaintiff-relator alleged four causes of action against all of the defendants: (1) submitting or causing to be submitted false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) (presentment claims); (2) making or causing to be made or used false statements or records material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B) (false statement claims); (3) knowingly avoiding or decreasing obligations to the United States in violation of 31 U.S.C. § 3729(a)(1)(G) (reverse false claims); and (4) conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C).

The following defendants moved to dismiss for failure to state a claim: Hudson Insurance Co., Hanover Insurance Co., Centennial Surety Associates, Inc., Michael Schendel, Ajay K. Madan, Vijay Narula, Optimal Solutions and Technologies, Inc. ("OST"), CB Construction Group, Inc. ("CB"), Dilip Parekh, Shobha N. Mehta, Melvin G. Goodweather, Citibuilders Solutions

Group, and Guatam Chitnis.[1]  On October 14, 2016, this Court granted in part and denied in part the motions.  *See United States ex. rel. Scollick v. Narula*, 215 F. Supp. 3d 26 (D.D.C. 2016).  The Court found that plaintiff-relator failed to state a claim against defendants Hudson Insurance Co., Hanover Insurance Co., Centennial Surety Associates, Inc., Michael Schendel, CB Construction, Dilip Parekh, Shobha N. Mehta, Melvin G. Goodweather, and OST and granted their motions to dismiss.  *Id.* at 30.

It found, however that "plaintiff-relator has stated claims against defendants Citibuilders, Ajay K. Madan, and Vijay Narula for certain FCA violations—presenting false claims in violation of 31 U.S.C. § 3729(a)(1)(A), making false statements in violation of 31 U.S.C. § 3729(a)(1)(B), and conspiracy in violation of 31 U.S.C. § 3729(a)(1)(C) (Counts I, II, IV)."  *Id.*  Plaintiff-relator "fail[ed] to state a claim for reverse FCA violations (31 U.S.C. § 3729(a)(1)(G)) against any of the defendants," including defendants Citibuilders, Madan, and Narula.  *Id.* at 36.

Plaintiff-relator now moves, pursuant to Federal Rule of Civil Procedure 15(a), for leave to amend his Complaint in order to address the pleading shortcomings in his original Complaint. *See* Mot. for Leave to Amend, ECF No. 131.  He asserts the same four causes of action under the FCA.  The following defendants have filed oppositions: 1) Hudson Insurance [ECF No. 133]; 2) Centennial Surety Associates and Michael Schendel [ECF No. 137]; Vijay Narula, Ajay Madan, and OST [ECF No. 138]; Shobha Mehta [ECF No. 145]; Hanover Insurance [ECF No. 146]; and Melvin Goodweather [ECF No. 157].  The defendants argue that plaintiff-relator's motion should be denied because the Amended Complaint fails to cure the pleading deficiencies previously identified by this Court, and therefore that amendment would be futile.

---

[1] Defendants Amar Gogia, Centurion Solutions Group, LLC ("CSG"), and Neil Parekh did not move to dismiss, instead filing Answers to the Complaint.

## II. BACKGROUND

The factual background of this case is set forth in this Court's prior opinion regarding defendants' motions to dismiss. *See United States ex. rel. Scollick v. Narula*, 215 F. Supp. 3d 26 (D.D.C. 2016). The Court need not repeat all of the details here, but, for clarity, will include an excerpt from that opinion regarding the general background of this case:

> The factual allegations in this case center around an alleged scheme to defraud the United States government by submitting bids to obtain government construction contracts. Plaintiff-relator claims that the defendants participated in this scheme by fraudulently claiming or obtaining service-disabled veteran-owned small business ("SDVOSB") status, HUBZone status, or section 8(a) status for certain companies to bid on and obtain set-aside contracts, when in fact the bidders did not qualify for the statuses claimed. Plaintiff-relator alleges that defendants, as part of this scheme, falsely certified these statuses, made false claims regarding past performance, hid certain aspects of the management and control of the companies at issue, and hid or falsified certain information regarding the employees of the companies at issue.

> The central actors in this scheme are Neil Parekh, Ajay K. Madan, Vijay Narula, Centurion Solutions Group ("CSG"), and Citibuilders Solutions Group ("Citibuilders"). Parekh, Narula, and Madan allegedly engaged in conspiracy to defraud the government by bidding on SDVOSB construction contracts although none of them were service disabled veterans. Accordingly, Parekh, Narula, and Madan established CSG as a "front company" for the purpose of allowing them to bid on and obtain SDVOSB set-aside contracts. To qualify for SDVOSB status, defendant Gogia—a service disabled veteran—was allegedly falsely identified as a 100% service disabled owner of CSG, although he did not actually exercise control or ownership over CSG. Parekh, Narula, Madan, and Gogia also falsely identified that CSG operated out of a HUBZone when in fact it did not. Plaintiff-relator alleges that CSG then submitted false claims and statements to the government. Plaintiff-relator claims that the CSG bids contained falsified information regarding past performance, and false representations concerning CSG's employees. Finally, plaintiff-relator claims that CSG obtained millions of dollars in government contracts as a result of this fraudulent scheme, and lists the specific contracts allegedly fraudulently obtained.

> With regard to Citibuilders, plaintiff-relator alleges that Parekh established Citibuilders to branch out his fraudulent SDVOSB contracting activity. According to the Complaint, Parekh falsely certified Citibuilders as a service-disabled veteran-owned entity—utilizing defendant Goodweather's service-disabled veteran status even though Parekh was the de facto owner and controller of Citibuilders, and misrepresented Citibuilders' past performance and project personnel. Plaintiff-relator claims that Citibuilders obtained millions of dollars in government contracts as a result of this fraudulent scheme, and lists the specific contracts allegedly fraudulently obtained. Plaintiff-relator claims that the creation of Citibuilders by Parekh caused a rift between himself and Narula and Madan. Plaintiff-relator claims that Narula is the alter ego of OST, that Neil Parekh, Dilip Parekh,

CB, and Citibuilders are all alter egos of each other, that Narula, Neil Parekh, Madan, OST, and CB are joint-alter egos of CSG, and that Neil Parekh, Goodweather, and Citibuilders are joint alter egos.

Finally, Plaintiff-relator claims that similar fraud was committed in the name of a third company, KCGI. Specifically it alleges that Narula, Parekh, Madan, Guatam Chitnis, and Anita Chitnis schemed to use KCGI to defraud the government by seeking Small Business Administration section 8(a) contracts and/or service disabled contracts. On December 21, 2015 plaintiff-relator, with the consent of the U.S. government, filed a notice of voluntary dismissal with respect to KCGI, Guatam Chitnis, and Anita Chitnis.

*Id.* at 30–32 (internal citations omitted). The Amended Complaint tells essentially the same story in greater detail and with additional allegations. Where necessary, the Court will discuss the new allegations with respect to the defendants at issue.

The Court found that plaintiff-relator failed to state a claim for any FCA violations against defendants Hudson, Hanover, Centennial, Schendel, Mehta, Goodweather, OST, CB Construction, and Dilip Parekh. It found that plaintiff-relator sufficiently stated claims for the presentment of false claims, making false statements, and conspiracy in violation of the FCA, but failed to state a claim for reverse false claims against defendants Citibuilders, Narula, and Madan. Defendants Amar Gogia, CSG, and Neil Parekh did not move to dismiss, but this Court sua sponte dismissed the reverse false claim count against them as well.

