**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA, ex rel.
ANDREW SCOLLICK
1505 N. Rhodes Street #4
Arlington VA 22209

Plaintiff-Relator,

BRINGING THIS ACTION ON BEHALF
OF THE UNITED STATES OF AMERICA

c/o
CHANNING D. PHILLIPS
UNITED STATES ATTORNEY
United States Attorney's Office
555 4th Street, NW
Washington, D.C. 20530

and

ATTORNEY GENERAL OF
THE UNITED STATES
U.S. Department of Justice
10th and Constitution Ave. NW
Washington, D.C. 20530

v.

VIJAY NARULA
8403 Driscoll Drive
Bowie MD 20720

NEIL PAREKH
8321 Old Courthouse Rd, Suite 260
Vienna, VA 22182

AMAR GOGIA
650 Garbers Church Road
Harrisonburg, VA 22801-8412

MELVIN G. GOODWEATHER
820 Emerald Dr.
Alexandria, VA 22308

Case No. 14-cv-01339-RCL

**AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

| | |
|---|---|
| AJAY K. MADAN | ) |
| 4621 24th Rd N | ) |
| Arlington, VA 22207-3514 | ) |
| | ) |
| OPTIMAL SOLUTIONS AND | ) |
| TECHNOLOGIES, INC. | ) |
| 2001 M Street, NW | ) |
| Suite 3000 | ) |
| Washington, D.C. 20036, | ) |
| | ) |
| CSG, LLC | ) |
| 650 Garbers Church Road | ) |
| Harrisonburg, VA 22801-8412 | ) |
| | ) |
| CITIBUILDIERS SOLUTIONS GROUP, LLC | ) |
| 1111 19th Street North, Suite 2001 | ) |
| Arlington, VA 22209 | ) |
| | ) |
| CB CONSTRUCTION GROUP, INC. | ) |
| 1410 35th Street NW | ) |
| Washington, D.C. 20007, | ) |
| | ) |
| SHOBHA N. METHA, MD | ) |
| 5021 Seminary Road | ) |
| Alexandria, VA 22311 | ) |
| | ) |
| CENTENNIAL SURETY ASSOCIATES, INC. | ) |
| 1514 Jabez Run, Suite 100 | ) |
| Millersville, MD 21108 | ) |
| | ) |
| MICHAEL SCHENDEL | ) |
| 1514 Jabez Run, Suite 100 | ) |
| Millersville, MD 21108 | ) |
| | ) |
| HUDSON INSURANCE CO. | ) |
| 17 State Street, 29th Floor | ) |
| New York, NY 10004 | ) |
| | ) |
| HANOVER INSURANCE CO. | ) |
| 440 Lincoln Street | ) |
| Worcester, MA 01653 | ) |
| | ) |
| Defendants. | ) |
| | ) |

This is an action commenced by *qui tam* relator Andrew Scollick ("Plaintiff-Relator") on behalf of himself and in the name of the United States of America to recover from the above-named Defendants damages and civil penalties and equitable relief arising from false claims presented to the federal government, conspiracy, and other violations of the federal False Claims Act ("FCA"), 31 U.S.C. §3729, *et seq.*, as amended. This action seeks to recover damages and equitable and other relief, sustained by and penalties owed to the United States and damages otherwise sustained by third parties, including service disabled veterans, because of an ongoing and continuing fraudulent scheme or schemes knowingly entered into and/or knowingly facilitated by each of the Defendants in violation of the FCA, as alleged herein.

## JURISDICTION AND VENUE

1. Plaintiff-Relator Andrew Scollick ("Relator") hereby alleges causes of action under the *qui tam* provisions of the False Claims Act, 31 U.S.C. § 3729, *et seq*., arising from the Defendants' actions to defraud agencies of the United States government, including but not limited to, the U.S. Department of Veterans Affairs ("Veterans Affairs" or "VA"), and the Small Business Administration ("SBA").

2. The Plaintiff-Relator has not made any public disclosures of the allegations contained herein at any time prior to the unsealing of the original complaint.

3. Pursuant to the requirements of 31 U.S.C § 3730(b), Plaintiff-Relator has voluntarily provided the federal government with a written disclosure statement, containing substantially all of the allegations made herein.

4. Plaintiff-Relator is an original source of all the allegations contained herein as defined by the False Claims Act, 31 U.S.C. § 3730(e)(4)(B), he has direct and independent knowledge of the information contained herein and he has voluntarily provided such information

to the government prior to bringing this action.

5. Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. § 3729 and 3732 and 28 U.S.C. § 1331 and 1345, in that this action arises under the laws of the United States.

6. Venue is proper in the United States District Court for the District of Columbia pursuant to 28 U.S.C. § 1391(b) and (c) and 31 U.S.C. § 3732, because this Court has jurisdiction over at least one Defendant who can be found in, resides, transacts business, or has performed acts proscribed by 31 U.S.C. § 3729 in the District of Columbia, and the False Claims Act provides for nationwide jurisdiction of such claims under 31 U.S.C. § 3732(a). Each Defendant also caused false claims to be made or falsely certified in this jurisdiction.

7. Plaintiff-Relator has complied with all conditions precedent to bringing this action.

## PARTIES

8. Plaintiff-Relator Andrew Scollick ("Scollick" or "Relator") is an adult who resides at 1505 N Rhodes St., Unit 4, Arlington, VA 22209. Relator was hired by Defendant Neil Parekh in December 2008. Parekh established a corporate entity known as CB Construction Group, Inc. ("CB"), and Scollick was on the CB payroll between July 2010 and April 2012, when he was transferred to the Citibuilders Solutions Group LLC payroll. Relator's employment relationship with Parekh and Citibuilders terminated in August 2012.

9. Defendant Optimal Solutions Technologies, Inc., ("OST") is a corporation with its principal place of business located at 2001 M Street, NW, Suite 3000, Washington, D.C. 20036. OST has satellite offices across the United States, including Virginia, Maryland, Pennsylvania, and Texas. OST also has components in India.

10. Defendant CB Construction Group, Inc., ("CB") claims as its corporate address 1410 35th Street NW, Washington, D.C. 20007. However, CB's actual principle place of business was OST's office space located at 2001 M Street, NW, Washington, D.C., 20036. In January 2012 OST relocated its offices to 1676 International Drive, Suite 1100, McLean VA, 22102, and CB's principal business operations were located there until May 2012. Beginning in May 2012, CB's business operations separated from OST and were relocated to 4620 Lee Highway, Suite 206, Arlington, VA, 22207. CB is controlled by defendant Neil Parekh.

11. Defendant Centurion Solutions Group, LLC ("CSG") is falsely registered as a HUBZone, service-disabled veteran-owned minority-owned small business. CSG's registered agent is Amar Gogia. CSG was established in or around January 2010 by defendants Narula, Madan, Parekh and Gogia for the purpose of bidding on and obtaining HUBZone, service-disabled veteran-owned, minority-owned and small business government contracts. Defendant CSG listed its principal place of business as 650 Garbers Church Road, Harrisonburg, VA 22801, which is Gogia's home address. Gogia's home address is identified as CSG's principal place of business because it falls within a HUBZone; however, CSG's real principal place of business was located within office space OST rented at 2001 M Street, NW, Washington, D.C. In January 2012 CSG's principal place of business was relocated to OST's offices located at 1676 International Drive, Suite 1100, McLean, VA, 22102.

12. Defendant Citibuilders Solutions Group LLC ("Citibuilders") is falsely registered as a service-disabled veteran-owned small business with its principle place of business located at 1111 19th Street North, Suite 2001, Arlington, VA, 22209. This LLC was formed for the purpose of bidding and obtaining service-disabled veteran-owned, minority-owned, and small business government contracts. Defendant Goodweather is listed as the CEO of Citibuilders.

13. Defendant Vijay Narula ("Narula") is sued in his personal and official capacities and resides at 8403 Driscoll Drive, Bowie, MD, 20720. He is the president and CEO of OST.

14. Defendant Neil Parekh ("Parekh") is sued in his personal and official capacities and resides at 2001 19th Street North, Suite 2001, Arlington, VA 22209. He is identified as the president and 45% owner of CB Construction.

15. Defendant Amar Gogia ("Gogia") is sued in his personal and official capacities and resides at 650 Garbers Church Road, Harrisonburg, VA 22801-8412. Gogia is a relative of Ajay Madan. For a limited liability company ("LLC") to qualify as a service-disabled veteran-owned small business ("SDVOSB") for the purpose of bidding on and being awarded SDVOSB government set aside contracts, the LLC must be owned, controlled, and under day-to-day management by a service-disabled veteran. Gogia qualifies as a disabled veteran. He entered a conspiracy to misuse his disabled veteran status so that Defendants Parekh, Narula, Madan, OST and CB could present CSG as a SDVOSB and obtain SDVOSB set aside contracts through fraudulent means. To accomplish this, Gogia entered the conspiracy so that he could be falsely identified as the president, founder, and 100% owner of CSG. However, Gogia was not the true owner and never exercised control of daily operations or disposition of CSG profits. Instead, Gogia functioned mostly as a CSG site supervisor subservient at all times to either Neil Parekh, Ajay Madan, and/or Vijay Narula.

16. Defendant Melvin G. Goodweather ("Goodweather") resides at 820 Emerald Dr., Alexandria, VA 22308. He is sued in his personal capacity and in his capacity as the President and/or CEO of CSG. Goodweather practiced law in the District of Columbia and is a registered corporate lobbyist.

17. Defendant Ajay K. Madan **("**Madan**")** is sued in his personal capacity and official

capacity as chief operating officer ("COO") of OST. Madan resides at 4621 24th Rd N, Arlington, VA 22207-3514. He is identified as a 49% owner of CSG.

18. Defendant Shobha N. Mehta, M.D. **("**Dr. Mehta") is an obstetrician and sole practitioner who practices out of an office located at 5021 Seminary Road, Suite 106, Alexandria, VA, 22311. Dr. Mehta is the aunt to defendant Parekh. Dr. Mehta committed overt acts in further of the conspiracy, including submitting falsified customer satisfaction surveys to the VA.

19. Defendant Centennial Surety Associates, Inc. ("Centennial"), resides at 1514 Jabez Run, Suite 100, Milersville, Maryland, 21108. Centennial is an insurance broker the agent of and attorney-in-fact for Hudson and Hanover insurance companies. Centennial helped secure the bonding the Defendants required to bid and obtain government construction contracts.

20. Defendant Michael Schendel ("Schendel") is sued in his personal and official capacities and is the president of Centennial Surety Associates, Inc. ("Centennial"). His office is located at 1514 Jabez Run, Suite 100, Millersville, Maryland, 21108.

21. Defendant Hudson Insurance Company ("Hudson"), is located at 17 State Street, 29th Floor, New York, NY 10004. Hudson, with the assistance of its agent Centennial, knowingly facilitated the fraud scheme and knowingly caused false claims to be submitted to the government by providing surety bonds the Defendants required to bid on and obtain government construction contracts when Hudson knew, or should have known, that the Defendants were concealing material information from the government. Had the government known about the information concealed by the Defendants and known to Hudson, the government would not have entered the contracts at issue or paid the claims at issue in this case. Furthermore, premiums and fees knowingly derived from the fraud scheme, and thereby indirectly charged to the

government, were paid to Hudson. Had the government known about the fraud scheme it would not have accepted the bid bonds and performance bonds and the fees derived therefrom would not have been obtained.

