## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANDREW SCOLLICK,<br>*ex rel.* UNITED STATES OF AMERICA,<br><br>*Plaintiff-Relator,*<br><br>v.<br><br>VIJAY NARULA, *et al.*,<br><br>*Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 14-cv-1339 (RCL) |

### MEMORANDUM OPINION

Defendants Optimal Solutions and Technologies, Inc. ("OST, Inc."), Vijay Narula, and Ajay Madan (collectively "OST Defendants") move to dismiss plaintiff-relator's second amended complaint (ECF No. 298) for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Mot., ECF No. 301. Alternatively, OST Defendants move for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). *Id.* Because the pleadings have not yet closed, the Court will construe OST Defendants' motion as a Rule 12(b)(6) motion to dismiss. *See* Fed. R. Civ. P. 12(c). Upon consideration of both parties' submissions (ECF Nos. 301, 303 & 306) and the relevant legal standards, the Court will **DENY** OST Defendants' motion (ECF No. 301).

### I. BACKGROUND

#### A. Initial Complaint

In mid-2014, plaintiff-relator Andrew Scollick sued eighteen defendants for their alleged involvement in an elaborate and ongoing scheme to defraud the federal government. Compl., ECF No. 1. Specifically, he claimed that the defendants secured (or helped to secure) small-business

set-aside contracts for construction jobs by falsely representing their eligibility to bid on those contracts. *Id.*

This alleged scheme was perpetrated by an extensive cast of characters. The complaint lists the following defendants and their respective roles: (1) five business entities, three of which actually submitted fraudulent bids for set-aside contracts and two of which effectively controlled an entity that submitted bids, (2) the officers and owners who controlled those five entities, (3) a party who provided false information to the government about one of the entities that submitted bids, and (4) two companies that provided the surety bonds needed to obtain the set-aside contracts, those companies' insurance broker, and the insurance broker's president (collectively "bonding defendants"). Compl. ¶¶ 10–175.[1]

Relevant to the present motion, the three moving defendants are: (a) Optimal Solutions and Technologies, Inc. ("OST, Inc."), one of the entities that caused another defendant to submit fraudulent bids, (b) Ajay Madan, OST, Inc.'s Chief Operating Officer, and (c) Vijay Narula, OST, Inc.'s Chief Executive Officer. Compl. ¶¶ 11, 15 & 20. The Court will refer to these three defendants collectively as "OST Defendants."

In his complaint, plaintiff-relator brought four causes of action under the False Claims Act, 31 U.S.C. § 3729 *et seq.*, against all defendants. *See* Compl. ¶¶ 176–225. The relevant text of the False Claims Act reads as follows:

> (a) LIABILITY FOR CERTAIN ACTS.–
>> (1) IN GENERAL. – Subject to paragraph (2), any person who –
>>> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

---

[1] For a complete recounting of the allegations in plaintiff-relator's initial complaint, *see United States ex rel. Scollick v. Narula* (*Scollick I*), 215 F. Supp. 3d 26, 30–34 (D.D.C. 2016) (resolving motions to dismiss the initial complaint).

**(B)** knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

**(C)** conspires to commit a violation of subparagraph (A), (B), [or] (G);

. . .

**(G)** knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government,

> is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

Count I of the complaint alleged that the defendants knowingly presented or caused to be presented false or fraudulent claims to the government in violation of subsection (a)(1)(A) ("presentment claim"). Compl. ¶¶ 176–189. Count II alleged that the defendants knowingly made, used, or caused, a false record or statement material to a false or fraudulent claim in violation of subsection (a)(1)(B) ("false statement claim"). *Id.* at ¶¶ 190–201. Count III alleged that defendants knowingly avoided or decreased an obligation to the government in violation of subsection (a)(1)(G) ("reverse false claim"). *Id.* at ¶¶ 202–09. And Count IV alleged that the defendants conspired to violate the False Claims Act in violation of subsection (a)(1)(C) ("conspiracy claim"). *Id.* at ¶¶ 210–225. The government declined to intervene. ECF No. 6.

OST Defendants, along with eleven others, moved to dismiss plaintiff-relator's complaint. *Scollick I*, 215 F. Supp. 3d at 30. The Court found that "[p]laintiff-relator largely fail[ed] to state claims against the defendants who have filed motions to dismiss" and left only a sliver of the suit intact: it allowed plaintiff-relator to proceed on Counts I, II, and IV against three defendants, including Madan and Narula. *Id.* at 36. Among other flaws, the Court found that plaintiff-relator

failed to "sufficiently allege facts showing that the alter ego doctrine applies" to hold the officers and owners personally liable for the acts of the business entities. *Id.* at 37.

## B. Amended Complaint

In response to the Court's ruling dismissing parts of his complaint, plaintiff-relator moved to amend his complaint to cure the pleading deficiencies identified by the Court. ECF No. 131. He sought to add factual allegations establishing liability for the owners and officers in their personal capacities, omit certain defendants whose claims were dismissed, and limit the reverse false claim (Count III) to the bonding defendants. ECF No. 131-1. The proposed amended complaint did not add any new counts, nor did it add any new defendants. *See id.*

OST Defendants opposed plaintiff-relator's motion, arguing that any amendment would be futile. ECF No. 138; *United States ex rel. Scollick v. Narula* (*Scollick II*), 14-cv-1339, 2017 WL 3268857, at *2 (D.D.C. July 31, 2017). The Court disagreed. *Scollick II*, 2017 WL 3268857, at *17. It granted in part and denied in part plaintiff-relator's request, finding that plaintiff-relator "largely cured the pleading deficiencies previously identified by this Court." *Id.* Relevant to the present motion, the Court allowed plaintiff-relator to proceed against OST Defendants on the presentment claim (Count I), false statement claim (Count II), and conspiracy claim (Count IV). *Id.* at *18.

