UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ANDREW SCOLLICK, | ) ) ) |
| Plaintiff-Relator, | ) Civ. Action No. 14-CV-01339-RCL ) ) |
| vs. | ) ) |
| VIJAY NARULA, *et al.,* | ) ) |
| Defendants. | ) ) ) |

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF-RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANTS CENTENNIAL SURETY ASSOCIATES, INC., MICHAEL SCHENDEL, HANOVER INSURANCE COMPANY, AND HUDSON INSURANCE COMPANY**

## INTRODUCTION

Issuing surety bonds on federal construction contracts is a lucrative business. Federal law requires that contractors obtain bonds for any construction contract with the United States over $100,000. 40 U.S.C. § 3131. The companies issuing these bonds receive a premium for every contract they bond, while at the same time requiring indemnification from the contractors on whose behalf the bonds are issued so that any potential loss from the issued bonds can be clawed back. To further help protect against losses, bonding companies perform diligent underwriting services to assess the competency of contractors and ensure there are enough financial resources associated with the contractor to obtain worthwhile indemnities.

In this case, Defendant Centennial Surety Associates, Inc. ("Centennial"), along with its President and owner Defendant Michael Schendel ("Schendel") acted as a bonding agent and facilitated surety bonding initially to Defendant Centurion Solutions Group, LLC ("CSG") and later to Citibuilders Solutions Group, LLC ("Citibuilders Solutions"). Both these construction companies were purportedly run by veterans, disabled in their service to the United States, and exclusively sought government contracts which Congress mandated be set-aside and awarded only to service-disabled veterans who own, control, and operate a small business through their personal sweat equity, hard-earned past experience, and financial investment. Centennial and Schendel eventually facilitated the bonding from Defendant Hanover Insurance Company ("Hanover") on eight of these service-disabled veteran-owned small business ("SDVOSB") set-aside contracts from the United States Department of Veterans Affairs ("VA") which were awarded to CSG. Defendant Hudson Insurance Company ("Hudson"), also through the facilitation of Centennial and Schendel, issued bonds on another five of CSG's VA SDVOSB set-aside contracts. Centennial also facilitated bonding from a separate bonding company for five additional VA SDVOSB set-

aside contracts awarded to Citibuilders Solutions.  For all these contracts, it was required that they be awarded and performed only by contractors that meet the stringent requirements mandated by Congress and set forth in VA regulations, most importantly that a service-disabled veteran majority-own and control the business.  The bonds issued by Hanover and Hudson, with the assistance of Centennial and Schendel, all guaranteed to the United States that eligible SDVOSBs would perform under the VA construction contracts.  If not, Hanover and Hudson agreed to be obligated to the United States for the cost of the SDVOSB set-aside contracts.

Hanover, Hudson, Centennial, and Schendel (collectively the "Insurance Defendants") all performed diligent underwriting on CSG or Citibuilders Solutions and obtained thorough knowledge of the ownership and operation of both contractors.  The Insurance Defendants then willingly and gladly accepted the profits which came from issuing bonds for these contractor's VA SDVOSB set-aside contracts.  The problem for the Insurance Defendants is that, for the entirety of the time period relevant to this case, they understood from their underwriting activities that CSG and Citibuilders Solutions **were not** majority-owned or controlled by a service-disabled veteran as required.  Yet, the Insurance Defendants did nothing with this information but simply arranged and issued bonds for CSG and Citibuilders Solutions on SDVOSB set-aside contracts.  Instead of rejecting the issuance of these bonds or alerting the United States that the bonded contracts were not being performed by SDVOSBs, the Insurance Defendants chose to bury their collective heads in the sand and ignore the foundational principle of SDVOSB contracting: a veteran must own and control the entity performing the contract.  All the while the taxpayer dollars specifically earmarked by Congress to uplift service-disabled veterans were being fraudulently diverted to non-eligible companies.  All told, Centennial and Schendel knowingly facilitated the bonding of SDVOSB set-aside contracts, which were not performed by SDVOSBs, totaling $8,802,847.  Out

of this amount, Hanover issued bonds on $4,044,697 worth of contracts and Hudson issued bonds on $1,359,685 worth of contracts.  All bonds were issued for SDVOSB set-aside contracts and none of the contracts were not performed by eligible SDOVSBs.

Through this motion, Plaintiff-Relator Andrew Scollick ("Relator" or "Scollick") seeks partial summary judgment under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, against the Insurance Defendants for 1) causing false claims for payment to be submitted to the United States under the SDVOSB set-aside contracts for which the Insurance Defendants either facilitated or issued bonds and 2)  avoiding payment of all obligations owed to the United States by Hanover and Hudson under the bonds they issued on  SDVOSB set-aside contracts.   31 U.S.C. § 3729(a)(1)(A) & (G).[1]   The damages suffered by the United States due to the Insurance Defendants' violations can be easily ascertained at this stage and, after trebling per the FCA, equal 1) $26,408,541 for Centennial and Schendel's violations; 2) $12,134,091 for Hanover's violations; and 3) $4,079,055 for Hudson's violations.[2]

## BACKGROUND

### A.  Procedural Background

Relator filed his *qui tam* FCA complaint [ECF No. 1] under seal on August 6, 2014, the United States formally declined to intervene on February 9, 2015 [ECF No. 6], and the case was

---

[1] Concurrent with this motion, Relator is also filing three additional motions for partial summary judgment against the remaining defendants in this case.  The totality of Relator's motions presents the full story of the conspiracy at issue in this case to violate the FCA.

[2] Not at issue in this motion for partial summary judgment are Relator's claims regarding: (1) claims for violations by the Insurance Defendants under FCA § 3729(a)(1)(B); (2) the FCA conspiracy claim against the Insurance Defendants; (3) the amount of civil penalties against the Insurance Defendants under the FCA; and (4) statutory fees and costs awardable under the FCA. Second Amended Complaint, ECF No. 298 at ¶¶ 229-40, 238, 245-60.

unsealed by the Court on July 9, 2015 [ECF No. 8].[3]  Several defendants filed motions to dismiss that were granted in part and denied in part.  *United States ex rel. Scollick v. Narula ("Scollick I")*, 215 F. Supp. 3d 26 (D.D.C. 2016).  Relator sought leave to amend his complaint to cure the defects identified by the Court and the Court issued another memorandum opinion and order granting in part and denying in part that motion.  *United States ex rel. Scollick v. Narula ("Scollick II")*, Case No. 1:14-cv-1339-RCL, 2017 U.S. Dist. LEXIS 119530 (D.D.C. July 31, 2017).  This opinion and order allowed, in part, Relator to proceed with counts against the Insurance Defendants for violations of 31 U.S.C. § 3729(a)(1)(A) and, additionally, against Hudson and Hanover for violations of § 3729(a)(1)(G), in relation to the VA SDVOSB set-aside contracts at issue.  *Id.* at *40-55.  During the pendency of discovery, Relator was permitted to file a Second Amended Complaint [ECF No. 298] and the Court later denied a motion to dismiss the Second Amended Complaint.  *United States ex rel. Scollick v. Narula ("Scollick III")*, Case No. 1:14-cv-1339-RCL, 2020 U.S. Dist. LEXIS 208604 (D.D.C. Nov. 6, 2020).

Pursuant to the briefing schedule set by this Court, Relator seeks partial summary judgment against the Insurance Defendants.  This motion is based on the knowledge and testimony of the defendants and their employees and the defendants' own documents which show their wanton disregard for VA SDVOSB regulations and bonding obligations owed the United States in pursuit of bonding premiums.

**B.  <u>Statement of Material Facts</u>**

---

[3] The United States remains active in this case, having settled with one former defendant, Melvin Goodweather [ECF No 307], initiating mediation [ECF No. 282], and attending depositions.

The SDVOSB set-aside contracts at issue were awarded to CSG by the VA between 2010 and 2015 and Citibuilders Solutions between 2012 and 2014. Stmt. ¶ 234, 267-68.[4] Under the Miller Act, 40 U.S.C. § 3131, government construction contracts over $100,000 are required be bonded. The Miller Act requires that "[b]efore any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government" a performance bond and payment bond. 40 U.S.C. § 3131(b). Stmt. ¶ 9. A performance bond issued by a bonding company guarantees to the United States that the construction contract at issue will be fully completed in compliance with the contractual requirements. Stmt. ¶ 10. Specifically, performance bonds state that a surety is "firmly bound to the United States of America in the above penal sum," and that obligation to pay the full amount of the contract is only extinguished when the contractor on the bond "[p]erforms and fulfills all the understandings, covenants, terms, conditions, and agreements of the contract . . . [and] any and all duly authorized modifications of the contract." *Id.* In this case, the single most predominant understanding, covenant, term, condition, or agreement found in the SDVOSB contracts was that the contracts were SDVOSB set-aside contracts, thus they had to be awarded to and performed by an eligible SDVOSB. *See e.g.*, Stmt. ¶ 128, 160, 234, 267-68.

1. The Insurance Defendants

At all relevant times, Schendel owned and was President of Centennial. Stmt. ¶ 21. Centennial worked as the bonding agent and "attorney-in-fact" for companies that provided surety bonds, including Hanover and Hudson. Stmt. ¶ 22. In that role, Centennial would obtain

---

[4] Factual citations are to supporting paragraphs in the Statement of Material Facts Not in Genuine Dispute ("Stmt."), filed herewith, which contain citations to discovery-produced documents, deposition testimony, declarations, and other evidence in this case. The Statement of Material Facts Not in Genuine Dispute contains a full description of the entire fraud scheme and is used to support all summary judgment motions filed by Relator.

information from contractors seeking bonding and would assist with, or obtain and provide contractor information for, the bonding companies' underwriting process.  Stmt. ¶ 24.  Hanover and Hudson each had thorough underwriting procedures and guidelines they used to minimize their risk exposure on bonds they issued by examining a contractor's organizational structure, finances, and construction competency. Stmt. ¶ 23.  Centennial would also receive requests for bonds from contractors and then obtain approval from the bonding company, or execute within its existing authority, to issue surety bonds that would obligate the bonding company.  Stmt. ¶ 24.  Centennial and Schendel would facilitate the bonding relationship between contractors and bonding companies and act on behalf of the bonding companies who actually issued bonds.  *Id.*

### 2.  Narula and Parekh Approach Centennial and Schendel About Bonding

Defendant Optimal Solutions and Technologies, Inc. ("OST") is a large and successful information technology ("IT") government contractor.  Stmt. ¶¶ 11, 14.  Defendant Vijay Narula ("Narula") is OST's owner and Chief Executive Officer, while Defendant Ajay Madan ("Madan") serves as OST's Chief Operating Officer.  Stmt. ¶¶ 11, 33.  OST, Narula, and Madan (collectively the "OST Defendants") had no meaningful experience in construction but were seeking to break into the lucrative government construction contracting industry in 2009.  Stmt. ¶¶ 14, 20.  For this purpose, Narula allied himself with Defendant Neil Parekh ("Parekh") who had previously performed renovation work on OST offices and possessed experience operating and managing construction companies.[5]  Stmt. ¶¶ 15, 17, 20.  OST was not an SDVOSB and Parekh was not a service-disabled veteran.  Stmt. ¶¶ 12, 16.

