UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ANDREW SCOLLICK, )))) | |
| Plaintiff-Relator, ) | Civ. Action No. 14-CV-01339-RCL |
| ) | |
| vs. ) | |
| ) | |
| VIJAY NARULA, *et al.,* ) | |
| ) | |
| Defendants. ) | |

## PLAINTIFF-RELATOR'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Plaintiff-Relator Andrew Scollick, by and through counsel, submits this Statement of Material Facts Not in Genuine Dispute in support of his four separate motions for partial summary judgment against Defendants Centurion Solutions Group, LLC, Amar Gogia, Optimal Solutions and Technologies, Inc., Vijay Narula, Ajay Madan, Centennial Surety Associates, Inc., Michael Schendel, Hanover Insurance Company, Hudson Insurance Company, and Neil Parekh.

**A.    Veterans Benefits Act and Veterans First Contracting**

1.      In an effort to expand greater contracting opportunities to individuals who were disabled in the service of this country, Congress enacted the Veterans Benefits, Health Care, and Information Technology Act of 2006 ("Veterans Benefits Act"), Pub. L. No. 109-461, tit. V, 120 Stat. 3403, 3425 (codified at 38 U.S.C. §§ 8127-28).   Under this Congressional mandate to prioritize service-disabled veterans in government contracting, the United States Department of

Veterans Affairs ("VA") established the Veterans First Contracting Program in 2006 which is governed by the regulations found at 38 C.F.R. Part 74.[1] (**Ex. 1**, Ward Decl. ¶ 4).

2.     The regulations at 38 C.F.R. Part 74 "include eligibility requirements for seeking service-disabled veteran-owned small business ("SDVOSB")" set-aside contracts. (**Ex. 1**, Ward Decl. ¶ 5).

3.     To be eligible "to be able to bid on, and be awarded an SDVOSB contract," a contractor must "submit an application and be verified by" the VA's Center for Verification and Evaluation ("CVE"). (**Ex. 1**, Ward Decl. ¶ 6).

4.     The CVE performs a review of various documents provided by the applicant to "determine if the applicant/participant meets the eligibility, ownership and control requirements in 38 C.F.R. Part 74." (**Ex. 1**, Ward Decl. ¶ 6).

5.     The VA regulations require that a service-disabled veteran "unconditionally and directly owns at least 51 percent" of an SDOVSB. (**Ex. 1**, Ward Decl. ¶ 6).

6.     For an entity to meet the VA's "control" requirement, a service-disabled veteran must conduct both the "business's long-term decision making" and the "day-to-day management and administration of the business operation." (**Ex. 1**, Ward Decl. ¶ 6). Further, a service-disabled veteran must hold "the highest officer position in the business" and have "the managerial experience of the extent and complexity needed to run the business." (***Id.***; *see id.* ¶ 9 (listing different factual scenarios which may lead to a determination by CVE that an entity is not an eligible SDVOSB.)).

---

[1] This Statement of Material Facts Not in Genuine Dispute is supported by the accompanying exhibits comprised of deposition testimony, documents produced in discovery, declarations, and other documents as described in the Declaration of Michael Kohn. (Kohn Decl., filed herewith)

7.      When approving SDVOSB applications, "CVE relies on the truthfulness of statements and documents submitted by the Veterans and owners." (**Ex. 1**, Ward Decl. ¶ 7).

8.      Once an application is approved, the CVE lists the applicant on the Vendor Information Pages ("VIP") database as an approved SDVOSB.  (**Ex. 1**, Ward Decl. ¶ 8).  The service-disabled veteran has an affirmative duty to "notify CVE of any change in the business that could affect the [SDVOSB's] verification eligibility." (***Id.***).

**B.  Miller Act Surety Bonding For Government Construction Contracts**

9.      Under the Miller Act, 40 U.S.C. § 3131, government construction contracts over $100,000 are required to be bonded.  The Miller Act requires that "[b]efore any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government" a performance bond and payment bond.  40 U.S.C. § 3131(b).

10.      Performance bonds guarantee to the United States that the construction contract at issue will be fully completed in compliance with the contractual requirements and are executed through the government-issued Standard Form 25.  (General Services Administration Standard Form    25,    *available    at*    https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwi3yYT4177uAhXKZs0KHbflDqYQFjAAegQIARAC&url=https%3A%2F%2Fwww.gsa.gov%2FForms%2FTrackForm%2F32905&usg=AOvVaw19uf9F0MvabvzL2B-9tfa1).  Specifically, performance bonds state that the surety is "firmly bound to the United States of America in the above penal sum," and that obligation to pay the full amount of the bond is only void if the principal of the bond (the contractor) "[p]erforms and fulfills all the understanding, covenants, terms, conditions, and agreements of the contract . . . [and] any and all duly authorized modifications of the contract." (***Id.***; *see e.g.*, **Ex. 2**, VA258-C-0436 Performance

Bond (Sept. 2, 2010), OST DEF000743-45 at 743; **Ex. 3**, VA250-C-0659 Performance Bond (July 29, 2011), Hudson NON PRIV 000104-05).

    **C.**   **<u>Defendants Optimal Solutions and Technologies, Neil Parekh, and Vijay Narula's Construction Venture</u>**

    11.    Defendant Optimal Solutions and Technologies, Inc. ("OST") is an information technology ("IT") firm established by Defendant Vijay Narula ("Narula"), who remains its 100% owner and Chief Executive Officer.  (**Ex. 4**, Narula Dep. 6:15-18, 14:13-14).

    12.    OST is not an SDVOSB.  (**Ex. 5**, Madan Dep. 87:9-16).

    13.    OST's main offices were located in Washington, D.C., at 2001 M Street NW.  (**Ex. 4**, Narula Dep. 9:10-10:9.  In late 2011, OST moved its main offices to McLean, Virginia.  (**Ex. 4**, Narula Dep. 186:8-21; **Ex. 6**, Email Chain (Nov. 17, 2011), OST DEF0009945-47 at 9946).

    14.    OST is a seasoned government contractor in the IT sector with no construction background.  (**Ex. 4**, Narula Dep. 14:13-14; **Ex. 7**, OST Account Summary (Sept. 16, 2010), Hudson NON PRIV 000054-60 at 56).  OST was, and still is, a very prosperous and stable company, with substantial financial resources.  (**Ex. 8**, Email from Michael Schendel to Courtney Seed (June 26, 2009), Cent 01835-36; **Ex. 9**, Letter from Michael Schendel to Courtney Seed (Apr. 27, 2010), Cent 01747-48; **Ex. 10**, OST Inc. Federal Award Recipient Profile).

    15.    Defendant Neil Parekh ("Parekh") was the owner of Citibuilders, Inc. and CB Construction Group, Inc., and through these companies possessed experience in bonded construction projects.  (**Ex. 11**, Parekh Dep. 7:4-8:11, 9:10-10:3).  Parekh transferred his operations from Citibuilders, Inc. to CB Construction in 2010.  (***Id.***).

    16.    Parekh is not a service-disabled veteran.  (**Ex. 11**, Parekh Dep. 7:2-3).

17.     In or around 2009, Parekh and Narula met when Parekh's company, Citibuilders, Inc., performed renovation work at office space occupied by OST.  (**Ex. 11**, Parekh Dep. 11:17-12:6; **Ex. 4**, Narula Dep. 7:5-8:11).

18.     OST obtained a task order from the Federal Aviation Administration ("FAA") for a project known as Runway Status Lights ("RWSL") and subcontracted work under that project to Citibuilders, Inc.  (**Ex. 4**, Narula Dep. 15:12-16:21).  Parekh then moved his operations into OST's offices in Washington, D.C in 2010.  (***Id.***).

19.     Plaintiff-Relator Andrew Scollick was first hired by, and began working for, Parekh's company Citibuilders, Inc. in December 2008 through January 2009 and, at some point in 2010, Parekh transferred Scollick's employment to his new company, CB Construction.  (**Ex. 13**, Scollick Decl. ¶ 1; **Ex. 14**, Scollick Dep. 16:20-17:10 (Apr. 11, 2019); **Ex. 239**, Scollick CB Construction Hire Letter (Sept. 21, 2010), SCOLLICK 103304).

20.     Beginning in 2009, Parekh and Narula began to discuss the possibility of pursuing government construction contracts.  (**Ex. 4**, Narula Dep. 13:17-15:11, 18:18-20:3; **Ex. 7**, OST Account Summary (Sept. 16, 2010), Hudson NON PRIV 000054-60 at 56; **Ex. 8**, Email from Michael Schendel to Courtney Seed (June 26, 2009), Cent 01835-36 at 1835).  The plan was to combine OST's and Narula's reputations and government contracting expertise with Parekh's construction expertise.  (**Ex. 4**, Narula Dep. 13:17-15:11, 18:18-20:3; **Ex. 7**, OST Account Summary (Sept. 16, 2010), Hudson NON PRIV 000054-60 at 56).

## D.  <u>Defendants Michael Schendel, Centennial Surety Associates, Inc, Hanover Insurance Company, and Hudson Insurance Company</u>

21.     Defendant Michael Schendel ("Schendel") owned and was President of Defendant Centennial Surety Associates, Inc. ("Centennial").  (**Ex. 15**, Schendel Dep. 7:5-11, 36:11-15, 38:5-12 (May 7, 2019)).

22.     Centennial worked as the bonding agent and "attorney-in-fact" for companies that provided surety bonds, including Defendants Hanover Insurance Company ("Hanover") and Hudson Insurance Company ("Hudson").  (**Ex. 15**, Schendel Dep. 18:17-19:14, 22:17-24:10 (May 7, 2019); **Ex. 16**, Hudson Program Administrator Agreement (Mar. 1, 2010), HUDSON NON 00400-40 at 401; **Ex. 2**, VA258-C-0436 Performance Bond (Sept. 2, 2010), OST DEF000743-45 at 743; **Ex. 3**, VA250-C-0659 Performance Bond (July 29, 2011), Hudson NON PRIV 000104-05).

23.     Hanover and Hudson each had thorough underwriting procedures and guidelines they used to minimize their risk exposure on bonds they issued by examining a contractor's organizational structure, finances, and construction competency. (**Ex. 17**, Hanover Bond Department Underwriting Manual (June 1, 2007), Hanover0001992-2056; **Ex. 16**, Hudson Program Administrator Agreement (Mar. 1, 2010), HUDSON NON 00400-40; **Ex. 18**, Hanover Dep. 82:16-84:20; **Ex. 19**, Seed Dep. 13:5-15:22).

24.     Centennial would obtain information from potential and current contractors seeking bonding and would assist with, or obtain and provide contractor information for, bonding companies' underwriting process.  (**Ex. 15**, Schendel Dep. 22:3-9, 24:2-10 (May 7, 2019); **Ex. 16**, Hudson Program Administrator Agreement (Mar. 1, 2010), HUDSON NON 00400-40 at 401-03). Centennial would also receive requests for bonds from contractors and then obtain approval from the bonding company to, or if within its existing authority, issue bonds themselves that would obligate the surety.  (**Ex. 20**, Defs. Centennial and Schendel's Answers to Pl.'s First Set of Interrogs. at 7; **Ex. 21**, Schendel Dep. 99:4-100:12 (May 14, 2019); *see e.g.*, **Ex. 241**, Bond Information Sheet (Aug. 31, 2010), Hanover0000855-59).  Generally, Centennial and Schendel would facilitate the bonding relationship between contractors and bonding companies, while it was

the bonding companies who actually issued bonds.  (**Ex. 15**, Schendel Dep. 160:9-161:10, 162:6-9-163:7 (May 7, 2019)).

### E.  Parekh and Narula Seek Bonding for an OST Construction Subsidiary

25.     Schendel had a prior working relationship with Parekh as he had previously "bonded Citibuilders [Inc.]."  (**Ex. 22**, Letter from Schendel to Cody White (Aug. 9, 2010), Cent 01708-09 at 1708; **Ex. 8**, Email from Michael Schendel to Courtney Seed (June 26, 2009), Cent 01835-36; **Ex. 11**, Parekh Dep. 14:9-15:3; **Ex. 15**, Schendel Dep. 88:6-13 (May 7, 2019)).

26.     In 2009, Parekh and Narula discussed forming a construction subsidiary of OST to pursue government contracts.  (**Ex. 4**, Narula Dep. 7:14-19, 13:17-14:5-8, 44:5-45:11) ("people knew that I was starting a subsidiary of OST and Neil [Parekh] was very open in discussion of that in the office, Hey, I'm going to be opening a subsidiary of OST")).

27.     Narula and Parekh set up a meeting with Schendel to discuss bonding for the new venture.  (**Ex. 4**, Narula Dep. 20:7-21:13; **Ex. 23**, Emails between Parekh and Schendel (June 23-24, 2010), Cent 01830).  Schendel traveled to OST's office and met in person with Parekh and Narula.  (**Ex. 23**, Emails between Parekh and Schendel (June 23-24, 2010), Cent 01830).

28.     On June 26, 2009, Schendel emailed Hanover about OST's plan to enter the government construction contracting area.  (**Ex. 8**, Email from Michael Schendel to Courtney Seed (June 26, 2009), Cent 01835-36).  Schendel explained to Hanover's underwriter Courtney Seed ("Seed") that OST had limited construction experience but was "plan[ing] to do $5-10 million of work in 2009 and all will be bonded."  (*Id.* at 1835).  Schendel further explained:

> To help facilitate construction they are putting together a team.  For example, a key person is someone whom I have known for years, Neil Parekh.  Neil [Parekh] has his own company for years and I have bonded him.  Neil and the owner of OST have known each other and Neil [Parekh] and Vijay [Narula] are putting together the team.

(*Id.*).

29.     The planning for Narula and Parekh's "construction division" continued over the next several months.  (**Ex. 24**, Emails between Narula and Schendel (July 12-29, 2009), Cent 01820-21; **Ex. 25**, Letter from Schendel to Narula (July 28, 2009), Cent 01822; **Ex. 26**, Emails between Schendel, Narula and Parekh (Sept. 2-Oct. 7, 2009), Cent 01803-06; **Ex. 27**, Letter from Schendel to Narula (Oct. 6, 2009), Cent 01798-802).  On July 12, 2009, Narula learned from Schendel that Hanover was going to require personal indemnity of Narula and Parekh and corporate indemnity from OST before providing any bonds.  (**Ex. 24**, Emails between Narula and Schendel (July 12-29, 2009), Cent 01820-21).

30.     Schendel and Centennial kept Hanover updated on the development of OST's construction division.  (**Ex. 28**,  Email from Schendel to Seed (Aug. 24, 2009), Cent 01813; **Ex. 29**, Email from Schendel to Seed (Dec. 4, 2009), Cent 01783).  On August 24, 2009, Schendel informed Hanover that Narula and Parekh had prepared "test-bids" but would not submit bids to the government until "OST offers the same quality to construction as they offer in their other line of business . . . He [Narula] has worked too hard with the Federal Government to build an excellent relationship and he wants their construction side, to have an excellent relationship too."  (**Ex. 28**, Email from Schendel to Seed (Aug. 24, 2009), Cent 01813).

**F.  Defendants Ajay Madan and Amar Gogia and the Formation of Defendant Centurion Solutions Group, LLC**

31.     In 2008, OST learned of a potential $125 million FAA SDVOSB set-aside contract known as "System Operations Management and Administrative Support Service" ("SOMASS").  (**Ex. 4**, Narula Dep. 26:6-15; **Ex. 5**, Madan Dep. 150:7-12; **Ex. 30**, Emails between Jose Benitez, Gogia, and Madan (Mar. 17-31, 2011), OST DEF003910-12 at 3910).  SOMASS was an IT project with no construction component.  (**Ex. 14**, Scollick Dep. 76:11-77:1 (Apr. 11, 2019)).

32.     In 2009, Narula concluded that OST could bid on SOMASS if it formed a joint venture with a qualified SDVOSB entity and the joint venture submitted the bid.  (**Ex. 4**, Narula Dep. 27:3-28:15)

33.     When OST was unable to locate a suitable existing SDVOSB entity, Defendant Ajay Madan ("Madan"), OST's Chief Operating Officer, reached out to Defendant Amar Gogia ("Gogia"), who is a service-disabled veteran and Madan's second cousin, to obtain proof of his service-disabled veteran status and, on November 30, 2009, Madan emailed Gogia's army discharge papers to Narula and Anil Chaudhry ("Chaudhry"), OST's Chief Financial Officer, and told them that Gogia is "willing to talk."  (**Ex. 31**, Emails between Madan, Gogia, Narula, and Chaudhry (Nov. 30-Dec. 3, 2009), OST DEF003762-63; **Ex. 5**, Madan Dep. 8:2-8, 9:16-21, 30:13-15).

34.     At that same time, Gogia provided information specifically on the VA's SDVOSB program and its requirements to Madan.  (**Ex. 31**, Emails between Madan, Gogia, Narula, and Chaudhry (Nov. 30-Dec. 3, 2009), OST DEF003762-63; **Ex. 32**, CSG Dep. 15:3-17:4 (June 21, 2019)).

35.     In late 2009, Narula and Gogia met in OST's offices and discussed SDVOSB contracting opportunities.  (**Ex. 32**, CSG Dep. 17:16-19:10 (June 21, 2019)).  In order to form a joint venture to pursue the SOMASS contract, it was required that they first set up an SDVOSB entity and then form a separate joint venture entity.  (**Ex. 5**, Madan Dep. 32:4-17).

36.     As of late 2009 and early 2010, Gogia faced financial hardships and required an $18,000 loan from Madan, with whom Gogia had a close relationship, to cover Gogia's living expenses.  (**Ex. 33**, Emails between Gogia and Madan (Jan. 4-5, 2010), OST DEF000903-04; **Ex. 32**, CSG Dep. 19:11-20:21 (June 21, 2019); **Ex. 5**, Madan Dep. 9:16-21).

37.     By January 6, 2010, Narula, Madan, Chaudhry, and Gogia were working together to form the new SDVOSB entity.  (**Ex. 34**, Email Chain (Jan. 6-Feb. 5, 2010), OST DEF000909-15).  Over the next several days these four individuals, with assistance from OST's outside accountant Ravi Narayan ("Narayan"), decided the potential SDVOSB would be a limited liability company with Centurion Solutions Group as its official name.  (*Id.*).

38.     On January 7, 2010, Madan told Gogia that "we" are a "well supported start up" and discussed with Gogia putting together a "rough concept" for a Centurion logo that OST's "in-house people" could tweak.  (**Ex. 35**, Emails between Gogia and Madan (Jan. 7, 2010), OST DEF003768-69 at 3769).  Madan also asked Chaudhry to create a Virginia "virtual address" for Centurion.  (*Id.* at 3768).

39.     In addition to these instructions, Madan also provided Gogia with Madan's Visa credit card information, with a billing address of OST's Washington, D.C. office.  (*Id.*).

40.     On January 14, 2010, Narayan updated Madan, Gogia, Chaudhry, and Narula that "the paperwork to [Virginia] for incorporation has been sent out.  Attached is the IRS [Internal Revenue Service] EIN [Employer Identification Number] number letter . . . I will send an invoice for incorporation by separate email."  (**Ex. 34**, Email Chain (Jan. 6-Feb. 5, 2010), OST DEF000909-15 at 910).

41.     On January 19, 2010, Gogia used Madan's credit card to purchase the domain name of Centurionsg.com.  (**Ex. 36**, Email from Gogia to Madan and Attached Receipt (Jan. 19, 2010), OST DEF000905-06).

42.     On January 23, 2010, Defendant Centurion Solutions Group, LLC ("CSG") was officially established as a limited liability company in the Commonwealth of Virginia.  (**Ex. 37**, CSG's Articles of Incorporation (Jan. 23, 2010)).

43.     On February 1, 2010, Narula, on behalf of OST, gave Gogia, on behalf of CSG, $95,445.04 to allegedly cover CSG's unexplained "expenses," the return of which was not required unless CSG and OST's pursuit of the SOMASS contract was successful.  (**Ex. 38**, CSG and OST Loan Agreement (Feb. 1. 2010), CSG-00012664; **Ex. 39**, CSG Dep. 7:15-22 (July 19, 2019)).  The funds were not deposited in CSG's bank account.   (**Ex. 40**, 2010 CSG Bank Statements, SCOLLICK 103063-96 at 3063-66).

44.     On February 23, 2010, Madan sent Gogia a subsequent payment of $5,000 which they refer to as CSG's "seed monies" and this payment was deposited it into CSG's newly established bank account.  (**Ex. 41**, Emails between Madan, Gogia, Narula, and Chaudhry (Feb. 23. 2010), OST DEF0009689; **Ex. 42**, Email from Gogia to Madan (Mar. 4, 2010), OST DEF000957; **Ex. 40**, 2010 CSG Bank Statements, SCOLLICK 103063-96 at 3065).  Madan further requested that he "be added to the [Bank of America] account so I can deposit monies."  (**Ex. 41**, Emails between Madan, Gogia, Narula, and Chaudhry (Feb. 23. 2010), OST DEF0009689).

45.     Gogia did not pay the cost for OST's outside accountant to establish CSG.  (**Ex. 43**, Email from Gogia to Chaudhry and Attached Invoice (Jan. 25, 2010), OST DEF000907-08; **Ex. 34**, Email Chain (Jan. 6-Feb. 5, 2010), OST DEF000909-15 at 909).  Instead Gogia first sent the accountant's invoice to Chaudhry at OST, but after following up with Narayan a little over a week later, Gogia learned that the invoice had not yet been paid.  (**Ex. 43**, Email from Gogia to Chaudhry and Attached Invoice (Jan. 25, 2010), OST DEF000907-08; **Ex. 34**, Email Chain (Jan. 6-Feb. 5, 2010), OST DEF000909-15 at 909).  Madan instructed Gogia to pay the invoice using the seed monies Madan provided.  (**Ex. 41**, Emails between Madan, Gogia, Narula, and Chaudhry (Feb. 23. 2010), OST DEF0009689).

46.     In May 2010, CSG and OST formed a joint venture that would pursue the SOMASS contract, named CSG-OST, LLC, which then sought an Employer Identification Number ("EIN") from the Internal Revenue Service ("IRS") registered with the CCR.  (**Ex. 44**, CSG-OST, LLC EIN and CCR Registration, OST DEF001606-12).   Nearly a year later, and in response to a potential award of the SOMASS contract, a Joint Venture Agreement was created for CSG-OST, LLC which was dated May 10, 2010 and listed CSG has holding a 51% ownership stake in CSG-OST, LLC and OST held a 49% stake.  (**Ex. 45**, Email from Madan to Gogia (Mar. 22, 2011) and Attached Joint Venture Agreement (May 10, 2010), OST DEF003893-909; **Ex. 30**, Emails between Jose Benitez, Gogia, and Madan (Mar. 17-31, 2011), OST DEF003910-12).

