UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ANDREW SCOLLICK, | ) ) ) | |
| Plaintiff-Relator, | ) ) | Civ. Action No. 14-CV-01339-RCL |
| vs. | ) ) | |
| VIJAY NARULA, *et al.,* | ) ) | |
| Defendants. | ) ) ) | |

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF-RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT NEIL PAREKH

**INTRODUCTION**

Defendant Neil Parekh repeatedly sought to fraudulently obtain lucrative government contracts which Congress explicitly chose to set aside to empower veterans disabled during their service to the United States who own, control, and operate small businesses through their personal sweat equity, hard-earned past experience, and financial investment.   Congress, on several occasions, mandated that federal agencies set aside certain government contracts for service-disabled veteran-owned small businesses ("SDVOSB") that affirmatively certify and prove that they meet stringent regulatory requirements.   Parekh is not a service-disabled veteran but made a vicious habit of seeking out service-disabled veterans and using them for his own personal gain. First, Parekh teamed with Defendants Optimal Solutions and Technologies, Inc. ("OST"), Vijay Narula ("Narula"), and Ajay Madan ("Madan") (collectively the "OST Defendants") to use Madan's second-cousin, Defendant Amar Gogia ("Gogia"), as the service-disabled veteran to start the supposedly SDVOSB construction company Defendant Centurion Solutions Group, LLC ("CSG").   After two years of running CSG, and secretly syphoning off over a million dollars that CSG had been paid under SDVOSB set-aside contracts, Parekh spun off on his own to duplicate the fraud with Melvin Goodweather ("Goodweather").   Parekh again used Goodweather's service-disabled veteran status to form and operate another construction company, Defendant Citibuilders Solutions Group ("Citibuilders Solutions"), that sought and was paid under government SDVOSB contracts with no involvement from Goodweather whatsoever.   Using these two front companies, Parekh was able to knowingly and fraudulently divert $12,438,512 in taxpayer-funded government construction contracts specifically mandated to go toward only deserving SDVOSBs to Parekh's front companies.

This case seeks to recover damages under the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, for all claims for payment submitted to the United States under the 19 SDVOSB set-aside contracts issued by the Department of Veterans Affairs ("VA") to CSG and the seven SDVOSB set-aside contracts issued by the VA to Citibuilders Solutions (collectively the "SDVOSB Contracts").  The undisputed material facts clearly show that at no point when CSG or Citibuilders Solutions were (1) registering or verifying their SDVOSB status or (2) bidding on, winning, performing, or receiving payment for the SDVOSB set-aside contracts did CSG or Citibuilders Solutions meet the statutory and regulatory requirements for SDVOSB eligibility.  This lack of statutory and regulatory compliance was due in large part to the improper and critical assistance knowingly provided by Parekh who ultimately exercised influence and control over CSG and Citibuilders Solutions.  Parekh not only knew of, but also fully embraced, encouraged, and took part in both CSG's and Citibuilders Solutions' misrepresentations to the United States regarding their SDVOSB eligibility and the resulting fraudulent inducement of the United States to award the SDVOSB Contracts.  From the outset, Parekh sought to create and use the shell SDVOSB companies to profit off of set-aside government contracts.

Through this motion, Plaintiff-Relator Andrew Scollick ("Relator" or "Scollick") seeks partial summary judgment against Parekh with respect to Relator's claims of violations of § 3729(a)(1)(A) & (B) of the FCA.[1]  Relator's motion seeks summary judgment on Parekh's liability for causing false claims to be submitted under the SDVOSB Contracts.  Further, Relator seeks summary judgment on Parekh's liability for the false statements and records he made, created, or caused to be made or created relating to these false claims.  The damages suffered by the United

---

[1] Concurrent with this motion, Relator is also filing three additional motions for partial summary judgment against the remaining defendants in this case.  The totality of Relator's motions presents the full story of the conspiracy to violate the FCA at issue in this case.

States due to Parekh's FCA violations can be easily ascertained at this stage and, after trebling per the FCA, equal $37,315,536.[2]

## BACKGROUND

### A.  Procedural Background

Relator filed his *qui tam* FCA complaint [ECF No. 1] under seal on August 6, 2014, the United States formally declined to intervene on February 9, 2015 [ECF No. 6], and the case was unsealed by the Court on July 9, 2015 [ECF No. 8].[3]  Several defendants filed motions to dismiss that were granted in part and denied in part.  *United States ex rel. Scollick v. Narula ("Scollick I")*, 215 F. Supp. 3d 26 (D.D.C. 2016).  Relator sought leave to amend his complaint to cure the defects identified by the Court and the Court issued another memorandum opinion and order granting in part and denying in part that motion.  *United States ex rel. Scollick v. Narula ("Scollick II")*, Case No. 1:14-cv-1339-RCL, 2017 U.S. Dist. LEXIS 119530 (D.D.C. July 31, 2017).  During the pendency of discovery, Relator was permitted to file a Second Amended Complaint [ECF No. 298] and the Court later denied a motion to dismiss the Second Amended Complaint.[4]  *United States ex rel. Scollick v. Narula ("Scollick III")*, Case No. 1:14-cv-1339-RCL, 2020 U.S. Dist. LEXIS 208604 (D.D.C. Nov. 6, 2020).

---

[2] Not at issue in this motion for partial summary judgment are Relator's claims against Parekh regarding: (1) the FCA conspiracy claim; (2) the amount of civil penalties under the FCA; and (3) statutory fees and costs awardable under the FCA.  Second Amended Complaint, ECF No. 298 at ¶¶ 205-14, 226, 234.

[3] The United States remains active in this case, having settled with one former defendant, Melvin Goodweather [ECF No 307], initiating mediation [ECF No. 282], and attending depositions.

[4] Parekh was sanctioned by this Court on September 8, 2020 for failing to appear for his deposition [ECF No. 294].  Parekh subsequently appeared for his re-noticed deposition but failed to produce a single document in discovery.  Ex. 11, Parekh Dep. 357:10-17-59:6.

Pursuant to the briefing schedule set by this Court, Relator seeks partial summary judgment against Parekh. This motion is based on the knowledge and testimony of the defendants and their employees and the defendants' own documents which show the intentional falsehoods and wanton disregard for SDVOSB regulations employed in pursuit of non-veteran entities and individuals profiting from the SDVOSB Contracts.

**B.  Statement of Material Facts**

1.  The OST Defendants and the Formation of CSG

OST is a large and successful information technology ("IT") government contractor. Stmt. ¶¶ 11, 14.[5] Narula is OST's owner and Chief Executive Officer, while Madan serves as OST's Chief Operating Officer. Stmt. ¶¶ 11, 29, 33. The OST Defendants had no meaningful experience in construction but were seeking to break into the lucrative government construction contracting industry in 2009. Stmt. ¶¶ 14, 20. For this purpose, Narula allied himself with Defendant Neil Parekh ("Parekh") who had previously performed renovation work on OST offices and possessed experience operating and managing construction companies. Stmt. ¶¶ 15, 17, 20. Parekh owned and operated Defendants Citibuilders, Inc. and CB Construction, Inc. ("CB Construction").[6] Stmt. ¶ 15. Parekh hired Scollick beginning in late 2008 to early 2009 to work for Citibuilders, Inc. and Scollick's employment shifted to CB Construction beginning in 2010. Stmt. ¶ 19. OST was not an SDVOSB and Parekh was not a service-disabled veteran. Stmt. ¶¶ 12, 16. Throughout the

---

[5] Factual citations are to supporting paragraphs in the Statement of Material Facts Not in Genuine Dispute ("Stmt."), filed herewith, which contain citations to discovery-produced documents, deposition testimony, declarations, and other evidence in this case. The Statement of Material Facts Not in Genuine Dispute contains a full description of the entire fraud scheme and is used to support all summary judgment motions filed by Relator.

[6] Citibuilders, Inc. was founded in 2004 but in 2009 Parekh established CB Construction and shifted all his business into that entity in 2010. *Id.* This brief will use the term "CB Construction" to refer to both Citibuilders, Inc. and CB Construction, Inc.

second half of 2009, Narula and Parekh met and communicated with Defendant Michael Schendel ("Schendel") and his company Defendant Centennial Surety Associates, Inc. ("Centennial") in an effort to obtain the surety bonding required for their newly forming "construction division" of OST.  Stmt. ¶¶ 9-10, 21-22, 24, 25-30.

During this same time period Madan and Gogia discussed the possibility of starting a new construction company using Gogia's status as a service-disabled veteran to target SDVOSB set-aside contracts, including a contract with the Federal Aviation Administration ("FAA"), the "SOMASS" contract.[7]  Stmt. ¶ 31-35.  On November 30, 2009, Gogia provided Madan with a copy of his army discharge papers documenting his service-disabled veteran status and, importantly, information about the VA's SDVOSB program and its requirements.  Stmt. ¶¶ 33-34.  Madan forwarded this information on to Narula and Anil Chaudhry ("Chaudhry"), OST's Chief Financial Officer, stating that Gogia qualifies as a service-disabled veteran and "is willing to talk."  *Id.*

Gogia is a service-disabled veteran who, as of late 2009, had no experience in commercial construction or government contracting.  Stmt. ¶¶ 33, 49.  In 2009, Gogia attempted to start a construction company, the Gogia Group.  Stmt. ¶ 49.  The Gogia Group only completed two projects during its existence from 2009 to 2010, which ended in a total loss of $1,969.  *Id.*  Gogia continued working for the Gogia Group into at least the Fall of 2010, despite a later assertion in a letter submitted to the VA that the Gogia Group "has not been active since 2009."  *Id.*  In the midst of this unsuccessful attempt at running his own construction company, Gogia was unable to cover his living expenses and turned to his second cousin, Defendant Ajay Madan ("Madan"), who provided him $18,000 in early 2010.  Stmt. ¶ 36.

---

[7] SOMASS was a massive $100+ million SDVOSB contract that the OST Defendants were tracking since 2008, but which they learned they could not perform unless OST partnered with an SDVOSB entity.  Stmt. ¶ 31-33.

By January 6, 2010, Gogia, Narula, Chaudhry, and Madan, along with OST's outside account, Ravi Narayan ("Narayan"), worked together to establish CSG as an LLC in Virginia, which formally occurred on January 23, 2010.  Stmt. ¶¶ 37-41.  At the time of CSG's formation, Gogia lacked 1) the necessary financial resources to establish and operate CSG, Stmt. ¶ 36; 2) government contracting expertise or experience to solicit government contracts, Stmt. ¶ 49; 3) commercial construction experience, *id.*; 4) meaningful experience managing and operating a construction company, *id.*; 5) the required past performance to obtain a government construction contract, Stmt. ¶ 279; and 6) the ability to obtain bonding on his or CSG's own merits, Stmt. ¶¶ 9, 106, all of which were prerequisites to obtaining government SDVOSB set-aside construction contracts. Stmt. ¶¶ 9, 106.

CSG's initial financial resources came from Madan and OST.  Stmt. ¶¶ 43-44.  On February 23, 2010, Madan sent Gogia "seed monies" in the amount of $5,000 to deposit into a newly formed CSG checking account and those funds were used to pay OST's accountant Narayan for his services in forming CSG.  Stmt. ¶¶ 44-45.  OST also provided CSG another $95,445.04, which was not deposited into CSG's bank account, as a conditional loan.  Stmt. ¶ 43.  From the outset, "it was the intent that CSG would evolve as the government construction division of OST, and [be] a company [Narula] thought could easily be a 100+ million dollar enterprise and would give [Parekh] a break and opportunity to further [his] career."  Stmt. ¶ 232.

2. CSG and Gogia Submit Materially False Misrepresentations to the VA

Before registering CSG as an SDVOSB, Gogia had actual knowledge of the regulations controlling the VA's SDVOSB program.  Stmt. ¶ 34, 52.  CSG first submitted an application to be verified as an SDVOSB to the VA on March 14, 2010.  Stmt. ¶ 59.  In support of this application, Gogia explicitly certified that "(1) he was a service-disabled veteran, (2) one or more veterans

owned at least 51% of CSG, and (3) that CSG was controlled by one [or] more veterans as outlined in 38 C.F.R. Part 74." *Id.* The VA relied on the truthfulness of this statement and based its verification of CSG's status on the certification. *Id.* CSG was verified as an SDVOSB on May 12, 2011. *Id.*

3. The Parekh, CB Construction, OST, and CSG Relationship and Early CSG Operations

Upon CSG's formation, Narula and Parekh began discussing how they could use CSG's SDVOSB status to pursue SDVOSB set-aside contracts now that Gogia had been brought aboard as a third partner in OST's construction subsidiary. Stmt. ¶ 44-45. On February 24, 2010, following the formation of CSG, Parekh obtained a list of pre-solicitation VA SDVOSB projects from Scollick. Stmt. ¶ 50. Parekh sent that list to Narula who forwarded it on to Gogia explaining that Narula would like to introduce Gogia to Parekh so that "as a team we can go after these opportunities." *Id.* Narula asked Parekh to call him "**to discuss how we can use the SDVO-SB. The company name is Centurion Group, LLC** [sic]." Stmt. ¶ 51 (emphasis added). Parekh told Narula he would like to work "**with [OST's] proposal/technical writing dept so we can all work together and send the best possible proposal**" for the SDVOSB projects. Stmt. ¶ 50 (emphasis added). From the inception of CSG, Narula and Parekh intended to use an SDVOSB entity to enter the government construction contracting field. Stmt. ¶¶ 47-48. Gogia was never a key player because he added nothing to the business model except that he possessed the one thing nobody else in the scheme had – he was a service-disabled veteran. Stmt. ¶¶ 33, 36, 49.

