IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex. Rel. ANDREW SCOLLICK ) ) ) | |
| Plaintiff, ) | |
| ) | |
| v. ) ) | Civil Action No. 1:14-cv-01339 Assigned to: The Honorable Royce C. Lamberth |
| VIJAY NARULA, *et al.* ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT THE HANOVER INSURANCE
<u>COMPANY'S MOTION FOR SUMMARY JUDGMENT</u>**

Robert G. Barbour, Esq. (admitted *pro hac vice*)
Hanna Lee Blake, Esq. (D.C. Bar No. 992512)
Matthew D. Baker, Esq. (D.C. Bar. No. 1024946)
WATT, TIEDER, HOFFAR &
 FITZGERALD, L.L.P.
1765 Greensboro Station Place
Suite 1000
McLean, VA  22102
Facsimile:  703-893-8029
rbarbour@watttieder.com
hblake@watttieder.com
mbaker@watttieder.com

*Counsel for Defendant The Hanover
 Insurance Company*

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................... 1

II.    STATEMENT OF MATERIAL FACTS ................................................................. 3

III.   LEGAL STANDARD ............................................................................................... 3

IV.   ARGUMENT ............................................................................................................ 4

     A.       HANOVER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INDIRECT PRESENTMENT CLAIMS ..................................... 4

          1.      Plaintiff Failed to Raise a Triable Issue as to Hanover's Knowledge of CSG's Alleged Fraud. ....................................... 5

              a.     Plaintiff failed to produce any evidence whatsoever of Hanover's actual knowledge of CSG's alleged fraud. .................. 6

                  i.     Plaintiff's interrogatory responses failed to identify evidence of Hanover's actual knowledge ......................... 6

                  ii.    Plaintiff's deposition testimony failed to identify evidence of Hanover's actual knowledge. ....................... 7

                  iii.   Plaintiff failed to produce evidence that Hanover ever even saw the SDVOSB regulations or CSG's technical proposals. ........................................................... 8

              b.     Plaintiff failed to produce any evidence whatsoever of Hanover's constructive knowledge of CSG's alleged fraud. .......... 9

                  i.     Plaintiff cannot demonstrate that Hanover owed the government a duty in connection with its underwriting ................................................................... 11

                  ii.    Plaintiff cannot demonstrate that Hanover had a duty to inquire under the common law or relevant statutes ....................................................................... 13

          2.      Plaintiff Failed to Raise a Triable Issue as to Hanover's Causation of CSG's Alleged Fraud. ............................................... 14

              a.     Plaintiff cannot demonstrate that Hanover was the proximate cause of CSG's alleged fraud ..................................... 15

              b.     Plaintiff cannot demonstrate that Hanover was "aware" of CSG's alleged fraud. ..................................................... 16

          3.      Plaintiff Failed to Raise a Triable Issue with Regard to its Fraud in the Inducement Theory of Falsity against Hanover. .............................. 19

     B.       HANOVER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S REVERSE FALSE CLAIMS. .................................................... 24

## TABLE OF CONTENTS
(continued)

**Page**

1. Plaintiff Failed to Raise a Triable Issue as to Hanover's Obligation to Pay Money to the Government ............................................................ 25

    a. Plaintiff failed to produce evidence of a performance default by CSG, let alone a basis on which CSG had to be terminated ................................................................................... 25

    b. Plaintiff cannot prove the type of obligation necessary to give rise to liability for a reverse false claim. ............................. 27

        i. Plaintiff cannot prove a non-contingent obligation under Hanover's Miller Act bonds. .................................. 28

        ii. Plaintiff cannot prove an obligation to pay or transmit money or property to the government ............... 29

2. Plaintiff Failed to Raise a Triable Issue as to Hanover's Knowing Concealment or Avoidance of an Obligation........................................... 31

C. HANOVER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S CONSPIRACY CLAIM................................................. 32

1. Plaintiff Failed to Raise a Triable Issue as to the Existence of an Underlying Violation of the FCA. .......................................................... 34

2. Plaintiff Failed To Raise A Triable Issue as to the Existence of an Agreement to violate the FCA. ................................................................ 34

3. Plaintiff Failed to Raise a Triable Issue as to the Existence of Damages Suffered by the Government. .................................................... 36

D. HANOVER IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S RIGHT TO RECOVER ACTUAL Damages.............................. 37

1. Plaintiff Failed to Raise a Triable Issue as to Whether the Government Sustained any Actual Damages............................................. 38

    a. Plaintiff cannot demonstrate that the government received no tangible benefit from CSG's performance. ............................ 40

    b. Plaintiff cannot demonstrate that the government received less than what it bargained to receive. ......................................... 42

2. Plaintiff Failed to Raise a Triable Issue as to the Amount of any Actual Damages Sustained by the Government........................................ 43

V. CONCLUSION................................................................................................ 45

**MEMORANDUM IN SUPPORT OF DEFENDANT THE HANOVER INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Defendant The Hanover Insurance Company ("Hanover") respectfully submits this Memorandum in Support of its Motion for Summary Judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

## I.   INTRODUCTION

This case was originally brought by relator Andrew Scollick ("Plaintiff") against eighteen corporate and individual defendants for violations of the False Claims Act ("FCA") in connection with an alleged scheme to obtain set-aside government construction contracts through fraudulent means.  As it relates to Hanover, Plaintiff's lawsuit seeks to hold a Miller Act surety liable under the FCA for its statutorily-prescribed role in providing bonding for Defendant Centurion Solutions Group, LLC ("CSG"), a registered set-aside contractor publicly listed in the database of verified service-disabled veteran-owned small business ("SDVOSB") concerns maintained by the United States Department of Veterans Affairs ("VA").  Plaintiff's lawsuit against Hanover appears to be the first of its kind ever filed in the United States.

Plaintiff's initial attempt to pursue Hanover under the FCA fell short at the pleading stage, as the Court dismissed Plaintiff's original Complaint against Hanover for failure to state a cause of action. [ECF 123]. Among other important findings, the Court held that while bonding is a necessary step in bidding for government construction contracts, "this does not mean that the issuance of bonds caused the submission of false claims or statements." *Id.* at 19.  To revive his dismissed claims, Plaintiff amended his Complaint to assert a handful of fabricated "facts" regarding Hanover's underwriting.  The Court took particular note of an allegation regarding the occurrence of a tour of Defendant OST's offices "the purpose of which was to ascertain the organizational structure, history, and financial capacity of CSG" [ECF 169, ¶ 176; ECF 298, ¶ 182] – an allegation for which Plaintiff has now admitted he has no evidentiary support.  *See* Statement of Undisputed Material Facts ("S.M.F."), ¶¶ 45-46.

Based upon the new and fabricated allegations in Plaintiff's Amended Complaint, the

Court held that Plaintiff had sufficiently *alleged* that Hanover continued to do business with CSG "upon becoming aware" that CSG was submitting false claims. [ECF 160, pp. 28-29].  After more than a year of floundering through discovery, however, Plaintiff has failed to identify any evidence whatsoever upon which a reasonable jury could find that Hanover had even constructive knowledge of any of the alleged fraud on CSG's part.  In fact, Plaintiff failed in discovery to establish that any employee of Hanover ever saw or had any familiarity with the regulatory requirements it alleges CSG violated, let alone had sufficient knowledge and understanding of those requirements to appreciate whether a violation had occurred – rendering it impossible for Plaintiff to establish Hanover possessed the requisite knowledge to establish liability under the FCA.

At the heart of Plaintiff's case against Hanover lies the novel and wholly unsupported theory that a surety conducts its underwriting process for the benefit of the government, and that as such, a Miller Act surety owes the government a duty to investigate the possibility of set-aside fraud by the contractor and bring any resulting suspicions to the government's attention.  Here, every bond issued by Hanover in favor of CSG followed the VA's award of a set-aside contract to CSG based upon CSG's verified participation in the VA's SDVOSB program.   No court in any jurisdiction in the country has ever held that a surety has a duty to look behind such an award or to determine whether a bonded contractor's verification and participation in a set-aside program is compliant with the regulatory requirements for participation before issuing a bond. In fact, sureties owe no such duty to the government or to any other third party.

While the Court held that Plaintiff stated *facially plausible* claims against Hanover that were sufficient to withstand dismissal at the pleadings stage, those claims died on the vine during discovery.  As discussed in more detail below, not only has Plaintiff failed to establish any basis for the fabricated allegations used to revive his originally dismissed Complaint, but he has also failed to raise a triable issue with regard to multiple essential elements of his FCA causes of action, including whether Hanover had the requisite *scienter* or knowledge of the alleged fraud

on the part of CSG and whether Hanover "caused" CSG to submit false or fraudulent claims. Plaintiff also failed during discovery to produce evidence of so much as a dollar in actual damages suffered by the government in connection with the alleged false claims. To the contrary, the evidence produced during discovery shows conclusively that the government received the full intended benefit under every contract that the government awarded to CSG and got exactly what it bargained for. Plaintiff's failure to raise triable issues with regard to these required elements of his causes of action entitles Hanover to judgment as a matter of law.

## II.   STATEMENT OF MATERIAL FACTS

Pursuant to Fed. R. Civ. Pro. 56(c)(1)(A) and LCvR 7(h)(1), Hanover incorporates the accompanying Statement of Material Facts by reference, as if fully set forth herein.

## III.   LEGAL STANDARD

"Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment when the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law."   *United States ex rel. K&R Ltd. P'ship. v. Massachusetts Hous. Fin. Agency*, 456 F. Supp.2d 46, 53 (D.D.C. 2006) (*aff'd* 530 F.3d 908 (D.C. Cir. 2008)) (*citing Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 247 (1986.)).   "The moving party bears the initial burden of demonstrating the absence of a genuine issue over a material fact."   *Id.* at 54 (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986.)).   "A disputed issue of material fact is genuine and therefore precludes summary judgment where the Court determines that a reasonable jury could conceivably find in favor of the non-moving party on that factual issue." *Id.* (*citing Anderson*, 477 U.S. at 248).

As this Court has made clear, "[s]ummary judgment is also appropriate when, 'after adequate time for discovery,' the nonmoving party 'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential

element of the nonmoving party's case necessarily renders all other facts immaterial." *United States ex rel. Barko v. Halliburton Co.*, 241 F.Supp.3d 37, 49 (D.D.C. 2017) (citation omitted).

IV.   <u>**ARGUMENT**</u>

    A.   **HANOVER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S INDIRECT PRESENTMENT CLAIMS.**

Count I of Plaintiff's Second Amended Complaint alleges that Hanover "knowingly presented or caused to be presented false or fraudulent claims for payment or approval by the Government" in violation of 31 U.S.C. §3729(a)(1)(A). [ECF 298, ¶ 216]. Count II alleges that Hanover "knowingly made, used or caused to be made or used [] false records and statements . . . to obtain payments from federal government agencies" in violation of 31 U.S.C. §3729(a)(1)(B). [ECF 298, ¶ 230]. As the Court has recognized, Plaintiff does not allege that Hanover directly presented false claims or made false statements to the government. Instead, with regard to Hanover, Plaintiff "relies on a theory of indirect presentment." [ECF 160, p. 25].

