UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ANDREW SCOLLICK | * | |
| | * | Case No.:  1:14-cv-01339 RCL |
| Plaintiff-Relator | * | |
| v. | * | |
| VIJAY NARULA *et al*. | * | |
| Defendants | * | |
| * * * * * * * * * * * * * | * | |

**HUDSON INSURANCE COMPANY'S STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
ON THE SECOND AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.    INTRODUCTION ……………………………………………………    1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS …………………………    4

      A.    Hudson and Surety Partners of America Mid Atlantic, LLC ……………..    4

      B.    CSG Formation and Operations Through Mid-2011 ……………………..    5

      C.    Hudson Issues Surety Bonds on CSG's Behalf between July
            and October 2011 ……………………………………………………    9

      D.    Hudson Declines to Provide Further Surety Bonding to CSG …………….    14

      E.    CSG Operations Post-2011 ……………………………………………..    15

III.  THE FCA LITIGATION ……………………………………………………    16

IV.   LEGAL STANDARD ………………………………………………………    18

V.    ARGUMENT …………………………………………………………..    20

      A.    The Public Disclosure Bar Is a Complete Prohibition of Plaintiff-
            Relator's Claims ……………………………………………………..    20

      B.    Hudson Is Entitled to Summary Judgment as to Plaintiff-Relator's
            Count I Presentment Claim ........……………………………………    25

            1.    Submission of a Claim:  Plaintiff-Relator does not allege, and
                  there is no evidence, that Hudson directly submitted any false
                  claims to the VA ………………………………………………    26

            2.    Submission of a Claim:  Plaintiff-Relator cannot establish any
                  indirect presentment of a false claim by Hudson to the VA ………    27

            3.    Falsity of the Claims:  Plaintiff-Relator has not established that
                  CSG's payment applications were fraudulent as CSG performed
                  the work for which it billed the VA ………………………………..    29

            4.    Falsity of the Claims:  Plaintiff-Relator has failed to adequately
                  plead the required elements of a false certification claim …………    30

5.   Falsity of the Claims:   undisputed facts doom Plaintiff-Relator's
attempt to assert a fraudulent inducement claim against Hudson ..    31

6.   Knowing Presentment of a False Claim:  there is no evidence that
Hudson had actual knowledge of CSG's alleged fraud ................    32

7.   Knowing Presentment of a False Claim:  there is no evidence that
Hudson had constructive knowledge of CSG's alleged fraud ........    35

C.   Hudson Is Entitled to Summary Judgment as to Plaintiff-Relator's     38
Count II False Statement Claim ……………………………………………

D.   Hudson Is Entitled to Judgment as a Matter of Law on Count III
(reverse false claim) ……………………………………………………    39

1.   Definition of a Reverse False Claim ………………………………    39

2.   Hudson's obligations under the Hudson Bonds have not been
7triggered but, even if its obligations were triggered, Hudson
did not knowingly make any false statements or conceal any
obligation to pay or transmit money to the federal government ….    40

E.   Hudson Is Entitled To Judgment As A Matter Of Law On Count IV
Of The Second Amended Complaint Because It Did Not Conspire To
Violate The FCA ………………………………………………………..    42

F.   Plaintiff-Relator Has Failed to Produce Evidence of the Government's
Entitlement to Recovery of Actual Damages related to any CSG
Contracts ………………………………………………………………..    43

VI.   CONCLUSION …………………………………………………………    43

Defendant/cross-claim plaintiff Hudson Insurance Company ("Hudson"), by its undersigned attorneys, respectfully submits this Statement of Points and Authorities in support of its Motion for Summary Judgment on the Second Amended Complaint pursuant to Federal Rule 56 and Local Rule 7(h).

## I.      INTRODUCTION

On August 6, 2014, plaintiff-relator Andrew Scollick ("Plaintiff-Relator") initiated this *qui tam* action under the False Claims Act, 31 U.S.C. § 3729 ("FCA"), by filing a complaint against 18 defendants, including Hudson.  On February 9, 2015, the United States of America filed a "Notice of Election Not to Intervene."  Plaintiff-Relator thereafter pursued the *qui tam*, alleging that certain contractors, including cross-defendant Centurion Solutions Group, LLC ("CSG"), fraudulently obtained service-disabled veteran-owned small business ("SDVOSB") status from the United States Department of Veteran Affairs ("VA") and used that SDVOSB status to induce the VA into awarding and making payments under SDVOSB set-aside contracts in violation of the FCA (hereafter, the "FCA Litigation").  In a case of first impression, Plaintiff-Relator seeks to hold Hudson liable under numerous provisions of the FCA solely on the basis that Hudson provided surety bonds (bid, performance, and payment bonds) on CSG's behalf, such bonds being required for federal construction contracts of a certain size pursuant to the terms of the Miller Act, 40 U.S.C. § 3131 *et seq*.

Initially, the Court granted Hudson's motion to dismiss the original complaint; however, the Court granted Plaintiff-Relator leave to file an amended complaint.  Plaintiff-Relator subsequently filed a Second Amended Complaint ("SAC") on September 8, 2020, which is the subject of this motion.  Despite having received extensive written evidence and testimony in discovery over the course of more than a year, Plaintiff-Relator's SAC continues to contain

numerous and significant factual misrepresentations related to Hudson, including that Hudson provided bonding for, or had any kind of relationship with, any of the other SDVOSB entities identified in the SAC, such as defendant Citibuilders Solutions Group, LLC ("Citibuilders"), and that Hudson representatives visited the offices of the various corporate defendants. The SAC also deliberately obfuscates the factual allegations by using the term "the Bonding Defendants" throughout the pleading rather than identifying specific parties.

At the summary judgment stage, Plaintiff-Relator can no longer rely on bald allegations and bears the burden of proof of specific evidence of both Hudson's alleged violations of the FCA and his entitlement to a recovery. As a threshold matter, Plaintiff-Relator's action must fail because the allegations on which the SAC are predicated were publicly-disclosed prior to the filing of this matter and Plaintiff-Relator is not otherwise an original source of the allegations. The FCA's Public Disclosure Bar, 31 U.S.C. § 3730 (e)(4), therefore, divests this Court of jurisdiction over this matter.

Even if this Court determines the Public Disclosure Bar is inapplicable, Hudson is entitled to judgment as a matter of law. Regarding Counts I and II (false claims and false statements), Plaintiff-Relator bears the burden of proof but has produced no evidence that Hudson participated in, knew about, willfully ignored, or recklessly disregarded any alleged fraud by CSG, including any fraud in the initial contract procurements. Plaintiff-Relator's allegations that Hudson learned of the alleged fraud through its underwriting process is belied by the evidence (or lack thereof) produced in discovery, including the financial and business information provided by CSG to Hudson during the underwriting process. In fact, the VA relied on nearly identical financial and business information in verifying CSG as an SDVOSB, a verification that occurred PRIOR to Hudson's bonding of CSG. Any arguments that Hudson was obligated to either know that the

contracts to be bonded were SDVOSB set aside contracts or that it was required to go behind the VA's verification to essentially conduct its own SDVOSB "verification" process, are unsupported at law.

As to Count III (reverse false claim) of the SAC, it is undisputed that the VA never made a claim against Hudson on any of the bid or performance bonds provided by Hudson on CSG's behalf; therefore, no obligations under those bonds have ever been triggered.  As a result, Hudson owes no obligation to the federal government under its bonds that would trigger the possibility of a reverse false claim.  Even if the Court disagrees with the proposition that no obligation was owed, there is no evidence that Hudson made any false statements or concealed any information regarding any such obligations in violation of the FCA.

Finally, as to Count IV (FCA conspiracy), because Hudson was not involved in any of the FCA violations alleged in the SAC, Hudson is not liable as a matter of law for conspiracy to violate the FCA.  Moreover, Plaintiff-Relator has not offered evidence of any agreement between Hudson and any other defendant to enter into the alleged fraud conspiracy such that a jury could even infer Hudson's participation.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   Hudson and Surety Partners of America Mid Atlantic, LLC

1.     Hudson is a surety company with a principal place of business in New York. Aff. of Michael Cifone, attached as **Exhibit 1**, at ¶2.  As a surety, among other things, Hudson provides bid bonds and performance and payment bonds required by construction contractors. *Id*.

2.     On March 1, 2010, Hudson and an entity known as Surety Partners of America Mid Atlantic, LLC ("Surety Partners") entered into a Program Administrator Agreement ("PAA").  A true and accurate copy of the PAA is attached as **Exhibit 2**. *See also* Exhibit 1 at ¶3.

3.     Through the PAA, Hudson appointed Surety Partners as "its general agent for the purpose of underwriting, issuance, and delivery of surety bonds, including endorsements and riders thereto."  Exhibit 2 at 2, ¶1.1.  The PAA limited Surety Partners' underwriting authority on Hudson's behalf to bond principals located in Maryland, Virginia and the District of Columbia for contract work to be performed in states where Hudson was licensed.  *Id*. at 19, at Exhibit 1-Schedule of Business at ¶1.

4.     Pursuant to the PAA, Hudson authorized Surety Partners to issue surety bonds on its behalf within the following parameters:

> 3. Maximum limits of liability: Four Million dollars ($4,000,000) per bond, Eight Million dollars ($8,000,000) per principal.  Any bonds in excess of this amount, up to limits of Five Million dollars ($5,000,000) per bond, Ten Million dollars ($10,000,000) per principal may be submitted to the Company for a special acceptance.

``*Id*. at 19, ¶3.

5.     Hudson delegated to Surety Partners the underwriting responsibility for surety bonds issued within the approved bonding limits, leaving to Surety Partners any needed evaluation of the bond principal's past performance.  Exhibit 1 at ¶4.  Hudson's corporate designee testified during Hudson's deposition that Surety Partners' "responsibility is to underwrite the contractor whether he can complete the work or no."  Hudson Dep. at 41 attached as **Exhibit 3**.  Hudson provided underwriting guidelines for Surety Partners to follow.  True and accurate copies of the Guidelines are attached as **Exhibit 4**.  *See also* Exhibit 1 at ¶4.

