**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* | ) | |
| **ANDREW SCOLLICK,** | ) | |
| | ) | |
| **Plaintiff-Relator,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 14-cv-01339-RCL** |
| | ) | |
| **VIJAY NARULA,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

**THE SURETY & FIDELITY ASSOCIATION OF AMERICA'S** *AMICUS CURIAE*
**BRIEF PERTAINING TO MOTIONS FOR SUMMARY JUDGMENT**

---

Shannon J. Briglia

Shannon J. Briglia
D.C. Bar No. 416746
Shoshana E. Rothman
D.C. Bar No. 981643
SMITH, CURRIE & HANCOCK LLP
1950 Old Gallows Road, Suite 750
Tysons, Virginia 22182
Telephone: (703) 506-1990
Facsimile:  (703) 506-1140
sjbriglia@smithcurrie.com
serothman@smithcurrie.com
*Attorneys for The Surety & Fidelity*
*Association of America*

## CORPORATE DISCLOSURE STATEMENT

I, the undersigned, counsel of record for The Surety & Fidelity Association of America ("SFAA"), certify that to the best of my knowledge and belief, SFAA is an organization existing under U.S. Internal Revenue Code Section 501(c)(6). SFAA has no parent companies, subsidiaries, or affiliates, and no companies own ten percent or more of SFAA.

These representations are made in order that judges of this Court may determine the need for recusal.

Dated: February 24, 2021

   */s/ Shoshana E. Rothman*
Shoshana E. Rothman
D.C. Bar No. 981643
Smith, Currie & Hancock LLP
1950 Old Gallows Road, Suite 750
Tysons, Virginia 22182
Telephone: (703) 506-1990
Facsimile:  (703) 506-1140
serothman@smithcurrie.com
*Attorney for The Surety & Fidelity*
*Association of America*

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................................. i

TABLE OF CONTENTS ....................................................................................... ii

TABLE OF AUTHORITIES .................................................................................. iii

IDENTITY AND INTEREST OF *AMICUS CURIAE*.................................................1

INTRODUCTION ...................................................................................................2

ARGUMENT ...........................................................................................................4

I.      FALSE CLAIMS ACT LIABILITY FOR SIZE AND STATUS
        DETERMINATIONS SHOULD NOT EXTEND TO SURETIES ...................................4

        A.     Sureties Should Not Be Responsible For Policing the
              Government's Set Aside Eligibility Standards .....................................................5

        B.     Surety Obligations In Connection With The Issuance
              Of Miller Act Bonds .....................................................9

        C.     Third Parties Cannot Rely Upon Surety Underwriting
              Which Is Undertaken For The Surety's Own Financial
              Risk Assessment Purposes .....................................................10

        D.     Negative Financial And Market Impacts To The Federal
              Government And Construction Industry Will Result
              From Extending False Claims Act Liability To Sureties
              For Their Underwriting .....................................................13

CONCLUSION....................................................................................................18

CERTIFICATE OF COMPLIANCE ........................................................................20

CERTIFICATE OF SERVICE ................................................................................21

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abbott v. Equity Grp., Inc.*,
  2 F.3d 613 (5th Cir. 1993) ....................................................................................... 11

*Goldberg.Marchesano.Kohlman. Inc. v. Old Republic Surety Co.*,
  727 A.2d 858 (D.C. 1999) ............................................................................................ 4

*Maxum Enters. LLC v. Auto. Fleet Enters., Inc.*,
  No. 3:18-CV-0687-B, 2019 WL 1493164 (N.D. Tex. Apr. 4, 2019) ........................... 12

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Arioli*,
  941 F. Supp. 646 (E.D. Mich. 1996) ........................................................................... 11

*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Eaton*,
  701 F. Supp. 1031 (S.D.N.Y. 1988) ............................................................................ 11

*Pearlman v. Reliance Ins. Co.*,
  371 U.S. 132 (1962) ...................................................................................................... 6

*Travelers Indemnity Co. v. Askew*,
  280 So.2d 469 (1973) ................................................................................................... 12

*United States for Use & Ben. of E. Gulf, Inc. v. Metzger Towing, Inc.*,
  910 F.2d 775 (11th Cir. 1990) ....................................................................................... 9

*United States for Use & Benefit of Am. Civil Constr., LLC v.*
  *Hirani Eng'g & Land Surveying, PC*, 962 F.3d 587 (D.C. Cir. 2020) .......................... 9

*ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*,
  917 So. 2d 368 (Fla. Dist. Ct. App. 2005) .................................................................. 11

**Statutes**

15 U.S.C. § 631 ................................................................................................................... 14

15 U.S.C. § 644(g)(1)(A)(ii) ............................................................................................... 14

15 U.S.C. § 694b .................................................................................................................. 17

40 U.S.C. § 3131, *et seq.* ............................................................................................ 4, 9, 14

**Other Authorities**

3 BRUNER & O'CONNOR CONSTRUCTION LAW ................................................................... 6, 7

Congressional Research Service, *SBA Surety Bond Guarantee Program*,
  (Jan. 15, 2020), p. 1, https://fas.org/sgp/crs/misc/R42037.pdf ................................... 17

David W. Slaughter, *Introduction to the Surety's Rights as the*
  *Foundation for the Indemnity Agreement*, *in* THE SURETY'S
  INDEMNITY AGREEMENT: LAW AND PRACTICE 7
  (Marilyn Klinger et al. eds., 2d ed. 2008) .................................................................. 10

EDWARD G. GALLAGHER, THE LAW OF SURETYSHIP 1 (2d ed. 2000) .................................. 5, 10

Kohn, Kohn & Colapinto LLP, *Andrew Scollick*,
  https://kkc.com/whistleblower-case-archive/andrew-scollick/
  (last visited February 22, 2021) ................................................................................. 2, 3

RESTATEMENT (THIRD) SURETYSHIP AND GUARANTY (1996) ...................................................5, 9

Scott Paice, *Inside the Mind of a Surety Bond Underwriter*,
   CONSTRUCTION EXECUTIVE, (Nov. 6, 2016),
   http://www.constructionexec.com/article/inside-the-mind-of-a-surety-
   bond-underwriter ...........................................................................................................16