Plaintiff now brings claims in the Amended Complaint under the same four causes of action: (1) submitting or causing to be submitted false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) (presentment claims) (Count I); (2) making or causing to be made or used false statements or records material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B) (false statement claims) (Count II); (3) knowingly avoiding or decreasing obligations to the United States in violation of 31 U.S.C. § 3729(a)(1)(G) (reverse false claims) (Count III); and (4) conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C) (Count IV). He has removed defendants Dilip Parekh, KCGI, Inc., Guatam Chitnis, and Anita

Chitnis from the Amended Complaint. He brings Counts I, II, and IV against all of the remaining defendants. He only brings Count III (reverse false claims) against defendants Hudson, Hanover, Centennial, and Schendel (the "insurance defendants"). As noted above, only defendants Hudson, Hanover, Centennial, Schendel, OST, Mehta, and Goodweather oppose plaintiff-relator's attempt to assert these claims. After reviewing the relevant legal standards, the Court will examine whether leave should be granted as to each of these defendants.

## III. LEGAL STANDARDS

### A. Leave to Amend

Parties have a right to amend their pleadings once as a matter of course. FED. R. CIV. P. 15(a)(1). After this, a party may amend if the opposing party consents, or if the court grants leave. FED. R. CIV. P. 15(a)(2). Courts "should freely give leave when justice so requires." *Id.* Whether to grant leave is within the discretion of the District Court. *Foman v. Davis*, 371 U.S. 178, 182 (1962). Reasons for denying leave to amend include "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Id.* "An amendment would be futile if it merely restates the same facts as the original complaint in different terms, reasserts a claim on which the court previously ruled, fails to state a legal theory, or could not withstand a motion to dismiss." *Robinson v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002).

If a party alleges that amendment would be futile because the amended complaint could not withstand a motion to dismiss, the court's "review . . . is, for practical purposes, identical to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint." *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 216 (D.C. Cir. 2010) (internal quotation marks

omitted).  To survive a 12(b)(b) motion to dismiss "a complaint must contain sufficient factual

matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (internal citations and quotation marks omitted).  Plaintiffs must provide more than

labels, conclusions, or "formulaic recitation of the elements of a cause of action." *Bell Atl. Corp.

v. Twombly*, 550 U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to

relief above the speculative level." *Id.*

As this Court previously explained, "Federal Rule of Civil Procedure 9(b) applies to FCA

actions." *Scollick*, 215 F. Supp. 3d at 35.  Thus,

> An FCA plaintiff "must state with particularity the circumstances surrounding the
> defendants' allegedly false claims, as required by Rule 9(b) of the Federal Rules of Civil
> Procedure." [*United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 544 (D.C.
> Cir. 2002)].  The "time, place, and contents of the false representations" must be pleaded
> with specificity, as these are the "element[s] of fraud about which the rule is chiefly
> concerned." *Id.*  "[A]n FCA plaintiff must identify the 'who, what, when, where, and how
> of the alleged fraud.'" *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F.Supp.2d
> 143, 153 (D.D.C. 2011).  In sum, "[c]ombining Rules 8 and 9(b), we require that 'the
> pleader . . . state the time, place and content of the false misrepresentations, the fact
> misrepresented and what was retained or given up as a consequence of the fraud," and that
> he "identify individuals allegedly involved in the fraud." *U.S. ex rel. Williams v. Martin–
> Baker Aircraft Co.*, 389 F.3d 1251, 1256 (D.C. Cir. 2004).

*Id.*

### B.     Elements of FCA Claims

This Court previously identified the elements of the four FCA violations at issue.  They are

as follows:

> The elements of presentment claims are as follows: "(1) the defendant submitted a claim
> to the government, (2) the claim was false, and (3) the defendant knew the claim was false."
> *Pencheng Si v. Laogai Research Found.*, 71 F.Supp.3d 73, 91 (D.D.C. 2014) (internal
> quotation marks omitted).  The elements of a false statement claim are nearly the same as
> those for a presentment claim, with the exception that a false statement claim "requires
> evidence that the defendant made a false statement to the government, as opposed to the

submission of a false claim for payment." *Id.* at 87. Defendants must make these claims or statements "knowingly," that is, "by (1) having actual knowledge, (2) acting in deliberate ignorance, or (3) acting in reckless disregard." *U.S. ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008).

A reverse false claim occurs when a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). In contrast to the claims described above, "[a] reverse false claim is any fraudulent conduct that 'results in no payment to the government when a payment is obligated.'" *Pencheng Si*, 71 F.Supp.3d at 88. "Whereas a traditional false claim action involves a false or fraudulent statement made to the government to support a claim for money from the government, a typical reverse false claim action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due." *Id.*

Finally, to state a claim for conspiracy under the FCA, the plaintiff-relator must allege "(1) that 'an agreement existed to have false or fraudulent claims allowed or paid' to the government, (2) that each alleged member of the conspiracy 'joined that agreement,' and (3) that 'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'" *Id.* at 89 (quoting *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 899 (D.C. Cir. 2010)). An action for conspiracy cannot exist absent underlying tortious conduct, and therefore "there can be no liability for conspiracy where there is no underlying violation of the FCA." *Id.*

*Id.* at 35–36.

Presentment and false statement claims can rest on a theory of direct presentment/making of false statements or indirect presentment/making of false statements. Indirect presentment or false statements occur when a defendant causes a false claim to be presented or a false statement to be made. The Court previously summarized the law surrounding indirect presentment/false statements as follows:

To determine whether a defendant who did not actually submit a claim or make a false statement "has 'caused' the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission." *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014). Courts should therefore consider whether the plaintiff has alleged that the defendant's conduct was "at least a substantial factor in causing, if not the but-for cause of, submission of false claims." [*United States v. Toyobo Co., Ltd.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011)] (finding that the causation requirement was satisfied by allegations that the non-submitting defendant, a fiber manufacturer, marketed the fiber to vest manufacturers

for use and "induced with the prospect of refunds, rebates, and reimbursements . . . manufacturers and other companies in the [fiber] supply chain to continue producing [fiber-related] products—and selling them to the government—when questions arose" regarding the fiber's suitability). Courts have credited indirect presentment and false statement claims in the following circumstances: "when the non-submitting party takes advantage of an unwitting intermediary, thereby causing that party to submit a false claim;" when "the non-submitter was the driving force behind an allegedly fraudulent scheme;" when "they had agreed to take certain critical actions in furtherance of the fraud;" and when the "non-submitter continued to do business with an entity upon becoming aware that that entity was submitting false claims." *Tran*, 53 F.Supp.3d at 126–27. Because the FCA "penalizes a person for his own acts, not for the acts of someone else," *United States v. Bornstein*, 423 U.S. 303, 312 (1976), failure to act is insufficient. "Courts generally require that the defendant affirmatively act in order to impose liability under the FCA, particularly when a plaintiff alleges that the defendant 'caused' the submission of false claims." *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 50 (D.D.C. 2014).

## IV.  ANALYSIS

Plaintiff-relator argues that his Amended Complaint cures the pleading deficiencies identified by this Court and now sufficiently alleges claims for the presentment of false claims, making false statements, and conspiracy against all of the defendants, and alleges a reverse false claims violation against defendants Hudson, Hanover, Centennial, and Schendel (the insurance defendants). The Court will consider in turn whether these claims are sufficiently alleged against the defendants who have raised oppositions to plaintiff-relator's motion.