22. Defendant Hanover Insurance Company ("Hanover") is located at 440 Lincoln Street, Worcester, MA 01653. Hanover, with the assistance of its agent Centennial, knowingly facilitated the fraud scheme and knowingly caused false claims to be submitted to the government by providing surety bonds the Defendants required to bid and obtain government construction contracts when Hanover knew, or should have known, that the Defendants were concealing material information from the government. Had the government known about the information concealed by the Defendants and known to Hanover, the government would not have entered the contracts at issue or paid the claims at issue in this case.

## FACTS

23. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

### Government Concern over Service Disabled Veterans

24. For a veteran who suffers a disability while in military service, the United States government has deemed it its moral obligation to provide the disabled veteran a range of benefits designed to ease the economic and other losses and disadvantages incurred because of the disability. These benefits include government assistance for entering the federal procurement marketplace.

25. A company that qualifies as a Service-Disabled Veteran-Owned Small Business ("SDVOSB") becomes eligible for set-asides in federal contracts.

**Government Imposed SDVOSB Requirements**

26. For a limited liability company ("LLC") to qualify as service-disabled veteran-owned small business concern ("SDVOSB"), it must be owned, controlled, and under day-to-day management by a service-disabled qualified individual. Ownership of a LLC means that one or more service-disabled veterans must directly own at least 51% of each class of membership making up the LLC, and that "the long-term decision making and the day-to-day management and administration of the business operations must be conducted by one or more service-disabled veterans." 13 C.F.R. §§125.9(a) and 125.10(a); *also see* 48 C.F.R. § 852.219-10 (a)(1).

27. A service-disabled veteran must likewise hold the highest officer position and must have the managerial experience of the extent and complexity needed to run the concern, *see* 13 C.F.R. § 125.10(b), with one or more service-disabled veterans serving as the managing member with "control over all decisions of the limited liability company," 13 C.F.R. § 125.10(d).

28. A SDVOSB prospective contractor must complete an application package consisting of representations, certifications, and personal documents as required by the Department of Veterans Affairs ("VA"). The VA reviews the application and determine whether the prospective contractor qualifies for SDVOSBC status.

29. After the VA determines that a contractor meets the SDVOSBC qualifications that contractor must register as a SDVOSB company. The registration pages are placed into the VA's Vendor Information Pages database ("VIP database"). Registration includes creating an electronic record ("VIP record"). This registration process requires the registrant to certify that all the information contained in its VIP record is true. 38 C.F.R. § 74.2. Thereafter, the participant must submit a new application each year certifying its accuracy to remain eligible. 38 C.F.R. § 74.1.

30. Any sole proprietor, corporation, partnership or other entity desiring to do business with the federal government ("prospective contractor") must be registered in the Central Contracting Registry ("CCR") database prior to award of a contract or agreement. FAR § 4.1102. The contractor is thereafter responsible for ensuring the accuracy of all information on its CCR record, and must renew it at least annually. A prospective contractor must remain active in the CCR to avoid discontinuation of payments.

31. The Online Contractor Representation and Certification Application ("ORCA") is a component module of the Business Partnership Network ("BPN"). In addition to the information provided to the government by a prospective contractor when it registers with the CCR, the prospective contractor must provide an answer to each component question of the ORCA. Certain information contained in the prospective contractor's CCR information and all representations and certifications constituting the prospective contractor's ORCA answers are compiled into the prospective contractor's ORCA record in the form of a table.

32. Included among the certifications and representations attested to by a business submitting an ORCA record is a field into which the prospective contractor may input "Yes" or "No," asking whether the prospective contractor is a SDVOSBC. A "Yes" response is a statement that the declarant prospective contractor is a SDVOSB, as defined in 13 C.F.R. § 125.8. Only business concerns which meet the criteria set forth in 13 C.F.R. § 125.8 are qualified to input "Yes" in this field, for only they meet the necessary criteria of a SDVOSBC.

**The CSG Conspiracy**

33. Defendants Narula, Parekh, and Madan were neither veterans nor disabled and OST and CB did not qualify as and were not certified as SDVOSB.

34. OST was not located in a HUBZone and no longer qualify as a small business

when the underlying CSG contracts that are the subject of this complaint were awarded.

35. Although Gogia qualified for disabled veteran status, he did not have the finances, managerial experience, or knowledge of government contracting needed to seek, obtain, or qualify for any of the SDVOSB set-aside contracts awarded to CSG.

36. Parekh (on behalf of himself and CB), Narula and Madan (on behalf of themselves and OST), and Gogia entered into a conspiracy to form a limited liability company, CSG, and thereafter registered and certified it as a SDVOSB entity for obtaining government contracts. These registrations and certifications were recorded in the ORCA, CCR, and VIP system of records. These registrations and certifications were obtained by falsely asserting that Gogia, owned 100% of CSG and was in control of CSG's day-to-day business activity. The CSG conspirators therefore knowingly and purposely made, used, or caused to be made or used, a false record material to a false or fraudulent claim in violation of 31 U.S.C. §§ 3729(a)(1)(A), (B) and (C).

37. CSG's majority ownership, operational and financial control and the distribution of CSG profits and resources, were controlled by Parekh (on behalf of himself and CB), and Madan and Narula (on behalf of themselves and OST).

38. Gogia was never in control of CSG and was, at all times relevant to this complaint, subservient to Narula, Madan, and Parekh.

39. The initial financing needed to launch CSG government contracting operations was in the form of an August 4, 2010, wire transfer in the amount of $211,612.34 from a Bank of America checking account held in Madan's name. This sum was wired into the newly established CSG checking account (Bank of America, Account No. 4350 0183 3728).

**OST Involvement in the CSG Conspiracy**

40. Bryan Van Gilder was employed by OST as its Senior Proposal Manager (SPM) and reported to Narula. In his official OST capacity Mr. Van Gilder was responsible for the preparation and finalization of government contracting proposals. In his capacity as OST's SPM, Van Gilder was tasked with responsible for the preparation and finalization the first fraudulent response to a government contract solicitation made in the name of CSG. This CSG contracting proposal was submitted in response to a Service-Disabled Veteran-Owned (SDVO) Small Business set-aside contracting solicitation offered by the United States Department of Veteran Affairs, known as Halls & Walls (VAMC Baltimore), Solicitation No. VA-245-10-RP-0076. (CSG's response to this government solicitation is hereinafter referred to as the "Halls & Walls Solicitation Response"). The Halls & Walls Solicitation Response was submitted in the name of CSG on April 7, 2010.

41. The drafting of the Halls & Walls Solicitation Response is of critical importance to the success of the CSG Conspiracy because all the future solicitation responses were based off this initial draft and the next version prepared by OST.

42. OST's senior management knew of, approved of, and played a critical role preparing the Halls & Walls Solicitation Response. In addition to OST's SPM, OST's Marketing Manager, Sujana Pathak, and OST's Director, Ronald Rhodes, were involved with the preparation and review of the CSG Halls & Walls Solicitation Response, and did so with the knowledge and support of OST's CEO, Vijay Narula.

43. The final draft of the CSG Halls & Walls Solicitation Response was circulated by Bryan Van Gilder, via OST's internal email system, to OST's CEO's Vijay Narula, OST's Marketing Manager Sujana Pathak, and an OST Director, Ronald Rhodes. This draft was also

shared with Neil Parekh and the Plaintiff-Relator.

44. OST's offices and employees were used to prop up CSG. All the CSG full-time office employees (i.e., Plaintiff-Relator, David Rubando, Tom Starkweather, Sami Ralli, and Neil Parekh) worked out of OST's office space; were provided OST email accounts (e.g. Plaintiff-Relator's email address was AScollick@ostglobal.com, Neil Parekh's email address was NPrekh@ostglobal.com); and OST phone lines. OST provided human resources, IT support, accounting support, corporate bonding, office space, printers, faxes, phone lines (CSG's "Magicjack" port identifying a false 540 area code ran on OST's computer system), an email server, computer stations and office supplies necessary for OST to solicit and service government contracts in the name of CSG. The totality of the resources OST provided to prop up CSG was essential to carry out the fraudulent scheme and conspiracy to commit fraud and was known to OST's CEO Vijay Narula, OST's COO Ajay Madan, and by OST's CFO Anil Chaudhry.

45. OST also covered the salary of a CSG employee. Carol Rogers was a direct employee of CSG between 2011 and 2012. However, upon information and belief, OST transmitted $100,000 from its corporate account into CSG's company account to pay Carol Rogers' salary.

46. OST's Sujana Pathak worked to locate additional construction opportunities for CSG and circulated potential construction opportunities to Ajay Madan, Neil Parekh and Andrew Scollick.

47. OST employees regularly prepared "pipeline" reports that would track the date CSG bid on a contract, the government entity soliciting the bid, the contract description and contract price. These reports were regularly circulated to Vijay Narula, Ajay Madan, and Neil

Parekh.

48. An OST team was created to prepare and assemble the Halls & Walls Solicitation Response. The creation of the Halls & Walls Solicitation Response was a critical step in furtherance of the CSG conspiracy because this document incorporated the materially false information that was thereafter repeated in all the other SDVOSB solicitation responses transmitted in the name of CSG. In other words, the Halls & Walls Solicitation Response functioned as the prototype for the subsequent solicitation responses submitted in the name of CSG that are the subject of this complaint. The Halls & Walls Solicitation Response is fraudulent because of, but not limited to, the following:

a) It was prepared by OST employees, out of OST's Washington, D.C. office, but submitted in the name of Centurion Solutions Group, LLC, utilizing a Harrisonburg, VA address;
b) falsely states that CSG "is a Service-Disabled Veteran-owned (SDVO) Small Business based in Harrisonburg, VA with more than 15 years of experience providing interior renovations for our government and industry customers." However, CSG did not exist prior to January 23, 2010, and was never controlled by a service disabled veteran and therefore never qualified as a SDVO Small Business;
c) falsely states that CSG "utiliz[es] an in-house crew for most of our work;"
d) falsely states that CSG has "in-depth construction experience specifically within the medical industry;"
e) falsely states that CSG has "a significant price advantage because of the volume of flooring products sold and installed through our company on a yearly basis;"
f) falsely states that "Team Centurion has their own in-house flooring crew;" and
g) falsely sets forth past performance claims from the Mehta Medical Group;

h) falsely sets forth past performance claims from FBR Interior Renovations, and

i) falsely sets forth past performance claims from CVENT.

49. OST executed and transmitted to Hudson Insurance Company and Hanover Insurance Company a signed, sealed, and notarized agreement of indemnity as well as corporate resolutions extending OST's bond to contracts submitted in the name of CSG.

50. As a corporate entity, OST exclusively acted through its executives, employees, and agents. Based on the totality of facts pertaining to OST employees set forth in the Amended Complaint, OST is jointly and severally or vicariously liable for the actions carried out by its employees, including OST's CEO and President Vijay Narula, COO Ajay Madan, OST's SPM Bryan Van Gilder, OST's Marketing Manager Sujana Pathak, and OST Director Ronald Rhodes.