The amended complaint lodges the following accusations against OST Defendants: OST, Inc. is a Washington, D.C. corporation. Am. Compl., ECF No. 169, at ¶ 9. Ajay Madan is the Chief Operating Officer of OST, Inc. and Vijay Narula is OST, Inc.'s Chief Executive Officer. *Id.* at ¶¶ 13 & 17. Along with Neil Parekh (the president of a construction company) and Amar Gogia (a relative of Madan), Madan and Narula formed a new limited liability company: Centurion Solutions Group, LLC ("CSG"). *Id.* at ¶¶ 14, 15 & 36.

4

After forming CSG, defendants Madan, Narula, Parekh, and Gogia fraudulently registered CSG as a service-disabled, veteran-owned small business ("SDVOSB"). *Id.* at ¶¶ 33–36. For an LLC to qualify as an SDVOSB, "it must be owned, controlled, and under day-to-day management by a service-disabled qualified individual." *Id.* at ¶ 26 (citing 13 C.F.R. §§ 125.9(a), 125.10(a)). Additionally, a "service-disabled veteran must [ ] hold the highest officer position" and have the managerial experience necessary to run the business. *Id.* at ¶ 27.

Yet defendants Narula, Parekh, and Madan were not disabled veterans. *Id.* at ¶ 33. And although defendant Gogia *was* a disabled veteran, "he was never in control of CSG." *Id.* at ¶¶ 35 & 38. Instead, Gogia "functioned as a local CSG cite manager" and was at all times "subservient to Narula, Madan, and Parekh." *Id.* at ¶ 38. For example, on May 31, 2011, Parekh emailed Gogia "threating to remove Gogia as the site supervisor of the CSG Wichita contract if Gogia's job performance did not improve." *Id.* at ¶ 60. Meanwhile, Madan, Narula, and Parekh carried out CSG's day-to-day business from OST Inc.'s headquarters, where Gogia did not even have an office. *Id.* at ¶ 54.

Nevertheless, together with Parekh and Gogia, Madan and Narula (on behalf of themselves and OST, Inc.) registered and certified CSG as an SDVOSB. *Id.* at ¶ 36. To do so, they "falsely assert[ed] that Gogia[ ] owned 100% of CSG and was in control of CSG's day-to-day business activity." *Id.* at ¶ 36. In reality, "CSG's majority ownership, operational and financial control and the distribution of CSG profits and resources were controlled by [Perekh], and Madan and Narula." *Id.* at ¶ 37.

Once OST Defendants falsely registered CSG as an SDVOSB, they started bidding on contracts reserved for SDVOSBs in CSG's name. *Id.* at ¶¶ 28–32. To do so, an OST, Inc. employee who reported to Narula was tasked with preparing and finalizing "the first fraudulent response to

a government contract solicitation made in the name of CSG." *Id.* at ¶ 40. Specifically, the bid was prepared in response to a "set aside contracting solicitation offered by the United States Department of Veteran Affairs" reserved for SDVOSBs. *Id.* OST Defendants' proposal, referred to as the "Halls & Walls solicitation response," contained several false statements, including the misrepresentation that CSG is an SDVOSB. *Id.* at ¶ 48(b). It also falsely represented CSG's past performance and experience in the construction business. *Id.* at ¶ 48(b), (d) & (g)–(i). After OST, Inc.'s senior management, including Narula, approved the Halls & Walls solicitation response, it was submitted "in the name of CSG on April 7, 2010." *Id.* at ¶ 40, 42 & 43.

After this initial bid, OST Defendants continued to submit "hundreds of responses to solicitations seeking SDVOSB[ ] contract awards" in CSG's name. *Id.* at ¶ 86. Each of these bids "were based off" of the Halls & Walls solicitation response and contained the same "false information" that OST Defendants included in that first bid. *Id.* at ¶ 41. As a result of those fraudulent bids, from August 24, 2010, until June 27, 2013, the Department of Veterans Affairs awarded CSG eighteen construction contracts totaling over $6.4 million. *Id.* at ¶ 86.

"Unaware of the false and fraudulent nature of the bids," the Department of Veterans Affairs "awarded contracts to CSG" and paid CSG's claims submitted under those contracts. *Id.* at ¶ 214. Yet had the government known of the fraudulent conduct, plaintiff-relator alleges, it would not have paid these false claims. *Id.* at ¶ 217. In fact, OST Defendants' "false statements . . . diverted government funds intended to be provided and which by law could only be provided to [SDVOSBs]." *Id.* at ¶ 215.

OST, Inc. moved to dismiss plaintiff-relator's amended complaint. ECF No. 189. It argued that plaintiff-relator failed to sufficiently allege *respondeat superior* liability and to state a claim for conspiracy under the False Claims Act. *Id.* at 3–8. The Court denied OST Inc.'s motion, finding

it to be a transparent attempt to relitigate the same issues the Court decided when it allowed plaintiff-relator to amend parts of his complaint. ECF No. 244. OST, Inc. subsequently answered the amended complaint, ECF No. 249, and the parties proceeded to discovery.