---

[5] Parekh owned and operated Defendants Citibuilders, Inc. and CB Construction, Inc. ("CB Construction").  Stmt. ¶ 15.  Citibuilders, Inc. was founded in 2004 but in 2009 Parekh established CB Construction and shifted all his business into that entity in 2010.  *Id.*  Parekh hired Scollick beginning in late 2008 to early 2009 to work for Citibuilders, Inc. and Scollick's employment

In 2009, Parekh, who had a prior working relationship with Schendel, organized a meeting at OST's offices between Parekh, Narula, and Schendel to discuss bonding for this new construction venture.  Stmt. ¶¶ 25, 27.  Following this meeting, on June 26, 2009, Schendel introduced Hanover to OST and provided a Hanover underwriter, Courtney Seed ("Seed"), with background information.[6]  Stmt. ¶ 28.  Schendel explained to Seed that OST was seeking "$5-10 million of bonded construction work in 2009, with a focus on government work" and that to "facilitate construction [OST] is putting together a team" that included Parekh.  *Id.*  Schendel and Centennial made it their business to keep Hanover updated on the status of OST, Narula, and Parekh's construction venture including Schendel telling Hanover on August 24, 2009 that Narula and Parekh had been preparing "test-bids" and that Narula "wants to understand and make sure OST offers the same quality to construction as they offer in their other line of business . . . He has worked too hard with the Federal Government to build an excellent relationship and he wants their construction side, to have an excellent relationship."  Stmt. ¶ 30.

In 2009, Defendant Amar Gogia ("Gogia") and Madan discussed the possibility of starting a new construction company using Gogia's status as a service-disabled veteran to target SDVOSB set-aside contracts.  Stmt. ¶¶ 31-34.  OST and Narula quickly became involved in the process as well.  Stmt. ¶ 35.  The OST Defendants and Gogia worked together to form CSG in January 2010.  Stmt. ¶¶ 36-40.  All startup money for CSG was provided by the OST Defendants.  Stmt. ¶¶ 43-44.  CSG first submitted an application to be verified as an SDVOSB to the VA on March 14, 2010.  Stmt. ¶ 59.  In support of this application, Gogia explicitly certified that "(1) he was a

---

shifted to CB Construction beginning in 2010.  Stmt. ¶ 19.  This brief will use the term "CB Construction" to refer to both Citibuilders, Inc. and CB Construction, Inc.

[6] Seed later left Hanover to work for Schendel and facilitate bonding between CSG and Hudson.  Stmt. ¶ 151.

service-disabled veteran, (2) one or more veterans owned at least 51% of CSG, and (3) that CSG

was controlled by one [or] more veterans as outlined in 38 C.F.R. Part 74." *Id.* The VA relied on

the truthfulness of this statement and based its verification of CSG's status on the certification. *Id.*

CSG was verified as an SDVOSB on May 12, 2011. *Id.*

3.  Parekh and Narula Obtain Bonding for CSG From Hanover Through Centennial and
    Schendel

Once CSG submitted its SDVOSB application, Parekh and others, but not Gogia, began

creating and submitting bid proposals to the VA for SDVOSB set-aside contracts in CSG's name.

Stmt. ¶ 60-68. Once CSG bid proposals began to be submitted, Centennial and Schendel updated

Hanover on Narula's plans and bonding needs. Stmt. ¶ 69. Importantly, Schendel obtained his

information regarding CSG, Narula, Parekh, and OST from Narula and Parekh. Stmt. ¶¶ 71, 131.

Gogia played no role in obtaining bonding from CSG beyond signing indemnification agreements.

Stmt. ¶ 78.

On April 15, 2010, Schendel assured Hanover that "OST remains a horse and cash is above

$8 million" and that "Vijay [Narula] had to put procedures and controls in place with Neil [Parekh]

before they started to bid this work and it is part of their plan to gear up in 2011 to pursue larger

work. **In 2010 they want to concentrate on Federal Opportunities of small size, build a**

**resume (of construction) and be ready for 2011**." Stmt. ¶ 70 (emphasis added). Schendel also

stated to Hanover that Narula and Parekh would be "**using the trade name, Centurion Solutions**

**Group, LLC which OST owns** . . . Neil [Parekh] brings the construction background and since

they remain strong financially, I would like to work along with their needs." *Id.* Gogia is never

mentioned by Schendel to Hanover. *Id.*

Centennial and Schendel informed Seed by letter on April 27, 2010 that Narula and Parekh

plan to bid on "**small business set aside jobs**." Stmt. ¶ 72 (emphasis added). Despite discussing

the "team" assembled to pursue the construction work, there is no mention of Gogia as taking part in any aspect of CSG.  *Id.*  Schendel outlined in a May 3, 2010 email to Hanover the construction experience of Parekh, David Rubando, and Mike Bender, but did not depict Gogia as playing a managerial or construction role or any role at all as a matter of fact.  Stmt. ¶ 73.

On June 13, 2010, Centennial and Schendel emailed Narula and Parekh about an upcoming meeting with Seed and her boss, Brent Davis, which occurred at OST's office without Gogia.  Stmt. ¶ 102.  After Schendel and Hanover negotiated the bonding terms for "OST," the proposed rates were provided to Parekh and Narula, but not Gogia.  Stmt. ¶ 103.  When speaking about another federal set-aside contracting program ("8(a)"), Schendel explicitly told Narula and Parekh on June 18, 2010 that "[t]here have been major fraud cases with fronts for 8(a) set-aside jobs."  Stmt. ¶ 104.  In a July 7, 2010 email, Schendel explained to Hanover that "**OST will keep bidding under their construction division, Centurion**."  Stmt. ¶ 105 (emphasis added).

Based on OST's financial support, Hanover agreed to provide surety bonds for CSG's SDVOSB set-aside contracts but required indemnification against any loss on CSG bonds.  Stmt. ¶¶ 106-07. A Hanover indemnity agreement was executed on July 15, 2010 and it provided that OST, Narula, Narula's wife Nishi Narula, Parekh, Gogia, Citibuilders, Inc., CSG, and Centurion OST, LLC would all indemnify Hanover for any losses on bonds issued for CSG, Citibuilders, Inc., or OST.  Stmt. ¶ 107.  CSG was the only entity on the Hanover Agreement of Indemnity that ever sought, or received, a bond from Hanover.  Stmt. ¶ 108.

On August 9, 2010, Schendel sent a letter to another bonding company and stated that "**Vijay [Narula] (owner of OST) set up Centurion which is a wholly owned subsidiary of OST and he hired Neil Parekh to run it**.  Neil [Parekh] had his own company called Citibuilders and I bonded Citibuilders.  Neil's [Parekh] resume of work is attached.  In addition to Neil [Parekh],

Vijay [Narula] hired David Rubando . . . Nathanial Baker and Andrew Scollick . . ."  Stmt. ¶ 130 (emphasis added).   The next day, Schendel told the same company that Schendel's "main motivation is **to bond OST through their wholly owned subsidiary of Centurion**."  *Id.*

4.  <u>Hanover's Bonding of CSG's SDVOSB Set-Aside Contracts</u>

Between 2010 and 2011, Hanover issued the required surety bonds, including performance bonds, for eight SDVOSB set-aside contracts awarded to CSG by the VA.  Stmt. ¶ 128.  Before Hanover provided bonds for a CSG project, Seed would receive a "Bond Information Sheet" from Centennial which contained a copy of the General Services Administration Standard Form 1442, the government form comprising the first pages of a government construction contract, which stated the contracts were SDVOSB set-aside.  Stmt. ¶ 129.

On September 16, 2010, as part of her formal underwriting responsibilities, Seed placed into Hanover's system of records an "OST, Inc., Account Summary" ("OST Account Summary").  Stmt. ¶ 131.  The Account Summary fulfilled a Hanover underwriting requirement that on "an annual basis, [Hanover underwriters] had to prepare an account summary."  *Id.*  All the information used to prepare the OST Account Summary came directly from Narula or from what Schendel told Seed based on his interactions with Narula, Parekh, or both.  *Id.*

The Summary stated that OST "**set up a subsidiary to handle general construction and construction management**" and that Narula "**brought Neil [Parekh] on to start up a construction arm of OST**."  Stmt. ¶ 132 (emphasis added).   The Summary provided "**Neil Parekh,** President CitiBuilders, a subsidiary of OST and **is running the construction division** . . . . Obtaining a current resume" and "**Amar Gogia Managing Member of Centurion Solutions Group, LLC also a subsidiary of OST is the SDV [service-disabled veteran] entity**.  Obtaining current resume."  *Id.* (emphasis added).  The Summary noted that Citibuilders, Inc. and Centurion

Solutions Group, LLC are "**subsidiaries of OST to build up the construction arm. All bids are in the name of Centurion Solutions Group, LLC**."  *Id.*  Next, the Summary stated that "OST already has an accounting staff that will be able to track and prepare credible internal statements and wips."  Stmt. ¶ 133.  On September 22, 2010, Seed informed Schendel and Centennial that she had "done my write up of the account and have set up a working line of $MM/$10MM."  Stmt. ¶ 134.  Seed requested Schendel and Centennial provide resumes for Parekh and Gogia to Hanover and, in response, a resume for Parekh was provided but Hanover never received a resume for Parekh.  Stmt. ¶ 135.

Schendel informed Hanover on September 20, 2010 that OST's plan remains for **"Neil [Parekh] to run the construction division."**  Stmt. ¶ 136.  In November 2010, Schendel again repeated to Hanover that "**Centurion and the other entities are wholly owned by OST**."  *Id.* (emphasis added).  Between December 1, 2010 and January 13, 2011, communications occurred between Hanover and Centennial during which Hanover sought further information on the "OST / Centurion" account.  Stmt. ¶ 140.  During this conversation, Keith McQuade ("McQuade"), who was the new underwriter on the account following Seed's departure to work for Schendel, asked Schendel about the ownership and operation of CSG.  Stmt. ¶ 138, 140.  McQuade also told Schendel "thanks again for setting up the meeting last week.  We were real impressed with both Vijay [Narula] and Neil [Parekh].  I like their approach in construction," and made no mention of Gogia.  Stmt. ¶ 140.  On January 12, 2011, Schendel told McQuade that "Neil [Parekh] and I went over the status of jobs and all of them are going along fine.  He said they backed off bidding for a while because they wanted to get jobs up and running . . . Now that the jobs are running, he is bidding more work."  Stmt. ¶ 142.  Schendel further told Hanover that "Centurion Solutions Group is the entity needing the bonds.  Vijay [Narula] wanted an entity that would be a different name so

it would not conflict with the work OST does. **Ownership is Vijay [Narula], Amar [Gogia] and Neil [Parekh]**." *Id.* (emphasis added).  McQuade then sent a clarifying email asking **"[i]s the ownership of Centurion broken out in thirds between Vijay [Narula], Neil [Parekh], and Amar [Gogia]? Or is it different."**  Stmt. ¶ 143.  Schendel responded on January 12, 2010 confirming that "**[y]es, ownership is as your state**," and acknowledged "I do not know much about [Gogia]."  *Id.*

On March 21, 2011, Schendel explained to Hanover that "**Neil [Parekh] put in $200-250,000 and Vijay [Narula] put in about the same amount in Centurion.**"  Stmt. ¶ 146 (emphasis added).