### G.  The Commencement of the CSG, OST, and CB Construction Relationship

47.     The formation of CSG led Narula and Parekh to discuss how they could use CSG's SDVOSB status to pursue SDVOSB construction set-aside contracts.  (**Ex. 4**, Narula Dep. 41:17-42:14).

48.     Narula explained to Parekh that, where they had initially envisioned OST's construction subsidiary to be just Narula and Parekh, now that Gogia came on board for SOMASS he needed to be included as well. (**Ex. 4**, Narula Dep. 107:18-108:5 ("Thus we would be three partners in the subsidiary now--Mr. Gogia, Mr. Parekh, and Vijay Narula")).

49.     Gogia lacked any government contracting or commercial construction experience. (**Ex. 32**, CSG Dep. 39:12-18 (June 21, 2019); **Ex. 46**, Gogia Resume, 000427; **Ex. 13**, Scollick Decl. ¶ 3).  Gogia only possessed marginal managerial experience of operating a construction company, having started a fledgling company in 2009, the Gogia Group.  (**Ex. 32**, CSG Dep. 10:13-11:14 (June 21, 2019)).  The Gogia Group, and Gogia's role with it, remained active through at least October 2010, despite Gogia informing the VA by letter on June 3, 2013 that the Gogia Group

"has not been active since 2009." (**Ex. 32**, CSG Dep. 150:15-154:13; **Ex. 5**, Madan Dep. 93:21-95:17; **Ex. 47**, Email from Parekh to Narula (Oct. 8, 2010), OST DEF01179; **Ex. 48**, Gogia Group Letter to VA (June 3, 2013), 000392). By 2010, the totality of the Gogia Group's construction projects consisted of an ongoing $100,000 home renovation and an unspecified, but much smaller, project. (**Ex. 4**, CSG Dep. 12:2-13:12 (June 21, 2019)). In total, Gogia reported in federal tax returns that his share of the Gogia Group's business income between 2009 and 2010 was a $1,969 loss. (**Ex. 49**, Gogia Group Tax Documents, 00014, 39, 43).

50.     On February 24, 2010, Parekh obtained from Scollick a list of VA SDVOSB set-aside construction projects that were in the pre-solicitation phase. (**Ex. 50**, Emails between Scollick, Parekh, Narula, and Gogia and Attachment (Feb. 24-28, 2010), OST DEF000359-78). Parekh emailed the list to Narula, stating "[a]ttached are several SDVOSB projects we have identified and would like to pursue. Please send me the SDVOSB company info (company name, address, CCR, DUNS, license etc). I would then like to send Andrew [Scollick] to your office to meet with your proposal/technical writing dept so we can all work together and send the best possible proposal."[2] (**Id.** at 359 (emphasis added)). A few minutes later, Narula emailed Gogia telling him to "send me the details of the company. I would like to introduce you to Neil [Parekh] so that **as a team we can go after these opportunities**." (**Id.** (emphasis added)).

51.     On February 28, 2010, Narula emailed Parekh stating "call me to discuss how **we can use the SDVO-SB.** The company name is Centurion Group, LLC [sic]." (**Ex. 52**, Emails

---

[2] The first SDVOSB bid proposal that was submitted in the name of CSG, VA Solicitation VA-245-10-RP-0076, was included in the list of SDVOSB set-aside contracts Parekh forwarded to Narula. (**Ex. 51**, Email from Bryan VanGilder to Scollick and Sujana Pathak and Attached CSG Halls and Walls Bid Proposal (Apr. 7, 2010), SCOLLICK 1000066-76); **Ex. 50**, Emails between Scollick, Parekh, Narula, and Gogia and Attachment (Feb. 24-28, 2010), OST DEF000359-78).

between Parekh, Narula, and Scollick (Feb 26-28, 2010), SCOLLICK 100009-11 at 10) (emphasis added).

52.     On March 1, 2010, Madan shared with Gogia an article outlining the VA rules for its SDVOSB set-aside program, with Madan's comments, as well as the full set of VA regulations. (**Ex. 53**, Emails between Gogia and Madan (Mar. 1, 2010), OST DEF006203-05).  Madan noted the requirement that SDVOSBs "must have one business in the federal contract set-aside program and work in that business full time" and commented CSG and the Gogia Group "both cannot be SDVO" and both could not "have [Gogia] full time."  (*Id*. at 6203).  Madan and Gogia further discussed registration for CSG in the VA's "Vet Biz [VIP] Database" and verification through the VA's CVE of SDVOSB status, both of which were required steps in order to bid on VA SDVOSB set-aside contracts.  (*Id.*).

53.     Gogia forwarded CSG's CCR registration materials, which included CSG registering as an SDVOSB, to Narula on March 1, 2010.  (**Ex. 54**, Email Chain and Attached CSG CCR Registration (Feb. 24-Mar. 1., 2010), OST DEF000379-84 at 382).  A meeting was then organized between Gogia, Scollick, Parekh, and Narula for March 5, 2010.  (**Ex. 55**, Email Chain (Feb. 24-Mar. 2, 2010), OST DEF 000391-93 at 391).

54.     Scollick, who at the time had no knowledge of SDVOSB contracting requirements, quickly realized that the SDVOSB contracting opportunities he sent to Parekh required bidding contractors to be registered in the CCR and VA's VetBiz VIP databases and notified Parekh of this requirement on February 26, 2010.  (**Ex. 56**, Email Chain (Feb. 26-Mar. 3, 2010), OST DEF000411-16 at 415; **Ex. 13**, Scollick Decl. ¶ 2).  Parekh forwarded Scollick's questions about the actual registration status of CSG to Narula.  (**Ex. 56**, Email Chain (Feb. 26-Mar. 3, 2010), OST DEF000411-16 at 415).  Narula in turn asked Madan and Chaudhry if (1) "we have the formalities

completed with CSG.  Also, who are the owners and officers on the papers?"; (2) "I need the Articles paper, CAGE code, EIN, SDVO letter, CCR number, etc."; (3) "I need to know who can sign on their behalf, as I need to get bonding!!";  and (4) "[a]lso need to register the company at VetBiz [VIP] . . . as a Service Disabled Veteran Owned Small Business."  (*Id.*).  Madan responded to Narula's questions by stating that the "formalities" with CSG had been completed and forwarding CSG's DUNS number, CAGE code, EIN, bank account and routing information, and Gogia's army discharge papers.  (*Id.* at 411)  Madan stated that he would ask Gogia to provide what Madan did not have and also ask Gogia to get CSG registered in the VetBiz VIP database. (*Id.*).  As part of this response, Madan included CSG's "SBA Profile" which self-certified that CSG is "Service-Disabled Veteran."  (*Id.* at 412).  Gogia was excluded from this email chain. (*Id.*).

55.     On March 5, 2010, Scollick emailed Gogia stating that it was "an absolute pleasure meeting with you today.  Neil [Parekh] and I are very excited to get things underway" and that Scollick would send Gogia "a copy of the 1st solicitation we will be pursuing."  (**Ex. 57**, Emails between Scollick, Gogia, and Parekh (Mar. 7, 2010), SCOLLICK 100012-14 at 13).  Gogia replied by stating that he would inform them when CSG's VetBiz VIP and ORCA registrations were completed.  (*Id.*).

56.     On March 8, 2010, as part of the VA's VIP registration process, Madan electronically signed CSG's application as a 49% owner of CSG on March 8, 2010 and affirmed that he had read and understood the SDVOSB regulations and CSG was in compliance.  (**Ex. 58**, Emails between Gogia and Madan and Attached VIP Signature Page (Mar. 7-8, 2010), OST DEF006201-02 at 6202).

57.     Later, as CSG's original Articles of Organization did not provide ownership details, Gogia had to ask Madan, Narula, and Narayan for alternative documentation because CSG was "bidding on a job which requires 'evidence' of my 51% ownership of CSG." (**Ex. 59**, Email from Gogia to Madan, Narula, and Narayan (May 26, 2010), OST DEF003523).

58.     In response, a new Operating Agreement was prepared for CSG which listed Madan as "Vice-President" and 49% owner, with separate copies of the document signed by each Madan and Gogia.  (**Ex. 60**, Madan Signed CSG Operating Agreement, OST DEF0009720-31; **Ex. 61**, Gogia Signed CSG Operating Agreement (May 26, 2010), SCOLLICK 103287-98; **Ex. 5**, Madan Dep. 104:10-105:7).

59.     CSG first submitted is application for to the VA's CVE for verification of SDVOSB status on March 14, 2010.  (**Ex. 1**, Ward Decl. ¶ 10).  At that time, Gogia certified to CVE that CSG was owned and controlled by a service-disabled veteran.  (***Id.***)  CVE verified CSG's SDVOSB status based on Gogia's "representation that (1) he was a service-disabled veteran, (2) one or more veterans owned at least 51% of CSG, and (3) that CSG was controlled by one [or] more veterans as outlined in 38 C.F.R. Part 74." (***Id.*** at ¶ 11).  CSG was "approved as a SDVOSB in the VA's [VIP] database on May 12, 2011. (***Id.*** at ¶ 10).

### H.  CSG Begins Submitting Bids For SDVOSB Set-Aside Contracts

60.     Employees of CB Construction and OST jointly tracked government SDVOSB contract solicitations and prepared bid proposals that were submitted in response to those solicitations.  (**Ex. 62**, Email Chain and Attached Pipeline Report (Mar. 11-16, 2010), OST DEF0004000-08; **Ex. 63**, Email from Sujana Pathak to Scollick, Gogia, Parekh, and Ronald Rhodes and Attached Proposal Template (Mar. 19, 2010), SCOLLICK 1000031-40; **Ex. 32**, CSG Dep. 66:19-67:18 (June 21, 2019); **Ex. 13**, Scollick Decl. ¶ 4).  The first government SDVOSB

solicitation they planned to submit a proposal for was for VA Solicitation VA-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 (the "Halls and Walls Project") (**Ex. 63**, Email from Sujana Pathak to Scollick, Gogia, Parekh, and Ronald Rhodes and Attached Proposal Template (Mar. 19, 2010), SCOLLICK 1000031-40; **Ex. 13**, Scollick Decl. ¶ 4).   Narula, OST, and its employees knew that these solicitations and bid proposals were for VA SDVOSB set-aside contracts and the bid proposals were being submitted in the name of CSG.  (**Ex. 62**, Email Chain and Attached Pipeline Report (Mar. 11-16, 2010), OST DEF0004000-08).

61.     On March 8, 2010, Scollick emailed OST employee Sujana Pathak ("Pathak") asking for a meeting to "go over a solicitation for our new Service disabled vet[e]ran department. . . . Your help on this project, and the next several upcoming solicitations will be of great importance in ensuring proper protocol for technical proposals."   (**Ex. 64**, Emails between Scollick, Pathak, Narula, and Parekh (Mar. 8, 2010), OST DEF0010232-34 at 10233).  Pathak responded by asking Scollick to come to OST's office for the meeting and stated that he would provide Scollick with instructions for using a new website created by OST to share files on the new "construction" project and would ensure that Scollick had access to all relevant folders.  (**Id.** at 10232).

62.     On March 11, 2010, Scollick provided an SDVOSB "pipeline report" to Pathak, as well as to Gogia and Parekh, that tracked the SDVOSB solicitations CSG anticipated bidding on. (**Ex. 62**, Email Chain and Attached Pipeline Report (Mar. 11-16, 2010), OST DEF0004000-08). Pathak forwarded this pipeline to Narula, Madan, and fellow OST employee Ronald Rhodes.  (**Id.** at 409).  The decision on how many and which contracts to pursue was left to Narula to make. (**Id.**).  Pathak, as an OST employee, wrote to Narula:

> Please let me know if we are thinking of going after all 4 bids in the attached sheet. These are in addition to the one we are already going after.  All of them are due in

the first week of April.  Given that we will have some proposals running at our end also, these might put some pressure on resources to our end.  Also the discussion we had with them yesterday did not touch any aspect of our share on these bids.  I had almost assumed we are going to bid with them all the time, until you asked the question on whether we have made a bid/no bid decision.

(*Id.*).  On March 16, 2010, Pathak followed up with Narula regarding OST's role in the upcoming SDVOSB proposals for CSG stating, "[t]he LOE [level of effort] from our side will include RFP [request for proposal] reviews, template creation, thorough pink/red reviews, introductory cameo's and fillers to make the proposal flow well."  (*Id.*).

63.     OST employees were responsible for preparing the initial "proposal template" that was used to submit CSG's bid proposal for the Halls and Walls Project, the first SDVOSB bid proposal submitted by CSG.  (**Ex. 63**, Email from Sujana Pathak to Scollick, Gogia, Parekh, and Ronald Rhodes and Attached Proposal Template (Mar. 19, 2010), SCOLLICK 1000031-40; **Ex. 13**, Scollick Decl. ¶ 4).  On March 19, 2010, Pathak provided the "Proposal Template_Halls and Walls RFP" to Scollick, Gogia, and Parekh by email, described the steps remaining for Scollick and Parekh to accomplish and stated that "[o]nce your fill in the specifics, we can review it at our end to ensure compliance.  (**Ex. 63**, Email from Sujana Pathak to Scollick, Gogia, Parekh, and Ronald Rhodes and Attached Proposal Template (Mar. 19, 2010), SCOLLICK 1000031-40 at 31).  Pathak also offered further support by stating that "we may not be able to get heavily involved with the other bids you have in your pipeline.  However, to alleviate the situation, I can answer any questions you might have on the proposal template/or may be take you through the process."  (*Id.*).  Another OST employee, Ronald Rhodes, was also copied on this email.  (*Id.*).

64.     On March 23, 2010, Scollick emailed Parekh and Gogia to explain the work he had put into the Halls and Walls Project proposal, which Parekh forwarded to Narula.  (**Ex. 65**, Emails between Scollick, Parekh, Gogia, and Narula (Mar. 23, 2010), OST DEF0010230-31).  Scollick

stated in his email that he had questions on a certain section and "sent those to Sujana [Pathak]" at OST.  (*Id.* at 10230).

65.     On April 5, 2010, two days before the final Halls and Walls Project proposal was dated, Pathak asked another OST employee, Julie Estrella ("Estrella"), to "please design a cover page for the attached Construction RFP.  We would need it by [tomorrow] if possible."  (**Ex. 66**, Email Chain (Apr. 5-19, 2010), OST DEF 0009866-68 at 9868).  After receiving a first draft, OST employee Bryan VanGilder ("VanGilder") provided instructions to update the draft and Estrella then made those changes.  (*Id.* at 9867).  After further edits, VanGilder sent the final CSG Halls and Wall bid proposal to Scollick on April 7, 2010.  (**Ex. 51**, Email VanGilder to Scollick and Pathak and Attached CSG Halls and Walls Bid Proposal (Apr. 7, 2010), SCOLLICK 1000066-76).

66.     Gogia had little to no involvement with the creation and submission of the Halls and Walls Project bid proposal besides attending the site visit, being provided the draft periodically, providing the CSG logo, and requesting the final version that had been submitted.  (**Ex. 63**, Email from Pathak to Scollick, Gogia, Parekh, and Ronald Rhodes and Attached Proposal Template (Mar. 19, 2010), SCOLLICK 1000031-40; **Ex. 13**, Scollick Decl. ¶ 5; **Ex. 67**, Emails between Gogia, Scollick, Parekh, and Narula (Apr. 5-9, 2010), OST DEF0010225-27).

67.     This template provided by OST would, after removing all references to OST and Citibuilders, Inc., be used for the future bid proposals for SDVOSB contracts which CSG prepared and submitted to the Government.  (**Ex. 13**, Scollick Decl. ¶ 4; *compare* **Ex. 51**, Email from VanGilder to Scollick and Pathak and Attached CSG Halls and Walls Bid Proposal (Apr. 7, 2010), SCOLLICK 1000066-76; *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66).  The initial cover page design for the Halls and Walls Project was changed

just a few weeks later by the same OST employee who designed it so it could be used for a different solicitation.  (**Ex. 66**, Email Chain (Apr. 5-19, 2010), OST DEF 0009866-68 at 9866).

68.     As the Halls and Walls Project proposal was being finalized, Parekh emailed Gogia on April 9, 2010 explaining the types of projects that Parekh chose for CSG to target.  (**Ex. 67**, Emails between Gogia, Scollick, Parekh, and Narula (Apr. 5-9, 2010), OST DEF0010225-27 at 10225).

**I.    Obtaining Bonding for CSG**

69.     Once bid proposals began to be submitted in CSG's name, Schendel and Centennial updated Hanover on Narula's plans and bonding needs.  (**Ex. 69**, Email from Schendel to Seed (Apr. 15, 2010), Cent 01765-66).

70.     On April 15, 2010, Schendel told Hanover that "OST remains a horse and cash is above $8 million."  (*Id.* at 1765).  Schendel further explained Narula's plan regarding CSG by stating that "Vijay [Narula] had to put procedures and controls in place with Neil [Parekh] before they started to bid this work and it is part of their plan to gear up in 2011 to pursue larger work. In 2010, they want to concentrate on Federal Opportunities of small size, build a resume (of construction) and be ready for 2011."  (*Id.*).  Schendel also told Hanover that "[t]o do this little work, **they are using the trade name, Centurion Solutions Group, LLC which OST owns and it is a division.**"  (*Id.* (emphasis added)).  Schendel reiterated to Hanover that "OST does all Federal Work and they are very familiar with the paperwork and process.  Neil [Parekh] brings the construction background and since they remain strong financially I would like to work along with their needs."  (*Id.*).  Amar Gogia is not mentioned in this email and is of no consequence to the discussion of bonding CSG.  (*Id.*).

71.     Schendel obtained his understanding of who owned and controlled CSG from Narula and Parekh.  (**Ex. 15**, Schendel Dep. 57:19-58:17, 59:20-60:8, 89:21-91:5, 92:16-94:5, 130:7-131:5, 174:7-175:4 (May 7, 2019)).

72.     Schendel informed Hanover underwriter Seed by letter dated April 27, 2010 that Narula and Parekh were planning to bid on "small business set aside jobs, but Vijay [Narula] has the inside track."  (**Ex. 9**, Letter from Michael Schendel to Courtney Seed (Apr. 27, 2010), Cent 01747-48 at 1747).  The letter discussed the "team" that Narula was building to pursue "small business set aside jobs," and again Gogia was not mentioned and of no consequence to the discussion of bonding CSG.  (***Id.***).

73.     Schendel and Centennial next provided Hanover with the relevant construction backgrounds of the individuals to be involved in Narula and Parekh's venture.  (**Ex. 70**, Email from Schendel to Seed (May 3, 2010), Cent 01745).  Specifically, Schendel outlined in a May 3, 2010 email the construction experience of Parekh, David Rubando ("Rubando"), and Mike Bender ("Bender").  (***Id.***).  Schendel described Rubando and Bender as the "right hand people [Parekh] is bringing over."  (***Id.***).  Again, Gogia is not mentioned and is of no consequence to the discussion of bonding CSG.  (***Id.***).

74.     Schendel further stated to Hanover that "Vijay [Narula] and Neil [Parekh] will work very closely as the company starts to secure work."  (***Id.***).  He then requested that Hanover approve a "bid bond."  (***Id.***).

75.     Narula gave Parekh the "authority" to approve CSG bid bonds and admittedly "let the fox guard my henhouse."  (**Ex. 4**, Narula Dep. 143:18-144:10).

76.     All the bonds requested of, and ultimately issued by, Hanover were in the name of CSG, meaning that no bonds were ever requested or issued to OST, Citibuilders, Inc., or CB Construction.  (**Ex. 135**, Def. Hanover's Resp. Plaintiff-Relator's First Set of Interrogs. at 27).

77.     Centennial's business records of May 14, 2010 include a spreadsheet with the heading of "OST, Inc.," under which bid bonds which had been issued for CSG bid proposals were listed. (**Ex. 71**, Centennial Bids Listing (May 14, 2010), Cent 01744).  As of this point, CSG had been issued six bid bonds, all for VA SDVOSB set-aside contracts.  (***Id.***; **Ex. 13**, Scollick Decl. ¶ 6).

78.     CSG admitted that "OST was the primary contact between the bonding company" and CSG.  (**Ex. 32**, CSG Dep. 183:15-184:18 (June 21, 2019)).  The entirety of Gogia's interactions with Schendel amounted to Gogia "interacted with Michael Schendel at one point.  I remember meeting him.  I submitted documentation that they required for the bonding.  And that was the gist of the relationship. . . . I recall a meet and greet at one point.  We just met each other.  I don't recall the substance of anything else we talked about."  (**Ex. 32**, CSG Dep. 183:15-184:18 (June 21, 2019)).

### J.   Early CSG Operations and Gogia's Role

79.     Parekh requested a meeting with Narula on May 28, 2010 to discuss "Amar [Gogia] and next steps with SDVOSB."  (**Ex. 72**, Email from Parekh to Narula (May 28, 2010), OST DEF011807).  A meeting was scheduled by Madan for early June 2010 between Madan, Narula, Parekh and Gogia at the OST offices.  (**Ex. 73**, Email Chain (June 2, 2010), OST DEF000609).

80.     Gogia's lack of involvement with CSG's bidding process resulted in Parekh asking Madan to have Gogia meet with Scollick so that Gogia "can get involved in the bidding process."  (***Id.***).

81. Madan scheduled a "joint operations meeting" between OST, CB Construction, and CSG to go over how the joint operations of the entities would function. (**Ex. 74**, Emails between Madan, Parekh, Narula, and Gogia (June 2, 2010), OST DEF000610-11). The subjects to be covered included maintaining the "pipeline" of SDVOSB construction opportunities, "making collective go / no go decisions," "who has the lead on a bid," "bonding," location of a "proposal library," "who's authorized to sign" bid proposals, and "who is assigned to oversee each won bid." (**Id.**). Madan further stated his intention for these joint meetings to be a regular occurrence. (**Id.** at 610).