In the first several months of CSG's existence, Gogia did not play a meaningful role, despite being CSG's only employee. Stmt. ¶¶ 66, 80, 82-84, 126. Instead, Parekh operated CSG out of CB Construction's office and then later from OST's office in Washington, D.C. after CB Construction moved into that space in 2010. Stmt. ¶¶ 18, 124. During this initial period Parekh,

along with employees of his company CB Construction and OST employees, created and submitted SDVOSB bid proposals to the VA in CSG's name, initially out of CB Construction's office and later OST's office.  Stmt. ¶¶ 60-67, 85, 97, 124.  These bid proposals contained material false statements about CSG's past performance and other experience, of which CSG had none.  Stmt. ¶¶ 277-89.  Rather, this past performance had purportedly been done by one of Parekh's companies and their description, including cost, scope, and time frame, were constantly and fraudulently changed to fit the different requirements for certain CSG bid proposals.  Stmt. ¶¶ 280-89.  It was Parekh who claimed sole responsibility for putting the past performance into the CSG bid proposals submitted to the United States.  Stmt. ¶ 287.  The interconnectedness between CSG, CB Construction, and OST was illustrated by Madan scheduling a joint operations meeting to discuss the logistics of CSG's operations and each party's role.  Stmt. ¶ 81.

Six months into CSG's existence, and after at least six CSG bid proposals had been submitted for VA SDVOSB contracts, Gogia admitted his complete lack of involvement in CSG, the company he certified to the VA that he "owned and controlled."  Stmt. ¶¶ 59, 82-85.  On June 2, 2010, after learning that numerous CSG bid proposals were submitted to the VA without his knowledge, Gogia wrote Madan an email confessing that Gogia had been "told who his new partners were" going to be and that Gogia had been "intentionally shut out" of CSG's operations.  Stmt. ¶ 83.  According to Gogia:

> I am only writing this to you.  This has built up.  A while back, I was told to come meet and greet CitiBuilders [CB Construction] – instead, at the meeting **I was told who my new partners were.  Since then I've been intentionally shut out**, which may have been ok if somebody had told me about it.  That last meeting with Vijay [Narula] caught me off guard and does not make me comfortable.  Still, **I could bear being locked out because I was told CitiBuilders [CB Construction] had experience and knew what they were doing**.  These are serious flaws in this bid.  The only two things I ever heard about it were a surprise call from the VA contracting officer, and now this.  Yet, the VA response is addressed to me, with

Centurion's name – reflecting on the reputation we're trying to build.  Please forgive the tone – tell the CitiBuilders [CB Construction] guys to stop **using my and Centurion's name** if these are the results we're going to be receiving.  I want to move forward and believe this will work, and apologize if I am being over the top.  **Maybe I'm missing the big picture, but it's because I've been blindfolded. How do I make sure I don't get another email like this?**

Stmt. ¶ 83 (emphasis added).  Madan responded by confirming that Gogia was shut out of CSG:

[T]he bottom line on this is that everyone has the same goals, but we are not coordinated well . . . **You have not been maliciously shut out, but you have been shut out for convenience because Neil [Parekh] is understaffed and was told by us to get multiple bids out right away**. . . . Neil [Parekh] was running hard on the bids, but does not have enough help to pump them out with high quality and high frequency.  He asked me last night if we can get an estimator.

Stmt. ¶ 84 (emphasis added).[8]  Madan asked Gogia if he could "perform estimation" and, in that way, "help out with [CSG's] bids" as "we need to get 20 of them out each month."  *Id.*  Madan then told Gogia that Parekh had "offered to provide working space at his Tyson's [C]orner office to get you fully plugged into the process and to take advantage of your expertise.  He did not know how much experience you had, and I think he is still trying to figure out who can do what to get more [CSG] bids out."  *Id.*  Gogia responded by saying that he "can definitely help" and that he was "**[e]xcited to get started**," when, in fact, Parekh and employees of CB Construction had already churned out at least six CSG SDVOSB bid proposals during the previous three months. Stmt. ¶¶ 85 (emphasis added).

On June 9, 2010, Gogia was told to meet with Scollick to learn CSG's "bidding and estimating process."  Stmt. ¶ 86.  Madan further illustrated his control over Gogia and Gogia's lack of full-time devotion to CSG by instructing Gogia on how much (only 20 hours per week)

---

[8] That Parekh chose to *intentionally* keep Gogia away from CSG operations when Parekh was "understaffed" and under pressure from Madan and Narula to "get multiple bids out right away" evidences that Gogia was of no consequence to CSG.  Stmt. ¶ 84.

and where (OST's offices) Gogia needed to work for CSG.  Stmt. ¶ 89.  Gogia's role remained minimal, as evidenced by a July 28, 2010 email from Parekh informing Narula that Gogia's "role and time commitment needs to be defined.  He is only committing 10 hours a week at the office." Stmt. ¶ 90.

    4.   <u>Attempts to Finalize an Operating Agreement</u>

During the summer of 2010, Parekh, Narula, and Madan, with Gogia notably and completely left out, discussed how the operations and profits of CSG would be distributed.  Stmt. ¶¶ 91-101.  As the discussions, proposals, and counter proposals progressed, it is striking that Gogia was not copied on any emails and, when it came to the distribution of profits, Narula, Parekh, and Madan *always* placed Gogia on the bottom rung and, at best, as someone who needed to be given a share of CSG's profits simply for providing his service-disabled veteran credentials for the others to use.  *Id.*

Parekh did not propose that Gogia would serve as CSG's highest ranking official, like President or Chief Executive Officer, but rather Gogia would work his way up from estimator to site superintendent to project manager over the course of several years.  Stmt. ¶ 91.  CB Construction was proposed to "manage and run all CSG operations."  Stmt. ¶ 99.  Regarding ownership and profit distribution, it was never proposed that Gogia receive more than a 25% share (most often far smaller) of SDVOSB profits and never a majority.  Stmt. ¶¶ 91, 94-97, 99.  While the rest of the participants brought much to the table in relation to the SDVOSB operations such as bonding, operations, rent free office space, past performance, and financials, all Gogia brought to the table were his "certifications." Stmt. ¶ 91, 94, 95-96.

During these discussions, Parekh again made it clear how little Gogia actually contributed to the pursuit of VA SDVOSB projects, telling Narula:

Amar [Gogia] was supposed to come in and be added value, however, he has been given no direction and therefore is all over the place, accounting, PM, estimating, marketing.  I need his focus to be on bidding and estimating ONLY for the next 0-12 months, which has already required a great amount of time from Andrew [Scollick] and I to get him up to speed . . . As for shared resources between Citibuilders and CSG, for the time being maybe we keep everything with Citibuilders and loan CSG personnel at cost and as required.  Once a few projects are under our belt and a pipeline is built we can then build up CSG with full-time personnel as necessary.

Stmt. ¶ 92.  Parekh also stated that over the past several months he had spent "at least 85% of my time . . . bidding on SDVOSB projects" and CB Construction had "spent well over $35,000 in supporting CSG."  Stmt. ¶ 97.  From its beginning to August 2010, no more than $1,700 was used from CSG's meager bank account, showing that its operations were funded from the outside.  Stmt. ¶ 98.

    5.  CSG Bonding

Pursuant to the Miller Act, 41 U.S.C. § 3131, the SDVOSB Contracts had to be bonded.  Stmt. ¶¶ 9-10.  The underwriting process to obtain bonding was supposedly rigorous and required contractors to provide information on the organizational structure, financial resources, and construction competency it possessed.  Stmt. ¶ 23.  To obtain bonding for CSG, Parekh and Narula used Schendel and his company Centennial as a bonding agent.  Stmt. ¶¶ 21-22.  Throughout the first several years of CSG's existence, it was Parekh and Narula that took the steps to secure CSG bonding by continually meeting, communicating, and working with Schendel and Centennial, as well as the bonding companies that eventually issued CSG bonds, Defendant Hanover Insurance Company ("Hanover") and Defendant Hudson Insurance Company ("Hudson").  Stmt. ¶¶ 69-78, 102-08, 128-70.  Aside from signing the indemnity agreements required by Hanover and Hudson and briefly meeting Schendel on one occasion, Gogia had no other interactions with any of the individuals or entities responsible for CSG's bonds.  Stmt. ¶¶ 78, 107, 157.

Throughout this period, all information on CSG was provided to Schendel and Centennial by Parekh and Narula, which Schendel and Centennial in turn relayed to Hudson and Hanover. Stmt. ¶¶ 71, 131.  This information included that CSG was owned either by OST as a wholly-owned subsidiary or as a partnership among Parekh, Narula, and Gogia, with Gogia only owning a third.  *See e.g.*, Stmt. ¶¶ 70, 130-33, 143, 162.  Further, the information possessed by the entities and individuals involved in CSG's bonding show that it was Parekh, not Gogia, controlling and running CSG.  *See e.g.*, Stmt. ¶¶ 130-33, 162.  Finally, the information provided to the entities and individuals involved in CSG's bonding shows OST's intent to build up a construction division through CSG and SDVOSB work.  *See e.g.*, Stmt. ¶¶ 70, 72, 105, 130-33, 147, 155, 162.

From 2010 to 2011, Centennial brokered bonding for eight of the SDVOSB Contracts from Hanover and five of the SDVOSB Contracts from Hudson.  Stmt. ¶¶ 128, 160.  Acquiring bonding is an absolutely crucial step to winning government construction contracts and Gogia played *zero* role in obtaining bonding from Centennial for CSG.  Stmt. ¶¶ 9-10, 78, 210.  Bonding for CSG was provided based on the financial resources of OST, Narula, and Parekh and based on the belief that CSG was majority-owned, controlled, and operated by OST, Narula, and Parekh, but not Gogia.  Stmt. ¶¶ 70-74, 102-08, 130-47, 152-56, 161-69.

6.  The SDVOSB Contracts and CSG Operations between 2010 and 2012

When CSG was first notified it was a low-bidder for a VA SDVOSB set-aside contract in late July 2010, CSG only had $3,318.91 in its bank account (which remained from the $5,000 originally provided by Madan).  Stmt. ¶¶ 44, 109-10.  Madan wired $211,612.34 into CSG's account as a supposed loan, which carried zero interest and was never repaid, to make it appear to the VA and the bonding underwriters that CSG could "carry" the SDVOSB contract being awarded.  Stmt. ¶ 111, 233.  This quick infusion of cash was knowingly and intentionally

categorized in the initial CSG financial statement as "contract revenues" instead of a loan.  Stmt. ¶ 112.  Madan was originally depicted as a 49% owner of CSG, but a new operating agreement was signed by Gogia on September 15, 2010 naming Gogia as CSG's 100% owner.  Stmt. ¶¶ 56, 58, 117.  However, a CSG financial statement from 2011, prepared by a Certified Public Accountant, still identified two equity members of CSG with one holding $18,668 in equity while the other held $210,000.  Stmt. ¶ 144.

The salary that Gogia eventually received from CSG was set at $65,000.  Stmt. ¶ 119.  Once CSG began performing construction projects under the SDVOSB Contracts, Parekh and Narula sent Gogia out in the field to work as a superintendent while Parekh managed all CSG operations from OST's offices.  Stmt. ¶ 121.  During Parekh's time working with CSG, he consistently exerted control over Gogia and gave Gogia instructions.  *See e.g.*, Stmt. ¶¶ 87, 88, 113, 119, 120, 123, 171, 177-78.  Parekh also signed nearly all documents on behalf of CSG as its "Managing Director," and even as a "Principal."  Stmt. ¶¶ 114-15.  CB Construction employees were in charge of CSG's finances and performed substantial amounts of CSG work, including all executive level construction tasks, administrative functions and solely overseeing several CSG projects, all while holding themselves out as CSG employees.  Stmt. ¶¶ 126-27, 201-02.  CSG operated out of CB Construction and OST office space for free during this period, despite its registered address being Gogia's home in Harrisonburg, Virginia.  Stmt. ¶ 124.  All the office and construction resources utilized by CSG were provided by the OST Defendants, Parekh, and CB Construction.  Stmt. ¶ 125, 127.

According to CSG's 2010 Form W-2s, Gogia earned $7,500 while another CSG employee, Martin Tubb, earned $16,923.06.  Stmt. ¶ 122.  In 2011, Gogia's Form W-2 indicates he earned $65,000 from CSG while Parekh earned $67,884.62.  Stmt. ¶ 200.  Additionally, CSG paid

Parekh's company CB Construction $743,700 in 2011 and CB Construction, in turn, paid Parekh wages of $274,615.42, while Gogia only claimed $20,168 in income from CSG on his personal tax return that year.  *Id.*

Gogia's focus was often on the work being done for the SOMASS proposal and not the comparatively smaller VA SDVOSB construction proposals.  Stmt. ¶ 180-82.  From 2010 through 2012, Gogia devoted substantial time to work unassociated with CSG and its execution of the SDVOSB Contracts.  *Id.*  Specifically, Gogia continued working for the Gogia Group through at least October 2010 and also devoted considerable time towards CSG-OST, LLC, the joint venture between CSG and OST that was created to bid on the SOMASS contract from the FAA.  Stmt. ¶¶ 35, 180-82.  While CSG and OST entered into a mentor-protégé agreement with the FAA to pursue the SOMASS contract, CSG did not have any agreements registered with the VA's mentor-protégé program, despite CSG and Gogia's knowledge of that program.  Stmt. ¶¶ 175-76.

7. Breakdown of the Relationship Between CSG, Gogia, the OST Defendants and Parekh and CB Construction

From late September 2011 on, the relationships between the defendants involved with CSG quickly deteriorated and numerous communications during this period further illustrate the power and control that the OST Defendants and Parekh held over Gogia and CSG.  On September 8, 2011, Madan prepared notes from a "Construction Meeting" held the previous day, stating: 1) "Neil [Parekh] to provide Amar [Gogia] admin access info for Sharepoint," 2) "Neil [Parekh] to provide accounting system access," 3) "Amar [Gogia] to begin signing" checks, and 4) "Amar's [Gogia] role going forward is "tbd after SOMASS."  Stmt. ¶ 178.