To prevail at trial on his indirect presentment claims, Plaintiff will bear the burden to prove that Hanover caused a false claim or false statement to be presented to the government, that the claim or statement was false, and that Hanover knew the claim or statement was false.[1] *See United States ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287 (D.C. Cir. 2015) (citing *United States ex. Rel. Davis v. District of Columbia*, 73 F.3d 120, 124 (D.C. Cir 2015.). After over a year of discovery, Plaintiff has failed to amass evidence sufficient for any reasonable jury to find that Hanover violated the FCA. Plaintiff's evidence on his indirect presentment claims against Hanover falls short on two critical elements: *knowledge* and *causation*. Each of these

---

[1] A false statement action under §3729 (a)(1)(B) is said to be "complementary" to a false claim action brought under §3729 (a)(1)(A), as the former is "designed to prevent those who make false records or statements [in order] to get claims paid or approved from escaping liability solely on the grounds that they did not *themselves* present a claim for payment or approval." *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 502 (D.C. Cir. 2004) (emphasis in original). For this reason, the elements of a cause of action brought under §3729 (a)(1)(B), and the corresponding burden of proof that a plaintiff bears, are practically identical to the to the elements of and burden of proof for a cause of action brought under §3729 (a)(1)(A). *See United States ex rel. Folliard v. CDW Technology Services, Inc.,* 722 F. Supp.2d 20, 36 (D.C. Cir. 2010).

failings is discussed in turn below.

> **1.**   **Plaintiff Failed to Raise a Triable Issue as to Hanover's *Knowledge* of CSG's Alleged Fraud.**

To be liable under the FCA, a defendant must have made the false claims or statements *knowingly*.   *Purcell*, 807 F.3d at 287 (*citing United States ex. Rel Folliard v. Gov't Acquisitions, Inc.,* 764 F.3d 19, 29 (D.C. Cir. 2014.); *United States ex rel. K&R Ltd. P'ship. v. Massachusetts Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008).   An entity acts *knowingly* under the False Claim Act by "(1) having actual knowledge, (2) acting in deliberate ignorance, or (3) acting in reckless disregard." *Id.*   (*citing* 31 U.S.C. § 3729(b)).   Although no specific intent to defraud is required on the part of the alleged violator, courts have held that "[t]he FCA's *scienter* requirement should be strictly enforced."   *See United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9 (D.D.C. 2014), *on reconsideration in part*, 160 F. Supp. 3d 253 (D.D.C. 2016), *and clarified on denial of reconsideration*, 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016).   "While scienter under the FCA is necessarily a fact-intensive inquiry, summary judgment is appropriate where plaintiff produces no evidence sufficient to support a finding of the requisite scienter." *K&R Ltd. P'ship*, 456 F. Supp.2d at 61 (internal quotation marks and citation omitted).   At bottom, "for a *qui tam* FCA action to survive summary judgment, the relator must provide 'sufficient evidence to support an inference of knowing fraud.'" *United States ex rel. Bettis v. Oderbrecht Contractors of California, Inc.*, 297 F.Supp.2d at 272 at 277-278 (D.D.C. 2004) (*quoting United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1995)).

Plaintiff's allegations regarding Hanover's "knowledge" fall into two distinct categories, both of which center upon Plaintiff's "fraudulent inducement theory" of liability.   First, Plaintiff alleges that Hanover knew, but failed to disclose, that CSG did not qualify for SDVOSB status prior to the Government's award of the contracts. [ECF 298, ¶ 197]   Second, Plaintiff alleges that CSG's technical proposals to the VA included materially false statements [ECF 298, ¶ 89] and that Hanover "would have known that the proposals submitted in the name of CSG in

furtherance of the CSG conspiracy knowingly misled the government as to the true ownership and control over CSG and that CSG did not qualify for SDVOSB status." [ECF 298, ¶ 197]. Plaintiff's allegations regarding Hanover's pre-bid knowledge regarding CSG's qualifications as an SDVOSB, coupled with Hanover's knowledge of the "false and fraudulent nature of the bids and technical proposals" serve as the basis for Plaintiff's allegation that Hanover fraudulently induced the government into awarding contracts.  [ECF 298, (Count I, ¶ 224; Count II, ¶ 236].

As set forth below, summary judgment is appropriate as to Counts I and II of the Second Amended Complaint because Plaintiff failed during discovery to produce any evidence of the required *scienter* element of his cause of action, *i.e.*, that Hanover had actual knowledge of CSG's alleged fraud or acted in deliberate ignorance or with reckless disregard of CSG's alleged fraud.

### a.      Plaintiff failed to produce any evidence whatsoever of Hanover's *actual knowledge* of CSG's alleged fraud.

Actual knowledge, as that concept is defined in the FCA, "goes after subjective knowledge." *United States ex rel. Hockett v. Columbia Healthcare Corp.*, 498 F.Supp.2d 25, 58 (D.D.C. 2007).  During discovery, Hanover probed Plaintiff on the evidence supporting the allegations in the Second Amended Complaint, including specifically what evidence Plaintiff has regarding Hanover's knowledge of the alleged fraud by CSG.

### i.      Plaintiff's interrogatory responses failed to identify evidence of Hanover's actual knowledge.

In that regard, Hanover's Interrogatory No. 1 to Plaintiff asked that Plaintiff identify any and all evidence demonstrating how Hanover "*knowingly* facilitated the fraud scheme and *knowingly* caused false claims to be submitted to the government." (S.M.F. ¶ 47) (emphasis added).  Hanover's interrogatory goes to the heart of the *scienter* element of Plaintiff's causes of action and required that Plaintiff identify the evidence on which Plaintiff intends to rely at trial to meet his burden of proof on this critical element of his FCA claims against Hanover.  Plaintiff's initial response to Hanover's Interrogatory No. 1 was completely non-substantive, referencing

generally "the documents and communications being produced alongside these interrogatory responses" and Plaintiff's "personal knowledge accumulated through his employment with the relevant entities." (S.M.F. ¶ 48).   After Plaintiff's counsel received a meet and confer letter advising that Plaintiff's interrogatory responses were generally deficient, Plaintiff supplemented his responses, (S.M.F. ¶ 49), but Plaintiff's supplemental response to Hanover's Interrogatory No. 1 consisted of nothing more than a narrative of conclusory allegations, none of which could be considered evidence. (S.M.F. ¶ 50).   While Plaintiff's supplemental interrogatory response did identify a handful of documents, 13 in total, that Plaintiff deemed "to be the most important in relation to Hanover," none of those documents reflect that any employee of Hanover (or anybody else) had actual, subjective knowledge of any false statement or regulatory violation by CSG. (S.M.F. ¶¶ 51-52).   Plaintiff never provided any further supplementation to his interrogatory responses, essentially conceding that Plaintiff has no evidence that Hanover knew about any fraud or regulatory non-compliance on the part of CSG.

### ii.   Plaintiff's deposition testimony failed to identify evidence of Hanover's actual knowledge.

During his deposition, Plaintiff Andrew Scollick was asked specifically about the evidence supporting his allegations regarding Hanover's knowledge of the fraud alleged in Plaintiff's complaint.    While Plaintiff asserted in conclusory fashion that Hanover had "actual knowledge" of CSG's fraud, and even went so far as to identify Courtney Seed, a former Hanover underwriter, as the individual who possessed the "actual knowledge," (S.M.F. ¶ 38), Plaintiff was unable to identify *any* evidence that reflected the requisite actual, subjective knowledge of the falsity of any statement made by CSG or any claim submitted by CSG. Instead, Plaintiff testified that his allegation was based on Ms. Seed's  awareness of certain facts, namely: (1) non-specific "ownership details;" (2) that Hanover obtained indemnity from Vijay Narula; and (3) the existence of a "million dollar set-aside" in order to obtain bonding.  (S.M.F. ¶ 39).   None of these "facts" asserted by Plaintiff is evidence of Ms. Seed having subjective

knowledge that any statement made by CSG or any claim submitted by CSG was false or fraudulent.   Despite this, Plaintiff testified repeatedly, without further explanation, that knowledge of these "facts" gave Ms. Seed "actual knowledge" of the fraud alleged.  Plaintiff failed in discovery to produce any evidence to support this conclusory testimony.

Ultimately, and as reflected in the Second Amended Complaint, Plaintiff's FCA claims against Hanover come down to nothing more than Plaintiff's assertion that Hanover somehow:

> . . . facilitated these fraud schemes *by obtaining facts* that [Hanover] knew or should have known violated the government's contracting requirements, but [Hanover] not only concealed those facts from the government, [Hanover] also issued surety bonds to CSG [ ], which gave the misleading appearance that CSG [ ] [was] qualified to bid on these SDVOSB construction contracts.

[ECF 298, ¶ 204] (Italics added).

During discovery, however, Plaintiff failed to identify *any* evidence that Ms. Seed or any other Hanover employee had actual, subjective knowledge of a false statement or fraudulent claim made by CSG.

### iii. Plaintiff failed to produce evidence that Hanover ever even saw the SDVOSB regulations or CSG's technical proposals.

Under no circumstances can Plaintiff raise a triable issue whether Ms. Seed, or any individual employed by Hanover, had actual knowledge within the first category of knowledge alleged in the Second Amended Complaint, *i.e.,* that CSG violated the VA's SDVOSB regulations. In addition to his failure to identify evidence of Hanover's subjective knowledge of the alleged regulatory violations, Plaintiff failed to establish during discovery that any individual employed by Hanover ever saw, or had any familiarity with, the VA's SBVOSB requirements, let alone had sufficient knowledge and understanding of those requirements to make a determination whether a violation had occurred.   To the contrary, every current or former Hanover employee examined by Plaintiff's counsel in deposition testified, or has subsequently affirmed by way of declaration, that she or he has never seen the relevant SDVOSB requirements

and has no familiarity with their substance. (S.M.F. ¶¶ 40-42). Thus, the evidence produced by Plaintiff is insufficient to support even an inference that Hanover had actual, subjective knowledge of CSG's alleged regulatory violations.

Nor can Plaintiff raise a triable issue whether Hanover had actual knowledge within the second category of knowledge alleged in the Second Amended Complaint, *i.e.,* that CSG's technical proposals contained materially false statements. Again, in addition to his failure to identify any evidence of Hanover's subjective knowledge of any false statement, Plaintiff failed to establish during discovery that Hanover, or anyone employed by Hanover, ever saw even one of CSG's technical proposals. In fact, every witness examined by Plaintiff's counsel in deposition testified, or has subsequently affirmed by way of declaration, that she or he never saw, let alone reviewed substantively, any of CSG's technical proposals. (S.M.F. ¶¶ 43-44). As such, Plaintiff has failed to produce evidence sufficient to support even an inference that Hanover had actual, subjective knowledge of the allegedly false and fraudulent statements included in CSG's technical proposals.

Unable to produce any evidence of Hanover's actual knowledge of CSG's alleged fraud, Plaintiff instead relies on Hanover's knowledge of facts, primarily relating to the structure of CSG's ownership and the control and operation of CSG as a company, which Plaintiff maintains *should have alerted* Hanover to CSG's submission of false statements in its technical proposals and CSG's regulatory violations. As discussed below, this argument is legally untenable and unsupported by evidence and is equally unavailing.

> **b.    Plaintiff failed to produce any evidence whatsoever of Hanover's *constructive knowledge* of CSG's alleged fraud.**

The "knowing" requirement under the FCA can also be established on the basis of constructive knowledge, where a person: (1) acts in *deliberate ignorance* of the truth or falsity of the information; or (2) acts in *reckless disregard* of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A)(ii)-(iii). While the FCA identifies these two forms of constructive

knowledge, federal courts have almost exclusively focused on the latter (*i.e.,* reckless disregard) to establish liability, presumably because deliberate ignorance and actual knowledge both require that a plaintiff provide proof of the defendant's state of mind, whereas reckless disregard does not. *United States v. Krizek*, 111 F.3d 934, 941-42 (D.C. Cir. 1997) (holding that reckless disregard is an "extreme version of ordinary negligence" that "may be established without reference to the subjective intent of the defendant"). Thus, reckless disregard presents the lowest threshold showing for a plaintiff to establish a defendant's liability under the FCA. *See K&R Ltd. P'ship*, 530 F.3d at 983 (noting that to oppose summary judgment the plaintiff must show that a reasonable factfinder could find the defendant "at least recklessly disregarded the falsity of its claims."); *see also United States ex rel. Streck v. Allegan, Inc.,* 894 F.Supp.2d 584, 600 n.11 (E.D. Pa 2012) (noting that reckless disregard "is the floor for the required mental state for a FCA claim."). Here, if Plaintiff cannot meet his burden in opposing summary judgment to raise a triable issue whether Hanover acted in reckless disregard to CSG's alleged fraud, he could never meet the higher threshold showing to establish that Hanover's actions amounted to deliberate ignorance.