6.     Notwithstanding the PAA, Hudson did evaluate the financial information for a prospective principal and any proposed indemnitors.  Exhibit 1 at ¶5.  The purpose of this financial review was to ascertain the financial risk to Hudson of extending surety credit to a principal and to establish a limit on the amount of bonding to a range that Hudson determined it could likely

obtain loss/expense reimbursement pursuant to its rights under a written indemnity agreement that Hudson required prior to issuance of any bonds. *Id*.

7.      With regard to surety bonds issued by Hudson through Surety Partners, Hudson received relevant financial information which underwriting then used to assess, among others things, a principal's and indemnitor's working capital and institutional debt ratio to working capital. Exhibit 1 at ¶6. Additional underwriting materials that may be obtained for the bond principal were also uploaded into Citrix. Exhibit 3 at 52.

8.      Hudson's underwriting procedures, including the responsibilities delegated to Surety Partners, did not include investigating whether any governmental entity issued any particular certification or verification to a potential bond principal, including SDVOSB verifications. Exhibit 3 at 34; Exhibit 1 at ¶7.

9.      Moreover, when Hudson is approached about its willingness to provide bonding credit to a new customer, the potential bond principal is <u>not</u> typically seeking surety bonding for a specific or already awarded contract. Exhibit 1 at ¶8. Rather, the potential bond principal usually is seeking a commitment for future surety bonding under certain defined limits prior to being awarded any contract, such limits being dependent largely on a financial risk/loss analysis. *Id*.

10.      After Hudson approves bonding credit for a particular principal, Hudson does not review each submitted bid proposal or awarded contract because that is "just not the normal course of business." Exhibit 3 at 190.

**B.      CSG Formation and Operations Through Mid-2011**

11.      Defendant Amar Gogia ("Gogia"), the owner of CSG, is a service-disabled veteran.

12.     On January 12, 2010, the Internal Revenue Service provided CSG with an EIN. 1/12/10 IRS Notice attached as **Exhibit 5**.  The IRS Notice was sent to CSG at an address listed as 650 Garbers Church Road, Harrisonburg, VA 22801.  *Id*.

13.     On January 23, 2010, CSG was registered with the Commonwealth of Virginia. SCC record attached as **Exhibit 6**.  CSG's registration identified 650 Garbers Church Road, Harrisonburg, VA 22801 as its "Principal Office" and "Registered Office."  *Id*.

14.     Hudson was not involved in any aspect of CSG's formation, which took place more than a year before Hudson was approached about providing bonding credit for CSG.    Exhibit 1 at ¶9.

15.     On January 29, 2010, Gogia, on behalf of CSG, completed the Central Contractor Registration ("CCR") form, which listed CSG's "Principal Street Address" as 650 Garbers Church Road, Harrisonburg, VA 22801.  CCR attached as **Exhibit 7**; 6/21/19 CSG Dep. at 37-38 attached as **Exhibit 8A**.

16.     On March 7, 2010, CSG successfully completed its Online Representations and Certifications Application ("ORCA").  3/7/10 email attached as **Exhibit 9**.

17.     Gogia testified that he owned 51% of CSG and defendant Ajay Madan owned 49% of CSG as of March 8, 2010.  Exhibit 8A at 65-66.

18.     On July 26, 2010, the SBA approved CSG as a "qualified HUBZone small business concern."  HUBZone certification attached as **Exhibit 10**.  CSG's address was listed as 650 Garbers Church Road, Harrisonburg, VA 22801.  *Id*.

19.      Gogia testified in deposition that he was the 100% owner of CSG as of September 15, 2010 and he had executed an Operating Agreement reflecting this ownership structure. Operating Agreement attached as **Exhibit 11**; Exhibit 8A at 131-32.

20.     In order to obtain its initial SDVOSB verification, CSG stated in its Answer to Hudson Interrogatory No. 6: "CSG followed the procedure prescribed by the VA/Vetbiz program for initial certification. This included a phone interview with Gogia, a site visit to the CSG office space, and submission of the documents that were requested." CSG ATI No. 6 attached as **Exhibit 16**.[1]

21.     Between August 2010 and May 2011, the VA awarded CSG eight SDVOSB contracts totaling approximately $4.6 million.  SAC at ¶87.  Defendant Hanover Insurance Company ("Hanover") provided surety bonding for each of these 8 contracts.  Hanover Answer to Plaintiff's Interrogatory No. 3 attached as **Exhibit 12**.

22.     On April 29, 2011, Calvary Contracting submitted a bid protest for Solicitation VA-250-11-IB-0114, Project No. 538-08-124, to the Contract Specialist, Joyce Graves. Calvary Contracting Bid Protest attached as **Exhibit 13**.  The VA had awarded this contract to CSG.  SAC at ¶87.  The Calvary Bid Protest raised the issue as to "Centurion Solutions Group's status to bid . . . as a Service Disabled Veteran Owned Small Business under FAR 19.4103."  Exhibit 13 at 1. The Calvary Bid Protest asserted that CSG was "not a legitimate SDVOSB and do not meet the requirements to participate in such set asides."  *Id*. at 2.  The Calvary Bid Protest also stated: "The requirement of the SDVOSB is that 25% of the work be self performed.  According [to] the D&B report for CSG, they have 6 employees.  How can they self-perform 25% of the work with only 6 employees?"  *Id*.  The Calvary Bid Protest attached four supporting exhibits:

- Exhibit A – D&B report for CSG
- Exhibit B – D&B report for an entity called The Gogia Group
- Exhibit C – CCR search results for CSG
- Exhibit D – D&B report for CB Construction

---

[1]     By way of further explanation, CSG's corporate designee Gogia testified in deposition in response to inquiries about a March 1, 2010, email from defendant Ajay Madan to Gogia enclosing the Code of Federal Regulations governing the SDVOSB verification process that he reviewed the rules to make sure that CSG was in compliance.  Exhibit 8A (6/21/19 CSG Dep.) at 52-55; 3/1/10 email attached as **Exhibit 17**.

*Id.*

23.     On May 3, 2011, Beverly Jones, Contracting Officer with the VA, forwarded the Calvary Bid Protest to Tim J. Foreman, Executive Director, Office of Small and Disadvantaged Business Utilization, Department of Veteran Affairs.  5/3/11 Letter attached as **Exhibit 14**.  The Contracting Officer "join[ed] in this protest" and "request[ed] resolution" and "requested that a review and determination on this matter be expedited."  *Id.*

24.     On May 12, 2011, the VA Center for Veterans Enterprise issued a letter to CSG, addressed to Gogia, stating: "Congratulations! On behalf of the U.S. Department of Veterans Affairs (VA), the Center for Veterans Enterprise (CVE), I am writing to inform you that your service-disabled Veteran-owned small business has been verified and added to the verified Veteran business database at www.Vetbiz.gov."  5/12/11 Letter attached as **Exhibit 15** (emphasis added).

25.     On June 20, 2011, the VA notified CSG that it was denying the Calvary Bid Protest. 6/20/11 Letter attached as **Exhibit 18**.  Prior to receiving documents in discovery in this lawsuit, Hudson was not aware of either the Calvary Bid Protest or its denial.  Exhibit 1 at ¶12.

26.     Hudson was not involved in any aspect of CSG's submissions for SDVOSB verification, which processes were completed months before Hudson was approached about providing bonding credit for CSG.  Exhibit 1 at ¶10.

27.     Hudson had no communication with defendants Vijay Narula, Ajay Madan, Neil Parekh, Gogia or anyone on behalf of Optimal Solutions and Technology, Inc. ("OST"), CB Construction Group, Inc. ("CB"), Citibuilders or CSG prior to or during CSG's formation in early 2010 through its completion of the SDVSOB verification process in May 2011.  Exhibit 1 at ¶11.

**C.     Hudson Issues Surety Bonds on CSG's Behalf between July and October 2011**

28.     In or about May 2011, defendant Centennial Surety Associates, Inc. ("Centennial"), acting as CSG's bond broker and agent, approached Surety Partners regarding Hudson's willingness to provide a surety bonding line to CSG.  Exhibit 1 at ¶¶13-14; 5/11/11 Seed email attached as **Exhibit 19**.

29.     On May 11, 2011, Surety Partners via email notified Hudson that CSG was an "existing" Centennial account and sought Hudson's review and approval for a bonding line for CSG of "$3MM/$8MM", which was within the PAA bonding parameters. *Id.*  at ¶14.

30.     Surety Partners further informed Hudson that:

- CSG was currently a Hanover account under a $3MM/$10MM program with corporate indemnity

- Hanover had a backlog-final bond totaling $4.542 million dating 9/2/10 through 5/10/11

*Id.  See also* Exhibit 12, Hanover ATI No. 3.

31.     To allow Hudson to evaluate the financial risk of bonding CSG, Centennial provided the following CSG financial information to Hudson:

CSG Compiled Financial Statements for Period Ending December 31, 2010, prepared by JF Kearney & Associates, P.A.

- Balance Sheet – Period Ended 12/31/10
- Statement of Income & Retained Earnings – Period Ended 12/31/10
- Statement of Cash Flows – Period Ended 12/31/10
- Statements of Operating Expenses – Period Ended 12/31/10

CSG Balance Sheet as of June 30, 2011

CSG Statement of Cash Flows – January through June 2011

CSG Profit & Loss Statement – January through June 2011

CSG financials attached as **Exhibit 25;** Exhibit 3 at 100; Exhibit 1 at ¶15.