U.S. Department of Defense Inspector General Audit of DoD
   Service-Disabled Veteran-Owned Small Business Contract Awards,
   Report No. DODIG-2020-063 (February 18, 2020) ............................................................8

U.S. Small Business Administration, *50th Anniversary
   Surety Bond Guarantee Program*, https://surety50.com/
   (last visited February 21, 2021) ........................................................................................17

U.S. Small Business Administration, *Contracting Guide*,
   https://www.sba.gov/federal-contracting/contracting-
   guide?utm_medium=email&utm_source=govdelivery
   (last visited February 21, 2021) ........................................................................................14

U.S. Small Business Administration, *Federal Government
   Exceeds Small Business Contracting Goals by Awarding
   Record-Breaking $132.9 Billion to Small Business*,
   https://www.sba.gov/article/2020/aug/12/federal-government-
   exceeds-small-business-contracting-goals-awarding-record-breaking-
   1329-billion (Aug. 12, 2020) ...........................................................................................16

U.S. Small Business Administration, Office of Surety Guarantees,
   *The Surety Bond Guarantee Program, SOP 50 45 3* (Aug. 5, 2015),
   https://www.sba.gov/sites/default/files/sops/SOP50433_1.pdf............................................17

U.S. Small Business Administration, *Surety Bond Guarantee
   Program Surpasses $7 Billion in Bond Guarantees*, (Oct. 30, 2020),
   https://www.sba.gov/article/2020/oct/30/sba-recognizes-top-active-
   surety-partners ................................................................................................................17

## Regulations

13 C.F.R. § 115.12 ..............................................................................................................17

13 C.F.R. § 115.13 ..............................................................................................................17

13 C.F.R. § 115.31 ..............................................................................................................17

13 C.F.R. § 121.1001, *et seq.* ...............................................................................................7

13 C.F.R. § 121.108(d)...........................................................................................................8

13 C.F.R. § 125.27, *et seq.* ...................................................................................................7

13 C.F.R. §125.6 ................................................................................................................13

38 C.F.R. § 74.1 ...................................................................................................................7

38 C.F.R. § 74.2...................................................................................................................7

48 C.F.R. § 28.102-2 ........................................................................................................4, 14

COMES NOW The Surety & Fidelity Association of America ("SFAA"), by counsel, and submits the following as its *Amicus Curiae* Brief for the Court's consideration of the policy concerns and the impact on the surety industry of Plaintiff-Relator's effort to expand sureties' liability under the False Claims Act.

## IDENTITY AND INTEREST OF *AMICUS CURIAE*

SFAA is a national trade association of companies licensed to write fidelity and surety bonds in the United States. SFAA's membership is comprised of over 420 companies, which includes the Surety Defendants and countless other national surety companies. SFAA's members write the vast majority of surety bonds across the nation, accounting for over 97 percent of the surety and fidelity premium written in the United States. As the leading trade association for the industry, SFAA serves as the thought leader and trusted advisor for the surety industry, state and federal agencies, and legislators. SFAA collects statistics on surety bond premiums and losses, and files the statistics with state insurance departments. SFAA supports initiatives, such as filing *amicus curiae*, to promote and preserve the use of surety bonds to protect public and private interests. Through this brief, SFAA seeks to assist the Court in understanding the wide reaching and long-lasting impact to the industry and government at large by the decision sought by the Plaintiff-Relator, issues distinct from the fact-based arguments being presented by the Surety Defendants.

The undersigned hereby certifies, pursuant to Fed. R. App. R. 29(a)(4)(E), that no party's counsel authored this *amicus curiae* brief in whole or in part, no party or its counsel contributed money that was specifically intended to fund preparing or submitting the brief, and that only SFAA funded the preparation of and submission of this brief.

1

## INTRODUCTION

A ruling in favor of Plaintiff-Relator and against The Hanover Insurance Company and Hudson Insurance Company ("the Surety Defendants") expanding sureties' liability for False Claims Act violations for claims arising from the sufficiency of their underwriting process, particularly with respect to confirming or ensuring their bond principals' compliance with size, status, and eligibility for set aside government contracting programs, will upend the surety industry and constrict or cut off socio-economically disadvantaged companies' access to the federal procurement market. In denying consent to SFAA to submit this brief, Plaintiff-Relator asserts that the Court has already determined "that the surety defendants are subject to FCA liability both by indirectly causing false claims to be submitted and under the reverse false claims provision for the bonding agreements submitted to the United States on Standard Form 25."[1] Further, Plaintiff-Relator claims through a statement on his counsel's website that the ruling issued by this Court on July 31, 2017, denying the Surety Defendants' motion to dismiss (Doc. 160) "expanded the scope of False Claims Act liability by establishing the legal precedent that bonding companies can be held liable for treble damages for issuing surety bonds to construction companies that [they reasonably knew] falsely claim . . . SDVOSB status."[2] The distortion of the Court's ruling denying the motions to dismiss demands correction in the public record,[3] and necessitates consideration of

---

[1] *See* **Exhibit 1**, December 1, 2020 letter from Michael D. Kohn, Esq.

[2] *See* **Exhibit 2**, Kohn, Kohn & Colapinto LLP, *Andrew Scollick*, https://kkc.com/whistleblower-case-archive/andrew-scollick/ (last visited February 22, 2021).

[3] Plaintiff-Relator's assertion overstates the import of the Court's ruling, which merely denied the Surety Defendants' motions to dismiss on the basis that sufficient facts concerning actual knowledge were alleged to state a cause of action. *See* Doc. 160 at pages 27, 28 and 31. The ruling is not a determination on the merits of a claim based upon constructive knowledge, nor does it specifically hold that sureties can be liable under the False Claims Act under the theories or facts presented by Plaintiff-Relator. *See id.*

how such a ruling imposing a duty upon sureties on summary judgment would impact the surety industry, the government, and the public at large.