### A.  OST

The Court previously summarized the facts alleged in plaintiff-relator's original Complaint regarding defendant OST as follows:

> OST is a corporation located in Washington, D.C. Vijay Narula is the president and CEO of OST. Ajay K. Madan is the chief operating officer of OST and is a 49% owner of CSG. Narula is alleged to be the alter ego of OST, and Narula, Madan, and OST are alleged to be (some of) the alter egos of CSG. Regarding OST, the Complaint alleges that CB's business operations were relocated to OST's office, that CSG's business operations occurred out of OST's headquarters, and that Narula, Madan, and Parekh prepared CSG bid proposals while working out of OST's office space. It alleges that OST never qualified for SDVOSB or HUBZone status and was not a small business enterprise. The Complaint further alleges that CSG's bid proposals "include[d] statements pertaining to work alleged to have been completed at defendant OST's corporate headquarters . . . [but] CSG never

performed any such construction activity." Narula allegedly "would personally provide past performance survey responses [regarding the OST project] to the government."

*Scollick*, 215 F. Supp. 3d at 32 (internal citations omitted).

### 1. *Vicarious Liability*

Plaintiff-relator originally alleged, in part, that defendant Narula was the alter ego of OST and that Narula, Neil Parekh, Madan, OST, and CB were joint-alter egos of CSG. This Court found that despite plaintiff-relator's "attempt to hold some of the defendants liable for the actions of CSG, Citibuilders, and KCGI . . . [by] alleg[ing] that many of the defendants [were] alter egos of each other and [were] therefore jointly and severally liable for each other's conduct," he "failed to sufficiently allege facts showing that the alter ego doctrine applie[d]." *Id.* at 36. Specifically, plaintiff-relator relied on legal conclusions that the defendants had "such a unity of interest and ownership that the individuality of each entity ceased and they functioned as a single entity," and failed to "identify the specific factual allegations in the Complaint that show commingling, manipulation, and diversion [of funds and assets]." *Id.* at 37. Importantly, he "failed to allege any facts showing that an inequitable result would follow if the corporate veil remains unpierced." *Id.*

Plaintiff-relator now argues that OST is vicariously liable for the acts of its agents and employees (specifically, Narula and Madan) under a theory of *respondeat superior*. "[A] corporation is liable under the FCA for the fraudulent acts of its agents even if the corporation received no benefit from its fraud." *U.S. ex rel. McCready v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 114, 118 (D.D.C. 2003) (Lamberth, J.). "Under the doctrine of *respondeat superior*, an employer may be held liable for the acts of his employees committed within the scope of their employment." *Boykin v. D.C.*, 484 A.2d 560, 561 (D.C. 1984).

The Court finds that plaintiff-relator has sufficiently alleged that OST is liable under a theory of *respondeat superior*, and therefore that amendment on this point would not be futile.

Plaintiff relator alleges that defendants Narula and Madan are senior executives of OST. Specifically, that Narula is the founder, president, and CEO of OST and that defendant Narula is OST's COO. Am. Compl. ¶¶ 13, 17, 50, 51, ECF No. 131-1. He also alleges that "[a]t all times relevant to this Amended Complaint, Narula and Madan acted within the scope of their OST authority and/or with apparent OST authority to carry out each act in furtherance of the fraud and conspiracy to commit fraud undertaken in the name of CSG." *Id.* ¶ 51.[2] Plaintiff-relator includes lengthy allegations regarding a scheme by Narula and Madan on behalf of OST, along with defendants Parekh and Gogia, to form a limited liability company, defendant CSG, and to use CSG to submit fraudulent bids. *See* Am. Compl. ¶¶ 36, 44–49, 54, 56–58.

He also alleges that OST is liable for acts committed by other, non-defendant, employees, including OST's Senior Proposal Manager Bryan Van Gilder, OST's Marketing Manager Sujana Pathak, and OST Director Ronald Rhodes. *Id.* ¶¶ 40, 50. With respect to these employees, plaintiff-relator alleges that "[i]n his official OST capacity Mr. Van Gilder was responsible for the preparation and finalization of government contracting proposals. In his capacity as OST's SPM, Van Gilder was tasked with responsible for the preparation and finalization the first fraudulent response to a government contract solicitation made in the name of CSG [Solicitation No. VA-245-10-RP-0076]." Am. Compl. ¶ 40. He alleges that "OST's Marketing Manager, Sujana Pathak, and OST's Director, Ronald Rhodes, were involved with the preparation and review of the CSG Halls & Walls Solicitation Response, and did so with the knowledge and support of OST's CEO, Vijay Narula." *Id.* ¶ 42. In addition, "[t]he final draft of the CSG Halls & Walls Solicitation

<hr>

[2] Plaintiff-relator also alleges that "Narula and OST constitute alter-egos of each other. They have such a unity of interest and ownership that the individuality of each ceased with respect to every act in furtherance of the CSG conspiracy." Compl. ¶ 51. To the extent that plaintiff-relator seeks to amend his complaint to assert a theory of alter ego liability, his motion shall be denied for the same reasons regarding failure to allege alter ego liability stated in this Court's prior opinion.

Response was circulated by Bryan Van Gilder, via OST's internal email system, to OST's CEO's Vijay Narula, OST's Marketing Manager Sujana Pathak, and an OST Director, Ronald Rhodes." *Id.* ¶ 43. Based on these allegations, and the fact that the defendants have failed to argue that *respondeat superior* does not apply,[3] plaintiff-relator has successfully alleged a theory of vicarious liability under the doctrine of *respondeat superior*.

### 2. *Presentment of False Claims/Making False Statements*

Furthermore, the Court finds that the Amended Complaint sufficiently states a claim against OST for presenting false claims and making false statements in violation of 31 U.S.C. § 3729(a)(1)(A)–(B). This Court previously noted that plaintiffs may bring claims under the FCA for indirect presentment or false statements where the defendant has caused a false claim to be presented or caused a false statement to be made. *Scollick*, 215 F. Supp. 3d at 39. "To determine whether a defendant who did not actually submit a claim or make a false statement 'has "caused" the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission.' *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014). Courts should therefore consider whether the plaintiff has alleged that the defendant's conduct was 'at least a substantial factor in causing, if not the but-for cause of, submission of false claims.' *Toyobo Co.*, 811 F. Supp. 2d at 48." *Id.*

The Court finds that plaintiff-relator's Amended Complaint sufficiently alleges that defendant OST's conduct was at least a substantial factor in the submission of false claims, even where it did not itself directly present false claims or make false statements in the name of OST.

---

[3] Defendants Narula, Madan, and OST only argue that plaintiff-relator has failed to sufficiently allege alter ego status.

Plaintiff-relator alleges that "OST's offices and employees were used to prop up CSG." Am. Compl. ¶ 44. He states that CSG employees worked out of OST's office space and were provided OST email addresses and phone lines. *Id.* He states that "OST provided human resources, IT support, accounting support, corporate bonding, office space, printers, faxes, phone lines (CSG's 'Magicjack' port identifying a false 540 area code ran on OST's computer system), an email server, computer stations and office supplies necessary for OST to solicit and service government contracts in the name of CSG." *Id.* In addition, he claims that 1) "OST . . . covered the salary of a CSG employee;" 2) "OST's Sujana Pathak worked to locate additional construction opportunities for CSG and circulated potential construction opportunities to Ajay Madan, Neil Parekh and Andrew Scollick;" 3) "OST employees regularly prepared 'pipeline' reports that would track the date CSG bid on a contract, the government entity soliciting the bid, the contract description and contract price;" 4) "[a]n OST team was created to prepare and assemble the Halls & Walls Solicitation Response . . . [which] functioned as the prototype for the subsequent solicitation responses submitted in the name of CSG;" 5) "OST executed and transmitted to Hudson Insurance Company and Hanover Insurance Company a signed, sealed, and notarized agreement of indemnity as well as corporate resolutions extending OST's bond to contracts submitted in the name of CSG;" 6) "CSG's day-to-day business decisions were carried out within OST's headquarter where Parekh, Madan, Narula, CB and OST were co-located;" 7) "[t]he drafting and submission of CSG's bids occurred out of OST's Washington, D.C., offices under the direction and control of Narula, Madan, and Parekh;" 8) "CSG's contracting solicitations were controlled by Parekh (on behalf of himself and CB), as well Narula and Madan (on behalf of themselves and OST);" and 9) "[t]he daily management and oversight over all CSG's SDVOSB construction activity was done by Parekh and CB Construction. OST's back office management was provided

by Madan, Narula, and OST." *Id.* ¶¶ 45–49, 54, 56–58. These allegations are sufficient to show that OST "was the driving force behind an allegedly fraudulent scheme." *Scollick*, 215 F. Supp. 3d at 39.