51. Narula is the founder, an owner, the president and CEO of OST and at all times controlled and dictated OST's business structure and personnel. At all times relevant to this Amended Complaint, Narula and Madan acted within the scope of their OST authority and/or with apparent OST authority to carry out each act in furtherance of the fraud and conspiracy to commit fraud undertaken in the name of CSG. Narula and OST constitute alter-egos of each other. They have such a unity of interest and ownership that the individuality of each ceased with respect to every act in furtherance of the CSG conspiracy.

52. A checking account was established in the name of CSG (Bank of America, Account No. 4350 0183 3728). Neil Parekh was a signatory to the CSG bank account and issued checks and otherwise engaged in the electronic transfer of funds from CSG's account into a CB account.

53. An example of Parekh's signature authority over CSG's check account is CSG check No. 1006, a payroll check issued by Parekh to Gogia.

54. CSG's day-to-day business decisions were carried out within OST's headquarters where Parekh, Madan, Narula, CB and OST were co-located. Gogia did not have an office or presence in that location.

55. Defendants Narula, Madan, and Parekh controlled the likeness of Gogia's signature, which they could affix to documents as they saw fit.

56. The drafting and submission of CSG's bids occurred out of OST's Washington, D.C., offices under the direction and control of Narula, Madan, and Parekh, and were routinely by Neil Parekh as CSG's "Managing Director."

57. CSG's contracting solicitations were controlled by Parekh (on behalf of himself and CB), as well as Narula and Madan (on behalf of themselves and OST).

58. The daily management and oversight over all CSG's SDVOSB construction activity was done by Parekh and CB Construction. OST's back office management was provided by Madan, Narula, and OST.

59. Evidence of Gogia's lack of control and domination over CSG includes Parekh's signing CSG's August 22, 2010, federal tax form 8655 (Reporting Agent Authorization), where he is identified as CSG's "Managing Director/Principal."

60. Gogia predominately functioned as a local CSG site manager and was supervised by Parekh. A prime example of Gogia's subservient position is the May 31, 2011, email Parekh sent to Gogia threatening to remove Gogia as the site supervisor of the CSG Wichita contract if Gogia's job performance did not improve. Parekh's email states in part: "If there is not significant improvement on [the 587A7-10-105 Wichita Msc Proj #1] over the next couple of weeks I will have no choice but to replace you on this project."

61. Additional examples that Parekh and not Gogia controlled CSG's operations is an

email exchange between Parekh and Gogia dated February 15, 2012, in which Gogia seeks Parekh's approval to pay CSG employees ("Neil – we are now 3 weeks behind on payment to Philadelphia workers, and 2 weeks behind on payment to Chillicothe workers. You still refuse to approve any payments. . . Checks are ready to go. We cannot hold our site laborers hostage, especially when we still need them to continue working. We also cannot afford any other complaints with DOL or the VA. Please approve immediately"). Another example is an August 6, 2010 email from Parekh to Gogia and relator "requiring you both" to make sure that the CSG proposals going out were full and complete.

62. Parekh routinely electronically transferred large sums of money out of the CSG checking account and into a CB checking account he controlled. This is demonstrated by comparing CB bank statements with the wire transfers identified in the CSG checking account statements. By way of example, a comparison between CSG's and CB's checking account statements demonstrates that between November 2010 and November 2011 Parekh transferred over $1,000,000 out of CSG's Bank of America checking account and into CB's Chevy Chase/Capital One checking account. The transfers documented in these bank statements are as follows:

| **Date** | **Amount of Transfers** |
|---|---|
| 11/18/2011 | $12,500 |
| 11/17.2011 | $35,000 |
| 10/27/2011 | $22,700 |
| 10/14/2011 | $25,000 |
| 09/08/2011 | $25,000 |
| 09/05/2011 | $38,500 |

| | |
|---|---|
| 09/02/2011 | $ 7,500 |
| 09/01/2011 | $35,000 |
| 08/15/2011 | $25,000 |
| 08/01/2011 | $15,000 |
| 07/28/2011 | $35,000 |
| 07/10/2011 | $30,000 |
| 06/04/2011 | $25,000 |
| 05/11/2011 | $15,000 |
| 05/06/2011 | $15,000 |
| 05/02/2011 | $12,500 |
| 04/26/2011 | $20,000 |
| 04/20/2011 | $15,000 |
| 04/15/2011 | $50,000 |
| 04/04/2011 | $25,000 |
| 03/28.2011 | $25,000 |
| 03/23/2011 | $15,000 |
| 03/22/2011 | $25,000 |
| 03/22/2011 | $20,000 |
| 03/21/2011 | $25,000 |
| 03/07/2011 | $5,000 |
| 03/04/2011 | $15,000 |
| 03/02/2011 | $15,000 |

| | |
|---|---|
| 02/26/2011 | $10,000 |
| 02/25/2011 | $10,000 |
| 02/23/2011 | $10,000 |
| 02/23/2011 | $5,000 |
| 01/24/2011 | $10,000 |
| 01/06/2011 | $20,000 |
| 01/02/2011 | $15,000 |
| 12/20/2010 | $50,000 |
| 12/19/2010 | $25,000 |
| 12/19/2010 | $20,000 |
| 12/17/2010 | $15,000 |
| 12/16/2010 | $25,000 |
| 12/15/2010 | $20,000 |
| 12/13/2010 | $25,000 |
| 12/13/2010 | $25,000 |
| 12/09/2010 | $15,000 |
| 12/06/2010 | $15,000 |
| 12/03/2010 | $10,000 |
| 12/03/2010 | $10,000 |
| 12/01/2010 | $10,000 |
| 11/23/2010 | $10,000 |
| 11/17/2010 | $10,000 |
| 11/13/2010 | $10,000 |

| | |
|---|---|
| 11/12/2010 | $10,000 |
| TOTAL $ | $1,013,700.00 |

63. CSG utilized credit cards issued to CB (Capital One Bank Visa, account Number ending in 7940) to conduct CSG business. The CB Visa cards used to conduct CSG business were issued in the names of Dilip Parekh (card ending in 7940), Neil Parekh (card ending 1119), Martin Tubb (card ending in 0054), Amar Gogia (card ending in 6186) and several others. Construction supplies, travel, lodging and other costs directly pertaining to CSG's government contracting activity were charged against these credit cards.

64. Additionally, an American Express credit card issued to Dilip Parekh against the CB account (ending in 73007) was used to bill CSG costs, and a Home Depot credit card in the name of CB was also used to conduct CSG business.

65. Neil Parekh signed all the awarded CSG SDVOSB contracts as CSG's "Managing Director." Yet, Parekh was not a CSG paid employee in 2010. In the second quarter of 2011 Parekh became a paid CSG employee and, thereby, according to Parekh's 2011 Form W-2, diverted $67,884.62 to himself.

66. Neil Parekh's established CSG's Go Daddy account and possessed and controlled CSG's Go Daddy user name and password. He shared that information with Narula, Madan, and OST.

67. Relator observed first-hand that Gogia was never in control of CSG.

68. Defendant Parekh branched out his fraudulent SDVOSB contracting activity by establishing a second contracting entity known as Citibuilders Solutions Group LLC ("Citibuilders").

69. With respect to Citibuilders, Parekh conspired with Goodweather to set up a separate LLC that would take the format developed by the CSG conspirators and use it to seek out SDVOSB contracts in the name of Citibuilders. Parekh cut Narula, Madan, and OST out of the newly formed Citibuilders conspiracy.

70. The creation of the Citibuilders conspiracy caused a rift between Parekh on the one hand and Narula, Madan, Gogia and OST on the other. The rift resulted in Madan seizing Parekh's computer upon learning that Parekh took the format the CSG conspirators developed and cut Narula, Madan, Gogia and OST out from the contracts Citibuilders obtained. Emails transmitted between Parekh, Narula, and Madan on December 28, 2011, and January 31, 2012, include discussions concerning Madan's confiscation of Parekh's computer appear.

71. Evidence that Gogia was not in control of CSG's finances is demonstrated in a December 27, 2011, email communication Parekh transmitted to Narula. In that email, Parekh pleads with Narula that he "urgently need[s] a payment from CSG to CB" that "last week when we met I put in another $35,000 of my own money because Ajay [Madan] took over all the accounts meaning we never received any payments for Nov or Dec. CSG has since received over $250,000 in payments from the government and there have been no payments to CB even though CB covers the payroll and up to Nov was also paying the credit cards." Gogia was not even copied on the email.

72. On January 6, 2012, Narula acknowledges to Parekh that "I did not put in the request for CSG to pay CB." Narula's ability to withhold CSG payments to Parekh evidences his control over CSG. This email chain further reflects a January 16, 2012, communication from Narula to Parekh advising Parekh that there "are payments up to $1M from CSG to CB" and that they needed "to tally the books on both sides" before Narula would approve payments from CSG

to CB.

73. On January 18, 2012, Madan emails Gogia, Parekh, and Narula explaining that Gogia and Parekh would perform the "front end review" and that Madan and Gogia would "perform a backend review." On January 20, 2012, Parekh, with the knowledge and approval of Narula and Madan, initiated payroll and other payments electronically from CSG's account to CB's checking account.

74. Payroll and payments disputes continued to erupt between Parekh, Madan, and Narula. On February 15, 2012, Gogia emailed Parekh seeking Parekh's approval of CSG payrolls. Gogia states to Parekh "You still refuse to approve any payments" and further states "[w]e cannot hold our site laborers hostage, especially when we still need them to continue working" and closes by asking Parekh to "[p]lease approve immediately."

75. Parekh, Narula, and Madan worked towards reaching an agreement as to how CSG's projects and profits would be handled moving forward.

76. A "one pager" memo was prepared outlining some of the accounting, operations, outstanding debts, bonding, loan repayments, project close out and how CB and CSG would separate.

77. On March 1, 2012, Narula, Parekh and Madan exchanged emails discussing the reconciliation of issues outlined in the "one pager." The email includes multiple recommendations demonstrating that the control and operation of CSG was for the benefit of Parekh, Madan, and Narula, and the CSG was a front organization in which "surplus income [was to] be distributed equally [between Parekh, Madan and Narula] after [CSG] projects are complete." Gogia was not copied on this email.

78. In an email dated March 8, 2012, Parekh advised Gogia that Gogia could not pay

expenses to a CSG employee "without my approval" and he further authorized Gogia to continue using CB credit cards until CSG got its own cards.

79. On March 22, 2012, Parekh emailed Madan complaining that files were removed and placed under Madan's "lock and key" and that this was the "second time" Madan confiscated CSG property without notification.

80. Parekh, Narula, and Madan agreed that Parekh would prepare a monthly update on CSG projects that he would share with them.

81. On April 9, 2012 Narula, Madan, and Parekh exchanged an email concerning the resumption of Gogia's CSG salary. Gogia was not copied on the email.

82. On April 12, 2012, Parekh prepared a governance document asking Narula and Madan to reinstate access to CSG's check wiring and bank transactions and further proposing that "CB to use CSG's qual[ification]s and pay CSG a fee based on receivables."

83. On May 22, 2012, Parekh emailed Narula concerning the immediate short term financial needs pertaining to CSG, OST, and CB.

84. On June 13-14, 2012, Narula, Parekh, and Gogia exchange emails concerning CSG's Wichita project and the processing of a payment of $170,000 to Madan.

85. On July 16, 2012, Parekh signed a check in the amount of $25,000 directly paying a CSG subcontractor for work performed on the Chillicothe contract previously awarded to CSG.