### C. Second Amended Complaint

Based on information that came to light in discovery, plaintiff-relator sought leave to add a new defendant to his complaint. ECF No. 273. The proposed second amended complaint did not add any new counts, nor did it add to or edit the allegations against existing defendants. *See* ECF No. 273-2. The Court granted plaintiff-relator's request. ECF No. 295. In so doing, it ordered that "no new answers are required to be filed in response to the Second Amended Complaint by Defendants who have previously filed an answer in this case and those Defendants may stand on their previously filed answers." *Id.*

Although OST Defendants could have rested on their answers to the amended complaint, ECF Nos. 190 & 249, they elected not to do so. Mot. at 3. Instead, they moved to dismiss the second amended complaint under Federal Rule of Civil Procedure 12(b)(6) or, alternatively, sought judgment on the pleadings under Rule 12(c). *Id.*

OST Defendants offer two arguments as to why dismissal (or judgment on the pleadings) is proper: First, they argue that the second amended complaint fails to meet the "materiality standard recently set" by the Supreme Court in *Universal Health Services, Inc. v. United States ex rel. Julio Escobar ("Escobar")*, 136 S. Ct. 1989 (2016). Mot. at 4–10. Based on their reading of *Escobar*, OST Defendants say that plaintiff-relator fails to state a claim because although he alleges that OST Defendants' fraudulent statements were material to CSG's *eligibility* to bid on SDVOSB set-aside contracts, he does not allege that those fraudulent statements were material to *the government's decision to pay* CSG for its work under those contracts. *Id.* at 7–9.

OST Defendants also argue that the Court should permit the United States Department of Veterans Affairs to decide whether CSG was eligible to bid on SDVOSB set-aside contracts. *Id.* at 10–12. This determination, they argue, is not within the province of this Court or a jury. *Id.* at 10. Plaintiff-relator opposed OST Defendants' motion, Resp., ECF No. 303, and OST Defendants replied, Reply, ECF No. 306. The motion is now ripe for consideration.

## II. LEGAL STANDARDS

As an initial matter, it is unclear whether OST Defendants bring the present motion as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a motion raising the defense of failure to state a claim brought under Rule 12(c), *see* Fed. R. Civ. P. 12(h)(2)(B), or a motion for judgment on the pleadings under Rule 12(c). *See* Mot. at 3. As the Federal Rules of Civil Procedure make clear, a defendant may raise the defense of failure to state a claim upon which relief can be granted in a Rule 12(b)(6) motion before answering the complaint, or in a Rule 12(c) motion for judgment on the pleadings after answering the complaint. *See* Fed. R. Civ. P. 12(h)(2)(B); *id.* r. 12(c). When a party uses a Rule 12(c) motion after the close of the pleadings to raise a Rule 12(b) defense, "courts apply the same standard applicable to the corresponding 12(b) motion." *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993). In this context, "Rule 12(c) is merely serving as an auxiliary or supplementary procedural device to determine the sufficiency of the case before proceeding any further." 5C Charles Alan Wright & Arthur R. Miller, 5C *Federal Practice & Procedure: Federal Rules of Civil Procedure* § 1367 (3d ed.).

Because the pleadings in this matter have not closed, the Court cannot construe the present motion as a motion for judgment on the pleadings under 12(c) or a motion using Rule 12(c) as a vehicle to raise the defense of failure to state a claim. *See* Fed. R. Civ. P. 12(c) (allowing a party

to move *after* the pleadings have closed). Though OST Defendants could have rested on their answers to the amended complaint, *see* ECF No. 295, they instead timely moved to dismiss plaintiff-relator's second amended complaint. *See* Second Am. Compl., ECF No. 298 (filed 9/8/2020); Mot. (filed 9/22/2020); Fed. R. Civ. P. 12(a)(1)(A)(i). By timely moving to dismiss, OST Defendants tolled the deadline to file an answer. *See* Fed. R. Civ. P. 12(a)(4)(A). And because OST Defendants will have fourteen days from the issuance of this Memorandum Opinion to answer the second amended complaint, the pleadings have not closed. *Id.*; *see* Fed. R. Civ. P. 7(a) (listing the pleadings allowed). Thus, the Court will construe OST Defendants' motion as a motion to dismiss for failure to state a claim brought under Rule 12(b)(6).

To survive OST Defendants' Rule 12(b)(6) motion to dismiss, plaintiff-relator's second amended complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the Court can reasonably infer from the factual content pleaded that the defendant is liable for the alleged misconduct. *Id.* Plausibility requires more than a "sheer possibility that the defendant has acted unlawfully" but does not require a "probability" that the defendant is in the wrong. *Id.* Though legal conclusions "can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679. For this reason, "'naked assertion[s]' devoid of 'further factual enhancement'" and "formulaic recitation[s] of the elements of a cause of action" will not survive a motion to dismiss. *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555 & 557).

Additionally, actions brought under the False Claims Act must satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *Escobar*, 136 S. Ct. at 2004 n.6. Under Rule 9(b), a party alleging fraud must "state with particularity the circumstances

constituting fraud or mistake." Fed. R. Civ. P. 9(b). This requires allegations of the "time, place, and content of the false misrepresentations," as well as "the fact misrepresented," and what was gained as a result of the fraud. *United States ex rel. Williams v. Martin-Baker Aircraft Co.* ("*Williams*"), 389 F.3d 1251, 1256 (D.C. Cir. 2004). Mental states including malice, intent, and knowledge, may be alleged generally. Fed. R. Civ. P. 9(b).

## III. ANALYSIS

### A. The "Law of the Case" Doctrine Does Not Govern the Court's Resolution of the Present Motion

Before addressing the merits of OST Defendants' Rule 12(b)(6) motion, the Court must briefly address a threshold issue raised by plaintiff-relator: whether the "law of the case" governs the Court's resolution of OST Defendants' motion. *See* Resp. 6–7. The "law of the case" doctrine is a prudential bar that directs courts not to revisit questions already decided in an earlier phase of the litigation absent extraordinary circumstances or new developments in the law. *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996); *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C. Cir. 1995). Issues already decided include "a court's explicit decisions, as well as those issues decided by necessary implication." *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987).