On March 29, 2011, Schendel provided an update to Hanover after meeting with Narula earlier that day, stating in part "**Vijay [Narula] injected about $210,000 of cash and Neil [Parekh] injected $220,000 of cash in Centurion** . . . Going forward Vijay's [Narula] plan is to have Centurion stand on it's own financially and his goal is to add 8% back into the company every year."  Stmt. ¶ 147.  Hanover last issued a bond for a CSG contract on May 4, 2011.  Stmt. ¶ 148.

     5.  <u>Hudson Takes Over CSG's Bonding</u>

Beginning in May 2011, Schendel turned to Hudson to take over bonding for CSG.  Stmt. ¶¶ 149-70.  Hudson and Surety Partners of America Mid Atlantic, LLC ("Surety Partners"), which was fully owned by Schendel and shared offices and employees with Centennial, entered into a Program Administrator Agreement for the purpose of having Surety Partners carry out "the bond business of Hudson" and Surety Partners was appointed Hudson's "general agent for the purposes of underwriting, issuance, and delivery of surety bonds."  Stmt. ¶¶ 149-50.

On May 11, 2011, Seed, who by now had left Hanover to work for Schendel, provided Hudson with an introduction to the "OST, Inc." account which in part stated that CSG was "financially supported by OST."  Stmt. ¶ 151-52.  On May 26, 2011, Seed met with "OST" to "explain the Surety Partners / Hudson arrangement" and told OST that Hudson was offering $3MM/$8MM in bonding for CSG construction projects.  Stmt. ¶ 153.  Seed issued a report to Schendel and Centennial stating that Narula "is monitoring all activity and holding Neil [Parekh] and Amar [Gogia] accountable for production, reports, etc." *Id.*

On June 15, 2011, Seed informed Hudson that she was going to provide "OST / Centurion Solutions" bonding "under our branch authority of $3MM/$8MM based on the corporate support of OST and personal and spousal indemnity of the President and 100% owner of Centurion Solutions" without identifying who that was.  Stmt. ¶ 154.  In an internal Hudson email on June 17, 2011, Hudson confirmed its understanding that Hudson's account is "really Centurion Solutions Group" and CSG's "majority of work is SDV work (Service Disabled Veterans)."  Stmt. ¶ 155.  Also on June 17, 2011, Seed provided the same OST Account Summary she previously drafted while at Hanover and which is discussed fully above.  Stmt. ¶ 156.

On July 22 and 27, 2011, two Hudson indemnity agreements were executed.  Stmt. ¶ 157. These agreements provided that OST, CSG, and CB Construction would provide corporate indemnity and Gogia and Vanessa Keasler Gogia would provide individual indemnity to Hudson for all surety bonds issued by Hudson to CSG, OST, or CB Construction.  *Id.*  OST and CB Construction never sought any bonds from Hudson and Hudson never issued any bonds to these entities.  Stmt. ¶ 159.  Hudson worded its indemnity agreements to require Narula, Parekh, and Gogia to affirm that OST, CSG, and CB Construction were companies that were "materially interested through common ownership in transactions in connection with which Centurion

13

Solutions Group, LLC and CB Construction Group, Inc. has applied or may hereafter apply to the Hudson Insurance Company for bonds or undertakings."  Stmt. ¶ 158.

Between July 22, 2011 and October 27, 2011, Surety Partners and Centennial, on behalf of Hudson, issued the required surety bonds, including performance bonds, for five SDVOSB set-aside contracts awarded to CSG by the VA.  Stmt. ¶ 160.

On August 15, 2011, Centennial employee Reggie Jarvis ("Jarvis") met with Parekh and they discussed a "new entity, CB Construction Group (1111 19th Street, North, Suite 2001, Arlington, VA 22209, Tax ID# 26-4077744)" whose "[f]unction is to carry operating costs for Centurion."  Stmt. ¶ 161.  Jarvis then noted that CB Construction Group "will invoice Centurion and be reimbursed for expenses on a monthly basis.  Centurion only has 3 to 4 employees on Payroll all other costs are paid by CB Construction Group."  *Id.*

On September 29, 2011, Seed referred Hudson to the OST Account Summary and summarized its content by stating to Hudson that "OST had contacts with Dept of Vet affairs as well as other branches of the government so **they started a construction arm, Centurion Solutions.  The financial support of course i[s] with OST . . . The goal is to have them stand alone in the near future.  Indemnity of OST is in place.**"  Stmt. ¶ 162 (emphasis added).  Hudson then acknowledged that it understood that **"Centurion is a subsidiary of OST."**  Stmt. ¶ 164. (emphasis added).  This understanding was reinforced on November 8, 2011, when Seed again informed Hudson that **Centurion Solutions "is the construction arm of OST."**  Stmt. ¶ 165 (emphasis added).

On November 29, 2011, Schendel sent "a memo to file" regarding "OST/Centurion" to Hudson stating "[w]e have met with OST/Centurion 3 times in 2011" and that "the person who is running Centurion used to own a company that I bonded," referring to Parekh.  Stmt. ¶ 166.  The

memo stated that Schendel "thought Centurion was going to be a subsidiary of OST and it is officially not one.  It is more of a sister company they keep arms length, even though they are located in the same building/share resources."  *Id.*  By this point, all the bonds facilitated by Centennial, and issued by Hudson, for CSG's VA SDVOSB contracts had already been issued.  Stmt. ¶ 160.

At some point, Hudson received a 2011 financial statement for CSG prepared by a Certified Public Accountant that identified two equity members, one holding $18,668 in equity and the other holding $210,000, and elsewhere identifies an additional unexplained $240,070 investment into the company.  Stmt. ¶ 144.

### 6.   CSG Operations During the Insurance Defendants' Bonding Period

During the time that Centennial and Schendel were working with Hanover and Hudson to provide surety bonds for CSG's VA SDVOSB set-aside contracts, CSG was being operated by and receiving substantial assistance from non-veteran individuals and entities.  Stmt. ¶¶ 31-68, 79-101, 109-27, 171-233.  The OST Defendants and Parekh controlled the finances, operations, and long-term decision making of CSG.  Stmt. ¶¶ 68, 119-21, 125-27, 171, 183, 186, 190-91, 194-98, 199, 203, 206, 208-09, 213, 216, 218, 224, 227.  Further, the majority of CSG profits were intended to, and in Parekh's case did, flow to the OST Defendants and Parekh instead of Gogia.  Stmt. ¶¶ 91-101, 144, 183, 187-93, 200.

### 7.   Citibuilders Solutions

Parekh separated from CSG in 2010 and from late 2009 through early 2010, worked to establish another construction entity with service-disabled veteran Melvin Goodweather ("Goodweather").  Stmt. ¶¶ 236-49.  This entity was Citibuilders Solutions and, beyond providing Parekh with documentation Parekh requested, Goodweather played no role in its formation.  Stmt.

¶ 245.  Citibuilders Solutions was verified as an SDVOSB with the VA on August 17, 2012, again with no assistance from Goodweather and without Goodweather even knowing how it was done. Stmt. ¶ 247.

To secure bonding for Citibuilders Solutions, Parekh again turned to Centennial and Schendel.  Stmt. ¶ 250.  After Parekh transmitted financials for Citibuilders Solutions to him, Schendel started seeking a bonding company to issue bonds for Citibuilders Solutions, first turning to Hanover, which declined.  *Id.*  On August 28, 2012, McQuade, who previously worked as an underwriter for Hanover but was now employed by Centennial, provided another bonding company, Aegis Security Insurance Company ("Aegis") an "account overview" for Citibuilders Solutions.  Stmt. ¶ 251.  McQuade stated that Citibuilders Solutions "has their SDVOSB and CVE" and provided Aegis with the VA's SDVOSB verification letter.  *Id.*  McQuade conveyed to Aegis that "Goodweather is the 100% owner," forwarded Goodweather's resume, and summarized Goodweather's career experience, which wholly lacked any construction experience.  *Id.* McQuade then described Parekh's role as "Vice President" of Citibuilders Solutions and described Parekh's construction experience including "running the construction arm of" "OST, Inc./Centurion Solutions."  *Id.*.  The letter than extensively explained Parekh's references and past construction experience, but omits any further discussions about Goodweather.  *Id.*.

An email from McQuade to Parekh, with Schendel copied, summarized Goodweather's role with Citibuilders Solutions as "connections w/ congre[ss]men, senators, connections in the DVA (worked in Pentagon for 10 years)."  Stmt. ¶ 252.   On September 13, 2012, McQuade emailed Parekh to inform him that McQuade had spoken to the bond company and "[t]hey are curious to know the arrangement, as it is unusual.  Mr. Goodweather owns 100% of the company however from my understanding, you [Parekh] personally capitalized the company.   Please

confirm this arrangement."  Stmt. ¶ 253.  McQuade then stated that its bonding company ("Aegis"),

before providing bonds to Citibuilders Solutions, would require the personal indemnification of

Goodweather as Citibuilders Solutions' owner.  *Id.*  Aegis agreed to provide bonds for Citibuilders

Solutions in October 2012 but required personal indemnification from Goodweather up to

$500,000.  Stmt. ¶ 254.  Goodweather signed an Aegis Agreement of Indemnity on October 24,

2012.  Stmt. ¶ 256.

On January 2, 2013, McQuade circulated notes from a meeting he had with "CB Solutions

(Citibuilders)" and Aegis on December 20, 2012.  Stmt. ¶ 257.  Goodweather did not attend the

meeting.  Stmt. ¶ 257.  On June 13, 2013, McQuade emailed Parekh requesting a meeting.  Stmt.

¶ 258.  Specifically, McQuade stated that "[w]e should have Melvin Goodweather and Gary

Goodweather at the meeting.  The company is a service-disabled veteran owned company and the

bond company (and myself) have only met w/ you.  I did speak on the phone that one time w/ the

Goodweathers but it would be good to get them in front of the surety too."  *Id.*  Goodweather never

attended a meeting with anyone from Centennial or Aegis and does not remember speaking on the

phone with McQuade.  *Id.*

On August 13, 2013, McQuade raised several issues with financial and tax documents

provided for Parekh on Citibuilders Solutions.  Stmt. ¶ 259.  Specifically, McQuade stated:

> [T]he 2012 tax return shows you as 100% owner.  Per the attached you provided this cannot be the case.  In order to be in compliance w/ the S.B.A. as a SDVOSB, I believe majority ownership must be a service-disabled veteran.  In this case, we were under the impression Melvin Goodweather was the 100% owner (see attached questionnaire he signed and filled out). . . . The surety will not be comfortable issuing more bonds until they are comfortable w/ the CPA's figures, as well as confirmation Citibuilders Solutions Group is 100% in compliance with federal guidelines re SDVOSB.