82. Before this meeting could occur however, Gogia emailed Madan in response to a June 2, 2010 email Gogia received from a VA contracting officer. (**Ex. 12**, Emails between Gogia, Madan, and Joseph Ercole (June 2, 2010), OST DEF006161-63). This email alerted Gogia to the fact that a CSG bid for Solicitation No. VA-243-10-IB-0319 was rejected because it contained multiple deficiencies. (**Id.** at 6162-63). Gogia admitted in his email to Madan that he was unaware that CSG bids were being submitted to the government. (**Id.** at 6162). At that point, at least six bids had already been submitted for SDVOSB set-aside contracts by CSG. (**Ex. 71**, Centennial Bids Listing (May 14, 2010), Cent 01744; **Ex. 13**, Scollick Decl. ¶ 6).

83. Gogia specifically stated to Madan:

I am only writing this to you. This has built up. A while back, I was told to come meet and greet CitiBuilders – instead, at the meeting **I was told who my new partners were. Since then I've been intentionally shut out**, which may have been ok if somebody had told me about it. That last meeting with Vijay [Narula] caught me off guard and does not make me comfortable. Still, **I could bear being locked out** because I was told CitiBuilders had experience and knew what they were doing. These are serious flaws in this bid. **The only two things I ever heard about** it were a surprise call from the VA contracting officer, and now this. Yet, the VA response is addressed to me, with Centurion's name – reflecting on the reputation we're trying to build. Please forgive the tone – **tell the CitiBuilders guys to stop using my and Centurion's name if these are the results we're going to be receiving.** I want to move forward and believe this will work, and apologize

if I am being over the top.  **Maybe I'm missing the big picture, but it's because I've been blindfolded.**  How do I make sure I don't get another email like this?

(**Ex. 12**, Emails between Gogia, Madan, and Joseph Ercole (June 2, 2010), OST DEF006161-63 at 6162 (emphasis added)).

84.    Madan's responded to Gogia with his view of the current CSG situation by stating:

> You are not being unreasonable.  I am a little dissatisfied myself.  And I share your concerns about the reputation of the 'brand'.  There might be a couple more rough emails from the government because **we have submitted some bids already**.  But we are all aware that we need to get better at this . . . We also had a long meeting with Neil [Parekh] yesterday.  The bottom line on this is that **everyone has the same goals**, but we are not coordinated well **. . . You have not been maliciously shut out, but you have been shut out for convenience** because Neil [Parekh] is understaffed and was told by us to get multiple bids out right away.

(*Id.* at 6161 (emphasis added)).  Madan further relayed to Gogia the status of CSG's current operations and what had been occurring over the last several months, which Gogia had been wholly unaware of, including that "Neil [Parekh] was running hard on the bids, but does not have enough help to pump them out with high quality and high frequency.  He asked me last night if we can get an estimator." (*Id.*).  Madan then asked Gogia if he could "perform estimation" and "help out with [CSG's] bids" as "we need to get 20 of them out each month."  (*Id.*).  Madan further informed Gogia that "Neil [Parekh] thought that we were coordinating with you (which we should have), and understands that the bidding and communication process is broke.  He said he wants to fix this." (*Id.*).  Madan then told Gogia they "need to have an operations meeting each Monday with Centurion, OST, and CITI [CB Construction]" and asked for Gogia to attend.  (*Id.*).  Madan stated to Gogia that Parekh "offered to provide working space at his Tyson's [C]orner office to get you fully plugged into the process and to take advantage of your expertise.  He did not know how much

experience you had, and I think he is still trying to figure out who can do what to get more bids out." (*Id.* at 6162).

85. Gogia responded by stating he "can definitely help with the estimating and other aspects of the bid prep. **I'll need to work with Neil [Parekh] to get familiar with his pricing structure**, which we can do once we're co-located . . . I'll make Mondays free for Ops Meetings" and that he was "**[e]xcited to get started**," over four months after CSG was formed and after at least 6 bids proposals had been prepared and submitted in CSG's name during the prior three months. (*Id.* at 6161 (emphasis added); **Ex. 71**, Centennial Bids Listing (May 14, 2010), Cent 01744).

86. On June 9, 2010, Gogia was brought in to meet with Scollick to review the current CSG project pipeline and learn the "bidding and estimating process." (**Ex. 75**, Emails between Gogia, Parekh, Narula and Madan (June 2-9, 2010), OST DEF000616-19 at 616).

87. On June 11, 2010, Parekh sent a copy of CSG's bid process to Gogia, Scollick, Narula, and Madan to be reviewed at the next Monday operations meeting. (**Ex. 76**, Email from Parekh to Gogia, Scollick Narula, and Madan and Attached Bid Process (June 11, 2010), OST DEF000345-46).

88. On June 16, 2010, Parekh instructed Gogia to take a 30-hour OSHA course online as a requirement to supervise CSG SDOVSB projects, which Gogia agreed to do. (**Ex. 77**, Emails between Parekh and Gogia (June 16, 2010), OST DEF0009500).

89. On July 15, 2010, Gogia's time commitment to CSG was defined by Madan who asked Gogia to "carve out 2 days a week, at OST site. Need you for about 5 hours each day. The remaining 10 or so hours can be done remotely." (**Ex. 78**, Emails between Madan and Gogia (July 15, 2010), OST DEF003354). Gogia agreed to this arrangement. (*Id.*).

90.     On July 28, 2010, Parekh emailed Narula stating "I have several bids Amar [Gogia]

will be working on.  End of August is going to be extremely crazy . . . and if he is pulled away we

either have to find other resources or let these projects go.  Basically, his role and time commitment

needs to be defined.  He is only committing 10 hours a week at the office."  (**Ex. 79**, Email from

Parekh to Narula (July 28, 2010), OST DEF0009537).

### K.  CSG, OST, and CB Construction Operating Agreement Discussions

91.     On June 7, 2010, Parekh emailed Narula to summarize the meeting they had about

the "SDVOSB Operating Agreement" that would govern CSG.  (**Ex. 80**, Email from Parekh to

Narula (June 7, 2010), OST DEF011998-99).  The first item of the meeting recap was entitled

"Amars [Gogia] [sic] Role and Compensation" and outlined that Gogia would hold the position of

"Estimator" for 0-6 months, "Site Superintendent" for 6-12 months, and "PM/Site Superintendent"

for 12 plus months and lays out a sliding scale for Gogia's salary based on the revenue of CSG

and Gogia's time commitment to CSG.  (*Id.* at 11998).  Next, the meeting recap outlined "Team

Contribution" for the SDVOSB with 1) OST providing "Assets," "Marketing/Proposal/Bidding,"

"Bonding,"     and     "Financials";     2)     CB     Construction     providing     "Assets,"

"Marketing/Proposal/Bidding," "Bonding," "Operations," "Financials," "Past Performance," and

"Management Team"; and 3) CSG providing only "Certification."  (*Id.*).  Finally, the meeting

recap outlined potential ownership structures of CSG.  (*Id.* at 11999).  Of all the proposed options,

the highest "ownership" proposed for Gogia is 25%.  (*Id.*)

92.     On June 15, 2010, Parekh again expressed to Narula his desire to come to an

agreement regarding the operations between CSG, OST, and CB Construction and explained his

current view of the situation, including Gogia's role, as follows:

> [R]eally need to come to an agreement on the CSG operations agreement soon.  As
> mentioned several weeks ago, I can sit down for 2-3 hours with your CFO and give him a

brain dump on how invoicing and construction billing works.  I am sure he will then tweak it to fit OST requirements.  Right now I have [] spent [a] tremendous amount of time, resources and money on bidding and setting up the bids for SDVOSB projects without any agreement . . . Amar [Gogia] was supposed to come in and be added value, however, he has been given no direction and therefore is all over the place, accounting, PM, estimating, marketing.  I need his focus to be on bidding and estimating ONLY for the next 0-12 months, which has already required a great amount of time from Andrew [Scollick] and I to get him up to speed . . . As for shared resources between Citibuilders and CSG, for the time being maybe we keep everything with Citibuilders and loan CSG personnel at cost and as required.  Once a few projects are under our belt and a pipeline is built we can then build up CSG with full-time personnel as necessary.

(**Ex. 81**, Emails between Parekh, Narula, and Madan (June 15, 2010), OST DEF000992-93).

Narula forwarded this message to Madan.  (***Id.***)

93.    On June 19, 2010, Madan told Gogia that he was "thinking about a comp[ensation] plan so that we can get more of your time, and you have a salary.  Following our meeting next week, can we get together to go over some models.  I am trying to think of ways for you to put bread on the table and to put away enough to cover our short and long term costs."  (**Ex. 82**, Email from Madan to Gogia (June 10, 2010), OST DEF0009835).

94.    The operating agreement conversation between Narula, Parekh, and Madan led to Parekh providing a "first draft" of a proposed agreement to Narula on July 6, 2010.  (**Ex. 83**, Emails between Parekh, Narula, and Madan (July 6-19, 2010), OST DEF000624-28 at 624-27). The draft agreement provided for an eight-way split of CSG profits between Parekh, Narula, Madan, Chaudhry, Gogia, Parekh's father, Narula's wife, and Chaudhry's wife.  (***Id.*** at 626).  Each member's proposed contributions to CSG were then broken down with Gogia only contributing "Certification (8a, SDVOSB)."  (***Id.***).  The draft agreement further provided that Parekh would "manage and be responsible for all construction services," "OST to provide temp office space until end Oct 31st without fee," "OST to aid in back office support until end Dec 1st without fee," and

"Parekh to provide assets (Office (CAD printers, computer equip, etc), tools, trucks, safety equip, mobilization equip until End Dec 1st without fee." (***Id.*** at 627).

95.     Narula forwarded the draft operating agreement to Madan who responded with his own "view" of the agreement.  (***Id.*** at 624-25).  Madan's draft kept the same eight-way split and credited Gogia with "Certification (8a, SDVOSB)" and "Past Performance." (***Id.***)  Gogia's total contribution score was 3 (equal to Parekh's father) with every other partners' score equaling at least 12, including five partners scoring at least 20.  (***Id.***).

96.     Narula replied stating that he hoped Madan "noticed that now there is an eight (8) way split.  This includes for initial investment and sharing of profits."  (***Id.*** at 624)  Madan responded that he had seen that and asked Narula if he was "ok with this? Neil [Parekh] is not convinced Amar [Gogia] should be an equal partner.  Yet Neil's [Parekh] dad (with less experience than Amar [Gogia]) is an equal partner?" (***Id.***).  Narula then replied that Parekh "is ok with AMAR [Gogia] with the split.  Also, he will provide the financial portion for two partners (his dad and himself) as well." (***Id.***)  To which Madan replied "[o]f course he is ok.  Neil [Parekh] just doubled his share by adding his father.  Instead of 1/7 (14%) share, he now has a 2/8 (25%) share." (***Id.***)

97.     Parekh again expressed concern to Narula on July 27, 2010 that an operations agreement is "delayed and not a focus."  (**Ex. 84**, Emails between Parekh and Narula (July 28, 2010), OST DEF011814.  Parekh explained that "[o]ver the past 4-5 months SDVOSB has been my primary focus with at least 85% of my time being committed to bidding on SDVOSB projects. My accountants notified me yesterday we have spent well over $35,000 in supporting CSG which DOES NOT include my salary (I have taken $0 this year) and with no aid from OST principals." (***Id.***).

98.    The fact that CSG's operations from February through August 2010 were funded by individuals or entities outside of CSG is evident from the lack of activity in CSG's bank account, where no further deposits were made after Madan's initial $5,000 investment and only roughly $1,700 was spent during that period.  (**Ex. 40**, 2010 CSG Bank Statements, SCOLLICK 103063-96 at 3063-76).  Yet, CSG was operational and bidding on SDVOSB set-aside contracts. (**Ex. 71**, Centennial Bids Listing (May 14, 2010), Cent 01744).

99.    Parekh next provided a recap of an August 2, 2010 meeting to Narula which shows CSG being "split 8 ways, CSG to sub all work to CB, CSG to show 8% profit at year's end, Amar [Gogia] salary?, Neil [Parekh] and OST to aid in managing CSG, each partner to evenly provide capital to CSG, Anil to control all CSG accounts and be authorized to sign all checks, Amar [Gogia]/Neil [Parekh] /OST member to be on corporate papers."  (**Ex. 85**, Email from Parekh to Narula (Aug. 2, 2010), OST DEF012015-16 at 12015).  It further stated that CB was "to receive all SDVOSB and Hub zone projects" as well as "manage and run all CSG operations."  (**Id.**).

100.    An operating agreement was never put in place establishing the relationship between OST, CB Construction, and CSG.  (**Ex. 32**, CSG Dep. 82:22-83:12, 94:18-21; 106:15-18, 157:19-159:19 (June 21, 2019)).

101.    Gogia and CSG did not know how the CSG profits would be split between OST, CB Construction, and CSG.  (**Id.** at 81:1-10; 83:4-84:10).  CSG understood that the three companies were "going to team together and try to pursue projects" and the profits would be decided "between our companies."  (**Id.** at 77:21-78:6; 84:6-7).

**L.  CSG Obtains Bonding from Hanover**

102.    During the summer of 2010, Parekh and Narula worked with Schendel and Centennial to obtain bonding for CSG from Hanover.  (**Ex. 86**, Emails between Schendel, Parekh,

and Narula (June 11-13, 2010), OST DEF0010405-07; **Ex. 87**, Letter from Schendel to Seed and Brent Davis (July 7, 2010), Cent 01716-17; **Ex. 88**, Emails between Seed, Schendel, and Brent Davis (June 14-15, 2010), Cent 01724-31; **Ex. 89**, Email Chain (June 15-16, 2010), Cent 01721-22; **Ex. 90**, Hanover Indemnity Agreement (July 15, 2010), Cent 09043-52).   On June 13, 2010, Schendel emailed Parekh and Narula about an upcoming meeting the three of them would have with Hanover underwriter Seed and her boss Brent Davis.  (**Ex. 86**, Emails between Schendel, Parekh, and Narula (June 11-13, 2010), OST DEF0010405-07 at 10406).  Schendel told Parekh and Narula that "[i]n my opinion, OST offers the financial support to do what you want but that you remain protective to build up the construction arm slowly with the proper procedures." (**Id.** at 10405).  The meeting took place at OST's headquarters.  (**Id.** at 10406).  Amar Gogia was not invited and did attend the meeting with Hanover.  (**Id.**; **Ex. 18**, Hanover Dep. 54:17-55:20).

103.    Following the meeting, Schendel and Hanover negotiated the bonding terms for "OST" and Schendel thereafter provided the proposed rates to Parekh and Narula.  (**Ex. 88**, Emails between Seed, Schendel, and Brent Davis (June 14-15, 2010), Cent 01724-31; **Ex. 89**, Email Chain (June 15-16, 2010), Cent 01721-22).  Amar Gogia is not included in the conversation nor was he sent the proposed bonding rates.  (**Ex. 89**, Email Chain (June 15-16, 2010), Cent 01721-22).

104.    On June 18, 2010, while speaking about another federal set-aside contracting program, 8(a), Schendel instructed Narula and Parekh that "[t]here have been major fraud cases with fronts for 8(a) [set-aside] jobs . . . ." (**Ex. 91**, Schendel Email to Narula and Parekh (June 18, 2010), Cent 01719-20 at 1719).

105.    On July 7, 2010 Schendel sent a letter to Hanover advising that "OST will keep bidding under their construction division, Centurion."  (**Ex. 87**, Letter from Schendel to Seed and Brent Davis (July 7, 2010), Cent 01716-17 at 1716).

106.    Hanover agreed to provide surety bonds for CSG's SDVOSB set-aside contracts based on OST's financial support.  (**Ex. 18**, Hanover Dep. 91:11-92:13).

107.    Hanover required an indemnification against any loss on CSG bonds.  (**Ex. 18**, Hanover Dep. 96:8-17).  A Hanover Agreement of Indemnity was entered into on July 15, 2010 which provided that OST, Narula, Narula's wife Nishi Narula, Parekh, Gogia, Citibuilders, Inc., CSG, and Centurion OST, LLC would all indemnify Hanover for any losses on bonds issued for CSG, Citibuilders, Inc, or OST.  (**Ex. 90**, Hanover Indemnity Agreement (July 15, 2010), Cent 09043-52).

108.    CSG was the only entity on the Hanover Agreement of Indemnity that ever sought, or received, a bond from Hanover.  (**Ex. 135**, Def. Hanover's Resp. Plaintiff-Relator's First Set of Interrogs. at 27).

## M. CSG Begins Being Awarded and Performing SDVOSB Contracts (August 2010-April 2011)

109.    CSG learned that it was the low bidder for a VA SDVOSB set-aside contract on July 31, 2010 for VA Contract No. VA258-C-0436.  (**Ex. 92**, Email from Gogia to Parekh, Madan, and Narula (July 31, 2010), OST DEF005539; *see* **Ex. 242**, Bond Information Sheet (Aug. 31, 2010), Hanover0000841-44).  Gogia informed Parekh, Madan, and Narula of this fact.  (**Ex. 92**, Email from Gogia to Parekh, Madan, and Narula (July 31, 2010), OST DEF005539).

110.    As of August 3, 2010, just three days after CSG was told it was in line to be awarded its first VA SDVOSB set-aside construction contract valued at $517,397.00, CSG's Bank of America account reflected a balance of $3,318.91.  (**Ex. 40**, 2010 CSG Bank Statements, SCOLLICK 103063-96 at 3076).

111.    On August 4, 2010, Madan wired $211,612.34 into the CSG checking account to reflect enough assets to secure bonding from Hanover, which was required to actually perform

under the VA contract it was just awarded and to assure the VA that CSG could "carry the program." (*Id.*; **Ex. 93**, Emails between Madan, Gogia, Chaudhry, and Narayan (Aug. 4, 2010), OST DEF001014-15; **Ex. 32**, CSG Dep. 135:8-136:10 (June 21, 2019); **Ex. 5**, Madan Dep. 109:2-110:9). This money was never repaid to Madan who, along with Narula and Gogia, were disturbed when they learned that Parekh, who had absolute control of the CSG checking account, took over a million dollars from the same CSG checking account Madan deposited the funds with no supporting documentation. (**Ex. 5**, Madan Dep. 120:1-12, 167:19-170:4).

112.    On August 4, 2010, Madan, Gogia, Narayan, and Chaudhry engaged in a scheme to conceal the immediate infusion of cash into the CSG bank account, which culminated with being instructed by Madan and Narayan to "get a statement on the Bank letterhead from the manager saying the current balance in the account is $_____. This way the sudden infusion of cash is not evident." (**Ex. 94**, Emails between Gogia, Narayan, Madan, and Chaudhry and Attached CSG Financial Sheets (Aug. 4, 2010), OST DEF001027-32 at 1027). Narayan then prepared a CSG "Statement of Financial Position as at August 5th 2010" and "Statement of Operations for the Six Months Feb 5th to August 5th, 2010" that falsely reflected Madan's contribution as qualifying as "contract revenues" when Narayan, Gogia, Madan, and Chaudhry knew the "contracts revenues" entry concealed an unrecorded cash contribution from Madan. (*Id.* at 1031).

113.    On August 6, 2010 Parekh disciplined Scollick and Gogia for failing to catch that a bid proposal that was submitted to the government in CSG's name did not include a statement of past performance, telling them in an email that he was "no longer requesting each of you to check each other's work and go through the checklist but **REQUIRING** you both to check list the full the [sic] complete proposal, everything completed except for cost 3 **DAYS prior to the bid**

**due date.** We can no longer afford any mistakes." (**Ex. 95**, Email from Parekh to Gogia and Scollick (Aug. 6, 2010), OST DEF000703 (emphasis in original)).

114. On August 24, 2010, the VA awarded Contract No. VA-258-C-0436 to "Neil Parekh, Managing Director, Centurion Solutions Group, LLC." (**Ex. 242**, Bond Information Sheet (Aug. 31, 2010), Hanover0000841-44 at 842). The contract specified that it was being awarded as a "100% Service-Disabled-Veteran-Owned-Small-Business-Set-Aside, (SDVOSB) Under Authority (38 USC 8127(d))." (*Id.* at 843). The offer for this contract was signed by Neil Parekh as "Managing Director" of CSG. (*Id.* at 844).

115. During his time working with CSG, Parekh signed nearly all documents requiring a CSG signature as the "Managing Director," and sometimes "Principal," of CSG. (*See e.g.*, *id.*; **Ex. 96**, Emails between Gogia, Madan, and Narula (Sept. 14, 2012), OST DEF0023429-30; **Ex. 97**, CSG Notice to Proceed (March 23, 2011), CSG-00000724).

116. On August 31, 2010, after meeting with Chaudhry to review accounting procedures, Parekh asked Narula to provide a server on OST's network to run QuickBooks and "PEM" software for CSG, which Narula did. (**Ex. 98**, Email from Parekh to Narula (Aug. 31, 2010), OST DEF011797; **Ex. 13**, Scollick Decl. ¶ 6).

117. On September 15, 2010, despite a previous operating agreement listing Gogia as a 51% owner and Madan as a 49% owner of CSG, Madan sent a different "Centurion Operating Agreement" to Gogia, with Chaudhry and Narula blind copied on the email. (*See supra* ¶ 58; **Ex. 99**, Email from Madan to Gogia, Chaudhry, and Narula and Attached CSG Operating Agreement (Sept. 15, 2010), OST DEF0009712-18). The agreement is signed by Gogia, notarized, and dated September 15, 2010. (*Id.* at 9718) In this operating agreement, Gogia is listed as the 100% owner

of CSG.  (*Id.*)  No affirmative record of Madan's removal as an owner of CSG was made.  (**Ex. 5**, Madan Dep. 155:4-19).

118.     Between October 3-12, 2010, Narula gathered information from Madan and Chaudhry in order for Narula to open a new bank account for CSG.  (**Ex. 100**, Email Chain (Oct. 3-12, 2010), OST DEF0009870-71).  During this time, Parekh asked Narula to send him "CSG bank info, business license # (Amar [Gogia]), and in house balance sheet/financial statement." (**Ex. 101**, Email from Parekh to Narula (Oct. 6, 2010), OST DEF011815).

119.     Parekh and Narula exerted control over Gogia with respect to CSG to the extent that on October 8, 2010, Parekh notified Narula that he "spoke with Amar [Gogia]. . . regarding his role and compensation package.  He is in agreement with all the below items,"  which Parekh listed as: 1) "Start date Nov 1st"; 2) "Salary $65,000";  3) "No benefits (he and his wife already have health benefits which are much cheaper than CSG package)"; 4) "1/8 revenue sharing. However, no distribution until end of year 2011 at the earliest"; 5) "Role a. Field supervisor (at least for 3 projects)," "b. After Nov 1st he will no longer be involved with the Gogia group and 100% focus on CSG projects," "c. 80% traveling."  (**Ex. 47**, Email from Parekh to Narula (Oct. 8, 2010), OST DEF01179).  Gogia's 2011 Form W-2 from CSG shows that he earned $65,000 in wages.  (**Ex. 102**, 2011 CSG Form W-2s, CSG-00000517, 521 at 517).