Between December 8 and 13, 2011, Narula and Parekh held a back and forth discussion regarding "Amar's [Gogia] Role" in CSG.  Stmt. ¶ 184.  Parekh was "opposed 100% to have

[Gogia] anywhere near the accounting system." Stmt. ¶ 185.  Narula thought that "[Gogia] needs

to be involved.  Like I mentioned he needs to be part of the process," to which Parekh replied:

> **Vijay [Narula], I let him be part of the process and it was a disaster.  He started
> in the office and did not like it and the work he did was scary, then went to
> field and we know what happened.  I am only now uncovering costs and
> subcontract work he approved without any authorization or notification to the
> office . . . .**

*Id.* (emphasis added).

Narula responded that "**at the end of the day you [Parekh] are running the

company**/work. . ." not Gogia.  Stmt. ¶ 186 (emphasis added).  Parekh responded by stating that

Gogia's salary should be set at "$40,000 per year" and "[a]fter Ajay [Madan] and myself have

been paid back in full the total amounts we have put into the company we can consider an

increase."  Stmt. ¶ 187.  Narula then said "if he is working full time and **we are using his [Service-**

**Disabled Veteran] quals**. **he needs to be compensated.  We need to come up with the %  of**

**sales/profit to give him for use of his certs and pay him for working as well.**"  *Id.*  (emphasis

added).

Parekh added that:

> [I]f we had paid him $50,000 to sit at home last year and kept him away from
> operations, we would have had a successful year and made money.  I agree with
> some percentage sales/profit and **he certainly should be compensated for letting
> us use his [Service-Disabled Veteran] quals, however, we no longer continue
> to spend time and resources teaching and mentoring him with no results.**

*Id.* (emphasis added).  Parekh closed the discussion by stating "in summary I would like for

[Gogia] to be away from all operations at least for the time being—it is a real mess and much more

than you or I have been lead [sic] to believe," to which Narula replied "I was trusting YOU

[Parekh] to be on top of the work.  You have too much on your plate.  You have been mentioning

about him for over a year and you should have mitigated it then and not after massive losses."
Stmt. ¶ 188.

On December 13, 2011, Madan was provided login access to CSG's QuickBooks, Bank of America, and Paycycle accounts.  Stmt. ¶ 190.  Several days later, on December 18, 2011, Madan sent Narula an email regarding CSG "Accounting and Financial" stating that Parekh was told that "3 party consent" was required before payments could be made.  Stmt. ¶ 192.  Madan further outlined that he had taken control of CSG's QuickBooks files, that no transactions will be made, and that Narula's accountant was coming in to look at CSG's books.  *Id.*  Madan informed Narula that 1) Madan, Parekh, and Gogia would jointly perform a payroll review; 2) Madan is to control the CSG checks; and 3) that "CB has been paid over $1M from CSG, with CB salaries at $750k and Neil's [Parekh] draw at $492K." *Id.*

From the formation of CSG in 2009 to February 2012, Parekh controlled the CSG bank account and transferred $1,048,700 out of the CSG account into a CB Construction Group account without being required to provide an accounting or supporting documentation, despite CSG incurring "massive losses."  Stmt. ¶ 183, 188.  To put this amount in perspective, in 2011 Gogia reported CSG profits of only $20,168.  Stmt. ¶ 200.

In a December 22-23, 2011 conversation, Narula told Parekh that "OST has not received any profit or a fee for bond support.  You told me clearly that we would make money . . . I have not seen a dime."  Stmt. ¶ 193.  Parekh responded that he had to "fund . . . the CSG start up" and that because CSG's bonding was provided in part because of OST and Narula's financial and indemnification support, "**OST was given 75% ownership**." *Id.*  (emphasis added).  Narula did not dispute this fact but instead stated that Parekh "committed to fund up [] to $650k" and "[**a**]**t**

**the end of the day you [Parekh] did not manage Amar [Gogia] and the contracts are where they are – in a loss.  You are responsible for all projects in CB or CSG**.”  Stmt. ¶ 194.

While this split with Parekh was occurring, Gogia and Madan had discussions on the current state of CSG.  Stmt. ¶ 195-98, 201, 218.  This conversation clearly shows Gogia's lack of control of CSG as he had to talk to numerous other people to understand what was happening in “his” company and the steps he would have to take to salvage CSG operations if Parekh left.  *Id.* Yet, the people he was speaking with were, in fact, all CB Construction employees.  *Id.*  Madan and Parekh exercised control over CSG payments throughout this period and Gogia required their approval before paying workers and taking care of other operational expenses.  Stmt. ¶ 199, 203, 216, 224.  On February 10, 2012, Madan stated to Narula that, after having a conversation with Gogia, “the plan is to have CSG become self-sustaining without a dependence on OST or CB [Construction]” and Gogia later repeated this sentiment in an email to Madan, stating CSG was “[m]oving towards independent operations—bonding, bidding, operations, account.”  Stmt. ¶¶ 202.

Parekh, Narula, Madan, and Gogia discussed how to salvage or amicably end the CB Construction and CSG relationship.  Stmt. ¶ 207.  By March 2012, Parekh prepared a proposed outline of the CSG, OST, and CB Construction relationship.  Stmt. ¶ 208.  It states in part, that “CB to continue managing projects to completion,” “CSG to pay CB a fixed monthly PM fee plus any expenses,” and to “part ways amicably and professionally” but “if CSG and CB continue to work together it should be performed as a prime and subcontractor relationship.”  *Id.*

On May 14, 2012, Gogia emailed Parekh, stating “I am comfortable with a model in which CB [Construction] is responsible for job operations, funding, and also responsible for any profit/loss.  CSG would be responsible for job payables/receivables and CSG would only retain a

fee as a percentage of contract amount.  I have attached more details, using 5% as the CSG fee, that can be negotiated per job/scope."  Stmt. ¶ 213.  The attached one pager shows that CB Construction was at the time running six CSG job sites.  *Id.*

On May 22, 2012, Parekh provided Gogia and Narula, who later forwarded it to Madan, a copy of a "CB-CSG Partnership" arrangement.  Stmt. ¶ 214.  On CSG jobs under this agreement, CB would provide the project manager, any superintendents would be employed by CSG but paid and managed by CB, and CB would perform back office operations.  *Id.*  That same day, Parekh emailed Narula stating that "[f]or 7 months I have in good faith continued to finance and manage all CSG projects."  Stmt. ¶ 215.

On September 14, 2012, Gogia complained to Madan and Narula that:

Neil [Parekh] wants me to sign a time extension for Chillicothe [an SDVOSB construction contract project] that I have nothing to do with.  He has had no problem signing as "Managing Director" for all of our current jobs, but is now refusing to sign.  We have taken over Durham, and I am signing everything for that job moving forward.  Should he not continue to sign off on Chillicothe documents?  I don't want my name on something I have no idea about.

Stmt. ¶ 220.

Around the time that Parekh was separating himself completely from CSG, Gogia, OST, Madan, and Narula, he was also quietly starting a new SDVOSB entity, Defendant Citibuilders Solutions Group, LLC, ("Citibuilders") with Melvin Goodweather.  Stmt. ¶ 226.  After Parekh's exit, Narula, Madan, and Gogia were left to scramble to recover financially from the over $1 million taken out of CSG by Parekh and CB Construction and to recover operationally on the ongoing CSG jobs that CB Construction had been running.  Stmt. ¶¶ 219-20, 222, 231, 233.

On December 4, 2012 Gogia provided Narula and Madan a document titled "CB Narrative" which laid out the "CB/CSG relationship."  Stmt. ¶ 227.  This narrative stated that CB Construction had been responsible for job operations and then said that "in March 2010, CSG entered

relationship with CB [Construction], Agreed that CB [Construction] would assume full responsibility of P&L and job operations for jobs bid with CSG, CB [Construction] granted access to CSG banking for job operations, Agreed CB [Construction] to be responsible for bookkeeping and accounting." *Id.* Gogia's narrative goes to state that:

> From 2010-2011, CB [Construction] responsible for creating 13 bids/awards . . . 5 out of 13 jobs bid/awarded by CB [Construction] abandoned by CB [Construction], violation of agreed responsibility with gross negligence, CSG now acting with diligence to complete projects and correct deficiencies caused by CB negligence and theft, CSG now left with substantial unpaid balances to subcontractors on jobs bid by CB [Construction], subcontracts signed by CB [Construction], and subcontracts managed by CB [Construction].

*Id.*

After Parekh's separation from CSG, the OST Defendants continued to prop up CSG, with Narula stating on February 8, 2013 that OST had contributed "[$]295k . . . since September 2012." Stmt. ¶ 231. On October 15, 2014, Madan lent an additional $165,000, again with no interest, to CSG, which was added to his still outstanding loan of $211, 612.34 from August 4, 2010. Stmt. ¶ 233.

Throughout its existence CSG was paid $7,003,693 by the VA in response to claims it submitted under the SDVOSB Contracts. Stmt. ¶ 234-35. All the SDVOSB Contracts were explicitly set-aside for eligible SDVOSBs only. Stmt. ¶ 234. To be eligible "to bid on, and be awarded" the SDVOSB Contracts, CSG had to be in compliance with the VA's SDVOSB regulations and owed a duty to affirmatively notify the VA if it was not. Stmt. ¶¶ 3, 8.

   8. Citibuilders Solutions

During late 2011 and early 2012, Parekh, on his own, approached another service-disabled veteran, Melvin Goodweather, with the proposal of starting a new SDVOSB construction company. Stmt. ¶ 231. At the time Parekh approached him, Goodweather had no knowledge of SDVOSB contracting programs and had zero construction experience. *Id.* On January 6, 2012,

Parekh emailed Goodweather a summary of SDVOSB requirements which in part stated that an eligible SDVOSB must be "[a]t least 51% owned by one or more Service-Disabled Veterans" and the "[m]anagement and daily busines operations [must be] controlled by one or more Service-Disabled Veterans."  Stmt. ¶ 232.  Goodweather agreed to Parekh's proposal of forming a new company together.  Stmt. ¶ 233.  Parekh, with no assistance from Goodweather beyond providing some documentation, formed Citibuilders Solutions on December 21, 2011 and registered Citibuilders Solutions with the Internal Revenue Service.  Stmt. ¶¶ 238-47.  Citibuilders Solutions was verified as an SDOVSB by the VA on August 17, 2012, despite the fact that Goodweather never authorized Parekh to do so.  Stmt. ¶ 247.  Goodweather also never certified to the VA that Citibuilders Solutions met the SDVOSB regulations, but such a certification, purportedly from Goodweather, was submitted on his behalf.  *Id*

Over eight months after Citibuilders Solutions formation, during which Goodweather had no role in, or knowledge of, its operations, Parekh provided Goodweather an update on August 27, 2012, stating:

> [L]ast week we finally received our SDVOSB certification which will allow us to start bidding on a variety of projects. . . . Over the next 12 months we will primarily be bidding on projects in the 250K-2MM range, looking for [] opportunities and potential sole source projects in the Federal Government.  I think it would be beneficial for [your son], you and I to meet on a monthly basis to brainstorm for potential projects and also **to bring you up to date on all areas of the company**.

Stmt. ¶ 248.

Parekh, with no assistance from Goodweather besides signing an indemnity agreement, took all the steps to obtain bonding for Citibuilders Solutions.  Stmt. ¶¶ 250-263.  During Citibuilders Solutions existence, Goodweather only visited Citibuilders Solutions' office once.  Stmt. ¶ 264.  Goodweather did not have any knowledge of income for Citibuilders Solutions and never saw or possessed a Citibuilders Solutions tax return.  *Id*.  Goodweather never played any

role in SDVOSB bid proposal creation or submission. *Id.* The bid proposals for Citibuilders Solutions contained the same false past performance Parekh had previously used for CSG. Stmt. ¶¶ 290-93. Goodweather never signed a check on behalf of Citibuilders Solutions despite Scollick receiving a Citibuilders Solutions paycheck supposedly signed by Goodweather. *Id*.

Despite this complete lack of participation from the service-disabled veteran, from 2012 through 2014, Citibuilders Solutions bid on, won, performed, and was paid a total of $5,434,819 for the seven SDVOSB set-aside contracts from the VA. Stmt. ¶ 266. Goodweather did not become aware that Citibuilders Solutions was even operating until November 2014 and his subsequent attempts to get information from Parekh demonstrate how he played absolutely no role in Citibuilders Solutions. Stmt. ¶ 270.

To pacify Goodweather, Parekh stated his intention to substitute his uncle, Defendant Dr. Nitin Mehta, for Goodweather as the service-disabled veteran owner of Citibuilders Solutions and on the indemnity agreement with the bonding company. Stmt. ¶ 273. However, the company issuing Citibuilders Solutions bonds would not permit Dr. Nitin Mehta to replace Goodweather and Goodweather was never released from the indemnity agreement. Stmt. ¶ 274.

## **ARGUMENT**

Parekh violated FCA § 3729(a)(1)(A) every time a claim for payment was submitted to the United States under the SDVOSB Contracts. The VA was fraudulently induced to award the SDVOSB Contracts based on the knowingly false representations that CSG and Citibuilders Solutions were in compliance with SDVOSB regulations when they were not. Parekh's conduct was a substantial factor in causing CSG and Citibuilders Solutions to fraudulently induce the United States and submit false claims under the contracts. Parekh further violated FCA § 3729(a)(1)(B) by causing of CSG and Citibuilders to make false statements and records about its

SDVOSB status and through his false assertions about their past performance.  The actual damage to the United States resulting from these violations should be found to equal all payments under the SDVOSB Contracts, which total $12,438,512.  These damages should then be trebled under the FCA for a total damage calculation of $37,315,536.