With regard to Plaintiff's burden of proof, reckless disregard under the FCA is "an extension of gross negligence." *United States ex rel. Davis v. District of Columbia*, 793 F.3d 120 (D.C. 2015) (*quoting Krizek*, 111 F.3d at 942) In the District of Columbia and this Circuit, in order for a plaintiff to prove liability for any level of negligence, it must show that: "(1) the defendant owed a duty of care to the plaintiff, (2) the defendant breached that duty, and (3) the breach of duty proximately caused damage to the plaintiff." *Tolu v. Ayodeji*, 945 A.2d 596, 601 (D.C. 2008) (citation omitted); *see also Renchard v. Prince William Marine Sales, Inc.*, 87 F.Supp.3d 271, 281-82 (D.D.C. 2015) (citation omitted) ("The foundation of modern negligence

10

law is the existence of a duty owed by the defendant to the plaintiff.").  The question of "whether a defendant owes a duty to a plaintiff under a particular set of circumstances is entirely a question of law . . ." *Tolu,* 945 A.2d at 601 (citation omitted).

### i.    Plaintiff cannot demonstrate that Hanover owed the government a duty in connection with its underwriting.

Here, Plaintiff's allegations regarding Hanover's knowledge of CSG's alleged fraud center on the underwriting and due diligence "engaged in by the Bonding Defendants," which "would reasonably have revealed" or that "reasonably led to the conclusion" that CSG failed to comply with the regulatory requirements of the VA's SDVOSB program. [ECF 298, ¶¶ 184-188]. To overcome summary judgment on his FCA claims, Plaintiff must show that a reasonable factfinder could find that Hanover "at least recklessly disregarded the falsity" of CSG's statements and claims.  *K&R Ltd. P'ship*, 530 F.3d at 983.  In connection with such a showing, Plaintiff must necessarily demonstrate that Hanover owed some duty to the government that it violated to the government's detriment.[2]  As discussed below, however, Hanover's underwriting and due diligence efforts were not for the benefit of the government, and Hanover owed no duty to the government or to any third-party to educate its employees as to the regulatory requirements of the VA's SDVOSB program, let alone to look behind the VA's verification of CSG into its program and to verify whether CSG qualified for SDVOSB status.  As such, Plaintiff cannot meet his burden to overcome summary judgment as a matter of law.

In *ZP No. 54 Limited Partnership v. Fidelity and Deposit Company of Maryland*, 917 So.2d 368 (Fla. 5th DCA 2005), a Florida District Court of Appeal specifically addressed an argument nearly identical to the one that underpins Plaintiff's FCA causes of action against

---

[2] This Court has recognized that a plaintiff's burden in establishing constructive knowledge under the FCA includes demonstrating the existence of a duty.  *See K&R Ltd. P'ship*, 456 F. Supp.2d at 62.

11

Hanover.   There, a property owner sued the surety that bonded a general contractor after discovering a fraudulent bid-rigging scheme involving the general contractor and the owner's designated representative.   *Id.* at 369.   The owner argued that, at the time it issued the bonds, the surety knew or should have known that the contractor was a sham construction company, not licensed, and not at all bondable.   *Id.* at 370. The owner further argued that the surety's underwriting did not meet the standard of care typically employed by surety underwriters and that several "red flags" should have tipped the surety off to the fraudulent activity.   *Id.* at 371. The trial court granted summary judgment in favor of the surety, and the owner appealed.

The District Court of Appeal upheld the trial court's grant of summary judgment in favor of the surety, specifically on the grounds that the surety *owed no duty* to the owner in connection with its underwriting or issuance of the bonds.   *Id.* at 371.   In so ruling, the District Court of Appeal noted that the surety's function was "to issue performance bonds, and to pay on the bonds if properly called upon to do so.   *It was not in the business of supplying information to third parties about the qualifications of the general contractor....*"   *Id.* at 373 (emphasis added). The District Court of Appeal also held that "[c]ompanies that issue performance bonds undertake their underwriting and make risk decisions *for their own purposes[,]" id.* (emphasis added), and that the owner "was not privileged to rely on the thoroughness or reasonability of the underwriting." *Id.* at 374.   The District Court of Appeal's ruling in *ZP No. 54* is consistent with a line of federal court decisions that have held that third parties have no right to rely on the underwriting efforts of a surety or insurer.   *See, e.g., National Union Fire Insurance Company of Pittsburgh v. Eaton, Jr.*, 701 F.Supp. 1031, 1034 (S.D.N.Y. 1988) (holding that the research efforts of an insurer were undertaken "solely for its own purposes" and that it assumed no obligation to inform others of the results*); National Union Fire Insurance Company of*

*Pittsburgh v. Arioli,* 941 F.Supp. 646, 656 (E.D. Mich. 1996) (granting summary judgment on a plaintiff's negligence claim against a surety on the basis that the surety owed the plaintiff no duty in connection with its underwriting).

> ii.    **Plaintiff cannot demonstrate that Hanover had a duty to inquire under the common law or relevant statutes.**

Here, the "underwriting process" and "due diligence" engaged in by Hanover was solely for Hanover's benefit, and Hanover owed no duty, to the government or to any other third party, to inquire regarding the accuracy of any statement made by CSG in its technical proposals to the VA or educate its underwriters on the regulatory requirements of the VA's SDVOSB program and to investigate CSG's compliance with those requirements.  Importantly, neither the common law, nor any of the various statutes referenced in Plaintiff's Second Amended Complaint creates or even recognizes the existence of such a duty on the part of the surety.[3]  As a matter of law to be determined by the Court, Hanover owed no duty to the government either to review and verify the accuracy of CSG's proposals to the VA or to verify CSG's status in the SDVOSB program in connection with its underwriting process.  Similarly, and again as a matter of law, Hanover owed no duty to the government even to review the regulatory requirements for participation in the VA's SDVOSB program, let alone to develop an understanding of those requirements sufficient to verify whether the VA accurately determined that a contractor's participation in the program is

---

[3] Plaintiff's Second Amended Complaint asserts that Hanover's bonds were issued pursuant to the requirements of the Miller Act, 40 U.S.C § 3131 (ECF 298, ¶¶ 171, 173). The Miller Act is silent, however, with regard to any duty owed by the surety to the government in connection with the surety's underwriting function.  Similarly, the Second Amended Complaint cites at length to both the Small Business Administration's SDVO SBC regulations at 13 C.F.R. §125, Subpart B and the VA's SDVOSB regulations at 48 C.F.R. § 852.219-10 (ECF 298, ¶27).  Neither of those regulations reflects that a surety's underwriting is for the benefit of the government or recognizes that a surety owes the government a duty in connection with its underwriting and due diligence.

statutorily compliant.[4]  As such, Plaintiff cannot meet his burden in opposing summary judgment

to raise a triable issue whether Hanover acted in reckless disregard to any of CSG's alleged fraud.

For all the reasons set forth above, Plaintiff has not and cannot raise a triable issue

regarding Hanover's knowledge of either CSG's alleged submission of false and fraudulent

statements in its technical proposals to the VA or CSG's alleged failure to satisfy the

requirements of the VA's SDVOSB program.  This complete failure of proof on the essential

*scienter* element of Plaintiff's FCA causes of action renders all other facts immaterial and

entitles Hanover to judgment on Counts I and II of Plaintiff's Second Amended Complaint as a

matter of law.  *Barko*, 241 F.Supp.3d at 49 (*citing Celotex*, 477 U.S. at 322).

### 2. Plaintiff Failed to Raise a Triable Issue as to Hanover's *Causation* of CSG's Alleged Fraud.

In connection with the causes of action set out in Counts I and II of the Second Amended

Complaint, Plaintiff "relies on a theory of indirect presentment." [ECF 160, p. 25]. To prevail at

trial on his indirect presentment causes of action, Plaintiff will bear the burden to prove that

Hanover *caused* CSG to present a false claim or a false statement to the government. The Court

has previously summarized the standards for determining *causation* in the context of indirect

presentment or false statements claims:

> To determine whether a defendant who did not actually submit a claim or make a
> false statement "has 'caused' the submission of a false claim or false statement, a
> court must look at the degree to which that party was involved in the scheme that
> results in the actual submission." *United States ex rel. Tran v. Computer Scis.
> Corp.,* 53 F.Supp. 3d 104, 127 (D.D.C. 2014).  Courts should therefore consider

---

[4] Surety underwriting involves financial risk assessment, not legal analysis.  A finding by the
Court that a Miller Act surety has a duty to read, understand and apply all of the highly technical
and complex laws and regulations regarding eligibility for government set-aside programs would
radically alter the fundamental nature of surety underwriting and would impose a never-before-
recognized, substantial and burdensome obligation on sureties, with the likely unintended
consequence of  making it less desirable for sureties to bond set-aside contractors.

whether the plaintiff has alleged that the defendant's conduct was "at least a substantial factor in causing, if not the but-for cause of, submission of false claims." [*United States v. Toyobo Co., Ltd.,* 811 F. Supp. 2d 37, 48 (D.D.C. 2011)]. Courts have credited indirect presentment and false statement claims in the following circumstances: "when the non-submitting party takes advantage of an unwitting intermediary, thereby causing that party to submit a false claim;" when "the non-submitter was the driving force behind an allegedly fraudulent scheme;" when "they had agreed to take certain critical actions in furtherance of the fraud;" and when the "non-submitter continued to do business with an entity upon becoming aware that that entity was submitting false claims." *Tran,* 53 F.Supp. 3d at 126-27.

[ECF 160, pp 7-8] [internal parenthetical omitted, brackets in original].

### a. Plaintiff cannot demonstrate that Hanover was the proximate cause of CSG's alleged fraud.

It is worth noting that both the *Tran* decision and the *Toyobo* decision cited by the Court pre-date the United States Supreme Court's decision in *Universal Health Services, Inc. v. United States ex rel. Escobar*, in which the Supreme Court explained that Congress intended to "retain[] all [] elements of common-law fraud" in the FCA. *Escobar,* 136 S. Ct. 1989, 1999 n.2 (2016). In the wake of *Escobar*, and based upon the common law standards governing fraud, this Court has recognized that both the "substantial factor" standard and the "but-for" standard understate "the stringency of the FCA's causation standard." *Cimino v. Int'l Bus. Machines Corp.,* No. 13-CV-00907 (APM), 2019 WL 4750259 (D.D.C. Sept. 30, 2019), *6 (On Appeal).  As the *Cimino* court noted in the specific context of indirect presentment claims, "[t]he clear weight of authority among the circuit courts is that the element of causation for an FCA claim requires a showing that the alleged false statement is not only the actual, or but-for, cause of the government harm, but also the legal, or proximate, cause of the loss.  *Id.* (*citing United States v. Luce*, 873 F.3d 999, 1009-14 (7th Cir 2017) (surveying cases and joining the Third and Fifth Circuits in adopting the "proximate cause" standard) *and United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 491 (3rd Cir. 2017) ("the causation element cannot be met by merely showing 'but for'

causation")).  Whether the *Toyobo* standard previously articulated by the Court understates the FCA's standards for proving causation in indirect presentment cases is immaterial to the present case, however, as Plaintiff failed in discovery to produce evidence sufficient to overcome summary judgment even under that less stringent standard.