32.     Centennial also provided Hudson the following OST financial information:

OST Financial Statements – For the Twelve Months Ended May 31, 2010

- Balance Sheet
- Income Statement
- Statement of Cash Flows

OST Financial Statements – For the Twelve Months Ended May 31, 2009

- Balance Sheet
- Income Statement
- Statement of Cash Flows

OST Financial Statements – For the Twelve Months Ended May 31, 2008

- Balance Sheet
- Statement of Income
- Statement of Changes in Stockholders' Equity
- Statement of Cash Flows

OST Profit & Loss – June 2010 through February 2011

OST Summary Balance Sheet – As of February 28, 2011

OST Summary Balance Sheet – As of November 30, 2010

OST Profit & Loss – June through November 2010

OST Summary Balance Sheet – As of May 31, 2010

OST Profit & Loss – June 2009 through May 2010

OST A/R Aging Summary – As of February 28, 2010

OST Profit & Loss – June 2009 through February 2010

OST Summary Balance Sheet – As of February 28, 2010

OST Summary Balance Sheet – As of October 31, 2009

OST Statement of Operations – For Twelve Month Fiscal Year Period Ended May 31, 2009

OST Summary Balance Sheet – As of May 31, 2009

OST Statement of Financial Position – As of May 31, 2009

OST Profit & Loss – June 2008 through May 2009

OST Balance Sheet – As of February 28, 2009

OST Profit & Loss – June 2008 through February 2009

OST Profit & Loss – June 2008 through May 2009

OST Financial Statements – February 28, 2010; May 31, 2010; May 31, 2009; May 31, 2008

Personal Financial Statement of Vijay Narula – As of February 28, 2011

OST 2007 U.S. Corporation Income Tax Return

OST financials attached as **Exhibit 26;** Exhibit 1 at ¶16.

33.     Hudson's corporate designee explained in deposition that the purpose of obtaining such extensive financial information is to "understand the strength of the entities that are on the indemnity agreement."  Exhibit 3 at 96.

34.     On or about July 22, 2011, CSG, CB, OST, Amar Gogia, and Vanessa Gogia entered into a general indemnity agreement in Hudson's favor for the purposes of indemnifying Hudson from all loss and expense incurred by Hudson in connection with the issuance of any such surety bonds.[2] A true and accurate copy of the July 22, 2011, General Indemnity Agreement is attached as **Exhibit 20**.  Exhibit 1 at ¶17.

35.     On or about July 27, 2011, CSG, Citibuilders, Amar Gogia, Vanessa Gogia, and Neil Parekh entered into a second general indemnity agreement in Hudson's favor for the purposes of indemnifying Hudson from all loss and expense incurred by Hudson in connection with the

---

[2]     Hudson filed a Third-Party Complaint against Vanessa Gogia in this matter but Ms. Gogia has since filed for bankruptcy and received a discharge.

issuance of any such surety bonds.  A true and accurate copy of the July 27, 2011, General Indemnity Agreement is attached as **Exhibit 21**.[3]  Exhibit 1 at ¶18.

36.    Hudson's corporate designee testified that Hudson requires more than just the intended bond principal to provide indemnity because "when we are writing bonds for anybody, we look to get indemnity of anybody and everybody that we can."  Exhibit 3 at 91.  Specifically, regarding multiple entities executing the general indemnity agreements, Hudson's corporate designee further explained that: "If someone's willing to sign this the way it is, it increases our recovery efforts on any bonds issued."  *Id*. at 113-14, 116.

37.    After analyzing CSG's and OST's financials and approving CSG for a surety bonding line within the limits set forth above, which limits fell within Surety Partners' scope of authority under the PAA, Hudson did not require Surety Partners to provide advance copies of bid bond forms, the solicitation packages for any contracts on which CSG bid, or the awarded contracts as a condition precedent to issuance of Hudson surety bonds.  *Id*. at ¶19.  Consistent with Hudson's general practice, Hudson was never involved in preparing or reviewing any of CSG's bids to the VA, submitting any of CSG's bids, or submitting payment applications for the contracts covered by Hudson issued surety bonds.  *Id*.

38.    Ultimately, in reliance upon the execution of the GIAs and the financial information it obtained through Centennial, Hudson issued the following five performance and payment bonds (Standard Form 25A), via Surety Partners pursuant to the PAA, on CSG's behalf and in favor of the VA as the bond obligee (the "Hudson Bonds"):

---

[3]    The two general indemnity agreements will be referred to collectively as the "GIAs."  CSG, Citibuilders, OST, CB, Amar Gogia, Vanessa Gogia, and Neil Parekh will collectively be referred to as the "Indemnitors."

| Program Number | Full Policy Number | Effective Date | Limit | Named Insured Full Name | Name of Surety Bond Obligee |
|---|---|---|---|---|---|
| | | | | | |
| 118 | HSAMA0202 | 7/22/2011 | $167,000.00 | Centurion Solutions Group, LLC | Department of Veterans Affairs |
| 118 | HSAMA0203 | 7/22/2011 | $179,800.00 | Centurion Solutions Group, LLC | Department of Veterans Affairs |
| 118 | HSAMA0208 | 7/29/2011 | $731,910.00 | Centurion Solutions Group, LLC | Department of Veterans Affairs |
| 118 | HSAMA0210 | 8/1/2011 | $187,942.00 | Centurion Solutions Group, LLC | Department of Veterans Affairs |
| 118 | HSAMA0294 | 10/27/2011 | $77,100.00 | Centurion Solutions Group, LLC | Department of Veterans Affairs |

Exhibit 1 at ¶20.

39.     On September 29, 2011, Surety Partners emailed Hudson to provide an update on CSG's contract award status.  9/29/11 email attached as **Exhibit 22**; Exhibit 1 at ¶21. Surety Partners also provided an "Account Summary" drafted by Hanover in 2010 providing corporate and financial information for OST and CSG that sets forth "the history of this account[.]". *Id*; C. Seed Dep. at 128-130 attached as **Exhibit 23**.  Hudson reviewed the information and responded the same day setting forth Hudson's understanding of CSG's financials at that time and that the "financial presentation must continue to improve[.]" 9/29/11 email attached as **Exhibit 24**; Exhibit 1 at ¶21.

40.     Hudson provided a total of five performance and payment bonds on CSG's behalf over a period of four months.  Hudson did not issue any surety bonds on behalf of CSG after October 27, 2011.  *Id*. at ¶22.

41.     At no time did a Hudson employee conduct a site visit of either the CSG or OST offices or otherwise meet with a representative of either entity.  *Id*. at ¶23.  Similarly, Hudson never communicated with defendants Vijay Narula, Ajay Madan, Neil Parekh, Amar Gogia or anyone at OST, Citibuilders, CB, or CSG before or during the process of issuing the Hudson Bonds in the summer and fall of 2011.  *Id*.

42.     The VA never made any demands for performance under the Hudson Bonds. *Id*. at ¶24.

43.     Hudson was never asked to nor it ever issue any surety bonds on behalf of any other defendant in this matter. *Id*. at ¶25.

**D.      Hudson Declines to Provide Further Surety Bonding to CSG**

44.     On November 28, 2011, Hudson notified Surety Partners and Centennial it would conduct the "second audit of the year on your books this Thursday" and specifically included the accounts for "OST/Centurion Solutions" as part of the audit.  11/28/11 email attached as **Exhibit 27;** Exhibit 1 at ¶26.

45.     Hudson completed its audit of Surety Partners.  *Id*.

46.     On November 29, 2011, defendant Michael Schendel of Centennial notified Hudson that: "I thought Centurion was going to be a subsidiary of OST and it is officially not one. It is more of a sister company they keep at arms length, even though they are located in the same building/share resources."  11/29/11 email attached as **Exhibit 28**; Exhibit 1 at ¶27.

47.     On December 12, 2011, Surety Partners contacted Hudson about its willingness to approve bonding for a $6 million project that CSG was pursuing, which was outside Surety Partners' authority under the PAA. 12/12-14/11 (5:16 p.m.) email attached as **Exhibit 29**; Exhibit 1 at ¶28.  Surety Partners confirmed the CSG account was just audited and Hudson's CSG financial

information was up to date with what Surety Partners possessed at that time.  *Id*.  Surety Partners noted that it was following up on obtaining additional, more current financial information.  *Id*.

48.     After confirming that Surety Partners did not have current financial statements previously requested, Hudson refused to authorize the requested bonding outside the limits permitted in the PAA.  *Id*.; Exhibit 1 at ¶29.

**E.     CSG Operations Post-2011**

49.     After Hudson discontinued surety bonding for CSG after several months, the VA awarded eight additional SDVOSB contracts to CSG that were bonded by three different surety companies not parties in this case.  Exhibit 16, CGS ATI No. 8 (and attached spreadsheet); Exhibit 8B at 126-137; SAC at ¶87.

50.     The VA also continued to re-examine and reverify CSG's SDVOSB status for several years.

51.     On June 7, 2013, the VA Centers for Veterans Enterprise issued a letter to CSG, addressed to Gogia, confirming it was verified as SDVOSB for two additional years.  Exhibit 16, CSG ATI No. 7.  *See also* 6/7/13 letter attached as **Exhibit 30**; Exhibit 8B at 126-137.

52.     On November 1, 2013, the VA Center for Verification and Evaluation issued a letter to CSG, addressed to Gogia, confirming that after an "on-site examination conducted on October 17, 2013," CSG remained "in compliance with the eligibility requirements" for the VetBiz Vendor Information Pages Verification Program and CSG's "verification as a service-disabled Veteran-owned small business (SDVOSB) is valid through June 7, 2015[.]" 11/1/13 letter attached as **Exhibit 31** (emphasis added). *See also* Exhibit 16, CGS ATI No. 7. CSG's corporate designee testified this onsite inspection occurred at its Virginia offices. Exhibit 8B at 126-137.

53.     On December 18, 2014, Gogia received an email from the VA Center for Verification and Evaluation stating that "based upon your recent <u>on-site examination</u>, CVE has confirmed that your company remains in compliance with the eligibility requirements" for the VetBiz Vendor Information Pages Verification Program. 12/18/14 email attached as **Exhibit 32**. CSG's corporate designee testified this onsite inspection occurred at its Virginia offices. Exhibit 8B at 126-137.