Sureties are in the business of issuing bonds guaranteeing completion of construction projects and payment for incorporated labor and materials. They underwrite bonds purely for their own financial benefit and risk evaluation – not for the benefit of third-parties. The government establishes eligibility standards for set aside contracts, and is legislatively obligated to ensure compliance with those standards. Sureties, who are not involved in the government's certification or compliance process, are entitled to rely upon the government's certification and subsequent award of a set aside contract based on the government's determination of an awardee's qualification under the set aside standards. Plaintiff-Relator contends, however, that sureties are subject to False Claims Act liability "if they reasonably knew that the bonded contractors did not qualify" for the set aside contract award.[4] This constructive knowledge alleged by Plaintiff-Relator was supposedly gained during the underwriting process. *See* Doc. 298 at ¶¶ 182-204 (Second Amended Complaint).

The consequence of the Court adopting Plaintiff-Relator's legal theory and ruling against the two Surety Defendants in this case, thereby expanding sureties' risk exposure, is the imposition of a duty during underwriting to verify the government's review and ensure the prospective principal's compliance with set aside requirements. Imposition of this duty will cause sureties to question, and undoubtedly halt, the extension of surety credit to small, disadvantaged, and emerging contractors, not to mention create a slippery slope to the expansion of this duty to require sureties to monitor the principals' compliance with set aside requirements for contracting during performance of the contract. Absent the availability of surety bonding for this market sector, there

---

[4] *See* **Exhibit 2**.

will be a cascading and catastrophic effect across the federal government procurement system, rendering it nearly impossible for many socio-economically disadvantaged contractors to bid on, receive, or perform any government contracts, despite a preference by the federal government for procurement with those contractors. Furthermore, statutory requirements that the government award certain percentages of federal contracts to set aside contractors will be unmet. Thus, a decision in favor of the Plaintiff-Relator against the Surety Defendants in this case will have the very real and profound effect of undermining the government-wide goal of ensuring that set aside contractors receive a fair share of government contracts.[5] As a whole, the federal government, and the nation itself, will be negatively impacted by a decision that results in the constriction or extinction of available surety bonding for set aside contractors.

## ARGUMENT

### I.      FALSE CLAIMS ACT LIABILITY FOR SIZE AND STATUS DETERMINATIONS SHOULD NOT EXTEND TO SURETIES

The surety industry has a unique role in public construction projects because, by statute, most government contracts require the successful contractor to obtain performance and payment bonds guaranteeing the performance of the contract. *See, e.g.*, 40 U.S.C. § 3131, *et seq.* (2006) and 48 C.F.R. § 28.102-2 (2021) (requiring surety bonds for the award of any federal construction project in excess of $150,000). In issuing a surety bond, the surety agrees to answer for the debts of another as measured by the conditions in the surety bond. *See Goldberg.Marchesano.Kohlman. Inc. v. Old Republic Surety Co.*, 727 A.2d 858, 860-1 (D.C. 1999). In other words, the surety

---

[5] As discussed below, federal policy requires that a proportion of all federal procurement be allocated to small, disadvantaged, and emerging contractors. One of the government's vehicles for ensuring satisfaction of that objective is the U.S. Small Business Administration's Bond Guarantee Program. That program guarantees surety bonds written by private surety companies, so more small businesses can qualify for bonding. Expanding sureties' liability will surely reduce the number of private sureties willing to participate in the program, thus frustrating the purpose of the SBA's Bond Guarantee Program.

guarantees and assumes joint and several responsibility with the contractor for the performance of the contractor's obligations to the government.[6] In the surety context then, the surety is extending credit enhancement by providing a "financial guarantee under which the surety suffers a loss only if the principal fails to perform its obligation and is financially unable to reimburse the surety." *See* EDWARD G. GALLAGHER, THE LAW OF SURETYSHIP 1 (2d ed. 2000) (explaining further that unlike insurance where the insurer expects to suffer a loss and sets its premiums accordingly, "[t]he surety does not anticipate a loss."). The principal named in the bond – whether a bid bond, Miller Act bond, Little Miller Act bond, or other bond – remains the primary obligor, and the surety stands behind that primary obligation as a secondary obligor.[7] As is evident by this secondary role, which is conditioned upon and triggered by the bonded contactor's material default of its performance and/or payment obligation, the surety is not involved in the day-to-day operation of the contract and remains essentially a stranger to the contract until given notice of default.

A.    **Sureties Should Not Be Responsible For Policing the Government's Set Aside Eligibility Standards**

Adoption of the Plaintiff-Relator's legal arguments places the surety industry in the role of policing the federal government's own programs and enforcing the government's regulatory requirements for small and disadvantaged businesses. Being put in a position to perform or backstop the government's eligibility determinations interjects the surety into the day-to-day performance of the work, and is a far cry from the purpose established by the Miller Act under which surety bonds guarantee the completion of construction work when and if contractual

---

[6] *See* RESTATEMENT (THIRD) SURETYSHIP AND GUARANTY §1 (1996).

[7] RESTATEMENT (THIRD) SURETYSHIP AND GUARANTY §1. The condition of the Miller Act bond Standard Form 25 is written in conditional "defeasance" language – declaring "the above obligation is void if the principal . . ." performs the contract in conformance with its terms and conditions.

obligations are unmet and ensure the payment of labor and materials incorporated into federal projects. Miller Act sureties do not monitor how a contractor's contractual obligations are met. Rather, those sureties are only notified and brought into the project if there has been an unremedied failure to complete the contractual obligations. Indeed, sureties must be careful not to interfere with their bonded principal's contract with the obligee, waiting to act if and until the principal has been declared in default.[8] Thus, while the SFAA certainly recognizes an urgent need in government contracting to identify and punish fraudulent certification of small and disadvantaged businesses, the burden of policing certified eligible contractors for set aside contracts should not fall on the surety industry. Imposing the duty on the surety industry to enforce government set aside regulations effectively converts a Miller Act bond to insurance against the federal government's negligence in failing to carry out its responsibility to verify contractor eligibility for set aside programs and creates a risk of breach of the surety's duty not to interfere with its principal's contract with the obligee. Suretyship is not insurance,[9] and the effort by Plaintiff-Relator to convert the role of a Miller Act surety to an insurer of the government's obligation to administer its own set aside programs must be rejected.