Furthermore, the Amended Complaint sufficiently alleges that OST knowingly defrauded the government by seeking SBA Section 8(a) contracts for KCGI and concealing OST's involvement. To qualify for such contracts "a business must be owned by socially or economically disadvantaged individuals, in business for at least two years with the owners having a net worth of under $250,000." Am. Compl. ¶ 200. The Complaint alleges that a plan was devised for "OST to gain a 60% stake in any SDVOSB contracts KVGI could obtain and a 40% share of the Section 8(a) contract profits." Am. Compl. ¶ 201. Thus, OST and Narula were to gain profits that were intended to be received by socially or economically disadvantaged individuals. The Amended Complaint alleges that OST "entered into an indemnification agreement with Merchants Bonding Company to bond the set aside contracts obtained by KGCI." *Id.* ¶ 202. Although defendants argue that plaintiff-relator has failed to allege why such conduct is fraudulent, the Amended Complaint states that the defendants then allegedly concealed this fact. *Id.* ¶ 205. Therefore, plaintiff-relator has sufficiently stated that such conduct is fraudulent.

Finally, in its opposition, the defendant states that plaintiff-relator does not allege that OST directly presented false claims or made false statements to the government. However, the Amended Complaint does allege that Narula, on behalf of himself and OST, filled out and submitted performance survey questionnaires in which he made false statements regarding work allegedly performed by CSG for OST. *See* Am. Compl. ¶¶ 112–21. These allegations are sufficient to allege that OST directly made false statements to the government.

### 3.    *Conspiracy*

The Amended Complaint brings a conspiracy count against defendant OST.  OST has

not, however, argued that plaintiff-relator has failed to sufficiently plead conspiracy.  Therefore,

plaintiff-relator will be granted leave to assert this claim against defendant OST.

In sum plaintiff-relator will be granted leave to amend to assert Counts I, II, and IV

against defendant OST.

### B.    **Shobha Mehta**

This Court previously described defendant Mehta's involvement in the scheme—as

explained by the original Complaint—as follows:

> Dr. Mehta is the aunt of Neil Parekh.  The Complaint alleges that, as part of the scheme, the defendants falsified past performances of CSG.  Specifically, it claims that defendants used a renovation project at Dr. Mehta's office as a credential of past performance that was necessary to bid and win contracts for medical centers. Plaintiff-relator alleges that Dr. Mehta's office was never renovated and that "[t]he defendants manufactured the Mehta Project and cut and pasted reference to the Mehta Project in various solicitations and bid proposals with differing size and costs of that project to fit the particular contract requirements under bid."  He claims that the defendants conspired with Dr. Mehta to allow them to identify her office as an example of CSG's past performance and that Dr. Mehta "would provide past performance survey information to the government falsely attesting to work CSG never performed."

*Scollick*, 215 F. Supp. 3d at 33 (D.D.C. 2016) (internal citations omitted).

As previously noted, this Court found that plaintiff-relator largely failed to allege that many

of the defendants directly presented false claims or made false statement, or that they were a

substantial factor in the submission of false claims or false statements.  *Id.* at 38–40.  With respect

to defendant Mehta specifically, the Court found that although plaintiff-relator alleged that she

made a false statement to the government—*i.e.*, that "Dr. Mehta would provide past performance

survey information to the government falsely attesting to work CSG never performed"—"[t]his

allegation . . . fail[ed] to meet the heightened pleading standard under Rule 9(b) . . . [because] it

[did] not identify with specificity when these statements were made, how they were made, or what facts were misrepresented." *Id.* at 40.

### 1.    *False Statements*

Plaintiff-relator now argues that he has amended the complaint to present the factual bases of defendant Mehta's liability, specifically that Dr. Mehta made false statements to the government and caused false statements to be submitted in furtherance of the conspiracy. The Amended Complaint again alleges that the defendants stated that they had completed work at Dr. Mehta's office (the "Mehta Project") as a credential of past performance to bid on and win contracts. Am. Compl. ¶¶ 93–96, 105–11 (listing the specific solicitations that used the Mehta Project as a credential of past performance). But, CSG's assertion "that it engaged in construction activities for Dr. Mehta is entirely false as the location specified was built in the 1980's and had yet to be renovated." *Id.* ¶ 97.

With respect to Dr. Mehta specifically, it alleges that, beginning in April 2010, she completed performance satisfaction surveys sent by VA contracting officers and stated that the work completed by CSG was outstanding, and that she verified this false information in phone calls from government contract officers. *Id.* ¶¶ 97–101. The Amended Complaint gives the following example: "on September 22, 2010, Dr. Mehta completed a customer satisfaction questionnaire that claimed her office had been renovated between January 2009 and May 2009 at a cost of $1,236,000. Dr. Mehta responded to this survey claiming that CSG's overall performance on a fictitious million plus dollar renovation was 'exceptional' and that she would hire CSG again." *Id.* ¶ 103. The Amended Complaint alleges that Dr. Mehta "knew that CSG claimed in some of its submissions that the renovations of Dr. Mehta's office occurring at 5021 Seminary Road, Alexandria, VA (the location specified by CSG) exceeded $1 million dollars. That office location,

however, consisted of a single room approximating 200 square feet and had not been renovated since it was originally constructed, upon information and belief, back in the 1980's." *Id.* ¶ 102.

Thus, the Amended Complaint alleges that CSG falsely claimed that it had completed work at Dr. Mehta's office, when in fact it had not, that Dr. Mehta knew that CSG falsely used the Mehta Project as a credential of past performance, and that she falsely asserted in satisfaction surveys and phone calls that this work had been done and was "exceptional" or "outstanding." These allegations cure the deficiencies previously identified by this Court; they describe when the statements were made, how they were made, and what facts were misrepresented. This is sufficient to state a claim for making false statements in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B). Plaintiff-relator does not appear to be asserting that defendant Mehta violated 31 U.S.C. § 3729(a)(1)(A) by presenting or causing to be presented false *claims* to the government.

### 2. *Conspiracy*

The Court also finds that plaintiff-relator has sufficiently stated a claim against Dr. Mehta for conspiracy in violation of the False Claims Act. The Court previously found that "[t]here be no conspiracy when there is no underlying FCA violation." *Scollick*, 215 F. Supp. 3d at 43. Plaintiff-relator has now sufficiently alleged the existence of underlying FCA violations. "[T]o state a claim for conspiracy under the FCA, the plaintiff-relator must allege '(1) that "an agreement existed to have false or fraudulent claims allowed or paid" to the government, (2) that each alleged member of the conspiracy "joined that agreement," and (3) that "one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy."'" *Id.* at 36.