86. Hundreds of responses to solicitations seeking SDVOSBC contract awards were made in the name of CSG. This resulted in CSG obtain millions of dollars in government SDVOSB contracts, including but not limited to over $6.4 million in federal government contracts from the Veteran Affairs Administration ("VA"). The contracts known to have been awarded to CSG by the VA are as follows:

| | Contract Award Date | Contract Price | Final Price |
|---|---|---|---|
| Solicitation Number: VA25810RA0191<br>Agency: Department of Veterans Affairs<br>Office: VA New Mexico Health Care System<br>Location: Department of Veterans Affairs New Mexico Health Care System<br>Contract Number: VA258-C-0436 | 8/24/10 | $517,397.00 | $503,774.00 |
| Solicitation Number: VA786A10IB0081<br>Agency: Department of Veterans Affairs<br>Office: VA National Cemetery Administration Construction Support Division<br>Location: VA National Cemetery Administration<br>Contract Number: VA786A-C-0355 | 8/31/10 | $377,000.00 | $400,042.00 |
| Solicitation Number: VA25610IB0291<br>Agency: Department of Veterans Affairs<br>Office: VA Gulf Coast Veterans Health Care System<br>Location: Department of Veterans Affairs Gulf Coast Veterans Health Care System<br>Contract Number:VA256-C-0984 | 9/17/10 | $122,599.00 | $139,579.00 |
| Solicitation Number: VA26310IB0325<br>Agency: Department of Veterans Affairs<br>Office: VA Nebraska Western Iowa Health Care System (Omaha Division)<br>Location: Department of Veterans Affairs Nebraska Western Iowa Health Care System<br>Contract Number: VA263-C-1066 | 9/22/10 | $57,000.00 | $65,155.00 |
| Solicitation Number: VA25510RP0476<br>Agency: Department of Veterans Affairs<br>Office: VA Heartland Network<br>Location: Department of Veterans Affairs Heartland Network<br>Contract Number: VA255-C-1536 | 9/24/10 | $1,277,000.00 | $1,287,005.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA24410RP0390<br>Agency: Department of Veterans Affairs<br>Office: Lebanon VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Contract Number: VA244-C-1556 | 9/29/10 | $672,236.00 | $68,598.00 |
| Solicitation Number: VA25610RP0445<br>Agency: Department of Veterans Affairs<br>Office: Oklahoma City VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Contract Number: VA256-C-1169 | 10/29/10 | $731,727.00 | $731,727.00 |
| Solicitation Number: VA25011IB0093<br>Agency: Department of Veterans Affairs<br>Office: Chillicothe VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Chillicothe Ohio (Women's Clinic)-VA-250-11-IB-0093 | 6/21/11 | $731,910.00 | $741,588.00 |
| Solicitation Number: VA25011IB0114<br>Agency: Department of Veterans Affairs<br>Office: Chillicothe VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Chillicothe Ohio (East Entry)- VA-250-11-IB-0114 | 6/22/11 | $167,000.00 | $166,557.00 |
| Solicitation Number: VA26311IB0345<br>Agency: Department of Veterans Affairs<br>Office: VA Central Iowa Health Care System (Des Moines)<br>Location: Department of Veterans Affairs Central Iowa Health Care System, Des Moines IA-Remodel Dom Phase II-Contract Number: VA-263-11-IB-0345 | 6/30/11 | $179,800.00 | $185,482.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA25511RP0378Z<br>Agency: Department of Veterans Affairs<br>Office: VA Heartland Network<br>PROJECT 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 - WOMEN'S HEALTH RESTROMM 7 PRIVACY, CONST.<br>Location: Department of Veterans Affairs Heartland Network Kansas City MO- Women's Health and Privacy Corrections- Contract Number: VA-255-11-RP-0378 | 7/25/11 | $187,942.00 | $187,942.00 |
| Solicitation Number: VA24611IB0278<br>Agency: Department of Veterans Affairs<br>Office: Durham VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Durham NC- Renovate CLC Restrooms<br>Contract Number: VA-246-11-IB-0278 | 9/23/11 | $77,100.00 | $78,116.00 |
| Solicitation Number: VA24410IB0398<br>Agency: Department of Veterans Affairs<br>Office: Philadelphia VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Philadelphia PA- Upgrade CLC Courtyards and Corridors- Contract Number VA-244-10-IB-0398 | 9/30/10 | $837,107.00 | $850,229.00 |
| Solicitation Number: VA246-12-B-2478<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Fire Damper Repairs<br>Contract Number: VA24612C0085 | 8/30/12 | $78,830.00 | $78,830.00 |
| Solicitation Number: VA246-12-B-1975<br>Agency: Department of Veterans Affairs<br>Office: Beckley WV VAMC<br>Title: Ceiling Tile Replacement Bldg 1<br>Contract Number: VA24612C0077 | 8/29/12 | $139,212.00 | $139,212.00 |
| Solicitation Number: VA246-13-B-0242<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Improvements to Building 6 Theatre<br>Contract Number: VA24613C0047 | 3/19/13 | $176,981.00 | $176,981.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA246-12-B-2719<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Hospice CLC Improvements<br>Contract Number: VA24612C0090 | 8/27/13 | $303,256.00 | $303,256.00 |
| Solicitation Number: VA246-13-B-0512<br>Agency: Department of Veterans Affairs<br>Office: Salisbury NC VAMC<br>Title: Exterior Masonry and Tuck Pointing<br>Contract Number: VA24613C0113 | 6/27/13 | $349,249.00 | $348,493.00 |
| | | | |
| ***CSG's SDVOSBC Revenue from VA Contracts as of 7/29/14:*** | | | ***$6,452,566.00*** |

87. Upon information and belief CSG continued to seek and obtain SDVOSBC contract funds through at least 2016.

88. All the contracts submitted were fraudulent because CSG did not qualify as a SDVOSBC and because they included material false statements. In fact, all the contract proposals submitted by CSG to the VA:

a. falsely certified service-disabled veteran-owned status;

b. falsely certified small business status;

c. falsified CSG's past performance;

d. hid Narula's, Madan's, and Parekh's direct control over CSG;

e. hid the fact that CB employees worked the CSG contracts;

f. hid the fact that Parekh, Narula, and Madan with the support of other OST staff employees were responsible for preparing the CSG submission presented to the United States government;

g. made material false statements about the knowledge and experience of CSG employees;

h. falsified OSHA certifications for certain employees; and

i. falsified the number of employees ready and available to staff a project.

**Materially False Misrepresentations as to CSG's Past Performance**

89. The CSG Conspiracy was not limited to the fraudulent representation of CSG as a SDVOSBC. The fraud engaged in by the CSG conspirators extended to the submission of material false statements in all the responses to solicitations CSG made to the VA.

90. The VA contract solicitation bid on by specified past performance criteria CSG would have to demonstrate to qualify for the contract. The past performance criteria often differed from solicitation to solicitation based on the scope and cost of the contract action. Past performance questionnaires were an important part of the VA's contract award decision. The CSG conspirators knew and understood that the past performance examples it provided to the VA contracting officer were material to the VA's decision to award a contract to CSG and would be evaluated based on the results of the past performance questionnaires returned to the VA contracting officer assigned to the contract award.

91. The CSG conspirators intentionally and knowingly manufactured false past performance examples that were tailor-made to increase CSG's chances of winning the VA contract.

92. CSG had no prior past performance. As such, the CSG conspirators had to falsify examples of claimed past performance and had to bring into the conspiracy individuals who would execute and return falsified performance questionnaires back to a VA contracting officer.

93. Upon information and belief, one or more of the CSG conspirators approached Dr. Mehta to obtain her assistance in furthering the conspiracy by agreeing to submit materially false performance questionnaires to the VA.

94. The CSG conspirators used the Mehta Project as a key credential of past

performance to bid and win contracts for construction activity at VA medical centers, including Veterans Affairs medical building contracts.

**Dr. Mehta Commits Overt Acts in Furtherance of the CSG Conspiracy**

95. Dr. Mehta committed overt acts in furtherance of the CSG conspiracy. CSG responded to the VA contract solicitations by including work it allegedly performed for Dr. Mehta. CSG identified Dr. Mehta as the owner "Mehta Medical Group." Dr. Mehta is a solo practitioner and, upon information and belief, is not a member of a medical group such that CSG's claim that the work was performed for the "Mehta Medical Group" is false and misleading.

96. As part of the contracting procedure, a VA contracting officer would transmit a performance survey questionnaire to Dr. Mehta. The questionnaire would identify that the VA was seeking past performance information about Centurion Solutions Group, would typically identify that the work project pertained to medical office renovations, would identify the date that CSG allegedly performed the renovations, the total contract value, and would request the questionnaire recipient to rate a dozen or more aspects of CSG's performance.

97. The assertion in the CSG response to the VA contract solicitations that it engaged in construction activities for Dr. Mehta is entirely false as the location specified was built in the 1980's and had yet to be renovated.

98. In furtherance of the CSG conspiracy, Dr. Mehta completed the customer satisfaction survey claiming that the CSG work performance was outstanding.

99. Dr. Mehta is believed to have signed and submit her falsified past performance survey reports to a VA contracting officer. Such submissions commence in or about April 2010.

100. Dr. Mehta's involvement in the CSG conspiracy continued over a period of years.

Dr. Mehta routinely retuned a customer satisfaction and, upon information and belief, did so for each VA contract awarded to CSG. Each such submission constituted an act in furtherance of the CSG conspiracy.

101. Dr. Mehta also answered phone calls from government Contract Officers verifying the false information provided in the proposals and any other questions they may have had.

102. The material misrepresentations made by Dr. Mehta knew that CSG claimed in some of its submissions that the renovations of Dr. Mehta's office occurring at 5021 Seminary Road, Alexandria, VA (the location specified by CSG) exceeded $1 million dollars. That office location, however, consisted of a single room approximating 200 square feet and had not been renovated since it was originally constructed, upon information and belief, back in the 1980's.

103. By way of example, on September 22, 2010, Dr. Mehta completed a customer satisfaction questionnaire that claimed her office had been renovated between January 2009 and May 2009 at a cost of $1,236,000. Dr. Mehta responded to this survey claiming that CSG's overall performance on a fictitious million plus dollar renovation was "exceptional" and that she would hire CSG again.

104. Depending on the past performance criteria, the CSG contracting proposals specified different size and cost of the Mehta construction project.

105. In response to solicitation No.VA-255-10-RP-0476; (Construct Misc. Projects - Wichita, KS), the CSG technical submission states that the Mehta Project cost $1,150,000 for renovating 2,300 square feet.

106. In response to Solicitation No. VA-244-10-RP-0390 (Renovate 17-2B, Primary Care - Lebanon, PA), the CSG proposal claims that the Mehta Project cost $263,000.

107. The VA issued Solicitation No. VA-255-11-RP-0378 (Woman's Health and Privacy Corrections - Kansas City, MO). The CSG response to this solicitation claims that the Metha Project cost $235,000.

108. In response to Solicitation No. VA-259-10-RP-0172 (bid but not awarded) the CSG proposal claimed that Mehta Project cost $568,000.

109. The Mehta Project was also used by CSG to claim experience with "negative air machines" and high efficiency particulate air ("HEPA") filters. This experience was necessary to bid and win large building projects where exposure to airborne hazardous materials was a concern. The Mehta Project likewise did not involve negative air machines or HEPA filters.