Plaintiff-relator argues that OST Defendants' present motion is foreclosed by this Court's prior rulings denying Madan and Narula's motion to dismiss the initial complaint, ECF No. 123, granting in part and denying in part plaintiff-relator's motion to amend the complaint, *Scollick II*, 2017 WL 3268857, at *17; and denying OST, Inc.'s motion to dismiss the amended complaint, ECF No. 244.[2] In those decisions, plaintiff-relator says, the Court "explicitly found that the

---

[2] Because OST Defendants argued that granting leave to amend would be futile, ECF No. 138 at 1, the Court's review of plaintiff-relator's motion to amend his complaint was "for practical purposes, identical

allegations [in plaintiff-relator's] pleadings sufficiently stated claims for relief under the [False Claims Act] against all the OST Defendants." Resp. at 6. And this finding, he argues, "necessarily includes the finding that the allegations met all requirements to state a claim under the [False Claims Act]." *Id.*

Plaintiff-relator's argument is based on a fundamental misunderstanding of what a court holds when it denies a motion to dismiss for failure to state a claim. In its rulings granting plaintiff-relator leave to amend the complaint and denying OST Defendants' motions to dismiss the complaint and amended complaint, the Court did not "necessarily" hold that plaintiff-relator's pleadings were flawless in all respects. Resp. at 6. Instead, the Court rejected the *specific legal theories* advanced by OST Defendants to attack the pleadings, none of which included the two legal theories raised in the present motion. *Compare* ECF Nos. 86-1, 138 & 189, *with* Mot. at 4–12. In other words, when a defendant moves to dismiss a complaint on legal theory A, courts do not take it upon themselves to evaluate the sufficiency of the pleadings under legal theories B, C, and D too. Though a court may sua sponte dismiss a complaint for failure to state a claim, it may do so only if it is "patently obvious" that the plaintiff cannot prevail on the facts alleged. *Baker v. Director, U.S. Parole Comm'n.*, 916 F.2d 725, 727 (D.C. Cir. 1990).

Plaintiff-relator's understanding of the "law of the case" doctrine also leads to an absurd result. Unlike the defenses listed in Rule 12(b)(2)–(5), the Rule 12(b)(6) defense of failure to state a claim upon which relief can be granted may be renewed at later stages in the litigation. *See* Fed. R. Civ. P. 12(h)(2)(A)–(C); *id.* r. 12(g)(2). Yet under plaintiff-relator's "law of the case" argument, if a court denies a Rule 12(b)(6) motion to dismiss for failure to state a claim and the defendant later renews that defense based on a new legal theory—either in a Rule 12(c) motion or at trial—

---

to review of a Rule 12(b)(6) dismissal based on the allegations in the amended complaint." *Scollick II*, 2017 WL 3268857, at *4 (quoting *In re Interbank Funding Corp. Sec. Litig.*, 629 F.3d 213, 216 (D.C. Cir. 2010)).

the defense would be foreclosed by the court's denial of the first motion. That cannot be so. If a court's denial of a motion to dismiss for failure to state a claim on one legal theory foreclosed all subsequent renewals of that same defense on other legal theories, why would Rule 12(h)(2) allow defendants to raise the defense more than once?

In sum, the Court's prior rulings in this case do not govern the resolution of the present motion. In the sections that follow, the Court will address each of OST Defendants' arguments as to why dismissal is proper. Ultimately, both fail.

## B. Plaintiff-Relator Need Not Plead Materiality as Set Forth in *Escobar* in His Claims Against OST Defendants

OST Defendants first argue that the second amended complaint does not meet the rigorous materiality standard set forth by the Supreme Court in *Escobar*. Mot. at 4–10. To contextualize *Escobar*, the Court must begin with the mechanics of the False Claims Act. As explained above, plaintiff-relator's second amended complaint brings three separate causes of action under the False Claims Act against OST Defendants: a presentment claim under subsection (a)(1)(A), a false statement claim under subsection (a)(1)(B), and a conspiracy claim under subsection (a)(1)(C). Second Am. Compl. ¶¶ 215–240 & 245–60. The text of those provisions reads as follows:

(a) LIABILITY FOR CERTAIN ACTS.–

(1) IN GENERAL. – Subject to paragraph (2), any person who –

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(C) conspires to commit a violation of subparagraph (A) [or] (B);

. . .

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000 . . . plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729.

Liability under subparagraph (a)(1)(A) requires proof that: (1) the defendant presented or caused to be presented a claim to the government, (2) the claim was false or fraudulent, and (3) the defendant knew the claim was false. *Scollick I*, 215 F. Supp. 3d at 35. Similarly, liability under subparagraph (a)(1)(B) requires proof that: (1) the defendant made, used, or caused to be made or used, a false record or statement to the government, (2) the record or statement was false or fraudulent, (3) the record or statement was material to a false or fraudulent claim, and (4) the defendant knew the record or statement was false. *Id.* Finally, liability for conspiring to violate the False Claims Act requires proof that: (1) an agreement existed to have false or fraudulent claims allowed or paid by the government, (2) that each alleged member of the conspiracy joined the agreement, and (3) that one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy. *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 889 (D.C. Cir. 2010).

Relevant to the present motion is one element common to all three causes of action: the requirement that there be a "false or fraudulent claim." 31 U.S.C. §§ 3728(a)(1)(A), (a)(1)(B) & (a)(1)(C). Though the False Claims Act does not define the words "false" or "fraudulent," courts recognize three ways that a claim can be false. *United States ex rel. McBride v. Halliburton Co.*, 848 F.3d 1027, 1031 (D.C. Cir. 2017). In the paradigmatic case, a claim is "false" if it includes "an incorrect description of goods or services provided" or a "request for reimbursement for goods or services never provided." *Id.* (quoting *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010)).