*Id.*

Parekh responded by claiming, without supporting documentation, that Goodweather is "currently the 100% owner" and that the Citibuilders Solutions' tax return had not been field and "revisions still need to be made and added." Stmt. ¶ 260. McQuade then forwarded this conversation to Greg Rzewnicki ("Rzewnicki") from Aegis on August 14, 2013. Stmt. ¶ 261. Rzewnicki stated that "I am ok with what Neil [Parekh] says on ownership, as he did mention what he says below in the past." *Id.* The 2012 Citibuilders Solutions' tax return in Centennial's possession does reflect that Parekh was its 100% owner and Centennial never received any other Citibuilders Solutions' tax return. Stmt. ¶ 257.

Throughout the entirety of Centennial's relationship with Citibuilders Solutions, Goodweather did not meet with any Centennial employee or representative. Stmt. ¶ 263. Centennial facilitated the required bonding from Aegis for five VA SDVOSB set-aside contracts, totaling $2,840,883. Stmt. ¶ 267-68.Throughout its existence, Goodweather played no role in Citibuilders Solutions and was wholly unaware of its operations. Stmt. ¶¶ 236-49, 269-74.

## **ARGUMENT**

The Insurance Defendants violated FCA § 3729(a)(1)(A) every time a claim for payment was submitted to the United States under the VA SDVOSB set-aside contracts that they either facilitated or issued the bonds on. The VA was fraudulently induced to award the SDVOSB contracts to CSG and Citibuilders Solutions based on their knowingly false representations that they were in compliance with the VA's SDVOSB regulations when they were in fact never in compliance. The Insurance Defendants possessed knowledge that CSG and/or Citibuilders Solutions did not meet VA SDVOSB requirements as they were not majority-owned and controlled by a service-disabled veteran. Yet, their conduct to facilitate and issue bonds despite this knowledge was a substantial factor in causing CSG and Citibuilders Solutions to submit false

claims under their SDVOSB contracts.  Further, Hudson and Hanover also violated FCA § 3729(a)(1)(G) by avoiding their obligations to pay the United States the full amount of the performance bonds for the VA SDVOSB set-aside contracts they issued bonds for.  The actual damage to the United States resulting from these violations should be found to equal all payments under the SDVOSB set-aside contracts that the Insurance Defendants were involved in bonding. These damages should then be trebled under the FCA for a total damage calculation of $26,408,541 against Centennial, $12,134,091 against Hanover, and $4,079,055 against Hudson.

## I.   LEGAL STANDARDS

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted for a claim, or a part of a claim, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (defining "material facts" as those which "might affect the outcome of the suit under the governing law").  To show a genuine issue of material fact exists, the non-movant must present specific facts, supported by the record and admissible at trial, that could lead a "reasonable jury" to find in its favor.  *Id.* at 248; *Allen v. Johnson*, 795 F.3d 34, 38 (D C. Cir. 2015).

When evaluating a motion for summary judgment, the Court must draw all reasonable inferences in favor of the non-movant.  *Liberty Lobby,* 477 U.S. at 255.  However, this does not mean the Court can rely simply on conclusory statements or mere allegations put forth by the non-movant.  *Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011).  The

non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsuhita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (footnote omitted).  As explained by the Supreme Court, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris,* 550 U.S. 372, 380 (2007).

### B.  False Claims Act

Previously in this case, the Court set out the elements for violations of FCA § 3729(a)(1)(A) by stating:

> Liability under [FCA] subparagraph (a)(1)(A) requires proof that: (1) the defendant presented or caused to be presented a claim to the government, (2) the claim was false or fraudulent, and (3) the defendant knew the claim was false.

*Scollick III*, 2020 U.S. Dist. LEXIS 208604, at *20 (citations omitted).  This Court then defined as a reverse false claim violation as:

> A reverse false claim is any fraudulent conduct that 'results in no payment to the government when a payment is obligated.  Whereas a traditional false claim action involves a false or fraudulent statement made to the government to support a claim for money from the government, a typical reverse false claim action involves a defendant knowingly making a false statement in order to avoid having to pay the government when payment is otherwise due.

*Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *11-12 (quoting *Pencheng Si*, 71 F. Supp. 3d at 88).

### C.  SDVOSB Statutes and Regulations

SDVOSB set-aside contracting is governed by several statutes and two distinct regulatory schemes.  As explained by the United States Court of Federal Claims:

"In an effort to encourage small business, Congress has mandated that federal agencies restrict competition for some federal contracts." *Kingdomware Techs. Inc. v. United States*, 136 S. Ct. 1969, 1973 (2016). Congress particularly sought to improve the position of "small business concerns owned and controlled by socially and economically disadvantaged individuals." 15 U.S.C. § 637(d)(1). To that end, it has required "each agency to set an annual goal that presents, for that agency, the maximum practicable opportunity for contracting with small businesses, including, [relevant here], those small business concerns owned and controlled by service-disabled veterans." *Kingdomware Techs.*, 136 S. Ct. at 1973 (internal quotation marks omitted) (citing 15 U.S.C. § 644(g)(1)(B))).; *see also* 38 U.S.C.   8128(a) ("In procuring goods and services pursuant to a contracting preference under this title or any other provision of law, [VA] shall give priority to a small business concern owned and controlled by veterans . . . ."). The task of promulgating regulations "set[ting] forth procedures . . . to set aside contracts for" SDVOSBs has been assigned to at least two distinct agencies, SBA and VA. *See Kingdomware Techs.*, 136 S. Ct. at 1973 (internal quotation marks omitted); *see also* 15 U.S.C. § 657f (SBA); 38 U.S.C. § 8127(a), (e) (VA).

*Veterans Contracting Grp., Inc. v. United States*, 135 Fed. Cl. 316, 318-19 (2017). Congress expressly stated the purpose of the Veterans Benefits Act of 2006 was to "increase contracting opportunities for small business concerns owned and controlled by . . . veterans with service connected disabilities." 38 U.S.C. § 8127(a)(1).

Both the VA (for VA contracts) and the SBA (for all other federal agency contracts) promulgated regulations regarding SDVOSB set-aside contracting. *See Veterans Contracting Grp., Inc.*, 135 Fed. Cl. 316, 319-22 (explaining the two programs). The eligibility requirements for both the VA and SBA SDVOSB programs were extremely similar and, in 2018, amendments to the relevant statutes went into effect that actually merged the two regulatory schemes.[7] *Id.* at 322-25. However, as the contracts at issue in this motion were all awarded before October 1, 2018 through VA SDVOSB set-aside solicitations, the VA SDVOSB eligibility regulations which were

---

[7] The controlling statutes and both the SBA and VA regulations all required a company to be majority-owned (at least 51% ownership) and controlled on a long-term and day-to-day basis by a service-disabled veteran to qualify for SDVOSB eligibility. 38 U.S.C. § 8127(f); 15 U.S.C. § 632(q)(1); 48 C.F.R. §§ 2.101, 52.212-3; 38 C.F.R. § 74; 13 C.F.R. § 125.10.

in place between 2010 and 2015, when all the SDVOSB Contracts were awarded, are controlling to this case. *See CVE Appeal of: Barry Capital Projects, Inc.*, 2019 SBA LEXIS 31, at *16-17, SBA No. CVE-106-A (SBA April 8, 2019) ("Determinations on [SDVOSB] eligibility prior to October 1, 2018 are based upon the VA's regulations at 38 C.F.R. [Part 74]").  Therefore, all citations in this motion will be to the relevant 2015 VA SDVOSB regulations, which are included as an appendix.

At a broad level, the VA regulations required that to qualify for an SDVOSB set-aside contract, the service-disabled veteran must control "both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations." 38 C.F.R. § 74.4(b) (2015).  Additionally, the VA regulations provided that a firm must be at least 51 percent unconditionally and directly owned by one or more service-disabled veterans.  *Id.* § 74.3 (2015).

A specific process had to be followed for potential SDOVSBs to be registered and verified by the VA, in particular by the VA's Center for Verification and Evaluation ("CVE").  The Court of Federal Claims summarized the process by writing:

> VA implemented the Veterans Benefits Act through the "Veterans First Contracting Program," established in 2007.  *See AmBuild Co. v. United States*, 119 Fed. Cl. 10, 19 (2014).  "At the Program's commencement, SDVOSB . . . entities were permitted to self-certify . . . for registration in the VetBiz VIP database." *Id.*  But the authorizing statute was subsequently amended, requiring the Secretary of Veterans Affairs to maintain the database and certify contracting entities through the VA's Center for Verification and Evaluation ("CVE").  *Id.* (citing 38 U.S.C. § 8127(e), (f)); *see also* 48 C.F.R. § 804.1102.  A business must be included on the VA's VIP database to qualify as an eligible SDVOSB for a contract award.  *See* 38 U.S.C. § 8127(e), (f); 48 C.F.R. § 804.1102.  The CVE now certifies participating entities and maintains such certification by performing examinations that "review . . . a[t] a minimum . . . all documents supporting the application, as described in [38 C.F.R.] § 74.12." *See* 38 C.F.R. § 74.20(b).

*Veterans Contracting Grp., Inc.*, 135 Fed. Cl. at 319.  Even after an entity is certified by CVE as an SDVOSB, it was under a continuing affirmative duty to "maintain its eligibility during its tenure and [] inform CVE of any changes that would adversely affect its eligibility." 38 C.F.R. § 74.15(a) (2015).

Additionally, when submitting proposals for SDVOSB set-aside contracts, a contractor "must represent to the contracting officer that it is a (1) SDVOSB concern []; (2) Small business concern under the North American Industry Classification System (NAICS) code assigned to the acquisition; and (3) Verified for eligibility in the VIP database." 48 C.F.R. § 819.7003(b).  When a contract is set aside for an SDVOSB, the solicitation and corresponding contract must include provisions stating that "[o]ffers received from concerns that are not [SDVOSBs] shall not be considered," and that "[a]ny award resulting from this solicitation shall be made to [an SDVOSB]." 48 C.F.R. §§ 19.1408, 52.219-27, 819.7009, 852.219-10.