120.     On October 26, 2010, Parekh asked that either Narula or Madan meet with him and Amar [Gogia] to discuss with Amar [Gogia] the following items: 1) "Pep Talk"; 2) "Amar's [Gogia] Role-he now is superintendent" 3) "Accountability"; 4) "Job Performance-this is the time to build our qualifications and positive track record"; 5) "Documentation"; 6) "Email (Paper trails are a must, can never accept any verbal responses)"; 7) "Preparation"; and 8) Do or die time—

mistake [sic] just can not be made."  (**Ex. 103**, Emails between Parekh, Madan, and Narula (Oct. 26, 2010), OST DEF000854).  Madan committed to take the meeting with Gogia.  (***Id.***)

121.   CSG continued to be awarded, and began performing, the SDVOSB construction projects and Gogia was assigned, by Parekh and Narula, to a position in the field to act as a "site superintendent" on CSG job sites, while Parekh stayed at OST's offices to oversee the executive and office functions of CSG, as well as pursuing other SDVOSB opportunities.  (**Ex. 32**, CSG Dep. 192:20-193:9 (June 21, 2019); **Ex. 13**, Scollick Decl. ¶ 7; *see e.g.* **Ex. 104**, Gogia CSG Timesheet (July 24-30, 2011), OST DEF001380).

122.   CSG's Form W-2s for 2010 show that Gogia earned wages of $7,500 and Martin Tubb earned $16,923.06.  (**Ex. 105**, CSG 2010 Form W-2s, 000032-33).

123.   On March 29, 2011, Parekh sent a spreadsheet of the CSG "AWARDED PROJECTS" to Narula and Chaudhry, which Narula forwarded to Madan.  (**Ex. 106**, Emails Between Parekh, Narula, and Madan (Mar. 29-Apr. 5, 2011), OST DEF000835).  Narula and Madan decided they needed to initiate a "pipeline review with Neil [Parekh] and Amar [Gogia]" as "part of governance and SOP's [standard operating procedures]."  (***Id.***)

124.   Despite CSG's registered address being Gogia's home address in Harrisonburg, Virginia, CSG operated out of OST offices, first in Washington, D.C. and then in McLean, Virginia until at least Spring 2012 when Parekh and CB Construction ended their relationship with CSG. (**Ex. 37**, CSG's Articles of Incorporation (Jan. 23, 2010); **Ex. 107**, Emails between Narula, Parekh, Gogia, and Madan (Dec. 12-15, 2011), OST DEF0009884-85; **Ex. 6**, Email Chain (Nov. 17, 2011), OST DEF0009945-47 at 9946; **Ex. 32**, CSG Dep. 76:10-77:1, 172:9-173:12; 222:22-225:1 (June 21, 2019); **Ex. 4**, Narula Dep. 17:19-18:6; **Ex. 5**, Madan Dep. 40:6-11, 106:4-19).  CSG did not pay any rent for the use of OST's office space.  (**Ex. 32**, CSG Dep. 76:10-77:1, 172:9-173:12 (June

21, 2019); **Ex. 5**, Madan Dep. 106:4-19; **Ex. 6**, Email Chain (Nov. 17, 2011), OST DEF0009945-47 at 9945).

125.    While operating out of OST offices, the employees performing CSG tasks utilized office workstations, desks, furniture, computers, internet and telephone service, telephones, fax machines, printers, servers, computer software, office supplies, and the use of OST's FedEx account for free.  (**Ex. 13**, Scollick Decl. ¶ 8; **Ex. 4**, CSG Dep. 172:9-173:1 (June 21, 2019); **Ex. 6**, Email Chain (Nov. 17, 2011), OST DEF0009945-47 at 9945-46).  However, Gogia himself did not have a workstation at the OST offices in Washington, D.C. and was required to be met in the lobby and escorted to the offices as he was not provided the required entry badge.  (**Ex. 13**, Scollick Decl. ¶ 8).

126.    From CSG's inception to the time when Parekh and CB Construction ended their relationship with CSG, all office support functions, such as submitting bond requests, were carried out by CB Construction employees, specifically Samantha D'Souza and Samantha Ralli who held themselves out as CSG employees, including using CSG email accounts.  (**Ex. 6**, Email Chain (Nov. 17, 2011), OST DEF0009945-47 at 9946; **Ex. 108**, Emails between Samantha D'Souza and Belinda Ferciot (Jan. 10, 2011), OST DEF0009555; **Ex. 109**, Email from Gogia to Madan (Dec. 20, 2011), OST DEF003305-06; **Ex. 13**, Scollick Decl. ¶ 9).  Neither Samantha D'Souza nor Samantha Ralli were employed by CSG.  (**Ex. 110**, Email from Madan to Narula and Attached 2010-11 CSG and CB Construction Payroll (Dec. 19, 2011), OST DEF000061-88 at 64, 71-72).  Throughout at least the first eight months of CSG's existence, when it was bidding on and beginning to receive VA SDVOSB set-aside contracts, it had no employees.  (**Ex. 32**, CSG Dep. 86:9-13, 133:9-15 (June 21, 2019)).

127.     Further, CB employees Rubando, Thomas Starkweather, and Scollick all oversaw CSG projects under the VA SDVOSB set-aside contracts between 2010 and 2012, without any involvement from a CSG employee and reported directly to Parekh.  (**Ex. 32**, CSG Dep. 213:9-214:14 (June 21, 2019), **Ex. 110**, Email from Madan to Narula and Attached 2010-11 CSG and CB Construction Payroll (Dec. 19, 2011), OST DEF000061-88 at 73-78; **Ex. 13**, Scollick Decl. ¶ 10).  All three were also provided with, and used, CSG email accounts with CSG signature blocks including when discussing CSG projects directly with VA representatives.  (**Ex. 6**, Email Chain (Nov. 17, 2011), OST DEF0009945-47 at 9946; **Ex. 111**, Email from Rubando to Steven Hammer (Nov. 10, 2010), OST DEF0007157.  CB Construction also provided construction resources such as trucks, trailers, power and hand tools, and personal protective equipment for CSG jobs.  (**Ex. 13**, Scollick Decl. ¶ 10).

## N.  **Hanover's Bonds for CSG SDVOSB Set-Aside Projects**

128.     Between August 24, 2010 and May 4, 2011 Hanover, through its bonding agent Centennial and Schendel, issued performance bonds with the VA as obligee and CSG as the principal, for the following eight VA SDVOSB set-aside contracts:

    a.   VA Contract No. 258-C-0436, Bond No. 1912640 (8/24/10), Amount: $517,397

    b.   VA Contract No. 786A-C-0355, Bond No. 1912641 (8/31/10), Amount: $377,000

    c.   VA Contract No. VA-244-C-1556, Bond No. 1946476 (9/29/10), Amount: $672,236

    d.   VA Contract No. VA-256-C-0984, Bond No. 1912647 (10/05/10), Amount: $122,599

    e.   VA Contract No. VA263-C-1066, Bond No. 1946469 (10/14/10), Amount: $57,700

    f.   VA Contract No. VA255-C-1536, Bond No. 1946471 (10/19/10), Amount: $1,227,000

g.   VA Contract No. VA256-C-1169, Bond No. 1946482 (10/29/10), Amount: $731,736.80

h.   VA Contract No. VA244-C-1539, Bond No. 1946507 (5/4/11), Amount: $837,107 (**Ex. 135**, Def. Hanover's Resp. Plaintiff-Relator's First Set of Interrogs. at 13; **Ex. 112**, Centennial Bond Listing, Cent 00001).

129.    Before Hanover provided bonds for a CSG project, Seed would receive a "Bond Information Sheet" from Centennial which contained a copy of the General Services Administration Standard Form 1442, the government form comprising the first pages of a government construction contract which stated the contracts were SDVOSB set-aside.  (**Ex. 19**, Seed Dep. 99:18-106:17; **Ex. 113**, Emails between Belinda Ferciot to Samantha Ralli (Apr. 29-May 5, 2011), Cent 09560-61 (describing Centennial's procedure of a contractor submitting "form 1442" when requesting bonds); *see e.g.*, **Ex. 241**, Bond Information Sheet (Aug. 31, 2010), Hanover0000855-59; **Ex. 242**, Bond Information Sheet (Aug. 31, 2010), Hanover0000841-44; **Ex. 243**, Bond Information Sheet (Oct. 12, 2010), Hanover0000408-11; **Ex. 244**, Bond Information Sheet (Oct. 21, 2010), Hanover0000583-86; **Ex. 245**, Bond Information Sheet (Nov. 4, 2010), Hanover0001931-36).

130.    On August 9, 2010, Schendel documented in a letter sent to Merchants Bonding Company representative Cody White ("White") that "**Vijay [Narula] (owner of OST) set up Centurion which is a wholly owned subsidiary of OST and he hired Neil Parekh to run it**. Neil [Parekh] had his own company called Citibuilders and I bonded Citibuilders.  Neil's [Parekh] resume of work is attached.  In addition to Neil [Parekh], Vijay [Narula] hired David Rubando . . . Nathanial Baker and Andrew Scollick . . ." (**Ex. 22**, Letter from Schendel to Cody White (Aug. 9, 2010), Cent 01708-09 at 1708 (emphasis added)).  The next day, Schendel told White that Schendel's "main motivation is **to bond OST through their wholly owned subsidiary of**

**Centurion**." (**Ex. 114**, Email from Schendel to Cody White (Aug. 10, 2010), Cent 01704-06 at 1704 (emphasis added). Gogia is not mentioned in either correspondence. (**Ex. 22**, Letter from Schendel to Cody White (Aug. 9, 2010), Cent 01708-09; (**Ex. 114**, Email from Schendel to Cody White (Aug. 10, 2010), Cent 01704-06). Schendel testified that as of August 9, 2010 he "viewed Neil [Parekh] as the main person that had the construction experience. And since he had that experience, he would be running" CSG. (**Ex. 15**, Schendel Dep. 144:19-146:5 (May 7, 2019)).

131.    On September 16, 2010, as part of her formal underwriting responsibilities, Seed filed into Hanover's system an "OST, Inc., Account Summary" ("OST Account Summary"). (**Ex. 7**, OST Account Summary (Sept. 16, 2010), Hudson NON PRIV 000054-60; **Ex. 19**, Seed Dep. 128:22-130:5). The Account Summary fulfilled a Hanover underwriting requirement that on "an annual basis, [Hanover underwriters] had to prepare an account summary." (**Ex. 19**, Seed Dep. 128:22-130:5). All the information used to prepare the OST Account Summary came directly from Narula or Schendel. (**Ex. 19**, Seed Dep. 131:19-32:14; 140:4-41:1). Schendel acknowledged that his information came from Narula or Parekh. (**Ex. 15**, Schendel Dep. 57:19-58:17, 59:20-60:8, 89:21-91:5, 92:16-94:5, 130:7-131:5, 174:7-175:4 (May 7, 2019)).

132.    The OST Account Summary made these specific representations:

a.    OST "**set up a subsidiary** to handle general construction and construction management" (**Ex. 7**, OST Account Summary (Sept. 16, 2010), Hudson NON PRIV 000054-60 at 56 (emphasis added)).

b.    Narula "**brought Neil [Parekh] on to start up a construction arm of OST**" (*Id.* (emphasis added)).

c.    "Neil Parekh [is the] President CitiBuilders, a subsidiary of OST" (*Id.* at 57).

d.    Parekh "is **running the construction division**" (*Id.* (emphasis added)).

e.    "Amar Gogia [is the] Managing Member of **Centurion Solutions Group, LLC also a subsidiary of OST**" (*Id.* (emphasis added)).

      f.   CSG "**is the SDV [service-disabled veteran] entity**" (*Id.* (emphasis added)).

      g.   "**All bids are in the name of Centurion Solutions Group, LLC**" (*Id.* (emphasis added)).

      h.   "Citibuilders, Inc. [and] Centurion Solutions Group, LLC . . . are **subsidiaries of OST to build up the construction arm**" (*Id.* (emphasis added)).

133.    The OST Account Summary also stated that "OST already has an accounting staff that will be able to track and prepare credible internal statements and wips [works in progress] for the construction activity to be bonded" and that "Vijay [Narula] reviews all [CSG] bids with Neil [Parekh] and Amar [Gogia]." (*Id.* at 58). While the OST Account Summary spends over four pages describing the finances and background of OST, Narula, and Parekh, it excluded any further discussion of Gogia than listed above and wholly ignores CSG's financial condition. (*Id.* at 56-60).

134.    On September 22, 2010, Seed informed Schendel and Centennial that she had "done my write up of the account and have set up a working line of $3MM/$10MM." (**Ex. 115**, Email from Seed to Schendel (Sept. 22, 2010), Cent 01675).

135.    The OST Account Summary noted that Seed requested a copy of Parekh's and Gogia's resumes. (**Ex. 7**, OST Account Summary (Sept. 16, 2010), Hudson NON PRIV 000054-60 at 60). In her September 22, 2010 communication with Schendel, Seed again explicitly requested resumes for Parekh and Gogia. (**Ex. 115**, Email from Seed to Schendel (Sept. 22, 2010), Cent 01675). Later that day, Schendel transmitted a copy of Parekh's resume. (**Ex. 116**, Letter from Schendel to Seed (Sept. 20, 2010), Cent 01671-72 at 1671); **Ex. 117**, Email from Belinda Ferciot to Seed (Sept. 20, 2010), Cent. 01673). However, a resume for Gogia was never provided to Hanover. (Kohn Decl. ¶ 9, filed herewith). Centennial likewise did not possess a copy of Gogia's resume. (*Id.*).

136.     In addition to Parekh's resume, Schendel also sent another letter to Seed September 20, 2010 which summarized OST's current state of affairs as "the desire for OST remains to do about $10 million of volume in 2011, specifically in construction" and "their construction team and procedures are officially in place."  (**Ex. 116**, Letter from Schendel to Seed (Sept. 20, 2010), Cent 01671-72 at 1671).  Schendel stated that "Vijay [Narula] and Neil [Parekh] have a good relationship and the plan remains for Neil [Parekh] to run the construction division.  Vijay [Narula] is extremely active in any project Neil [Parekh] pursues.  The jobs are bid jointly."  (***Id.***).  Gogia is not mentioned anywhere in this letter.  (***Id.***)

137.     Between November 5 and 8, 2010 Schendel communicated with Hanover to discuss "OST / Corinthian [sic]" and to set up a meeting after Hanover inquired about several financial items concerning OST. (**Ex. 119**, Email Chain (Nov. 5-8, 2010), Cent 01648-51).  Schendel asked Hanover if they would like to "meet with the OST people . . .to see what they have done and to hear the progress they have made, in the construction division.  We think OST may have opportunities coming up that will need your support and may need to get more capacity."  (***Id.*** at 1651).  Schendel told Hanover that "[t]hey [Narula and Parekh] want to be ready for Jan and Feb bidding" and that "both Vijay [Narula] and Neil [Parekh] can meet 11/23."  (***Id.*** at 1648, 50).  Nowhere in this discussion is Gogia mentioned and at no time was he asked to attend a meeting with Hanover.  (***Id.***).

138.     By this time, a new Hanover underwriter, Keith McQuade ("McQuade"), replaced Seed as the main underwriter for the OST/CSG account and on November 8, 2010 McQuade asked for clarification on a number of items because the supporting documentation could not be located in Hanover's files.  (***Id.*** at 1648-49).  One specific area of underwriting concern was the actual ownership and corporate structures of CSG and the other entities associated with the bonding

account.  (*Id.*).  Schendel responded by telling McQuade that "**Centurion and the other entities are wholly owned by OST**."  (*Id.* at 1648 (emphasis added)).

139.    On November 27, 2010 Schendel emailed Narula in advance of a future meetings with Hanover, alerting Narula that the Hanover representatives would like to "meet with you separately to discuss any financial questions, before bringing in Neil [Parekh] to discuss operational issues."  (**Ex. 120**, Email from Schendel to Narula (Nov. 27, 2010), Cent 01647). There is no mention of Gogia attending any bond meetings, either past or future.  (*Id.*).

140.    Between December 1, 2010 and January 13, 2011, Hanover sought information on the ownership structure of CSG.  On December 1, 2010, Keith McQuade asked Schendel to explain "[w]hat is the ownership breakdown of each entity?  I know Vijay [Narula] owns 100% of OST. But other than that its vague."  (**Ex. 121**, Email Chain (Dec. 1, 2010-Jan. 12, 2011), Cent 01637-40 at 1639-40).  McQuade closed his email by saying "[t]hanks again for setting up the meeting last week.  We were real impressed with both Vijay [Narula] and Neil [Parekh].  I like their approach in construction."  (*Id.* at 1640).  McQuade does not mention Gogia.  (*Id.*).

141.    On January 10, 2011, McQuade reminded Schendel and Centennial that "[w]e really need the organizational breakdown for each entity."  (**Ex. 122**, Emails between McQuade and Belinda Ferciot (Jan. 10, 2011), Cent 01646).

142.    On January 12, 2011, Schendel responded to McQuade's inquiry into the organization breakdown of the OST related entities.  (**Ex. 121**, Email Chain (Dec. 1, 2010-Jan. 12, 2011), Cent 01637-40 at 1637).  Schendel stated that "Neil [Parekh] and I went over the status of jobs and all of them are going along fine.  He said they backed off bidding for a while because the wanted to get the jobs up and running . . . Now that the jobs are running, he is bidding more work." (*Id.*).  There is no mention of Gogia.  (*Id.*).  Under the heading "Organizational Breakdown"

Schendel explained that "Citibuilders is a dormant company and therefore there was no reason for a resolution. I went round and round with Vijay [Narula] and Courtney about it and the only reason it is on the GIA is because it was Neils [Parekh] [sic] old company. There is no activity in Citibuilders and there are no plans to start it up. The idea of picking it up stems from Neil [Parekh] owing has own company and that Neil [Parekh] was running the work for OST." (**Id.**). Schendel then stated "**Centurion Solutions Group is the entity needing the bonds**. Vijay [Narula] wanted an entity that would be a different name so it would not conflict with the work OST does. **Ownership is Vijay [Narula], Amar [Gogia] and Neil [Parekh]**." (**Id.**) (emphasis added). He then stated that "Centurion OST, LLC was set up if for some reason, OST would team with Centurion. It is for lack of a better word JV with the two companies but there is NO activity at all in the entity." (**Id.**).

143.    McQuade pressed for ownership percentages of CSG among the three principals, asking Schendel if "**the ownership of Centurion broken out in thirds between Vijay [Narula], Neil [Parekh], and Amar[Gogia]? Or is it different**." (**Ex. 123**, Email Chain (Jan. 12-13, 2011), Cent 01633-36 at 1634 (emphasis added)). On January 12, 2010, Schendel responded with "**[y]es, ownership is as your state**." (**Id.** at 1633 (emphasis added)). Schendel added that "I honestly met Amar [Gogia] in [OST's] office so I do not know much about him." (**Id.**).

144.    At some point in 2011, a Certified Public Accountant prepared a "Compiled Financial Statements for Period Ending December 31, 2010" for CSG. (**Ex. 240**, CSG Compiled Financial Statements (Dec. 31, 2010), HUDSON NON 000688-99). The Compiled Financial Statements identifies two equity members of CSG, one holding $18,668 in equity and the other holding $210,000, roughly the amount of Madan's interest free "loan" to CSG in August 2010. (**Id.** at 691; **Ex. 5**, Madan Dep. 122:3-17). A CSG Balance Sheet as of June 30, 2011 shows that

Gogia only had $3,589.72 in equity.  (**Ex. 240**, CSG Compiled Financial Statements (Dec. 31, 2010), HUDSON NON 000688-99 at 697).  The financial statements further show $240,070 in unexplained "investments" into CSG.  (***Id***. at 692).  The financial statements include a line item indicating that CSG paid $50,000 in "rent" despite the fact it operated out of OST's offices for free.  (***Id.*** at 696; **Ex. 32**, CSG Dep. 76:10-77:1, 172:9-73:12 (June 21, 2019); **Ex. 5**, Madan Dep. 106:4-19).

145.     Madan admitted that "honestly, if we did go through a formal valuation process, how much is the company [CSG]  worth as of 9/15/2010, it's worth noting."  (**Ex. 5**, Madan Dep. 155:11-56:4).

146.     On March 21, 2011, Schendel told Hanover that "**Neil** [Parekh] **put in $200-250,000 and Vijay [Narula] put in about the same amount in Centurion**."  (**Ex. 124**, Emails between Schendel, McQuade, Brent Davis, and Belinda Ferciot (Mar. 21, 2011), Cent 01628-29 at 1628 (emphasis added)).

147.     Schendel met with Narula on March 29, 2011 and that same day updated Hanover about "OST/Centurion."  (**Ex. 125**, Emails between Schendel and McQuade (Mar. 29, 2011), Cent 01620-21).  Schendel told Hanover that "Vijay [Narula] absolutely wants to maintain a good working relationship with Hanover and he is serious about it" because "[b]onding is a very important piece of his plan."  (***Id.*** at 1620).  Schendel further stated that "Vijay [Narula] injected about $210,000 of cash and Neil [Parekh] injected $220,000 of cash in Centurion.  (***Id.***).  There is no mention of Gogia investing any funds.  (***Id.***).  Schendel further advised Hanover that "[g]oing forward Vijay's [Narula] plan is to have Centurion stand on it's own financially and his goal is to add 8% back into the company every year" and that "[t]hey are still focusing 100% attention on Federal and have been able to maintain on average 12% margin.  All work will be renovation

driven.  Vijay [Narula] expects to see a big increase in bidding and contract activity in the next couple months."  (*Id.*).  Schendel closed by stating in part that "**Vijay [Narula] is excited with the team he is building coupled with the infrastructure and controls he has in place.**"  (*Id.* at 1620-21).

148.    Hanover last issued bonds for a CSG project on May 4, 2011.  (**Ex. 135**, Def. Hanover's Resp. Plaintiff-Relator's First Set of Interrogs. at 13).