## I.    LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted for a claim, or a part of a claim, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether there is a need for a trial – whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (defining "material facts" as those which "might affect the outcome of the suit under the governing law").  To show a genuine issue of material fact exists, the non-movant must present specific facts, supported by the record and admissible at trial, that could lead a "reasonable jury" to find in its favor.  *Id.* at 248; *Allen v. Johnson*, 795 F.3d 34, 38 (D C. Cir. 2015).

When evaluating a motion for summary judgment, the Court must draw all reasonable inferences in favor of the non-movant.  *Liberty Lobby,* 477 U.S. at 255.  However, this does not mean the Court can rely simply on conclusory statements or mere allegations put forth by the non-movant.  *Equal Rights Ctr. v. Post Props, Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011).  The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsuhita Elec. Industrial Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (footnote omitted).  As explained by the Supreme Court, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris,* 550 U.S. 372, 380 (2007).

### B.  False Claims Act

Previously in this case, the Court set out the elements for the FCA violations relevant to this motion, most recently stating:

> Liability under [FCA] subparagraph (a)(1)(A) requires proof that: (1) the defendant presented or caused to be presented a claim to the government, (2) the claim was false or fraudulent, and (3) the defendant knew the claim was false.

> Similarly, liability under [FCA] subparagraph (a)(1)(B) requires proof that: (1) the defendant made, used, or caused to be made or used, a false record or statement to the government, (2) the record or statement was false or fraudulent, (3) the record or statement was material to a false or fraudulent claim, and (4) the defendant knew the record or statement was false.

*Scollick III*, 2020 U.S. Dist. LEXIS 208604, at *20 (citations omitted).

### C.  SDVOSB Statutes and Regulations

SDVOSB set-aside contracting is governed by several statutes and two distinct regulatory schemes.  As explained by the United States Court of Federal Claims:

> "In an effort to encourage small business, Congress has mandated that federal agencies restrict competition for some federal contracts."  *Kingdomware Techs. Inc. v. United States*, 136 S. Ct. 1969, 1973 (2016).  Congress particularly sought to improve the position of "small business concerns owned and controlled by socially and economically disadvantaged individuals."  15 U.S.C. § 637(d)(1).  To that end, it has required "each agency to set an annual goal that presents, for that agency, the maximum practicable opportunity for contracting with small businesses, including, [relevant here], those small business concerns owned and controlled by service-disabled veterans."  *Kingdomware Techs.*, 136 S. Ct. at 1973 (internal quotation marks omitted) (citing 15 U.S.C. § 644(g)(1)(B)).; *see also* 38 U.S.C.  8128(a) ("In procuring goods and services pursuant to a contracting preference under this title or any other provision of law, [VA] shall give priority to

a small business concern owned and controlled by veterans . . . .").  The task of
promulgating regulations "set[ting] forth procedures . . . to set aside contracts for"
SDVOSBs has been assigned to at least two distinct agencies, SBA and VA.  *See
Kingdomware Techs.*, 136 S. Ct. at 1973 (internal quotation marks omitted); *see
also* 15 U.S.C. § 657f (SBA); 38 U.S.C. § 8127(a), (e) (VA).

*Veterans Contracting Grp., Inc. v. United States*, 135 Fed. Cl. 316, 318-19 (2017).  Congress

expressly stated the purpose of the Veterans Benefits Act of 2006 was to "increase contracting

opportunities for small business concerns owned and controlled by . . . veterans with service

connected disabilities."  38 U.S.C. § 8127(a)(1).

Both the VA (for VA contracts) and the SBA (for all other federal agency contracts)

promulgated regulations regarding SDVOSB set-aside contracting.  *See Veterans Contracting

Grp., Inc.*, 135 Fed. Cl. 316, 319-22 (explaining the two programs).  The eligibility requirements

for both the VA and SBA SDVOSB programs were extremely similar and, in 2018, amendments

to the relevant statutes went into effect that actually merged the two regulatory schemes.[9]  *Id.* at

322-25.  However, as the contracts at issue in this motion were all awarded before October 1, 2018

through VA SDVOSB set-aside solicitations, the VA SDVOSB eligibility regulations which were

in place between 2010 and 2015, when all the SDVOSB Contracts were awarded, are controlling

to this case. *See CVE Appeal of: Barry Capital Projects, Inc.*, 2019 SBA LEXIS 31, at *16-17,

SBA No. CVE-106-A (SBA April 8, 2019) ("Determinations on [SDVOSB] eligibility prior to

October 1, 2018 are based upon the VA's regulations at 38 C.F.R. [Part 74]").  Therefore, all

citations in this motion will be to the relevant 2015 VA SDVOSB regulations, which are included

as an appendix.

---

[9] The controlling statutes and both the SBA and VA regulations all required a company to
be majority owned (at least 51% ownership) and controlled on a long-term and day-to-day basis
by a service-disabled veteran to qualify for SDVOSB eligibility.  38 U.S.C. § 8127(f); 15 U.S.C.
§ 632(q)(1); 48 C.F.R. §§ 2.101, 52.212-3; 38 C.F.R. § 74; 13 C.F.R. § 125.10.

At a broad level, the VA regulations required that to qualify for an SDVOSB set-aside contract, the service-disabled veteran must control "both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations." 38 C.F.R. § 74.4(b) (2015).  Additionally, the VA regulations provided that a firm must be at least 51 percent unconditionally and directly owned by one or more service-disabled veterans.  *Id.* § 74.3 (2015).

A specific process had to be followed for potential SDOVSBs to be registered and verified by the VA, in particular by the VA's Center for Verification and Evaluation ("CVE").  The Court of Federal Claims summarized the process by writing:

> VA implemented the Veterans Benefits Act through the "Veterans First Contracting Program," established in 2007.  *See AmBuild Co. v. United States*, 119 Fed. Cl. 10, 19 (2014).  "At the Program's commencement, SDVOSB . . . entities were permitted to self-certify . . . for registration in the VetBiz VIP database."  *Id.*  But the authorizing statute was subsequently amended, requiring the Secretary of Veterans Affairs to maintain the database and certify contracting entities through the VA's Center for Verification and Evaluation ("CVE").  *Id.* (citing 38 U.S.C. § 8127(e), (f)); *see also* 48 C.F.R. § 804.1102.  A business must be included on the VA's VIP database to qualify as an eligible SDVOSB for a contract award.  *See* 38 U.S.C. § 8127(e), (f); 48 C.F.R. § 804.1102.  The CVE now certifies participating entities and maintains such certification by performing examinations that "review . . . a[t] a minimum . . . all documents supporting the application, as described in [38 C.F.R.] § 74.12."  *See* 38 C.F.R. § 74.20(b).

*Veterans Contracting Grp., Inc.*, 135 Fed. Cl. at 319.  Even after an entity is certified by CVE as an SDVOSB, it was under a continuing affirmative duty to "maintain its eligibility during its tenure and [] inform CVE of any changes that would adversely affect its eligibility."  38 C.F.R. § 74.15(a) (2015).

Additionally, when submitting proposals for SDVOSB set-aside contracts, a contractor "must represent to the contracting officer that it is a (1) SDVOSB concern []; (2) Small business concern under the North American Industry Classification System (NAICS) code assigned to the

acquisition; and (3) Verified for eligibility in the VIP database." 48 C.F.R. § 819.7003(b).  When a contract is set aside for an SDVOSB, the solicitation and corresponding contract must include provisions stating that "[o]ffers received from concerns that are not [SDVOSBs] shall not be considered," and that "[a]ny award resulting from this solicitation shall be made to [an SDVOSB]." 48 C.F.R. §§ 19.1408, 52.219-27, 819.7009, 852.219-10.  Finally, if an applicant knowingly submits false statements or information to CVE when applying for SDVOSB verification, the CVE "will request that debarment proceedings be initiated by the [VA]."  38 C.F.R. § 74.2(c) (2015); *see also* 38 U.S.C. § 8127(g)(1).

## II.     PAREKH VIOLATED FCA § 3729(a)(1)(A)

There are no disputed material facts preventing this Court from finding that Parekh violated the FCA with each claim for payment submitted under the SDVOSB Contracts.  The FCA creates liability under § 3729(a)(1)(A) for any party who "knowingly presents, or causes to be presented . . . a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).  Liability under this section requires proving the following three elements: "(1) the defendant presented or caused to be presented a claim to the government, (2) the claim was false or fraudulent, and (3) the defendant knew the claim was false or fraudulent."  *Scollick III*, 2020 U.S. Dist. LEXIS 208604, at *20.  A party is still liable under the FCA for indirect presentment even if the party itself does not present a false claim to the United States so long as the party's conduct was "at least a substantial factor in causing, if not the but-for cause of, the submission of false claims."  *Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *19-20.

Therefore, for Parekh to be liable under FCA § 3729(a)(1)(A), it must be established that Parekh knowingly submitted false claims, or that Parekh knowingly caused CSG and Citibuilders

Solutions to submit false claims.  The undisputed material facts in the record clearly establish all these elements.

### A. False Claims were Submitted to the United States by Parekh, CSG, and Citibuilders Solutions Under the SDVOSB Contracts.

The FCA broadly defines "claim" as, among other things, "any request or demand, whether under a contract or otherwise, for money or property . . . that is presented to an officer, employee, or agent of the United States."  31 U.S.C. § 3729(b)(2).  To receive payments for the work it performed, CSG and Citibuilders Solutions submitted applications for payment under the SDVOSB Contracts.  Stmt. ¶ 235, 266.  These applications for payment were submitted directly to a federal agency and requested money for the construction work performed under the SDVOSB, which was paid by the United States.  Stmt. ¶ 229, 261.  However, these claims for payment were "false or fraudulent."

CSG and Citibuilders Solutions repeatedly misrepresented to the VA that they were eligible SDVOSBs when they were not "owned and controlled by [a] veteran[] with service-connected disabilities" as required and defined by statute and regulation.  38 U.S.C. § 8127; 38 C.F.R. 74.2 (2015).  These misrepresentations fraudulently induced the VA to award the SDVOSB Contracts to CSG and Citibuilders Solutions, when it was legally and contractually bound to only award the contracts to eligible SDVOSBs.  38 U.S.C. § 8127(a), (d); 48 C.F.R. §§ 819.7009, 852.219-10(b).  This initial fraud tainted all claims subsequently submitted under the SDVOSB Contracts and rendered them "false or fraudulent" under the FCA, thereby satisfying the second element for a violation of § 3729(a)(1)(A).

The FCA's so-call "fraud in the inducement" theory of falsity was previously explained by this Court:

> A claim can also be "false or fraudulent" if it is submitted pursuant to a contract that was "procured by fraud." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.* [], 393 F.3d 1321, 1326 (D.C. Cir. 2015). The Supreme Court recognized this theory of falsity, referred to as the "fraud in the inducement" theory in *United States ex rel. Marcus v. Hess* [], 317 U.S. 537, 542-44 (1943). . . . The Supreme Court held that the contractors presented a "fraudulent" claim to the government in violation of the False Claims Act because the "initial fraudulent action" (procuring the contract by fraud) "taint[ed]" all subsequent claims made under the contract. *Id.* at 543. Thus, under the fraud in the inducement of falsity, claims submitted pursuant to a contract procured by fraud are considered "false or fraudulent" even without "evidence that the claims were fraudulent in themselves." *Bettis*, 293 F.3d at 1326.

*Scollick III*, 2020 U.S. Dist. LEXIS 208604, at *21-22. Further, "a misrepresentation in the defendant's bid must have *caused* the government to award the defendant the contract" in order for that initial fraud to taint the claims submitted under that contract. *Id.* at 28.

1. <u>CSG and Citibuilders Solutions Were Not Eligible SDVOSBs When They Bid on and Were Awarded the SDVOSB Contracts.</u>

The representations and certifications repeatedly made to the United States by CSG and Citibuilders Solutions that they were eligible to be awarded the SDVOSB Contracts were false because at no time when their proposals were submitted did they actually meet the regulatory and statutory requirements for SDVOSBs. Entities attempting to obtain VA SDVOSB set-aside contracts are governed by a regulatory scheme which they must comply with in order to earn, perform, and be paid for those contracts. 38 C.F.R. Part 74 (2015); Stmt. ¶¶ 1-8. Importantly to this case, an SDVOSB must be "controlled" by a service-disabled veteran, meaning that a service-disabled veteran must control "both the day-to-day management and long-term decision-making authority" of the SDVOSB. 38 C.F.R. §§ 74.2 & 74.4 (2015); Stmt. ¶ 6. Additionally, an SDVOSB must be "at least 51 percent unconditionally and directly owned by one or more . . . service-disabled veterans." 38 C.F.R. §§ 74.2 & 74.3 (2015); Stmt. ¶ 5.

i. *CSG and Citibuilders Solutions did not qualify as an SDVSOB because Gogia and Goodweather did not "control" them.*

The SDVOSB regulation regarding who it would consider to "control" an SDVOSB is thorough and specific. 38 C.F.R. § 74.4 (2015). According to the VA regulation, "[c]ontrol means both the day-to-day management and long-term decision-making authority" for the SDVOSB. *Id.* § 74.4(a) (2015). Further, an SDVOSB's "management and daily business operations must be conducted by one or more . . . service-disabled veterans" and the service-disabled veteran "must have managerial experience of the extent and complexity needed to run the concern." *Id.* § 74.4(b) (2015). The "service-disabled veteran owners who manage the [SDVOSB] must devote full-time to the business during the normal working hours of firms in the same or similar line of business." *Id.* § 74.4(c)(3) (2015). Another requirement for control was that while "[n]on-veterans may be involved in the management of an [SDVOSB] . . . no such non-veteran may . . . [r]eceive compensation from the [SDVOSB] in any form as directors, officers, or employees, including dividends, that exceeds the compensation to be received by the highest officer" unless the highest ranking officer demonstrates to the VA "that it helps the [SDVOSB]. *Id.* § 74.4(g)(3) (2015). The regulation also provided numerous guideposts for potential SDVOSB applicants to follow and explicitly set forth illustrative, though not exhaustive, examples of situations where the VA could find that a service-disabled veteran did control the entity. *Id.* § 74.4(i) (2015); Stmt. ¶ 6.