As the Court noted when it allowed Plaintiff's claims to move past the pleadings stage, Plaintiff *alleged* facts sufficient to fit into one of the circumstances in which courts have acknowledged or credited causation in connection with false statements and indirect presentment claims.  Specifically, the Court found that Plaintiff had sufficiently alleged that the insurance defendants "had *knowledge*" that CSG was fraudulently asserting status as an SDVOSB, and that "given this *knowledge*," the Amended Complaint sufficiently alleged that defendants continued to do business with CSG even though they "*were aware*" that CSG was committing fraud. [ECF 160, pp. 27-28 (emphasis added)].

> **b.**     **Plaintiff cannot demonstrate that Hanover was "aware" of CSG's alleged fraud.**

As an initial matter, the word "aware" connotes actual, subjective knowledge as opposed to constructive knowledge through a "should have known" standard.  *See* "aware." *Meriam-Webster.com.*, https://www.merriam-webster.com (last accessed February 23, 2021) ("having or showing realization, perception, or knowledge").   This is consistent with both of the cases relied upon by the *Tran* court, which reflect that to find causation in an indirect presentment case the non-submitter must have *actual knowledge* of the falsity of the statement or claim submitted.  An analysis of the facts and the relevant holdings of those two cases clearly reflects the requirement of *actual knowledge*.

In the first case, *United States ex rel. Long v. SCS Bus. & Technical Inst.*, 999 F. Supp. 78 (D.D.C. 1998), the plaintiff alleged that the State of New York and high-level officials *caused*

false claims to be submitted by failing to act on knowledge of the submitter's fraudulent conduct. The plaintiff in *Long* served as a coordinator of investigations for the Bureau of Proprietary School Supervision ("BPSS") that supervised school programs for the State of New York Department of Education.  *Id.* at 81. The plaintiff directed an investigation that he alleged uncovered a variety of fraudulent policies and acts by a company, SCS Business and Technical Institute, Inc. ("SCS"), which was involved in federal programs for student financial assistance. Following the investigation, the BPSS and SCS entered into a settlement, to which the plaintiff objected, and SCS continued to perform work for the State of New York and receive federal funding.  *Id.* at 81-82.

Among other allegations, the plaintiff in *Long* alleged that New York officials, including his supervisor at BPSS, *knew* that the scope of the settlement reached with SCS understated the fraud and *knew* that the fraud committed by SCS was occurring on a broader scale. *Id.* Plaintiff further alleged that New York officials indicated to the federal government through the settlement that there was no evidence of widespread fraud or involvement of SCS management, even though they "*knew* this was false." *Id.* at 82.  In analyzing whether the plaintiff had sufficiently pled causation (*i.e.,* "whether New York's alleged failure to act was a course of conduct that allowed fraudulent claims to be submitted to the government"), the district court in *Long* specifically pointed to the plaintiff's allegation that "as a result of the findings of his investigations, New York knew that SCS was presenting false claims and that it did not stop SCS from doing so." *Id.* at 91.  There is no discussion in *Long* regarding constructive knowledge or of facts through which New York "should have known" about SCS's fraud.  Thus, the *Long* decision relied upon by the *Tran* court stands for the proposition that a defendant's continued

business relations with the submitter of false statements or claims can amount to causation where the defendant has *actual, subjective knowledge* of the falsity to those statements or claims.

The second case relied upon by the *Tran* court, *United States v. President and Fellows of Harvard College*, 323 F.Supp.2d 151 (D. Mass. 2004), involved a government-sponsored project run by Harvard to assist Russia in developing capital markets and foreign investments. *Id.* at 159. Harvard's contract with the government barred employees assigned to the project from certain business and investment activities that could give rise to real or apparent conflicts of interest. *Id.* Among other defendants, the government brought FCA claims against two senior advisory figures who the government alleged knowingly violated the contract's conflict of interest provisions. *Id.* These violations, the government argued, resulted in false certifications that *caused* Harvard to submit false claims for payment to the government. *Id.*

In its discussion whether the senior advisory figures could be liable under an indirect presentment theory, the *Harvard College* court pointed to the D.C. District Court's decision in *Long*, *supra*, for the following proposition:

> Where the defendant has an ongoing business relationship with a repeated false claimant, and the defendant *knows* of the false claims, *yet does not cease doing business with the claimant or disclose the false claims to the United States*, the defendant's ostrich-like behavior itself becomes a 'course of conduct that allowed fraudulent claims to be presented to the federal government.' *United States ex. Rel Long v. SCS Bus. & Tech. Inst.*, 999 F. Supp. 78, 91 (D.D.C. 1998), *rev'd on other grounds*, 173 F.3d 870 (D.C. Cir. 1999), *amended*, 173 F.3d 890, *cert. denied.*, 530 U.S. 1202 (2000).

323 F.Supp.2d at 187 (emphasis added). For a defendant with an ongoing business relationship with a repeated false claimant to take affirmative, responsive action (*i.e.,* to cease doing business with the claimant or to make a disclosure regarding the false claims to the government), that defendant would necessarily have to have actual, subjective knowledge that false claims were being submitted. Nothing in the *Harvard College* decision stands for the proposition that

18

constructive knowledge under a "should have known" standard could result in a continued business relationship with a wrongdoer *causing* the submission of false statements or claims.

Here, the Court allowed Plaintiff's Amended Complaint to move forward based upon allegations from which Hanover's actual knowledge of CSG's false statements and false claims could be inferred. The record developed in discovery and supplemented by the declarations accompanying this Motion, however, reflects that Hanover did not have, nor could it have had, actual knowledge of CSG's alleged wrongdoing. Based upon the evidence of record, Plaintiff cannot, as a matter of law, meet his burden to prove that Hanover *caused* CSG to present false statements or claims to the government. Because Plaintiff has not and cannot raise a triable issue regarding Hanover's *causation* of CSG's alleged fraud, Hanover is entitled to judgment on Counts I and II of Plaintiff's Second Amended Complaint as a matter of law.

### 3.    Plaintiff Failed to Raise a Triable Issue with Regard to its *Fraud in the Inducement Theory of Falsity* against Hanover.

As the Court has recognized, the *theory of falsity* that underpins Counts I and II of Plaintiff's Second Amended Complaint rests on Plaintiff's contention that the defendants, including Hanover, *fraudulently induced the VA* to enter into the contracts in question with CSG. [ECF 311, p. 16]. Where a plaintiff bases an FCA claim on fraud in the inducement, the plaintiff bears the burden to prove that theory of falsity as to each individual defendant. *See, e.g., United States ex rel. Westrick v. Second Chance Body Armor,* 266 F.Supp.3d 110, 126 (D.D.C. 2017) (determining in the context of contracts to sell bulletproof vests to the government that FCA liability could attach to a *vest material supplier* based upon its knowing omission of negative testing data materially relevant to the government's contracting decisions but that no liability could attach to the *vest manufacturer* who had no knowledge of the testing data). Thus, to prevail at trial on the indirect presentment claims set forth in Counts I and II of his Second

Amended Complaint, Plaintiff will bear the burden to prove that: i) Hanover knowingly made a false representation or omission (*i.e.,* concealed material facts known to Hanover) during the procurement process; and ii) that the VA was "induced by, or relied upon, the fraudulent statement or omission when it awarded a contract . . ." *Id.* at 125 (*citing United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 18 (D.D.C. 2015)). The second prong of the burden of proof focuses on *causation*, and this Court has recognized that a plaintiff pursuing an FCA claim on a fraud in the inducement theory bears the burden to show that an individual defendant's conduct *caused* the government to award the contract at issue. *Id.* at 129.

In connection with its efforts to shoehorn Hanover into a procurement process in which it played no role, Plaintiff alleges first that Hanover knew, but *concealed from the government*, that CSG did not qualify for SDVOSB status prior to the government's award of each contract. [ECF 298, ¶ 204]. Second, Plaintiff alleges that CSG's technical proposals to the VA included materially false statements [ECF 298, ¶ 89] and that Hanover "would have known that the proposals submitted in the name of CSG in furtherance of the CSG conspiracy knowingly misled the government as to the true ownership and control over CSG and that CSG did not qualify for SDVOSB status." [ECF 298, ¶ 197]. While this second allegation does not specifically allege Hanover's failure to disclose what it allegedly "would have known," there is no allegation in Plaintiff's Second Amended Complaint that Hanover *ever* made any affirmative misrepresentation to the VA, nor has Plaintiff identified any evidentiary support for that proposition. Thus, Plaintiff's fraud in the inducement theory of Hanover's FCA liability rests entirely on the proposition that Hanover's failure to disclose that CSG did not meet the SDVOSB requirements and that CSG's technical proposals contained false statements caused the VA to award contracts to CSG.

As an initial matter, while the failure to disclose material information may constitute a false claim for purposes of the FCA, this Court has made it clear that a defendant can incur FCA liability for failure to disclose information "only where the defendant had a legal obligation to disclose the omitted information." *United States ex rel. Ervin and Associates, Inc. v. The Hamilton Securities Group, Inc.*, 370 F. Supp.2d 18, 54 (D.D.C. 2005) (*citing United States ex rel. Berge v. Board of Trustees of the University of Alabama,* 104 F.3d 1453, 1459 (4th Cir. 1997.)).  Such an obligation arises "when there is some special relationship or contact between the parties justifying the imposition of a duty," *Westrick*, 266 F.Supp.3d at 127 (*quoting Jefferson v. Collins*, 905 F.Supp.2d 269, 287 (D.D.C. 2012.), or where the "disclosure of the omitted fact is necessary in order to make a defendant's affirmative statements not misleading." *Id*. (*quoting Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 24 F. Supp. 3d 32, 47 (D.D.C. 2014)).

Plaintiff cannot establish that Hanover had a duty to disclose under either of these scenarios.  With regard to the latter, Plaintiff failed during discovery to produce evidence that Hanover made any affirmative statements to the VA during the bidding and procurement process that led to the VA's contract awards to CSG, let alone produce evidence that Hanover made affirmative statements that it knew were misleading.   Neither did Plaintiff produce evidence of a special relationship or contact between Hanover and the VA that would create or justify a duty to disclose information prior to the VA awarding contracts to CSG.   In fact, prior to each of the VA contract awards at issue, Hanover's only involvement *of any kind* was the issuance of a generic bid bond. (S.M.F ¶ 21).  Notably, the bid bonds themselves contain no reference to the SDVOSB program or to the fact that the contract being bid was an SDVOSB set-aside contract.

21

(S.M.F. ¶ 23).[5] Consistent with this fact, the uncontroverted evidence reflects that at the time each of these generic bid bonds was issued, Hanover had no knowledge that the contract being bid by CSG was an SDVOSB set-aside contract.  (S.M.F ¶¶ 22-24).[6]  Thus, in addition to the lack of any legal obligation to disclose information to the VA, Hanover had no practical reason to disclose any information to the VA regarding CSG's status as an SDVOSB during the bidding and procurement process because it had no knowledge that the specific contract being pursued were SDVOSB set-aside contracts.   Under the circumstances, Hanover cannot have liability under the FCA for fraudulently inducing the VA's awards to CSG.

Plaintiff's fraud in the inducement theory fails against Hanover for another fundamental reason – Plaintiff cannot prove *causation*, *i.e.,* that the VA was induced by or relied upon Hanover's allegedly fraudulent omission.   With regard to Plaintiff's first allegation that Hanover knew, but concealed from the government, that CSG did not qualify as an SDVOSB, there is simply no evidence in the record that the VA was misled by Hanover regarding CSG's eligibility to participate in the SDVOSB program.  To the contrary, it is beyond dispute that Congress tasked the VA, not bonding companies, with making SDVOSB eligibility determinations. Indeed, pursuant to the Veterans Benefits, Health Care, and Information Technology Act of 2006 (the "Act"), the VA was required to establish a "database of veteran-owned businesses

---

[5] Hanover also issued performance and payment bonds in connection with the VA contracts awarded to CSG; however, those bonds *post-dated* the award of the contract.  Thus, from a temporal standpoint, no logical argument can be made that the VA was induced by or relied upon those bonds in connection with its decision to award a given contract to CSG.  (S.M.F. ¶¶ 19, 31).