54.     On July 24, 2015, <u>after this lawsuit was filed and unsealed,</u> the VA again verified CSG's SDVSOB status.  Exhibit 16, CGS ATI No. 7.

55.     On March 17, 2016, the VA again verified CSG as SDVOSB compliant. *Id*.

### III.     THE FCA LITIGATION

Plaintiff-Relator testified in deposition that the alleged fraud pled in the SAC began in early 2010.  Plaintiff-Relator Dep. at 198-199 attached as **Exhibit 33**.  He also testified that he first learned of the alleged fraud in September 2010 but never informed the VA at any time.  *Id*. at 206.

Plaintiff-Relator's Answer to Hudson Interrogatory No. 2 states he "believe[s] the" first "informal communications" with the federal government regarding CSG's alleged fraud "were initiated in or about late July 2014," but "Plaintiff-Relator's counsel did not document the occurrence of these informal communications[.]" Plaintiff-Realtor Answer to Hudson Interrogatory No. 2 attached as **Exhibit 34**.  Rather, Plaintiff-Relator concedes that the initial disclosure statement pursuant to 31 U.S.C. § 3730(b)(2) was not "formally submitted to the government" until "on or about August 6, 2014." *Id*.  On August 6, 2014, the same day as the 31 U.S.C. § 3730(b)(2) initial disclosure was made, Plaintiff-Relator initiated the instant *qui tam* action that alleged a wide-ranging conspiracy to defraud the federal government in violation of the FCA.

On September 8, 2020, Plaintiff-Relator filed the SAC asserting four counts against Hudson: (i) Count I – knowingly submitting or causing to be submitted false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(A) (presentment claims); (ii) Count II – knowingly making or causing to be made or used false statements or records material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B) (false statement claims); (iii) Count III – knowingly avoiding or decreasing obligations in violation of 31 U.S.C. § 3729(a)(1)(G) (reverse false claims); and (iv) Count IV – conspiracy to violate the FAC in violation of 31 U.S.C. § 3729(a)(1)(C).

The SAC alleges that defendants CSG, OST, CB, Citibuilders, Amar Gogia, Vijay Narula, Ajay Madan and Neil Parekh conspired to fraudulently obtain SDVOSB verification status for CSG. The SAC alleges that as a result of the fraudulently obtained SDVOSB verification, CSG bid on and was awarded SDVOSB set-aside contracts totaling $6,452,566.00.  SAC at ¶87.

With specific respect to Hudson, the SAC alleges that Hudson issued surety bonds on behalf of CSG and other entities that Hudson never bonded.  Regarding Counts I and II, the SAC alleges that Hudson's "underwriting and due diligence… would reasonably have revealed that CSG" could not undertake the "scope of contracting activity" it was bidding on and awarded and "was not a service-disabled small business[.]" SAC at ¶¶184-89.  Regarding Count III, the SAC alleges that the surety bonds Hudson issued on CSG's behalf "were separate instruments entered into between the United States government and although submitted with the contract, did separately obligate [Hudson] to compensate the government for losses sustained if the specifications found in the contract, including the specification that the construction activity be paid [to] a service-disabled veteran, veteran-owned small business entity" were not satisfied.  SAC at ¶242.

However, Plaintiff-Relator conceded in deposition that Hudson was not involved in any of the alleged fraud that took place in early 2010 or even at the time that he claims that he learned of the alleged fraud in September 2010.  Exhibit 33 at p.197-99.  Rather, Plaintiff-Relator testified in deposition that Hudson came into the alleged existing fraudulent conspiracy for the first time in 2011 when it entered into the "bond contract" with CSG.  *Id.*  As noted above, the first time Hudson entered into an agreement with CSG was under the July 2011, GIAs.  Exhibits 20-21.  Thus, according to Plaintiff-Relator's testimony, the alleged fraud had been ongoing for approximately 18 months before Hudson allegedly became involved.   Notwithstanding, Plaintiff-Relator conceded that he never notified Hudson of the alleged ongoing fraud prior to Hudson issuing the Hudson Bonds from July to October 2011, just as he never informed the VA.  Exhibit 33 at p. 205.

Plaintiff-Relator also testified in deposition that he is asserting that Hudson had actual knowledge of the fraud alleged in the SAC at the time it entered into the "bonding agreement between Hudson and CSG," *e.g.*, the July 2011 GIAs.  *Id.* at 197-98.  However, Plaintiff-Relator testified he "cannot recall at this time" how Hudson actually learned of the alleged fraud.  *Id.* at 200.  Moreover, other than vaguely referring to the documents "Hudson has produced" in discovery in this matter, Plaintiff-Relator could not identify a single Hudson employee that he asserts had actual knowledge of the alleged fraud.  *Id.* 200-01.

## IV.    LEGAL STANDARD

This Court has defined the standard for review of a summary judgment motion as follows:

The Federal Rules of Civil Procedure state that '[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The standard requires more than the existence of some factual dispute: 'the requirement is that there be no *genuine* issue of *material* fact.' *Anderson,* 477 U.S. at 247–48, 106 S.Ct. 2505 (1986) (emphasis in original). A fact is a material fact if, under the applicable law, it could affect the outcome of the case. *Id.* A

dispute is a genuine dispute for summary judgment purposes if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Id.* Also, because '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' the 'evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.' *Id.* at 255, 106 S.Ct. 2505. A nonmoving party, however, must establish more than 'the existence of a scintilla of evidence' in support of its position. *Id.* at 252, 106 S.Ct. 2505. In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *See Greene v. Dalton,* 164 F.3d 671, 675 (D.C.Cir.1999). The nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Id.* If the evidence presented is 'merely colorable, or is not significantly probative, summary judgment may be granted.' *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

*U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 858 F. Supp. 2d 79, 81–82 (D.D.C. 2012), *aff'd,*

764 F.3d 19 (D.C. Cir. 2014), and *aff'd,* 764 F.3d 19 (D.C. Cir. 2014).

Relevant here, "the burden on the moving party may be discharged by 'showing' – that is pointing out to the … court – that there is an absence of evidence to support the nonmoving party's case."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). *United States ex rel. Barko v. Halliburton Co.,* 241 F.Supp.3d 37, 49 (D.D.C. 2017) (*citing Celotex,* 477 U.S. at 322).

The undisputed facts in this case establish that Hudson provided bonds for only one entity identified in the lawsuit, CSG, a bonding relationship that did not commence until mid-2011 and ended only months later.  To the extent that Plaintiff-Relator still seeks to establish FCA liability and recover damages related to alleged fraudulent behavior by defendant Citibuilders and non-party KCGI, there is no legal or factual basis to find Hudson responsible for the alleged actions of companies with which it had no bonding relationship; accordingly, Hudson's argument will be limited to Hudson's involvement with CSG.

## V.      ARGUMENT

### A.      The Public Disclosure Bar Is a Complete Prohibition of Plaintiff-Relator's Claims

The Public Disclosure Bar divests courts of "subject-matter jurisdiction over FCA *qui tam* lawsuits if the information upon which the allegations or transactions are based was publicly disclosed before the filing of the complaint." *A1 Procurement, LLC v. Hendry Corp.*, No. 11-23582-CIV, 2013 WL 12061863, at *3 (S.D. Fla. Apr. 12, 2013) (quoting *U.S. ex rel. Brown v. Walt Disney World Co.*, 361 Fed. Appx. 66, 68 (11th Cir. 2010)).  A "challenge under the FCA's jurisdictional bar is the equivalent of a motion for summary judgment because it is necessarily intertwined with the merits." *United States ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 143 (5th Cir. 2017).

In relevant part, the Public Disclosure Bar states:

(e) Certain Actions Barred.-

*      *      *

**(4)(A)** The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—

**(i)** in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;…

unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

**(B)** For purposes of this paragraph, 'original source' means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730 (e)(4) (emphasis added).  Regarding sub-paragraph (4)(B)(2), the "test is stated in the conjunctive, meaning a negative answer to either will require dismissal of the complaint." *United States ex rel. Solomon*, 878 F.3d at 146.

In *Hendry Corp.*, the court addressed a similar scenario to the instant matter. The relator alleged Henry Corp. and other defendants were not 51% owned by a service-disabled veteran and violated the FCA by falsely asserting they were SDVOSBs to the federal government.  *Hendry Corp.*, No., 2013 WL 12061863, at *1.  Prior to the relator notifying the federal government of the alleged fraud, another entity, ETSC, submitted a bid protest by emailing a letter to the United States Coast Guard stating that "it was aware of the requirements for claiming SDVOSB status" but could find no evidence that the owner of Hendry "had any prior military service, and challenge that he did, or did not." *Id*. at *2.  The Coast Guard referred ETSC's bid protest to the SBA, which dismissed the bid protest "for lack of specificity." *Id*.

After the bid protest was filed and on the same day that the SBA dismissed the ETSC bid protest, the relator filed its own bid protest regarding Hendry with the SBA, which was dismissed when Hendry withdrew its bid.  Subsequently, the SBA OHA affirmed the dismissal of ETSC's Bid Protest.  *Id*.

The relator then filed a *qui tam* action and Hendry moved to dismiss under the Public Disclosure Bar for lack of subject matter jurisdiction.  *Id*. at *1-2. In analyzing the motion to dismiss, the district court followed a "three-part inquiry to determine whether a public disclosure divested a court of subject matter jurisdiction":

> (1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information." *Battle v. Bd. of Regents,* 468 F.3d 755, 762 (11th Cir. 2006) (quoting *Cooper v. Blue Cross and Blue Shield of Fla, Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994)); *see also U.S. ex rel. Osheroff v. Tenet*

> *Healthcare Corp.*, No. 09–22253–CIV, 2012 WL 2871264, at *2 (S.D. Fla. July
> 12, 2012) (citations omitted).