Government agencies that have established set aside programs have also developed processes to verify eligibility and ferret out fraud. For example, Service Disabled Veteran-Owned Small Businesses ("SDVOSBs") such as the principal defendant in this case, competing for work

---

[8] *See* 3 BRUNER & O'CONNOR CONSTRUCTION LAW §§ 12:2 (Suretyship: A tripartite relationship) (explaining the surety's multiple obligations to the bond principal and obligee to act fairly and in good faith) and 12:36 (Triggering performance bond surety's obligation to perform – Generally) ("A performance bond surety has no right to unjustly interfere with its principal's performance of the bonded contract in the absence of the principal's 'voluntary default' or the obligee's declaration of default.").

[9] *See Pearlman v. Reliance Ins. Co.*, 371 U.S. 132, 140, n.19 (1962) (confirming the view that "suretyship is not insurance" but is instead an extension of credit or credit enhancement by which the surety guarantees the principal's performance of its contractual undertaking).

from the Department of Veterans Affairs ("VA"), are verified for eligibility by the VA through its Center for Verification and Evaluation ("CVE").[10] Contractors are required to submit to the CVE documentation supporting their ownership, including majority ownership, management, and control of long-term and daily business operations and the highest-ranking officer's service-disabled status. Decisions on eligibility are subject to appeal, and the VA is authorized to remove a contractor from its database should the VA determine that eligibility was obtained under false pretenses. *See* 38 C.F.R. § 74.2 (2018) (eligibility requirements for the VA's small and disadvantaged set aside program). The establishment of this process logically creates an expectation of reliance by those not involved in the process. When reviewing the Court's earlier decision in this case denying the Surety Defendants' motions to dismiss, a noted treatise commented "[b]ecause the VA's program requires a separate verification process, it is difficult to understand how the surety could be subject to [False Claims Act] liability for relying on status conferred upon its principal through a separate process in which it was not engaged." 3 BRUNER & O'CONNOR CONSTRUCTION LAW § 8:66.30, n. 3. Protests can also help the government police eligibility criteria as claims of ineligibility raised by disappointed bidders will be investigated or examined as part of the protest. *See, e.g.*, 13 C.F.R. § 125.27, *et seq.* (2016) (protests concerning service-disabled veteran status); 13 C.F.R. § 121.1001, *et seq.* (2020) (procedures for size protests and requests for formal size determinations).

Administering these programs and ensuring compliance is challenging, however, and multiple iterations of internal audits demonstrate that the Department of Defense ("DoD") routinely awards set aside contracts to non-qualified contractors, and both DoD and the VA fail to fully monitor compliance with subcontracting limitations during performance. *See* U.S.

---

[10] 38 C.F.R. § 74.1 (2018).

Department of Defense Inspector General Audit of DoD Service-Disabled Veteran-Owned Small Business Contract Awards, Report No. DODIG-2020-063 (February 18, 2020), pp. 10-12 and 18, (concluding that DoD will continue to award to ineligible contractors until procedures for verifying eligibility and monitoring subcontract limits are implemented). Simply because government agencies find it challenging to monitor and ensure compliance with their eligibility standards is not, however, reason to foist that responsibility onto sureties, who play no role in the verification or performance process. In fact, sureties are completely unsuited to undertake responsibility for evaluating initial qualification for participation or monitoring a bond principal's compliance with eligibility standards during performance, as they are virtually a stranger to the contract until a default occurs.

Finally, ruling in favor of the Plaintiff-Relator and against the Surety Defendants on this issue will create a dichotomy where a surety who guarantees a contractor's performance is held liable for conduct for which the government expressly immunizes the prime contractor. Prime contractors are granted immunity for their subcontractors' misrepresentations of size and eligibility status under the U.S. Small Business Administration regulations. *See* 13 C.F.R. § 121.108(d) (2016) ("A prime contractor acting in good faith should not be held liable for misrepresentations made by its subcontractors regarding the subcontractors' size"). This immunity is granted even though prime contractors scrutinize their subcontractors more vigorously than a surety's underwriting process, evaluating not only the subcontractors' character, capability, and capacity to complete the subcontracted scope of work but also the subcontractor's bid, past performance, reputation in the industry, price, materials, and means and methods. Undeniably this regulation demonstrates legislative intent to permit prime contractors to rely upon the eligibility certification and verification bestowed by the government. Applying similar reasoning, sureties, like prime

contractors, should be able to rely upon the certification bestowed on the bonded principal by a federal agency. Sureties, who are not a part of the governmental certification process and have no control over the contractor's representations in obtaining the certification, should not be subject to False Claims Act liability for their failure to discern during their underwriting process that their bond principal misrepresented its eligibility when applying for and obtaining set aside certification, or that the governmental agency failed to properly evaluate and certify that the contractor met the applicable set aside requirements.

**B.**     <u>**Surety Obligations In Connection With The Issuance Of Miller Act Bonds**</u>

Miller Act bonds serve to secure the completion of the bonded work for the protection of the federal government, and guarantee payment to subcontractors and suppliers for the labor and materials furnished for the performance of work. *See* 40 U.S.C. § 3131, *et seq.*; *see also United States for Use & Benefit of Am. Civil Constr., LLC v. Hirani Eng'g & Land Surveying, PC*, 962 F.3d 587, 591–92 (D.C. Cir. 2020) (explaining the congressional intent of the Miller Act "to protect those whose labor and materials go into public projects."). "[I]t was not the intention of Congress to extend or enlarge the liability of the surety [under a Miller Act bond] beyond the contractual or quasi-contractual obligations of the contractor who remains primarily liable." *United States for Use & Ben. of E. Gulf, Inc. v. Metzger Towing, Inc.*, 910 F.2d 775, 781 (11th Cir. 1990) (citations omitted). The bonded obligation does not include liability for any penalties for failing to fulfill the underlying obligation unless the bond so provides. *See* RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 73 (1996) ("When the secondary obligation is a legally mandated bond, that obligation does not include any penalties imposed on the principal obligor for failure to fulfill the underlying obligation unless the secondary obligation so provides.").