Plaintiff-relator has alleged the existence of an agreement and that Dr. Mehta joined the agreement. The Amended Complaint alleges that "[u]pon information and belief, one or more of

the CSG conspirators approached Dr. Mehta to obtain her assistance in furthering the conspiracy by agreeing to submit materially false performance questionnaires to the VA." Am. Compl. ¶ 93. Plaintiff-relator has alleged that Dr. Mehta committed an overt act in furtherance of the conspiracy—specifically, as explained above, that she falsely affirmed that CSG had performed work at her office that was never actually performed. The Court thus finds that the Amended Complaint sufficiently states a claim for conspiracy against Dr. Mehta.

## C.     Melvin Goodweather

Plaintiff's original Complaint alleged the following with respect to defendant Melvin G. Goodweather:

> Defendant Goodweather is a service disabled veteran allegedly falsely identified as the sole owner and CEO of Citibuilders, although he was subservient to Neil Parekh. He is alleged to be an alter ego of Neil Parekh and Citibuilders. The Complaint claims that Parekh utilized Goodweather's service disabled veteran status to establish Citibuilders as a SDVOSB entity, but that Citibuilders was under the direct control of Parekh who was the de facto owner.

*Scollick*, 215 F. Supp. 3d at 33. Plaintiff-relator now argues that the Amended Complaint sufficiently alleges that defendant Goodweather indirectly caused the submission of false claims and statements and participated in a conspiracy to violate the False Claims Act.

### 1.     *Presentment of False Claims/Making False Statements*

The Amended Complaint expands on the allegations regarding defendant Goodweather. It alleges that Goodweather formed Citibuilders and "establish[ed] himself as its sole owner, President, and CEO of that entity knowing that he would never function in those capacities." Am. Compl. ¶ 143; *see also id.* ¶ 150–51. It alleges that he "establish[ed] a bank account in the name of Citibuilders knowing that control of the back account would be provided to Parekh; provided documentation of his service disabled veteran status so that Parekh could obtain SDVOSB government contracts; and execut[ed] bonding agreements so as to provide Parekh with the

bonding needed to carry out the fraud scheme; . . . [and] handed day-to-day operation and control of Citibuilders to Parekh." *Id.* ¶¶ 143, 146. Goodweather allegedly received payment for such actions. *Id.* ¶ 149. The Amended Complaint then alleges that "Citibuilders was certified and registered in the VIP Database, CCR, and ORCA as a SDVOSB," that "Goodweather knew or reasonably should have known that such certifications were falsely obtained," and that "Goodweather knew or reasonably should have known that turning control of Citibuilders over to Parekh made the SDVOSB claim included in each contract proposal submitted to the VA materially false." *Id.* ¶¶ 146, 148.

Defendant Goodweather takes issue with the fact that many of the allegations in the Amended Complaint are made "upon information and belief" or state that Goodweather "should have known" or "reasonably knew." Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). Furthermore, "the *Twombly* plausibility standard . . . does not prevent a plaintiff[/relator] from 'pleading facts alleged upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *United States ex rel. Conteh v. IKON Office Sols., Inc.*, 103 F. Supp. 3d 59, 66 (D.D.C. 2015) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) and citing *U.S. ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1258 (D.C. Cir. 2004)). The allegations at issue here both relate to defendant Goodweather's knowledge and intent, and the relevant facts are within the possession and control of defendant Goodweather. Therefore, the Court finds that plaintiff-relator's allegations that defendant Goodweather "should have known" or "reasonably knew," and his allegations that rely on information and belief are proper.

Given this conclusion, the Amended Complaint sufficiently alleges that defendant Goodweather indirectly caused the submission of false claims and statements. First, the Amended Complaint lists nine specific contracts that were bid on and awarded to Citibuilders between 2012 and 2014, and includes the contract and solicitation numbers, the agency information, the contract title or description, the date the contract was awarded, and pricing information. Am. Compl. at 42–44. Thus, defendant Goodweather's argument that the Amended Complaint fails to allege that Citibuilders made SDVOSB solicitations fails. The allegations described above clearly indicate that such solicitations were made.

The Amended Complaint also sufficiently alleges that defendant was a substantial factor in the submission of such false claims. As explained above, defendant Goodweather allegedly worked with Parekh to create Citibuilders using defendant Goodweather's status as a service disabled veteran so that Citibuilders and Parekh could obtain SDVOSB contracts, and then established a Citibuilders bank account, provided the necessary documentation of his service disabled status, executed bonding agreements, and handed operation and control to Parekh. Without these actions on the part of defendant Goodweather, Citibuilders would not have been able to allegedly fraudulently register as an SDVOSB or bid on and obtain SDVOSB contracts. The Court finds that plaintiff-relator has alleged facts showing that defendant Goodweather "agreed to take certain critical actions in furtherance of the fraud" and "continued to do business with [Citibuilders] upon becoming aware that [Citibuilders] was submitting false claims," which is sufficient to establish that defendant Goodweather's conduct was a substantial factor in causing the submission of false claims. Plaintiff-relator has sufficiently stated a claim for the presentment of false claims and statements in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A)–(B).

The Amended Complaint similarly sufficiently alleges that defendant Goodweather made false certifications in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A).  Under the FCA, "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement" and "the omission renders those representations misleading."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1995 (2016).  Federal regulations concerning SDVOSB set-aside contracts state that the following:

> the management and daily business operations of the concern must be controlled by one or more service-disabled veterans . . . .  Control by one or more service-disabled veterans means that both the long-term decisions making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans.

13 C.F.R. § 125.13(a).  Furthermore,

> A service-disabled veteran . . . must hold the highest officer position in the concern (usually President or Chief Executive Officer) and must have managerial experience of the extent and complexity needed to run the concern.  The service-disabled veteran manager . . . need not have the technical expertise or possess the required license to be found to control the concern if the service-disabled veteran can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise.

*Id.* § 125.13(b).  Finally,

> In the case of a limited liability company, one or more service-disabled veterans (or in the case of a veteran with permanent or severe disability, the spouse or permanent caregiver of such veteran) must serve as managing members, with control over all decisions of the limited liability company.

*Id.* § 125.13(d).

The Amended Complaint alleges that Citibuilders was registered as an SDVOSB and bid on and obtained SDVOSB set aside contracts even though the management and daily operations were not controlled by a service-disabled veteran and Goodweather never intended to and did not

function as the president, CEO, or owner of Citibuilders as required by the regulations. These allegations are sufficient to state a claim for false certification under *Escobar* because defendant Goodweather knew of and failed to disclose Citibuilders' noncompliance with regulatory requirements and such omissions rendered Citibuilders' representations as an SDVOSB misleading.

Defendant Goodweather also argues that the Amended Complaint fails to plead that he acted with the requisite scienter. The FCA requires the "knowing" submission of false claims or statements, which means that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b). Again, however, elements such as knowledge and intent may be alleged generally under Rule 9(b) and "information and belief" pleadings are acceptable where the facts are within the possession of the defendant. The Amended Complaint alleges the following: 1) "Citibuilders was certified and registered in the VIP Database, CCR, and ORCA as a SDVOSB. Upon information and belief, Goodweather knew or reasonably should have known that such certifications were falsely obtained;" 2) "Goodweather knew or reasonably should have known that turning control of Citibuilders over to Parekh made the SDVOSB claim included in each contract proposal submitted to the VA materially false;" 3) Goodweather knowingly established Parekh as the de facto President, CEO, and owner of Citibuilders for using Goodweather's disabled veteran status to obtain SDVOSB government contracts;" 4) "[u]pon information and belief, Goodweather knew (or reasonably should have known) that Citibuilders was soliciting SDVOSB contracts;" 5) "[u]pon information and belief, Goodweather knew or reasonably should have known that the proposals Citibuilders submitted to the VA were materially false because they alleged past performance on the part of Citibuilders that

did not exist;" 6) "Goodweather knew or reasonably should have known that Citibuilders'
responses to VA solicitations were false because they claimed that Citibuilders qualified as a
SDVOSB," and 7) "[u]pon information and belief, after knowing that the deposits made into the
Citibuilders bank account were obtained from payments made against SDVOSB contracts that
were obtained through fraud." Am. Compl. ¶¶ 146, 148, 150, 158–61. These allegations are
sufficient to establish the element of scienter.