110. As part of the solicitation process, the VA established technical requirements that had to be established satisfied in a contractor's response to the solicitation. The failure to satisfy the technical specifications disqualified the contractor from further consideration. The technical requirements to the VA solicitations CSG chose to respond required proof of past performance similar is scope to the work specified in the solicitation. If a prospective contractor failed to satisfy the technical requires as to past performance that contractor would be disqualified from the competition.

111. The CSG conspirators needed Dr. Mehta to provide falsified past performance so that CSG's responses to the VA solicitation were not rejected for failing to provide evidence of past performance. To meet the past performance criteria set forth in a solicitation the CSG conspirators would change the cost and the scope of the past performance they claimed for the Mehta Project. In addition to the fact that the claimed renovation of the Mehta Medical Group never occurred, the CSG proposals changed the cost claimed to have been expended by Dr. Mehta to coincide with past performance criteria established in the solicitation. Dr. Mehta would

separately confirm to the VA contracting officer by submitting a completed questionnaire confirming that the construction had taken place and that CSG's performance on that contracting action excellent.

**Falsified Past Performance Submitted by OST**

112. In furtherance of the CSG conspiracy, material false statements were made concerning alleged past performance CSG supposedly completed at defendant OST's corporate headquarters located at 2001 M Street NW in Washington, D.C. ("OST Renovations").

113. CSG contract proposals identified the OST Renovations as a key aspect of CSG's past performance. But CSG never performed the OST Renovations. Instead, the space OST occupied at 2001 M Street, NW, consisted of subleased, fully furnished office space that had never been renovated by OST.

114. As part of the contracting procedure, a performance survey questionnaires were transmitted to Narula. The questionnaire would identify that the questionnaire was sought on behalf of a federal agency, the VA, to confirm CSG's past performance on the OST Renovations.

115. In furtherance of the CSG conspiracy, Narula, on behalf of himself and OST, would fill out, sign and return to the VA contracting officer a customer performance questionnaire declaring that CSG work performance to be outstanding. Acting on behalf of the CSG conspirators, Narula commenced submitting the false declarations as to CSG's past performance in 2010 and continued doing so for a period of years.

116. As founder and CEO of OST, Narula had personal knowledge that the claim that CSG had carried out renovations of office space that Narula occupied was false. Narula, on behalf of himself and OST, caused the false statements concerning the OST Renovations to be incorporated into the CSG contracting proposals.

117. Narula, on behalf of himself and OST, understood that as part of the CSG conspiracy the scope and time and monetary value of the OST Renovation claim would be freely altered to coincide with the past work performance criteria established for a given VA contract solicitation. By way of example of such knowledge, in a June 7, 2011, email exchange, Narula was transmitted a past performance questionnaire for the CSG proposal responding to VA Solicitation No. VA-236-11-RP-0291. In his email response to this email Narula asked "What is scope and time frame you want me to fill?", thereby acknowledging his personal knowledge that the CSG claims as to the scope of the work performed were being altered to address the past performance criteria sought by the VA about the solicitation.

118. Upon information and belief, all the CSG contract proposals transmitted to the VA that resulted in a contract being awarded to CSG included material false assertions that CSG had completed the OST Renovations and that, depending on the past performance criteria objectives specified by the VA, the CSG proposals were materially altered to claim that the OST Renovation fit within those criteria.

119. Because of these actions, every time the VA awarded the contracts at issue herein to CSG the underlying proposal that CSG submitted to the VA the OST Renovation was knowingly used as a false measure of CSG's past performance.

120. Because of these actions, each time Narula, personally and on behalf of OST, transmitted a past performance questionnaire survey to a VA contracting officer falsely attesting to the fact that OST Renovation had occurred and that CSG's work performance on that project was outstanding constituted a separate act that Narula, acting on behalf of OST, took in furtherance of the CSG conspiracy.

121. Past performance claims about the OST Renovations appearing in CSG's

responses to a VA contract solicitation were altered to falsely state the dollar value and size of the construction undertaken as were the time frames and start and completion dates. These material alterations were made to falsely demonstrate compliance with bidding specifications found in the contract solicitations that required the bidder to establish past performance that differed in the scope, duration and date of completion. These material alterations were routinely carried out by Defendants Parekh, CSG, Narula and OST, and on behalf of the CSG conspirators. This falsification of compliance with past performance specifications is demonstrated by the following examples:

a. In response to solicitation No. VA-255-11-RP-0378, the CSG proposal claims that the OST Renovations cost $3,100,000 for the "design/build of 16,000 SF, 12,000 SF, and 2,500 SF shell condition spaces";

b. In response to Solicitation No DTMANM-11-R-00006, the CSG proposal claims that the OST Renovations cost was $3,100,000 for the "design/build of 16,000 SF, 12,000 SF, and 2,500 SF shell condition spaces";

c. In response to Solicitation No. VA-256-10-RP-0333 (bid but not awarded) the CSG proposal claimed that the OST renovation cost $1,296,500 for the "design/build of 16,000 SF, 12,000 SF, and 2,500 SF shell condition spaces";

d. In response to Solicitation No. VA-259-10-RP-0172 (bid but not awarded) the CSG proposal claimed that the OST renovation cost $750,000 for the "design/build of 16,000 SF, 12,000 SF, and 2,500 SF shell condition spaces".

**<u>Falsified CVENT Past Performance</u>**

122. The CSG contract proposals transmitted to the VA included past performance claims that CSG had performed for CVENT ("CVENT Project"). The CVENT Project was

completed by Citibuilders, Inc., a company established by Parekh in or about 2005. CSG was not the CVENT project contractor.

123. The site supervisor on the CVENT Project from inception to completion was the beginning to the of the CVENT project end The Citibuilders, Inc., site supervisor assigned to the Relator, Andrew Scollick. The Relator has firsthand knowledge of the size and cost of that project, and has personal knowledge that the CVENT project was contracted out to Citibuilders in 2009 before CSG came into existence. Relator has personal knowledge that the actual cost of the CVENT Project was $120,000 and that the scope of work was limited to renovating less than 3,000 square feet.

124. Relator has direct personal knowledge that the CSG proposals submitted to the VA falsely allege that CSG was the contractor on the CVENT Project and has personal knowledge that statements as to the cost of that project were materially altered in the CSG proposals to comply with past performance criteria established by the VA with respect to specific contract solicitations.

125. By way of example, in the solicitation No.VA-255-10-RP-0476; (Construct Misc. Projects – Wichita, KS) ("Wichita Solicitation"), the solicitation identifies that the government would not consider a contractor's proposal unless the contractor submitted proof of past performance that it functioned as the "prime contractor" on a project with a "dollar magnitude equal to, or greater than $1,00,000.00." In response to this solicitation the CSG conspirators falsely stated in the CSG proposal that the cost of CVENT project was $1,477,000. This claim by the CSG conspirators is materially false because as CSG was not the prime contractor (Citibuilders was the prime contractor) and because the actual dollar magnitude of the CVENT project was $120,000. The time frame of when the CVENT project was alleged to have occurred

also knowingly altered by the CSG conspirators to meet VA guidelines for “Recent Past Performance” which typically demanded that the project had be completed within one year prior of solicitation.

126. CSG proposals knowingly submitted and in furtherance of the CSG conspiracy also included false assertions that the CVENT Project included the construction of a sliding partition to minimize disruption and that CSG brought in “our HEPA air purifier with an extra carbon filter which took the device to stage 4 and eliminated any noxious glue fumes” are false. Relator has firsthand knowledge that the project utilized an ineffective plastic sheet barrier and not a sliding partition and that a HEPA filtration system was never used on the CVENT Project and that this failure resulted in CVENT employees becoming ill and having to be evacuated, and that CVENT’s HR department sent several employees home due to the inhalation of noxious fumes. Employees from the mortgage company on the floor above also had to be evacuated.

127. In response to Solicitation No. VA-244-10-RP-0390 (Renovate 17-2B, Primary Care - Lebanon, PA), CSG’s technical proposal is identically worded to the Wichita Solicitation with the exception that the cost of the CVENT project was changed to $896,500. The reason for this material alteration was because the VA’s technical requirements required past performance had to be between $500,000 and $1,000,000. The made up $896,500 amount fit within this criterion whereas the $1,477,000 cost figure CSG identified for the same project did not.

128. In response to Solicitation No. VA-259-10-RP-0172 (bid but not awarded) the CSG proposal claimed that CVENT project cost $896,500.

**<u>Falsified FBR Renovation Past Performance</u>**

129. In furtherance of the CSG conspiracy, material false statements were made concerning alleged past performance CSG supposedly completed for FBR Capital Markets

Corporation, located at 1001 19th Street North, Arlington, VA ("FBR interior renovations").

130. CSG did not perform the FBR interior renovations work. The CSG past performance claims for the FBR interior renovations work altered the claimed cost of that renovation. By way of example, CSG's response to Solicitation No. VA-244-10-RP-0390 (Renovate 17-2B, Primary Care, Lebanon, PA), claimed the cost of the FBR interior renovation was $537,000. However, when CSG responded to another VA solicitation, Solicitation No. VA-256-10-RP-0333 (bid but not awarded) CSG cut and pasted the exact content with the exception that the FBR interior renovation cost $837,000 as opposed to $537,000.

131. The started/completed dates for the FBR projects were also changed to meet VA guidelines for "Recent Past Performance" that typically required that the project had to be completed within one year of the date of the solicitation.

**False Representations Concerning CSG's Employees**

132. The CSG bids knowingly and falsely claim in furtherance of the CSG conspiracy that CSG employed people who were not employed by CSG and these CSG bids knowingly falsified the background, knowledge, and experience of employees who were employed by CSG.

133. CB formally issued separate letters of hire to David Rubando, relator Andrew Scollick, and Martin Tubb. The formal start date of employment for all three individuals is September 27, 2010. Unlike Rubando and the relator, Mr. Tubb was eventually placed on CSG's payroll; however, in December 2010, Mr. Tubb left CSG's employ in less than favorable terms and had no intention of ever returning to work for CSG or the defendants. In essence, Mr. Tubb leaving CSG's employ was final and there was no expectation on the part of CSG or the defendants that he would ever return.

134. Mr. Tubb was employed by the defendants between September and December

2010. Following Mr. Tubb's departure both the CSG and Citibuilders response to solicitations continued to list Tubb as the site supervisor or other site management position on the proposals submitted, and did so in at least 50 separate responses to VA contract solicitations. For example, in VA-255-11-RP-0378 (Kansas City, MO) (Women's Health and Privacy Corrections) was submitted on June 13, 2011, listing Mr. Tubb as the proposed "Site Superintendent/Quality Control Officer" knowing that Mr. Tubb was unwilling to work for CSG.

135. Defendants OST, CB, Parekh, Narula and Madan knew that following Tubb's departure that the continued submission of Mr. Tubb's name constituted a material misrepresentation to the government that was undertaken for the purpose of obtaining government contracts under false pretenses.