A claim can also be "false or fraudulent" if it is submitted pursuant to a contract that was "procured by fraud." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.* ("*Bettis*"),

13

393 F.3d 1321, 1326 (D.C. Cir. 2015). The Supreme Court recognized this theory of falsity, referred to as the "fraud in the inducement" theory, in *United States ex rel. Marcus v. Hess* ("*Marcus*"), 317 U.S. 537, 542–44 (1943). There, contractors procured government contracts by misrepresenting that they satisfied a non-collusive bidding requirement. *Marcus*, 317 U.S. at 542– 43. The Supreme Court held that the contractors presented a "fraudulent" claim to the government in violation of the False Claims Act because the "initial fraudulent action" (procuring the contract by fraud) "taint[ed]" all subsequent claims made under the contract. *Id.* at 543. Thus, under the fraud in the inducement of falsity, claims submitted pursuant to a contract procured by fraud are considered "false or fraudulent" even without "evidence that the claims were fraudulent in themselves." *Bettis*, 393 F.3d at 1326.

Most recently, in *Escobar*, the Supreme Court recognized a theory of falsity based on misleading half-truths. *See* 136 S. Ct. at 1995. There, the plaintiffs brought a presentment claim under the False Claims Act against a mental health facility that allegedly submitted Medicaid reimbursement claims without disclosing its noncompliance with regulations governing the licensing and qualifications of its practitioners. *Id.* at 1996–97. Before the district court, the plaintiffs argued that the mental health facility violated the False Claims Act under the "implied false certification" theory of falsity. *Id.* at 1997–98. According to "implied false certification" theory, a defendant "impliedly certifies compliance with all conditions of payment" when it submits a claim to the government. *Id.* at 1995. Thus, says the theory, if a claim "fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement," then "the defendant has made a misrepresentation that renders the claim 'false or fraudulent'" for purposes of the False Claims Act. *Id.*

The Supreme Court in *Escobar* confirmed that, under certain circumstances, the implied false certification theory can be a basis for liability under the False Claims Act. *Id.* Specifically, a claim is "false or fraudulent" when a defendant: (i) submits a claim for payment that makes specific representations about the goods or services provided, (ii) knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement, and (iii) knows that its noncompliance with that requirement is material to the government's decision to pay the defendant. *Id.* at 1995–96 & 2001.

Though it validated the implied false certification theory of falsity, the Supreme Court was careful to limit the theory's reach. It explained that because the False Claims Act is not an "'all-purpose antifraud statute' or a vehicle for punishing garden-variety breaches of contract or regulatory violations," the materiality standard required to show falsity under the implied false certification theory is "demanding." *Id.* at 2003 (quoting *Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 668 (2008)) (internal citation omitted). Thus, the fact that the government requires compliance with a statutory, regulatory, or contractual requirement as a *condition of payment* is not sufficient to show that noncompliance with that requirement is material. *Id.* Instead, the plaintiff must show something more. For example, "evidence that the defendant knows the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement" can show materiality. *Id.* Conversely, evidence that the government "regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated" and has not indicated a change in its position is strong evidence that the noncompliance is immaterial. *Id.* at 2003–04.

With this background, the Court now turns to OST Defendants' argument under *Escobar*. OST Defendants say that plaintiff-relator's second amended complaint should be dismissed

because it fails to meet the "materiality standard recently set by the Supreme Court in [*Escobar*]."

Mot. at 4. Although plaintiff-relator alleges that OST Defendants' misrepresentation of CSG as an

SDVOSB was material to CSG's *eligibility* to bid on SDVOSB set-aside contracts, they argue,

plaintiff-relator failed to allege that this misrepresentation was material to *the government's*

*decision to pay* CSG for its work under those contracts. *Id.* at 6.[3]

The problem with OST Defendants' argument is that *Escobar*'s materiality standard

applies *only* to False Claims Act suits alleging falsity under the implied false certification theory

of falsity. And plaintiff-relator does not plead falsity under that theory; he does not allege that bids

submitted by CSG contained *misleading half-truths*. Instead, plaintiff-relator alleges that OST

Defendants *blatantly lied* to the government by claiming that CSG was an SDVOSB when it was

not. Second Am. Compl. ¶ 49(a)–(i). In so alleging, plaintiff-relator pleads falsity under another

theory: fraud in the inducement. *See Bettis*, 393 F.3d at 1323. And by pleading falsity under the

fraud in the inducement theory, plaintiff-relator's allegations against OST Defendants fall outside

the ambit of *Escobar*.

---

[3] In support of this reading of *Escobar*, OST Defendants cite two opinions from the same case in the Western District of New York. Mot. at 4–7 (citing *United States v. Strock* (*Strock II*), No. 15-cv-0887, 2019 WL 4640687 (W.D.N.Y. Sept. 24, 2019); *United States v. Strock* (*Strock I*), No. 15-cv-0887, 2018 WL 647471 (W.D.N.Y. Jan. 31, 2018)). In those cases, like here, a False Claims Act plaintiff alleged that a construction business fraudulently represented itself as an SDVOSB to secure SDVOSB set-aside contracts. *Strock I*, 2018 WL 647471 at *3. The district court read *Escobar* as requiring the plaintiff to allege that the defendants' SDVOSB status was material to the government's *decision to pay* the defendants' claims, not just to the government's *decision to award* the defendants the SDVOSB contracts. *Strock II*, 2019 WL 647471, at *8. OST Defendants argue that this "critical distinction" set forth in *Escobar* and recognized by *Strock I & II* is fatal to plaintiff-relator's second amended complaint. Mot. at 6.

i. *Escobar*'s Materiality Requirement Does Not Apply to Claims Alleging Falsity
Under the Fraud in the Inducement Theory

Though the Court in *Escobar* does not explicitly say so, it is clear from the Court's discussion that the materiality standard set forth in *Escobar* does not apply to False Claims Act suits alleging falsity under the fraud in the inducement theory. As explained above, the Court in *Escobar* held that misleading half-truths can be "false or fraudulent" for purposes of the False Claims Act when a defendant: (i) submits a claim for payment that makes specific representations about the goods or services provided, (ii) knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement, and (iii) knows that its noncompliance with that requirement is material to the government's decision to pay the defendant. *Id.* at 1995–96 & 2001. Materiality, the Court held, requires a showing that the defendant's noncompliance with a statutory, regulatory, or contractual requirement is material to the government's decision to pay the defendant. *Id.* at 2003.