## II.     THE INSURANCE DEFENDANTS VIOLATED THE FCA

The undisputed material facts conclusively show that the Insurance Defendants committed violations of FCA § 3729(a)(1)(A) by causing false claims to be submitted to the United States and that Hanover and Hudson committed reverse false claims violations under FCA § 3729(a)(1)(G).  The most important issue running through all the FCA violations is the knowledge possessed by the Insurance Defendants.   In a previous opinion examining the Insurance Defendants' potential FCA liability, this Court found that allegations showing that the Insurance Defendants "had knowledge of CSG's and Citibuilders fraud, *i.e.*, that they were fraudulently asserting status as SDVOSBs" was critical to the Insurance Defendants' liability under both FCA § 3729(a)(1)(A) & (G). *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *45-57.   Once that knowledge is established, liability for causing false claims to be submitted can then be shown if

the Insurance Defendants either "took critical actions in furtherance of the fraud" or "continued to do business with an entity upon becoming aware of the" fraud.  *Id.* at \*47-49, *see United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014).   Additionally, if Hanover and Hudson possessed this knowledge but then avoided their obligation to pay the United States under the performance bonds they issued for VA SDVOSB set-aside contracts, reverse false claim liability would exist.  *Scollick*, 2017 U.S. Dist. LEXIS 119530, at \*52-53.

Here, Schendel and Centennial had knowledge that CSG and later Citibuilders Solutions were not majority-owned nor controlled by a service-disabled veteran.  Schendel and Centennial provided this knowledge to Hanover and Hudson.   Despite this knowledge, the Insurance Defendants facilitated and issued the required performance bonds to the United States, without which the SDVOSB set-aside construction contracts could not have been awarded.  Hanover and Hudson further failed to satisfy their obligation under their issued performance bonds, that they repay the United States the full performance bond amount because the work was not completed by an eligible SDVOSB.

**A.  The Insurance Defendants' Knowledge of CSG and Citibuilders' Fraudulent Assertions of SDVOSB Status.**

As defined by the FCA, "knowledge" means a party has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A); *Escobar*, 136 S. Ct. at 1996; *see United States v. Speqtrum, Inc.*, 113 F. Supp. 3d 238, 249 (D.D.C. 2015) (defining "deliberate ignorance" as "the kind of willful blindness from which subjective intent can be inferred); *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, Case No. 10-1094, 2017 U.S. Dist. LEXIS 49531, at \*65 (D.D.C. Apr. 19, 2017) (defining "reckless disregard" as "the refusal to learn of information which an individual, in the exercise of prudent judgment, should have

24

discovered").  In order to be eligible to receive SDVOSB set-aside contracts from the VA, an entity **must** be owned and controlled by a service-disabled veteran.  38 C.F.R. § 74.2 (2015).  If not, the entity is not eligible to bid on, win, perform, or be paid under a VA SDVOSB set-aside contract. 38 U.S.C. § 8127(a), (d); 48 C.F.R. §§ 819.7009, 852.219-10(b).

The record unequivocally shows that the Insurance Defendants had actual knowledge, or that the very least exercised reckless disregard after being put on high notice, that the entities they were bonding were not majority-owned and controlled by service-disabled veterans but were nevertheless asserting as much to obtain SDVOSB set-aside contracts.

### 1.   The Insurance Defendants' SDVOSB Knowledge

The record shows that during the times the Insurance Defendants' were involved in facilitating or issuing surety bonds, they knew that CSG or Citibuilders Solutions were registered as SDVOSBs and the contracts they were bonding were VA SDVOSB set-aside contracts.

In a letter from April 27, 2010, Centennial and Schendel told Hanover that Narula and Parekh's planned construction jobs "will be small business set aside jobs."  Stmt. ¶ 72.  The OST Account Summary prepared for Hanover on September 16, 2010 and later given to Hudson on June 17, 2011 explicitly stated that "Centurion Solutions Group LLC . . . is the SDV [service-disabled veteran] entity" and that "[a]ll bids are in the name of Centurion Solutions Group, LLC." Stmt. ¶¶ 131-32, 156.  On June 17, 2011, Hudson confirmed in an email its knowledge that their "account is really Centurion Solutions Group" and the "[m]ajority of work is SDV work (Service Disabled Veterans) . . . [a]ll bonds are written for Centurion Solutions Group."  Stmt. ¶ 155. Importantly, Hanover and Hudson agreed when they issued performance bonds for SDVOSB set-aside contracts that they would be obligated for a penal sum equal to the bonds' entire value if the contracts "were not awarded to and performed by SDVOSBs."  Stmt. ¶ 128, 160; *Scollick II*, 2017

25

U.S. Dist. LEXIS 119530, at *53-54; *see Rock Island, A. & L. R. Co. v. United States*, 254 U.S. 141, 143 (1920).  Regarding Citibuilders Solutions, from the start Centennial was aware it was asserting SDVOSB status.  Stmt. ¶ 251.

Further, it was Centennial's procedure to receive a copy of the pages of a contract that stated the contract was SDVOSB set-aside when CSG or Citibuilders Solutions requested a bond. Stmt. ¶¶ 129, 160.  These pages were then either sent to Hanover for bond approval, or Centennial would issue the bond while acting as Hudson's agent.  Stmt. ¶¶ 129, 160.  Even if not made explicitly aware that each contract was an SDVOSB set-aside, failing to make the inquiries to ascertain this knowledge is at the very least deliberate ignorance or reckless disregard under the FCA.  31 U.S.C. § 3729(b)(1)(A); *Speqtrum, Inc.*, 113 F. Supp. 3d at 249; *Scutellaro*, 2017 U.S. Dist. LEXIS 49531, at *65.

There is no dispute that the Insurance Defendants had knowledge that the contracts they were facilitating and issuing bonds for were VA SDVOSB set-aside contracts.

## 2.   The Insurance Defendants' Knowledge of Ownership

Next, the record clearly shows that the Insurance Defendants all possessed knowledge at the time they were facilitating or issuing the relevant bonds that neither CSG nor Citibuilders Solutions were at least 51% owned by a service-disabled veteran as required.  38 C.F.R. §§ 74.2, 74.2 (2015).  First, the Insurance Defendants all knew, or should have known through limited inquiry, that the service-disabled veteran associated with CSG was Gogia, and Schendel and Centennial knew the service-disabled veteran associated with Citibuilders Solutions was Goodweather.  Stmt. ¶¶ 131-32, 156, 251.  Despite this, Centennial and Schendel repeatedly told Hanover that CSG was either: 1) a "wholly owned subsidiary" of OST, Stmt. ¶¶ 130, 138; 2) a "construction division" or "construction arm" of OST, Stmt. ¶ 105; 136; or 3) that ownership was

divided in thirds between Narula, Parekh, and Gogia. Stmt. ¶ 142-43. Hanover memorialized its understanding that CSG was not owned by Gogia in its OST Account Summary. Stmt. ¶ 132 ("Amar Gogia Managing Member of Centurion Solutions Group, LLC also a subsidiary of OST is the SDV entity"). Centennial and Schendel continued passing along their knowledge that Gogia did not own CSG to Hudson, which itself stated that "Centurion is a subsidiary of OST." Stmt. ¶¶ 156, 162, 164, 167. It was not until November 29, 2011, after all the CSG bonds relevant to this case had been issued, that Centennial and Schendel finally stated that "I thought Centurion was going to be a subsidiary of OST and it is officially not one." Stmt. ¶ 166.

As for Citibuilders Solutions, while Centennial and Schendel were actually told that a service-disabled veteran, Goodweather, was actually Citibuilders Solutions' 100% owner, they were later put on notice that this was not in fact the case. Stmt. ¶¶ 251, 253, 259-62. First, Centennial was made aware that even though Mr. Goodweather supposedly owned 100% of Citibuilders Solutions, Parekh provided all the capital, an "unusual" arrangement according to Centennial. Stmt. ¶ 253. Next, Parekh provided Centennial with Citibuilders Solutions tax documents that listed Parekh as the 100% owner and expressly stated that "majority ownership must be a service-disabled veteran" to be an eligible SDVOSB. Stmt. ¶¶ 259-62. However, Centennial simply accepted Parekh's two-line explanation for the tax documents listed him as the full owner of Citibuilders Solutions and did not request any further evidence of Goodweather's actual ownership. *Id.*

### 3. Insurance Defendants' Knowledge of Control

The Insurance Defendants' communications and actions demonstrate their knowledge that neither CSG nor Citibuilders Solutions were "controlled" by a service-disabled veteran. 38 C.F.R. §§ 74.2, 74.4 (2015). First, throughout the entirety of the bonding relationship between the

27

Insurance Defendants and CSG or Citibuilders Solutions, the Insurance Defendants only ever dealt with Parekh or Narula, never Gogia or Goodweather, clearly evidencing their belief that Gogia and Goodweather did not manage CSG and Citibuilders Solutions as required.  Stmt. ¶¶ 78, 258, 263; 38 C.F.R. § 74.4 (2015).  Additionally, the Insurance Defendants had knowledge that large amounts of money had been put into CSG and Citibuilders Solutions by individuals or entities other than the associated service-disabled veterans.  Stmt. ¶¶ 146-47, 152, 161-162, 253; 38 C.F.R. § 74.4(i).  Finally, the communications among the Insurance Defendants repeatedly illustrate that they had knowledge that individuals other than Gogia and Goodweather were running the SDVOSBs, with Gogia and Goodweather rarely, if ever, mentioned and their backgrounds and roles rarely, if ever, discussed.  Stmt. ¶¶ 70, 73, 132, 135-36, 142, 153, 156, 162, 252.

### 4.   Knowledge of CSG's and Citibuilders Solutions' Fraud

When taken together, the Insurance Defendants actual knowledge that it was facilitating or issuing bonds on VA SDVOSB set-aside contracts for companies that were neither majority-owned nor controlled by the service-disabled veterans associated with those companies provides the required "knowledge of CSG's and Citibuilders fraud, *i.e.*, that they were fraudulently asserting status as SDVOSBs." *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *45-57.  All that was required to have full knowledge of the fraud was for the Insurance Defendants to take the actual knowledge they possessed and apply it to the ownership and control regulations applicable to all VA SDVOSB set-aside contracts.  *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63 (1984) (recognizing the duty on parties to "familiarize themselves with the legal requirements for payment" when dealing with the United States Government); *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001).  By failing to take this simple last step to ensure they were not substantially assisting fraud, and instead burying their collective heads in the sand while continuing to reap the profits from bond premiums,

the Insurance Defendants at the very least acted with reckless disregard or deliberate ignorance under the FCA. *Speqtrum, Inc.*, 113 F. supp. 3d 238, 249 (D.D.C. 2015); *Scutellaro*, 2017 U.S. Dist. LEXIS 49531, at *65; *United States ex rel. Ervin & Assocs. V. Hamilton Sec. Grp.*, 370 F. Supp. 2d 18, 41-42 (D.D.C. 2005) (explaining that the FCA was amended in 1986 to "reach what has become known as the ostrich type situation where an individual has buried his head in the sand and failed to make simple inquiries which would alert him that false claims are being submitted"). Even if the Insurance Defendants did not possess knowledge of the actual truth of what was occurring at CSG and Citibuilders Solutions, they intentionally chose to make no further inquiries into the legality of CSG's and Citibuilders Solutions' conduct, wholly failed to initiate any substantial communications with Gogia or Goodweather, and never sought to determine their roles in CSG and Citibuilders Solutions, respectively.