**O.  Hudson Insurance Company Takes Over CSG Bonding**

149.    Hudson entered into an agreement with Surety Partners of America Mid Atlantic, LLC ("Surety Partners"), for the purpose of having Surety Partners carry out "the bond business of Hudson Insurance Company."  (**Ex. 15**, Schendel Dep. 44:12-16 (May 7, 2019); **Ex. 19**, Seed Dep. 7:13-8:6, 9:21-22).  Surety Partners was 100% owned by Schendel and shared offices and employees with Centennial.  (**Ex. 15**, Schendel Dep. 7:12-18, 45:16-47:9 (May 7, 2019)).

150.    The relationship between Hudson and Schendel's Surety Partners was governed by the Program Administrator Agreement ("PA Agreement") executed on March 1, 2010.  (**Ex. 16**, Hudson Program Administrator Agreement (Mar. 1, 2010), HUDSON NON 00400-40).  Pursuant to the PA Agreement, Surety Partners was appointed Hudson's "general agent for the purposes of underwriting, issuance, and delivery of surety bonds."  (*Id.* at 401).

151.    By this time Courtney Seed had left employment with Hanover, where she had overseen the OST/CSG account, and was now employed by Surety Partners.  (**Ex. 21**, Schendel Dep. 7:12-15; 44:12-16 (May 14, 2019); **Ex. 19**, Seed Dep. 7:13-8:6, 9:21-22).

152.    On May 11, 2011 Seed provided Hudson with a summary of a potential new account, which she identifies to Hudson as "OST, Inc."  (**Ex. 126**, Emails between Seed, Blair Holl, Sid Frankel, Schendel, and Belinda Ferciot (May 11-June 15, 2011), Hudson NON

PRIV000062-63 at 62).  Seed's summary was based on documents she loaded into the "Citrix" database used by Hudson as a system of record.  (*Id.*).  In her summary, Seed identified the excellent financial strength of OST and told Hudson that "Centurion has not been in business for a full year" and is "financially supported by OST."  (*Id.*).

153.    Seed emailed Centennial employees on May 27, 2011 after meeting with "OST" to "explain the Surety Partners / Hudson arrangement" and to state they had secured a Hudson $3MM/$8MM bonding line. (**Ex. 127**, Email from Seed to Schendel, Belinda Ferciot, and Catie Matthews and Attached Meeting Notes (May 27, 2011), Cent 00309-10 at 309).  Seed stated that Narula "is monitoring all activity and holding Neil [Parekh] and Amar [Gogia] accountable for production, reports, etc."  (*Id.*)  Seed said that "[w]e will met [sic] with Vijay [Narula] in July to get the new structure of OST and Centurion.  OST is growing exponentially so further procedures & structure will be implemented with both companies."  (*Id.*)

154.    On June 15, 2011, Seed followed up to inform Hudson that she was going to provide "OST / Centurion Solutions" bonding "under our branch authority of $3MM/$8MM based on corporate support of OST and personal and spousal indemnity of the President and 100% owner of Centurion Solutions."  (**Ex. 128**, Emails between Seed, Schendel, Blair Holl, and Sid Frankel (June 15, 2011), Hudson NON PRIV 000064).  Hudson employees responded to this message internally stating that the OST/Centurion Solutions account "looks like a slam dunk on the surface."  (*Id.*).

155.    In an internal email between Hudson employees dated June 17, 2011, Hudson confirmed its understanding that the bonded entity for the OST account "is really Centurion Solutions Group.  **Majority of work is SDV work (Service Disabled Veterans) . . . All bonds are written for Centurion Solutions Group.  No bonds are written for OST, Inc.**"  (**Ex. 129**,

Emails between Sid Frankel, Blair Holl, and David Halper (June 17-Dec. 13, 2011), Hudson NON PRIV 000292-93 at 292 (emphasis added)).

156.    On June 17, 2011 Seed provided the OST Account Summary to Hudson, which she drafted previously while working as an underwriter for Hanover.  (*See supra* ¶¶ 131-33; **Ex. 7**, OST Account Summary (Sept. 16, 2010), Hudson NON PRIV 000054-60).

157.    Two Hudson General Indemnity Agreement were entered into by OST, CSG, CB Construction, Gogia, and Vanessa Keasler Gogia.  (**Ex. 130**, Hudson's Answers to Pl.'s First Set of Interrogs. at 4; **Ex. 131**, Hudson General Indemnity Agreement (July 22, 2011), Cent 10027-44.  The first is dated July 22, 2011 and the second is dated July 27, 2011.  (**Ex. 130**, Hudson's Answers to Pl.'s First Set of Interrogs. at 4)   These Hudson General Indemnity Agreements provided that OST, CSG, and CB Construction would provide corporate indemnity and Gogia and Vanessa Keasler Gogia would provide individual indemnity to Hudson for all surety bonds issued by Hudson to CSG, OST, or CB Construction.  (**Ex. 131**, Hudson General Indemnity Agreement (July 22, 2011), Cent 10027-44).

158.    Hudson explicitly included language in the Agreements to require Narula, Parekh, and Gogia to affirm that OST, CSG, and CB Construction were companies that were "**materially interested through common ownership** in transactions in connection with which Centurion Solutions Group, LLC and CB Construction Group, Inc. has applied or may hereafter apply to the Hudson Insurance Company for bonds or undertakings."  (**Ex. 131**, Hudson General Indemnity Agreement (July 22, 2011), Cent 10027-44 at 42-44).

159.    OST and CB Construction never sought, and Hudson never provided, any bonds under the Agreements.  (**Ex. 130**, Hudson's Answers to Pl.'s First Set of Interrogs. at 5).

160.    Between July 22, 2011 and October 27, 2011 Hudson, through its bonding agent Centennial and Schendel, issued payment and performance bonds, using Standard Form 25, with the VA as obligee and CSG as the principal, for the following five VA SDVOSB set-aside contracts:

   a.   VA Contract No. VA250-C-0698, Bond No. HSAMA0202 (7/22/11), Amount: $167,000

   b.   VA Contract No. VA263-C-1298, Bond No. HSAMA0203 (7/22/11), Amount: $179,800

   c.   VA Contract No, VA250-C-0659, Bond No. HSAMA0208 (7/29/11), Amount: $731,910

   d.   VA Contract No. VA255-C-2060, Bond No. HSAMA0210 (8/1/11), Amount: $187,942

   e.   VA Contract No. VA2446-C-0632, Bond No. HSAMA0294 (10/27/11), Amount: $77,100

(**Ex. 130**, Hudson's Answers to Pl.'s First Set of Interrogs. at 4-5, **Ex. 112**, Centennial Bond Listing, Cent 00001).  Surety Partners and Centennial received bond information sheets containing Standard Form 1442, or other documents, showing the contracts these Hudson bonds were issued for were SDVOSB set-aside.  (**Ex. 113**, Emails between Belinda Ferciot to Samantha Ralli (Apr. 29-May 5, 2011), Cent 09560-61; *see e.g.*, **Ex. 132**, Bond Information Sheet (July 29, 2011), Cent 00325-29; **Ex. 133**, Email Chain and Attached Bond Information Sheet (July 21, 2011), Cent 11063-74; **Ex. 134**, Email Chain and Attachments (July 20, 2011), Cent 11157-62).

161.    On August 15, 2011 Centennial employee Reggie Jarvis met with Parekh.  (**Ex. 137**, Reggie Jarvis Meeting Notes (Aug. 15, 2011), Cent 09906-07).  The meeting began with Parekh explaining the current bid board of CSG and the upcoming bid intentions.  (*Id.* at 9906) Parekh and Jarvis then discussed "new entity, CB Construction Group (1111 19th Street, North, Suite 2001, Arlington, VA 22209, Tax ID# 26-4077744)" whose "[f]unction is to carry operating

costs for Centurion.  They will invoice Centurion and be reimbursed for expenses on a monthly

basis.  Centurion only has 3 to 4 employees on Payroll all other costs are paid by CB Construction

Group."  (*Id.*)  Gogia is not mentioned.  (*Id.*)

162.    Seed continued to update Hudson and provided information regarding the

"OST/Centurion" account for the rest of 2011.  (**Ex. 138**, Email Chain (Sept. 29, 2011), Hudson

NON PRIV 000285-86; **Ex. 139**, Emails between Seed, David Halper, and Schendel (Nov. 8,

2011), Hudson NON PRIV 000302).  First, Seed stated by email on September 29, 2011 that the

account currently was on a $4MM/$8MM bonding program and requested a higher soft backlog.

(**Ex. 138**, Email Chain (Sept. 29, 2011), Hudson NON PRIV 000285-86 at 286).  She then referred

Hudson to the "[OST] Account Summary" in the Citrix database and summarized it, stating "OST

had contacts with the Dept of Vet affairs as well as other branches of the government so they

started a construction arm, Centurion Solutions.  The financial support of course if [sic] with OST

. . . The goal is to have them stand alone in the near future.  Indemnity of OST is in place."  (*Id.*)

163.    Hudson acknowledged that the OST Account Summary placed it on notice that

Hudson was told that the managing member of CSG, that CSG was a subsidiary of OST, and that

CSG was purportedly a service-disabled veteran entity.  (**Ex. 140**, Hudson Dep. 68:3-70:2).

164.    David Halper ("Halper") of Hudson responded by confirming that Hudson would

provide a "soft backlog" of $12-15mm and made further "account comments" on the

OST/Centurion account.  (**Ex. 138**, Email Chain (Sept. 29, 2011), Hudson NON PRIV 000285-86

at 285)  Halper also stated that Hudson had been advised that "**Centurion is a subsidiary of OST**."

(*Id.* (emphasis added)).

165.    On November 8, 2011, Seed confirmed to Hudson that Centurion Solutions "is the

construction arm of OST."  (**Ex. 139**, Emails between Seed, David Halper, and Schendel (Nov. 8,

2011), Hudson NON PRIV 000302).  Hudson previously noted that five bonds had already been issued for CSG even though no information on CSG was in the Citrix database.  (***Id.***)  Halper asked if CSG was part of another company.  (***Id.***)  Seed directed Hudson to look at OST on Citrix to get the information on CSG as it is OST's "construction arm."  (***Id.***).

166.    On November 29, 2011 Schendel provided Hudson an email response to previous questions which also served "as a memo to file" regarding "OST/Centurion."  (**Ex. 141**, Email Chain (Sept. 29-Nov. 29, 2011), Hudson NON PRIV 000298-301 at 298).  Schendel began the memo by explaining that "[w]e have met with OST/Centurion 3 times in 2011 and Courtney and I are meeting with them 12/7."  (***Id.***)  Schendel then explained that "Centurion targets 100% federal renovation projects."  (***Id.***)  Schendel stated that "[t]he person who is running Centurion used to own a company that I bonded. . . . He still owns the company but it is not active.  I have some history with the person running it.  Centurion is operated out of the same building that OST is located in, in Washington.  Centurion enjoys the resources of a large company but they are lean."  (***Id.***).  Schendel's memo then stated that "Vijay [Narula] agreed to personally inject a chunk of $ into the company should they want something larger" and that "[t]he intent of Centurion is for it to stand on its own, eventually without OST."  (***Id.***)  Schendel then clarified that "I thought Centurion was going to be a subsidiary of OST and it is officially not one.  It is more of a sister company they keep arms length, even though they are located in the same building/share resources."  (***Id.***).

167.    Hudson, as of December 31, 2011, was still working under the belief that "Centurion is the construction arm of OST, Inc."  (**Ex. 142**, Hudson Contract Surety Worksheet (Dec. 31, 2011), HUDSON NON 000474-75).

168.    An underwriter for Hudson completed a "Contract Surety Worksheet" on December 31, 2011 which evaluated its account for "OST Inc. dba Centurion." (**Ex. 142**, Hudson Contract Surety Worksheet (Dec. 31, 2011), HUDSON NON 000474-75 at 74).  The Worksheet utilized the financial information of OST, not Centurion.  (*Id.* at 74-75)  It stated that "Centurion is sister (construction arm)" of OST, Inc.  (**Id.** at 74).

169.    On January 13, 2012 Seed emailed a recap of a recent meeting to Narula, Madan, Gogia, and Parekh.  (**Ex. 143**, Email Chain (Jan. 13-17, 2012), Cent 09917-19).   The notes document that CSG's bonding was still "based on OST's financial support." (*Id.* at 9918).

170.    Centennial did not facilitate any further bonds for CSG from this point forward. (**Ex. 130**, Hudson's Answers to Pl.'s First Set of Interrogs. at 5).

### P.  CSG Operations During Hudson Bonding Period

171.    On May 28, 2011, a VA contracting official identified to Parekh and Gogia issues and concerns on CSG's Wichita, Kansas job ("Wichita Project"), Contract No. VA255-10-RP-0476, specifically with regards to Gogia's performance.  (**Ex. 144**, Emails between Parekh, Gogia, Narula, and David Leach (May 27-June 1, 2011), OSTDEF0009507-10, at 9509-10).  Gogia was working as a site superintendent on the Wichita Project.  (**Ex. 32**, CSG Dep. 211:15-22 (June 21, 2019; **Ex. 104**, Gogia CSG Timesheet (July 24-30, 2011), OST DEF001380).  Parekh responded by disciplining Gogia, telling Gogia that "[i]f there is not a significant improvement on this project over the next couple weeks I will have no choice but to replace you on this project.  Not following basic construction and OSHA policies is inexcusable.  The COTR has signaled you out as not complying with OSHA policies and procedures, lack of notification, and poor workmanship." (**Ex. 144**, Emails between Parekh, Gogia, Narula, and David Leach (May 27-June 1, 2011),

OSTDEF0009507-10, at 9507-08).  Parekh forwarded his disciplinary email to Narula, and in an email exchange, told Narula:

> [J]ust sent this to you as an FYI because if I continue to lose money on this project and Amar [Gogia] does not improve I may have to send him home.  I don't think that will happen but if it does I wanted to give you fair warning.  For now I would like to keep it quiet and would appreciate you just keep it to yourself.  No need to escalate this cause added pressure to Amar [Gogia], he know[s] what he needs to do.  I have implemented some policies for Amar [Gogia] to follow which should turn this around, however, he needs to step up and can never be at fault for basic procedures . . . There is only so much I can do.

(*Id.* at 9507).

172.    Shortly thereafter, on June 1, 2011, Madan requested from Gogia and Parekh, with Narula and Chaudhry copied, that Madan be able to withdraw his seed money from CSG, a total of $211,612.34.  (**Ex. 145**, Email from Madan to Gogia, Parekh, Narula, and Chaudhry (June 1, 2011), OST DEF011794).  No withdraw or return of seed money to Madan occurred.  (**Ex. 5**, Madan Dep. 120:1-12).

173.    Around this same time, Narula began to express doubts about Parekh to Madan.  (**Ex. 146**, Emails between Madan and Narula (June 24-25, 2011), OST DEF011795).  On June 24, 2011 Narula told Madan "I do not have comfort with [Parekh] . . . we need to keep over sight."  (*Id.*).  Madan informed Narula he had not been able to get his money out and that he "wants to push him [Parekh], but want to talk to you first" and explained that he could "take control over the [CSG] bank account and lock him out."  (*Id.*).

174.    On June 7, 2011, Narula emailed Chaudhry, Madan, Nishi Narula, and Renu Chaudhry stating "[w]e need to get the agreement for CSG and [CB Construction] in place.  We need to review and implement the legal implications of a SDVOSB for SOMASS.  I am very reluctant to push SOMASS forward without having this in place."  (**Ex. 147**, Email Chain (June

2-7, 2011), OST DEF0009909-10 at 9909).  Narula then asked for "a link or document with the constructs of  SDVO- JV" which Madan provided from the SBA.  (*Id.*).

175.    On August 8, 2011, Gogia emailed Madan and Chaudhry about the potential of setting up a "Mentor-Protégé Agreement" for the VA.  (**Ex. 148**, Emails from Gogia to Madan and Chaudhry (Aug. 8, 2011), OST DEF006191-92 at 6191).  Then on August 29, 2011, Gogia again emailed Madan about a putting "together the VA [Mentor Protégé] agreement."  (**Ex. 149**, Email Chain (Aug. 26-29, 2011), OST DEF005410-11 at 5410).

176.    CSG and OST did enter into a Mentor Protégé Agreement "under the Federal Aviation Administration (FAA) Mentor/Protégé program" for "teaming on anticipated FAA projects."  (**Ex. 150**, CSG and OST Mentor Protégé Agreement (April 15, 2010), OST DEF005267-69).  However, CSG never entered into a joint venture or mentor-protégé agreement under the VA with any other entity including OST or CB Construction.  (**Ex. 39**, CSG Dep. 13:8-11 (July 19, 2019)).

177.    In the Fall of 2011, Parekh asked Madan, with Narula copied, about Gogia's availability for construction work, stating that "[i]f he is available I would like to send him to Kansas for a three week project."  (**Ex. 151**, Email from Parekh to Narula and Madan (Sept. 8, 2011), OST DEF011754).

178.    On September 8, 2011, Madan sent meeting notes to Gogia and Parekh regarding the "Construction Meeting" they held the previous day.  (**Ex. 152**, Emails between Madan, Gogia, and Parekh and Attached Meeting Notes (Sept. 8-11, 2011), OST DEF005441-43).  Both Parekh and Gogia provided comments on the notes.  (*Id.*)  The notes include: 1) "Neil [Parekh] to provide Amar [Gogia] admin access info for Sharepoint," 2) "Neil [Parekh] to provide accounting system

access," 3) "Amar [Gogia] to begin signing" checks, and 4) Amar's [Gogia] role going forward is "tbd after SOMASS."  (*Id.* at 5442-43).

179.     Around this time Narula also began expressing his concerns about Gogia.  (**Ex. 153**, Emails between Narula, Madan, Parekh, and Gogia (Sept. 25-26, 2011), OST DEF005555-56). Specifically, he emailed Madan on September 26, 2011 asking "[h]ow can we help Amar [Gogia]? I am worried!" after seeing an email from Parekh to Gogia explaining the deficiencies in Gogia's schedule for the Wichita project.  (*Id.*).

**Q. Gogia's Focus on SOMASS**

180.     The SOMASS contract was awarded to CSG-OST, LLC on May 31, 2011 but the award was later withdrawn.  (**Ex. 5**, Madan Dep. 47:22-48:16).

181.     From the formation of CSG through at least 2011, Gogia devoted a substantial amount of time preparing the bid for SOMASS, communicating and meeting with government officials regarding SOMASS, and preparing to initiate performance on SOMASS.  (**Ex. 5**, Madan Dep. 47:4-48:16, 67:6-68:13; **Ex. 154**, Email from Gogia to Madan, and Chaudhry (Aug. 29, 2011), OST DEF003309; **Ex. 155**, Emails between Gogia and Madan (July 10-12, 2011), OST DEF003872; **Ex. 156**, Email Chain (Aug. 10, 2010), OST DEF004436; **Ex. 157**, Email Chain (Nov. 8-9, 2010), OST DEF004441-42; **Ex. 158**, Email between Gogia, Veronica Sines, and Madan (June 24, 2011), OST DEF005351-32; **Ex. 159**, Email Chain (July 7, 2011), OST DEF5377-78; **Ex. 160**, Email from Goga (July 11, 2011), OST DEF005383).

182.     This work by Gogia was done under the CSG-OST, LLC joint venture, it directly "consum[ed] a lot of [Gogia's] time," and took away from the time Gogia devoted to CSG and the VA SDVOSB set-aside contracts CSG was performing.  (**Ex. 5**, Madan Dep. 40:6-20, 67:6-68:13, 93:13-94:22, 138:10-139:8, 146:18-147:16; 166:4-17; **Ex. 151**, Email from Parekh to Narula and

Madan (Sept. 8, 2011), OST DEF011754; **Ex. 4**, Narula Dep. 33:6-35:10).   When testifying

regarding SOMASS, Narula stated:

> Mr. Parekh and I had a very good understanding that we'll be opening a subsidiary
> of OST, to handle matters of  construction, and more towards the PMO and
> anything else.  All of a sudden he saw Mr. Gogia come in, take over what he thought
> was his.  He should have had the opportunity for SOMASS and he saw all of a
> sudden my focus move from him to Mr. Gogia for this $160 million opportunity.

(**Ex. 4**, Narula Dep. 40:2-10).  Narula went on to say:

> "I work probably 18 to 24 hours a day sometimes, on proposal days.  And this is
> the time Mr. Gogia involved in the [SOMASS] proposal and his other
> [construction] duties that he was doing.  I have no idea what he was doing, but
> whatever he was involved in was other time he had.  It is only part of the time was
> committed to – a significant amount was committed to SOMASS.  And rightfully
> so being $100 million plus contract, the significance, so he saw the value.

(*Id.* at 35:1-10).

### R. __Breakdown of CSG and Parekh Relationship__

183.    Parekh had full control of CSG's checking account and between November 12,

2010 and December 7, 2011, Parekh, without providing sufficient accounting or documentation,

withdrew a total of $1,048,700 from the CSG checking account and deposited it to Parekh's

company CB Construction Group.  (**Ex. 40**, 2010 CSG Bank Statements, SCOLLICK 103063-96

at 3084, 3092-94; **Ex. 161**, CSG Contractor Payments for CB Construction (Feb. 14, 2009-Apr.

14, 2012), OST DEF001369-70; **Ex. 162**, Emails between Gogia, Madan, Parekh, and Narula

(Dec. 20-22, 2011), OST DEF001099; **Ex. 32**. CSG Dep. 186:18-195:4 (June 21, 2019); **Ex. 163**,

Emails between Gogia, Narula, and Madan (Feb. 29, 2012), OST DEF001409).  Parekh managed

CSG's financial accounting.  (**Ex. 11**, Parekh Dep. 244:20-45:3; **Ex. 32**, CSG Dep. 186:14-17

(June 21, 2019)).  Parekh had complete access to the CSG bank account and sent direct deposit

payments from that account to the CB Construction account without supporting documentation to

justify the transfers.  (**Ex. 32**, CSG. Dep. 191:7-15, 220:8-11(June 21, 2019)).  In December 2011,

CSG prepared a spreadsheet that identified $1,048,700 worth of these transfers.  (**Ex. 161**, CSG Contractor Payments for CB Construction (Feb. 14, 2009-Apr. 14, 2012), OST DEF001369-70). When questioned about these transfers, Parekh acknowledged that there was no specific invoicing or accounting involved but instead "we kind of skipped all that.  We just, as necessary, we sent money to CSG, and then, as necessary, they would send the money back."  (**Ex. 11**, Parekh Dep. 232:16-234:1).  In 2011, Gogia reported on his personal income taxes that CSG had earned a profit of only $20,168.  (**Ex. 136**, Gogia 2011 Tax Return Excerpts, 000065, 000068).