Contrary to its representations, CSG was not controlled by Gogia. Rather, non-veteran and non-veteran entities, specifically the OST Defendants, Parekh, and CB Construction, wielded extreme influence over CSG and Gogia. Moreover, CSG depended fully on their resources and financial support to function. 38 C.F.R. § 74.4 (2015). First, the OST Defendants and Parekh provided "critical financial" and "bonding support" in exchange for equity and profits of CSG, which allowed the OST Defendants and Parekh to "influence the business decisions" of CSG. 38 C.F.R. § 74.4(i)(2) (2015). Not only did the OST Defendants provide all initial capital to CSG,

the OST Defendants and Parekh continued to inject capital to keep CSG operational for its entire existence, with Madan contributing at least $381,612.34, Stmt. ¶¶ 44-45, 111, 233, OST contributing at least $390,000, Stmt. ¶ 43, 231, and Parekh contributing at least $70,000. Stmt. ¶¶ 97, 199. Gogia did not contribute any meaningful capital into CSG and did not have the means to do so. Stmt. ¶ 36, 45. OST, Narula, and Parekh also provided significant financial backing required to secure the bonding necessary for CSG. Stmt. ¶¶ 106-07, 157. The OST Defendants and Parekh provided all this financial and bonding support in exchange for an equity share in CSG profits. Stmt. ¶¶ 91-101, 183, 193 ("OST has not received any profit or a fee for bond support. You [Parekh] told me [Narula] that we would make money . . ."). All this support allowed the OST Defendants and Parekh to not only "influence" but in fact manage and control the business decisions of CSG, which they repeatedly did. *See e.g.*, Stmt. ¶¶ 119-21, 171, 183, 186, 190, 192. Parekh and CB Construction were in charge of CSG operations and exercised control of CSG financing for several years. *See e.g.*, Stmt. ¶¶ 126-27, 183, 186, 194, 208, 213, 227 (Gogia writing "in March 2010, CSG entered relationship with CB [Construction], [a]greed CB [Construction] to assume full responsibility of P&L and job operations for jobs bid with CSG, CB [Construction granted access to CSG banking for job operations, [a]greed CB [Construction to be responsible for bookkeeping and accounting"). The OST Defendants were also able to control CSG finances and forced Gogia to seek their approval before making payments on CSG's behalf. *See e.g.*, Stmt. ¶¶ 190, 199, 203, 216, 224.

Second, CSG maintained business relationships with the OST Defendants, Parekh, and CB Construction outside of the financial and bonding support which caused "such dependence" that CSG could not "exercise independent business judgment without great economic risk." 38 C.F.R. §§ 74.4(i)(4) (2015). Specifically, 1) CSG's business and construction operations were run

through its business relationship with Parekh and his company CB Construction, Stmt. ¶¶ 126-27, 183, 186, 194, 208, 213, 227; 2) CSG's business relationship with the OST Defendants granted it free access to office space and office resources, Stmt. ¶¶ 124-25; 3) separate from the financial support, the business relationships with Parekh and the OST Defendants allowed CSG to secure bonding through their relationships and interactions with Centennial, Hanover, and Hudson, Stmt. ¶¶ 70-74, 102-109, 130-47, 152-56, 161-68, 210; and 4) the business relationships with the OST Defendants and Parekh provided CSG with the "managerial experience of the extent and complexity needed to run" CSG as Parekh had several years' experience running commercial construction companies whereas Gogia only briefly operated one unsuccessful company that essentially only performed a $100,000 residential renovation that resulted in a loss. Stmt. ¶¶ 15, 49; 38 C.F.R. § 74.4(i)(4) (2015); *id.* § 74.4.(b) (2015). The situation shows complete and total dependence by CSG and Gogia on the OST Defendants, Parekh, and CB Construction from CSG's inception. As Gogia himself explained over two years into CSG's existence, CSG was only then "[m]oving towards independent operations—bonding, bidding, operations, account." Stmt. ¶ 211. Gogia could not exercise actual "independent judgment" because he would have risked losing the OST Defendants' and Parekh's support which would have effectively ended CSG as a company and caused economic ruin to Gogia. After all, Gogia could not even meet his living expenses at the beginning of the CSG fraud scheme and if Madan or Narula had demanded the repayment of the loans, made in writing and otherwise, it would have bankrupted CSG and Gogia. Stmt. ¶¶ 36, 43-45, 111, 231, 233; 38 C.F.R. ¶ 74.4(i)(3) (2015). This lack of independent judgment is clearly illustrated by the countless examples of Parekh, Madan, or Narula controlling CSG operations or requiring Gogia to get approval before taking actions on behalf of CSG. *See e.g.*, Stmt. ¶¶ 125-26, 183, 186, 191, 194, 199, 203, 209, 213, 216, 224, 227. Gogia and Madan discussed multiple

times the large amount of effort it would take should Parekh and CB Construction separate from CSG and, in fact, CSG required large influxes of cash from OST and Madan to stay afloat after that departure.  Stmt. ¶ 195-98, 201, 218, 231, 233.

Third, several defendants, including Gogia himself readily admitted that Gogia spent little time working for CSG at first and later devoted considerable time to employment outside of CSG, showing he did not "devote full-time to the business during the normal working hours of firms in the same or similar line of business," as required.  38 C.F.R. § 74.4(c)(3) (2015) (requiring the veteran owners "managing" an SDVOSB to devote full-time to the SDVOSB during normal busines hours).  During the first five months of CSG, Gogia barely contributed any time to its operations and Gogia himself stated that he had been "shut out" and was only "get[ting] started" after months of CSG preparing and submitting SDVOSB set-aside bid proposals to the VA without Gogia's involvement.  Stmt. ¶ 82-85, *see also* Stmt. ¶ 66.  Even after he began actually contributing to CSG's operations, until work on the SDVOSB Contracts actually began, Gogia was asked to devote only 10 hours a week at CSG's office and only another 10 remotely.  Stmt. ¶¶ 89-90. During this time Gogia was also still performing work for the Gogia Group.  Stmt. ¶¶ 49, 119. Finally, for CSG's first two years, Gogia devoted a substantial amount of time to the joint venture, CSG-OST, LLC and its pursuit of the FAA's SOMASS contract.[10]  Stmt. ¶¶ 181-82.  This lack of full-time devotion to CSG is, by itself, enough to show he did not control CSG under the VA regulation.  38 C.F.R. § 74.4(c)(3) (2015).

---

[10] Importantly, CSG merely held a 51% ownership stake in CSG-OST, LLC.  Stmt. ¶ 46; *see* 38 C.F.R. § 74.4(c)(3) (2015) ("Work in a wholly-owned subsidiary of the [SDVOSB] may be considered to meet the requirement of full-time devotion" but "[t]his only applies to a subsidiary owned by the [SD]VOSB itself, and not to firms in which the veteran has a mere ownership interest).

Fourth, for at least two years, non-veteran employees of CSG "receive[d] compensation from" CSG that "exceed[ed] the compensation" received by Gogia.  38 C.F.R. § 74.4(g)(3) (2015).  In 2010, Martin Tubb earned $16,923.06 in compensation from CSG, which exceed the $7,500 earned by Gogia.  Stmt. ¶ 122.  In 2011, Parekh directly received $67,884.62 while Gogia's Form W-2 indicates compensation of $65,000.  Stmt. ¶ 200.  Further, in 2011 Parekh also earned at least $272,615.42 in wages from CB Construction after $743,700 was funneled from CSG to CB Construction, while Gogia only claimed $20,168 in CSG income on his 2011 personal tax return.  *Id.*  The fact that Gogia received less compensation in both 2010 and 2011 than other CSG employees, while making no demonstration to the VA why such an arrangement was helpful to CSG, shows a lack of control under the VA regulation.  38 C.F.R. § 74.4(g)(3) (2015).

Even though each of these issues, on their own, would be enough for CSG to be ineligible as an SDVOSB, simply reviewing the record as a whole clearly shows that CSG failed to meet the overarching general requirement that a service-disabled veteran control "both the day-to-day management and long-term decision-making authority" of CSG.  38 C.F.R. § 74.4(a) (2015).  Gogia wholly lacked the experience or ability to operate a construction company working on millions of dollars' worth of jobs simultaneously, especially considering the substantial time Gogia was committing to the SOMASS project which had nothing to do with CSG's management of the SDVOSB Contacts.  Stmt. ¶ 49, 181-82.  In fact, Gogia was judged by Narula and Parekh as being unable to perform satisfactorily even on the single CSG projects where he acted as a site superintendent.  Stmt. ¶¶ 171, 185-88, 194.

The OST Defendants and Parekh decided which jobs to bid on, decided Gogia's compensation and time commitment to CSG, oversaw and managed Gogia as an employee, made Gogia seek their approval to take actions on behalf of CSG, and generally ran the company.  *See*

33

*e.g.*, Stmt. ¶¶ 68, 126-27, 183, 186, 190, 194, 199, 203, 206, 213, 216, 224, 227. The contemporaneous communications between the parties during the relevant time period show that Gogia was subservient at best and, at worst, not even involved in the critical operations of CSG. The e-mails and documents in the record speak for themselves.

When Parekh and CB Construction separated from CSG in late 2012, the dependence CSG previously had on them was clear. CSG and the OST Defendants had to scramble to keep operations running and had to invest heavily to overcome the losses which CSG had incurred, including OST investing at least $295,000 and Madan adding another $165,000. Stmt. ¶¶ 221, 218-22, 231, 233. Further, any income CSG received from the United States that was used to carry on operations following Parekh's departure was the product of CSG's previous fraud. Finally, if the CVE had been aware of the misrepresentations previously made by CSG regarding its SDVOSB compliance, it would have sought debarment, foreclosing the ability for CSG to continue seeking or performing VA SDVOSB set-aside contracts. 38 C.F.R. § 74.2(c) (2015).

The VA has denied SDVOSB status to other entities in similar situations to CSG's here. *See CS-360, LLC v. U.S. Dep't of Veterans Affairs*, 101 F. Supp. 3d 29, 33 (D.D.C. 2015) (affirming the VA's decision to not verify SDVOSB applicant where SDVOSB applicant 1) received initial funding from non-veteran entity; 2) non-veteran entity provided essential resources; and 3) SDVOSB applicant did not have resources to function independently); *Storms v. United States*, Case No. 13-cv-811, 2017 U.S. Dist. LEXIS 95149 (E.D.N.Y June 20, 2017) (upholding the VA's decision to remove a contractor's SDVOSB status because, among other factors, 1) the service-disabled veteran worked for another company during the normal business hours of the supposed SDVOSB; 2) the SDVOSB lacked the necessary number of employees to carry out the contracts it had bid on and been awarded; and 3) arrangements with non-SDVOSB

companies provided the necessary technical and managerial expertise); *BTR Enters. of SC, LLC v. United States*, 140 Fed. Cl. 500 (2018) (upholding the VA's decision to revoke SDVOSB status where service-disabled veteran was not able to operate the business without substantial support from non-veterans). The arrangements found here not only mirror, but go above and beyond, the situation in *CS-360*, where the District Court for the District of Columbia upheld the VA's determination that an entity was not SDVOSB eligible. *CS-360, LLC*, 101 F. Supp. 3d 29. In *CS-360*, the court reviewed the multiple factors considered by the VA when deciding that the SDVOSB applicant, CS-360, LLC ("CS-360"), was not controlled by a service-disabled veteran. *Id.* Specifically, the VA found that CS-360's relationship to a non-veteran entity, B & R Construction Services, LLC ("B & R"), improper. *Id.* at 34-35. B & R provided all the capital for CS-360 and all the minority owners of CS-360 where B & R officers or employees. *Id.* at 34. The structure of the capital relationship in *CS-360*, along with the fact that CS-360 was wholly reliant on B & R's resources to operate, led the VA to conclude B & R could improperly control CS-360. Here, all the capital was provided for CSG by either the OST Defendants or Parekh, in exchange for which they sought a share in CSG's profits and, as explained above, CSG was completely dependent on the OST Defendants, Parekh, and CB Construction to operate.

The VA also found that the relationship between B & R and CS-360 was in violation of the SDVOSB control regulation because CS-360 only had two full time employees and B & R was supposed to furnish all employees necessary for CS-360 to operate. *Id.* at 34. At no point while Parekh was involved did CSG have more than a few employees (with one being Parekh himself), while CB Construction and OST employees carried out substantial operations of behalf of CSG. Stmt. ¶ 60-67, 126-27. Finally, like what occurred here with the contributions on the OST Defendants and Parekh, the VA found that CS-360 receiving essentially free office space and

resources from B & R was substantial proof that non-veterans could control CS-360.  *Id.* at 35; Stmt. ¶¶ 124-25.

Goodweather's lack of control in Citibuilders Solutions is wholly undisputed.  Stmt. ¶¶ 236-74.  Goodweather himself stated that he played no role in Citibuilders Solutions' operations and was unaware of its activities.  Stmt. ¶¶ 242, 246, 249, 264-65.  From Citibuilders Solutions formation in 2010 until after it had already been awarded all its SDVOSB contracts in November 2014, Goodweather did not even have knowledge that Citibuilders Solutions was operational. Stmt. ¶ 270.  Parekh and his employees ran the entire operation and egregiously used Goodweather as its service-disabled veteran front.  Stmt. ¶ 265.