[6] Importantly, only a small fraction of the contracts put out to bid by the VA in a given year are SDVOSB set-asides. In that regard, federal law establishes a "governmental goal" that *at least 3%* of all contracts awarded during the fiscal year go to SDVOSB program participants. S*ee* 15 U.S.C. § 644(g)(1)(A)(ii).  Separate legislation requires that the VA's annual procurements for SDVOSB's at least match this 3% set aside threshold.  *See* 38 U.S.C. § 8127.

maintained by the [VA] Secretary" who are eligible for SDVOSB set-aside contracts. (S.M.F. ¶¶ 1-4). The Act further required the VA, not bonding companies, to verify "that each small business concern listed in the database is owned and controlled by veterans." *Id.* As such, any argument by Plaintiff that the VA relied on Hanover with respect to CSG's ability to participate in the SDVOSB program is both legally and factually untenable.

With regard to Plaintiff's second allegation, that Hanover "would have known that the proposals submitted in the name of CSG in furtherance of the CSG conspiracy knowingly misled the government," [ECF 298, ¶ 197] Plaintiff failed to establish during discovery that Hanover, or anyone employed by Hanover, ever even saw any of CSG's technical proposals. To the contrary, every current or former Hanover employee examined by Plaintiff's counsel testified, or has subsequently affirmed by way of declaration, that he or she has never seen *any* of CSG's technical proposals. (S.M.F. ¶¶ 43-44). Thus, the proposition that Hanover knew CSG's proposals misled the VA is factually unsupportable and cannot, as a matter of law, support Plaintiff's fraud in the inducement theory against Hanover.

Plaintiff's failure to produce evidence of a materially false statement or non-disclosure of material facts by Hanover, coupled with his separate failure to establish the requisite causal nexus between Hanover's alleged non-disclosure and the VA's own determination of CSG's SDVOSB status, renders Plaintiff's theory of falsity as to Hanover hopelessly flawed. Put simply, Plaintiff failed to produce evidence upon which a reasonable juror could find that Hanover fraudulently induced the VA to award the contracts at issue to CSG. Plaintiff has not and cannot raise a triable issue regarding its theory of falsity as to Hanover entitling Hanover to judgment on Counts I and II of Plaintiff's Second Amended Complaint as a matter of law.

**B.     HANOVER IS ENTITLED TO SUMMARY JUDGMENT ON
         PLAINTIFF'S REVERSE FALSE CLAIMS.**

Count III of the Second Amended Complaint alleges that Hanover violated 31 U.S.C.
§ 3729(a)(1)(G), known as the "reverse false claims" provision of the FCA, which creates
liability for any person who " … knowingly conceals or knowingly and improperly avoids or
decreases an obligation to pay or transmit money or property to the Government."[7]  Claims under
31 U.S.C. § 3729(a)(1)(G) reverse the typical claim under the FCA in that "'the defendant's
action does not result in improper payment by the government to the defendant, but instead
results in *no payment* to the government when a payment is obligated.'" *Hicks v. D.C.*, 306 F.
Supp. 3d 131, 154 (D.D.C. 2018) (citation omitted) (emphasis added).  To prevail at trial on his
reverse false claims against Hanover, Plaintiff will bear the burden to prove that Hanover: "(1)
concealed or improperly avoided or decreased an *obligation to pay the government* and (2) did so
*knowingly*."  *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp.3d 1010, 1056 (N.D. Cal.
2020) (emphasis added) (*citing* 31 U.S.C. § 3729(a)(1)(G)).

During discovery, Plaintiff failed to produce evidence sufficient for any reasonable juror
to find that Hanover violated 31 U.S.C. § 3729(a)(1)(G).  The evidence and accompanying legal
arguments supporting Plaintiff's reverse false claim falls short with regard to two critical
elements, in that Plaintiff cannot demonstrate that Hanover: (i) had the requisite *obligation to
pay money to the government;* or (ii) had the requisite *knowledge* to create liability under 31
U.S.C. § 3729(a)(1)(G).   Each of these failings is discussed in turn below, and each
independently entitles Hanover to summary judgment as to Count III of Plaintiff's Second
Amended Complaint.

---

[7] 31 U.S.C. § 3729(a)(1)(G) creates liability under two scenarios, the first of which addresses the
knowing creation or use of "a false record or statement material to an obligation to pay or
transmit money or property to the Government." Count III of the Second Amended Complaint
does not allege that Hanover made, used or caused to be made a false record or statement.
Instead, Count III alleges that Hanover's liability arises under the second scenario, which
addresses the knowing concealment or avoidance of an obligation to pay the government money.

1.      **Plaintiff Failed to Raise a Triable Issue as to Hanover's** *Obligation to Pay Money to the Government*

An obligation to pay money to the government is the *sine qua non* of any reverse false claim under the FCA.  Plaintiff has been clear, and the Court has acknowledged, that the alleged obligation on which Plaintiff's reverse false claims are premised arose, if at all, under the standard form SF-25 *Performance Bonds* issued by Hanover pursuant to the Miller Act in connection with seven contracts awarded by the VA to CSG.  [ECF 298, ¶¶ 242-244; ECF 160, p. 30].  Plaintiff has also clearly presented his theory of how Hanover's obligations under the Miller Act performance bonds were triggered and exactly what payments Hanover was obligated to make.  Specifically, in connection with the briefing on Plaintiff's Motion for Leave to File Amended Complaint, Plaintiff addressed Hanover's argument that a performance bond is not an insurance product and that a surety's obligations under a Miller Act performance bond are not triggered until the surety's principal defaults on its performance of the bonded obligation. Plaintiff wrote:

> Hanover's argument is inapplicable to the case at bar, because here, the principal *had to be terminated* if the contract was to be lawfully complied with and because the damages incurred as a result of the work not being performed by an SDVOSB is set by the penal sum set forth in the Standard Form 25 submitted against each of the contracts awarded to CSG . . .

[ECF 151, p. 12] (emphasis in original).

As set forth below, Plaintiff's assertion that Hanover's obligations under the standard form SF-25 *Performance Bonds* issued to the VA were triggered because CSG *had to be terminated* is wrong as a matter of law.  Further, by Plaintiff's own admission, any decision to terminate CSG would necessarily involve the exercise of government discretion.  As a matter of law, contingent obligations (*i.e.*, those that arise upon the exercise of government discretion) cannot give rise to liability under 31 U.S.C. § 3729(a)(1)(G).

a.      **Plaintiff failed to produce evidence of a performance default by CSG, let alone a basis on which CSG** *had to be terminated.*

Appreciating that Hanover's obligations under the standard form SF-25 *Performance*

25

*Bonds* could only be triggered by a default in CSG's *performance* obligations, Plaintiff alleges in the Second Amended Complaint that CSG's failure to qualify for SDVOSB status somehow violated "the specifications found in the contract." [ECF 298, ¶242].  Specifically, Plaintiff bases its reverse false claim on an allegation that a specification in the contract requires that contract payments be made to an SDVOSB. [ECF 298, ¶ 242 (referring to "the specification that the construction activity be paid a service-disabled, veteran-owned small business"); ¶ 244 (describing Hanover's obligation as arising "each time funds under the contract were not transmitted to service-disabled, veteran-owned small business entity")].  In point of fact, there is no such "specification" in any of CSG's contracts with the VA requiring that any payments under the contract be made to or received by an SDVOSB.  Put simply, Plaintiff cannot produce evidence of a performance default by CSG because the performance specification allegedly violated does not exist.  (S.M.F. ¶ 20).

More importantly, Plaintiff's theory that CSG's alleged failure to qualify for SDVOSB status *mandated CSG's termination* and triggered Hanover's obligation to make a payment to the VA is legally untenable and actually conflicts with the VA's veteran-owned small business ("VOSB") and SDVOSB regulations.  As discussed below, those regulations would actually require that CSG complete its performance on any bonded contract, even if the VA determined that CSG did not qualify to participate in the SDVOSB program.

By way of background, three years *before* Hanover issued its first Miller Act performance bond in connection with a CSG contract, Congress mandated that eligibility for the VA's VOSB/SDVOSB program be restricted to contractors listed in a database maintained by the Secretary of Veterans Affairs and, further, that the Secretary of Veterans Affairs be responsible for verifying that each small business listed in the database "*is owned and controlled by veterans.*"  Congress subsequently passed the "Veterans Small Business Verification Act." (S.M.F., ¶ 6).   This legislation, which was codified in part through revisions to 38 U.S.C. § 8127(f)(4)), left the responsibility to verify a small businesses' qualification for SDVOSB status

precisely where it originated, with the VA, but went further, declaring that "[n]o small business concern may be listed in the database *until the Secretary has verified* that—[ ] the small business concern is owned and controlled by veterans."  (S.M.F., ¶ 8) (emphasis added).

Acknowledging the possibility that errors would be made in the process of verifying contractors' compliance with the VOSB/SDVOSB program requirements, the VA adopted regulations in 2008 for removing SDVOSB contractors from the VA's database of verified SDVOSB contractors while making it clear that delisted contractors would still be *"obligated to perform previously awarded contracts to the completion of their existing term of performance."* (S.M.F., ¶ 9-11).   Thus, at all times relevant to the CSG contracts bonded by Hanover:  (i) the VA's VOSB/SDVOSB regulations contemplated that contracts might be awarded to contractors who did not qualify for SDVOSB status; (ii) the VA anticipated ongoing verification on its part and delisting non-SDVOSB contractors as appropriate; and (iii) the VA had a regulation in effect obligating delisted contractors to *perform previously awarded contracts to their completion*.

Given the VA's regulations, which mandated that CSG continue to perform any previously awarded contracts even if it was delisted and lost its SDVOSB status, the premise of Plaintiff's reverse false claim *(i.e.,* that CSG "*had to be terminated* if the contract was to be lawfully complied with") falls apart.  Even had the VA determined that CSG did not qualify for SDVOSB status, the VA's own regulations provide that CSG, not Hanover, would be required to complete the remaining work under any bonded contract.  Plaintiff's theory that CSG had to be terminated is legally infirm, and Plaintiff cannot meet even its threshold burden to show that Hanover's obligations under the standard form SF-25 *Performance Bonds* were triggered.

> **b.     Plaintiff cannot prove the *type of obligation* necessary to give rise to liability for a reverse false claim.**

Plaintiff's reverse false claim necessarily fails on the separate, independent grounds that a Miller Act surety's obligations under a standard form SF-25 *Performance Bond*, even if triggered, are not the type of obligation referenced in 31 U.S.C. § 3729(a)(1)(G).  In that regard, it is well

settled that reverse false claim liability cannot attach unless the obligation avoided by a defendant is both *non-contingent* and *requires a payment* to the government.  As discussed below, Plaintiff cannot meet his burden of proof on these requirements as a matter of law.

> **i.    Plaintiff cannot prove a *non-contingent obligation* under Hanover's Miller Act bonds.**

A defendant does not subject itself to reverse false claim liability by "engaging in behavior that *might or might not* result in the creation of an obligation to pay or transmit money or property to the government."  *United States ex rel. Kasowitz Benson Torres LLP v. BASF Corp.*, 285 F. Supp 3d. 44, 52 (D.D.C 2017) (citing *American Textile Mfg. v. The Limited Inc.*, 190 F.3d 729, 738 (6th Cir. 1999.) (emphasis added)).  Moreover, it is clear that "[c]ontingent obligations – those that arise only after the exercise of discretion by government actors – are not contemplated by the statute."  *Id.* at 52 (citing *American Textile Mfg.*, 190 F.3d at 738)).