*Hendry Corp.*, 2013 WL 12061863, at *4.  In regard to the third factor, it is well-settled that it is

the "Relator's burden to prove it is an 'original source.'"  *Id*. at *7.

Regarding the first factor, the district court found that a bid protest is a public disclosure in

an administrative hearing under 31 U.S.C. § 3730 (e)(4)(A)(i):

> Under the Public Disclosure Bar, disclosure during a 'Federal administrative
> hearing' includes 'the filing of an administrative complaint,' and if 'the filing was
> not under seal and the document was available upon request ... the allegations
> contained in the ... agency protest were publicly disclosed.' *Grayson v. Advanced
> Mgmt. Tech., Inc.*, 221 F.3d 580, 582 (4th Cir. 2000). Submitting a bid protest, for
> Public Disclosure Bar purposes, is the equivalent of filing an administrative
> complaint. Indeed, contrary to Relator's arguments at the Hearing, ' 'a civil
> hearing' encompasses the filing of a civil complaint and [ ] allegations contained in
> such a complaint are 'publicly disclosed' for purposes of section 3730(e)(4)(A) ....
> '[A]dministrative hearings' [ ] include[s] the filing of an administrative complaint.'
> *Id.* (citation omitted); *see also U.S. ex rel. Barrett v. Johnson Controls, Inc.*, No.
> 3:01–CV–1641–M, 2003 WL 21500400, at *7 (N.D. Tex. Apr. 9, 2003) ('Because
> there is no evidence that the 1997 [b]id [p]rotest was filed under seal or unavailable
> to the public, [the written bid protest] constitutes a public disclosure in an
> administrative           hearing.'           (footnote           call           number           omitted)).

*Id*. at *5 (emphasis added).  Following this analysis, the court found this factor was satisfied

because "once ETSC sent its Bid Protest to the Coast Guard, the Coast Guard was required to send

it to the SBA."  *Id*.

As to the second factor, the court stated allegations are "substantially the same" if they

"name the specific defendant and allege the defendant actually engaged in wrong doing" and

provide the government with information "'to investigate the case and to make a decision whether

to prosecute or where the information could at least have alerted ... authorities to the likelihood of

wrongdoing.'"  *Id*. at *6. (quoting *U.S. ex rel. Davis v. District of Columbia*, 679 F.3d 832, 836

(D.C. Cir. 2012)).  The court further stated that "allegation" within the Public Disclosure Bar "has

been defined as 'a conclusory statement implying the existence of provable supporting facts." *Id.* (quoting *U.S. ex rel. Findley v. FPC–Boron Emp.'s Club*, 105 F.3d 675, 687 (D.C. Cir. 1997)).

The *Hendry Corp.* court found that ETSC's bid protest satisfied the second factor because the bid protest named Hendry and the information was sufficient for the SBA to "adequately investigate the case" even though the SBA ultimately denied the bid protest for lack of a factual basis. *Id.* ("It is of no moment, for purposes of this inquiry, that the ETSC Bid Protest was not sufficient for the SBA to proceed under 13 C.F.R. section 125.25(b).").

Regarding the third factor, the court determined that, although the relator ultimately obtained information that materially added to the previously publicly disclosed information, the relator's disclosure came after the ETSC bid protest, and the additional material information was not provided until after the *qui tam* action was initiated, so the relator was not an original source under 31 U.S.C. § 3730(e)(4). *Id.* at *8-9.

Here, like in *Hendry Corp.*, the Calvary Bid Protest, which was joined in by the Contracting Officer, satisfies the Public Disclosure Bar. This Court, therefore, does not have subject matter jurisdiction over this matter.

First, the Calvary Bid Protest constitutes a public disclosure in an administrative hearing under the Public Disclosure Bar. *Hendry Corp.*, 2013 WL 12061863, at *5. Second, the Calvary Bid Protest disclosed allegations that are substantially similar to those in the FCA Litigation. The Calvary Bid Protest: (i) specifically named CSG; (ii) referenced and attached CSG's Dunn & Bradstreet's report, which identified its Virginia address, phone number and Gogia as the Chief Executive Officer; and (iii) referenced and attached CCR search results for CSG, which identified CSG's primary contacts as Gogia and Parekh and noted that the information listed for Parekh was the same as for CB Construction. Exhibit 13. Further, the Calvary Bid Protest specifically raised

concerns as to who "is the service disabled veteran for" CSG relative to the SDVOSB 51% ownership requirement, if CSG was capable of self-performing 25% of the contract given the number of employees, and whether a service-disabled veteran controlled CSG's daily operations. *Id*. Thus, the Calvary Bid Protest unequivocally named CSG as a purported wrongdoer and alleged it engaged in specific wrongdoing that exceeds simply "implying the existence of provable supporting facts," which <u>was</u> sufficient in *Hendry Corp*.[4]

Finally, the Calvary Bid Protest's assertions that 51% of CSG was not owned by and the daily operations of CSG were not controlled by a service-disabled veteran are the very allegations serving as the predicate for Plaintiff-Relator's claims against CSG in this matter. In sum, the Calvary Bid Protest provided sufficient information "to investigate the case" of CSG's SDVOSB verification status sufficient to satisfy the second element of the Public Disclosure Bar. *See Hendry Corp.*, 2013 WL 12061863, at *5.

Under the third prong of the test, Plaintiff-Relator is not an "original source" of the information regarding CSG. 31 U.S.C. § 3730(e)(4)(B)(i) requires Plaintiff-Relator to have provided his knowledge of the alleged fraud to the government prior to the public disclosure. As noted above, the Calvary Bid Protest was submitted on April 29, 2011. Plaintiff-Relator testified in deposition that he never informed the VA about CSG's alleged fraud at any time. Exhibit 33 at 206. Moreover, Plaintiff-Relator's Answer to Hudson Interrogatory No. 2 states he "believe[s] the" first "informal communications" with the federal government regarding CSG's alleged fraud "were initiated in or about late July 2014," but concedes there is no record of these purported communications. Exhibit 34, ATI No. 2. Rather, Plaintiff-Relator concedes that "the initial disclosure statement pursuant to 31 U.S.C. § 3730(b)(2)" was not "submitted to the government

---

[4] Hudson does not concede any allegation asserted in the Calvary Bid Protest.

[until] on or about August 6, 2014" – the same date that he filed the FCA Litigation.  *Id.*  In other words, Plaintiff-Relator concedes he did not provide the information to the federal government prior to filing the FCA Litigation – over three years after the Calvary Bid Protest.  *Id.* Exhibit 33 (Pl. Dep.) at 206.  The undisputed facts demonstrate that Plaintiff-Relator cannot satisfy the requirements of 31 U.S.C. § 3730(e)(4)(B)(i).

Plaintiff-Relator fares no better under 31 U.S.C. § 3730(e)(4)(B)(2), which requires Plaintiff-Relator to satisfy the conjunctive requirements that he provided the government "knowledge that is independent of and materially adds to the publicly disclosed allegations… *and*… voluntarily provided the information to the Government *before* filing an action" under the FCA. (emphasis added). *See United States ex rel. Solomon*, 878 F.3d at 146. As noted, Plaintiff-Relator concedes that he did not provide the federal government with his alleged knowledge of the fraud allegations prior to initiating the FCA Litigation. Exhibit 34, ATI No. 2.  Thus, Plaintiff-Relator cannot satisfy the conjunctive requirements of this section.  Moreover, as in *Hendry Corp.*, even if Plaintiff-Relator has obtained information during the course of this action that materially adds to the previously disclosed information in the Calvary Bid Protest, it is too late to satisfy § 3730 (e)(4)(B)(2).

Accordingly, the SAC must be dismissed as it relates to the allegations involving CSG.

## B.   Hudson Is Entitled to Summary Judgment as to Plaintiff-Relator's Count I Presentment Claim

The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (known as a presentment claim).  The FCA defines the terms "knowing" and "knowingly" as someone who: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity

of the information; or (iii) acts in reckless disregard of the truth or falsity of the information[.]" 31

U.S.C.A. § 3729(b)(1)(A)(i)-(iii).

To survive summary judgment on his presentment claim, Plaintiff-Relator must produce

evidence that "'(1) the defendant submitted [or caused to be submitted] a claim to the government,

(2) the claim was false, and (3) the defendant knew the claim was false.'"   *United States ex rel.*

*Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 121-22 (D.D.C. 2014) (citing *U.S. ex rel. Head*

*v. Kane Co.,* 798 F.Supp.2d 186, 196 (D.D.C.2011) (quoting *U.S. ex rel. Folliard,* 722 F. Supp. 2d

at 26).

### 1.      Submission of a Claim:  Plaintiff-Relator does not allege, and there is no evidence, that Hudson directly submitted any false claims to the VA

Plaintiff-Relator has not alleged or offered any evidence that Hudson directly presented

any false claims to the federal government.  Absent presentment, mere knowledge that a fraudulent

claim was submitted cannot by itself support liability under § 3729 (a)(1)(A).  *See e.g*., *See United*

*States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (confirming necessity of "some action by

the defendant whereby the claim is presented or caused to be presented"); *U.S. ex rel. Kinney v.*

*Hennepin Cnty. Med. Ctr.*, No. CIV.971680(RHK/JMM), 2001 WL 964011, at *7 (D. Minn. Aug.

22, 2001) (no liability under § 3729 (a)(1)(A) because complaint failed to allege defendant "itself

presented a false or fraudulent claim for payment or approval, nor would the record support such

a finding").

Indeed, in granting Plaintiff-Relator's Motion for Leave to File Amended Complaint, this

Court stated: "the Amended Complaint does not allege that insurance defendants directly presented

false claims or made false statements to the government. Rather, plaintiff-relator relies on a theory

of indirect presentment."  Mem. Op. at 25.  Plaintiff-Relator has not subsequently modified his

claims and therefore cannot satisfy his burden of establishing Hudson directly presented a claim in violation of 31 U.S.C. § 3729(a)(1)(A) under Count I of the SAC.