If Congress had intended to hold sureties liable under the False Claims Act for ensuring that their bond principal was properly certified as eligible for a set aside contract, or remains in

compliance with set aside eligibility standards during performance, the Miller Act could have been amended to add that obligation. It was not, and, in fact, Congress has articulated its intent that the government agencies authorized to establish set aside standards are also obligated to enforce those standards. In the absence of legislative action, no additional duties should be imposed on the surety.

### C.   Third Parties Cannot Rely Upon Surety Underwriting Which Is Undertaken For The Surety's Own Financial Risk Assessment Purposes

The extension of surety credit rests upon an underwriting process which focuses on confirming that a contractor has both the financial capacity and the competence to perform the contract.[11] Underwriting ensures that the issuance of surety bonds to the contractor are in the best interest of both the surety and the contractor:

> The role of a company underwriter is not only to protect his company from a loss but also to help the contractor protect and preserve his company and his worth. The role of the company underwriter is not one of an order taker, not one of simply a bond writer, but as the name implies, an underwriter. The underwriter is a person who looks at all the financial figures, the credit experience, the bonding relationship and the technical expertise and makes an underwriting decision – an educated, well thought out decision that will benefit both the surety company and the contractor client.

GALLAGHER, *supra*, pp. 57-58. However, "[t]he underwriting of surety bonds is not an exact science." *Id.* at 58. Individual sureties have different underwriting guidelines, and there is no one size fits all or standard approach to underwriting. *See id.* at 42.

Sureties conduct as much or as little underwriting as satisfies their self-interest before deciding whether to extend surety credit. While underwriting provides a bond's obligee with the indirect assurance that the contractor must be capable of completing the work or it would not have obtained the bond, "[c]ompanies that issue performance bonds undertake their underwriting, and

---

[11] David W. Slaughter, *Introduction to the Surety's Rights as the Foundation for the Indemnity Agreement*, *in* THE SURETY'S INDEMNITY AGREEMENT: LAW AND PRACTICE 7 (Marilyn Klinger et al. eds., 2d ed. 2008).

make risk decisions for their <u>own</u> purposes." *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*, 917 So. 2d 368, 373 (Fla. Dist. Ct. App. 2005) (emphasis added). The lack of a uniform set of standards dictates against any sort of reliance by third parties on the sufficiency of the underwriting process. As explained by that Florida court, "[i]ssuing a bond based on bad underwriting does not create a foreseeable zone of risk because a person receiving the benefit of the bond simply does not have the right to rely on the competence of the underwriting." *Id.* at 375 (also explaining that an obligee relying on a bond only has the right to expect that the surety will honor the bond according to the bond's terms). Thus, the Florida court expressly rejected an argument that "sureties have a duty to third parties as a result of its underwriting activities." *Id.* Other cases from across the nation are in accord that sureties' underwriting is for their own benefit and is not for the benefit of others. *See, e.g., Abbott v. Equity Grp., Inc.*, 2 F.3d 613, 623 (5th Cir. 1993) (affirming decision that surety and bonding agent were not liable for aiding and abetting securities fraud because their roles did not rise to more than a surety and bonding agent, and thus, they had no duty to disclose deficiencies in a private placement memorandum to prospective investors in a failed business); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Arioli*, 941 F. Supp. 646, 656 (E.D. Mich. 1996) (surety of financial guarantee bond of forged promissory note owed no duty to debtor of promissory note by the surety's investigation of the bonded investment because "[t]he research efforts National Union expended were solely for its own purposes"); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Eaton*, 701 F. Supp. 1031, 1034 (S.D.N.Y. 1988) (rejecting the notion that a duty to others arises from surety underwriting).

More recently in a Texas federal case, the Northern District of Texas examined a similar issue on a dispute arising from a motor vehicle title bond. The Texas federal court concluded it is not reasonable for a surety to have a duty to third parties "arising out of its underwriting activities

that is more expansive than what was provided for by the express terms of the bonds[.]" *Maxum Enters. LLC v. Auto. Fleet Enters., Inc.*, No. 3:18-CV-0687-B, 2019 WL 1493164, at *5 (N.D. Tex. Apr. 4, 2019). "To do so would also render the language in the statute and on the bond form limiting the surety's maximum liability meaningless[.]" *Id.* The Texas federal court granted the surety's motion to dismiss a negligence claim, which sought to impose a duty on the surety to determine the fair market value of the bonded vehicles as part of its underwriting activities. *See id.* at *6 (denying plaintiff's efforts to seek to hold the surety liable for the value of each vehicle in excess of the penal sum of each vehicle title bond). That court also noted that "the general rule recognized by the almost unanimous weight of authority in this country is that recovery on a penal bond is limited to the amount of the penalty named in the bond, without interest from the date of the breach." *Id.* (quoting *Travelers Indemnity Co. v. Askew*, 280 So.2d 469, 471 (1973)). The only exception being "where the wording of the bond or the statute pursuant to which it was given indicates an intention to extend the liability of the bond beyond the maximum sum stated therein." *Id.*

Here, Plaintiff-Relator not only seeks to impose a duty upon sureties to conduct their underwriting for the benefit of the bond obligee – the federal government – but also to expose sureties to liability for False Claims Act penalties in amounts far beyond the penal sum of each bond. Both of those arguments contravene well-established principles of suretyship that: (1) there are no obligations to others from surety underwriting; and (2) a surety's liability is limited to the penal sums of its bond. Moreover, establishing a duty owed by the surety to the obligee during the underwriting process creates a slippery slope towards an even more expanded duty on the part of the surety during contract performance to ensure compliance with other aspects of set aside

12

contracting, such as limitations on subcontracting.[12] If the surety is held responsible for ensuring compliance with set aside qualifications at the outset of a contract as urged by Plaintiff-Relator here, there is little doubt that the government will seek to extend that duty even further until the surety is as much a part of the day-to-day contract process as its bonded principal, a result that eliminates the notion that the contractor is the primary obligor and destroys the concept of suretyship.