### 2.    *Conspiracy*

Finally, the Court finds that the Amended Complaint sufficiently alleges conspiracy in
violation of the FCA. Again, "to state a claim for conspiracy under the FCA, the plaintiff-relator
must allege '(1) that "an agreement existed to have false or fraudulent claims allowed or paid" to
the government, (2) that each alleged member of the conspiracy "joined that agreement," and (3)
that "one or more conspirators knowingly committed one or more overt acts in furtherance of the
object of the conspiracy."'" *Scollick*, 215 F. Supp. 3d at 36.

### a)    *Elements of Conspiracy Claim*

The Amended Complaint sufficiently alleges that an agreement existed to have false or
fraudulent claims allowed or paid to the government and that defendant Goodweather joined that
agreement. Specifically, it states that "[d]efendant Parekh entered a separate conspiracy with
Melvin Goodweather to utilize Goodweather's status as a disabled veteran to establish a LLC for
the sole purpose of obtaining SDVOSB set aside contracts." Am. Compl. ¶ 142. It then describes
the ways in which Goodweather and Parekh worked together to establish Citibuilders as an
SDVOSB with defendant Goodweather as president and CEO, knowing that defendant
Goodweather would not actually engage in the oversight and management of Citibuilders, and
knowing that such actions resulted in the submission of false claims and certifications. The

Amended Complaint also alleges that defendant Goodweather engaged in overt acts in furtherance of the conspiracy by setting up Citibuilders as previously described. Am. Compl. ¶ 143.

b)      *Intracorporate Conspiracy Doctrine*

Defendant Goodweather argues that the intracorporate conspiracy doctrine applies to the conspiracy claim brought against him. Under the intracorporate conspiracy doctrine "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees." *Scollick*, 215 F. Supp. 3d at 44 (quoting *Kelley v. D.C.*, 893 F. Supp. 2d 115, 119–20 (D.D.C. 2012)). However, the "doctrine only applies if the individual defendants were acting within the scope of their shared employment." *Id.* For example, the doctrine does not apply "where an entity's employees are pursuing their own personal interests, rather than the interests of the corporate entity." *Kenley v. District of Columbia*, 83 F. Supp. 3d 20, 33 (D.D.C. 2015).

This Court previously found that "Neil Parekh is alleged to have committed acts apparently outside the scope of his Citibuilders employment in furtherance of the alleged scheme, for example in his capacity as an officer of CSG. Therefore, defendant Citibuilders' intracorporate conspiracy doctrine argument is misplaced and plaintiff-relator has stated a claim for conspiracy." *Scollick*, 215 F. Supp. 3d at 44–45. Here, the Amended Complaint alleges that "after knowing that the deposits made into the Citibuilders bank account were obtained from payments made against SDVOSB contracts that were obtained through fraud, Goodweather purposefully diverted large cash payments from the Citibuilders' bank account into a private account under his personal control." Am. Compl. ¶ 158. This is sufficient to allege that defendant Goodweather was acting for his own personal interest, rather than the interest of Citibuilders. The intracorporate conspiracy doctrine is therefore inapplicable.

### D. Insurance Defendants

The insurance defendants are Hudson Insurance Co., Hanover Insurance Co., Centennial Surety Associates, Inc., and Michael Schendel.[4]  This Court previously summarized the original Complaint's allegations regarding the insurance defendants as follows:

> Under the Miller Act, contractors bidding for government construction contracts are required to post bid bonds, performance bonds, and payment bonds, and the bid bond company is required to ensure that the contractor will perform the work.  Centennial is an insurance broker, Schendel is the president of Centennial, and Hudson and Hanover are insurance companies that provided surety bonds to the defendants.
>
> The bid proposals submitted here were dependent upon the issuance of surety bonds and performance bonds by Centennial, "as the agent and attorney-in-fact for Hudson Insurance Company and Hanover Insurance Company."  Plaintiff-relator claims that Centennial and Schendel were the lawful agents of and attorneys-in-fact for Hanover and Hudson and that Schendel was responsible for causing Hudson and Hanover to issue bid and performance bonds to CSG and Citibuilders.  Plaintiff-relator claims that Schendel had a long-standing relationship with Neil Parekh and that Centennial knew that OST, CSG, and CB Construction shared a single office and that Parekh and Narula were in functional control of CSG.
>
> Plaintiff-relator alleges that the contracts at issue required Citibuilders and CSG to obtain bid bonds and performance bonds, without which the fraudulent activity could not be carried out.  He claims that Schendel and Centennial knew the details of the bid proposals submitted by OST, CSG, and CB.  He also claims that Hudson and Hanover "by and through its agent and attorneys-in-fact Centennial" understood that OST, CSG, and CB shared common ownership, requiring Narula, Parekh, and Gogia to execute corporate resolutions acknowledging this fact.  In addition, Schendel and Centennial allegedly "understood that Parekh, Narula, and Madan had ownership interests in CSG and deliberately disregarded this fact when issuing bonds in connections with the false certifications contained in the bidding proposals submitted to the government."  Finally, the Complaint alleges that Hudson and Hanover knew that bonds were required for the contracts at issue and "[b]ut for Defendant Schendel, Centennial Surety Associates, Inc., acting as agents and attorney-in fact to Hudson Insurance Company and Hanover Insurance Company for the purpose of issuing bid bonds and performance bonds, the fraudulent bid submissions made by CSG and Citibuilders would not have been awarded."

*Scollick*, 215 F. Supp. 3d at 33–34 (internal citations omitted).

---

[4] Plaintiff-relator refers to this group of defendants as the "bonding defendants."  For consistency with this Court's prior opinion, it will continue to refer to this group as the "insurance defendants."

The Court found that plaintiff-relator failed to sufficiently allege that the insurance defendants indirectly caused the submission of false claims or statements because, according to the allegations in the Complaint, they "did not take advantage of unwitting submitters (CSG, Citibuilders, and KCGI), . . . did not envision the scheme or push the other defendants to enact it, . . . [did not] agree[] to bonding in furtherance of the fraud alleged, . . . [and did not] continue[] to do business with the other defendants upon becoming aware that the other defendants were submitting false claims." *Id.* at 40–41. Turning to the reverse false claims allegations, the Court found that plaintiff-relator failed to state a claim against the insurance defendants for the following reasons:

> The allegation that the insurance defendants should have denied issuance of the surety bonds does not equate to an allegation that the defendants actually owed any payment to the government in connection with the bonds. Moreover, the Complaint contains no allegations that the insurance defendants knew the bids were fraudulent—it merely states that they knew the details of the bid proposals and that Parekh, Narula, and Madan had ownership interests in CSG. Furthermore, although the Complaint states that under the Miller Act, bid bond companies are required to ensure that the contractor will undertake the contract, that the contractor will complete the project in accordance with the specifications, and will ensure that those who furnish labor and materials will be paid, there are no allegations that any of those actions were not taken here. The Complaint does not state with any particularity what obligations were owed by which insurance defendants, and how such obligations were avoided or decreased.

*Id.* at 42. The Court also concluded that plaintiff-relator failed to state a claim for conspiracy. *Id.* at 43.