136. In furtherance of the CSG conspiracy CSG also knowingly submitted Mr. Tubb's name as a proposed site manager when he was already functioning as such on an existing awarded contract. For example, Mr. Tubb was selected as the site supervisor for Solicitation No. VA-256-10-IB-0291 (Biloxi, MS), which was awarded on September 17, 2010. However, right before Thanksgiving 2010, Parekh falsely stated to Mark Wesson, the VA contracting officer in Biloxi, and to the Contract Officer's Technical Representative, Brandon O'Neal, that Mr. Tubb had experienced a "family emergency" requiring him to leave the project. In fact, CSG had identified Mr. Tubb as the site supervisor in a separate VA contract, Solicitation No. VA-258-10-RA-0191 (Albuquerque, New Mexico), and he was dispatched to that project after in late November 2010.

137. CSG, CB, and OST, by and through Parekh, Narula and Madan, knowingly submitted a false bid on Solicitation No. VA-255-10-RP-0476 (Wichita, KS) in September 2010 by listing Tubb as the "Safety Compliance" project officer, a role Defendants knew Tubb would

never fill, and, in fact, did not fill after the contract was awarded.

138. Mr. David Rubando is falsely identified as a CSG employee on all bid proposals submitted by and awarded to CSG. This is a materially false statement made in violation of the False Claims Act. The CSG conspirators, including CB, OST, Parekh, Narula and Madan, knew that at all times Mr. Rubando worked for and was exclusively on the CB payrolls.

139. For example, with respect to bid proposals on VA-255-10-RP-0476 and VA-244-10-RP-0390, David Rubando is claimed to have been employed as the Overall Project Manager of CSG for the past 1.5 years. Both statements are false as Mr. Rubando was never employed by CSG and because he was not hired even by CB until September 2010. Mr. Rubando remained exclusively employed by CB until he left the company in or about December 2013.

140. CB and OST, through the actions of Parekh, Narula, and Madan, knowingly and falsely stated when pursuing government contracts that the Relator, Andrew Scollick, was an employee of CSG. They knew that the Relator was employed by CB and thereafter by Citibuilders. The claim that the Relator was employed by CSG is a material false statement submitted to the government for the purposes of securing government contracts.

**The Citibuilders Conspiracy**

141. Melvin Goodweather is a veteran of the United States Air Force who left the Air Force to become registered corporate lobbyist. Goodweather is an attorney whose past work legal work with the Air Force and private sector provided him was a background in government contracting. Goodweather qualifies as a service disabled veteran.

142. Defendant Parekh entered a separate conspiracy with Melvin Goodweather to utilize Goodweather's status as a disabled veteran to establish a LLC for the sole purpose of obtaining SDVOSB set aside contracts.

143. Goodweather engaged in overt acts in furtherance of the conspiracy. Such overt acts include Goodweather forming a LLC known as Citibuilders Solutions Group, LLC ("Citibuilders"); establishing himself as its sole owner, President, and CEO of that entity knowing that he would never function in those capacities; establishing a bank account in the name of Citibuilders knowing that control of the back account would be provided to Parekh; provided documentation of his service disabled veteran status so that Parekh could obtain SDVOSB government contracts; and executing bonding agreements so as to provide Parekh with the bonding needed to carry out the fraud scheme.

144. Goodweather is and has always been a signatory on the Citibuilders' bank account.

145. Goodweather continues to hold himself out as the owner, President, and CEO of Citibuilders and has withdrawn money from the Citibuilders bank account knowing that those funds were obtained through fraud.

146. Citibuilders was certified and registered in the VIP Database, CCR, and ORCA as a SDVOSB. Upon information and belief, Goodweather knew or reasonably should have known that such certifications were falsely obtained.

147. Lacking knowledge of the construction business and having no prior experience managing a construction project, Goodweather necessarily handed day-to-day operation and control of Citibuilders to Parekh.

148. Goodweather knew or reasonably should have known that turning control of Citibuilders over to Parekh made the SDVOSB claim included in each contract proposal submitted to the VA materially false.

149. Goodweather understood that he would be obtain payments and, upon information

and belief, did obtain payment, in exchange for allowing the Citibuilders LLC to be established, for agreeing to claim at the time of formation that he was the true President, CEO, and owner of that entity, for providing Parekh with his service disabled credential and for turning control and dominion over Citibuilders to Parekh so that SDVOSB contracts could be obtained in the name of Citibuilders.

150. Goodweather knowingly established Parekh as the de facto President, CEO, and owner of Citibuilders for using Goodweather's disabled veteran status to obtain SDVOSB government contracts.

151. Goodweather never intended to engage in oversight and management of Citibuidlers. He reasonably knew from the outset that he was being identified as that entity's President, CEO, and sole owner of Citibuilders so that Parekh could use that credential to obtain SDVOSB contracts; he reasonably knew from the outset that he would never function as the President, CEO, or owner of Citibuilders; that he reasonably knew from the outset that Citibuilders was created so that Parekh could obtain SDVOSB contracts from the government; he reasonably knew that by providing proof of his service disabled veteran status was done to allow Citibuilders to obtain SDVOSB government contracting funds and that millions of dollars of SDVOSB contracting funds were deposited into the Citibuilder's bank account.

152. Goodweather understood that by retaining legal ownership of Citibuilders and retaining his position as president and CEO of company that he was responsible for the government contracting activity engaged in by Citibuilders and was responsible for the proper reporting of Citibuilders' income and profits.

153. Goodweather direct participation in the Citibuilders conspiracy included the overt act of establishing Citibuilders LLC, and providing Parekh with proof of his disabled veteran

status.

154. Goodweather reasonably understood that Citibuilders was established for the purpose of obtaining SDVOSB set aside contracts and that Goodweather's service disabled status would be used for that purpose.

155. Goodweather's access to the Citibuilders bank account provided him with full and complete knowledge of the millions of dollars in VA government contracting funds that were deposited into the Citibuilders bank account.

156. Between 2012 and 2014, Citibuilders obtained at over $6 million in set aside SDVOSB funds from the federal government. A listing of Citibuilders' fraudulently awarded contracts known to have been awarded between 2012 and 2014 are as follows:

| ***Citibuilders Solutions Group, LLC*** | **Date of Award** | **Original price** | **Final price** |
|---|---|---|---|
| Program Source: 14-4556<br>Department/Agency: Department of the Interior: Geological Survey<br>Product/Service: Z1AA: MAINTENANCE OF OFFICE BUILDINGS<br>Description: MILL&PAVE PARKING LOTS&ROAD<br>Herndon VA- Mill and Pave Parking Lots and Road- ING12PX01800 | 9/13/12 | $128,741.00 | $135,705.00 |
| Solicitation Number: VA246-14-B-0071<br>Agency: Department of Veterans Affairs<br>Location: Salisbury NC VAMC<br>Title: Replacement of Windows Stationwide<br>Contract Number: VA24614C0033 | 6/30/14 | $2,144,000.00 | $2,144,000.00 |
| Solicitation Number: VA244-12-B-1357<br>Agency: Department of Veterans Affairs<br>Location: Philadelphia PA VAMC<br>Renovate Laboratory and Ac 19<br>Contract Number: VA24412C0529 | 9/27/12 | $1,777,000.00 | $1,790,568.00 |

| | | | |
|---|---|---|---|
| Solicitation Number: VA24612B2836<br>Agency: Department of Veterans Affairs<br>Office: Salisbury VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Salisbury NC- Building 21 Basement Improvements<br>Contract Number: VA24612C0126 | 9/24/12 | $279,000.00 | $279,000.00 |
| PIID/MOD: VA786A12C0082 / 0<br>Program Source: 36-0129<br>Department/Agency: Department of Veterans Affairs<br>Product/Service: Y1PZ: CONSTRUCTION OF OTHER NON-BUILDING FACILITIES<br>Richmond VA- Remove Underground Service Tank<br>Contract Number: VA786A12C0082 | 9/26/12 | $23,005.00 | $23,005.00 |
| PIID/MOD: VA24612C0125 / 0<br>Program Source: 36-0162<br>Department/Agency: Department of Veterans Affairs<br>Product/Service: Z1DA: MAINTENANCE OF HOSPITALS AND INFIRMARIES<br>Description: TUNNEL RENOVATIONS<br>Salisbury NC- Tunnel Renovations<br>Contract Number VA24612C0125 | 9/26/12 | $278,384.00 | $306,338.00 |
| Solicitation Number: VA25012B0639<br>Agency: Department of Veterans Affairs<br>Office: Brecksville (Cleveland) VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Cleveland OH - Renovate Dietetics Admin Space Project 541-12-113<br>Contract No. VA25012C0107 | 9/28/12 | $627,000.00 | $650,947.00 |

| | | | |
|---|---|---|---|
| RECONSTRUCT/EXPAND SOUTH PARKING LOT<br>Solicitation Number: VA26313B1756<br>Agency: Department of Veterans Affairs<br>Office: Fargo VAMROC<br>Location: Department of Veterans Affairs Medical and Regional Office Center<br>Fargo ND- Reconstruct and Expand South parking Lot-<br>Contract No. VA26313C0153 | 6/26/13 | $447,000.00 | $664,600.00 |
| Solicitation Number: VA24413Q0801<br>Agency: Department of Veterans Affairs<br>Office: Erie VAMC<br>Location: Department of Veterans Affairs Medical Center<br>Erie PA- Replace Canteen Floor<br>Contract Number: VA24413C0359 | 7/19/13 | $72,000.00 | $88,540.00 |
| | | | |
| ***Citibuilders Solutions Group- Total Revenue to Date 7/29/2014*** | | | ***$6,082,703.00*** |

157. Goodweather, as owner, President, and CEO of Citibuilders, controlled the allocation of company profits and he permitted and otherwise allowed such profits to be diverted to Parekh and CB.

158. Upon information and belief, after knowing that the deposits made into the Citibuilders bank account were obtained from payments made against SDVOSB contracts that were obtained through fraud, Goodweather purposefully diverted large cash payments from the Citibuilders' bank account into a private account under his personal control.

159. Upon information and belief, Goodweather knew (or reasonably should have known) that Citibuilders was soliciting SDVOSB contracts.

160. Upon information and belief, Goodweather knew or reasonably should have known that the proposals Citibuilders submitted to the VA were materially false because they

alleged past performance on the part of Citibuilders that did not exist.

161. Goodweather knew or reasonably should have known that Citibuilders's responses to VA solicitations were false because they claimed that Citibuilders qualified as a SDVOSB.

162. Parekh knew that the Citibuilders contracting actions were materially false because they:

a. Falsely certified service-disabled veteran status;

b. Falsified past performance experience;

c. Hid that Parekh was in control of Citibuilders;

d. Hid that CB employees were claimed to be employed by Citibuilders;

e. Made material false statements about the knowledge and experience of Citibuilders employees;

f. Falsified OSHA certifications for certain employees; and

g. Falsified the number of employees who were ready and available to staff a project.

163. The fraud knowingly committed in the name of Citibuilders is ongoing and continuous.

**Participation of the Bonding Defendants**

164. Bonds were issued on the Citibuilders SDVOSB construction contracts by Hanover Insurance Company and Hudson Insurance Company through their agent and attorney-in-fact Schendel, Centennial. Together these entities are referred to as the "Bonding Defendants."

165. Pursuant to the Miller Act, (40 U.S.C. §3131), contractors who bid on government construction contracts are required to post bid bonds, performance bonds and

payment bonds.

166. A "bid bond" is required to ensure that a contractor will in fact undertake the contract if its bid is accepted; a "performance bond" is a guarantee that the contractor will complete the project in accordance with the specifications set forth in the contract; and the "payment bond" ensures that those who furnish labor and materials for the project will be paid.