The Court grafted this demanding materiality standard onto the implied false certification theory for good reason. If a party could be liable under the False Claims Act for submitting a claim for payment without disclosing the party's noncompliance with *any* violation of a statutory, regulatory, or contractual requirement (even when its noncompliance had no effect on the government's decision to pay the party) the False Claims Act could be misused as a "vehicle for punishing garden-variety breaches of contract or regulatory violations." *Id.*[4]

---

[4] The Court in *Escobar* used the following example to illustrate the need for a demanding materiality requirement: say the government "contracts for health services and adds a requirement that contractors buy American-made staplers." 136 S. Ct. at 2004. Without a stringent materiality standard, "anyone who submits a claim for those services but fails to disclose its use of foreign staplers violates the False Claims Act." *Id.* "Likewise, if the Government required contractors to aver their compliance with the entire U.S. Code and Code of Federal Regulations," then without the requirement that the noncompliance be material *to the government's payment decision,* "failing to mention noncompliance with any of those requirements" could subject a defendant to False Claims Act liability. *Id.*

In the context of the fraud in the inducement theory of falsity, however, it would make no sense to require a plaintiff to plead that false statements were material to the government's decision to pay a claim. First, under the fraud in the inducement theory of falsity, the initial fraud in procuring the contract "taint[s]" all subsequent actions, including the defendant's submission of claims to the government for payment under that contract. *Marcus*, 317 U.S. at 543–44 ("[The contractors'] fraud did not spend itself with the execution of the contract. Its taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by [the government to the contractors].")." Thus, plaintiffs suing under the fraud in the inducement theory need only allege that false statements induced the government to *award the contract*, not also that those false statements were material to the government's *decision to pay the party under the contract*.

Furthermore, while requiring plaintiffs showing falsity under the implied false certification theory to meet a demanding "material to the payment decision" standard prevents an overly expansive application of the False Claims Act, *Escobar*, 136 S. Ct. at 2004, the fraud in the inducement theory already has a strict materiality requirement baked in. For a claim to be "false or fraudulent" under the fraud in the inducement theory, the contract must have been "procured by fraud." *Bettis*, 393 F.3d at 1326. In other words, a misrepresentation in the defendant's bid must have *caused* the government to award the defendant the contract. *See id.* And if a defendant secures a government contract through fraud, the only way the defendant can be paid for work performed under that contract is through that same fraud. *Cf. Marcus*, 317 U.S. at 543–44. So while a contractor's undisclosed noncompliance with a statutory, regulatory, or contractual requirement could be immaterial to the government's decision to pay that contractor, *see Escobar*, 136 S. Ct. at 2003, a fraudulent statement that secures a government contract *will always be material* to the

government's decision to pay the contractor under that agreement. *See Escobar*, 136 S. Ct. at 2002 (noting that "any understanding" of the concept of materiality "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation") (quoting 26 *Williston on Contracts* § 69:12 (4th ed.)).

In fact, the Court in *Escobar* recognized this when it cited *Marcus* for the proposition that materiality "cannot be found when noncompliance is minor or insubstantial." 136 S. Ct. at 2003 (citing *Marcus*, 317 U.S. at 543). In *Marcus*, it noted, "[t]he government's money would never have been placed in the joint fund for payment to [the contractors] had [the government's] agents known the bids were collusive." *Id.* (citing *Marcus*, 317 U.S. at 543). In other words, the fraudulent bids in *Marcus* were material to the government's payment of the claims because without those fraudulent bids, the government would not have awarded the contracts or paid the claims submitted under the contracts.

Perhaps OST Defendants read *Escobar* as doing away with the fraud in the inducement theory of falsity altogether. If that were the case, plaintiff-relator would have to plead falsity under some other theory, such as implied false certification. But *Escobar* did no such thing. To begin, *Escobar* did not explicitly overrule *Marcus*. And a "lower court must not presume Supreme Court precedent has been limited or overruled absent explicit indication." *United States v. Campbell*, 798 F. Supp. 2d 293, 303 (D.D.C. 2011) (citing *Tenet v. Doe*, 544 U.S. 1, 10 (2005)).

Even more tellingly, the Court in *Escobar explicitly recognized* that a party can be liable under the False Claims Act for securing a government contract by fraudulent means. *See* 136 S. Ct. at 2002. When the defendant-petitioner argued that "False Claims Act liability should be limited to undisclosed violations of *expressly designated* conditions of payment," the Court rejected that argument. 136 S. Ct. at 2002 (emphasis added). It noted that this standard for

materiality would create the "arbitrar[y]" result that "misrepresenting compliance with a requirement that the Government expressly identified as a condition of payment could expose a defendant to liability," whereas "misrepresenting compliance with a *condition of eligibility* to even participate in a federal program when submitting a claim would not." *Id.* (emphasis added). By refusing to shield parties who fraudulently procure government contracts from False Claims Act liability, the Supreme Court recognized the viability of the fraud in the inducement theory of falsity.