## B. CSG and Citibuilders Solutions Were Not Eligible SDVOSBs and Submitted False Claims to the United States

For the Insurance Defendants to have either caused the submission of false claims, or for Hudson and Hanover to have avoided their obligations to the United States under their performance bonds, CSG and Citibuilders Solutions must actually have been ineligible for SDVOSB status yet still have performed and submitted claims under the relevant VA SDVOSB set-aside contracts. The record clearly shows this to be the case.[8] First, CSG and Citibuilders Solutions were never in compliance with the VA SDVOSB regulations as they were not majority-owned and controlled by Gogia and Goodweather. 38 C.F.R. §§ 74.2-74.4 (2015). Rather, as the internal communications between the parties show, essentially every aspect of CSG was controlled

---

[8] A full description and argument related to CSG's and Citibuilders Solutions' FCA violations can be found in Relator's motions for partial summary judgment against the other defendants in this case submitted alongside this motion.

by the OST Defendants and Parekh, including finances, operations, and long-term decision making.  Stmt. ¶¶ 68, 119-21, 125-27, 171, 183, 186, 190-91, 194-98, 199, 203, 206, 208-09, 213, 216, 218, 224, 227; 38 C.F.R. § 74.4 (2015).   The service-disabled veteran associated with Citibuilders Solutions, Goodweather, played **no** role in its operations and was not even aware Citibuilders Solutions was in operation.   Stmt. ¶¶ 236-49, 269-74.   Non-veterans also held improper ownership interests in both CSG and Citibuilders Solutions.  Stmt. ¶¶ 91-101, 144, 183, 187-93, 200, 262, 264.

Despite this, CSG and Citibuilders Solutions both repeatedly certified to the United States that they were eligible SDVOSBs.   Stmt. ¶ 59, 247, 289; 48 C.F.R. § 819.7003(b).   The misrepresentations regarding CSG's and Citibuilders Solutions' SDVOSB compliance necessarily caused the VA to award the SDVOSB Contracts.  *Scollick III*, 2020 U.S. Dist. LEXIS 208604, at *28; *United States v. Honeywell, Inc.*, Case No. 08-0961, 2020 U.S. Dist. LEXIS 221960, at *65 (D.D.C. Nov. 25, 2020) (describing causation in fraud in the inducement cases).   As set-aside contracts, the SDVOSB contracts at issue could **only** be awarded to eligible SDVOSBs.  38 U.S.C. § 8127(a), (d); 48 C.F.R. §§ 819.7009, 852.219-10(b).

### C.  Indirect Presentment Violations Under FCA § 3729(a)(1)(A)

Since the Insurance Defendants possessed the above-described knowledge of CSG's and Citibuilders' fraudulent assertions of SDVOSB status, the conduct they engaged in easily constitutes FCA violations for causing false claims to be submitted.  Under the theory of indirect presentment, a party is still liable under the FCA even if it does not present a false claim to the United States directly so long as its conduct was "at least a substantial factor in causing, if not the but-for cause of, the submission of false claims."  *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *19-20.  As explained by this court, the action of the Insurance Defendants satisfies this element

if either (1) the Insurance Defendants "continued to do business with CSG and Citibuilders even though they were aware that CSG and Citibuilders were committing fraud" or (2) the Insurance Defendants "took critical actions in furtherance of the fraud." *Id.* at \*47-49.

Here, the Insurance Defendants did both.  With the knowledge of CSG's fraud, the Insurance Defendants continued to do business with them by facilitating and issuing bonds for CSG's VA SDVOSB set-aside contracts.  Stmt. ¶¶ 128-29, 160; *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at \*47-48.  Next, the facilitation and issuance of bonds by the Insurance Defendants was a "critical action in furtherance of the fraud" as the bonds were required for CSG to obtain, perform, and submit claims for payment under the VA SDVOSB set-aside contracts.  Stmt. ¶¶ 9-10, 128, 160; 40 U.S.C. § 3113; *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at \*48-49.  The same applies to Schendel and Centennial with respect to Citibuilders Solutions as they, with knowledge of Citibuilders Solutions' fraud, continued to do business with Citibuilders Solutions and provide the "critical action" of facilitating the required bonding.  Stmt. ¶¶ 267-68; 40 U.S.C. § 3113; *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at \*47-49.

### D.  Reverse False Claims Violations Under § 3729(a)(1)(G)

Hanover and Hudson violated the reverse false claims provision of the FCA when, with full knowledge that the VA SDVOSB set-aside contracts for which they issued performance bonds were awarded to and performed by a non-SDVOSB, they avoided their obligations under the issued performance bonds to pay the United States the total amount of the performance bonds. 31 U.S.C. ¶ 3729(a)(1)(G).  Performance bonds are executed through the government-issued Standard Form 25 which specifically states that the surety who issues the bond is "firmly bound to the United States of America in the above penal sum" unless the "[p]rincipal fulfills all the understandings, covenants, terms, conditions, and agreements of the contract . . . [and] any and all duly authorized

31

modifications of the contract."  Stmt. ¶ 10.  As previously stated by this Court, the performance

bond requires that SDVOSB set-aside contracts "be awarded to and performed by SDVOSBs."

*Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *53-54.  Hanover issued eight performance bonds

as the surety and Hudson issued five performance bonds as the surety, all thirteen of which listed

CSG as the principal and were for VA SDVOSB set-aside contracts.  Stmt. ¶ 128-9, 160.  By the

terms of the performance bond, Hanover and Hudson were obligated to pay the entire amount of

each performance bond after the contracts were neither awarded to nor performed by an SDVOSB.

Stmt. ¶ 10, 128-29, 160.  Neither Hanover nor Hudson alerted the United States to the fact the

contracts at issue were not awarded to or performed by an SDVOSB and neither paid the penal

sum as obligated.  Therefore, Hudson and Hanover both avoided having to pay the United States

the obligated penal sum that was due and violated FCA § 3729(a)(1)(G) for every CSG

performance bond issued.  *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *53-54.

## III.   DAMAGES

The damages sustained by the United States as a result of the Insurance Defendants' FCA

violations are equal to the total amount the United States paid out under the relevant SDVOSB set-

aside contracts.   Under the FCA, a party "is liable to the United States Government for . . . 3 times

the amount of damages which the Government sustains because of the act of that person."  31

U.S.C. § 3729(a).  As this Court has already held in this case when confronted with arguments by

defendants to the contrary:

> [A]lthough the government may not have experienced a financial loss, it still
> experienced a loss according to Circuit precedent, which states that "where the
> defendant fraudulently sought payments for participating in programs designed to
> benefit third-parties rather than the government itself, the government can easily
> establish that it received nothing of value from the defendant and that all payments
> made are therefore recoverable as damages."  *United States v. Sci. Applications
> Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010).   The intended third party
> beneficiaries here are actual SDVOSBs who are eligible for SDOVSB set aside

> contracts.  The Amended Complaint alleges that CSG and Citibuilders—who did not qualify as SDOVSBs—sought payment for contracts awarded pursuant to this SDVOSB set aside program.  Thus, it has sufficiently alleged that the government received nothing of value here.

*Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *54; *see* Hudson Opposition, ECF No. 133 at 16-17 (arguing that government suffered no loss because the construction underlying the SDVOSB contracts was completed.).

Courts have routinely found that the United States suffers a complete loss where FCA violations fraudulently (1) divert taxpayer dollars from intended third party beneficiaries in a government program or (2) subvert the purpose of a statute.  *See SAIC*, 626 F.3d at 1279; *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (assessing FCA damages based on the totality of federal healthcare dollars reimbursed even though "most of the patients for which claims were submitted received some medical care—perhaps all the care reflected in the claim forms"); *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 90 (2d Cir. 2021) (recognizing that in a situation where "the government bargained for something qualitatively, but not quantifiably, different from what it received" and "the government was paying for a program that was not at all as specified" the damages are equal to the full amount paid); *United States v. Mackby*, 939 F.3d 1013, 1018-19 (9th Cir. 2003); *United States ex rel. Liotine v. CDW Gov't, Inc.*, Case No. 05-33-DRH, 2012 U.S. Dist. LEXIS 94837, at *32-33 (S.D. Ill. July 10, 2012) (holding that when a company knowingly violates the Trade Agreement Act by selling the United States goods from a non-compliant country, the FCA damages are equal to the full cost paid out by the United States even if the United States received sufficient quality goods).  Congress itself codified the belief that the damages in set-aside contracting fraud cases are presumed to be the entirety of what was paid when it explicitly included in the Small Business Act that:

> In every contract . . . which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract . . . whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

15 U.S.C. § 632(w).

Here, Congress intended the funds paid out under the SDVOSB contracts to go to only to actual SDVOSBs.  38 U.S.C. § 8127(a), (d).  Congress took the steps to repeatedly pass and amend statutes to bolster the number of contracts awarded to SDVOSBs.  *Kingdomware Techs., Inc.*, 136 S. Ct. at 1973-74.  With this background, it is clear that when entering into the SDVOSB contracts here, the United States did not simply bargain for construction work, but rather it bargained for construction work performed by an eligible SDVOSB.  The fact that an SDVOSB would perform the work was the heart of what the United States sought when entering the SDVOSB contracts.  It did not receive the benefit of that bargain.  Rather, the fraudulent inducement to award CSG and Citibuilders Solutions the SDVOSB set-aside contracts in this case wholly prevented the United States from getting the services it bargained for.

The total amount paid out by the United States under the SDVOSB contracts that the Insurance Defendants facilitated or issued the bonding for is easily ascertainable at $8,802,847 for Centennial and Schendel, Stmt. ¶¶ 128, 160, 267-68); $4,044,697 for Hanover, Stmt. ¶ 128; and $1,359,685 for Hudson.  Stmt. ¶ 160.  When trebled, the total damages for the false claims the Insurance Defendants caused to be submitted, or for the obligations Hudson and Hanover avoided paying, equal 1) $26,408,541 for Centennial and Schendel; 2) $12,134,091 for Hanover; and 3) $4,079,055 for Hudson.[9]

---

[9] Relator is also concurrently seeking summary judgment against other defendants in this case besides the Insurance Defendants.  Therefore, any other defendants whose FCA violations

## CONCLUSION

For the foregoing reasons, Relator's Motion for Partial Summary Judgment Against Defendants Centennial Surety Associates, Inc., Michael Schendel, Hanover Insurance Company, and Hudson Insurance Company should be granted.

Respectfully submitted,

 /s/ Michael D. Kohn
Michael Kohn, DC BAR #425617
/s/ Todd Yoder
Todd Yoder, DC BAR # 1048520
David K. Colapinto, DC BAR #416390

KOHN, KOHN & COLAPINTO, LLP
1710 N Street, N.W.
Washington, D.C. 20036
Phone: (202) 342-6980
Fax: (202) 342-6984
*Attorneys for Plaintiff-Relator*

February 24, 2021

---

also resulted in all or a portion of these damages should be held jointly and severally liable for the amount of those damages correlated to their violations.