184.    Between December 8-13, 2011 Narula and Parekh held a back and forth discussion regarding "Amar's [Gogia] Role" in CSG and other issues related to CSG.  (**Ex. 164**, Emails between Narula and Parekh (Dec. 8-13, 2011), OST DEF0009530-32).[3]

185.    Parekh began by stating he is "opposed 100% to have [Gogia] anywhere near the accounting system." (***Id.*** at 9531)  Narula responded to this by saying "he needs to be involved.  Like I mentioned he needs to be part of the process" and Parekh replied:

> Vijay [Narula], I let him be part of the process and it was a disaster.  He started in the office and did not like it and the work he did was scary, then went to field and we know what happened.  I am only now uncovering costs and subcontract work he approved without any authorization or notification to the office.  His constant remarks that the COTR's like him and believe he is doing a good job were entirely false.  Even last week now that he has access to the payroll system he changed the passwords, ran the payroll without notifying nor receiving my approval.  He also ran his own pay check.  He neither has the expertise nor the experience to do this and I certainly will NOT let mistakes happen again under any circumstance.

(***Id.***).

186.    Parekh made his next point about Gogia stating "[r]emember in the past he did not want to be in office and preferred to be in the field.  We have to be careful what he is given.  There

---

[3] When deposed, Narula identified which of the comments in the email he made and which Parekh made.  (**Ex. 4**, Narula Depo. 147:13-151:15).

are so many issues I have uncovered over the past few days that are going to be difficult to fix and when all send [sic] and done probably will result in a wasteful 150-200K, I'm not kidding nor sensationalizing the loss we are going to incur." (*Id.*).  Narula responded to this statement by saying "**at the end of the day you [Parekh] are running the company/work**.  This loss is due to BOTH of you – Amar [Gogia] for on-site work and not [sic] for not being able to manage the contract/work."  (*Id.*).  Parekh then told Narula "I agree with you and certainly take much blame for the losses.  I kick myself every night for not acting earlier on these projects . . ." (*Id.* (emphasis added)).

187.    Parekh proposed that Gogia receive a salary of "$40,000 per year.  After Ajay [Madan] and myself have been paid back in full the total amounts we have put into the company we can consider an increase." (*Id.*).  Narula responded by saying "[i]f he is working full time and **we are using his quals**. he needs to be compensated.  **We need to come up with the % of sales/profit to give hi[m] for use of his certs** and pay him for working as well." (*Id.* (emphasis added)).  Parekh then said that "[i]f we had paid him $50,000 to sit at home last year and kept him away from operations, we would have had a successful year and made money.  I agree with some percentage sales/profit and **he certainly should be compensated for letting us use his quals**, however, we no longer continue to spend time and resources teaching and mentoring him with no results." (*Id.* (emphasis added)).

188.    Parekh closed the discussion by writing "[i]n summary I would like for him to be away from all operations at least for the time being—it is a real mess and much more than you or I have been lead [sic] to believe," to which Narula replied "I was trusting YOU to be on top of the work.  You have too much on your plate.  You have been mentioning about him for over a year and you should have mitigated it then and not after massive losses."  (*Id.*).

189.     On December 12, 2011, Narula sent an email to Parekh and Gogia, with Madan copied, requesting that Parekh and Gogia provide Narula with an update on several items concerning CSG.  (**Ex. 107**, Emails between Narula, Parekh, Gogia, and Madan (Dec. 12-15, 2011), OST DEF0009884-85).

190.     On December 13, 2011, Madan was provided login information for CSG's QuickBooks account, Bank of America account, and Paycycle account.  (**Ex. 165**, Email from Gogia to Madan (Dec. 13, 2011), OST DEF001084).

191.     On December 14, 2011, Gogia told Parekh that Parekh submitted a CSG tax filing that listed OST's address and asked what other documents had been filed using this address.  (**Ex. 166**, Email from Gogia to Parekh and Madan (Dec. 14, 2011), OST DEF001086).

192.     Madan sent Narula an email on December 14, 2011 regarding CSG "Accounting and Financial."  (**Ex. 110**, Email from Madan to Narula and Attached 2010-11 CSG and CB Construction Payroll (Dec. 19, 2011), OST DEF000061-88).  Madan relayed that Parekh had been told that only Gogia can now make CSG payments but that all payments must have "3 party consent."  (*Id.* at 61).  Madan further outlined that he has taken control of CSG's QuickBook files, that no transactions will be made, and that Narula's accountant was coming in to look at CSG's books.  (*Id.*).  Madan also informed Narula that: 1) Madan, Parekh, and Gogia would henceforth jointly perform a payroll review; 2) Madan could control the CSG checks; and 3) that "CSG has paid over $1M to CB [Construction" and "CB's salaries are $750K" and "Neil's [Parekh] draw was $492K."  (*Id.* at 62).  Madan followed up with Narula on December 19, 2011 stating he had taken Parekh's computer and refused to give it back until the finances were straightened out as Parekh had "taken $492k in salary," when he was owed only $150,000.  (*Id.* at 61).

193.    On December 22, 2011, Madan copied Narula and Parekh on an email in which Madan instructed Gogia to hold off making further payments to CB Construction while allowing all other payments to be processed.  (**Ex. 167**, Emails between Parekh, Narula, Madan, and Gogia (Dec. 22, 2011), OST DEF003297-99 at 3298-99).  Parekh disagreed with this instruction and asked Narula to intervene.  (*Id.* at 3298).  Narula responded that "first Ajay's [Madan] payment has to be resolved.  You told me June it is now December.  Secondly, **OST has not received any profit or a fee for bond support.  You told me clearly that we would make money** . . . I have not seen a dime."  (*Id.*) (emphasis added).  Parekh responded to Narula saying:

> I agreed to fund this endeavor for 2010 on the agreement we would receive $15,000.00 each month for every airport we were contracted to do – this amount would be used to cover the cost of RSWL, our overhead, expenses and also would start up the SDVOSB division.  We never received one timely payment form OST and instead I had to not only fund RSWL including the 2 month delayed start date but also the CSG start up.  Ajay's [Madan] money is in CSG accounts and if FT Scott, Wichita and RSWL were closed out most of his balance if not all would probably have been paid back to him.

(*Id.* at 3297)  Parekh goes on to say that "[b]**onding was provided on the basis of past performance (CB [Construction]), personnel indemnification (Neil [Parekh], Vijay [Narula] and Nishi [Narula]) and OST financial – for this OST was given 75% ownership.**"  (*Id.* (emphasis added)).

194.    Narula responds to Parekh stating:

> FUNDING: - You committed to fund up [] to $650k.  You were not to touch Ajay's [Madan] money.  We were suppose meet [sic] in Jan 2011 to go over 2010 accomplishments and see if we want to continue.  That never happened because of both sides.  We had discussions since [M]arch and **you committed to me to pay back Ajay [Madan] by June 2011 and get me the financials for both companies. At the end of the day you did not manage Amar [Gogia] and the contracts are where they are – in a loss.  You are responsible for all projects in CB [Construction] or CSG**.

(*Id.* (emphasis added)).

195.    On December 20, 2011 Gogia submitted to Madan his "unvarnished" view of CSG who forwarded the email to Narula.  (**Ex. 109**, Email from Gogia to Madan (Dec. 20, 2011), OST DEF003305-06).  Gogia told Madan he:

> [T]alked to a few people in CSG to obtain the pulse . . . During an informal meeting with David Rubando yesterday, some issues were brought to light.  CSG's operations are improving and getting better organized, but there are some questions regarding the assignment of roles and duties moving forward.  We discussed the extent of Neil's [Parekh] experience as a field supervisor, how it translates to operations management, and have some concerns.  Neil [Parekh] has experience as a drywall/ceiling/ installation superintendent/PM.  This experience does not qualify one to manage larger scopes of work that require working together with several different subcontractors, different types of materials and complex schedules.

(*Id.* at 3305)  Rubando was an employee of CB Construction, not CSG.  (**Ex. 110**, Email from Madan to Narula and Attached 2010-11 CSG and CB Construction Payroll (Dec. 19, 2011), OST DEF000061-88 at 73-74).

196.    Gogia went on to say that:

> [W]e have a precon checklist that was created by David [Rubando] and is starting to be applied to every job, under David's supervision . . . There is a clear difference in the way Ft. Scott, Wichita, and Kansas City were setup by Neil [Parekh] and the way Des Moines and Philadelphia were setup by David . . . The integrity of a company's operations comes from strong planning which allows for honest, upfront dealing with subs and vendors . . . We have not been employing these values and it is hurting not only our reputation with subs and vendors, but also internally among staff.

(**Ex. 109**, Email from Gogia to Madan (Dec. 20, 2011), OST DEF003305-06 at 3305).

197.    Gogia then turned to relaying a conversation with another CB Construction employee saying:

> Samantha Ralli has turned in her resignation.  David [Rubando] said it was directly because of poor treatment by Neil [Parekh].  I spoke with Sami [Ralli] this morning and asked her in a very open-ended way why she has decided to leave.  She confirmed what David [Rubando] has said.  She said she has been looking for a new job since March 2011 because the environment she has been working in is filled with disrespect, misguidance, secrecy, and a lack of organization.  She also

said it is the same reason Samantha D'Souza (who worked with Sami [Ralli] earlier this year) decided to leave.

(*Id.*)  Samantha D'Souza and Samantha Ralli were both CB Construction employees, not CSG employees.  (**Ex. 110**, Email from Madan to Narula and Attached 2010-11 CSG and CB Construction Payroll (Dec. 19, 2011), OST DEF000061-88 at 71-72).

198.    Gogia closed by telling Madan that:

> David [Rubando] is excited to be a part of our team, he does not have a strong relationship with Neil [Parekh], rather he is motivated by being part of something from the ground up and setting the stage for something bigger.  He realizes the potential we have moving forward.  He also suggested that all jobs be run through him alone, with the help of our estimator/superintendents.  He mentioned he was glad I was becoming more involved.

(**Ex. 109**, Email from Gogia to Madan (Dec. 20, 2011), OST DEF003305-06 at 3305).  Regarding Samantha Ralli, he stated "I am working with Sami [Ralli] through next week to define and document her duties.  We need to fill the role she plays; any replacement must be a CSG employee (not CB [Construction]) and I will work with them directly."  (*Id.* at 3306).

199.    On December 27, 2011, Parekh requested from Narula a payment of $35,000 and further explained that he "put another $35,000 of my own money because Ajay [Madan] took over all accounts meaning we never received any payments for Nov and Dec.  CSG has since received over $250,000 in payments from the government and there has been no payments to CB even though CB covers the payroll and up to Nov was also paying the credit cards."  (**Ex. 168**, Emails between Parekh and Narula (Dec. 27-28, 2011), OST DEF011777-78 at 11777).

200.    CSG's Form W-2s for the 2011 tax year indicate that Gogia earned $65,000 in wages and Parekh earned $67,884.62.  (**Ex. 102**, 2011 CSG Form W-2s, CSG-00000517, 21 at 517).  Further, CSG's Form 1099 for CB Construction in 2011 shows payments of $743,700 and the payroll for CB Construction in 2011 show Parekh was paid $274,615.42 in wages and

$43,461.50 in "contractor payments" by CB Construction.  (**Ex. 169**, CB Construction 2011 Form 1099, CSG-00001948; **Ex. 110**, Email from Madan to Narula and Attached 2010-11 CSG and CB Construction Payroll (Dec. 19, 2011), OST DEF000061-88 at 65-67).  Gogia's personal income tax return claimed that he received $20,168 in income from CSG in 2011.  (**Ex. 136**, Gogia 2011 Tax Return Excerpts, 000065, 000068).

201.    Illustrative of the lack of involvement Gogia had with running CSG, between January 12-16, 2012, Madan and Gogia discussed "[i]f Neil [Parekh] gets hit by a bus, how will [Gogia] assume all of the current project work?"  (**Ex. 170**, Emails between Gogia and Madan (Jan. 12-16, 2012), OST DEF0032993-94 at 3293).  Gogia stated that:

> David [Rubando], Andrew [Scollick], and Tom [Starkweather] have all the information relating to every job and are the one's really running operations.  They deal with COTRs and Superintendents, subs, pricing, scheduling, etc.  David [Rubando] would assume a bigger role, sans Neil [Parekh], which he is capable and eager to do.  He would be overseeing every project.  We would need an admin person and an additional PM, the cost of both is a fraction of Neil's [Parekh] cost.  I would be focused on BD and filling the bidding pipeline, which I am moving towards regardless.

(*Id.*).  In response to Madan's question as to would happen if Rubando left too, Gogia said "[t]hat would put significant pressure on Andrew [Scollick]/Tom [Starkweather], superintendents, and me in holding jobs together until we found another competent PM.  I would be worried about others leaving with David [Rubando] more than anyone leaving with Neil [Parekh]."  (*Id.*).

202.    On February 10, 2012, after Gogia had met with another company to potentially replace CB Construction, Madan stated to Narula that he had met with Gogia and "the plan is to have CSG become self sustaining without a dependence on OST or CB."  (**Ex. 171**, Emails between Gogia, Madan, Narula, and JM Snell (Feb. 3-11, 2012), OST DEF003287-89 at 3287).  Narula responded "Good.  I am glad they will be independent and we can concentrate on OST – full time."  (*Id.*).

203.    Gogia emailed Parekh on February 15, 2012 stating that CSG is "3 weeks behind on payment to Philadelphia workers, and 2 weeks behind on payment to Chillicothe workers.  You still refuse to approve any payments . . . Please approve immediately."  (**Ex. 172**, Emails between Parekh, Gogia, Narula, and Madan (Feb. 16, 2012), OST DEF001353-55, 1354-55).  After a back and forth between Gogia, Parekh, and Madan, Parekh stated that "[i]f office staff excluding myself and Amar [Gogia] can be paid, I have no disagreement in approving paying the laborers at the same time."  (*Id.* at 1354)  Madan then stated that:

> The payments to the laborers are DOL requirements.  We have put off these payments for too long.  You and I both agree these payments are appropriate.  The laborers keep calling daily because they need to put bread on the table.  I am not going to risk another round of claims against CSG.  I have these payments ready and want your support because it is the right thing to do.

(*Id.* at 1353).  Madan further stated that they need to reconcile payments between CB Construction and CSG and CB may owe CSG $100,000.  (*Id.*).

204.    On February 16, 2012, Gogia emailed Parekh and described CSG's new payment tracking system and stated "[t]he system that was in place this past year before I got involved had two payment tracking systems."  (**Ex. 173**, Emails between Parekh, Gogia, Narula and Madan (Feb. 14-16, 2012), OST DEF001335-36 at 1335).

205.    On February 29, 2012, Gogia emailed Narula and Madan and highlighted several issues he found when reviewing CSG and CB financial records, specifically stating that "CSG books maintained by CB [Construction] during 2011 do not correlate to CB invoices provided" and demonstrate the lack of oversight over CSG accounts and ability for CB Construction's ability to take large amounts from CSG without sufficient documentation.  (**Ex. 163**, Emails between Gogia, Narula, and Madan (Feb. 29, 2012), OST DEF001409).

206.     On March 2, 2012, Parekh informed Narula that CB Construction "cannot continue to fund CSG projects any further." (**Ex. 174**, Emails between Chaudhry, Narula, Madan and Parekh (Mar. 1, 2012), SCOLLICK 101277).

207.     At this stage Parekh, Narula, Madan, and Gogia began discussions on how to salvage or amicably end the CB Construction and CSG relationship. (**Ex. 175**, Emails between Gogia, Madan, and Narula (Mar. 5, 2012), OST DEF004365).

208.     On March 5, 2012 Narula forwarded a "one pager" drafted by Parekh regarding CSG, OST, and CB relationship to Gogia and Madan. (*Id.*). In part it stated that "CB to continue managing projects to completion," "CSG to pay CB a fixed monthly PM fee plus any expenses," and to "[p]art ways amicably and professionally" but "[i]f CSG and CB continue to work together it should be performed as a prime and subcontractor relationship." (*Id.*)

209.     On March 5, 2012 Gogia informed Madan that Parekh has been "[c]harging CB job expenses and paying for them with CSG money" and that he hopes Narula is "fully aware." (**Ex. 176**, Emails between Gogia, Parekh, Madan, and Narula (Feb. 18-Mar. 5, 2012), OST DEF001449-52 at 1449)).

210.     On March 30, 2012, Gogia again demonstrated his lack of ability to get bonding for CSG, asking Madan through email if Madan could arrange bonding through Centennial but without CB Construction on the bond. (**Ex. 177**, Email from Gogia to Madan (Mar. 30, 2012), OST DEF001788).

211.     Madan received a list of current issues CSG was dealing with from Gogia on April 6, 2012. (**Ex. 178**, Email from Gogia to Madan and Attached Outline (Apr. 6, 2012), OST DEF004360-62). Under general items it is listed "[m]oving towards independent operations—bonding, bidding, operations, accounting." (*Id.* at 4361).

212.    On May 10, 2012, Gogia asked Madan about advice for how to pay for CSG expenses.  (**Ex. 179**, Email from Gogia to Madan (May 10, 2012), OST DEF004107).  Gogia also informed Madan that Parekh is paying for CB Construction expenses on a credit card that "CSG is paying for."  (*Id.*)

213.    Gogia then emailed Parekh on May 14, 2012, stating "I am comfortable with a model in which CB is responsible for job operations, funding, and also responsible for any profit/loss.  CSG would be responsible for job payables/receivables and CSG would only retain a fee as a percentage of contract amount.  I have attached more details, using 5% as the CSG fee, that can be negotiated per job/scope."  (**Ex. 180**, Email from Gogia to Narula and Madan and Attached One Pager (May 14, 2012), OST DEF004376-78 at 4376).  The attached one pager shows that CB was at the time running six CSG job sites at the time.  (*Id.* at 4378).

214.    On May 22, 2012, Parekh provided Gogia and Narula, who later forwarded it to Madan, a copy of a "CB-CSG Partnership" arrangement.  (**Ex. 181**, Emails between Parekh, Narula, and Madan and Attached Agreement (May 22-June 1, 2012), OST DEF004379-80).  On CSG jobs under this agreement, CB Construction would provide the project manager and perform back office operations while any superintendents would be employed by CSG but paid and managed by CB Construction.  (*Id.* at 4380).  The agreement then laid out three separate options for CSG compensation for the projects.  (*Id.* at 4380).

215.    That same day Parekh emailed Narula, who forwarded the email to Madan, stating "[f]or 7 months I have in good faith continued to finance and manage all CSG projects which in turn has resulted putting myself in considerable debt.  I have not received a penny from CSG, nor OST during this time."  (**Ex. 182**, Emails between Parekh, Narula, and Madan (May 22, 2012), OST DEF000582).    Parekh further informed Narula "I certainly will take my share of

responsibility for some of the failures of CSG, however, I can assure you the 212K that Ajay [Madan] deposited into CSG would not have been touched if OST had paid their RSWL invoices and the balance in a timely manner to CB." (*Id.*).

216.    On June 15, 2012, Gogia again sought Parekh's approval for a CSG payment. (**Ex. 183**, Emails between Gogia, Parekh, Narula, and Madan (June 15-21, 2012), OST DEF001542-45 at 1545).  He also requested approval of a "payable list" so that Gogia and Narula could process payments, including those to CSG laborers. (*Id.* at 1544)  Parekh responded by stating that he was "not approving any more payments until CB gets paid." (*Id.*).  Gogia stated to Parekh that "[n]othing is paid until you sign off." (*Id.*).  Narula added that he will need to add Ajay's [Madan] payment of $170k and that he "will process all the payments today or no later than tomorrow." (*Id.*).  Gogia then emailed Madan and Narula to state that "[i]t was my understanding that once Neil [Parekh] approved a list of payments, as presented to Vijay [Narula], they are good to be paid." (*Id.* at 1542).  Gogia then stated "I have been wanting to get payables approved since last week.  We have laborers that are behind on their pay because payments are not getting approved on time." (*Id.*).

217.    In response to Parekh stating that Gogia or Perry Schultz needed to finish up a SDVOSB contract in Chillicothe, Ohio, Gogia responded on July 27, 2012 stating "since mid-May Perry [Schultz] has not been actively involved in operations at Chillicothe.  I have never been involved with this job at all." (**Ex. 184**, Email Chain (July 27, 2012), OST DEF000637).

218.    Then, on August 29, 2012, Rubando emailed Madan directly and secretly because "Neil [Parekh] keeps telling me that OST agreed to put money into the CSG account and Amar [Gogia] keeps telling me that Neil [Parekh] agreed to put money into the CSG account.  I suspect both are incorrect.  In the meantime-none of the actual workers are getting paid." (**Ex. 185**, Emails

between Rubando, Madan, and Gogia (Aug. 29-30, 2012), OST DEF003263-65 at 3264).  Madan

again asked Gogia what would happen if Neil [Parekh] left, to which Gogia said he

> [W]ould need to first contact on site supers to let them know there's been a management change and get up to speed on current job operations; with David's [Rubando] help if he's truly on board.  Then call all Cos/COTRs and do the same with them, followed by subs/labor crews.  Meet supers/cotrs/subs on each job site asap and get plan of action in place for completion.  Make regular visits to each job through completion, scheduled around all the new jobs we are getting ready to start . . . Not impossible if it's the only option; will be happy to have CB risk and exposure off our back.  Funding for completion will be a major hurdle.

(*Id.* at 3263).

219.    On September 11, 2012 Gogia informed Madan that "[w]e have taken control of

the Durham job and completion is underway" and asked to speak with Narula about how to gain

control over other CSG projects.  (**Ex. 186**, Emails between Gogia Michael Jakubiak, Perry

Schultz, and Madan (Sept. 7-11, 2012), OST DEF003585-88 at 3585).

220.    On September 14, 2012, after Parekh objected to Gogia's instruction for Parekh to

sign a document because "[t]his is an official CSG document which must be signed by a director

or owner of CSG.  I am neither," Gogia emailed Madan and Narula stating:

> Neil [Parekh] wants me to sign a time extension for Chillicothe that I have nothing to do with.  He has had no problem signing as 'Managing Director' for all of our current jobs, but is now refusing to sign.  We have taken over Durham, and I am signing everything for that job moving forward.  Should he not continue to sign off on Chillicothe documents?  I don't want my name on something I have no idea about.

(**Ex. 96**, Emails between Gogia, Madan, and Narula (Sept. 14, 2012), OST DEF0023429-30 at

2429).