The undisputed material facts clearly show that Gogia and Goodweather did not meet the SDVOSB control requirement for CSG and Citibuilders Solutions to be an eligible SDVOSB.

> ii.   *CSG and Citibuilders Solutions did not qualify as SDVOSBs because Gogia and Goodweather were not their majority owners.*

As a separate requirement, the VA regulations required that an SDVOSB be "at least 51% unconditionally and directly owned" by a service-disabled veteran.  38 C.F.R. § 74.3 (2015).  As part of its ownership determination, the VA regulation stated that the service-disabled veteran purported to own the SDVOSB "must be entitled to receive [a]t least 51 percent of the annual distribution of profits paid to the owners" and the service-disabled veteran's "ability to share in the profits of the concern should be commensurate with the extent of his/her ownership interest in that [SDVOSB]."  *Id.* § 74.3(d)(1) & (5).  Gogia did not "unconditionally and directly" own the required 51% of CSG as the OST Defendants and Parekh all held stakes in CSG as a result of the support, both financial and otherwise, that they provided to CSG.  38 C.F.R. § 74.3 (2015).  The record illustrates that the OST Defendants and Parekh, due to their substantial and critical contributions to CSG, were entitled to equity in, and the profits of CSG, which well exceeded that

36

of Gogia.  Stmt. ¶¶ 91-101, 187-93; 38 C.F.R. § 74.3(d) (2015).   All discussions of an equity split or profit sharing called for CSG Gogia to receive far less than an "unconditional" majority stake of CSG.  Stmt. ¶¶ 91-101.  Further, Parekh, on behalf of his company CB Construction, was able to secure over $1 million from CSG, including $743,700 in the same year that Gogia as the "owner" of CSG only reported receiving $20,168 in CSG profits.  Stmt. ¶ 183, 200.  Despite any assertions in CSG's operating documents otherwise, the facts in the record indicate the OST Defendants and Parekh intended to, and in Parekh's case did, cause CSG profits to be divided amongst themselves in such a way that Gogia would not be entitled to at least a 51% share, much less the required 100% commensurate with his purported ownership interest.  38 C.F.R. § 74.3 (2015).  In fact, a Certified Public Account financial statement prepared for CSG explicitly listed two equity members, with one holding vastly more equity in CSG that is roughly equivalent to Madan's contributions.  Stmt. ¶ 144.

Regarding Citibuilders Solutions, Goodweather was never even aware that Citibuilders Solutions was receiving any income, let only actually collecting any of the over $5 million in SDVOSB set-aside contracts revenue for himself.  Stmt. ¶¶ 264, 261; 38 C.F.R. § 74.3 (2015).  Rather, it was Parekh himself who stated on tax documents that he was the 100% owner of Citibuilders Solutions.  Stmt.  ¶ 262.

2.  CSG and Citibuilders Solutions Repeatedly Certified to the Government that it was an Eligible SDVOSB.

Despite the fact that CSG and Citibuilders Solutions were neither controlled nor majority-owned by Gogia or Goodweather, they repeatedly certified through the required registrations, verification processes, and actual proposals submitted to contracting officers for the SDVOSB Contracts that it was an eligible SDVOSB in compliance with all relevant regulations.  Stmt. ¶ 59, 247, 289; 48 C.F.R. § 819.7003(b) (requiring certifications in bid proposals that the contractor is

an eligible SDVOSB).  Further, the actual payment requisitions submitted by CSG contained an express signed certification stating "[t]he undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents" and the "Contract Documents" stated that the contract could only be awarded to and completed by a qualified SDVOSB.  Stmt. ¶ 235.  Finally, CSG and Citibuilders Solutions were under an affirmative duty to alert the VA if they did not meet the eligibility requirements to be verified as an SDVOSB, which they never did. 38 C.F.R. § 74.15(a) (2015); Stmt. ¶ 8.

### 3.  The Fraudulent Misrepresentations Caused the SDVOSB Contracts to be Awarded.

The fraudulent misrepresentations regarding CSG's and Citibuilders Solutions' SDVOSB compliance necessarily caused the United States to award the SDVOSB Contracts.  *Scollick III*, 2020 U.S. Dist. LEXIS 208604, at *28; *United States v. Honeywell, Inc.*, Case No. 08-0961, 2020 U.S. Dist. LEXIS 221960, at *65 (D.D.C. Nov. 25, 2020) (describing causation in fraud in the inducement cases).  As set-aside contracts, the SDVOSB Contracts could **only** be awarded to eligible SDVOSBs.  38 U.S.C. § 8127(a), (d); 48 C.F.R. §§ 819.7009, 852.219-10(b).  CVE based its verification of CSG as an SDVOSB on Gogia's "representation that (1) he was a service-disabled veteran, (2) one or more veterans owned at least 51% of CSG, and (3) that CSG was controlled by one [or] more veterans as outlined in 38 C.F.R. Part 74."  Stmt. ¶ 59.  CVE based its verification of Citibuilders Solutions on a similar certification.  Stmt. ¶ 258.  Further, CSG and Citibuilders Solutions had to certify their SDVOSB compliance in every bid proposal submitted for the SDVOSB Contracts.  48 C.F.R. § 819.7003(b).  The undisputed facts here show that 1) CSG and Citibuilders Solutions were not controlled or majority-owned by service-disabled veterans; 2) CSG and Citibuilders Solutions were therefore not eligible SDVOSBs; 3) CSG and

Citibuilders Solutions nonetheless represented to the VA that they were eligible; and 4) those misrepresentations induced the VA to award the SDVOSB Contracts.  Therefore, under the fraud in the inducement theory, all claims submitted under the SDVOSB Contracts were false or fraudulent

### B.  Parekh Caused the False Claims Under the SDVOSB Contracts to be Submitted to the United States.

If this Court finds that false claims were in fact submitted by CSG and Citibuilders Solutions under the SDVOSB Contracts then Parekh should be held liable under the FCA for, at the very least, "causing" their submissions.[11]  To be liable for the claims submitted by another party, it must be shown that a party "caused" the submission by examining "the degree to which that party was involved in the scheme that results in the actual submission."  *Scollick I*, 215 F. Supp. 3d at 39 (quoting *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014)).  The proper analysis is to determine if a defendant's conduct was "at least a substantial factor in causing, if not the but-for cause of, submission of false claims."  *Id.* (citing *United States v. Toyobo Co., Ltd.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011)).  Examples of when this standard has been found satisfied is when defendants were "the driving force behind an allegedly fraudulent scheme," "agreed to take certain critical actions in furtherance of the fraud," or "continued to do business with an entity upon becoming aware that the entity was submitting false claims."  *See Tran*, 53 F. Supp. 3d at 126-27.  Here, Parekh's conduct clearly played a substantial role in the submission of CSG's and Citibuilders' false claims.

---

[11] Parekh definitively signed and submitted at least some of the claims for payment under the CSG contracts, and by virtue of his control over Citibuilders Solutions, reasonably submitted all of its claims.  Stmt. ¶ 235.

In hopes of fraudulently obtaining easy profits, Parekh and his company, CB Construction fully operated CSG and without his critical actions, CSG would have ceased to function. *See e.g.*, Stmt. ¶¶ 68, 119-21, 125-27, 171, 186, 191, 193-98, 199, 203, 206, 208-09, 213, 216, 218, 227. In exchange, Parekh was able to take out over a million dollars from CSG, money it had received from the SDVOSB Contracts. Stmt. ¶ 183. Further, Citibuilders Solutions obviously could not have operated without Parekh as Goodweather played no role and Parekh ran the company as his own. Stmt. ¶ 264-65.

The record clearly illustrates that Parekh's conduct was a "substantial factor" in CSG's and Citibuilders Solutions' submission of false claims and without his critical actions, the false claims could never have been submitted. *Scollick I*, 215 F. Supp. 3d at 39. For these reasons, the Court should find that Parekh caused CSG to submit false claims under the SDVOSB Contracts.

## C. Parekh Acted "Knowingly" When Causing the Submission of CSG's False Claims.

The "knowledge" element required for a violation of § 3729(a)(1)(A) is also satisfied here as the undisputed material facts prove that Parekh acted "knowingly." As defined by the FCA, "knowledge" means a party has "actual knowledge of the information," "acts in deliberate ignorance of the truth or falsity of the information," or "acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A); *Escobar*, 136 S. Ct. at 1996; *see United States ex rel. Scutellaro v. Capitol Supply, Inc.*, Case No. 10-1094, 2017 U.S. Dist. LEXIS 49531, at *65 (D.D.C. Apr. 19, 2017) (defining "reckless disregard" as "the refusal to learn of information which an individual, in the exercise of prudent judgment, should have discovered"). In fraud in the inducement cases, the defendant "must have known that the statements inducing the agreement were false." *United States v. DynCorp, Int'l, LLC*, 253 F. Supp. 3d 89, 108 (D.D.C. 2017). Finally, "[p]rotection of the public fisc requires that those who seek public funds act with scrupulous regard

for the requirements of law . . . ." *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) (recognizing also the duty on parties to "familiarize themselves with the legal requirements for payment" when dealing with the United States Government).

Throughout the entire fraud scheme, Parekh knew that CSG and Citibuilders Solutions were seeking, performing, and submitting claims to the United States specifically for SDVOSB set-aside contracts. *See e.g.* Stmt. ¶¶ 50-51, 236-37.  Parekh had actual knowledge of the SDVOSB regulations as demonstrated through his role in CSG's registration and providing the requirements to Goodweather.  Stmt. ¶¶ 50, 51, 54, 237; *Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63 (1984) (recognizing the duty on parties to "familiarize themselves with the legal requirements for payment" when dealing with the United States Government); *Mackby*, 261 F.3d at 828.  Finally, Parekh had knowledge that CSG and Citibuilders Solutions were not in compliance with the SDVOSB regulations because their non-compliance was in large part a direct consequence of Parekh's control and ownership over CSG and Citibuilders Solutions.  *See supra* Section II.A.1.

As no genuine issue of material fact exists regarding the FCA § 3729(a)(1)(A) claims, the Court should grant Relator's motion for summary judgment and find Parekh liable under the FCA for every claim for payment submitted by CSG and Citibuilders Solutions to the United States Government under the SDVOSB Contracts.

### D.  PAREKH VIOLATED SECTION 3729(a)(1)(B)

The FCA also imposes liability under § 3729(a)(1)(B) on any party who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The undisputed material facts and arguments previously advanced which support liability under § 3729(a)(1)(A) also support liability against Parekh under § 3729(a)(1)(B) for causing CSG and Citibuilders Solutions to make or use a false

record or statement.  Further, the materially false statements made by Parekh to the United States regarding CSG's and Citibuilders Solutions' past performance are also violations under § 3729(a)(1)(B).  The elements needed for a § 3729(a)(1)(b) violation are: "(1) the defendant made, used, or caused to be made or used, a false record or statement to the government, (2) the record or statement was false or fraudulent, (3) the record or statement was material to a false or fraudulent claim, and (4) the defendant knew the record or statement was false." *Scollick III*, 2020 U.S. Dist. LEXIS 208604, at *20.

The false statements and records made or created by CSG and Citibuilders Solutions which supported the misrepresentations that they were eligible SDVOSBs all separately represent § 3729(a)(1)(B) violations.  These include the certifications CSG and Citibuilders Solutions made that they were in compliance with the SDVOSB regulations when verifying their SDVOSB status with the VA, the certifications of SDVOSB status in the bid proposals submitted for the SDVOSB Contracts, and all certifications on CSG's and Citibuilders Solutions' claims for payment to the VA that CSG complied with the contractual requirements.  Stmt. ¶ 59, 235, 247 289; 48 C.F.R. § 819.7003(b).  All these false statements and records were made or created in order to obtain the SDVOSB Contracts and submit the claims under the SDVOSB Contracts.  As discussed above, these false statements and records were clearly material as the SDVOSB Contracts would not have been awarded without them and they were made knowingly.  The same actions described above by Parekh which were a substantial factor in the fraud scheme that resulted in the submission of false claims, were likewise a substantial factor in the creation and use of these false statements or records by CSG and Citibuilders Solutions.

Further, the CSG and Citibuilders Solutions bid proposals submitted to the VA for the SDVOSB Contracts contained materially false statements about CSG's and Citibuilders Solutions'

past performance as well as a host of other false statements.  Stmt.  ¶¶ 277-293.  CSG and

Citibuilders Solutions possessed no past performance but yet claimed multiple examples of work

it had supposedly completed to meet the mandatory past performance requirements needed to bid

on and be awarded the VA SDVOSB Contracts.  Stmt. ¶¶ 278-79, 290-92.  The past performance

examples in CSG's and Citibuilders Solutions' bid proposals were also fraudulently altered to fit

the requirements of each contract.  Stmt. ¶¶ 280-87, 290-92.  Parekh himself was in charge of

including the false statements in the bid proposals.  Stmt. ¶¶ 264, 287.

As there are no genuine issues of material facts related to Parekh's violations of FCA §

3729(a)(1)(B), the Court should grant Relator's motion for summary judgment with respect to

these claims.

### E.  DAMAGES

The damages sustained by the United States as a result of Parekh's FCA violations are

equal to the total amount the United States paid out under the SDVOSB Contracts, specifically

$12,438,512.   Under the FCA, a party "is liable to the United States Government for . . . 3 times

the amount of damages which the Government sustains because of the act of that person."  31

U.S.C. § 3729(a).  As this Court has already held in this case when confronted with arguments by

defendants to the contrary:

> [A]lthough the government may not have experienced a financial loss, it still
> experienced a loss according to Circuit precedent, which states that "where the
> defendant fraudulently sought payments for participating in programs designed to
> benefit third-parties rather than the government itself, the government can easily
> establish that it received nothing of value from the defendant and that all payments
> made are therefore recoverable as damages."  *United States v. Sci. Applications
> Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010).  The intended third party
> beneficiaries here are actual SDVOSBs who are eligible for SDOVSB set aside
> contracts.  The Amended Complaint alleges that CSG and Citibuilders—who did
> not qualify as SDOVSBs—sought payment for contracts awarded pursuant to this
> SDVOSB set aside program.  Thus, it has sufficiently alleged that the government
> received nothing of value here.