As discussed above, had the VA determined at any point that CSG did not qualify as an SDVOSB, CSG would have been obligated, nonetheless, to complete its performance under any ongoing contract bonded by Hanover.  Any determination by the VA not to follow its own regulations and to make a demand on Hanover's standard form SF-25 *Performance Bond* would necessarily have required "discretion by government actors," placing any resulting obligation on Hanover's part outside the scope of 31 U.S.C. § 3729(a)(1)(G) as a matter of law.

Ironically, Plaintiff himself argued, in the context of whether CSG's failure to qualify as an SDVOSB would be material to the VA's decision to terminate CSG as opposed to continue making payments to CSG, that substantial governmental discretion would have to be brought to bear.  Plaintiff argued:

> Hanover's reliance on payment [as an indicia of materiality] is simply too thin a reed to dismiss the Amended Complaint.  This is necessarily so because there are a host of factors the government considers in construction projects, including: the government's ability to recover damages from the bonding company, the ability to obtain damages damage [sic] associated with halting an in-progress construction project, urgent need for the facility under construction, harm to subcontractors and employees of the contractor if payment is not made …

[ECF 204, p. 9]

Plaintiff's recognition that the decision whether to terminate a contractor and make a demand for performance on a Miller Act surety requires governmental discretion is consistent with relevant case law from the United States Court of Federal Claims and the United States Court of Appeals for the Federal Circuit, which courts routinely address questions arising under the Miller Act. *See e.g., State of Fla., Dep't of Ins. v. United States*, 33 Fed. Cl. 188, 196 (1995), aff'd, 81 F.3d 1093 (Fed. Cir. 1996) ("The decision to terminate a contractor is a *discretionary decision* based on the business judgment of the contracting officer."); *Engineered Maint. Servs., Inc. v. United States*, 55 Fed. Cl. 637, 641 (2003) (the government's determination whether to terminate a contractor for default under FAR § 52.249-10 is a *discretionary decision*); *Nuclear Research Corp. v. United States,* 814 F.2d 647, 649 (Fed. Cir. 1987) ("In deciding whether to terminate a contract for default, the CO is required to *exercise his discretion*, to make sure that termination is in the best interests of the Government.").

The discretionary, contingent nature of the VA's decision whether to declare CSG in default and to make a demand upon Hanover for performance under its standard form SF-25 *Performance Bonds* sounds the death knell for Plaintiff's reverse false claim, as the predicate for reverse false claim liability under 31 U.S.C. § 3729(a)(1)(G) – a *non-contingent* obligation – does not exist.  On this basis alone, Hanover is entitled to summary judgment on Count III of Plaintiff's Second Amended Complaint as a matter of law.

  **ii.**  **Plaintiff cannot prove an obligation** *to pay or transmit money or property to the government.*

To prevail at trial on his reverse false claim against Hanover, Plaintiff will not only bear the burden to prove that Hanover had a non-contingent obligation under its standard form SF-25 *Performance Bonds*, but will also bear the burden to prove that Hanover's obligation was to "*pay or transmit money or property to the Government*."  31 U.S.C. § 3729(a)(1)(G) (emphasis added). As discussed below, Plaintiff cannot meet his burden on this issue because the surety's

obligations under a standard form SF-25 *Performance Bond* do not necessarily include the payment of money to the government and, in fact, are fundamentally non-monetary.

As an initial matter, it is important to note that federal law governs the rights and obligations of a Miller Act surety. *See United States for Use & Benefit of Heller Elec. Co. v. William F. Klingensmith, Inc.*, 670 F.2d 1227, 1231 fn. 20 (D.C. Cir. 1982). Moreover, because the language used in the standard form SF-25 *Performance Bond* is derived directly from the language and intent of the statute, the SF-25 *Performance Bond* must be read in light of the Miller Act. *Transamerica Premier Ins. Co. v. Ober*, 894 F. Supp. 471, 481 (D. Me. 1995) ("The bonds must, therefore, be read in light of the statute mandating that prime contractors obtain the bonds."). Under federal law, the language in the standard form SF-25 *Performance Bond* binding the surety "[f]or payment of the penal sum" has uniformly been interpreted to guaranty, not a payment of money to the government, but that "a contract will be completed in the event of the prime contractor's default and that the government will not have to pay more than the contract price." *United States Sur. Co. v. United States*, 83 Fed. Cl. 306, 310 (2008); *see also Morrison Assur. Co. v. United States*, 3 Cl. Ct. 626, 632 (1983) (holding that the Miller Act performance bond "… obligates the surety to complete an unfinished construction project.").

Federal law also recognizes that, in connection with discharging this completion obligation, a Miller Act surety has the option to assume the contract and to complete performance of the bonded work itself. *See e.g., Nelson Const. Co. v. United States*, 79 Fed. Cl. 81, 89–90 (2007) (holding that under a Miller Act performance bond, the surety has three options upon the contractor's default: "(1) assume the contract and complete performance; (2) assume liability for the government's costs in completing the contract that exceed the contract price; or (3) provide funds to an insolvent contractor to complete performance."); *Ins. Co. of the W. v. United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001) (Miller Act bond gives "the surety the option of taking over and completing performance or of assuming liability for the government's costs in completing the contract which are in excess of the contract price."); *Covenant Mut. Ins.*

30

*Co. v. Able Concrete Pump*, 609 F. Supp. 27, 30 (N.D. Cal. 1984) (in the event of a default, Miller Act surety must *either* complete performance or reimburse the government for its completion costs, minus retainages."); *Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir. 1967) (Miller Act surety may either pay for "damages incurred by the government in completing the job" or "[o]n the other hand, the surety may undertake to complete the job itself.").[8]  Under federal law, even had Hanover's obligations under any one of the standard form SF-25 *Performance Bonds* been triggered, Hanover would have had the option to step in and complete CSG's scope of work, without making any payment of any kind to the government.

No case interpreting the Miller Act under federal law has ever held that the surety on a standard form SF-25 *Performance Bond* is required, upon the occurrence of a performance default by its principal, to make a payment of money to the government.  Because Plaintiff has not and cannot demonstrate that Hanover had an obligation under its standard form SF-25 Performance Bonds *to pay the government money* as a result of the alleged fraud on the part of its principal CSG, Hanover is entitled to summary judgment on Count III of Plaintiff's Second Amended Complaint as a matter of law.

### 2.   Plaintiff Failed to Raise a Triable Issue as to Hanover's *Knowing* Concealment or Avoidance of an Obligation.

To be liable under the reverse false claims provision of the FCA, a defendant must have concealed or avoided an obligation to pay the government *knowingly*.  31 U.S.C. § 3729(a)(1)(G). As discussed above, an entity acts *knowingly* under the FCA by: "(1) having actual knowledge,

---

[8] In explaining his reverse false claim, Plaintiff baldly asserts that "the damages incurred as a result of the work not being performed by an SDVOSB is set by the penal sum set forth in the Standard Form 25 submitted against each of the contracts awarded to CSG ... ." [ECF 204, p. 9]. As these relevant cases interpreting the Miller Act make clear, Plaintiff's assertion is wrong as a matter of law.  To the contrary, the government's recovery against a Miller Act surety, if any, is measured by the government's costs in completing the contract that exceed the contract price. Here, Plaintiff has not and cannot produce evidence that the VA incurred any such costs. Moreover, as explained in Section IV.C, below, Plaintiff's argument equating the government's "damages" with the full amount of CSG's contracts is similarly wrong as a matter of law.

(2) acting in deliberate ignorance, or (3) acting in reckless disregard." *United States ex rel. Purcell v. MWI Corp.,* 807 F.3d 281, 287 (D.C. Cir. 2015).  To meet this *scienter* requirement, Plaintiff will bear the burden at trial to prove, at a minimum, that Hanover had actual knowledge of CSG's alleged fraud or that Hanover acted in reckless disregard with regard to CSG allegedly fraudulent actions.   As detailed in Section IV.A.1 above, however, Plaintiff failed during discovery to produce sufficient evidence for any reasonable juror to find that Hanover acted *knowingly* with regard to CSG's alleged fraud.  This independent failure of proof on an essential element of Plaintiff's reverse false claims entitles Hanover to judgment on Count III of Plaintiff's Second Amended Complaint as a matter of law. *Barko,* 241 F.Supp.3d at 49 (*citing Celotex,* 477 U.S. at 322).

### C.     HANOVER IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S *CONSPIRACY* CLAIM.

As it relates to Count IV of the Second Amended Complaint, 31 U.S.C. § 3729(a)(1)(C) imposes liability on any person who "conspires to commit a violation" of any substantive section of the FCA.  Count IV alleges broadly that "all Defendants knew about the scheme to defraud the United States by making false records, statements and certifications …" and that "[b]y participating in this scheme, Defendants implicitly agreed to form a conspiracy to violate 31 U.S.C § 3729(a)(1)(A), (B), (D), and (G)." [ECF 298, ¶ 247].[9]  The Second Amended Complaint further alleges that the scheme to defraud the United States involved obtaining "service-disabled

---

[9] 31 U.S.C § 3729(a)(1)(D) imposes liability upon any person who "has possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivers, or causes to be delivered, less than all of that money or property."  While Count IV of the Second Amended Complaint alleges the existence of a conspiracy to violate Section 3729(a)(1)(D), Plaintiff has not alleged a violation of that substantive section of the FCA.  As our Circuit Court has made clear, "[s]ince liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort." *Halberstam v. Welch,* 705 F.2d 472, 479 (D.C. Cir. 1983).  As such, Plaintiff's conspiracy count, to the extent it is based upon an alleged agreement to violate Section 3729(a)(1)(D), fails as a matter of law.

veteran owned small business ("SDVOSB"), and/or 8(a) and/or HUBZone set-aside contracts" and was done "in the name of CSG and Citibuilders and KCGI." [ECF 298, ¶¶ 249, 250]. The Second Amended Complaint does not identify the individual or individuals at Hanover who "implicitly agreed" to form a conspiracy, nor does it provide any information on the conspiratorial objective of that agreement.

While the FCA does not define a conspiracy, this Court has held that general civil conspiracy principles apply to FCA-based conspiracy actions. *Pencheng Si v. Laogai Research Foundation,* 71 F.Supp.3d 73, 89 (D.D.C. 2014) (*citing United States ex rel. Head v. Kane Co.,* 798 F.Supp.2d 186, 201 (D.D.C. 2011.)). Thus, to prevail at trial on his conspiracy claim, Plaintiff will bear the burden to prove: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam v. Welch,* 705 F.2d 472, 477 (D.C. Cir. 1983).[10] Based upon the evidence amassed by Plaintiff during discovery, no reasonable jury could ever find that Hanover agreed to participate in violating the FCA.

In this case, three principles of civil conspiracy law are central to the determination that Plaintiff's FCA-based conspiracy claim against Hanover cannot survive summary judgment. The failings in Plaintiff's evidence in connection with these principles, which entitle Hanover to summary judgment on Count IV of the Second Amended Complaint, are discussed below.

---

[10] Relying on a case that involved claims pre-dating the changes to the FCA implemented through the Fraud Enforcement and Recovery Act of 2009 ("FERA"), this Court has held that to succeed on a conspiracy claim in the specific context of the FCA, a plaintiff "must show (1) that [the defendant] conspired with one or more persons to have a fraudulent claim paid by the United States, (2) that one or more of the conspirators performed any act to have such a claim paid by the United States, and (3) that the United States suffered damages as a result of the claim." *United States ex. rel Conteh v. IKON Office Solutions, Inc.,* 103 F.Supp.3d 59, 68 (D.D.C. 2015) (*quoting United States ex rel. Westrick v. Second Chance Body Armor, Inc.,* 685 F. Supp.2d 129, 140 (D.D.C. 2010). Post-FERA, a plaintiff must show that the objective of the agreement between or among conspirators was to "commit a violation" of the FCA. *See* 31 U.S.C § 3729(a)(1)(C).