### 2. Submission of a Claim: Plaintiff-Relator cannot establish any indirect presentment of a false claim by Hudson to the VA

A presentment claim may be brought against a defendant when a defendant does not directly present false claims to the federal government but indirectly "causes" false claims to be made. *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011). "Put differently, '[t]he False Claims Act extends beyond the person making a false claim to one who engages in a fraudulent course of conduct that induces payment by the government.'" *Computer Scis. Corp.*, 53 F. Supp. 3d at 126 (citation omitted).

Generally, courts require that a defendant affirmatively act in order to impose liability under the FCA, particularly when a plaintiff alleges that the defendant "caused" the submission of false claims. *See U.S. ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006) (requiring "affirmative action on the part of a defendant before imposing liability under the FCA" because "too broad an interpretation of the 'causes to be presented' language in the FCA 'would impose liability on parties merely for failing to prevent the fraudulent acts of others'"), *abrogated on different grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019); *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 50 (D.D.C. 2014), *on reconsideration in part*, 160 F. Supp. 3d 253 (D.D.C. 2016), and *clarified on denial of reconsideration*, No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016). At bottom, "for a qui tam FCA action to survive summary judgment, the relator must provide 'sufficient evidence to support an inference of knowing fraud.'" *United States ex rel. Bettis v. Oderbrecht Contractors of California, Inc.*, 297 F.Supp.2d at 272 at 277-278 (D.D.C. 2004) (*quoting United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1995)).

Specifically, for "causation" claims, this Court has explained that the "paradigmatic case occurs when the non-submitting party takes advantage of an unwitting intermediary, thereby causing that party to submit a false claim." *Computer Scis. Corp.*, 53 F. Supp. 3d at 126. "Courts have also credited allegations that a nonsubmitting party caused false claims to be submitted in a variety of contexts where the non-submitter was the driving force behind an allegedly fraudulent scheme." *Id.* at 127 (emphasis added). Thus, courts recognize that "a failure to act, without more, is insufficient to impose FCA liability." *Tailwind Sports Corporation*, 51 F. Supp. 3d at 50 (citing John T. Boese, Civil False Claims § 2.01(A), at 15 (4th ed. & 2013–2 Supp.) ("Mere inaction does not constitute a violation of the False Claims Act, and the government must argue more than that a defendant was aware of an alleged fraud.")). Ultimately, this Court opined that "[a]s a whole, these cases indicate that, in examining whether a non-submitting party has 'caused' the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission." *Computer Scis. Corp.*, 53 F. Supp. 3d at 127.

To support an indirect presentment claim against Hudson, Plaintiff-Relator bears the burden of providing evidence showing that Hudson's conduct was 'at least a substantial factor in causing, if not the but-for cause of'" the fraud. *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011). This matter does not present an example of the "paradigmatic case" in which a non-submitting party, *e.g.*, Hudson, "takes advantage of an unwitting intermediary, thereby causing that party to submit a false claim," *e.g.*, CSG, nor was Hudson otherwise a "driving force" behind the alleged fraudulent behavior, including the pursuit of SDVOSB status or pursuit of VA contracts.

The undisputed facts show that the majority of the alleged behavior that Plaintiff-Relator deems fraudulent – submission of documents to be certified as a SDVOSB and preparation of bids

containing inaccurate past performance representations - took place largely before Hudson had any business relationship with CSG or issued the Hudson Bonds and Plaintiff-Relator has presented no evidence of Hudson's involvement in these activities. *See Computer Scis. Corp.*, 53 F. Supp. 3d at 126-27.  To the contrary, the evidence and all reasonable inferences lead to the opposite conclusion – if any alleged fraud by CSG did occur, it was Hudson that was the "unwitting" party and was simply one of the five different surety companies from whom CSG obtained surety bonding for its federal government contract work over a period of several years.

In its original decision granting Hudson's motion to dismiss the original complaint, the Court noted: "although bonding was a necessary step in submitting the bids at issue, no facts are alleged that would allow the inference that the insurance defendants agreed to bonding in furtherance of the fraud alleged."  *Narula*, 2016 WL 6078246, at *9.  Despite being given the opportunity to conduct extensive discovery on this issue, Plaintiff-Relator remains unable to provide any facts sufficient for any reasonable jury to find that Hudson provided bonds for purposes of supporting or perpetuating CSG's alleged pre-existing fraud.

### 3. Falsity of the Claims:  Plaintiff-Relator has not established that CSG's payment applications were fraudulent as CSG performed the work for which it billed the VA

The underlying factual basis for Plaintiff-Relator's claims against Hudson is that Hudson provided Miller Act bonds that allowed CSG to successfully receive, perform and bill the VA under certain contracts alleged to be SDVOSB set-aside contracts.  Plaintiff-Relator further alleges that the payment applications submitted by CSG constitute fraudulent claims because CSG was not a valid SDVOSB despite the VA's certification of its SDVOSB status.

As to the CSG contracts bonded by Hudson, there is no evidence that the work was not performed (performance bonds) or that the laborers and materialmen were not paid (payment

bonds).  The VA received valuable construction services for the payments it made to CSG.  The contract payments made to an alleged fraudulent SDVOSB did not result in a "loss" to the VA because the VA would have had to pay some contractor to perform the work.

### 4.   Falsity of the Claims:  Plaintiff-Relator has failed to adequately plead the required elements of a false certification claim

Liability under the FCA may be predicated on a "false certification theory," which occurs "when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not complied." *Honeywell Int'l Inc.*, 2020 WL 6940028, at *13. *Computer Scis. Corp.*, 53 F. Supp. 3d at 122 (quoting *United States v. Sci. Applications Int'l Corp.,* 626 F.3d 1257, 1266 (D.C.Cir.2010)).  The alleged false representation must be "material to the government's decision to pay." *Computer Scis. Corp.*, 53 F. Supp. 3d at 122.

In this case, to establish Hudson's liability on this basis, Plaintiff-Relator would have to produce evidence that SDVOSB status was a contractual requirement of the five CSG/VA contracts bonded by Hudson, that CSG did not validly attain such SDVOSB status (despite multiple certifications and recertifications by the VA stating the contrary), and that CSG explicitly or at least implicitly represented in its payment applications for those contracts that it met such technical requirements.   In denying defendant OST's recent motion to dismiss, this Court previously determined that Plaintiff-Relator is not asserting claims based upon a false certification theory, but rather based solely on a fraud in the inducement theory. *Scollick*, No. 14-CV-1339 (RCL), 2020 WL 6544734, at *8 ("plaintiff-relator pleads falsity under another theory: fraud in the inducement").

**5.    Falsity of the Claims:   undisputed facts doom Plaintiff-Relator's attempt to assert a fraudulent inducement claim against Hudson**

FCA liability may be imposed under a "fraud in the inducement" theory if <u>during the contract bid process</u> "a misrepresentation in the defendant's bid must have *caused* the government to award the defendant the contract." *Scollick ex rel. United States v. Narula*, No. 14-CV-1339 (RCL), 2020 WL 6544734, at *9 (D.D.C. Nov. 6, 2020) (emphasis in original). *See also id.* ("false statements induced the government to *award the contract*") (emphasis in original); *United States v. Honeywell Int'l Inc.*, No. CV 08-0961 (PLF), 2020 WL 6940028, at *18 (D.D.C. Nov. 25, 2020) ("Once the United States has established that a defendant made a false representation or omission, the FCA also requires proof that the omitted or false information was material and that the [party] was 'induced by, or relied on, the fraudulent statement or omission when it <u>awarded the contract</u>.'") (emphasis added).

This Court has previously explained that all claims submitted under a theory of fraudulent inducement are a continuation of the original fraud: "Thus, under the fraud in the inducement of falsity, claims submitted pursuant to a contract procured by fraud are considered 'false or fraudulent' even without 'evidence that the claims were fraudulent in themselves.'" *Scollick*, No. 14-CV-1339 (RCL), 2020 WL 6544734, at *7 ("The Supreme Court held that the contractors presented a "fraudulent" claim to the government in violation of the False Claims Act because the 'initial fraudulent action' (procuring the contract by fraud) 'taint[ed]' all subsequent claims made under the contract.") (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)).

In the SAC, Plaintiff-Relator makes vague and often false factual allegations about the existence of a generic "bonding agreement" and about actions attributed to the so-called "Bonding Defendants" without identifying specific documents, individuals or companies.  At the summary judgment stage, however, Plaintiff-Relator bears the burden of proving his fraudulent inducement

theory of liability as to each individual defendant and can no longer rely on the trick of conflating

four separate defendants into a single entity, the "Bonding Defendants," to attribute the actions of

any of the four to all four. *See, e.g., United States ex rel. Westrick v. Second Chance Body Armor,*

266 F.Supp.3d 110, 126 (D.D.C. 2017).

### 6.    Knowing Presentment of a False Claim:  there is no evidence that Hudson had actual knowledge of CSG's alleged fraud

Many of the activities that Plaintiff-Relator alleges to be fraudulent with respect to CSG

occurred prior to any CSG relationship with Hudson.  Hudson was first approached in 2011 but

CSG was formed in January 2010.  Exhibit 1 at ¶¶13-14.  Hudson was not involved in CSG's

SDVOSB verification process, which was finally completed when the VA issued the May 12,

2011, SDVOSB verification letter and added CSG to the Vetbiz database – events that took place

before the GIAs were executed or the Hudson Bonds were issued.  *Id.* at ¶10; Exhibit 15.  Hudson

had no relationship with CSG, OST, CB, Citibuilders, Vijay Narula, Ajay Madan, Neil Parekh or

Amar Gogia between the time frame of CSG's formation and its SDVOSB final verification.

Exhibit 1 at ¶11.  Thus, there can be no dispute that Hudson had no actual knowledge of the alleged

fraudulent activity related to CSG's formation, its initial SDVOSB verification or any alleged

SDVOSB set-aside contracts pre-dating the Hudson Bonds because it had no relationship with the

parties alleged to be involved.