> **D.   Negative Financial And Market Impacts To The Federal Government And Construction Industry Will Result From Extending False Claims Act Liability To Sureties For Their Underwriting**

Adopting the Plaintiff-Relator's argument that sureties be held liable under the False Claims Act both by indirectly causing false claims and under reverse false claims will have a severe and chilling effect on the bonding of small, disadvantaged, and emerging contractors. If the Court accepts the Plaintiff-Relator's position, Miller Act bonds will carry a significantly increased risk of exposure for False Claims Act penalties, particularly if that risk is not capped at the bond's penal sum. SFAA anticipates that the surety industry will quickly become, at best, reluctant, and at worst, will refuse to bond any small, disadvantaged, and emerging contractors performing set aside contracts. The lack of access to bonds will hurt the surety industry by the elimination of a market for their bonds, hurt contractors and public owners by removing a large group of contractors from the procurement process, and hurt the public by undermining the purpose of the set aside program.

Surety bonding is the financial backbone of public construction, and without Miller Act bonds, federal construction projects simply cannot proceed. *See generally* 40 U.S.C. § 3131,

---

[12] *See* 13 C.F.R. §125.6 (2020) (applicable to the VA through a July 25, 2016 Class Deviation modifying VA regulations to incorporate pre-existing SBA subcontractor limitations).

*et seq.* and 48 C.F.R. § 28.102-2 (requiring a contractor to furnish performance and payment bonds for any construction contract in excess of $150,000). The United States government, the largest purchaser of goods and services in the world,[13] sets goals to ensure its procurement supports the most disadvantaged businesses in the nation. Congress has established socioeconomic programs setting aside procurement opportunities and preferences for small and disadvantaged businesses to support the economic well-being and security of the nation:

> It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631 (2010).

To achieve that policy, Congress enacted a statutory goal of no less than three percent of the total value of all prime contracts and subcontracts awarded in each fiscal year shall include participation by small business concerns owned and controlled by SDVOSBs. *See* 15 U.S.C. § 644(g)(1)(A)(ii) (2019) ("The Government-wide goal for participation by small business concerns owned and controlled by service-disabled veterans shall be established at not less than 3 percent of the total value of all prime contracts and subcontract awards for each fiscal year."). Critical to the achievement of that goal though, is that SDVOSBs be eligible to compete for those contracts, which requires the ability to obtain surety bonds. If sureties become subject to False Claims Act penalties solely as a result of having provided the necessary bonds to a SDVOSB who, by its

---

[13] *See* U.S. Small Business Administration, *Contracting Guide*, https://www.sba.gov/federal-contract-ing/contracting-guide?utm_medium=email&utm_source=govdelivery (last visited February 21, 2021).

actions (or inactions) does not actually qualify as a SDVOSB, the affordability and availability of bonding for public improvements will be drastically decreased or completely eliminated. The restriction or absence of surety bonding will significantly shrink or eliminate the pool of qualified bidders for government set aside projects.

The consequence of a ruling in Plaintiff-Relator's favor against the Surety Defendants is that sureties will either cease extending surety credit to SDVOSBs or will intensify their underwriting and monitoring of ongoing work to address the increased risk of exposure to False Claims Act penalties.[14] Sureties who decide to undertake the additional risk will be forced to conduct their own independent investigation of whether the federal government properly certified a SDVOSB, and whether that entity continues to meet eligibility criteria, thereby forcing the surety into the dual role of law enforcer and insurer for the agency who originates the standards and should play the primary role in administering those standards. Tightening their underwriting standards and enhancing compliance monitoring of the federal government's certification and the bonded principal will increase sureties' costs. Those increased costs will be felt on every public project because of the corresponding need to increase surety bond premiums, which contractors will pass on to the government, and, ultimately, the taxpayer.

Surety bond premiums vary depending on the surety's assessment of the risk involved and project size, but typically range from .5 to 3 percent of the contract amount. *See* Scott Paice, *Inside the Mind of a Surety Bond Underwriter*, CONSTRUCTION EXECUTIVE, (Nov. 6, 2016),

---

[14] As discussed above, surety underwriting is not designed to evaluate whether a surety bond applicant meets all eligible governmental set aside procurement requirements. Changes to underwriting programs come with their own costs, and if underwriting must be expanded, those costs will also be passed forward to the contractor in the form of increased premiums. Ultimately, the federal government and the public at large will bear those increased costs, as the price of surety bonds are included in government reimbursements to contractors.

http://www.constructionexec.com/article/inside-the-mind-of-a-surety-bond-underwriter (explaining the range of surety bond premiums, which are not designed to cover losses). A ruling in favor of the Plaintiff-Relator will increase that percentage. The market for federal set aside contracts in fiscal year 2019 alone was $132.9 billion. *See* U.S. Small Business Administration, *Federal Government Exceeds Small Business Contracting Goals by Awarding Record-Breaking $132.9 Billion to Small Business*, https://www.sba.gov/article/2020/aug/12/federal-government-exceeds-small-business-contracting-goals-awarding-record-breaking-1329-billion (Aug. 12, 2020). Thus, even a quarter percent increase in surety bond premiums will significantly increase the cost of the public construction program, which is ultimately funded by taxpayers. Increased premiums directly translate to greater expenditures of tax dollars, hurting the public itself.

       With fewer sureties writing bonds for the set aside market, and those engaged in the market employing tightened underwriting standards, small, disadvantaged, and emerging contractors will find it harder, if not impossible, to obtain surety credit for federal construction projects. As the pool of bidders capable of satisfying statutory bonding requirements shrinks, and governmental set aside policies are unmet, the end result is less competition leading to an increased cost of public construction, as well as decreased opportunities for the very businesses Congress strives to support. The public's interest therefore lies in ensuring against the expansion of False Claims Act liability for sureties, whose essential function in the process is ensuring the completion of the construction work and payment for the labor and materials incorporated into the project, not ensuring compliance with set aside standards.

       One specific example of an unintended consequence of this Court expanding False Claims Act exposure for sureties is it places the U.S. Small Business Administration's Bond Guarantee Program in jeopardy. The SBA's Bond Guarantee Program has existed for fifty years to support

small businesses who would otherwise struggle to obtain surety bonding for construction projects. *See* U.S. Small Business Administration, *50th Anniversary Surety Bond Guarantee Program*, https://surety50.com/ (last visited February 21, 2021); *see also* U.S. Small Business Administration, Office of Surety Guarantees, *The Surety Bond Guarantee Program, SOP 50 45 3* (Aug. 5, 2015), https://www.sba.gov/sites/default/files/sops/SOP50433_1.pdf (explaining the mission of the SBA Bond Guarantee Program to provide bonding assistance to qualified small businesses).