### 1.    *Presentment of False Claims/Making False Statements*

Again, the Amended Complaint does not allege that the insurance defendants directly presented false claims or made false statements to the government. Rather, plaintiff-relator relies on a theory of indirect presentment. He argues that the actions of the insurance defendants were critical actions that directly led to the submission of false claims and that they continued to do business with the other defendants upon becoming aware that the other defendants were submitting

25

false claims. The Court finds that the Amended Complaint sufficiently alleges such theories of indirect presentment.

<em>a)    Knowledge</em>

The Court first addresses the issue of the insurance defendants' knowledge. The original Complaint alleged

> that Centennial knew that OST, CSG, and CB shared an office, that Parekh and Narula were in functional control of CSG, that Parekh, Narula, and Madan had ownership interests in CSG and disregarded this fact, that Schendel had a relationship with Parekh, and that Schendel and Centennial knew of the details of each bid proposal submitted by OST, CSG, and CB. It also allege[d] that Hudson and Hanover knew that OST, CSG, and CB shared common ownership and therefore required Narula, Parekh, and Gogia to execute corporate resolutions acknowledging this fact, and that they knew that surety bid bonds were required

*Scollick*, 215 F. Supp. 3d at 40–41. The Court found that, based on these allegations regarding knowledge, "no facts [were] alleged that would allow the inference that the insurance defendants agreed to bonding in furtherance of the fraud alleged." *Id.* at 41. With respect to allegations that the insurance defendants continued to do business with the other defendants upon becoming aware that the other defendants were submitting false claims, this Court found that "[t]he allegation that the insurance defendants knew the contents of the bid proposals does not mean the insurance defendants knew the content included false claims." *Id.*

Plaintiff-relator's Amended Complaint supplements the previously alleged facts with new details regarding the insurance defendants' knowledge. It alleges that the insurance defendants "facilitated [the CSG and Citibuilders] fraud schemes by obtaining facts that the Bonding Defendants knew or should have known violated the government's contracting requirements, but the Bonding Defendants not only concealed those facts from the government, they also issued surety bonds to CSG and Citibuilders, which gave the misleading appearance that CSG and Citibuilders were qualified to bid on these SDVOSB construction contracts." *Id.* ¶ 198. Specifically, the Amended Complaint sufficiently alleges that the insurance defendants knew or

should have known that CSG and Citibuilders were violating the government's contracting requirements by alleging that the insurance defendants engaged in an underwriting process during which they conducted an on-site inspection of OST's offices. *Id.* ¶ 176. After this tour, the insurance defendants "necessarily understood that CSG was a shell company dependent on the resources and capabilities and capital of CB and OST and the experience and knowledge and financial backing of Parekh, Narula, and Madan," and the underwriting and due diligence "would reasonably have revealed that CSG did not possess the necessary construction history or financial capabilities to carry out the scope of the contracting activity ultimately undertaken in the name of CSG." *Id.* ¶¶ 177–78. The Amended Complaint further alleges that the underwriting and due diligence reasonably led to the conclusions that "Parekh, Narula, and Madan exerted dominance and control over CSG," that "Gogia lacked the skill, knowledge, resources and past performance to engage in the scope of contracting activity undertaken by the CSG conspirators," and that "CSG was not a service-disabled small business operating out of Harrisonburg." *Id.* ¶¶ 180–82. It also alleges that "[t]he underwriting and due diligence by the Bonding Defendants to provide bonding to Citibuilders would have revealed that Goodweather was not in control of that entity and that Citibuilders constitutes a separate shell company Parekh established for the purpose of obtaining SDVOSB contracts." *Id.* ¶ 194. These allegations go beyond those in the original Complaint regarding knowledge of CSG's and Citibuilders' ownership and control. They are now sufficient to allege that the insurance defendants had knowledge of CSG's and Citibuilders' fraud, *i.e.*, that they were fraudulently asserting status as SDVOSBs.

b)      *Indirect Presentment of False Claims/False Statements*

Given this knowledge, the Amended Complaint sufficiently alleges that the insurance defendants continued to do business with CSG and Citibuilders even though they were aware that

CSG and Citibuilders were committing fraud. Plaintiff-relator describes solicitations made by and contracts awarded to CSG between 2010 and 2016, and solicitations made by and contracts awarded to Citibuilders between 2012 and 2014. Am. Compl. at 23–27, 42–44. It alleges that "[b]onds were issued on the Citibuilders SDVOSB construction contracts by Hanover Insurance Company and Hudson Insurance Company through their agent and attorney-in-fact Schendel, Centennial," and that "[t]he Bonding Defendants reviewed every SDVOSB contracting action pursued in the name of CSG and issued bonding against all of them." *Id.* ¶¶ 164, 190. As explained above, the allegations are sufficient to show that the insurance defendants had knowledge that CSG and Citibuilders were fraudulently asserting status as SDVOSBs. These allegations are sufficient to allege that the insurance defendants "continued to do business with [CSG and Citibuilders] upon becoming aware that [CSG and Citibuilders] [were] submitting false claims," which, as this Court previously explained, is grounds for alleging an indirect presentment claim. *Scollick*, 215 F. Supp. 3d at 39.

The Amended Complaint also sufficiently alleges that the insurance defendants took critical actions in furtherance of the fraud. This Court previously acknowledged that "bonding was a necessary step in submitting the bids at issue." *Scollick*, 215 F. Supp. 3d at 40. But, this Court also found that "no facts are alleged that would allow the inference that the insurance defendants agreed to bonding in furtherance of the fraud alleged," because the original Complaint only alleged the facts regarding knowledge described above. *Id.* The Amended Complaint has cured those deficiencies regarding the knowledge of the insurance defendants. It now sufficiently alleges facts showing that the insurance defendants knew that CSG and Citibuilders were fraudulently asserting status as SDVOSBs. Because the actions of the insurance defendants were critical to CSG's and Citibuilders' ability to bid on and obtain the contracts at issue, and because

the facts alleged now show that the insurance defendants knew that CSG and Citibuilders did not in fact qualify as SDVOSBs, this Court concludes that the Amended Complaint sufficiently alleges that "to take certain critical actions in furtherance of the fraud" which is a theory of indirect presentment under the FCA. *Scollick*, 215 F. Supp. 3d at 39.

### 2. *Reverse False Claims*

Section 3729(a)(1)(G) prohibits "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Reverse false claims occur when "the defendant's alleged deception 'results in no payment to the government when a payment is obligated.' In contrast to typical false claims actions, 'a typical reverse false claim action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due.'" *Scollick*, 215 F. Supp. 3d at 41 (internal citations omitted).

With respect to reverse false claims, this Court previously found that plaintiff-relator failed to state a claim against the insurance defendants for the following reasons:

> The allegation that the insurance defendants should have denied issuance of the surety bonds does not equate to an allegation that the defendants actually owed any payment to the government in connection with the bonds. Moreover, the Complaint contains no allegations that the insurance defendants knew the bids were fraudulent—it merely states that they knew the details of the bid proposals and that Parekh, Narula, and Madan had ownership interests in CSG. Furthermore, although the Complaint states that under the Miller Act, bid bond companies are required to ensure that the contractor will undertake the contract, that the contractor will complete the project in accordance with the specifications, and will ensure that those who furnish labor and materials will be paid, there are no allegations that any of those actions were not taken here. The Complaint does not state with any particularity what obligations were owed by which insurance defendants, and how such obligations were avoided or decreased. There is simply no allegation in the Complaint that the insurance defendants had an obligation to pay the government the full amount of the bonds.