167. The Miller Act requires performance bonds for the protection of thegovernment. The construction contract cannot be awarded and cannot commence unless the required bonding is in place.

168. Federal acquisition regulations ("FAR") Subpart 28.2 requires that the surety company hold a certificate of authority from the Department of the Treasury.

169. 31 CFR Part 223 sets forth the financial information the surety must provide in order to be issued a certificate of authority.

170. Federal acquisition regulations specify that bid bonds are to be submitted on Standard Form 24, payment bonds on Standard Form 25, and performance bonds on Standard Form 25A. The failure to supply proof on bonding is fatal to a contractor's ability to bid on or be awarded a construction contract.

171. Surety bonds differ from insurance in that the issuer of the bond is to be indemnified and reimbursed for any loss, fees, or other expenses incurred on behalf of a contractor.

172. Surety bonding is subject to underwriting.

173. The key concepts to surety underwriting are referred to as the "three Cs"--Character, Capacity and Capital. Under the three Cs, underwriting activity will focus on an evaluation of the contractor's manpower, expertise, past experience, net worth, cash flow,

assets, income, work history, banking relationships and the nature of the projects to be bonded.

174. Obtaining construction bonding is a difficult undertaking for the contractor. The fact that bonding was obtained by a contractor provides a government contracting officer with reasonable assurances that the contractor's structural organization and financial ability can satisfy the obligations set forth in the construction contract.

175. Centennial, by and through Michael E. Schendel, Debra L. Stewart, Catherine M. Mathews, Belinda M. Ferclot and/or Anthony J. Pung, were the lawful agents and the attorney-in-fact for Hanover Insurance Company and Hudson Insurance Company.

176. As part of the underwriting process, Schendel and other agents of the Bonding Defendants toured OST's offices located at 2001 M Street, NW, Washington, D.C., for the purpose of ascertaining the organizational structure, history, and financial capacity of CSG. Schendel had an existing business relationship with Parekh and, upon information and belief, already had a deep understanding of the assets and capabilities CB possessed.

177. Because of the on-site tour of OST's offices, the Bonding Defendants necessarily understood that CSG was a shell company dependent on the resources and capabilities and capital of CB and OST and the experience and knowledge and financial backing of Parekh, Narula, and Madan.

178. The underwriting and due diligence engaged in by the Bonding Defendants would reasonably have revealed that CSG did not possess the necessary construction history or financial capabilities to carry out the scope of the contracting activity ultimately undertaken in the name of CSG.

179. The Bonding Defendants' due diligence and underwriting reasonably led to the conclusion that OST, CSG, and CB Construction shared common ownership.

180. The Bonding Defendants' due diligence and underwriting reasonably led to the conclusion that Parekh, Narula, and Madan exerted dominance and control over CSG.

181. The Bonding Defendants' due diligence and underwriting reasonably led to the conclusion that Gogia lacked the skill, knowledge, resources and past performance to engage in the scope of contracting activity undertaken by the CSG conspirators.

182. The Bonding Defendants' due diligence and underwriting reasonably led to the conclusion that CSG was not a service-disabled small business operating out of Harrisonburg, Virginia.

183. The Bonding Defendants would have reasonably concluded that Parekh, Narula, and Madan exercised domination and control and ownership over CSG are such conclusion was manifest in Bonding Defendants' insistence that OST and CB had to acknowledge common ownership of CSG and had to agree to indemnify the Bonding Defendants for any losses sustained on bonds issued against any contracts issued in the name of CSG.

184. The Bonding Defendants required Gogia to execute a notarized agreement on behalf of CSG confirming that OST, CB, and CSG were "materially interested through common ownership" and "authorizes, affirms, ratifies and approves the acts" OST and CB engaged in on its behalf.

185. The Bonding Defendants required Narula to execute on behalf of OST a notarized agreement confirming that OST, CB, and CSG were "materially interested through common ownership" and "authorizes, affirms, ratifies and approves the acts" of the other entities.

186. The Bonding Defendants forced Parekh to execute on behalf of CB a notarized agreement confirming that OST, CB, and CSG were "materially interested through common ownership" and "authorizes, affirms, ratifies and approves the acts" of the other entities.

187. The Bonding Defendants further required Narula and his wife to separately agree to personally indemnify the bonding defendants in the amount of $1,000,000 for any contracting activity engaged in by CSG.

188. The Bonding Defendants issued a single bonding agreement that extended to OST, CSG, and CB.

189. With the bonding agreement in place, the CSG conspirators commenced the process of bidding on SDVOSB set aside contracts without revealing to the government material facts related to the true control and ownership of CSG, or that OST, Narula, Parekh and Madan exercised control over CSG in violation of the government's contracting requirements for the contacts at issue herein.

190. The Bonding Defendants reviewed every SDVOSB contracting action pursued in the name of CSG and issued bonding against all of them.

191. Each and every time a bond was issued against a contract executed in the name of CSG the Bonding Defendants reasonably understood that CSG was nothing more than a shell company, that CSG did not operate out of Harrisonburg, VA, that the contract proposal originated out of OST's Washington, D.C. offices, that the execution of the contract would be carried out under the direction of Parekh, Narula, and Madan, that day-to-day management of that contracting action would be done by Parekh, that financing necessary to carry out the contract would be provided by OST, CB, Parekh, Narula and Madan, that Gogia did not have the knowledge, skill, background or financial resources to undertake the contracting actions CSG was submitting to the VA. In sum and substance, the Bonding Defendants would have known that the proposals submitted in the name of CSG in furtherance of the CSG conspiracy knowingly misled the government as to the true ownership and control over CSG and that CSG

did not qualify for SDVOSB status.

192. That the bonding extended to a hundred of bids submitted in the name of CSG and extended over a period of multiple years meant that the Bonding Defendants engaged in due diligence and underwriting activity and multiple occasions. An example of the multiple evaluations undertaken by the Insurance Defendants is contained in a January 13, 2012, email issued by Centennial to Madan, Narula, Parekh and Gogia reconfirming the Insurance Defendants' conclusion that CSG remained unable to "stand on their own merits for a bond" and that CSG's bonding was "based on OST's financial support" and remained dependent on "written indemnity" from OST. In other words, the Bonding Defendants knew that OST, in addition to the other Defendants involved in the CSG conspiracy, exercised financial control over CSG.

193. But for the actions of Bonding Defendants, CSG could not have bid on or been awarded the SDVOSB construction contracts because CSG would not have met the government's material conditions to award those contracts. Had the government known the material information about the financial ownership and control over CSG by the other CSG conspiracy defendants, including OST, the government would not have awarded the contracts to CSG and the government would not have paid any of the false claims made or caused to be made pursuant to the CSG contracts.

194. The Citibuilders conspiracy also could not have taken place without bonding. The underwriting and due diligence by the Bonding Defendants to provide bonding to Citibuilders would have revealed that Goodweather was not in control of that entity and that Citibuilders constitutes a separate shell company Parekh established for the purpose of obtaining SDVOSB contracts.

195. But for the actions of the Bonding Defendants, Citibuilders could not have bid on or been awarded its SDVOSB construction contracts because Citibuilders would not have met the government's material conditions to award those contracts. Had the government known the material information about the financial ownership and control over Citibuilders by the other Defendants, including OST, the government would not have awarded the contracts to Citibuilders and the government would not have paid any of the false claims made or caused to be made pursuant to the Citibuilders contracts.

196. The Bonding Defendants sought and obtained financial gain from the fraud CSG and Citibuilders carried out. Under the Miller Act, bonding submitted in connection with any of the CSG or Citibuilders contracts represented steady cash flow derived from the millions of dollars in bonds written against the millions of dollars in SDVOSB contracts awarded to CSG and Citibuilders. Furthermore, the Bonding Defendants utilized its underwriting capabilities to knowingly extracted indemnification agreements from CSG and Citibuilders conspirators.

197. The Bonding Defendants underwriting capacity led them to believe they were inoculated against any loss should the scheme unravel. The steady flow of income and the indemnification protections provide ample motivation to participate in the scheme that included supplying CSG and Citibuilders bonding for all their SDVOSB construction contracts.

198. Because of the foregoing factual allegations, the Bonding Defendants were willing participants in the CSG conspiracy and Citibuilders conspiracy to commit the fraud CSG and Citibuilders fraud schemes. In fact, the Bonding Defendants facilitated these fraud schemes by obtaining facts that the Bonding Defendants knew or should have known violated the government's contracting requirements, but the Bonding Defendants not only concealed those facts from the government, they also issued surety bonds to CSG and Citibuilders, which gave

the misleading appearance that CSG and Citibuilders were qualified to bid on these SDVOSB construction contracts. The Bonding Defendants also materially benefitted because of their participation in the scheme. Had the government known the facts known by the Bonding Defendants about the true ownership and control over CSG and Citibuilders, the government would not have awarded CSG and Citibuilders these contracts and the government would not have paid these claims. Accordingly, the Bonding Defendants knowingly participated in the schemes and they also knowingly caused CSG and Citibuilders to submit false bids and false claims to the government on the SDVOSB construction contracts.

**The KCGI Fraud Scheme**

199. In or about 2010, OST, Narula, Parekh, and Madan knowingly defrauded the government by seeking Small Business Administration ("SBA") Section 8(a) set aside contracts and/or service disabled contracts extending bonding access to a failing economically disadvantaged corporate entity known as KCGI.

200. To qualify a business must be owned by socially or economically disadvantaged individuals, in business for at least two years with the owners having a net worth of under $250,000.

201. The scheme to defraud the government was discussed in a "Teaming Arrangement" memo was prepared by Parekh and shared with Narula and Madan. The memo devised a plan for OST to gain a 60% stake in any SDVOSB contracts KVGI could obtain and a 40% share of the Section 8(a) contract profits.

202. On or about August 17, 2010, OST, through the hands of Narula, entered into an indemnification agreement with Merchants Bonding Company to bond the set aside contracts obtained by KGCI.

203. Parekh was involved with KCGI contracting activity. He possessed a copy of "Teaming Arrangement" document.

204. Parekh flew to Boston to assist with price out the KCGI contracts and, upon information and belief, helped oversee KCGI projects.

205. KCGI, Guatam Chitnis, Anita Chitnis, OST and Narula teamed together and conspired with one another to seek and obtain 8(a) set aside contracts by fraudulently concealing OST's and Narula's involvement.