In sum, *Escobar* set forth a demanding materiality standard for plaintiffs who plead falsity under the implied false certification theory. Its materiality standard does not apply, however, when a plaintiff pleads falsity under the fraud in the inducement theory of falsity. For the reasons explained below, the allegations in plaintiff-relator's second amended complaint against OST Defendants plead falsity under the fraud in the inducement theory, not under the implied false certification theory. Thus, plaintiff-relator need not allege materiality as set forth in *Escobar*.

ii.  The Allegations in the Second Amended Complaint Against OST Defendants Adequately Plead Falsity Under the Fraud in the Inducement Theory

To plausibly plead the False Claims Act's falsity requirement based on the fraud in the inducement theory, a plaintiff must allege that the government was induced by or relied on a false statement when it awarded the defendant a contract. *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 47 (D.D.C. 2015) (citing *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 791 (4th Cir. 1999)); *accord Bettis*, 393 F.3d at 1326. As stated above, suits brought under the False Claims Act must satisfy the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). *Escobar*, 136 S. Ct. at 2004 n.6. Under Rule 9(b), a party alleging fraud must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). This

requires allegations of the "time, place, and content of the false misrepresentations," as well as "the fact misrepresented," and what was gained as a result of the fraud. *Williams*, 389 F.3d at 1256.

Plaintiff-relator's second amended complaint pleads with particularity that OST Defendants secured SDVOSB set-aside contracts in CSG's name by fraudulently claiming that CSG is an SDVOSB. Though plaintiff-relator asserts the bare legal conclusion that OST Defendants "engaged in fraud in the inducement," Second Am. Compl. ¶ 256, he also pleads the following, specific facts to support this statement. *See Iqbal*, 556 U.S. at 678.

First, plaintiff-relator alleges that OST Defendants fraudulently registered CSG as an SDVOSB. He states that for an LLC to qualify as an SDVOSB, "it must be owned, controlled, and under day-to-day management by a service-disabled qualified individual." Second Am. Compl. ¶ 27 (citing 13 C.F.R. §§ 125.9(a) & 125.10(a)). But CSG did not meet those requirements, as Narula, Madan, and Parekh were neither veterans nor disabled. *Id.* at ¶ 34. Though Gogia *was* a disabled veteran, *id.* at ¶ 36, "Gogia was never in control of CSG and was, at all times . . . subservient to Narula, Madan[,] and Parekh." *Id.* at ¶¶ 34, 36 & 39. For example, on May 31, 2011, Parekh emailed Gogia threatening to remove him as the site supervisor of the CSG Wichita contract if Gogia's job performance did not improve. *Id.* at ¶ 61. Additionally, "[d]efendants Narula, Madan, and Parekh controlled the likeness of Gogia's signature, which they could affix to documents as they [saw] fit." *Id.* at ¶ 56. And "[i]n an email dated March 8, 2012, Parekh advised Gogia that Gogia could not pay expenses to a CSG employee 'without my approval.'" *Id.* at ¶ 79. Although CSG did not qualify as an SDVOSB, *id.* at ¶ 89, OST Defendants nevertheless "registered and certified" it as such by "falsely asserting that Gogia[ ] owned 100% of CSG and was in control of CSG's day-to-day business activity." *Id.* at ¶ 37.

Once they registered CSG as an SDVOSB, plaintiff-relator alleges, OST Defendants bid on hundreds of contracts reserved for SDVOSBs in CSG's name. *Id.* at ¶ 87. As a result of bids that represented CSG as an SDVOSB, the Department of Veterans Affairs awarded CSG eighteen construction contracts from August 24, 2010, until June 27, 2013. *Id.* And it later paid CSG over $6.4 million for work performed under those contracts. *Id.* Furthermore, plaintiff-relator pleads, the government awarded CSG these SDVOSB contracts in reliance on the false representation that CSG was an SDVOSB. By causing CSG to misrepresent its status as an SDVOSB, plaintiff-relator states, OST Defendants "diverted government funds *intended to be provided and which by law could only be provided* to [SDVOSBs]." *Id.* at ¶ 221 (emphasis added). "As a direct and proximate result of" this fraud, plaintiff-relator alleges, the government paid "numerous false claims that it would not otherwise have paid." *Id.* at ¶ 223.

Based on these allegations, the Court finds it plausible that OST Defendants fraudulently induced the government to award CSG set-aside contracts for SDVOSBs. *See Iqbal*, 556 U.S. at 678. From the face of the complaint, it is clear that but for OST Defendants' misrepresentation that CSG is an SDVOSB, the Department of Veterans Affairs would not have awarded CSG the contracts. Indeed, the funds paid to CSG were not only "intended" to be provided to SDVOSBs, but "by law could only be provided" to such entities. Second Am. Compl. ¶ 221.

Furthermore, plaintiff-relator pleads fraudulent inducement with particularity. *See Escobar*, 136 S. Ct. at 2004 n.6 (citing Fed. R. Civ. P. 9(b)). The second amended complaint provides the dates that each of the eighteen contracts were awarded to CSG by the Department of Veterans Affairs. Second Am. Compl. ¶ 87. It also provides the amount paid to CSG under each of those contracts. *Id.* And it details the "fact misrepresented," *Williams*, 389 F.3d at 1256, by pleading that OST Defendants fraudulently certified to the government that CSG was an SDVOSB.

Second Am. Compl. ¶¶ 34–39. In sum, the Court finds that the allegations in plaintiff-relator's second amended complaint against OST Defendants adequately plead falsity as is required for the presentment claim (Count I), false statement claim (Count II), and conspiracy claim (Count IV).