## **<u>APPENDIX</u>**

The following pages contain the 2015 versions of the VA SDVOSB regulations relied upon in this brief.

## 2015 38 CFR 74.1

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS >  PART 74-- VETERANS SMALL BUSINESS REGULATIONS >  GENERAL GUIDELINES*

## § 74.1 What definitions are important for VetBiz Vendor Information Pages (VIP) Verification Program?

For the purposes of part 74, the following definitions apply.

Center for Veterans Enterprise (CVE) is an office within the U.S. Department of Veterans Affairs (VA) and is a subdivision of VA's Office of Small and Disadvantaged Business Utilization. The CVE helps veterans interested in forming or expanding their own small businesses. It also helps VA contracting offices identify veteran-owned small businesses and works with the Small Business Administration's Veterans Business Development Officers and Small Business Development Centers nationwide regarding veterans' business financing, management, and technical assistance needs.

Days are calendar days. In computing any period of time described in part 74, the day from which the period begins to run is not counted, and when the last day of the period is a Saturday, Sunday, or Federal holiday, the period extends to the next day that is not a Saturday, Sunday, or Federal holiday. Similarly, in circumstances where CVE is closed for all or part of the last day, the period extends to the next day on which the agency is open.

Day-to-day management means supervising the executive team, formulating sound policies and setting strategic direction.

Day-to-day operations mean the marketing, production, sales, and administrative functions of the firm.

Eligible individual means a veteran, service-disabled veteran or surviving spouse, as defined in this section.

Immediate family member means father, mother, husband, wife, son, daughter, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, and mother-in-law.

Joint venture is an association of two or more small business concerns to engage in and carry out a single, specific business venture for joint profit, for which purpose they combine their efforts, property, money, skill, or knowledge, but not on a continuing or permanent basis for conducting business generally. For VA contracts, a joint venture must be in the form of a separate legal entity.

Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's chapter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.

Non-veteran means any individual who does not claim veteran status, or upon whose status an applicant or participant does not rely in qualifying for VetBiz Vendor Information Pages (VIP) Verification Program participation.

Office of Small and Disadvantaged Business Utilization is the office within the Department of Veterans Affairs that establishes and monitors small business program goals at the prime and subcontract levels and which functions as the ombudsman for veterans and service-disabled veterans seeking procurement opportunities with the Department.

Participant means a veteran-owned small business concern that has verified status in the VetBiz Vendor Information Pages database.

2015 38 CFR 74.1

Primary industry classification means the six-digit North American Industry Classification System (NAICS) code designation which best describes the primary business activity of the participant. The NAICS code designations are described in the North American Industry Classification System (NAICS) Manual published by the U.S. Office of Management and Budget.

Principal place of business means the business location where the individuals who manage the concern's day-to-day operations spend most working hours and where top management's current business records are kept. If the office from which management is directed and where the current business records are kept are in different locations, CVE will determine the principal place of business for program purposes.

Same or similar line of business means business activities within the same three-digit "Major Group" of the NAICS Manual as the primary industry classification of the applicant or participant. The phrase "same business area" is synonymous with this definition.

Service-disabled veteran is a veteran who possesses either a disability rating letter issued by the Department of Veterans Affairs, establishing a service-connected rating between 0 and 100 percent, or a disability determination from the Department of Defense.

Service-disabled veteran-owned small business concern is a business not less than 51 percent of which is owned by one or more service-disabled veterans, or in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; the management and daily business operations of which are controlled by one or more service-disabled veterans, or in the case of a veteran with a permanent and severe disability, a spouse or permanent caregiver of such veteran. In addition, some businesses may be owned and operated by an eligible surviving spouse. Reservists or members of the National Guard disabled from a disease or injury incurred or aggravated in line of duty or while in training status also qualify.

Small business concern is-- CVE applies the small business concern definition established by 48 CFR 2.101.

Surviving spouse is any individual identified as such by VA's Veterans Benefits Administration and listed in its database of veterans and family members. To be eligible for VetBiz VIP Verification, the following conditions must apply:

**(1)** If the death of the veteran causes the small business concern to be less than 51 percent owned by one or more veterans, the surviving spouse of such veteran who acquires ownership rights in such small business shall, for the period described in paragraph (2) of this definition, be treated as if the surviving spouse were that veteran for the purpose of maintaining the status of the small business concern as a service-disabled veteran-owned small business.

**(2)** The period referred to in paragraph (1) of this definition is the period beginning on the date on which the veteran dies and ending on the earliest of the following dates:

**(i)** The date on which the surviving spouse remarries;

**(ii)** The date on which the surviving spouse relinquishes an ownership interest in the small business concern;

**(iii)** The date that is 10 years after the date of the veteran's death; or

**(iv)** The date on which the business concern is no longer small under Federal small business size standards.

**(3)** The veteran must have had a 100 percent service-connected disability or died as a direct result of a service-connected disability.

Note to definition of surviving spouse: For program eligibility purposes, the surviving spouse has the same rights and entitlements of the service-disabled veteran who transferred ownership upon his or her death.

Unconditional ownership means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or

incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

VA is the U.S. Department of Veterans Affairs.

Vendor Information Pages (VIP) is a database of businesses eligible to participate in VA's Veteran-owned Small Business Program. The online database may be accessed at no charge via the Internet at http://www.VetBiz.gov.

Verification eligibility period is a 12-month period that begins on the date the Center for Veterans Enterprise issues the approval letter establishing verified status. The participant must submit a new application each year to continue eligibility.

VetBiz.gov (VetBiz) is a Web portal VA maintains at http://www.VetBiz.gov. It hosts the Vendor Information Pages database.

Veteran is a person who served on active duty with the U.S. Army, Air Force, Navy, Marine Corps or Coast Guard, for any length of time and at any place and who was discharged or released under conditions other than dishonorable. Reservists or members of the National Guard called to Federal active duty or disabled from a disease or injury incurred or aggravated in line of duty or while in training status also qualify as a veteran.

Veteran-owned small business concern (VOSB) is a small business concern that is not less than 51 percent owned by one or more veterans, or in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; the management and daily business operations of which are controlled by one or more veterans and qualifies as "small" for Federal business size standard purposes. All service-disabled veteran-owned small business concerns (SDVOSBs) are also, by definition, veteran-owned small business concerns. When used in these guidelines, the term "VOSB" includes SDVOSBs.

Veterans Affairs Acquisition Regulation (VAAR) is the set of rules that specifically govern requirements exclusive to the U.S. Department of Veterans Affairs (VA) prime and subcontracting actions. The VAAR is chapter 8 of title 48, Code of Federal Regulations, and supplements the Federal Acquisition Regulation (FAR), which contains guidance applicable to most Federal agencies.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 76 FR 3017, 3022, Jan. 19, 2011]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

# 2015 38 CFR 74.2

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS >  PART 74-- VETERANS SMALL BUSINESS REGULATIONS >  GENERAL GUIDELINES*

## § 74.2 What are the eligibility requirements a concern must meet for VetBiz VIP Verification Program?

**(a)**Ownership and control. A small business concern must be unconditionally owned and controlled by one or more eligible veterans, service-disabled veterans or surviving spouses, have completed the online Vendor Information Pages database forms at http://www.VetBiz.gov, and has been examined by VA's Center for Veterans Enterprise. Such businesses appear in the VIP database as "verified."

**(b)**Good character. Veterans, service-disabled veterans and surviving spouses with ownership interests in VetBiz verified businesses must have good character. Debarred or suspended concerns or concerns owned or controlled by debarred or suspended persons are ineligible for VetBiz VIP Verification.

**(c)**False Statements. If, during the processing of an application, CVE determines that an applicant has knowingly submitted false information, regardless of whether correct information would cause CVE to deny the application, and regardless of whether correct information was given to CVE in accompanying documents, CVE will deny the application. If, after verifying the Participant's eligibility, CVE discovers that false information has been knowingly submitted by a firm, CVE will remove the "verified" status from the VIP database and notify the business by phone and mail. Whenever CVE determines that the applicant submitted false information, the matter will be referred to the Office of Inspector General for review. In addition, the CVE will request that debarment proceedings be initiated by the Department.

**(d)**Federal financial obligations. Neither a firm nor any of its eligible individuals that fails to pay significant financial obligations owed to the Federal Government, including unresolved tax liens and defaults on Federal loans or other Federally assisted financing, is eligible for VetBiz VIP Verification.

**(e)  U.S.**Small Business Administration (SBA) Protest Decisions. Any firm registered in the VetBiz VIP database that is found to be ineligible due to an SBA protest decision or other negative finding will be immediately removed from the VetBiz VIP database. Until such time as CVE receives official notification that the firm has proven that it has successfully overcome the grounds for the determination or that the SBA decision is overturned on appeal, the firm will not be eligible to participate in the 38 U.S.C. 8127 program.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010]

2015 38 CFR 74.2

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**End of Document**

# 2015 38 CFR 74.3

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF  >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS  >  PART 74-- VETERANS SMALL BUSINESS REGULATIONS  >  GENERAL GUIDELINES*

## § 74.3 Who does the Center for Veterans Enterprise (CVE) consider to own a veteran-owned small business?

An applicant or participant must be at least 51 percent unconditionally and directly owned by one or more veterans or service-disabled veterans.

**(a)**Ownership must be direct. Ownership by one or more veterans or service-disabled veterans must be direct ownership. An applicant or participant owned principally by another business entity or by a trust (including employee stock ownership plans [ESOP]) that is in turn owned by one or more veterans or service-disabled veterans does not meet this requirement. However, ownership by a trust, such as a living trust, may be treated as the functional equivalent of ownership by a veteran or service-disabled veteran where the trust is revocable, and the veteran or service-disabled veteran is the grantor, a trustee, and the sole current beneficiary of the trust. For employee stock ownership plans where 5 or fewer persons who are individuals, estates, or trusts own 50 percent or more of the total combined voting power of the corporation, the employee plan will be determined to be "excluded stock" and eligible parties must control 51 percent or more of the combined voting power of the corporation. For employee stock ownership plans where greater than 5 persons who are individuals, estates, or trusts own 50 percent or more of the total stock, eligible parties must control 51 percent or more of the combined voting power of the corporation, including the ESOP stock.

**(b)**Ownership must be unconditional. Ownership by one or more veterans or service-disabled veterans must be unconditional ownership. Ownership must not be subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms. In particular, CVE will evaluate ownership according to the following criteria for specific types of small business concerns.

**(1)**Ownership of a partnership. In the case of a concern that is a partnership, at least 51 percent of every class of partnership interest must be unconditionally owned by one or more veterans or service-disabled veterans. The ownership must be reflected in the concern's partnership agreement.

**(2)**Ownership of a limited liability company. In the case of a concern that is a limited liability company, at least 51 percent of each class of member interest must be unconditionally owned by one or more veterans or service-disabled veterans.