221.    On September 17, 2012 Gogia provided Madan and Narula a recap of a discussion

he had that day with Narula.  (**Ex. 187**, Email Chain (Sept. 14-17, 2012), OST DEF003426-28).

He indicated that "CB has no intention of completing the current jobs they are responsible for.  It

also seems that control of current jobs is the **only** leverage CB has in dealing with us." (***Id.*** at 3426). Gogia then provided a plan including that "I need to let the VA know that we are not happy with the management of these jobs and we decided to completely change the team they have been dealing with." (***Id.***). Gogia's plan included that "CSG completes the work at Chillicothe," and "CB is no longer responsible for, nor allowed, communication with our subs, COs or COTRs." (***Id.***). Finally, Gogia stated that "I am not enthused by having to add these jobs to our plate . . . However, I think having CB remain on CSG jobs will only delay the resolution of the finances . . . The sooner we get CB off our jobs, the sooner we can aggressively pursue collections from them." (***Id.***).

222.    After bond claims were filed by CSG subcontractors, Schendel provided an update to Hudson on September 25, 2012. (**Ex. 188**, Email Chain (Sept. 24-25, 2012), Hudson NON PRIV 000236-37). Schendel observed that "there was a change in personnel at Centurion" and that "Am[a]r [Gogia] is taking action to get [the contracts] closed." (***Id.*** at 236) Schendel further explained:

> From our standpoint, there was a failure of communication and communication was the primary reason we cut off the account. A very strong indemnitor, OST who routinely [sic] has $5 million plus in cash is owned by Vijay [Narula] Narula. OST has never used their $3-5 million bank line. Vijay [Narula] wanted to open a construction arm and started Centurion. Neil Pakera (sp?) [Parekh] [sic] was running Centurion and Neil [Parekh] left because he got frustrated with OST's lack of financial reporting because it held up Centurion to obtain a steady flow of bonds."

(***Id.***).

223.    After an inquiry from Gogia, Narula instructed him to process payments for a CSG job in a new Wells Fargo bank account instead of the Bank of America account CSG had been using which Parekh had read access to. (**Ex. 189**, Emails between Gogia, Madan, and Narula (Oct. 2, 2012), OST DEF000893).

68

224.     On October 3, 2012 Gogia sent Madan a spreadsheet created by Gogia and Narula outlining CSG financials.  (**Ex. 190**, Email from Gogia to Narula and Madan and Attached Financials (Oct. 3, 2012), OST DEF000875-82).  He also asked if Madan is "ok with Vijay [Narula] putting in 70k now and using 30k from the WF account to help with the operations cost?" (*Id.*).

225.     Narula then sent Parekh an email regarding account resolutions on October 12, 2012.  (**Ex. 191**, Email from Narula to Parekh (Oct. 12, 2102), OST DEF000690-92).  Narula stated that CSG has over "$400k in payments to make and no money."  (*Id.* at 690).  Narula wrote that it was always Parekh's "responsibility for the operations and P/L for the jobs" and that "I am still shocked at the discovery that we have massive losses on projects that you were running and you never identified that earlier in any of our discussions."  (*Id.*).  Narula added that "[w]e have payments to make to the sub-contractors that you hired and managed, to work on the projects." (*Id.* at 691).

226.     During this time frame, Parekh separated himself completely from CSG, Gogia, OST, Madan, and Narula to start a new SDVOSB entity, Defendant Citibuilders Solutions Group, LLC, with Defendant Melvin Goodweather.  (*See infra* ¶¶ 236-49).

227.     Gogia provided Narula and Madan a document titled "CB Narrative" on December 4, 2012 which lays out the "CB/CSG relationship."  (**Ex. 192**, Email from Gogia to Narula and Madan and Attached Narrative (Dec. 4, 2012), OST DEF001704-05).  This narrative stated that CB Construction was responsible for job operations and then said that "in March 2010, CSG entered relationship with CB [Construction], Agreed that CB [Construction] would assume full responsibility of P&L and job operations for jobs bid with CSG, CB [Construction] granted access

to CSG banking for job operations, Agreed CB [Construction] to be responsible for bookkeeping and accounting." (*Id.* at 1705). The narrative goes to state that:

> [F]rom 2010-2011, CB [Construction] responsible for creating 13 bids/awards . . . 5 out of 13 jobs bid/awarded by CB [Construction] abandoned by CB [Construction], violation of agreed responsibility with gross negligence, CSG now acting with diligence to complete projects and correct deficiencies caused by CB [Construction] negligence and theft, CSG now left with substantial unpaid balances to subcontractors on jobs bid by CB [Construction], subcontracts signed by CB [Construction], and subcontracts managed by CB [Construction].

(*Id.*).

228.    On December 16, 2012, Gogia informed Madan that he needed to "find emails documenting Neil's [Parekh] responsibility for P&L on CSG jobs" to show attorneys. (**Ex. 193**, Email from Gogia to Madan and Narula (Dec. 16, 2012), OST DEF003483).

229.    On December 27, 2012, Madan forwarded the email found in Exhibit 83, *supra* ¶¶ 94-96, outlining the proposed Operating Agreements drafted by Parekh and Madan in July 2010 relating to CSG, OST, and CB Construction. (**Ex. 194**, Email from Madan to Gogia (Dec. 17, 2012), OST DEF0000760-62).

230.    On February 8, 2013, Gogia sent another version of CSG/CB Relationship Narrative to Narula. (**Ex. 195**, Emails from Gogia to Narula and Attached Narrative (Feb. 8, 2013), OST DEF0008323-27). This narrative stated that:

> CSG formed in 2010 as an SDVO company to pursue federal construction job opportunities. In effort to bolster experience and past performance, looked at teaming opportunities/partners, for value add in providing services to government. CSG met with multiple companies, and decided to form alliances with OST and CB. CSG initiated the relationship with CB/OST on a trial basis to see if relationship can be further defined. After various options, decided not to pursue equitable distribution, instead business relationship between three companies. CSG to provide framework, management. OST provide infrastructure, guidance, SOPs. CB to provide job specific operation support to include: Responsibilities of CB/Neil Parekh, Report to Managing Member, status of construction opportunities, Coordinate all construction activities with managing member, Ensure compliance with all permitting/licensing regulations on the Federal, State, and Local level

> Identifying new opportunities, Estimating/bidding, Jobsite operations, Job accounting/budget/P&L, Subcontractor management, Account Payable/Receivable, Customer/Contracting Officer relations, Job completion. CSG managing member, Amar Gogia, agreed to be involved in job operations on site (80%) time, office management (20%) . . . Due to new startup, lack of credit history—Ajay Madan decided to put up security money for establishing credit ($211,612.34), period of 6 months, was not to be used for operations.   OST provided help in bonding capacity, OST offered free space to help with operational expenses until 10/2010, extended to 12/31/2010.

(*Id.* at 8325).  The next section of the narrative illustrates that Parekh was able to have free reign over CSG.  (*Id.* at 8326).

231.    The dispute between Parekh and Narula, Madan, and Gogia stretched on for years and in 2013, Narula told Parekh "you have contributed 79k which is not significant compared to the 295k that OST has contributed since September 2012," while speaking of CSG.  (**Ex. 196**, Emails between Narula, Parekh, and Gogia (May 29-July 2, 2013), OST DEF0007829-33 at 7831).

232.    On November 4, 2013 Parekh emailed Narula saying:

> It was over three years ago when you approached me to help with starting CSG and also work on some FAA construction management projects.  It was the intent that CSG would evolve as the government construction division of OST, and a company you thought could easily be a 100+ million dollar enterprise and would give me a break and opportunity to further my career.  I left a fledgling business, put a good part of my savings, brought the experience of all my employees to the table and gave 3 years of time.  My efforts and resources I feel were usurped during this time to simply further the interests of OST and CSG.

(**Ex. 197**, Emails between Narula, Parekh, and Gogia (July 10-Nov. 21, 2013), OST DEF0007649-53 at 7650).

233.    On October 15, 2014 Madan lent CSG an additional $165,000 with no interest.  (**Ex. 198**, Promissory Note (Oct. 15, 2014), OST DEF003205-07).  This amount was added to the $211,612 which Madan had loaned to CSG on August 4, 2010.  (*Id.*).

**S.  CSG SDVOSB Contracts**

234.    The following nineteen contracts, all SDVOSB set-aside and totaling $7,003,693.11, were awarded and paid to CSG by the VA:

a.  Award ID: VA255C1536; Start Date: 4/4/11; Bonds: Hanover; Amount: $1,287,004.50

b.  Award ID: VA244C1539; Start Date: 3/26/12; Bonds: Hanover; Amount: $850,228.55

c.  Award ID: VA250C0659; Start Date: 6/1/12; Bonds: Hudson; Amount: $741,587.56

d.  Award ID: VA256C1169; Start Date: 11/1/10; Bonds: Hanover; Amount: $731,726.80

e.  Award ID: VA24514C0102; Start Date: 9/30/15; Amount: $552,538.65

f.  Award ID: VA258C0436; Start Date:8/24/10; Bonds: Hanover; Amount: $503,773.89

g.  Award ID: VA786AC0355; Start Date: 2/2/12; Bonds: Hanover; Amount: $400,042.00

h.  Award ID: VA24613C0113; Start Date: 2/28/14; Amount: $348,492.75

i.  Award ID: VA24612C0090; Start Date: 8/27/13; Amount: $303,256.00

j.  Award ID: VA255C2060; Start Date: 7/25/11; Bonds: Hudson; Amount: $187,942.00

k.  Award ID: VA263C1298; Start Date: 4/25/12; Bonds: Hudson; Amount: $185,482.20

l.  Award ID: VA24613C0047; Start Date: 3/19/13; Amount: $176,981.00

m.  Award ID: VA250C0698; Start Date: 9/12/12; Bonds: Hudson; Amount: $166,557.04

n.  Award ID: VA24612C0077; Start Date: 9/18/12; Amount: $139,212.19

o.  Award ID: VA256C0984; Start Date: 3/31/11; Bonds: Hanover; Amount: $138,169.00

    p.   Award ID: VA24612C0085; Start Date: 8/20/12; Amount: $78,830.00

    q.   Award ID: VA246C0632; Start Date: 6/26/12; Bonds: Hudson; Amount: $78,116.00

    r.   Award ID: VA244C1556; Start Date: 10/8/12; Bonds: Hanover; Amount: $68,597.98

    s.   Award ID: VA263C1066; Start Date: 5/25/11; Bonds: Hanover; Amount: $65,155.00

(**Ex. 199**, Defs. Amar Gogia and Centurion Solutions' Answers to Pl.'s First Set of Interrogs. at 5-6 (identifying "all the SDVOSB contracts awarded by the Government to CSG"); **Ex. 200**, CSG SDVOSB Contract Reports from USAspending.gov; **Ex. 112**, Centennial Bond Listing, Cent 00001).

235.    CSG submitted claims directly to the VA for all payment under the above contracts, including "Application for Payment Requestions" which were at first signed by Parekh and later Gogia.  (*See e.g.*, **Ex 201**, CSG Applications for Payment, CSG-00004842-46, OST DEF003995-98).  These applications contained certifications ensuring the work was performed to the contractual specifications such as "[t]he undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents."  (*Id.*)

## T.  **Citibuilders Solutions Group**

236.    During late 2011 and early 2012, Parekh, on his own, approached another service-disabled veteran, Melvin Goodweather ("Goodweather"), with the proposal of starting a new SDVOSB construction company.[4]  (**Ex. 202**, Goodweather Dep. 11:1-3; **Ex. 203**, Email from

---

[4] Goodweather was previously a defendant in this case but, after reaching a settlement agreement with the United States and Relator Scollick, the claims against Goodweather were dismissed on October 15, 2020 [ECF No. 307].

Goodweather to Parekh and Attached Letter (Jan. 17, 2012), MGG00041-43).  At the time Parekh

approached him, Goodweather had no knowledge of SDVOSB contracting programs and had zero

construction experience.  (**Ex. 202**, Goodweather Dep. 1:8-17, 11:11-19; **Ex. 204**, Goodweather

Resume, Cent 02365-66).

237.    On January 6, 2012, Parekh emailed Goodweather a summary of SDVOSB

requirements which in part stated that an eligible SDVOSB must be "[a]t least 51% owned by one

or more Service-Disabled Veterans" and the "[m]anagement and daily busines operations [must

be] controlled by one or more Service-Disabled Veterans."  (**Ex. 205**, Emails between Parekh,

Goodweather, and Gary Goodweather (Jan. 6-14, 2012), MGG00037-40 at 39).

238.    Goodweather agreed to Parekh's proposal of forming a new company together.

(**Ex. 202**, Goodweather Dep. 11:24-12:7).

239.    Effective December 21, 2011, Defendant Citibuilders Solutions Group, LLC

("Citibuilders Solutions") was formed as a limited liability company in the Commonwealth of

Virginia.  (**Ex. 206**, Citibuilders Solutions Articles of Incorporation (Dec. 21, 2012), MGG00001-

3).  On August 15, 2013 Parekh caused Citibuilders Solutions' name to be officially changed to

CitiBuilders Group, LLC.[5]  (**Ex. 118**, Citibuilders Solutions Name Change (Aug. 15, 2013)).

240.    Citibuilders Solutions' Articles of Organization listed Neil Parekh as its "registered

agent" and declared that Parekh was "a member or manager of the limited liability company." (**Ex.**

**206**, Citibuilders Solutions Articles of Incorporation (Dec. 21, 2012), MGG00001-3 at 1).

Citibuilders Solutions' registered and principal office address was listed as 1111 19th St. North,

Suite 20001, Arlington, Virginia 22209.  (**Id.**).  This was actually Parekh's home address and

---

[5] For simplicity purposes, this Statement will refer to the entity as Citibuilders Solutions, but that
term incorporates Citibuilders Group, LLC.

Citibuilders Solutions operated out of office space located at 4620 Lee Highway, Suite 206, Arlington, Virginia.  (**Ex. 13**, Scollick Decl. ¶ 12).  Goodweather's name did not appear on Citibuilders Solutions' Articles of Organization.  (**Ex. 206**, Citibuilders Solutions Articles of Incorporation (Dec. 21, 20122), MGG00001-3).

241.    On December 21, 2011, an application for an EIN was submitted to the IRS for Citibuilders Solutions.  (**Ex. 207**, Citibuilders Solutions EIN Application (Dec. 21, 2011), MGG00004-5).  "Neil Parekh MBR" is listed as the "responsible party" and Citibuilders Solutions' is listed as having 30 employees.  (*Id.*).  Again, Goodweather's name does not appear on the EIN application.  (*Id.*).

242.    A Citibuilders Solutions Operating Agreement was also drafted that identified Parekh as Citibuilders Solutions' "Resident Agent" and Goodweather as its "Manager."  (**Ex. 208**, Citibuilders Solutions Operating Agreement, MGG00007-18 at 8).  Further, the Operating Agreement claims that Goodweather contributed $100 of capital to Citibuilders' Solutions and he held 100% of Citibuilders Solutions' "membership interest."  (*Id.* at 18).  Goodweather never signed nor approved the Operating Agreement.  (*Id.*; **Ex. 202**, Goodweather Dep. 13:6-19).  Further, Goodweather never contributed any capital to Citibuilders Solutions.  (**Ex. 202**, Goodweather Dep. 13:20-22).

243.    On December 22, 2011, Parekh told Goodweather that Parekh had received Citibuilders Solutions "DUNS and Tax ID number," provided the next steps he was planning on taking to register Citibuilders Solutions as an SDVOSB, and requested a resume and previous tax returns from Goodweather.  (**Ex. 209**, Emails between Parekh and Goodweather (Dec. 22, 2011), MGG00033-36 at 35).  Parekh indicated that beyond Goodweather providing Parekh the requested documents, Parekh would handle all other necessary items.  (*Id.*).

244.    On January 17, 2011, Goodweather provided Parekh a VA letter evidencing Goodweather's service disabled veteran status.  (**Ex. 203**, Email from Goodweather to Parekh and Attached Letter (Jan. 17, 2012), MGG00041-43).

245.    Apart from the documentation requested by Parekh, Goodweather played no role in the formation of Citibuilders Solutions.  (**Ex. 202**, Goodweather Dep. 12:23-13:1).

246.    Goodweather has never visited either CCR.gov or SAM.gov and Goodweather did not authorize anyone to register Citibuilders Solutions on either website.  (**Ex. 202**, Goodweather Dep. 14:23-15:13).

247.    On August 17, 2012, Citibuilders Solutions was verified as an SDVOSB by CVE and added to the VA's VIP database.  (**Ex. 210**, Citibuilders Solutions SDVOSB Verification Letter (Aug. 17, 2012), Cent 02360; **Ex. 1**, Ward Decl. ¶ 13).  Documents in support of Citibuilders Solutions' SDVOSB verification were first submitted to CVE on December 29, 2011 and include a certification from Goodweather that "CitiBuilders Solutions was owned and controlled by a service-disabled veteran."  (**Ex. 1**, Ward Decl. ¶ 13).  CVE verified Citibuilders Solutions as an SDVOSB "based upon Melvin G. Goodweather['s] representation that" Citibuilders Solutions was owned and controlled by one or more veterans as outlined in 38 C.F.R. Part 74.  (**Ex. 1**, Ward. Decl. ¶ 14).  Goodweather never certified through any means that Citibuilders was an SDVOSB. (**Ex. 202**, Goodweather Dep. 15:14-18).

248.    On August 27, 2012, Parekh emailed Goodweather to provide on update on Citibuilders Solutions' operations, stating:

> [L]ast week we finally received our SDVOSB certification which will allow us to start bidding on a variety of projects. . . . Over the next 12 months we will primarily be bidding on projects in the 250K-2MM range, looking for N opportunities and potential sole source projects in the Federal Government.  I think it would be beneficial for [your son], you and I to meet on a monthly basis to brainstorm for potential projects and also **to bring you up to date on all areas of the company**.

In the meantime, I need a financial statement from you . . . it will NOT be used to secure any loans, bonds, debt etc. . . . For our bonding, I have an investor who will be putting forth a letter of credit and cash (1 MM) to secure our bonding requirements.

(**Ex. 211**, Emails between Parekh, Goodweather, and Gary Goodweather (Aug. 28-Sept. 2, 2012), MGG00044-46 (emphasis added).

249.    Goodweather never communicated in any form with the CVE.   (**Ex. 202**, Goodweather Dep. 13:13-22).  Goodweather has no knowledge of who took the steps to register and verify Citibuilders as an SDVOSB.  (**Ex. 202**, Goodweather Dep. 15:23-16:17).

**U.  Centennial Serves as Bonding Agent for Citibuilders Solutions**

250.    To secure bonding for Citibuilders Solutions, Parekh again used Centennial and Schendel as a bonding agent.  (**Ex. 246**, Emails between Schendel, Brent Davis, and William Linthicum (Aug. 21, 2012), Hanover0000690-91).   After Parekh transmitted financials for Citibuilders Solutions to him, Schendel started seeking a bonding company, first turning to Hanover, which declined.  (*Id.* at 690).

251.    McQuade, who previously worked as an underwriter for Hanover but was now employed by Centennial, provided another bonding company, Aegis Security Insurance Company ("Aegis") an "account overview" for Citibuilders Solutions on August 28, 2012.  (**Ex. 212**, Email Chain (Aug. 28-29, 2012), Cent 00813-15).  McQuade first stated that Citibuilders Solutions "has their SDVOSB and CVE" and provided Aegis with the VA's SDVOSB verification letter.  (*Id.* at 814).   McQuade conveyed to Aegis that "Goodweather is the 100% owner," forwarded Goodweather's resume, and summarized Goodweather's career experience, which wholly lacked any construction experience.  (*Id.*).  McQuade then described Parekh's role as "Vice President" of Citibuilders Solutions and described Parekh's construction experience included "running the

construction arm of" "OST, Inc./Centurion Solutions." (**Id.**).  The letter then extensively explained Parekh's past construction experience and included references for Parekh and does not discuss Goodweather any further.  (**Id.** at 814-15). On August 29, 2012, McQuade requested four bid bonds for Citibuilders Solutions, "conditioned on a signed GIA [general indemnity agreement] before final bonds," which Aegis approved.  (**Id.**)

252.   An email from McQuade to Parekh also summarized Goodweather's role with Citibuilders Solutions as "connections w/ congre[ss]men, senators, connections in the DVA (worked in Pentagon for 10 years)."  (**Ex. 213**, Email between McQuade, Parekh, and Schendel, Cent 00826).

253.   On September 13, 2012, McQuade emailed Parekh to inform him that McQuade had spoken to the bond company and "[t]hey are curious to know the arrangement, as it is unusual. Mr. Goodweather owns 100% of the company however from my understanding, you [Parekh] personally capitalized the company.  Please confirm this arrangement."  (**Ex. 214**, Email from McQuade to Parekh, Schendel, and Belinda Ferciot (Sept. 13, 2012), Cent 00771).  McQuade then stated that Aegis, before providing bonds to Citibuilders Solutions, would require the personal indemnification of Goodweather as Citibuilders Solutions' owner.  (**Id.**).

254.   Aegis agreed to provide bonds for Citibuilders Solutions in October 2012 but required personal indemnification from Goodweather up to $500,000.  (**Ex. 215**, Emails between McQuade and Greg Rzewnicki (Oct. 11-12, 2012), Cent 02486-91 at 2489).

255.   Goodweather was reluctant to agree to indemnify Citibuilders Solutions' bonds but Parekh convinced him to do so through a separate indemnity agreement ("Mehta Indemnity Agreement").  (**Ex. 216**, Mehta Indemnification Agreement (Aug. 25, 2012), MGG00019-22). The Mehta Indemnity Agreement provided that Defendant Dr. Nitin Mehta, Parekh's uncle, would

post a Letter of Credit of $500,000 on behalf of Citibuilders Solutions and indemnify Goodweather personally for the $500,000 Goodweather was indemnifying Aegis. (*Id.* at 20). In exchange, Dr. Nitin Mehta was to receive a 10% interest in Citibuilders Solutions' profits for a three year period. (*Id.*). Dr. Nitin Mehta was also required under this agreement to deposit $250,000 into a Citibuilders Solutions bank account. (*Id.*; **Ex. 202**, Goodweather Dep. 50:13-51:3).

256. Goodweather signed an Aegis Agreement of Indemnity on October 24, 2012. (**Ex. 217**, Aegis Indemnity Agreement (Oct. 24, 2012), MGG00023-32).