*Scollick II*, 2017 U.S. Dist. LEXIS 119530, at *54; *see* Hudson Opposition, ECF No. 133 at 16-17 (arguing that government suffered no loss because the construction underlying the SDVOSB Contracts was completed.).  This holding still controls and is fully supported by case law and statutory authority.

Courts have routinely found that the United States suffers a complete loss where FCA violations fraudulently (1) divert taxpayer dollars from intended third party beneficiaries in a government program or (2) subvert the purpose of a statute.  *See SAIC*, 626 F.3d at 1279; *United States v. Rogan*, 517 F.3d 449, 453 (7th Cir. 2008) (assessing FCA damages based on the totality of federal healthcare dollars reimbursed even though "most of the patients for which claims were submitted received some medical care—perhaps all the care reflected in the claim forms"); *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 90 (2d Cir. 2021) (recognizing that in a situation where "the government bargained for something qualitatively, but not quantifiably, different from what it received" and "the government was paying for a program that was not at all as specified" the damages are equal to the full amount paid); *United States v. Mackby*, 939 F.3d 1013, 1018-19 (9th Cir. 2003); *United States ex rel. Liotine v. CDW Gov't, Inc.*, Case No. 05-33-DRH, 2012 U.S. Dist. LEXIS 94837, at *32-33 (S.D. Ill. July 10, 2012) (holding that when a company knowingly violates the Trade Agreement Act by selling the United States goods from a non-compliant country, the FCA damages are equal to the full cost paid out by the United States even if the United States received sufficient quality goods).  Congress itself codified the belief that the damages in set-aside contracting fraud cases are presumed to be the entirety of what was paid when it explicitly included in the Small Business Act that:

> In every contract . . . which is set aside, reserved, or otherwise classified as intended
> for award to small business concerns, there shall be a presumption of loss to the
> United States based on the total amount expended on the contract . . . whenever it

is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation.

15 U.S.C. § 632(w).

Here, Congress intended the funds paid out under the SDVOSB Contracts to go to only to actual SDVOSBs. 38 U.S.C. § 8127(a), (d).  Congress took the steps to repeatedly pass and amend statutes to bolster the number of contracts awarded to SDVOSBs.  *Kingdomware Techs., Inc.*, 136 S. Ct. at 1973-74.  With this background, it is clear that when entering into the SDVOSB Contracts, the United States did not simply bargain for construction work, but rather it bargained for construction work performed by an eligible SDVOSB.  The fact that an SDVOSB would perform the work was the heart of what the United States sought when entering the SDVOSB Contracts.  It did not receive the benefit of that bargain.  Rather, the fraudulent inducement to award CSG and Citibuilders Solutions the SDVOSB Contracts wholly prevented the United States from getting the services it bargained for.

The total amount paid out by the United States under the SDVOSB Contracts is easily ascertainable at $12,438,512.  Stmt. ¶ 234, 266.  When trebled, the total damages for the false claims submitted under the SDVOSB Contracts should be found to be $37,315,536.[12]

## CONCLUSION

For the foregoing reasons, Relator's Motion for Partial Summary Judgment Against Defendant Neil Parekh should be granted.

Respectfully submitted,

/s/ Michael D. Kohn
Michael Kohn, DC BAR #425617

---

[12] Relator is also concurrently seeking summary judgment against other defendants in this case besides Parekh.  Therefore, any other defendants whose FCA violations also resulted in all or a portion of the $37,315,536 sought against Parekh should be held jointly and severally liable for the amount of those damages correlated to their violations.

_/s/ Todd Yoder_____
Todd Yoder, DC BAR # 1048520
David K. Colapinto, DC BAR #416390

KOHN, KOHN & COLAPINTO, LLP
1710 N Street, N.W.
Washington, D.C. 20036
Phone: (202) 342-6980
Fax: (202) 342-6984
_Attorneys for Plaintiff-Relator_

February 24, 2021

## **APPENDIX**

The following pages contain the 2015 versions of the VA SDVOSB regulations relied upon in this brief.

**2015 38 CFR 74.1**

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF  >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS  >  PART 74--VETERANS SMALL BUSINESS REGULATIONS  >  GENERAL GUIDELINES*

## § 74.1 What definitions are important for VetBiz Vendor Information Pages (VIP) Verification Program?

For the purposes of part 74, the following definitions apply.

Center for Veterans Enterprise (CVE) is an office within the U.S. Department of Veterans Affairs (VA) and is a subdivision of VA's Office of Small and Disadvantaged Business Utilization. The CVE helps veterans interested in forming or expanding their own small businesses. It also helps VA contracting offices identify veteran-owned small businesses and works with the Small Business Administration's Veterans Business Development Officers and Small Business Development Centers nationwide regarding veterans' business financing, management, and technical assistance needs.

Days are calendar days. In computing any period of time described in part 74, the day from which the period begins to run is not counted, and when the last day of the period is a Saturday, Sunday, or Federal holiday, the period extends to the next day that is not a Saturday, Sunday, or Federal holiday. Similarly, in circumstances where CVE is closed for all or part of the last day, the period extends to the next day on which the agency is open.

Day-to-day management means supervising the executive team, formulating sound policies and setting strategic direction.

Day-to-day operations mean the marketing, production, sales, and administrative functions of the firm.

Eligible individual means a veteran, service-disabled veteran or surviving spouse, as defined in this section.

Immediate family member means father, mother, husband, wife, son, daughter, brother, sister, grandfather, grandmother, grandson, granddaughter, father-in-law, and mother-in-law.

Joint venture is an association of two or more small business concerns to engage in and carry out a single, specific business venture for joint profit, for which purpose they combine their efforts, property, money, skill, or knowledge, but not on a continuing or permanent basis for conducting business generally. For VA contracts, a joint venture must be in the form of a separate legal entity.

Negative control includes, but is not limited to, instances where a minority shareholder has the ability, under the concern's chapter, by-laws, or shareholder's agreement, to prevent a quorum or otherwise block action by the board of directors or shareholders.

Non-veteran means any individual who does not claim veteran status, or upon whose status an applicant or participant does not rely in qualifying for VetBiz Vendor Information Pages (VIP) Verification Program participation.

Office of Small and Disadvantaged Business Utilization is the office within the Department of Veterans Affairs that establishes and monitors small business program goals at the prime and subcontract levels and which functions as the ombudsman for veterans and service-disabled veterans seeking procurement opportunities with the Department.

Participant means a veteran-owned small business concern that has verified status in the VetBiz Vendor Information Pages database.

2015 38 CFR 74.1

Primary industry classification means the six-digit North American Industry Classification System (NAICS) code designation which best describes the primary business activity of the participant. The NAICS code designations are described in the North American Industry Classification System (NAICS) Manual published by the U.S. Office of Management and Budget.

Principal place of business means the business location where the individuals who manage the concern's day-to-day operations spend most working hours and where top management's current business records are kept. If the office from which management is directed and where the current business records are kept are in different locations, CVE will determine the principal place of business for program purposes.

Same or similar line of business means business activities within the same three-digit "Major Group" of the NAICS Manual as the primary industry classification of the applicant or participant. The phrase "same business area" is synonymous with this definition.

Service-disabled veteran is a veteran who possesses either a disability rating letter issued by the Department of Veterans Affairs, establishing a service-connected rating between 0 and 100 percent, or a disability determination from the Department of Defense.

Service-disabled veteran-owned small business concern is a business not less than 51 percent of which is owned by one or more service-disabled veterans, or in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more service-disabled veterans; the management and daily business operations of which are controlled by one or more service-disabled veterans, or in the case of a veteran with a permanent and severe disability, a spouse or permanent caregiver of such veteran. In addition, some businesses may be owned and operated by an eligible surviving spouse. Reservists or members of the National Guard disabled from a disease or injury incurred or aggravated in line of duty or while in training status also qualify.

Small business concern is-- CVE applies the small business concern definition established by 48 CFR 2.101.

Surviving spouse is any individual identified as such by VA's Veterans Benefits Administration and listed in its database of veterans and family members. To be eligible for VetBiz VIP Verification, the following conditions must apply:

**(1)** If the death of the veteran causes the small business concern to be less than 51 percent owned by one or more veterans, the surviving spouse of such veteran who acquires ownership rights in such small business shall, for the period described in paragraph (2) of this definition, be treated as if the surviving spouse were that veteran for the purpose of maintaining the status of the small business concern as a service-disabled veteran-owned small business.

**(2)** The period referred to in paragraph (1) of this definition is the period beginning on the date on which the veteran dies and ending on the earliest of the following dates:

**(i)** The date on which the surviving spouse remarries;

**(ii)** The date on which the surviving spouse relinquishes an ownership interest in the small business concern;

**(iii)** The date that is 10 years after the date of the veteran's death; or

**(iv)** The date on which the business concern is no longer small under Federal small business size standards.

**(3)** The veteran must have had a 100 percent service-connected disability or died as a direct result of a service-connected disability.

Note to definition of surviving spouse: For program eligibility purposes, the surviving spouse has the same rights and entitlements of the service-disabled veteran who transferred ownership upon his or her death.

Unconditional ownership means ownership that is not subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on or assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or

incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms.

VA is the U.S. Department of Veterans Affairs.

Vendor Information Pages (VIP) is a database of businesses eligible to participate in VA's Veteran-owned Small Business Program. The online database may be accessed at no charge via the Internet at http://www.VetBiz.gov.

Verification eligibility period is a 12-month period that begins on the date the Center for Veterans Enterprise issues the approval letter establishing verified status. The participant must submit a new application each year to continue eligibility.

VetBiz.gov (VetBiz) is a Web portal VA maintains at http://www.VetBiz.gov. It hosts the Vendor Information Pages database.

Veteran is a person who served on active duty with the U.S. Army, Air Force, Navy, Marine Corps or Coast Guard, for any length of time and at any place and who was discharged or released under conditions other than dishonorable. Reservists or members of the National Guard called to Federal active duty or disabled from a disease or injury incurred or aggravated in line of duty or while in training status also qualify as a veteran.

Veteran-owned small business concern (VOSB) is a small business concern that is not less than 51 percent owned by one or more veterans, or in the case of any publicly owned business, not less than 51 percent of the stock of which is owned by one or more veterans; the management and daily business operations of which are controlled by one or more veterans and qualifies as "small" for Federal business size standard purposes. All service-disabled veteran-owned small business concerns (SDVOSBs) are also, by definition, veteran-owned small business concerns. When used in these guidelines, the term "VOSB" includes SDVOSBs.

Veterans Affairs Acquisition Regulation (VAAR) is the set of rules that specifically govern requirements exclusive to the U.S. Department of Veterans Affairs (VA) prime and subcontracting actions. The VAAR is chapter 8 of title 48, Code of Federal Regulations, and supplements the Federal Acquisition Regulation (FAR), which contains guidance applicable to most Federal agencies.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 76 FR 3017, 3022, Jan. 19, 2011]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS

Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

*End of Document*

# 2015 38 CFR 74.2

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF > CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS > PART 74-- VETERANS SMALL BUSINESS REGULATIONS >  GENERAL GUIDELINES*

## § 74.2 What are the eligibility requirements a concern must meet for VetBiz VIP Verification Program?

**(a)**Ownership and control. A small business concern must be unconditionally owned and controlled by one or more eligible veterans, service-disabled veterans or surviving spouses, have completed the online Vendor Information Pages database forms at http://www.VetBiz.gov, and has been examined by VA's Center for Veterans Enterprise. Such businesses appear in the VIP database as "verified."

**(b)**Good character. Veterans, service-disabled veterans and surviving spouses with ownership interests in VetBiz verified businesses must have good character. Debarred or suspended concerns or concerns owned or controlled by debarred or suspended persons are ineligible for VetBiz VIP Verification.

**(c)**False Statements. If, during the processing of an application, CVE determines that an applicant has knowingly submitted false information, regardless of whether correct information would cause CVE to deny the application, and regardless of whether correct information was given to CVE in accompanying documents, CVE will deny the application. If, after verifying the Participant's eligibility, CVE discovers that false information has been knowingly submitted by a firm, CVE will remove the "verified" status from the VIP database and notify the business by phone and mail. Whenever CVE determines that the applicant submitted false information, the matter will be referred to the Office of Inspector General for review. In addition, the CVE will request that debarment proceedings be initiated by the Department.

**(d)**Federal financial obligations. Neither a firm nor any of its eligible individuals that fails to pay significant financial obligations owed to the Federal Government, including unresolved tax liens and defaults on Federal loans or other Federally assisted financing, is eligible for VetBiz VIP Verification.

**(e)  U.S.**Small Business Administration (SBA) Protest Decisions. Any firm registered in the VetBiz VIP database that is found to be ineligible due to an SBA protest decision or other negative finding will be immediately removed from the VetBiz VIP database. Until such time as CVE receives official notification that the firm has proven that it has successfully overcome the grounds for the determination or that the SBA decision is overturned on appeal, the firm will not be eligible to participate in the 38 U.S.C. 8127 program.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010]

2015 38 CFR 74.2

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**End of Document**

# 2015 38 CFR 74.3

2015 Code of Federal Regulations Archive

*LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF  >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS  >  PART 74-- VETERANS SMALL BUSINESS REGULATIONS  >  GENERAL GUIDELINES*

## § 74.3 Who does the Center for Veterans Enterprise (CVE) consider to own a veteran-owned small business?

An applicant or participant must be at least 51 percent unconditionally and directly owned by one or more veterans or service-disabled veterans.