1.      **Plaintiff Failed to Raise a Triable Issue as to the *Existence of an Underlying Violation* of the FCA.**

The first principle relevant to Plaintiff's conspiracy claim against Hanover is that "no conspiracy can exist without 'some underlying tortious act.'" *Pencheng Si,* 71 F.Supp.3d at 89 (*citing Halberstam*, 705 F.2d at 477).  "In the context of the FCA, this means that there can be no liability for conspiracy where there is no underlying violation of the FCA." *Id.* (*citing United States ex rel Amin v. George Washington Univ.,* 26 F.Supp.2d 162, 165 (D.D.C. 1998)).

As set forth in Section IV.A above, no reasonable jury could find that Hanover violated the substantive provisions of either 31 U.S.C § 3729(a)(1)(A) or (B).  In that regard, Plaintiff failed during discovery to raise a triable issue as to Hanover's *knowledge* of the fraud alleged in the Amended Complaint.  Plaintiff also failed to raise a triable issue as to Hanover's *causation* of the false statements and false claims Plaintiff has alleged.  The complete failure of proof on these critical elements of Plaintiff's underlying substantive claims entitles Hanover to summary judgment on Plaintiff's indirect presentment claims.  As set forth in Section IV.B above, Plaintiff's reverse false claim against Hanover under 31 U.S.C. § 3729(a)(1)(D) fails, on its face, as a matter of law. Plaintiff's inability, under any circumstances, to prove an underlying violation of the FCA entitles Hanover to judgment on the conspiracy claim set forth in Count IV of Plaintiff's Second Amended Complaint as a matter of law.

2.      **Plaintiff Failed To Raise A Triable Issue as to the *Existence of an Agreement* to violate the FCA.**

The second principle of civil conspiracy relevant to Plaintiff's claim against Hanover under Section 3729(a)(1)(C) is that "conspiracy involves an agreement to participate in a wrongful activity." *Halberstam,* 705 F.2d at 478. Here, Plaintiff bears the burden to prove that Hanover entered into an agreement, with one or more of the other defendants, specifically to violate the FCA.  During discovery, Plaintiff failed to produce any evidence that an agreement to

violate the FCA ever existed, let alone produce evidence from which a trier of fact could infer that an employee of Hanover willingly entered into that agreement, what the terms of that agreement were, or when that agreement was reached.

The United States Court of Appeals for the D.C. Circuit has recognized that "'in most civil conspiracy cases,' the jury 'ha[s] to infer an agreement from indirect evidence,'" *United States ex. rel Miller v. Bill Harbert International Constr., Inc.,* 608 F.3d 871, 901 (D.C. Cir. 2010) (*quoting Halberstam*, 705 F.2d at 486), and has further noted that "[a] jury may infer that a defendant willfully joined the conspiracy if he understood the scheme's 'essential nature and general scope.'" *Miller,* 608 F.3d at 901 (*quoting Hobson v. Wilson*, 737 F.2d 1, 52 (D.C. Cir. 1984). Here, Plaintiff failed during discovery to produce *any* evidence, direct or indirect, that any employee of Hanover understood the essential nature or general scope of the "scheme" Plaintiff alleges – that CSG was submitting materially false statements in its technical proposals and that CSG violated the VA's SDVOSB regulations and was, therefore, submitting false claims for payment.

During discovery, Hanover probed Plaintiff on the evidence supporting the allegations in Plaintiff's complaint, including specifically what evidence Plaintiff has regarding Hanover's alleged agreement to join a conspiracy to defraud the government. In that regard, Hanover's Interrogatory No. 16 to Plaintiff asked that Plaintiff identify "each and every communication between Hanover and any other Defendant that you maintain contains, embodies or reflects an agreement to obtain service-disabled veteran-owned small business, and/or 8(a) and/or HUBZone set-aside contracts through fraudulent means." (S.M.F. ¶ 53). Hanover's interrogatory goes to the heart of Plaintiff's conspiracy claim and required that Plaintiff identify the evidence on which Plaintiff intends to rely at trial to meet his burden of proof as to the existence of an agreement to violate the FCA - a critical element of Plaintiff's conspiracy claim.

Plaintiff's initial response to Hanover's Interrogatory No. 16 was completely non-responsive, referencing without specificity "each and every relevant communication between

Hanover and any other Defendant" and incorporating by reference "the documents and communications produced in response to Hanover's First Request for Production of Documents." (S.M.F. ¶ 54).  In response to the meet and confer letter from Hanover's counsel regarding the generally deficient nature of the discovery responses, Plaintiff supplemented his response to Interrogatory No. 16 by incorporating his supplemental response to Hanover's Interrogatory No. 1 – which had nothing to do with Hanover's agreement to join in a conspiracy.  While Plaintiff's supplemental response incorporated by reference the 13 documents that Plaintiff previously deemed "to be the most important in relation to Hanover," not one of those documents contains, embodies, or reflects (or is in any other way evidence of) an agreement, willingly entered into by Hanover, to violate the FCA.[11]  Simply put, there is nothing in the 13 documents identified by Plaintiff, nor has Plaintiff identified any other evidence, from which a reasonable juror could infer that Hanover understood the "essential nature and general scope" of the fraud scheme Plaintiff has alleged.  This complete failure of proof on this essential element of Plaintiff's conspiracy cause of action – Hanover's agreement to join a conspiracy to violate the FCA – renders all other facts immaterial and entitles Hanover to judgment on Count IV of Plaintiff's Amended Complaint as a matter of law.  *Barko*, 241 F. Supp.3d at 49. (citation omitted)

### 3.    Plaintiff Failed to Raise a Triable Issue as to the *Existence of Damages Suffered by the Government.*

The third principle of civil conspiracy relevant to Plaintiff's claim against Hanover under Section 3729(a)(1)(C) is that to prevail on a civil conspiracy claim, a plaintiff must prove that some overt act taken in furtherance of the conspiracy resulted in damages. *Halberstam,* 705 F.2d at 477; *see also United States ex. rel Conteh v. IKON Office Solutions, Inc.*, 103 F.Supp.3d

---

[11] During his deposition, Plaintiff was asked specifically about the 13 documents he identified, by reference, in his supplemental response to Hanover's Interrogatory No. 16.  While his testimony is too extensive to reprint here, suffice it to say he was unable to cogently identify where any one of the 13 documents contains, embodies, or reflects an agreement among any of the defendants to violate the FCA, let alone that such an agreement was willingly entered into by Hanover.  (S.M.F. ¶ 59).

59, 68 (D.D.C. 2015) (*quoting Westrick*, 685 F. Supp.2d at 140). Thus, to prevail at trial on his conspiracy claim against Hanover, Plaintiff will bear the burden to prove that the government, and specifically the VA, suffered damages as a result of the conspiracy scheme alleged in the Second Amended Complaint.

As discussed more fully in Section IV.D. below, Plaintiff failed in discovery to raise a triable issue as to whether the VA sustained *any actual damages* as a result of the fraud scheme Plaintiff alleges. In that regard, the evidence produced in discovery reflects that, in connection with every single contract bonded by Hanover, the VA received *exactly* what it contracted with CSG to provide. Under the "benefit-of-the-bargain" framework applicable to the calculation of damages under the FCA, Plaintiff failed to produce any evidence on which a reasonable jury could find that the value of the construction services provided by CSG was less than the value for which the VA contracted and, therefore, that the VA actually sustained damages. Plaintiff's failure to produce any evidence of damages dooms Plaintiff's claim to recover damages against Hanover under the substantive provisions of 31 U.S.C. § 3729(a), and further entitles Hanover to summary judgment on the conspiracy claim in Count IV of Plaintiff's Second Amended Complaint, as a matter of law.

### D.   HANOVER IS ENTITLED TO SUMMARY JUDGMENT AS TO PLAINTIFF'S RIGHT TO RECOVER *ACTUAL DAMAGES.*

The FCA "imposes two types of liability." *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1277 (D.C. Cir. 2010) (*citing United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.* 393 F.3d 1321, 1326 (D.C. Cir. 2005). "First, a defendant who submits a false claim or makes a false statement to get a false claim paid is liable for civil penalties regardless of whether the government shows that the submission of that claim caused the government damages." *Id.* Second, a defendant found to have violated the provisions of the FCA

"is liable for 3 times the amount of damages which the [g]overnment sustains because of the act of [the defendant]." *Id (internal citation marks omitted); see also* 31 U.S.C. § 3729(a).   To prevail at trial on his claims against Hanover, Plaintiff will bear the burden "to prove all essential elements of the cause of action, including damages…" 31 U.S.C. § 3731(d).   In connection with proving his claimed damages against Hanover, Plaintiff will first bear the burden to establish "that the fact of the damages is certain," *i.e.*, that the VA actually sustained damages.  *Ervin*, 370 F. Supp. 2d 18, 55–56 (D.D.C. 2005).   Second, Plaintiff will bear "the burden of presenting sufficient evidence to allow the jury to determine the amount of damages it is owed." *United States v. Sci. Applications Int'l Corp.*, 958 F.Supp.2d 53, 77-78 (D.D.C. 2013) (*citing United States v. Sci. Applications Int'l Corp.*, 626 F.3d at 1280).  Plaintiff's evidence falls short on both prongs of his burden to prove damages. In that regard, Plaintiff failed wholly to produce any evidence that the VA incurred actual damages as a result of CSG's alleged fraud, let alone to produce evidence from which a reasonable jury could determine the amount of those damages.

### 1.    Plaintiff Failed to Raise a Triable Issue as to Whether the Government *Sustained any Actual Damages.*

Damages under the FCA "are measured under a 'benefit-of-the-bargain' framework." *United States ex rel. Purcell v. MWI Corp.*, No. CV 98-2088 (GK), 2013 WL 12341670, at *3 (D.D.C. Nov. 6, 2013) (*citing Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1278-79 (D.C. Cir. 2010).  The objective of that framework is to "to set an award that puts the government in the same position as it would have been in if the defendant's claims had not been false."  *Sci. Applications Int'l Corp.*, 626 F.3d at 1278.  Importantly, to establish damages under the benefit-of-the-bargain framework, a plaintiff must prove "not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, *but also* that the performance the government received was worth less than what it believed it had purchased."

38

*United States. ex rel. Davis v. D.C.*, 679 F.3d 832, 839 (D.C. Cir. 2012) (*quoting Sci. Applications Int'l Corp.*, 626 F.3d at 1278) (emphasis added).  Under the benefit-of-the-bargain framework, courts have employed different measures of damages depending on whether the government received any tangible benefit from the contractor's performance.[12]

Where the government receives a tangible benefit in the form of goods or services from the contractor, this Circuit has been clear that "the proper measure of damages is the difference between the value of the goods or services actually provided by the contractor and the value the goods or services would have had to the government had they been delivered as promised." *Sci. Applications Int'l Corp.*, 626 F.3d 1257 at 1278. [13]    Where the contractor provides nonconforming goods or services to the government that have an ascertainable market value, the

---

[12]    In its July 31, 2017 Memorandum Opinion, the Court addressed whether Plaintiff had sufficiently pled the existence of damages in connection with its reverse false claim cause of action.  The Court noted that, although the government may not have experienced financial loss, it still experienced loss "according to Circuit precedent." [ECF 160, p. 31].  In support of that statement, the Court quoted from *Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1279 (D.C. Cir. 2010) where the Court of Appeal noted that "where the defendant fraudulently sought payments for participating in programs designated to benefit third-parties rather than the government itself, the government can easily establish that it received nothing of value from the defendant and that all payments made are therefore recoverable as damages." The Court of Appeal's decision makes it clear through its use of citations, however, that the quoted language applies only to the calculation of damages where the contract at issue *does not produce a tangible benefit* to the government. *See United States v. TDC Man, Corp, Inc.* 288 F.3d 421 (D.C. Cir. 2002) ("The [p]rogram at issue, however, did not call for TDC to produce a tangible structure or asset … "); *United States ex. rel. Longhi v Lithium Power Techs., Inc*., 575 F.3d 458 (5th Cir. 2009) (involving a grant program that "did not produce a tangible benefit" to the government); *United States v. Rogan,* 517 F.3d 449 (7th Cir. 2008) (the defendant sought a government "subsidy" and "did not furnish any medical service to the United States.").  Where the contract at issue results in the government *receiving a tangible benefit*, equating damages to the full amount of the government's payments is mistaken. *Sci. Applications Int'l Corp.*, 626 F.3d at 1278-79 (D.C. Cir 2010).