There is no evidence that Hudson became aware of any fraud after receipt of the GIAs and

during the window of time - July through October 2011 - that it provided bonds for CSG.  First,

Hudson delegated to Surety Partners under the PAA the underwriting functions related to

evaluating whether CSG could perform the type of contract work it sought. Exhibit 2.  Although

paragraph 184 of the SAC alleges that Hudson's "underwriting and due diligence… would

reasonably have revealed that CSG did not possess the necessary construction history… to carry

out the scope of the contracting activity," there is no evidence that Surety Partners provided any information to Hudson that indicated CSG could not perform the contracts it was awarded.  *See also* SAC at ¶187 (similar allegations as to Gogia).  To the contrary, prior to issuance of the Hudson Bonds, as noted above, Surety Partners notified Hudson that CSG had been awarded eight contracts that Hanover bonded totaling "$4.542M dating 9/2/2010 thru 5/10/11."  Exhibit 19.

Second, there can be no legitimate dispute that Hudson was not involved in procuring contracts for CSG.  Contrary to the allegations in paragraph 196 of the SAC, Hudson did not review "every SDVOSB contracting action pursued in the name of CSG."  Exhibit 3 at 190. Plaintiff-Relator concedes that if Hudson was involved in the alleged CSG fraud, which it was not, it did not enter the alleged fraudulent conspiracy until July 2011 when the GIAs were executed and after eight contracts were awarded.  Exhibit 33 (Pl. Dep.) at 198. Thus, the only evidence in this matter is that Hudson provided bonds for five CSG contracts over a period of a couple of months.

Even after Hudson agreed to provide a bonding credit line for CSG, Hudson was not involved in any CSG contract bid process and did not prepare or review any CSG contract bids or the solicitation packages, in part because the requested CSG bonds were within Hudson's pre-approved surety bond limit established for CSG and fell within the parameters of Surety Partners' authority under the PAA. Exhibit 1 at ¶19; Exhibit 3 at 190.  Plaintiff-Relator has not and cannot offer any evidence to the contrary.

Third, there is no evidence that Hudson ever received any information that would raise concerns about CSG's performance capability.  Hudson was not aware of any complaint by the VA that CSG was either incapable or unwilling to perform its obligations under the eight  Hanover-bonded contracts.  Similarly, Hudson never received any complaints from the VA about CSG's performance on the contracts bonded by Hudson.

Finally, Plaintiff-Relator conceded that he never warned Hudson about the alleged fraud even though he testified he was aware of the alleged fraud beginning in September 2010 – approximately ten months prior to the execution of the Hudson GIAs. Exhibit 33 at 198; Exhibits 20-21.  Not surprisingly, Plaintiff-Relator could not even identify the basis for Hudson's purported knowledge or a single Hudson employee who knew of the alleged fraud. *Id*. at 204-205. Moreover, although the SAC asserts the "Bonding Defendants" toured OST facilities, Plaintiff-Relator testified this "tour" occurred in the summer or fall of 2010, before Hudson had any involvement with CSG. Exhibit 33 at 191-194. Plaintiff-Relator has conceded that he has no knowledge that Hudson ever participated in any tour of an OST office prior to, during or after the period it issued the Hudson Bonds and Hudson confirms that it never did so.  *Id*.; Exhibit 1 at ¶23. The SAC's allegations that Hudson toured OST's offices are demonstrably false.  *See* SAC at ¶¶182-83.

Further, contrary to the insinuations contained in paragraph 194 the SAC, Hudson's requirement of contractual indemnity from more parties than just CSG was not some indicia of Hudson's knowledge of an ongoing fraud but rather typical industry practice.[5]  Hudson's corporate designee testified that "we look to get indemnity of anybody and everybody that we can" to increase "recovery efforts on any bonds issued."  Exhibit 3 at 91, 113-14, 116.  *See, also., Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300 (2004) ("In the construction industry, it is standard practice for surety companies to require contractors for whom they write bonds to execute indemnity agreements by which principals and their individual backers agree to indemnify sureties against any loss they may incur as a result of writing bonds on behalf of principals. *See generally The Surety's Indemnity Agreement—Law & Practice* (Marilyn Klinger, *et al., eds.,* Am. Bar Assoc. 2002)") (emphasis added). *See also* M. Klinger, G. Bachrach, T. Haley,

---

[5]        Paragraph 193 of the SAC alleges that the "Bonding Defendants further required Narula and his wife" to provide $1 million in indemnity.  This is not true as to Hudson.  *See* Exhibits 20-21 (GIAs).

*The Surety's Indemnity Agreement*: *Law and Practice* at 185 (2nd ed. 2008) (indemnitors "are intended to provide the surety a source of recourse to reduce loss resulting from the issuance of bonds for the principal…. As with principals, indemnitors are not limited in nature or number.").

### 7. Knowing Presentment of a False Claim: there is no evidence that Hudson had constructive knowledge of CSG's alleged fraud

Under the FCA, a party cannot avoid liability by burying its head in the sand while being the beneficiary of fraudulent behavior. A party can be found to have "constructive knowledge" of a fraud if it acts with "deliberate ignorance" or "reckless disregard" for the truth. 31 U.S.C. § 3729(b)(1)(A)(ii)-(iii). Here, the record reflects that Hudson adequately and thoroughly vetted CSG before agreeing to issue bonds on its behalf.

When asked to provide a bonding line, Hudson reviewed CSG's and OST's then current financial information during the underwriting process to analyze the potential financial risk to Hudson in issuing surety bonding to CSG and to determine the acceptable bonding limits to provide to Surety Partners to limit Hudson's financial exposure. Exhibit 3 at 15; Exhibits 25-26 (financials). Although paragraph 184 of the SAC alleges that Hudson's "underwriting and due diligence… would reasonably have revealed that CSG did not possess the necessary… financial capabilities to carry out the scope of the contracting activity," there is no evidence that the financial information Hudson obtained was incorrect or that Hudson's financial analysis was flawed. To the contrary, Hudson's corporate designee testified that CSG and OST's financials were "adequate for the size bonds we issued." Exhibit 3 at 15.

The extensive financial records provided no evidence to Hudson that "Parekh, Narula and Madan exerted dominance and control over CSG." *See* SAC at ¶186. Similarly, to the extent that any CSG financial documents revealed more than one member of CSG, that, alone, is of no moment because SDVOSB status requires only 51% ownership by a service-disabled veteran. *See*

38 C.F.R. 74.1.  In any event, Surety Partners did not approach Hudson about providing a bonding line to CSG exclusively for SDVOSB set-aside contracts but for its general bonding needs.  It is typical, like the situation here, to secure general bonding capability before submitting bids on projects known to require bonding. Exhibit 1 at ¶8.

The fact that CSG already had received SDVOSB certification from the VA before it ever sought bonds from Hudson is further evidence that Hudson had no constructive knowledge of any fraud.  The VA is required by federal law to undertake specific procedures to examine a potential SDVOSB entity during the verification process, including obtaining significant documentation delineated in the relevant federal regulations relating to financial statements and corporate structure documents, among others.  *See* 38 C.F.R. §§74.10 – 74.12, 74.20.[6]  The VA is statutorily required to establish a "database of veteran-owned businesses maintained by the [VA] Secretary" that are eligible for SDVOSB set-aside contracts and the VA, not sureties, are statutorily required to verify "that each small business concern listed in the database is owned and controlled by veterans." 38 U.S.C.A. § 8127 (f)(4). *See, e.g*., Exhibit 15.

Hudson's corporate designee testified that it is not the normal course of business to underwrite government-issued verifications. Exhibit 3 at 190.  *See also* 38 C.F.R. 74 *et seq*. Plaintiff-Relator has not, because he cannot, identify any federal law or regulation that requires a surety to investigate the legitimacy of a government-issued SDVOSB verification in the absence of any information indicating improper verification – particularly when the verifying agency is

---

[6]     38 C.F.R. § 74.12 (What must a concern submit to apply for VIP Verification Program?) required CSG to submit specific information to the VA that overlapped with information in Hudson's underwriting file identified above: "The documentation to be submitted to CVE includes, but is not limited to: Articles of Incorporation/Organization; corporate by-laws or **operating agreements**; shareholder agreements; voting records and voting agreements; trust agreements; franchise agreements, organizational, annual, and board/member meeting records; stock ledgers and certificates; State-issued Certificates of Good Standing; contract, lease and loan agreements; **payroll records; bank account signature cards**; **financial statements**; Federal personal and business tax returns for up to 3 years; and licenses." (emphasis added).

also the bond obligee and required by law to review the same financial information and corporate structure documents provided to the surety.

Plaintiff-Relator's argument that Hudson was obligated to look behind CSG's verification is also without merit because by the time Hudson began its underwriting process, the VA had already finally verified CSG's SDVOSB status and awarded CSG 8 SDVOSB set-aside contracts. Exhibit 12 (Hanover ATIs) at No. 3; Exhibit 16 at No. 8 (with spreadsheet). *See also* Section II.A. at ¶20.

Instructively, courts have previously found that third parties do not have a duty to investigate the underlying factual predicate for a government-issued verification/certification and such a decision, alone, is not reckless disregard or deliberate ignorance of fraud under the FCA:

> '[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of ... regulations are not fraud unless the violator knowingly lies to the government about them.' *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1020 (7th Cir.1999). Thus, the FCA is violated only by deliberate falsehoods or, at minimum, statements made with reckless disregard of their truth or falsity. [citation omitted]… Neither negligent misstatements nor innocent mistakes are sufficient to establish liability under the FCA. [citation omitted] Where the government has assured a contracting party that a certain fact is true, and the contracting party has no reason to doubt the government's assurances, it is not a reckless or deliberate falsehood to rely on those assurances in making a claim to the government. [citations omitted]

*U.S. ex rel. Burlbaw v. Orenduff*, 400 F. Supp. 2d 1276, 1285–86 (D.N.M. 2005) (declining to find fraud under FCA where defendant did not investigate Department of Education issued certification), *aff'd,* 548 F.3d 931, 957 (10th Cir. 2008) ("defendants reasonably relied upon the written assurances of the governmental agency responsible for administering the program under which NMSU sought and obtained the now-contested contracts") (emphasis added). *See also* 3 Bruner & O'Connor Construction Law § 8:66.30 (Surety exposure to False Claims Act (FCA) liability) n.3 ("Because the VA's program requires a separate verification process, it is difficult to

understand how the surety could be subject to [False Claims Act] liability for relying on status conferred upon its principal through a separate process in which it was not engaged.").