Under the SBA's Bond Guarantee Program, the SBA guarantees bonds issued by sureties approved by the SBA program to qualified small businesses. *See* 15 U.S.C. § 694b (2016); *see also* 13 C.F.R. §§ 115.12 (2014) and 115.13 (2016) (general program policies, provisions, and eligibility criteria). SBA guarantees bonds by private sureties to approved SDVOSBs, minority owned businesses, HUBZone small business concerns, or for contracts less than $100,000, thereby encouraging sureties to serve this riskier market by providing recovery to the surety of up to ninety percent of the surety's losses for bonds written under the SBA program. *See* 13 C.F.R. § 115.31 (2019).

The SBA Bond Guarantee Program supports a massive amount of construction activities across the country, both in public and private construction. In fiscal year 2019, the SBA guaranteed 9,905 bonds with a total contract value of nearly $6.5 billion. *See* Congressional Research Service, *SBA Surety Bond Guarantee Program*, (Jan. 15, 2020), p. 1, https://fas.org/sgp/crs/misc/R42037.pdf. That amount surpassed $7 billion in fiscal year 2020. *See* U.S. Small Business Administration, *Surety Bond Guarantee Program Surpasses $7 Billion in Bond Guarantees*, (Oct. 30, 2020), https://www.sba.gov/article/2020/oct/30/sba-recognizes-top-active-surety-partners. The SBA has been working tirelessly to increase the use of its Bond Guarantee Program, however, despite those efforts, only a small number of sureties in the industry are willing to accept the heightened risk of

writing bonds for small businesses under the SBA Bond Guarantee Program. A ruling here imposing liability on sureties for False Claims Act penalties will cause that small group of sureties to decrease even further, possibly eliminating that pool altogether, thereby undermining the government's efforts to expand the utilization of the SBA Bond Guarantee Program.

Another example of negative consequences from a ruling holding sureties liable under the False Claims Act for constructive knowledge of set aside eligibility is that with public funds being finite, an increase in the cost of public construction will likely also result in a decrease in construction, thereby causing a loss of business not just to public improvement contractors, but also to all others who benefit from new buildings and infrastructure. Thus, decisions that increase the exposure of sureties beyond what the legislature intended will have wider, longer-lasting, deleterious effects on all who depend on surety bonding to ensure the completion of public construction projects, including the public at large.

## **CONCLUSION**

The purpose of False Claims Act penalties is to punish the wrongdoer and deter conduct in the future. Imposing a duty upon sureties to investigate during their underwriting process the accuracy of their bonded principal's set aside size or eligibility qualifications fails to accomplish those statutory purposes. Imposition of such a duty also expands the role and purpose of a Miller Act surety in the government contract process.

A decision in favor of the Plaintiff-Relator here and against the Surety Defendants will result in an unprecedented industry-wide shift in the practice of the issuance of surety bonds. Many sureties, of an already limited pool, will likely decide to cease extending surety credit to small, disadvantaged, and emerging contractors because of the additional risk of False Claims Act liability associated with ensuring compliance with federal size and eligibility qualifications. Those sureties who continue to service that market sector will expand their underwriting and monitoring

of on-going projects as a condition of extending surety credit, with a corresponding increase in bond premiums, to anticipate and financially plan for the added risk of exposure to False Claims Act liability for potential fraudulent size and eligibility certifications. The unintended consequences of those actions will decrease competition for set aside contracts, increase construction costs, and cause a detrimental financial impact on the public at large, the ultimate beneficiaries of the protections afforded by surety bonds.

For these reasons, The Surety & Fidelity Association of America respectfully requests the Court consider the policy concerns and the impact on the surety industry as it evaluates the Plaintiff-Relator's effort to expand sureties' liability under the False Claims Act.

Dated: February 24, 2021

Respectfully Submitted,

By counsel,

**THE SURETY & FIDELITY ASSOCIATION OF AMERICA**

  _/s/ Shoshana E. Rothman_____
Shannon J. Briglia
D.C. Bar No. 416746
Shoshana E. Rothman
D.C. Bar No. 981643
SMITH, CURRIE & HANCOCK LLP
1950 Old Gallows Road, Suite 750
Tysons, Virginia 22182
Telephone: (703) 506-1990
Facsimile:  (703) 506-1140
sjbriglia@smithcurrie.com
serothman@smithcurrie.com
_Attorneys for The Surety & Fidelity Association of America_

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this Brief conforms to the requirements of LCvR 5.4 and does not exceed 25 pages, as required by LCvR 7(o)(4).

Dated: February 24, 2021

                                         */s/ Shoshana E. Rothman*
                                        Shoshana E. Rothman
                                        D.C. Bar No. 981643
                                        Smith, Currie & Hancock LLP
                                        1950 Old Gallows Road, Suite 750
                                        Tysons, Virginia 22182
                                        Telephone: (703) 506-1990
                                        Facsimile:  (703) 506-1140
                                        serothman@smithcurrie.com
                                        *Attorney for The Surety & Fidelity*
                                        *Association of America*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 24th day of February, 2021, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

> */s/ Shoshana E. Rothman*
> Shoshana E. Rothman
> D.C. Bar No. 981643
> Smith, Currie & Hancock LLP
> 1950 Old Gallows Road, Suite 750
> Tysons, Virginia 22182
> Telephone: (703) 506-1990
> Facsimile:  (703) 506-1140
> serothman@smithcurrie.com
> *Attorney for The Surety & Fidelity*
> *Association of America*

# EXHIBIT 1



<div align="center">December 1, 2020</div>

<u>Via E-mail</u>

Shannon J. Briglia, Esq.
Smith, Currie & Hancock LLP
sjbriglia@smithcurrie.com
1950 Old Gallows Road, Suite 750
Tysons, VA 22182
Alexandria, VA 22308