*Id.* at 42 (internal citations omitted).  Plaintiff-relator now argues that the insurance defendants

> agreed to compensate the government for losses sustained should the specifications found in the contract, including the specification that the construction activity be paid a service-disabled, veteran-owned small business entity, fail to occur.  The Bonding Defendants exercised due diligence to obtain facts from the other defendants that the Bonding Defendants knew or should have known violated the government's service-disabled, veteran-owned contracting requirements. For example, each time the Bonding Defendants knew that the government made a payment that violated the service-disabled, veteran-owned specification they knowingly avoided an obligation to compensate the government for that loss.  The Bonding Defendants also knowingly concealed information and committed other acts that facilitated the fraudulent scheme and caused the other defendants to violate the FCA.

Pl.'s Mot. 6, ECF No. 131.

The insurance defendants argue that plaintiff-relator is essentially alleging that the insurance defendants' obligation to pay arose out of their concealment of the fraud.  However, "[a] reverse false claim may not rest . . . on the argument 'that an obligation arose out of Defendants' concealment of their allegedly fraudulent activity,' because 'by this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action.'"  *Scollick*, 215 F. Supp. 3d at 41.  The Court disagrees.  Plaintiff-relator alleges that "[t]he bonding agreements were separate instruments entered between the United States government and although submitted with the contract, did separately obligate the Bonding Defendants to compensate the government for losses sustained if the specifications found in the contract, including the specification that the construction activity be paid a service-disabled, veteran-owned small business entity."  Am. Compl. ¶ 236.  Thus, the insurance defendants' obligation arose out of these agreements, not out of an obligation to repay the government as a result of the fraud.

Defendant Hudson also argues the following: 1) the Amended Complaint fails to plead that the insurance defendants knew that CSG and Citibuilders were not properly SDVOSB certified; 2) the specification in the contract that the construction activity be paid to an SDVOSB certified company is not contained in the bond forms; and 3) the Amended Complaint fails to plead that the

government suffered a loss as a result of the alleged reverse false claims. All of these are unavailing. First, this Court has already found that the Amended Complaint sufficiently alleges that the insurance defendants knew that CSG and Citibuilders were not properly SDVOSB certified. Second, although the specific statement that the construction activity be paid to an SDVOSB certified company is not contained in the bond forms, Standard Form 25 states that the performance guarantee extends to "all the understanding, covenants, terms, conditions, and agreements of the contract."[5] The "understanding, covenants, terms, conditions, and agreements" of the contracts at issue require that the contract is awarded to and performed by an SDVOSB. Thus, Standard Form 25 includes by implication the specification that the contracts be awarded to and performed by SDVOSBs. Finally, although the government may not have experienced a financial loss, it still experienced a loss according to Circuit precedent, which states that "where the defendant fraudulently sought payments for participating in programs designed to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010). The intended third party beneficiaries here are actual SDVOSBs who are eligible for SDVOSB set aside contracts. The Amended Complaint alleges that CSG and Citibuilders—who did not qualify as SDVOSBs—sought payments for contracts awarded pursuant to this SDVOSB set aside program. Thus, it has sufficiently alleged that the government received nothing of value here.

The Court finds that, based on the above, plaintiff-relator has stated a claim for reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(G) against defendants Hudson and Hanover. The Court finds, however, that plaintiff-relator has failed to state a claim under 31 U.S.C. §

---

[5] Standard Form 25 is available for download at https://www.gsa.gov/portal/forms/download/115986

3729(a)(1)(G) against defendants Schendel and Centennial. According to the Amended Complaint, Centennial "is an insurance broker the agent of and attorney-in-fact for Hudson and Hanover insurance companies" and "helped secure the bonding the Defendants required to bid and obtain government construction contracts." Am. Compl. ¶ 19. Defendant Schendel is the president of Centennial. *Id.* ¶ 20. Unlike Hudson and Hanover, which were the actual insurance companies that provided the surety bonds to the CSG and Citibuilders, Centennial and Schendel were simply brokers. There are no allegations that would allow this Court to infer that Centennial and Schendel issued the bonds and incurred any obligation to the government.

### 3. *Conspiracy*

The insurance defendants' only argument regarding the conspiracy claims is that because the Amended Complaint fails to state a claim for the presentment of false claims, for making false statements, or for reverse false claims, there can be no conspiracy claim. Because this Court has found that the Amended Complaint does in fact state claims for the presentment of false claims, for making false statements, or for reverse false claims, the insurance defendants' argument fails and plaintiff-relator may assert his conspiracy claim against them.

## V. CONCLUSION

As demonstrated by the foregoing analysis, plaintiff-relator has largely cured the pleading deficiencies previously identified by this Court. Plaintiff-relator's motion for leave to amend will be granted in part and denied in part. Given, the above analysis, plaintiff-relator will be granted leave to amend his complaint to assert Count I (presentment of false claims in violation of 31 U.S.C. § 3729(a)(1)(A)) against defendants OST, Melvin Goodweather, Hudson Insurance, Hanover Insurance, Centennial Surety Associates, and Michael Schendel. Plaintiff-relator will be granted leave to amend his complaint to assert Count II (making false statements in violation of

31 U.S.C. § 3729(a)(1)(B)) against defendants OST, Shobha Mehta, Melvin Goodweather, Hudson Insurance, Hanover Insurance, Centennial Surety Associates, and Michael Schendel. Plaintiff-relator will be granted leave to amend his complaint to assert Count III (reverse false claims in violation of 31 U.S.C. § 3729(a)(1)(G)) against defendants Hudson Insurance and Hanover Insurance. Plaintiff-relator will be granted leave to amend his complaint to assert Count IV (conspiracy in violation of 31 U.S.C. § 3729(a)(1)(C)) against defendants OST, Shobha Mehta, Melvin Goodweather, Hudson Insurance, Hanover Insurance, Centennial Surety Associates, and Michael Schendel.

This Court previously found that plaintiff-relator stated a claim for presentment of false claims (Count I), making false statements (Count II), and conspiracy (Count III) against defendants Citibuilders, Ajay Madan, and Vijay Narula. The Court found, however, that plaintiff-relator failed to state a claim against defendants Citibuilders, Madan, and Narula for reverse false claims (Count III). Plaintiff-relator does not assert Count III against these defendants in the Amended Complaint.

Defendants Amar Gogia, CSG, and Neil Parekh did not move to dismiss, instead filing Answers to the Complaint. This Court, however, sua sponte dismissed the reverse false claims count (Count III) against Gogia, CSG, and Parekh. The Amended Complaint does not assert Count III against these defendants.

The Court previously found that the original Complaint failed to state claims against defendant CB Construction and dismissed it from the case. In the Amended Complaint, plaintiff-relator brings Counts I, II, and IV against CB. CB has not filed an opposition to plaintiff-relator's motion for leave to file an amended complaint. Therefore, Counts I, II, and IV may proceed as alleged in the Amended Complaint against defendant CB Construction.

Plaintiff-relator has removed defendants Dilip Parekh, KCGI, Inc., Guatam Chitnis, and Anita Chitnis from the Amended Complaint. These defendants remain dismissed from this action.

In sum, Counts II (making or causing to be made or used false statements or records material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B)) and IV (conspiracy to violate the FCA in violation of 31 U.S.C. § 3729(a)(1)(C)) may proceed against all of the defendants named in the Amended Complaint. Count I (submitting or causing to be submitted false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1)(A)) may proceed against all defendants named in the Amended Complaint except defendant Shoba Mehta. Count III (knowingly avoiding or decreasing obligations to the United States in violation of 31 U.S.C. § 3729(a)(1)(G)) may proceed against defendants Hudson and Hanover.

A separate Order accompanies this Memorandum Opinion.

Date: July **31**, 2017

Royce C. Lamberth
United States District Judge