206. Narula and OST provided indemnification on KCGI 8(a) contracts to gain a share of 8(a) contract profits that including but may not be limited to the following:

| ***KGCI*** | **Contract Award Date** | **Original Price** | **Final Price** |
|---|---|---|---|
| Recipient: KGCI INC<br>999 BROADWAY STE 302, SAUGUS, Massachusetts<br>Program Source: 14-1039<br>Department/Agency: Department of the Interior: National Park Service<br>Product/Service: Z199: MAINT-REP-ALT/MISC BLDGS<br>Description: BOST 16306 DRYDOCK AND REHABILITATE HISTORIC SHIP<br><br>Boston MA- Drydock and Rehabilitate historic ship USS Cassin Young Boston National Historic Park-INPC2011100224 (Awarded 6/1/2010) | 6/1/10 | $3,406,186.00 | $2,708,311.00 |

| | | | |
|---|---|---|---|
| Recipient: KGCI INC<br>999 BROADWAY STE 302, SAUGUS, Massachusetts<br>Program Source: 14-1036<br>Department/Agency: Department of the Interior: National Park Service<br>Product/Service: C119: OTHER BUILDINGS<br>Description: EAGLE CONDITION SURVEY, FORT JAY, GOVERNOR'S ISLAN<br><br>Staton Island NY- Eagle Condition Survey- Governors National Monument- Construction of Scaffolding, Condition Survey and Masonry Probes- INPC1766100050 (Awarded 9/18/2010) | 9/18/10 | $187,250.00 | $189,392.00 |
| Boston MA- Improvements Building 5 and Quarters B, Boston National Historic Park, Boston MA- C1720100416 (Awarded 9/24/2010) | 9/24/10 | $591,603.00 | $717,387.00 |
| | | | |
| ***KGCI Total Revenue to Date*** | | | ***$3,615,090.00*** |

207. Merchants Bonding Company, who provided bonding on the KCGI contracts, filed claim against OST as the indemnifier of those contracts.

208. A pattern of bonding manipulation on government set aside contracts through the use of indemnification agreements exists.

**COUNT I**

**VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(A)**
**(Submitting or Causing to Be Submitted False or Fraudulent Claims to the United States)**

209. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

210. In violation of 31 U.S.C. § 3729(a)(1)(A), Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Government.

211. Defendants obtained service-disabled veteran-owned small business ("SDVOSB"), and/or Section 8(a) and/or HUBzone set-aside contracts through fraudulent means and false certifications.

212. The fraudulent contracting activity by Defendants was done in the name of CSG, Citibuilders, and KGCI and other unknown co-conspirators.

213. By virtue of the false statements, false certifications, and fraudulent conduct described herein, Defendants knowingly made, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly made or caused to be made false and fraudulent statements, and/or created false records, to obtain contracts through fraudulent means and to get a false and fraudulent claim against such contracts paid.

214. Unaware of the false and fraudulent nature of the bids and technical proposals, the United States – in reliance on the claims and certifications submitted therewith – awarded contracts to CSG, Citibuilders, and KGCI, respectively, and the government was damaged thereby. The amount of damages would include the total sum paid out or otherwise disbursed against each contract the Defendants obtained based on false claims of services-disabled, and/or veteran-owned small business and/or HUBZone and/or Section 8(a) status, as well as every contract and claim that included knowingly false and material statements.

215. Defendants' false statements and certifications, which included claims that CSG or Citibuilders was a services-disabled and/or veteran-owned small business and/or Hub-Zone entity diverted government funds intended to be provided and which by law could only be provided to small businesses and/or service-disabled veteran-owned and/or entities located in a Hub-Zone.

216. Defendants' false statements as to KCGI's Section 8(a) status diverted

government funds intended to be provided and which by law could only be provided to Section 8(a) qualified entities.

217. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

218. Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

219. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

220. Each separate submission of a fraudulent bid proposal or contract claim are subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000) per occurrence.

221. Defendants are jointly and severally liable for all damages.

222. Because of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

**COUNT II**

**VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(B)**

**(Causing to Be Made or Used False Records to Submit False or Fraudulent Claims to the United States or to Avoid Obligations)**

223. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

224. In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants knowingly made or used false records to submit false or fraudulent claims for payment or approval by the Government, or to avoid obligations to the Government. In violation of 31 U.S.C. § 3729(a)(1)(B), Defendants

knowingly made, used or caused to be made or used, the false records and statements described above to obtain payments from federal government agencies under government contracts, with knowledge they were false and/or with deliberate ignorance of their truth or falsity, and/or with reckless disregard for their truth or falsity.

225. Defendants obtained service-disabled veteran-owned small business ("SDVOSB"), and/or 8(a) and/or HUBzone set-aside contracts through fraudulent means, false certifications and by making or using false records. By the false statements, false records, false certifications and fraudulent conduct described herein, Defendants knowingly made, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly made or caused to be made false and fraudulent statements, and/or created false records, to obtain contracts through fraudulent means and to get a false and fraudulent claim against such contracts paid.

226. Unaware of the false and fraudulent nature of the bids and technical proposals, the United States – in reliance on the claims and certifications submitted therewith – awarded contracts to Defendants and was damaged thereby. The amount of damages would include the total sum paid out and disbursed on every contract the Defendants submitted or caused to be submitted that were awarded on behalf of the United States based on false claims of services-disabled, and/or veteran-owned small business and/or HUBZone and/or Section 8(a) status, or because of including materially false statements including false statements as to past performance.

227. Defendants' false statements, false records and false certifications claiming CSG or Citibuilders was a services-disabled, and/or veteran-owned small business and/or Hub-Zone entity diverted government funds intended to be provided and which by law could only be

provided to small businesses and/or service-disabled veteran-owned and/or entities located in a Hub-Zone.

228. Defendants' false statements as to KCGI's Section 8(a) status diverted government funds intended to be provided and which by law could only be provided to Section 8(a) qualified entities.

229. As a direct and proximate result of Defendants' fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

230. Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

231. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

232. Each such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

233. Defendants are jointly and severally liable for all damages.

234. Because of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

## COUNT III

### VIOLATIONS OF 31 U.S.C. § 3729(a)(1)(G)
### (Avoiding an Obligation Owed to the United States)

235. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

236. The bonding agreements were separate instruments entered between the United States government and although submitted with the contract, did separately obligate the Bonding

Defendants to compensate the government for losses sustained if the specifications found in the contract, including the specification that the construction activity be paid a service-disabled, veteran-owned small business entity.

237. The Bonding Defendants knew each time a payment was transmitted to CSG or Citibuilders against a bonded contract that a violation of the SDVOSB specification did occur and that the government suffered a loss in that amount.

238. In violation of 31 U.S.C. § 3729(a)(1)(G), the Bonding Defendants knowingly concealed and avoided an obligation to pay against the bonding agreement each time funds under the contract were not transmitted to service-disabled, veteran-owned small business entity. The Bonding Defendants thereby purposely of improperly avoided an obligation it owed to the United States of America. In carrying out these wrongful acts, Bonding Defendants have engaged in a protracted and continuing course and pattern of fraudulent conduct that deceived the United States into believing it was not owed this money.

## COUNT IV

**(Conspiracy to Violate the False Claims Act, 31 U.S.C. §3729(a)(1)(C))**

239. The allegations contained in the above paragraphs are hereby realleged as set forth fully above.

240. Defendants conspired with each other to commit the violations of 31 U.S.C. § 3729(a)(1) (A), (B), and (G) described above.

241. As described throughout this Complaint, all Defendants knew about the scheme to defraud the United States by making false records, statements and certifications in violation of 31 U.S.C. § 3729(a)(1)(A), (B), and (G). By participating in this scheme, Defendants implicitly agreed to form a conspiracy to violate 31 U.S.C. § 3729(a)(1)(A), (B), (D) and (G).

242. Each of the Defendants committed one or more overt acts in furtherance of the conspiracy to violate 31 U.S.C. §§3729(a)(1)(A), (B), and (G), including but not limited to each time they made false records, false statements, and/or false certifications to conceal from the United States the Defendants' fraudulent scheme and false claims, and each time false claims were submitted or caused to be submitted to the United States.

243. Defendants conspired with each other to and did obtain service-disabled veteran-owned small business ("SDVOSB"), and/or 8(a) and/or HUBzone set-aside contracts through fraudulent means in violation of the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

244. The fraudulent contracting activity was done in the name of CSG and Citibuilders and KGCI and other unknown co-conspirators.

245. Defendants knowingly conspired with each other to make, or caused to be made, false and fraudulent claims for federal funds. Defendants, and each of them, knowingly conspired to make or caused to be made false and fraudulent statements, and/or created false records, to obtain contracts through fraudulent means and to get a false and fraudulent claim against such contracts paid.

246. Unaware of the Defendants' conspiracy or the false and fraudulent nature of the bids and technical proposals, the United States – in reliance on the claims and certifications submitted therewith – awarded contracts to Defendants and was damaged thereby. The amount of damages would include the total sum paid out and disbursed on each contract in which the Defendants submitted or caused to be submitted bid proposals that were awarded on behalf of the United States based on false claims of services-disabled, and/or veteran-owned small business and/or HUBZone and/or Section 8(a) status.

247. Defendants' false statements and certifications claiming CSG or Citibuilders was

a services-disabled, and/or veteran-owned small business and/or Hub-Zone entity, and all the other above-identified material false statements, including false statements as to past performance, diverted government funds intended to be provided and which by law could only be provided to small businesses and/or service-disabled veteran-owned and/or entities located in a Hub-Zone.

248. Defendants' false statements as to KCGI's 8(a) status diverted government funds intended to be provided and which by law could only be provided to 8(a) qualified entities.

249. As a direct and proximate result of Defendants' conspiracy resulting in fraudulent and/or illegal actions and pattern of fraudulent conduct, the United States has paid directly or indirectly numerous false claims that it would not otherwise have paid.

250. Defendants engaged in fraud in the inducement such that the United States was damaged in the entire amount of the contract funds awarded and paid to the Defendants.

251. Damages to the United States include, but are not limited to, three times the full value of all such fraudulent claims.

252. Each such fraudulent claim is also subject to a civil fine under the False Claims Act of five thousand five hundred to eleven thousand dollars ($5,500 – $11,000).

253. Defendants are jointly and severally liable for all damages.

254. Because of Defendants' violations of 31 U.S.C. § 3729, *et seq.,* the United States has suffered damages in an amount to be determined at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff-Relator, on behalf of himself and the United States, requests:

a. That the Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions,

including but not limited to the full value of all economic benefits obtained by Defendants through their illegal conduct, plus a civil penalty of between $5,500 and $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, for each violation of 31 U.S.C. § 3729;

b. That Plaintiff-Relator be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall be at least 15 percent but not more than 25 percent of the proceeds of the action or settlement of the claim if the United States intervenes, and not less than 25 percent nor more than 30 percent of the proceeds of the action or settlement of the claim if the United States does not intervene;

c. That Plaintiff-Relator be awarded all costs and expenses incurred, including reasonable attorneys' fees, with interest, including expert witness fees;

d. That Plaintiff-Relator and the United States be awarded pre-judgment interest on all monies awarded;

e. That Plaintiff-Relator be awarded an amount that the Court decides is reasonable, which shall be not less than 15% nor more than 30% of the proceeds awarded to the United States from any alternate remedies under the False Claims Act, 31 U.S.C. §§ 3729(a)(1), 3730(c)(5), (d), including but not limited to proceeds from any related administrative, criminal, or civil actions, and the monetary value of any equitable relief, fines, restitution, or disgorgement to the United States and/or third parties;

f. That Plaintiff-Relator be granted all other relief provided for in the False Claims Act not specifically referenced above; and

g. That all appropriate equitable be awarded.

**JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a jury trial.

Respectfully submitted,

/s/ Michael D. Kohn
Michael D. Kohn
DC BAR # 425617
Email: mk@kkc.com

/s/ David K. Colapinto
David K. Colapinto
DC BAR # 416390
Email: dc@kkc.com

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007
Phone: 202-342-6980
Fax: 202-342-6984

Attorneys for Plaintiff-Relator

January 30, 2017