## C.  The Primary Jurisdiction Doctrine Does Not Warrant Dismissal

In addition to their materiality argument, OST Defendants also ask the Court to dismiss plaintiff-relator's second amended complaint because they say that neither the Court nor a jury "should be the arbiter of whether CSG was eligible to participate in the SDVOSB program." Mot at 10. This determination, they argue, should be made by the U.S. Department of Veterans Affairs. *Id.* In so arguing, OST Defendants invoke the primary jurisdiction doctrine. Under that doctrine, when resolving a claim would require a court to decide an issue that has "been placed within the special competence of an administrative body" by a regulatory scheme, the court may "suspend the judicial process 'pending referral of such issues to the administrative body for its view.'" *United States v. Philip Morris USA, Inc.*, 686 F.3d 832, 837 (D.C. Cir. 2012) (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 64 (1956)).

OST Defendants' primary jurisdiction argument fails for two reasons. First, at the pleading stage, the question of CSG's eligibility to bid on SDVOSB set-aside contracts need not *actually* be decided. Instead, the Court takes all factual allegations in the second amended complaint as true and asks whether plaintiff-relator adequately states a claim under the pleading standards set forth in Rules 8(a) and 9(b). *Iqbal*, 556 U.S. at 677–78 (citing *Twombly*, 550 U.S. at 556–70). Furthermore, there is a mismatch between the argument advanced and the remedy sought. OST Defendants' present motion seeks dismissal under Rule 12(b)(6). Referring the issue of CSG's eligibility to bid on SDVOSB set-aside contracts to the Department of Veterans Affairs, however,

would result in a stay, not dismissal. Thus, at this posture, the primary jurisdiction doctrine is of no use to OST Defendants.

Alternatively, even if the question of CSG's eligibility to bid on SDVOSB contracts were presently before the Court, it would nevertheless decline to stay the proceedings pending administrative resolution of this issue. Though "no fixed formula exists" for applying the primary jurisdiction doctrine, courts typically invoke the doctrine when an issue arises that is within an agency's expertise or when resolving the issue judicially could lead to inconsistent outcomes. *W. Pac. R.R. Co.*, 352 U.S. at 64; *accord Philip Morris USA, Inc.*, 686 F.3d at 837. Neither justification applies here.

Based on the definitions provided by 13 C.F.R. § 125.11 ("the Regulation"), the question of whether CSG was an SDVOSB is hardly one that requires the expertise of the Department of Veterans Affairs. Under the Regulation, a "small business concern owned and controlled by service-disabled veterans" means "any of the following":

**(1)** A small business concern –

    **(i)** Not less than 51 percent of which is owned by one or more service-disabled veterans or, in the case of any publicly owned business, not less than 51 percent of the stock (not including any stock owned by an [employee stock ownership plan]) of which is owned by one or more service-disabled veterans; and

    **(ii)** The management and daily business operations of which are controlled by one or more service-disabled veterans or, in the case of a veteran with a permanent and severe disability, the spouse or permanent caregiver of such veteran;

**(2)** A small business concern –

    **(i)** Not less than 51 percent of which is owned by one or more service-disabled veterans with a disability that is rated by the Secretary of Veterans Affairs as a permanent and total disability who are unable to manage the daily business operations of such concern; or

    **(ii)** In the case of a publicly owned business, not less than 51 percent of the stock (not including any stock owned by an [employee stock ownership plan]) of which is owned by one or more such veterans.

13 C.F.R. § 125.11.

The Regulation also defines "veteran" as a "person who served in the active military, naval, or air service, and who was discharged or released therefrom under conditions other than dishonorable." 38 U.S.C. § 101(2); *see* 13 C.F.R. § 125.11 (incorporating the definition of "veteran" as set forth in 38 U.S.C. § 101(2)). This includes "[a] reservist or member of the National Guard called to Federal active duty or disabled from a disease or injury incurred or aggravated in line of duty or while in training status." 13 C.F.R. § 125.11. And the Regulation defines "service-disabled veteran" as:

> [A] veteran who possesses either a valid disability rating letter issued by the Department of Veterans Affairs, establishing a service-connected rating between 0 and 100 percent, or a valid disability determination from the Department of Defense or is registered in the Beneficiary Identification and Records Locator Subsystem maintained by Department of Veterans Affairs' Veterans Benefits Administration as a service-disabled veteran. Reservists or members of the National Guard disabled from a disease or injury incurred or aggravated in line of duty or while in training status also qualify.

*Id.*

The fact-finding required to decide whether CSG qualified as an SDVOSB under the Regulation is squarely within the province of this Court. Applying the Regulation's definitions of "veteran," "service-disabled veteran," and "small business concern owned and controlled by service-disabled veterans" to the facts of this case does not require knowledge that is within the technical expertise of the Department of Veterans Affairs. *See Pac. R.R. Co.*, 352 U.S. at 65. Nor does it require the Department of Veterans Affairs to make a "policy judgment[] needed to implement [the] agency's mandate." *Allnet Commc'n Serv., Inc.*, 956 F.2d at 1120 (finding the primary jurisdiction doctrine applicable to the issue of whether a new drug was "safe and effective for interstate sale" under U.S. Food & Drug Administration regulations).

Finally, judicial resolution of this issue will not lead to inconsistent outcomes. *See W. Pac. R.R. Co.*, 352 U.S. at 64. Indeed, an entity's SDVOSB status is a fact-specific inquiry that will

differ from case to case. In sum, even if the issue of CSG's SDVOSB status were currently before the Court, it would decline to stay the proceedings pending resolution of this issue by the Department of Veterans Affairs.

## IV. CONCLUSION

For the reasons stated above, the Court will **DENY** OST Defendants' motion to dismiss the second amended complaint (ECF No. 301). OST Defendants shall answer the second amended complaint (ECF No. 298) within fourteen days, *see* Fed. R. Civ. P. 12(a)(4)(A), or otherwise indicate that they wish to rest on their answers to the amended complaint. *See* ECF No. 295.

An accompanying Order shall follow.

Date: November 6, 2020

Hon. Royce C. Lamberth
United States District Judge