**(3)**Ownership of a corporation. In the case of a concern that is a corporation, at least 51 percent of each class of voting stock outstanding and 51 percent of the aggregate of all stock outstanding must be unconditionally owned by one or more veterans or service-disabled veterans.

**(c)** Stock options' effect on ownership. In determining unconditional ownership, CVE will disregard any unexercised stock options or similar agreements held by veterans or service-disabled veterans. However, any unexercised stock options or similar agreements (including rights to convert non-voting stock or debentures into voting stock) held by non-veterans will be treated as exercised, except for any ownership interests that are held by investment companies licensed under part 107 of title 13, Code of Federal Regulations.

**(d)** Profits and distributions. One or more veterans or service-disabled veterans must be entitled to receive:

**(1)** At least 51 percent of the annual distribution of profits paid to the owners of a corporate, partnership, or LLC applicant or participant;

**(2)** At least 51 percent of the net profits earned by a joint venture in which the applicant or participant is the lead concern;

**(3)** 100 percent of the value of each share of stock owned by them in the event that the stock is sold; and

**(4)** At least 51 percent of the retained earnings of the concern and 100 percent of the unencumbered value of each share of stock owned in the event of dissolution of the corporation, partnership, or LLC.

**(5)** An eligible individual's ability to share in the profits of the concern should be commensurate with the extent of his/her ownership interest in that concern.

**(e) Change of ownership.**

**(1)** A participant may remain eligible after a change in its ownership or business structure, so long as one or more veterans or service-disabled veterans own and control it after the change and the participant files a new application identifying the new veteran owners or their new business interest.

**(2)** Any participant that is performing contracts and desires to substitute one veteran owner for another shall submit a proposed novation agreement and supporting documentation in accordance with FAR Subpart 42.12 to the contracting officer prior to the substitution or change of ownership for approval.

**(3)** Where the transfer results from the death or incapacity due to a serious, long-term illness or injury of an eligible principal, prior approval is not required, but the concern must file a new application with contracting officer and CVE within 60 days of the change. Existing contracts may be performed to the end of the instant term. However, no options may be exercised.

**(4)** Continued eligibility of the participant with new ownership and the award of any new contracts require that CVE verify all eligibility requirements are met by the concern and the new owners.

**(f)** Community property laws given effect. In determining ownership interests when an owner resides in any of the community property States or territories of the United States, CVE considers applicable State community property laws. If only one spouse claims veteran status, that spouse's ownership interest will be considered unconditionally held only to the extent it is vested by the community property laws.

# Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

# History

2015 38 CFR 74.3

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 76 FR 3017, 3022, Jan. 19, 2011]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**End of Document**

## 2015 38 CFR 74.4

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF  >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS  >  PART 74-- VETERANS SMALL BUSINESS REGULATIONS  >  GENERAL GUIDELINES*

## § 74.4 Who does CVE consider to control a veteran-owned small business?

**(a)**Control means both the day-to-day management and long-term decision-making authority for the VOSB. Many persons share control of a concern, including each of those occupying the following positions: Officer, director, general partner, managing partner, managing member and manager. In addition, key employees who possess expertise or responsibilities related to the concern's primary economic activity may share significant control of the concern. CVE will consider the control potential of such key employees on a case-by-case basis.

**(b)**Control is not the same as ownership, although both may reside in the same person. CVE regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations. An applicant or participant's management and daily business operations must be conducted by one or more veterans or service-disabled veterans. Individuals managing the concern must have managerial experience of the extent and complexity needed to run the concern. A veteran need not have the technical expertise or possess a required license to be found to control an applicant or participant if he or she can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise. However, where a critical license is held by a non-veteran having an equity interest in the applicant or participant firm, the non-veteran may be found to control the firm.

**(c)**

> **(1)**An applicant or participant must be controlled by one or more veterans or service-disabled veterans who possess requisite management capabilities. Owners need not work full-time but must show sustained and significant time invested in the business. An owner engaged in employment or management outside the applicant concern must submit a written statement supplemental to the application which demonstrates that such activities will not have a significant impact on the owner's ability to manage and control the applicant concern. Applications from joint-ventures are exempt from the requirement to submit a supplemental written statement.

> **(2)**An eligible full-time manager must hold the highest officer position (usually President or Chief Executive Officer) in the applicant or participant.

> **(3)**One or more veterans or service-disabled veteran owners who manage the applicant or participant must devote full-time to the business during the normal working hours of firms in the same or similar line of business. Work in a wholly-owned subsidiary of the applicant or participant may be considered to meet the requirement of full-time devotion. This applies only to a subsidiary owned by the VOSB itself, and not to firms in which the veteran has a mere ownership interest.

> **(4)**Except as provided in paragraph (f)(1) of this section, a veteran owner's unexercised right to cause a change in the management of the applicant concern does not in itself constitute veteran control, regardless of how quickly or easily the right could be exercised.

**(d)**In the case of a partnership, one or more veterans or service-disabled veterans must serve as general partners, with control over all partnership decisions. A partnership in which no veteran is a general partner will be ineligible for participation.

2015 38 CFR 74.4

**(e)** In the case of a limited liability company, one or more veterans or service-disabled veterans must serve as management members, with control over all decisions of the limited liability company.

**(f)** One or more veterans or service-disabled veterans must control the board of directors of a corporate applicant or participant.

    **(1)** CVE will deem veterans or service-disabled veterans to control the board of directors where:

        **(i)** A single veteran owns 100 percent of all voting stock of an applicant or participant concern;

        **(ii)** A single veteran owns at least 51 percent of all voting stock of an applicant or participant, the individual is on the board of directors and no super majority voting requirements exist for shareholders to approve corporation actions. Where supermajority voting requirements are provided for in the concern's articles of incorporation, its by-laws, or by State law, the veteran must own at least the percent of the voting stock needed to overcome any such supermajority voting requirements; or

        **(iii)** No single veteran owns 51 percent of all voting stock but multiple veterans in combination do own at least 51 percent of all voting stock, each such veteran is on the board of directors, no supermajority voting requirements exist, and the veteran shareholders can demonstrate that they have made enforceable arrangements to permit one of them to vote the stock of all as a block without a shareholder meeting. Where the concern has supermajority voting requirements, the veteran shareholders must own at least that percentage of voting stock needed to overcome any such supermajority ownership requirements.

    **(2)** Where an applicant or participant does not meet the requirements set forth in paragraph (f)(1) of this section, the veteran(s) upon whom eligibility is based must control the board of directors through actual numbers of voting directors or, where permitted by state law, through weighted voting (e.g., in a concern having a two-person board of directors where one individual on the board is a veteran and one is not, the veteran vote must be weighted--worth more than one vote--in order for the concern to be eligible for VetBiz VIP Verification). Where a concern seeks to comply with this paragraph:

        **(i)** Provisions for the establishment of a quorum cannot permit non-veteran directors to control the board of directors, directly or indirectly;

        **(ii)** Any executive committee of the board of directors must be controlled by veteran directors unless the executive committee can only make recommendations to and cannot independently exercise the authority of the board of directors.

    **(3)** Non-voting, advisory, or honorary directors may be appointed without affecting veterans' or service-disabled veterans' control of the board of directors.

    **(4)** Arrangements regarding the structure and voting rights of the board of directors must comply with applicable state law.

**(g)** Non-veterans may be involved in the management of an applicant or participant, and may be stockholders, partners, limited liability members, officers, or directors of the applicant or participant. With the exception of a spouse or personal caregiver who represents a severely disabled veteran owner, no such non-veteran or immediate family member may:

    **(1)** Exercise actual control or have the power to control the applicant or participant;

    **(2)** Be a former employer or a principal of a former employer of any affiliated business of the applicant or participant, unless it is determined by the CVE that the relationship between the former employer or principal and the eligible individual or applicant concern does not give the former employer actual control or the potential to control the applicant or participant and such relationship is in the best interests of the participant firm; or

    **(3)** Receive compensation from the applicant or participant in any form as directors, officers or employees, including dividends, that exceeds the compensation to be received by the highest officer

2015 38 CFR 74.4

(usually chief executive officer or president). The highest ranking officer may elect to take a lower salary than a non-veteran only upon demonstrating that it helps the applicant or participant.

**(h)**Non-veterans who transfer majority stock ownership or control of the firm to an immediate family member within 2 years prior to the application and remain involved in the firm as a stockholder, officer, director, or key employee of the firm are presumed to control the firm. The presumption may be rebutted by showing that the transferee has independent management experience necessary to control the operation of the firm, and indeed is participating in the management of the firm.

**(i)**Non-veterans or entities may be found to control or have the power to control in any of the following circumstances, which are illustrative only and not all inclusive:

> **(1)**Non-veterans control the board of directors of the applicant or participant, either directly through majority voting membership, or indirectly, where the by-laws allow non-veterans effectively to prevent a quorum or block actions proposed by the veterans or service-disabled veterans.

> **(2)**A non-veteran or entity, having an equity interest in the applicant or participant, provides critical financial or bonding support or a critical license to the applicant or participant which directly or indirectly allows the non-veteran significantly to influence business decisions of the participant, unless an exception is authorized by the Office of Small and Disadvantaged Business Utilization.

> **(3)**A non-veteran or entity controls the applicant or participant or an individual veteran owner through loan arrangements. Providing a loan guaranty on commercially reasonable terms does not, by itself, give a non-veteran or entity the power to control a firm.

> **(4)**Business relationships exist with non-veterans or entities which cause such dependence that the applicant or participant cannot exercise independent business judgment without great economic risk.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 75 FR 80720, Dec. 23, 2010; 76 FR 3017, 3023, Jan. 19, 2011]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**End of Document**

# 2015 38 CFR 74.15

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF  >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS  >  PART 74-- VETERANS SMALL BUSINESS REGULATIONS  >  APPLICATION GUIDELINES*

# § 74.15 What length of time may a business participate in VetBiz VIP Verification Program?

**(a)**A participant receives an eligibility term of 2 years from the date of CVE's approval letter establishing verified status. The participant must maintain its eligibility during its tenure and must inform CVE of any changes that would adversely affect its eligibility. The eligibility term may be shortened by cancellation by CVE or voluntary withdrawal by the participant (i.e., no longer eligible as a small business concern), as provided for in this subpart.

**(b)**When at least 50 percent of the assets of a concern are the same as those of an affiliated business, the concern will not be eligible for verification.

**(c)**CVE may initiate a verification examination whenever it receives credible information calling into the question a participant's eligibility as a VOSB. Upon its completion of the examination, CVE will issue a written decision regarding the continued eligibility status of the questioned participant.

**(d)**If CVE finds that the participant does not qualify as a VOSB, the procedures at § 74.22will apply.

**(e)**If CVE finds that the participant continues to qualify as a VOSB, the program term remains in effect.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 77 FR 38181, 38183, June 27, 2012, as confirmed at 78 FR 52085, 52087, Aug. 22, 2013]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

*End of Document*