257. On January 2, 2013, McQuade transmitted notes from a meeting he had with "CB Solutions (Citibuilders)" and Aegis on December 20, 2012. (**Ex. 218**, Email from McQuade to Belinda Ferciot and Schendel (Jan. 2, 2013), Cent 02445-50). Goodweather did not attend the meeting. (*Id.*).

258. On June 13, 2013, McQuade emailed Parekh requesting a meeting. (**Ex. 219**, Emails between McQuade and Parekh (June 13, 2013), Cent 0724). Specifically, McQuade stated that "[w]e should have Melvin Goodweather and Gary Goodweather at the meeting. The company is a service-disabled veteran owned company and the bond company (and myself) have only met w/ you. I did speak on the phone that one time w/ the Goodweathers but it would be good to get them in front of the surety too." (*Id.*). Goodweather never attended a meeting with anyone from Centennial or Aegis and does not remember speaking on the phone with McQuade. (**Ex. 202**, Goodweather Dep. 38:9-25).

259. On August 13, 2013, McQuade raised several issues with financial and tax documents provided by Parekh on Citibuilders Solutions. (**Ex. 220**, Emails between McQuade, Parekh, and Greg Rzewnicki (Aug. 13-14, 2013), Cent 02534-36). Specifically, McQuade stated:

> [T]he 2012 tax return shows you as 100% owner. Per the attached you provided this cannot be the case. In order to be in compliance w/ the S.B.A. as a SDVOSB,

> I believe majority ownership must be a service-disabled veteran.  In this case, we were under the impression Melvin Goodweather was the 100% owner (see attached questionnaire he signed and filled out). . . . The surety will not be comfortable issuing more bonds until they are comfortable w/ the CPA's figures, as well as confirmation Citibuilders Solutions Group is 100% in compliance with federal guidelines re SDVOSB.

(*Id.* at 2535).

260.    Parekh responded by claiming, without supporting documentation, that Goodweather is "currently the 100% owner" and that the Citibuilders Solutions' tax return had not been field and "revisions still need to be made and added."  (*Id.* at 2535)

261.    McQuade then forwarded this conversation to Greg Rzewnicki ("Rzewnicki") from Aegis on August 14, 2013.  (*Id.* at 2534).  Rzewnicki stated that "I am ok with what Neil [Parekh] says on ownership, as he did mention what he says below in the past."  (*Id.*).

262.    The 2012 Citibuilders Solutions' Schedule K-1 in Centennial's possession does reflect that Parekh was the 100% owner and Centennial never received any other Citibuilders Solutions' tax return.  (**Ex. 221**, 2012 Citibuilders Solutions Schedule K-1, Cent 02432).

263.    Throughout the entirety of Centennial's relationship with Citibuilders Solutions, Goodweather did not meet with any Centennial employee or representative.  (**Ex. 202**, Goodweather Dep. 38:9-17).

## V.   Citibuilders Solutions SDVOSB Contracts and Operations

264.    During Citibuilders Solutions, Goodweather only visited Citibuilders Solutions office once and did not personally have an office at that location.  (**Ex. 202**, Goodweather Dep. 33:11-21; 46:24-47:1).  Goodweather did not have any knowledge of income for Citibuilders Solutions or ever see or possess a Citibuilders Solutions tax return.  (*Id.* at 47:14-20, 39:6-8).  Goodweather never played any role in the creation or submission of an SDVOSB bid proposal.

(*Id.* at 11:20-23).  Goodweather never signed a check on behalf of Citibuilders Solutions.  (*Id.* at 46:6-23).

265.    Scollick continued to work for Parekh and between May and August 2012, he was on Citibuilders Solutions' payroll.  (**Ex. 13**, Scollick Decl. ¶ 1).  Scollick never once saw Goodweather and was told specifically that he was not involved in Citibuilders Solutions.  (*Id.*). Instead, Parekh insisted Citibuilders Solutions was fully Parkeh's company.  (*Id.*)    Scollick received a paycheck purportedly signed by Goodweather during this period.  (**Ex. 222**, Scollick Citibuilders Solutions Paychecks, SCOLLICK 103278-79 at 3278).  However, Goodweather never signed any checks for Citibuilders Solutions.  (**Ex. 202**, Goodweather Dep. 46:6-23).

266.    From 2012 through 2014, Citibuilders Solutions bid on, won, performed, and was paid a total of $5,565,470 for the following seven SDVOSB set-aside contracts from the VA:

   a.   Award ID: VA24412C0529; Start Date: 9/27/12; Amount: $2,073,136.96

   b.   Award ID: VA24614C0033; Start Date: 6/30/14; Amount: $2,013,349.47

   c.   Award ID: VA25012C0107; Start Date: 9/28/12; Amount: $651,450.05

   d.   Award ID: VA24612C0125; Start Date: 9/26/12; Amount: $306,337.98

   e.   Award ID: VA24612C0126; Start Date: 9/24/12; Amount: $279,000.00

   f.   Award ID: VA24413C0359; Start Date: 7/9/13; Amount: $88,540.42

   g.   Award ID: VA786A12C0082; Start Date: 9/26/13; Amount: $23,005.00

(**Ex. 223**, Citibuilders Solutions SDVOSB Contract Reports from USAspending.gov).

267.    Of the above listed contracts, Centennial facilitated the required bonding from Aegis for the following five contracts, totaling $3,398,465:

   a.   Award ID: VA24412C0529; Start Date: 9/27/12; Amount: $2,073,136.96

   b.   Award ID: VA24612C0126; Start Date: 9/24/12; Amount: $279,000

    c.   Award ID: VA24612C0125; Start Date: 9/26/12; Amount: $306,337.98

    d.   Award ID: VA25012C0107; Start Date: 9/28/12; Amount: $651,450.05

    e.   Award ID: VA24413C0359; Start Date: 7/9/13; Amount: $88,540.42

(**Ex. 112**, Centennial Bond Listing, Cent 00001).

268.    All the Citibuilders Solutions contracts which Centennial facilitated bonding for were SDVOSB set-aside.  (**Ex. 223**, Citibuilders Solutions SDVOSB Contract Reports from USAspending.gov).

269.    On August 27, 2014, Goodweather's son, Gary Goodweather, told Parekh that Goodweather was "concerned about his ongoing risk and liability and lack of understanding what he is involved in" and Goodweather's "first priority is written release and confirmation form the bonding company." (**Ex. 224**, Emails between Gary Goodweather and Parekh (Aug. 27-28, 2011), MGG00072-73).

270.    Despite the fact that Goodweather, as the service-disabled veteran, was required to own and control Citibuilders Solutions if it was performing SDVOSB set-aside contracts, Goodweather was wholly unaware that any contracting activity was occurring in Citibuilders Solutions until November 10, 2014 when he received a copy of a "cure notice" previously mailed to Parekh by the VA and a related letter form Aegis.  (**Ex. 225**, Emails between Goodweather and Parekh (Nov. 15, 2014), MGG00076-77; **Ex. 202**, Goodweather Dep. 29:19-30:24).  Prior to this point, Goodweather had no knowledge of Citibuilders Solutions' SDVOSB activity and Goodweather never approved or participated in Citibuilders Solutions' SDVOSB activity at any point.  (**Ex. 202**, Goodweather Dep. 29:19-30:24).

271.    It was Parekh who submitted a response to the VA's cure notice on November 17, 2014.  (**Ex. 226**, Letter from Parekh to VA (Nov. 17, 2014), MGG00090-92).

272.     Goodweather continued to voice his concerns with Citibuilders Solutions, his exposure to liability under the Aegis indemnity agreement, and his desire to be removed from the agreement over the next several months.  (**Ex. 227**, Goodweather Emails, MGG00099-106, 118-22, 125-30, 148-53).  Goodweather was wholly unaware of Citibuilders Solutions' business activities and eventually requested a number of documents on Citibuilders Solutions from Parekh.  (*Id.* at 150).

273.     Parekh stated his intention to substitute his uncle, Dr. Nitin Mehta, for Goodweather as the service-disabled veteran owner of Citibuilders Solutions and on the Aegis indemnity agreement.  (**Ex. 220**, Emails between McQuade, Parekh, and Greg Rzewnicki (Aug. 13-14, 2013), Cent 02532-36 at 35; **Ex. 228**, Email Chain (Mar. 30-Apr. 3, 2015), Cent 02500-02 at 2501).

274.     Dr. Nitin Mehta did not replace Goodweather and Goodweather was not released from the indemnity agreement with Aegis.  (**Ex. 228**, Email Chain (Mar. 30-Apr. 3, 2015), Cent 02500-02 at 2501).

275.     A new limited liability company, Racana Group, LLC, was formed in Virginia on November 4, 2015 with Dr. Nitin Mehta listed as the registered agent.  (**Rel. Ex. 229**, Racana Group Documents).

276.     Racana Group, LLC is publicly listed as an SDVOSB.  (**Rel. Ex. 229,** Racana Group Documents).

## W. <u>Materially False Statements Regarding Past Performance Contained in CSG's Bid Proposals</u>

277.     The construction contracts CSG bid on required proof of qualifying past performance be contained in contractors' bid proposals.  (**Ex. 14**, Scollick Dep. 230:13-231:3 (Apr. 11, 2019); **Ex. 4**, Narula Dep. 55:7-13).  The VA solicitations typically required three examples of past performance, but some required up to five.  (**Ex. 14**, Scollick Dep. 254:2-5 (Apr. 11, 2019);

**Ex. 95**, Email from Parekh to Gogia and Scollick (Aug. 6, 2010), OST DEF000703 (emphasis in original) (explaining that a CSG bid was rejected for failing to show the required past performance).

278.    CSG submitted hundreds of SDVOSB bid proposals that included falsified and fabricated past performance examples.  (**Ex. 14**, Scollick Dep. 230:13-231:3 (Apr. 11, 2019)).

279.    From its formation until it completed its first VA project, CSG had **no** past performance.  (**Ex. 32**, CSG Dep. 93:16-94:6 (June 21, 2019)).  The past performance contained in CSG's bid proposals explicitly attributed the past performance to CSG which was false.  (*See e.g.* **Ex. 230**, Pages from CSG Bid Proposal (Nov. 4, 2010), SCOLLICK 101503-07).

280.    Many of the proposals listed "OST Interior Renovations" as a specific example of past performance.  (**Ex. 230**, Pages from CSG Bid Proposal (Nov. 4, 2010), SCOLLICK 101503-07; **Ex. 231**, Pages from CSG Bid Proposal for VA-255-11-RP-0325, SCOLLICK 101799-804; **Ex. 232**, Pages from CSG Bid Proposal for No. VA-255-11-RP-03782,  SCOLLICK 101680-83).  Scollick witnessed how the OST Interior Renovations past performance listed in the bid proposals "were changed to fit whatever scope was needed for that specific bid; that the dates and times were changed; that the square footage was changed; that the amounts were changed; all in an effort to meet the past performance criteria" required by the specific solicitation.  (**Ex. 14**., Scollick Dep. 164:14-165:4 (Apr. 11, 2019)).

281.    The "OST Interior Renovations" past performance examples were substantially altered to claim that the renovations cost $750,000 in one proposal, $1.1 million is another, and $3.1 million in yet another.  (**Ex. 230**, Pages from CSG Bid Proposal (Nov. 4, 2010), SCOLLICK 101503-07; **Ex. 231**, Pages from CSG Bid Proposal for VA-255-11-RP-0325, SCOLLICK 101799-804; **Ex. 232**, Pages from CSG Bid Proposal for No. VA-255-11-RP-03782, SCOLLICK

101680-83).  All three of these proposals identify the exact same scope of work.  (**Ex. 230**, Pages from CSG Bid Proposal (Nov. 4, 2010), SCOLLICK 101503-07; **Ex. 231**, Pages from CSG Bid Proposal for VA-255-11-RP-0325, SCOLLICK 101799-804; **Ex. 232**, Pages from CSG Bid Proposal for No. VA-255-11-RP-03782, SCOLLICK 101680-83).  Narula could not explain the variations nor confirm that any of the alleged payments were paid.  (**Ex. 4**., Narula Dep. 73:13-77:5).  No proof of payment or other supporting documentation was produced by either OST or Parekh to evidence the alleged payments.  (Kohn Decl. ¶ 10, filed herewith).  All the cited VA proposals listing the OST past performance were submitted to the VA.  (**Ex. 13**, Scollick Decl. ¶ 11).

282.    In addition to requiring past performance examples, the VA SDVOSB solicitations often sought references from the bidding contractor's previous clients through questionnaires or surveys that rated CSG's performance.  (*See e.g.*, **Ex. 233**, Emails between Samantha Ralli, Narula, and Parekh and Attached Questionnaire (June 6-8, 2011), OST DEF0010559-63; **Ex. 234**, Completed Narula Surveys, SCOLLICK 101495-502).   Scollick saw several of the past performance questionnaires that Narula filed out and saw the altered scopes, dates, and costs Narula was vouching for.  (**Ex. 14**, Scollick Dep. 252:21-254:22 (Apr. 11, 2019)).

283.    As a result of Parekh tasking Scollick to help prepare CSG bid proposals, Scollick saw how "Vijay [Narula] was continually used over and over again because [CSG] didn't have any past performance. So Vijay [Narula] would continue to issue false past performance questionnaires. ·He would take calls from VA contracting officers and e-mails confirming all this." (**Ex. 14**, Scollick Dep. 249:20-250:4 (Apr. 11, 2019)).

284.    Narula admitted that he filled out and signed multiple questionnaires attesting to past construction CSG allegedly performed and returned them back to CSG to forward to

government contracting officers. (**Ex. 4**, Narula Dep. 80:17-81:4; **Ex. 233**, Emails between Samantha Ralli, Narula, and Parekh and Attached Questionnaire (June 6-8, 2011), OST DEF0010559-63; **Ex. 234**, Completed Narula Surveys, SCOLLICK 101495-502). As CSG was preparing a June 14, 2011 bid proposal that claimed $3.1 million in OST renovation costs as past performance, CB Construction employee, Samantha Ralli (performing CSG duties), emailed Narula requesting that he "complete this questionnaire for us and send to Kimberly Hurt kimberly.hurt@va.gov for a project we are bidding (Solicitation Number VA 263-11-BP-0291)? It needs to be sent out by Thursday, June 9th." (**Ex. 233**, Emails between Samantha Ralli, Narula, and Parekh and Attached Questionnaire (June 6-8, 2011), OST DEF0010559-63 at 10559; *see* **Ex. 235**, CSG Bid Proposal (June 14, 2011), SCOLLICK 101684-93). Narula responded by asking "[w]hat is scope and time frame you want me to fill in?" (**Ex. 233**, Emails between Samantha Ralli, Narula, and Parekh and Attached Questionnaire (June 6-8, 2011), OST DEF0010559-63 at 10559. To avoid error, a revised questionnaire was provided to Narula for him to sign identifying the OST Interior Renovations as having cost $3.1 million. (***Id.***).

285. The "Mehta Medical Group" was routinely used as a past performance example with the alleged contract amounts changing according to the requirements of the VA solicitation with the values ranging between $263,000 and $1.5 million. (**Ex. 51**, Email from Bryan VanGilder to Scollick and Sujana Pathak and Attached CSG Halls and Walls Bid Proposal (Apr. 7, 2010), SCOLLICK 1000066-76 at 73; **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10763; **Ex. 230**, Pages from CSG Bid Proposal (Nov. 4, 2010), SCOLLICK 101503-07 at 1507; **Ex. 232**, Pages from CSG Bid Proposal for No. VA-255-11-RP-03782, SCOLLICK 101680-83 at 1681; **Ex. 235**, CSG Bid Proposal (June 14, 2011), SCOLLICK 101684-93 at 1693; **Ex. 236**, CSG Bid Proposal (Sept. 8, 2010), SCOLLICK 101447-56 at 1448;

**Ex. 237**, CSG Bid Proposal for VA-244-10-RP-0390, SCOLLICK 101469-94 at 1487).  All the cited VA proposals listing the Mehta Medical Group past performance were submitted to the VA. (**Ex. 13**, Scollick Decl. ¶ 11).

286.    The first SDVOSB proposal was submitted to the VA on April 7, 2010 by CSG for the Halls and Walls Project.  (**Ex. 51**, Email from VanGilder to Scollick and Pathak and Attached CSG Halls and Walls Bid Proposal (Apr. 7, 2010), SCOLLICK 1000066-76); **Ex. 13**, Scollick Decl. ¶ 3).  It described the Mehta Medical Group office project as costing $263,000.  (**Id.** at 73).  On September 8, 2010, another CSG bid proposal was submitted to the VA on a SDVOSB set-aside contract  (**Ex. 236**, CSG Bid Proposal (Sept. 8, 2010), SCOLLICK 101447-56 at 1448).  In this proposal the Mehta medical office project is identified as having cost $1,150,000, yet the description of the project is identical, the date of the project is identical, and the location of the project is identical.  (*Compare* **Ex. 51**, Email from VanGilder to Scollick and Pathak and Attached CSG Halls and Walls Bid Proposal (Apr. 7, 2010), SCOLLICK 1000066-76 at 73, *with* **Ex. 236**, CSG Bid Proposal (Sept. 8, 2010), SCOLLICK 101447-56 at 1448).

287.    CSG and Gogia were unable to explain why CSG was altering the construction cost of its listed past performance, other than to state that Gogia was relying on Parekh to provide the past performance examples.  (**Ex. 32**, CSG Dep. 227:12-229:10 (June 21, 2019).  CSG explicitly admitted that any past performance for the Mehta Medical Group claimed by CSG and submitted in CSG bid proposals were false.  (**Id.** at 95:3-96:4).

288.    CSG also admitted that any past performance claimed by CSG and submitted in CSG bid proposals for construction work performed for FBR Capital Markets Corporation ("FBR") and CVENT was false.  (**Ex. 32**, CSG Dep. 96:1-14 (June 21, 2019)).

289.    CSG bid proposals included a myriad of additional false statements including the false certifications that CSG met the eligibility requirements for SDVOSBs.  (*See e.g.*, **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10755; **Ex. 13**, Scollick Decl. ¶ 11).  Other false statements in CSG bid proposals including claims that:

a) CSG had "more than 15 years of experience providing interior renovations for our government and industry customers."  (**Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10756.  CSG conceded that this is a false statement.  (**Ex. 32**, CSG Dep. 89:2-11 (June 21, 2019).

b) CSG had "in-depth construction experience specifical within the medical industry," which CSG conceded was false.  (**Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10756; **Ex. 32**, CSG Dep. 89:15-90:13 (June 21, 2019).

c) CSG has "an in-house crew for most of our work," "self-performs all drywall and painting with our very capable in-house crew," has their own in-house ceiling crew, which currently operates in several facilities and organizations on a task order basis," "has their own in-house flooring crew."  (**Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10756-59).  Gogia admitted that these assertions were false because CSG actually had no in-house crew.  (**Ex. 32**, CSG Dep. 86:9-17; 91:2-5 (June 21, 2019).

d) CSG "completed similar projects in both scope and complexity," which was a false statement as CSG was recently established and had no past performance until it completed its first SDVOSB project.  (**Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10756; **Ex. 32**, CSG Dep. 12:2-13:12 (June 21, 2019)).

e) CSG had three employees, Parekh, Scollick, and Rubando, in addition to Gogia.  (**Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10757.  Scollick and Rubando were never employed by CSG but rather CB Construction and Parekh was not employed by CSG until 2011.  (**Ex. 110**, Email from Madan to Narula and Attached 2010-11 CSG and CB Construction Payroll (Dec. 19, 2011), OST DEF000061-88 at 65-70, 73-76).

## X. Materially False Statements Regarding Past Performance Contained in Citibuilders Solutions' Bid Proposals

290.    The proposals prepared in the name of Citibuilders Solutions used the identical or nearly identical past performance found in the CSG proposals, except that the prime contractor

was identified as "CB Group" instead of CSG, and the past performance contract amounts are altered.  (**Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59).   For example, where the Citibuilders Solutions proposal identified the Mehta Medical Group project as costing $1,263,000, a CSG proposal claimed the cost for the same project as $263,000.  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2241, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10763 at 10763).   The wording of the project description is identical, save the last sentence, which is omitted, as it did not fit on the page.  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2241, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10763 at 10763).  Where the Citibuilders Solutions proposal claimed the work was performed by CB Group, the CSG proposal claimed the work was performed by CSG.  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2241, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10763 at 10763).

291.   Where the Citibuilders proposal stated that the FBR project cost $1,537,000, the CSG proposal claimed that the project cost was $537,000.  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2342, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10763 at 10764).   The description found in the Citibuilders Solutions proposal and the CSG proposal is identical.  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2342, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10764).  Where the Citibuilders Solutions proposal claimed the work was performed by CB Group, the CSG proposal claimed the work was performed by CSG.  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2342, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10764).

292.    The CVENT project example found in the Citibuilders Solutions and CSG proposals is identical in all respects (i.e., cost, description, and statement of scope of work) with the exception of stating that the contact was performed by CB Group in the Citibuilders Solutions proposal and CSG in the CSG proposal.  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2343-44, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10765*).*  For example, where the Citibuilders Solutions proposal began "Team CB Group has been the GC [general contractor] for all of CVENT's construction projects," the CSG proposal stated that "Team Centurion has been the GC for all of CVENT's construction projects."  (*Compare* **Ex. 238**, CB Solutions Bid Proposal, Cent 02340-59 at 2343-44, *with* **Ex. 68**, CSG Bid Proposal for VA-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 (May 27, 2010), OST DEF0010753-66 at 10765).

293.    Relator Andrew Scollick, who witnessed first-hand what was transpiring, summarized it this way: "The fraud was clearly visible from the bid proposals themselves as the past performance claims found in the Citibuilders [Solutions] and CSG proposals was duplicative of each other, with both entities claiming the identical past performance claims, save the proposals were materially altered to change the details of the scope, price and duration to coincide with the mandatory past performance requirements against which the proposals were submitted to a government contracting officer for review and approval." (**Ex. 14**, Scollick Dep.  53:14-54:3 (Apr. 12, 2019)).

Respectfully submitted,

*/s/ Michael D. Kohn*
Michael Kohn, DC BAR #425617
*/s/ Todd Yoder*
Todd Yoder, DC BAR # 1048520
David K. Colapinto, DC BAR #416390

KOHN, KOHN & COLAPINTO, LLP
1710 N Street, N.W.

Washington, D.C. 20036
Phone: (202) 342-6980
Fax: (202) 342-6984
*Attorneys for Plaintiff-Relator*