**(a)**Ownership must be direct. Ownership by one or more veterans or service-disabled veterans must be direct ownership. An applicant or participant owned principally by another business entity or by a trust (including employee stock ownership plans [ESOP]) that is in turn owned by one or more veterans or service-disabled veterans does not meet this requirement. However, ownership by a trust, such as a living trust, may be treated as the functional equivalent of ownership by a veteran or service-disabled veteran where the trust is revocable, and the veteran or service-disabled veteran is the grantor, a trustee, and the sole current beneficiary of the trust. For employee stock ownership plans where 5 or fewer persons who are individuals, estates, or trusts own 50 percent or more of the total combined voting power of the corporation, the employee plan will be determined to be "excluded stock" and eligible parties must control 51 percent or more of the combined voting power of the corporation. For employee stock ownership plans where greater than 5 persons who are individuals, estates, or trusts own 50 percent or more of the total stock, eligible parties must control 51 percent or more of the combined voting power of the corporation, including the ESOP stock.

**(b)**Ownership must be unconditional. Ownership by one or more veterans or service-disabled veterans must be unconditional ownership. Ownership must not be subject to conditions precedent, conditions subsequent, executory agreements, voting trusts, restrictions on assignments of voting rights, or other arrangements causing or potentially causing ownership benefits to go to another (other than after death or incapacity). The pledge or encumbrance of stock or other ownership interest as collateral, including seller-financed transactions, does not affect the unconditional nature of ownership if the terms follow normal commercial practices and the owner retains control absent violations of the terms. In particular, CVE will evaluate ownership according to the following criteria for specific types of small business concerns.

**(1)**Ownership of a partnership. In the case of a concern that is a partnership, at least 51 percent of every class of partnership interest must be unconditionally owned by one or more veterans or service-disabled veterans. The ownership must be reflected in the concern's partnership agreement.

**(2)**Ownership of a limited liability company. In the case of a concern that is a limited liability company, at least 51 percent of each class of member interest must be unconditionally owned by one or more veterans or service-disabled veterans.

**(3)**Ownership of a corporation. In the case of a concern that is a corporation, at least 51 percent of each class of voting stock outstanding and 51 percent of the aggregate of all stock outstanding must be unconditionally owned by one or more veterans or service-disabled veterans.

**(c)**Stock options' effect on ownership. In determining unconditional ownership, CVE will disregard any unexercised stock options or similar agreements held by veterans or service-disabled veterans. However, any unexercised stock options or similar agreements (including rights to convert non-voting stock or debentures into voting stock) held by non-veterans will be treated as exercised, except for any ownership interests that are held by investment companies licensed under part 107 of title 13, Code of Federal Regulations.

**(d)**Profits and distributions. One or more veterans or service-disabled veterans must be entitled to receive:

>   **(1)**At least 51 percent of the annual distribution of profits paid to the owners of a corporate, partnership, or LLC applicant or participant;

>   **(2)**At least 51 percent of the net profits earned by a joint venture in which the applicant or participant is the lead concern;

>   **(3)**100 percent of the value of each share of stock owned by them in the event that the stock is sold; and

>   **(4)**At least 51 percent of the retained earnings of the concern and 100 percent of the unencumbered value of each share of stock owned in the event of dissolution of the corporation, partnership, or LLC.

>   **(5)**An eligible individual's ability to share in the profits of the concern should be commensurate with the extent of his/her ownership interest in that concern.

**(e) Change of ownership.**

>   **(1)**A participant may remain eligible after a change in its ownership or business structure, so long as one or more veterans or service-disabled veterans own and control it after the change and the participant files a new application identifying the new veteran owners or their new business interest.

>   **(2)**Any participant that is performing contracts and desires to substitute one veteran owner for another shall submit a proposed novation agreement and supporting documentation in accordance with FAR Subpart 42.12 to the contracting officer prior to the substitution or change of ownership for approval.

>   **(3)**Where the transfer results from the death or incapacity due to a serious, long-term illness or injury of an eligible principal, prior approval is not required, but the concern must file a new application with contracting officer and CVE within 60 days of the change. Existing contracts may be performed to the end of the instant term. However, no options may be exercised.

>   **(4)**Continued eligibility of the participant with new ownership and the award of any new contracts require that CVE verify all eligibility requirements are met by the concern and the new owners.

**(f)**Community property laws given effect. In determining ownership interests when an owner resides in any of the community property States or territories of the United States, CVE considers applicable State community property laws. If only one spouse claims veteran status, that spouse's ownership interest will be considered unconditionally held only to the extent it is vested by the community property laws.

# Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

# History

2015 38 CFR 74.3

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 76 FR 3017, 3022, Jan. 19, 2011]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**End of Document**

# 2015 38 CFR 74.4

2015 Code of Federal Regulations Archive

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF  >  CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS  >  PART 74-- VETERANS SMALL BUSINESS REGULATIONS  >  GENERAL GUIDELINES***

## § 74.4 Who does CVE consider to control a veteran-owned small business?

**(a)**Control means both the day-to-day management and long-term decision-making authority for the VOSB. Many persons share control of a concern, including each of those occupying the following positions: Officer, director, general partner, managing partner, managing member and manager. In addition, key employees who possess expertise or responsibilities related to the concern's primary economic activity may share significant control of the concern. CVE will consider the control potential of such key employees on a case-by-case basis.

**(b)**Control is not the same as ownership, although both may reside in the same person. CVE regards control as including both the strategic policy setting exercised by boards of directors and the day-to-day management and administration of business operations. An applicant or participant's management and daily business operations must be conducted by one or more veterans or service-disabled veterans. Individuals managing the concern must have managerial experience of the extent and complexity needed to run the concern. A veteran need not have the technical expertise or possess a required license to be found to control an applicant or participant if he or she can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise. However, where a critical license is held by a non-veteran having an equity interest in the applicant or participant firm, the non-veteran may be found to control the firm.

**(c)**

**(1)**An applicant or participant must be controlled by one or more veterans or service-disabled veterans who possess requisite management capabilities. Owners need not work full-time but must show sustained and significant time invested in the business. An owner engaged in employment or management outside the applicant concern must submit a written statement supplemental to the application which demonstrates that such activities will not have a significant impact on the owner's ability to manage and control the applicant concern. Applications from joint-ventures are exempt from the requirement to submit a supplemental written statement.

**(2)**An eligible full-time manager must hold the highest officer position (usually President or Chief Executive Officer) in the applicant or participant.

**(3)**One or more veterans or service-disabled veteran owners who manage the applicant or participant must devote full-time to the business during the normal working hours of firms in the same or similar line of business. Work in a wholly-owned subsidiary of the applicant or participant may be considered to meet the requirement of full-time devotion. This applies only to a subsidiary owned by the VOSB itself, and not to firms in which the veteran has a mere ownership interest.

**(4)**Except as provided in paragraph (f)(1) of this section, a veteran owner's unexercised right to cause a change in the management of the applicant concern does not in itself constitute veteran control, regardless of how quickly or easily the right could be exercised.

**(d)**In the case of a partnership, one or more veterans or service-disabled veterans must serve as general partners, with control over all partnership decisions. A partnership in which no veteran is a general partner will be ineligible for participation.

2015 38 CFR 74.4

**(e)**In the case of a limited liability company, one or more veterans or service-disabled veterans must serve as management members, with control over all decisions of the limited liability company.

**(f)**One or more veterans or service-disabled veterans must control the board of directors of a corporate applicant or participant.

**(1)**CVE will deem veterans or service-disabled veterans to control the board of directors where:

**(i)**A single veteran owns 100 percent of all voting stock of an applicant or participant concern;

**(ii)**A single veteran owns at least 51 percent of all voting stock of an applicant or participant, the individual is on the board of directors and no super majority voting requirements exist for shareholders to approve corporation actions. Where supermajority voting requirements are provided for in the concern's articles of incorporation, its by-laws, or by State law, the veteran must own at least the percent of the voting stock needed to overcome any such supermajority voting requirements; or

**(iii)**No single veteran owns 51 percent of all voting stock but multiple veterans in combination do own at least 51 percent of all voting stock, each such veteran is on the board of directors, no supermajority voting requirements exist, and the veteran shareholders can demonstrate that they have made enforceable arrangements to permit one of them to vote the stock of all as a block without a shareholder meeting. Where the concern has supermajority voting requirements, the veteran shareholders must own at least that percentage of voting stock needed to overcome any such supermajority ownership requirements.

**(2)**Where an applicant or participant does not meet the requirements set forth in paragraph (f)(1) of this section, the veteran(s) upon whom eligibility is based must control the board of directors through actual numbers of voting directors or, where permitted by state law, through weighted voting (e.g., in a concern having a two-person board of directors where one individual on the board is a veteran and one is not, the veteran vote must be weighted--worth more than one vote--in order for the concern to be eligible for VetBiz VIP Verification). Where a concern seeks to comply with this paragraph:

**(i)**Provisions for the establishment of a quorum cannot permit non-veteran directors to control the board of directors, directly or indirectly;

**(ii)**Any executive committee of the board of directors must be controlled by veteran directors unless the executive committee can only make recommendations to and cannot independently exercise the authority of the board of directors.

**(3)**Non-voting, advisory, or honorary directors may be appointed without affecting veterans' or service-disabled veterans' control of the board of directors.

**(4)**Arrangements regarding the structure and voting rights of the board of directors must comply with applicable state law.

**(g)**Non-veterans may be involved in the management of an applicant or participant, and may be stockholders, partners, limited liability members, officers, or directors of the applicant or participant. With the exception of a spouse or personal caregiver who represents a severely disabled veteran owner, no such non-veteran or immediate family member may:

**(1)**Exercise actual control or have the power to control the applicant or participant;

**(2)**Be a former employer or a principal of a former employer of any affiliated business of the applicant or participant, unless it is determined by the CVE that the relationship between the former employer or principal and the eligible individual or applicant concern does not give the former employer actual control or the potential to control the applicant or participant and such relationship is in the best interests of the participant firm; or

**(3)**Receive compensation from the applicant or participant in any form as directors, officers or employees, including dividends, that exceeds the compensation to be received by the highest officer

A-11

(usually chief executive officer or president). The highest ranking officer may elect to take a lower salary than a non-veteran only upon demonstrating that it helps the applicant or participant.

**(h)**Non-veterans who transfer majority stock ownership or control of the firm to an immediate family member within 2 years prior to the application and remain involved in the firm as a stockholder, officer, director, or key employee of the firm are presumed to control the firm. The presumption may be rebutted by showing that the transferee has independent management experience necessary to control the operation of the firm, and indeed is participating in the management of the firm.

**(i)**Non-veterans or entities may be found to control or have the power to control in any of the following circumstances, which are illustrative only and not all inclusive:

**(1)**Non-veterans control the board of directors of the applicant or participant, either directly through majority voting membership, or indirectly, where the by-laws allow non-veterans effectively to prevent a quorum or block actions proposed by the veterans or service-disabled veterans.

**(2)**A non-veteran or entity, having an equity interest in the applicant or participant, provides critical financial or bonding support or a critical license to the applicant or participant which directly or indirectly allows the non-veteran significantly to influence business decisions of the participant, unless an exception is authorized by the Office of Small and Disadvantaged Business Utilization.

**(3)**A non-veteran or entity controls the applicant or participant or an individual veteran owner through loan arrangements. Providing a loan guaranty on commercially reasonable terms does not, by itself, give a non-veteran or entity the power to control a firm.

**(4)**Business relationships exist with non-veterans or entities which cause such dependence that the applicant or participant cannot exercise independent business judgment without great economic risk.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 75 FR 80720, Dec. 23, 2010; 76 FR 3017, 3023, Jan. 19, 2011]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**End of Document**

# 2015 38 CFR 74.15

2015 Code of Federal Regulations Archive

***LEXISNEXIS' CODE OF FEDERAL REGULATIONS  >  TITLE 38 -- PENSIONS, BONUSES, AND VETERANS' RELIEF > CHAPTER I -- DEPARTMENT OF VETERANS AFFAIRS > PART 74-- VETERANS SMALL BUSINESS REGULATIONS > APPLICATION GUIDELINES***

## § 74.15 What length of time may a business participate in VetBiz VIP Verification Program?

**(a)**A participant receives an eligibility term of 2 years from the date of CVE's approval letter establishing verified status. The participant must maintain its eligibility during its tenure and must inform CVE of any changes that would adversely affect its eligibility. The eligibility term may be shortened by cancellation by CVE or voluntary withdrawal by the participant (i.e., no longer eligible as a small business concern), as provided for in this subpart.

**(b)**When at least 50 percent of the assets of a concern are the same as those of an affiliated business, the concern will not be eligible for verification.

**(c)**CVE may initiate a verification examination whenever it receives credible information calling into the question a participant's eligibility as a VOSB. Upon its completion of the examination, CVE will issue a written decision regarding the continued eligibility status of the questioned participant.

**(d)**If CVE finds that the participant does not qualify as a VOSB, the procedures at § 74.22will apply.

**(e)**If CVE finds that the participant continues to qualify as a VOSB, the program term remains in effect.

## Statutory Authority

**AUTHORITY NOTE APPLICABLE TO ENTIRE PART:**

38 U.S.C. 501, 513, and as noted in specific sections.

## History

[73 FR 29024, 29026, May 19, 2008, as confirmed and revised at 75 FR 6098, 6101, Feb. 8, 2010; 77 FR 38181, 38183, June 27, 2012, as confirmed at 78 FR 52085, 52087, Aug. 22, 2013]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2021, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

End of Document