[13]   Other Circuits have ruled similarly.  *See e.g., United States ex rel. Feldman v. Van Gorp,*  697 F.3d 78, 87 (2nd Cir. 2012); *United States v. Woodbury,* 359 F.2d 370, 379 (9th Cir. 1966); and *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 923 (4th Cir. 2003).

Supreme Court has instructed that "[t]he Government's actual damages are equal to the difference between the market value of the [goods or services] it received and retained and the market value that the [goods or services] would have had if they had been of the specified quality." *United States v. Bornstein,* 423 U.S. 303, 316 n.13 (1976) (citation omitted).  Where "the value that conforming goods or services would have had is impossible to determine," the government's actual damages are measured as "the amount the government actually paid minus the value of the goods or services the government received or used." *Sci. Applications Int'l Corp.*, 626 F.3d 1257 at 1278. (*citing* Joel M. Androphy, *Federal False Claims Act & Qui Tam Litigation* § 11.03[2] (2009)).  The rationale behind this rule is simple.  Under the benefit-of-the-bargain framework, it would be manifestly inequitable to permit the government simultaneously to retain the tangible assets for which it has contracted and recover "the entire amount it paid." *United States ex rel. Longhi v. Lithium Power Techs., Inc*., 530 F. Supp. 2d 888, 895 (S.D. Tex. 2008), *aff'd sub nom. Longhi*, 575 F.3d (5th Cir. 2009) (citation omitted).  Such an outcome would provide the government with a windfall rather than make the government whole.

> a.  **Plaintiff cannot demonstrate that the government received no tangible benefit from CSG's performance.**

Here, there is no legitimate question but that the VA received a tangible benefit from the construction work that CSG performed under the contracts for which Hanover provided bonding. Unless terminated for the VA's convenience, every one of the contracts was completed to the satisfaction of the VA's Contracting Officer in accordance with the contract plans and specifications.  (S.M.F. ¶ 35).  In connection with each of those completed projects, the VA paid CSG the full amount of the contract value and closed out the contract without any complaints regarding the quality of the labor or materials provided by CSG or the value of the final construction that the VA received.  (S.M.F. ¶ 60).  The VA has retained the construction work

performed by CSG on each of those completed projects and has subsequently used all of the spaces in which CSG's work, which largely involved renovation, was performed.  (S.M.F. ¶ 62). Despite these undisputed facts regarding the tangible benefit received by the VA, Plaintiff seeks as damages against Hanover the total amount of the seven contracts awarded to CSG and bonded by Hanover, $4,055,970, "trebled pursuant to the False Claims Act . . . for a total of $12,167,910." (S.M.F. ¶ 69).

Courts have repeatedly rejected the argument, inherent in Plaintiff's damage calculation, that the government receives no value from a completed construction contract tainted by collateral false certifications. For example, in *Ab-Tech Const., Inc. v. United States*, 31 Fed. Cl. 429 (1994), *aff'd sub nom. Ab-Tech Const. v. United States*, 57 F.3d 1084 (Fed. Cir. 1995),  a minority-owned, small business contractor was awarded and completed an SBA contract for the construction of a data processing facility for the U.S. Army Corps of Engineers.  In connection with the project, the contractor entered into a "prohibited contract co-management agreement" with its primary subcontractor, a non-minority owned enterprise. *Id.* at 431-433.  By submitting progress payment requests in connection with the project, the court found that the contractor implicitly misrepresented "its continuing adherence to the requirements for participation in the 8(a) program" causing "the Government to pay out funds in the mistaken belief that it was furthering the aims of the 8(a) program." *Id.* at 434.  Nevertheless, noting that from a capital investment standpoint the government "got essentially what it paid for — an automated data processing facility built in accordance with the contract drawings and specifications," the *Ab-Tech Constr.* court rejected the government's argument that it was entitled to recover three times the total of its contractual payments.  *Id.* at 434.  Instead, finding that the government offered no proof of "detriment to its contract interest," the court declined to award any actual damages.  *Id.*

Similarly, *United States ex rel. Wall v. Circle C. Const., LLC,* 813 F.3d 616 (6th Cir. 2016), involved a defendant-appellant contractor that was found to have falsely certified its payment of Davis-Bacon Act wages in connection with the electrical work performed under a contract to construct 42 warehouses for the United States Army. *Id.* at 617. The district court accepted the plaintiff-relator's argument that all of the work performed by the contractor was "valueless" because it was "tainted" by the contractor's fraud and determined that the government's damages were equal to the entire amount the government had paid for the electrical work across the entire project. *Id.* On appeal, the court of appeal noted that in connection with entering into the contract, "the government bargained for two things: the buildings, and payment of Davis–Bacon wages." The court of appeal rejected the district court's logic regarding damages, noting that the government's argument that the warehouses were valueless was "belied by the government's own conduct in using the buildings." *Id.* at 617. The court of appeal went on to reaffirm that the government's actual damages were "the difference in value between what the government bargained for and what the government received." *Id.* at 617.

> **b.      Plaintiff cannot demonstrate that the government received less than what it bargained to receive.**

In connection with the benefit-of-the-bargain framework, Plaintiff will bear the burden at trial to prove that the performance the VA received from CSG on the contracts bonded by Hanover (*i.e.,* the physical construction work performed by CSG, including the labor, materials and supplies incorporated into the eight final projects) was worth *less* than what the VA bargained to received. *See Davis,* 679 F.3d at 839. During discovery, Plaintiff ignored the issue of the government's damages altogether, assuming that the Court would accept his argument that CSG's alleged fraud rendered CSG's performance "valueless." As the government failed to do

in *Ab-Tech Const., supra,* Plaintiff here failed to produce any evidence of a "detriment to [the government's] contract interest" or any other evidence from which a reasonable jury could conclude that the VA received anything less than what it paid CSG for.  In so doing, Plaintiff failed to raise a triable issue with regard to whether the government sustained any actual damages, entitling Hanover to summary judgment on that issue.

### 2. Plaintiff Failed to Raise a Triable Issue as to the *Amount* of any Actual Damages Sustained by the Government.

At trial, Plaintiff will bear the burden, not only of proving the existence of the government's actual damages, but also "of presenting sufficient evidence to allow the jury to determine the amount of damages it is owed." *United States v. Sci. Applications Int'l Corp.*, 958 F.Supp.2d at 77.  During discovery, Hanover probed Plaintiff on the basis for his claimed damages.  In that regard, Hanover's Interrogatory No. 17 to Plaintiff asked that Plaintiff "[i]temize and show how you calculate the damages you are asserting solely with respect to Hanover," and Hanover's Request for Production of Documents No. 6 to Plaintiff asked that Plaintiff produce "[a]ll documents supporting, relating to, or referring to the damages you are asserting with respect to Hanover." (S.M.F. ¶ 63).  Hanover's interrogatory and document request go to the heart of Plaintiff's claimed damages and required that Plaintiff identify the evidence on which Plaintiff intends to rely at trial to meet his burden of proof on the damages component of his claims against Hanover.

Plaintiff's initial interrogatory response was, again, completely non-substantive, stating only that:

> Under all counts contained in the Amended Complaint of FCA violations, including Count IV, Conspiracy to Violate False Claims Act, Plaintiff-Relator asserts that Hanover's exposure is equal to the total amount of funds paid out under each and every contract identified in the Amended Complaint, trebled pursuant to 31 U.S.C. § 3729(a)(1), plus statutory attorney fees and fines and

penalties for each request for payment submitted to the government against each and every contract identified in the Amended Complaint.

(S.M.F. ¶ 64). Plaintiff failed to produce even a single piece of paper in response to Hanover's request for documents. (S.M.F. ¶ 66). After Plaintiff's counsel received a meet and confer letter advising that Plaintiff's responses and were generally deficient, Plaintiff again supplemented his responses. (S.M.F. ¶¶ 67, 68). Plaintiff's supplemental response to Hanover's Interrogatory No. 17, however, contained nothing more than a list, by contract, of the total amounts paid by the VA on the eight CSG contracts bonded by Hanover and a statement that "[t]he amount of these contracts, $4,055,970, is to be trebled pursuant to the False Claims Act ("FCA") for a total of $12,167,910," along with a regurgitation of Plaintiff's alleged right to recover fines, penalties, attorney's fees and litigation costs. (S.M.F. ¶ 69). Plaintiff's supplemental response to Hanover's Request for Production of Documents No. 6 again failed to produce even a single piece of paper, this time noting that "Plaintiff Relator is currently awaiting formal documentation from the United States Government regarding all clams [sic] for payments and payments for the SDVOSB contracts at issue in this case." (S.M.F. ¶ 70). Plaintiff never provided any further supplementation to his interrogatory response, nor did Plaintiff ever produce any documentation relating to his claimed damages. (S.M.F. ¶ 71).

Noticeably absent from Plaintiff's discovery responses was reference to or identification of any evidence regarding the value of the performance the VA received from CSG on the contracts bonded by Hanover. Neither did Plaintiff's counsel elicit from any of the witnesses deposed during discovery so much as a word of testimony regarding CSG's compliance with the contract plans and specifications or the sufficiency or value of CSG's performance on any of the eight contracts bonded by Hanover. In short, Plaintiff failed during discovery to produce *any* evidence of the value of the benefit received and retained by the VA, let alone "sufficient

44

evidence to allow the jury to determine the amount of damages [the government] is owed." Plaintiff's failure to produce such evidence dooms his claim for actual damages, entitling Hanover to summary judgment as to Plaintiff's right to recover actual damages against Hanover under 31 U.S.C. § 3729(a).

## V.   **CONCLUSION**

For the reasons set forth above, the Court should enter judgment in Hanover's favor and against Plaintiff on Counts I, II, III and IV of Plaintiff's Second Amended Complaint.  The Court should further grant judgment in Hanover's favor and against Plaintiff with regard to Plaintiff's claim for actual damages under each and every Count in the Second Amended Complaint.

Dated: February 24, 2021

Respectfully Submitted,

WATT, TIEDER, HOFFAR &
  FITZGERALD, L.L.P.

_____*/s/ Hanna Lee Blake*_____
Robert G. Barbour, Esq. (admitted *pro hac vice*)
Hanna Lee Blake, Esq. (D.C. Bar No. 992512)
Matthew D. Baker, Esq. (D.C. Bar No. 1024946)
WATT, TIEDER, HOFFAR &
  FITZGERALD, L.L.P.
1765 Greensboro Station Place
Suite 1000
McLean, VA  22102
Facsimile:  703-893-8029
rbarbour@watttieder.com
hblake@watttieder.com
mbaker@watttieder.com

*Counsel for Defendant The Hanover
 Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 24th day of February 2021, I will electronically file the forgoing MEMORANDUM IN SUPPORT OF DEFENDANT THE HANOVER INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the parties indicated on the electronic filing receipt and I will cause a copy of the foregoing to be sent via U.S. Mail First-Class, postage-prepaid to the following:

Neil Parekh
8321 Old Courthouse Road, Suite 260
Vienna, VA 22182

Shobha Mehta
5201 Seminary Road
Alexandria, VA 22311



*/s/ Hanna Lee Blake*
Counsel