Accordingly, paragraph 204 of the SAC alleging that the issuance of the Hudson Bonds created a false impression to the VA that CSG was properly SDVOSB verified is nonsensical because it was the VA that issued the SDVOSB verification to begin with and awarded eight SDVOSB set-aside contracts to CSG – all *prior* to issuance of the Hudson Bonds.  Similarly, the allegation in paragraph 185 that Hudson's "due diligence and underwriting reasonably led to the conclusion that OST, CSG and CB shared common ownership" also falls flat because Hudson was entitled to rely on the government's SDVOSB verification, which included determining the 51% service-disabled ownership requirement was met, and, as noted above, there is no prohibition against multiple owners of an SDVOSB entity that would have triggered a reason for Hudson to question the SDVOSB verification in the first instance.  *See also* SAC at ¶¶190-92; 38 C.F.R. 74.2 – 74.4, 74.12.

## C.    Hudson Is Entitled to Summary Judgment as to Plaintiff-Relator's Count II False Statement Claim

Similar to a presentment claim, the FCA imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (false statement/record claim).  As to Count II, summary judgment must be granted to Hudson unless Plaintiff-Relator must establish "(1) the defendant made or used a 'record or statement;' (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was 'material' to a false or fraudulent claim." *Computer Scis. Corp.*, 53 F. Supp. 3d at 123 (citing *U.S. ex rel. Hood v. Satory Global, Inc.,* 946 F. Supp. 2d 69, 85 (D.D.C. 2013)).

The elements of a false statement claim "are practically identical to the requirements for a presentment claim" and the "only notable difference is that, as the language suggests, [a false statement claim] requires evidence that the defendant made a false *statement* to the government, as opposed to the submission of a false claim for payment." *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014) (clarification added and emphasis in original). For the same reasons that Plaintiff-Relator's presentment claims must fail, his false statement claim must fail because there is no evidence that Hudson knowingly submitted or caused to be submitted a false record.

**D.      Hudson Is Entitled to Judgment as a Matter of Law on Count III (reverse false claim)**

**1.      Definition of a Reverse False Claim**

Section 3729(a)(1)(G) of the FCA "provides a cause of action where the defendant has made what is commonly known as a 'reverse' false claim." *Pencheng Si*, 71 F. Supp. 3d at 88. Reverse false claim liability arises when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. § 3729(a)(1)(G). In other words, a "reverse false claim is any fraudulent conduct that results in no payment to the government when a payment is obligated." *Pencheng Si*, 71 F. Supp. 3d at 88.

The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3). *See also United States ex rel. Morsell v. Symantec Corp.,*130 F. Supp. 3d 106, 125-126 (D.C. 2015). Relevant to the instant matter, this Court clarified that reverse false

claim fraud must arise from a separate monetary obligation flowing to the government distinct from the obligation simply to repay the government any monies obtained through false claim or false statement fraud:

> A reverse false claim may not rest, however, on the argument 'that an obligation arose out of Defendants' concealment of their allegedly fraudulent activity,' because 'by this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement action under 3729(a)(1)(A) or 3729(A)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money.

*Scollick*, 2016 WL 6078246, at *9 (quoting *Pencheng Si*, 71 F. Supp. 3d at 97).

> **2.      Hudson's obligations under the Hudson Bonds have not been triggered but, even if its obligations were triggered, Hudson did not knowingly make any false statements or conceal any obligation to pay or transmit money to the federal government**

The SAC alleges the Hudson Bonds "were separate instruments entered into [sic] between the United States government and although submitted with the contract, did separately obligate [Hudson] to compensate the government for losses sustained if the specifications found in the contract, including the specification that the construction activity be paid [to] a service-disabled veteran-owned small business entity" were not satisfied and that Hudson failed to notify the federal government that CSG fraudulently obtained its SDVOSB verification.  SAC at ¶242-244.

A surety's obligation to perform under a bond does not arise until its principal has materially defaulted under the terms of its underlying contract with the obligee.  *See* L.R. Moelmann & J.T. Harris, *The Law of Performance Bonds*, p.37 (1999).  *See also* E.G. Gallagher, *The Law of Suretyship* at 82 (2nd ed. 2000) ("If the principal on the project defaults on the underlying contract, the surety has a contractual obligation to the obligee with regard to completion of the project.").

Depending upon the terms of the bond, upon the principal's default on a performance bond, the surety may have the option of: "either completing the project itself, or of assuming liability for the government's excess costs in completing the contract." *Ins. Co. of the West,* 243 F.3d 1367, 1370 (Fed. Cir. 2001); *Aetna Cas. & Sur. Co. v. United States,* 845 F.2d 971, 975 (Fed.Cir.1988). *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300 (2004) ("Upon default of the principal, the surety may pay the money and proceed against the principal for indemnity.") (citing *Dixon v. Spencer,* 59 Md. 246, 248 (1883)). A third alternative is to provide the "funds to an insolvent contractor to complete performance." *Id. See also Int'l Fidelity Ins. Co. v. County of Rockland,* 98 F. Supp. 2d 400, 423 (S.D.N.Y. 2000).

It is undisputed that the obligee for each of the Hudson Bonds was the VA. Further, it is undisputed that: (i) the VA never made a performance bond claim on any of the Hudson Bonds; and (ii) the VA, even as of the date of the filing of *this* motion, has never notified Hudson that CSG failed to meet, or even potentially failed to meet, all requirements of the relevant contracts, including SDVOSB status, despite this lawsuit being unsealed several years ago. Exhibit 1 at ¶24. Accordingly, Hudson's obligations under the Hudson Bonds have never been triggered and Hudson did not and does not owe any obligation under the Hudson Bonds to the VA that can serve as the predicate for a Section 3729(a)(1)(G) claim.

Assuming *arguendo* the Court finds that CSG's alleged fraud triggered Hudson's obligations under the Hudson Bonds, Plaintiff-Relator has offered no evidence that Hudson ever made or caused to be made "a false record" regarding, or a "statement material" to, its obligations to the VA under the Hudson Bonds, much less that such a record or statement caused it to avoid or decrease any obligation under the Hudson Bonds. *See* 31 U.S.C. § 3729(a)(1)(G). As a matter of undisputed fact, Hudson never communicated with the VA regarding the Hudson Bonds at all.

*Celotex Corp.*, 477 U.S. at 325 ("the burden on the moving party may be discharged by 'showing' – that is pointing out to the … court – that there is an absence of evidence to support the nonmoving party's case").  Moreover, because Hudson never participated in, knew of or learned of CSG's alleged fraud before, during or after issuance of the Hudson Bonds, it could not have concealed the alleged fraud from the federal government to reduce any obligation under the Hudson Bonds. *Id*.

**E.     Hudson Is Entitled to Judgment as a Matter of Law on Count IV of the Second Amended Complaint Because It Did Not Conspire to Violate the FCA**

Section 3729(a)(1)(C) of the FCA imposes liability on anyone who "conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)."  "To state a cause of action for conspiracy under this statutory provision, the relator must allege (1) that 'an agreement existed to have false or fraudulent claims allowed or paid' to the government, (2) that each alleged member of the conspiracy 'joined that agreement,' and (3) that 'one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the conspiracy.'" *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 89 (D.D.C. 2014) (citing *United States ex rel. Miller v. Bill Harbert Int'l Constr., Inc.,* 608 F.3d 871, 899 (D.C. Cir. 2010)).

It is well-settled law that no FCA conspiracy claim can be maintained in the absence of any underlying claim. *Id*. In other words, in "the context of the FCA, this means that there can be no liability for conspiracy where there is no underlying violation of the FCA."  *Id*. Here, Plaintiff-Relator asserts the underlying claims for the FCA conspiracy claim are alleged violations of § 3729(a)(1)(A), (B) and (G).  Hudson is entitled to judgment on the SAC's conspiracy claim because, for the reasons set forth above, Hudson has not violated any other terms of the FCA. Moreover, there is not even a scintilla of evidence that Hudson agreed with any defendant to engage in the alleged fraud, which is fatal to satisfying a conspiracy claim.

**F.      Plaintiff-Relator Has Failed to Produce Evidence of the Government's Entitlement to Recovery of Actual Damages related to any CSG Contracts**

Hudson incorporates herein by reference the arguments raised by Hanover in its summary judgment motion regarding Plaintiff-Relator's failure to produce evidence that the VA has suffered any actual damages arising from any SDVOSB contracts awarded to CSG or evidence identifying the amount of such damages.  To the extent applicable to the claims asserted against Hudson in the SAC, Hudson incorporates by reference all arguments of the other defendants in this matter contained in any summary judgment motion as if fully set forth herein.

## VI.      CONCLUSION

For the reasons set forth herein, Hudson is entitled to judgment as a matter of law on the Second Amended Complaint.

Respectfully submitted,

_____/s/ *Cynthia E. Rodgers-Waire*_____
Cynthia E. Rodgers-Waire (Bar No. 444095)
Marc A. Campsen (Bar No. 989796)
Wright, Constable & Skeen, LLP
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
crodgers-waire@wcslaw.com
mcampsen@wcslaw.com
Telephone: 410-659-1300
Fax: 410-659-1350
*Attorneys for Hudson Insurance Company*