**Re:**    **Request for Consent to Amicus Brief in *United States ex rel. Scollick v. Narula, et al.*, Case No. 1:14-cv-1339 (D.D.C.)**

Ms. Briglia:

This letter serves as Plaintiff-Relator Andrew Scollick's response to your November 13, 2020 e-mail requesting Plaintiff-Relator's consent for your firm's motion for leave to file an *amicus curiae* brief in the above-captioned case on behalf of The Surety & Fidelity Association of America ("SFAA").  At this stage of the litigation, Plaintiff-Relator does not believe it proper for SFAA to participate as *amicus curiae* and respectfully declines to consent to SFAA's proposed motion for leave.  We begin by noting that you neglected to identify two of the defendants, Hanover Insurance Company ("Hanover") and Hudson Insurance Company ("Hudson"), as active SFAA member companies.  As you know, both Hudson and Hanover are well represented by counsel familiar with your industry.  Having not disclosed the relationship, it may not be appropriate for the submission of an *amicus* brief on behalf of parties who are well represented.

Further, you stated that "SFAA would like to present to the court public policy concerns stemming from the attempted expansion of False Claims Act liability to include Miller Act sureties based on a surety's underwriting of Miller Act bonds implicated by the pleadings in the case."  This basis for submitting an *amicus* brief is improper because the legal issue of surety liability under the False Claims Act ("FCA") for knowingly bonding a fraudulent service-disabled veteran-owned small business ("SDVOSB") entity was vigorously contested and repeatedly briefed by your two member companies, Hudson and Hanover.  While it may have been proper to assist your member companies through your proposed *amicus* brief at that stage of litigation, it is untimely now.  Specifically, the surety defendants in this case filed multiple motions to dismiss and vigorously opposed Plaintiff-Relator's motion for leave to amend his complaint.  In each instance, your members argued that False Claims Act liability does not attach to a surety's alleged underwriting activities for the bonding of the SDVOSB contracts.  The Court rejected that very argument, holding that the surety defendants are subject to FCA liability both by indirectly causing false claims to be submitted and under the reverse false claims provision for the bonding agreements submitted to the United States on Standard Form 25.  *United States ex rel. Scollick v. Narula*, No. 14-cv-01339-RCL, 2017 U.S. Dist. LEXIS 1119530, at *40-56 (D.D.C. July 31, 2017).

November 30, 2020
Page 2 of 2

In sum, Plaintiff-Relator does not believe the filing of your proposed *amicus* brief would be beneficial to the Court after the Court has already ruled on the issue you identify as needing to be briefed.

We will reconsider Plaintiff-Relator's position should the legal issues of interest to the SFAA resurface on appeal.

If you do move forward with your proposed motion for leave on behalf of SFAA, Plaintiff-Relator asks that you submit this letter alongside that motion to properly note our opposition to the Court.

Sincerely,

/s/ *Michael D. Kohn*
Michael D. Kohn, mk@kkc.com
Attorney for Plaintiff-Relator

# EXHIBIT 2

Read Our Whistleblower & Qui Tam Blog ›



Our Firm ⌄    Practice Areas ⌄    Resources ⌄    Cases    FAQs    **Free Consultation**    🔍

Select Page ⌄



# Andrew Scollick

Home › Portfolio › False Claims/Qui Tam › Andrew Scollick

Qui tam whistleblower Andrew Scollick blew the whistle on a multi-million dollar scheme to systematically deny service-disabled small business veterans contracts as a result of two contracting firms working in conjunction with two of the largest surety bonding companies, Hanover Insurance Company and Hudson Insurance Company, to obtain Service-Disabled Veteran-Owned Small Business (SDVOSB) set-aside contracts from Veteran Administration when the insurance companies reasonably knew that the bonded contractors did not qualify as service-disabled, veteran-owned small businesses in violation of the False Claims Act.

In a precedent-setting reverse False Claims Act case, Scollick alleged that the bonding companies "knew or should have known" the construction companies were shell companies acting as a front for larger non-veteran owned entities violating the government's contracting requirements. Scollick's qui tam whistleblower lawsuit expanded the scope of False Claims Act liability by establishing the legal precedent that bonding companies can be held liable for treble damages for issuing surety bonds to construction companies that falsely claim to SDVOSB status. Scollick is represented by qui tam attorneys Kohn, Kohn & Colapinto, LLP.

See United States ex. rel. Scollick v. Narula, Case No: 14-cv-01339-RCL (District Court, District of Columbia. July 31, 2017).

Read: Reverse False Claims Act Liability Extended to Bonding Companies



## Request a Confidential Case Review

**Contact Us**

^

Navigate To:

**Case Vault**

# Want to Blow the Whistle?

All information submitted in the client intake form or in email from anyone seeking legal help is considered covered under the attorney client and work product privileges to the fullest extent of the law.

**Name**

First Name

Last Name

**Phone**

Telephone Number

**Email** *

Email Address

**Contact Reason**

What would you like to discuss?

**Your Message**

Please tell us more about your inquiry

Submit Confidentially

Your communications are secured and sent over 256-bit SSL encryption. Protect your identity and confidentiality, do not use any devices owned or controlled by a private corporation or governmental entity. It is also recommended to protect your online identity by establishing a new email account that does not identify you and to avoid the use of other online platforms that may disclose your identity.

**Subscribe to our newsletter** to receive whistleblower news and resources crafted & curated by the partners and associates at KKC.

Email Address...

Subscribe

Whistleblower Advocacy +

Resources +

Get Help +

Our Firm +

Practice Areas +

Other Practice Areas +

Language ☰

Country ☰

State Laws ☰

National Whistleblower Day ☰

© 2020 Kohn, Kohn & Colapinto LLP. All Rights Reserved.

1710 N Street NW, Washington, DC 20036

Your Privacy | Disclaimer

Career Opportunities

The information you obtain at this site is not, nor is it intended to be, legal advice. You should consult an attorney for advice regarding your individual situation. All information submitted in the client intake form or in email from anyone seeking legal assistance is considered covered under the attorney client and work product privileges to the fullest extent of the law. While we treat your information as confidential, a lawyer-client relationship is created only by express written agreement signed by both you and Kohn, Kohn & Colapinto.

