UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, *ex rel.*
ANDREW SCOLLICK

&ast;  Case No.:  1:14-cv-01339 RCL

   Plaintiff-Relator

&ast;

v.

&ast;

VIJAY NARULA *et al.*

&ast;

   Defendants

&ast;

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**HUDSON INSURANCE COMPANY'S STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF-RELATOR'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   LEGAL STANDARD ........................................................................................4

III.  ARGUMENT ....................................................................................................5

A.    Plaintiff-Relator Is Not Entitled to Judgment On Count I Presentment Claim...................5

    1.    Plaintiff-Relator fails to establish Hudson had knowledge of CSG's
        alleged fraud........................................................................................5

        a.    Knowing Presentment of a False Claim:  there is no evidence that
            Hudson had actual knowledge of CSG's alleged fraud ..............................6

        b.    Knowing Presentment of a False Claim:  there is no evidence that
            Hudson had constructive knowledge of CSG's alleged fraud .................13

            i.    Hudson's financial review of CSG and OST did not reveal
                any alleged fraud and Hudson had no obligation to
                affirmatively audit either for fraud .................................................14

            ii.   Hudson had no obligation to underwrite CSG's SDVOSB
                verification and the VA was not entitled to rely on Hudson's
                underwriting to confirm its prior SDVOSB verification process ..18

            iii.  Hudson continued to review the CSG account after its initial
                underwriting but identified no fraud and any undefined
                "inquiries" Plaintiff-Relator asserts Hudson should have made
                would not have revealed the alleged fraud ....................................21

            iv.   Plaintiff-Relator's unsupported attempt to impose a duty on
                Hudson to conduct a legal analysis of CSG's SDVOSB status
                confirms Hudson had no knowledge of the alleged fraud ............22

        c.    Centennial's purported knowledge of CSG's alleged fraud cannot be
            imputed on to Hudson to establish FCA liability as to Hudson................24

    2.    Plaintiff-Relator fails to establish Hudson caused submission of a false claim ....27

        a.    Submission of a Claim:  Plaintiff-Relator does not allege, and there
            is no evidence, that Hudson directly submitted any false claims to
            the VA......................................................................................27

     b.  Submission of a Claim:  Plaintiff-Relator cannot establish any
       indirect presentment of a false claim by Hudson to the VA ....................28

   3.  Falsity of the Claims: undisputed facts doom Plaintiff-Relator's attempt to
     assert a fraudulent inducement claim against Hudson ..........................................30

   4.  Falsity of the Claims:  Plaintiff-Relator has failed to adequately plead the
     required elements of a false certification claim ......................................................33

   5.  Falsity of the Claims:  Plaintiff-Relator has not established that CSG's
     payment applications for the contracts underlying the Hudson Bonds
     were fraudulent as CSG performed the work for which it billed the VA .............34

B.  Hudson Is Entitled To Judgment As A Matter Of Law On Count III
  (reverse false claim)  .........................................................................................................34

   1.  Definition of a Reverse False Claim ......................................................................34

   2.  Hudson's obligations under the Hudson Bonds have not been triggered but,
     even if its obligations were triggered, Hudson did not knowingly make any
     false statements or conceal any obligation to pay or transmit money to the
     federal government .................................................................................................35

C.  The Motion Must Be Denied Because The Public Disclosure Bar Is A Complete
  Prohibition Of Plaintiff-Relator's Claims.........................................................................38

D.  Plaintiff-Relator Has Failed To Produce Evidence Of The Government's Entitlement
  To Recovery Of Actual Damages Related To Any CSG Contracts .................................41

V.  CONCLUSION...............................................................................................................41

Defendant/cross-claim plaintiff Hudson Insurance Company ("Hudson"), by its undersigned attorneys, respectfully submits this Statement of Points and Authorities in Opposition to Plaintiff-Relator's Motion for Partial Summary Judgment.

## I.      INTRODUCTION

On February 24, 2021, Hudson filed a motion for summary judgment asserting that there are no material disputes of fact and that Hudson is entitled to judgment as a matter of law as to all counts in the second amended complaint ("SAC").   On the same date, plaintiff-relator Andrew Scollick ("Plaintiff-Relator") filed his own motion for partial summary judgment against Hudson asserting that he is entitled to judgment in his favor as a matter of law as to Count I – knowingly submitting or causing to be submitted false or fraudulent claims in violation of 31 U.S.C. §3729(a)(1)(A) of the False Claims Act ("FCA") (presentment claims) and Count III – knowingly avoiding or decreasing obligations in violation of 31 U.S.C. §3729(a)(1)(G) (reverse false claims).

As described in Hudson's Motion, the SAC alleges that certain contractors, including cross-defendant Centurion Solutions Group, LLC ("CSG"), fraudulently obtained service-disabled veteran-owned small business ("SDVOSB") status from the United States Department of Veteran Affairs ("VA") and used that SDVOSB status to induce the VA into awarding and making payments under SDVOSB set-aside contracts in violation of the FCA.  To overcome the pleading deficiencies that resulted in his first complaint being dismissed, the Plaintiff-Relator asserts numerous and significant factual misrepresentations pertaining to Hudson in the SAC and deliberately obfuscates the factual allegations by using the term "the Bonding Defendants" throughout the pleading rather than identifying specific actions taken by individual defendants or knowledge acquired by specific parties.

After extensive and prolonged discovery that generated thousands of documents, written evidence and testimony, all material allegations against Hudson in the SAC have been demonstrated to be false. To overcome this fatal lack of evidence as to Hudson, Plaintiff-Relator's Motion follows the SAC's naked strategy of attempting to weave a years-long narrative through a 293-paragarph, 91-page factual statement in which defendants Hudson, Hanover Insurance Company ("Hanover"), Centennial Surety Associates, Inc. ("Centennial") and Michael Schendel ("Schendel") are re-named but still conflated into a single entity known as the "Insurance Defendants" and Plaintiff-Relator seeks to attribute the individual actions and knowledge of any one of them to all of them with no distinction or evidentiary support. However, summary judgment is not the pleading stage and Plaintiff-Relator must now prove every required element of each cause of action against each defendant individually.

Plaintiff-Relator's Motion only serves to further confirm the fatal deficiencies in his claims against Hudson. Regarding Count I (false claims), Plaintiff-Relator asserts that Hudson continued to do business with CSG after it learned that CSG had fraudulently induced the VA into awarding SDVOSB set-aside contracts. Mot. at 18, 31. Plaintiff-Relator bears the burden of proof yet has produced no evidence that Hudson participated in, knew about, willfully ignored, or recklessly disregarded any alleged fraud by CSG, including any fraud in the initial contract procurements.

Regarding Count III (reverse false claim), Plaintiff-Relator asserts Hudson had independent obligations to the VA under the bonds it issued on CSG's behalf and attempted to conceal those obligations. Plaintiff-Relator fails to establish the obligations under those bonds it issued to CSG have ever been triggered and, even if the Court disagrees, there is no evidence that

Hudson made any false statements or concealed any information regarding any such obligations as required to be a violation of the FCA.

Once viewed under the proper evidentiary burden, it becomes clear that Plaintiff-Relator's strategy to establish liability as to Hudson relies almost exclusively on the knowledge and actions of entities and individuals other than Hudson and on documents that Hudson never possessed. Of the 246 exhibits attached to his Motion, Plaintiff-Relator only identifies 8 exhibits purportedly supporting his claims against Hudson. Of those 8 exhibits, Hudson was in possession of 6 – exhibits 7, 128, 129, 138, 139, 142. There is no evidence that Hudson ever acquired or possessed exhibits 127 or 143 prior to discovery in this litigation. Regarding the former 6 exhibits, there can be no legitimate dispute that nothing contained in exhibits 7, 128, 129, 138, 139, 142 establishes that Hudson had actual knowledge of or participated in any alleged fraud and Plaintiff-Relator does not so claim. Regarding the latter exhibits, documents that Hudson never received or obtained cannot serve as the predicate to establish it had knowledge of CSG's alleged fraud as a matter of both fact and law. No other evidence is offered against Hudson.

Recognizing this deficiency, Plaintiff-Relator attempts to establish Hudson had constructive knowledge of the alleged CSG fraud by unilaterally creating and imposing obligations on Hudson to investigate the VA's SDVOSB verification of CSG that was completed prior to the time period that Hudson provided bonding, to audit CSG's financials, and to conduct a broad and continuing legal analysis of CSG's SDVOSB status, including knowledge and understanding of the relevant regulations, despite no such obligations being imposed by law. Moreover, Plaintiff-Relator's proposed legal analysis obligation undercuts Plaintiff-Relator's theory set forth in the SAC that Hudson's underwriting – alone – should have uncovered the

alleged fraud, implicitly conceding there is *no* information that Hudson obtained during the underwriting process that triggered knowledge of the alleged fraud.

Finally, Plaintiff-Relator's entire argument against Hudson assumes as an adjudicated fact that CSG was not a proper SDVOSB.  Because no such finding has been made, the Motion is premature as to Hudson. Mot. at 29 ("CSG and Citibuilders Solutions were never in compliance with the VA SDVOSB regulations").  For these reasons and as more fully explained below, the Plaintiff' Relator's motion must be denied and Hudson's previously filed motion for summary judgment must be granted in its entirety. [1]

## II.     LEGAL STANDARD

This Court has defined the standard for review of a summary judgment motion as follows:

> The Federal Rules of Civil Procedure state that '[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.' Fed.R.Civ.P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). judgment may be granted.' *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

*U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 858 F. Supp. 2d 79, 81–82 (D.D.C. 2012), *aff'd,* 764 F.3d 19 (D.C. Cir. 2014), and *aff'd,* 764 F.3d 19 (D.C. Cir. 2014).

The undisputed facts in this case establish, and Plaintiff-Relator concedes, that Hudson provided bonds for only one entity identified in this lawsuit, CSG, a bonding relationship that did not commence until mid-2011, which Plaintiff-Relator also concedes, and ended only 4 months later, which cannot be legitimately disputed.  Because it is undisputed Hudson was not requested to and did not provide bonds to Citibuilders or KCGI, the Opposition addresses only CSG.

---

[1] All cites to Hudson's Statement of Undisputed Material Facts will be "Hudson SUMF at ¶___". All defined terms in Hudson's SUMF will have the same meaning herein. All cites to Plaintiff-Relator's Statement of Material Facts not in Genuine Dispute will be "Mot., SMF at ¶___".

### III.    ARGUMENT

**A.    Plaintiff-Relator Is Not Entitled To Judgment On His Count I Presentment Claim**

The FCA imposes liability on anyone who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (known as a presentment claim).  The FCA defines the terms "knowing" and "knowingly" as someone who: "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information[.]" 31 U.S.C.A. § 3729(b)(1)(A)(i)-(iii).

To support his motion for summary judgment on Count I, Plaintiff-Relator must produce evidence that "'(1) the defendant submitted [or caused to be submitted] a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false.'"  *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 121-22 (D.D.C. 2014) (citing *U.S. ex rel. Head v. Kane Co.,* 798 F.Supp.2d 186, 196 (D.D.C.2011) (quoting *U.S. ex rel. Folliard,* 722 F. Supp. 2d at 26).

### 1.    Plaintiff-Relator fails to establish Hudson had knowledge of CSG's alleged fraud

At bottom, "the relator must provide 'sufficient evidence to support an inference of knowing fraud.'" *United States ex rel. Bettis v. Oderbrecht Contractors of California, Inc.*l2004) (*quoting United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir. 1995)). "Mere negligence cannot support liability under the FCA." *U.S. ex rel. K & R Ltd. P'ship v. Massachusetts Hous. Fin. Agency*, 456 F. Supp. 2d 46, 61 (D.D.C. 2006), *aff'd,* 530 F.3d 980 (D.C. Cir. 2008).

Plaintiff-Relator has failed to produce any evidence that Hudson's underwriters either knew or understood the SDVSOB requirements regarding ownership or control.  Further, his

arguments that Hudson knew that CSG was a verified SDVSOB that failed to meet the statutory and regulatory ownership and control requirements are predicated on nakedly conflating Hudson, Hanover and Centennial and relying on purported facts pre-dating Hudson's involvement with CSG and information Plaintiff-Relator does not even assert Hudson ever received.  Such a brazen sleight of hand is wholly insufficient to satisfy Plaintiff-Relator's burden on summary judgment as to Count I and confirms the Hudson's Motion should be granted as to both Count I and II because there is no evidence of Hudson's knowledge of the alleged CSG fraud.

> **a.    Knowing Presentment of a False Claim:  there is no evidence that Hudson had actual knowledge of CSG's alleged fraud**

<u>First</u>, the vast majority of the activities that Plaintiff-Relator alleges to be fraudulent with respect to CSG indisputably occurred prior to any CSG-Hudson relationship. It is undisputed that Hudson was *first* approached in mid-2011 but CSG was formed in January 2010.  Hudson Exhibit 1 at ¶¶13-14. Mot., SMF at ¶152. Hudson SUMF at ¶¶28-30. Hudson was not involved in CSG's SDVOSB verification process, which was finally completed when the VA issued the May 12, 2011, SDVOSB verification letter and added CSG to the Vetbiz.gov database – events that took place *before* the GIAs were executed or the Hudson Bonds were issued.  *Hudson* Exhibit 1 at ¶10; Exhibit 15. Hudson SUMF at ¶24. Hudson had no relationship with CSG, OST, CB, Citibuilders, Vijay Narula, Ajay Madan, Neil Parekh or Amar Gogia between the time frame of CSG's formation and its SDVOSB final verification and Plaintiff-Relator offers no evidence to the contrary. Exhibit 1 at ¶11. Plaintiff-Relator also testified Hudson was not involved in the alleged fraud in 2010.  Hudson Exhibit 33 at p.197-99. Thus, there can be no dispute that Hudson had no actual knowledge of the alleged fraudulent activity related to CSG's formation, its initial SDVOSB verification or any alleged SDVOSB set-aside contracts pre-dating the Hudson Bonds because it had no relationship with the parties alleged to be involved.

<u>Second</u>, there is no evidence that Hudson became aware of any fraud *after* receipt of the GIAs or during the short period from July through October 2011 during which it issued bonds for CSG – when Plaintiff-Relator testified Hudson *first* allegedly entered the fraud.  Hudson Exhibit 33 at p.197-99.   Initially, Plaintiff-Relator conceded that he never warned Hudson about the alleged fraud even though he testified he was aware of the alleged fraud beginning in September 2010 – approximately ten months prior to the execution of the Hudson GIAs and issuance of the Hudson Bonds. Hudson Exhibit 33 at 198; Hudson Exhibits 20-21. Hudson SUMF at ¶¶34-35. Plaintiff-Relator also could not identify the basis for Hudson's purported knowledge or a single Hudson employee who knew of the alleged fraud. Hudson Exhibit 33 at 204-205.

Next, Hudson delegated to Surety Partners under the PAA the underwriting functions related to evaluating whether CSG could perform the type of contract work it sought.  Hudson Exhibit 2.  Although paragraph 184 of the SAC alleges that Hudson's "underwriting and due diligence… would reasonably have revealed that CSG did not possess the necessary construction history… to carry out the scope of the contracting activity," there is no evidence that Surety Partners provided any information to Hudson that indicated CSG could not perform the contracts it was awarded or otherwise raised performance capability concerns.  *See also* SAC at ¶187 (similar allegations as to Gogia).[2]

To the contrary, prior to issuance of the Hudson Bonds as noted above, it is undisputed that Surety Partners notified Hudson that CSG had been awarded eight contracts that Hanover bonded totaling "$4.542M dating 9/2/2010 thru 5/10/11."  Hudson Exhibit 19; Hudson SUMF at ¶¶29-30. There is no evidence that Hudson was notified or discovered any complaint by the VA that CSG was either incapable or unwilling to perform its obligations under the eight Hanover-

---

[2] The Motion's SMF at ¶171 references performance concerns on a particular contract but it is undisputed Hudson did not bond that contract. Mot., SMF at ¶160 (Hudson bonded contracts).

bonded contracts, to the extent any complaint was ever made, and Plaintiff-Relator has not identified any. Notably, the five contracts bonded by Hudson were all *similarly priced* to the Hanover bonded contracts. Mot., SMF at ¶128 (Hanover) and ¶160 (Hudson). It is undisputed that the VA never notified Hudson about any CSG performance concerns on the contracts bonded by Hudson and no performance bond claims were made. Hudson Exhibit 1 at ¶24.

Further, Hudson undertook a financial analysis of OST's and CSG's financials prepared by a certified public accountant during the underwriting process but there can be no legitimate dispute that no information contained in such financials provided Hudson with actual knowledge of any alleged fraud and Plaintiff-Relator does not so assert. Hudson Exhibits 25 and 26. Hudson Exhibit 1 at ¶¶15-16. Mot., Exhibit 240. Hudson SUMF at ¶¶31-32.

Still further, contrary to the allegations in paragraph 196 of the SAC, Hudson did not review "every SDVOSB contracting action pursued in the name of CSG." Hudson Exhibit 3 at 190. Hudson was not involved in any CSG contract bid process and did not prepare or review any CSG contract bid proposals or the solicitation packages, in part because the requested CSG bonds were within Hudson's pre-approved surety bond limit established for CSG and fell within the parameters of Surety Partners' authority under the PAA. Hudson Exhibit 1 at ¶19; Hudson Exhibit 3 at 190. Hudson also did not review any awarded contracts, which fell within the established pre-approved bonding parameters. *Id*. Plaintiff-Relator has not and cannot offer any evidence as to any specific bid or contract document Hudson was provided or reviewed. *See, e.g.*, Mot. at 26 (asserting that Centennial received contract pages stating "contract was SDVOSB set-aside" but never asserting Centennial sent those "pages" to Hudson). In any event, there can be no legitimate dispute that Surety Partners did not approach Hudson about providing a bonding line to CSG exclusively for SDVOSB set-aside contracts but, rather, for its general

bonding needs.  It is typical, like the situation here, to secure general bonding capability before submitting bids on projects known to require bonding. Exhibit 1 at ¶8.

Third, although the SAC asserts the "Bonding Defendants" toured OST facilities, Plaintiff-Relator testified this "tour" occurred in the summer or fall of 2010, *before* Hudson had any involvement with CSG. Hudson Exhibit 33 at 191-194; *see* SAC at ¶¶182-83.  Plaintiff-Relator conceded in deposition that he has no knowledge that Hudson ever participated in any tour of an OST office prior to, during or after the period it issued the Hudson Bonds and Hudson confirms that it never did.  *Id*.; Hudson Exhibit 1 at ¶23.  The SAC's allegations that Hudson toured OST's offices are demonstrably false.  Similarly, although the Motion asserts the "Insurance Defendants only ever dealt with Parekh or Narula, never Gogia or Goodweather, clearly evidencing their belief that Gogia and Goodweather did not manage CSG and Citibuilders as required," this is also demonstrably false as to Hudson because the only evidence the Motion cites to support this conclusory argument are the communications of Schendel and Hanover – not Hudson.  Mot. at 28.  There is not a scintilla of evidence in the 246 exhibits offered by Plaintiff-Relator showing Hudson ever communicated with Parekh or Narula.

Fourth, contrary to the insinuations contained in paragraph 194 of the SAC, Hudson's requirement of contractual indemnity from more parties than just CSG was not some indicia of Hudson's actual knowledge of an ongoing fraud but rather typical industry practice.[3]  Hudson's corporate designee testified that "we look to get indemnity of anybody and everybody that we can" to increase "recovery efforts on any bonds issued."  Hudson Exhibit 3 at 91, 113-14, 116. *See also Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300 (2004) ("In the construction industry, it is standard practice for surety companies to require contractors for

---

[3]      Paragraph 193 of the SAC alleges that the "Bonding Defendants further required Narula and his wife" to provide $1 million in indemnity.  This is not true as to Hudson.  *See* Hudson Exhibits 20-21.

whom they write bonds to execute indemnity agreements by <u>which principals and their individual backers agree to indemnify sureties</u> against any loss they may incur as a result of writing bonds on behalf of principals. *See generally The Surety's Indemnity Agreement—Law & Practice* (Marilyn Klinger, *et al., eds.,* Am. Bar Assoc. 2002)") (emphasis added). *See also* M. Klinger, G. Bachrach, T. Haley, *The Surety's Indemnity Agreement*: *Law and Practice* at 185 (2nd ed. 2008) (indemnitors "are intended to provide the surety a source of recourse to reduce loss resulting from the issuance of bonds for the principal…. As with principals, indemnitors are not limited in nature or number.").

Plaintiff-Relator attempts to escape this well-recognized industry standard by pointing to the GIAs' language stating OST, CSG, Citibuilders and CB Construction were "materially interested through common ownership in transactions" with each other, but there is no dispute that Centennial provided the fully executed GIAs to Hudson after filling in that language. Even assuming *arguendo* common ownership existed among some of these entities, the GIAs do not identify the common ownership and Hudson's corporate designee testified Hudson did not know if there was common ownership between those entities or why that terminology was used in the GIAs because Hudson did not complete the forms.  Hudson Corp. Des. Dep. at 119-123 attached as **Exhibit 35**.   In any event, not even Plaintiff-Relator is suggesting there was common ownership between all four of these indemnitors and fails to identify which entities Hudson allegedly knew had the alleged common ownership based on the GIAs.  Plaintiff-Relator also ignores that Amar Gogia executed the GIAs as CSG's "Managing Member."  Hudson Exhibits 20 and 21. Thus, the GIAs cannot be the basis for Hudson's purported "actual" knowledge that CSG was not an SDVOSB nor create a *genuine* dispute to withstand the Hudson Motion.

Finally, the Motion's reliance on several of the 246 exhibits is unavailing to reach a different conclusion. Plaintiff-Relator cites to exhibit 127, which is a May 27, 2011, email from Courtney Seed discussing a meeting with OST the prior day. Mot., SMF at ¶153. There is no evidence, nor does Plaintiff-Relator assert, that Hudson ever received this email. *United States ex rel. Tran*, 53 F. Supp. 3d at 129 (dismissing FCA claim stating: "But Relator's argument here puts the cart before the horse—before Sagent can be accused of ignoring information, it must be aware that such information exists."). Notwithstanding, even had Hudson received the email it would have been notified that "Amar [Gogia] and his wife own Centurion and they will both personally indemnify." (Cent. 310) (emphasis added).

Plaintiff-Relator then points to exhibit 128, a June 15, 2011, email between Ms. Seed and Hudson in which Ms. Seed notified Hudson that "personal and spousal indemnity of the President and 100% owner of Centurion Solutions" will be provided. Mot., SMF at ¶154 (emphasis added). Plaintiff-Relator does not dispute that Ms. Seed is again referring to Gogia. Plaintiff-Relator next points to exhibit 129, consisting of June 17, 2011 internal Hudson emails memorializing a discussion with Courtney Seed in which Hudson notes it was informed that the "majority" of CSG's "work is SDV work (Service Disabled Veterans)" but Plaintiff-Relator omits that Hudson states in the *same* email it was notified that Ms. Seed had "secured" the "full personal indemnity of the 100% owner of Centurion Solutions Group, Inc. and his wife." Mot., SMF at ¶155 (emphasis added). Notably, these numerous representations as to Gogia's 100% ownership of CSG further belies any argument the GIAs, executed in July 2011, provided Hudson with actual knowledge of CSG's alleged fraud.

Plaintiff-Relator tries to overcome the undisputed fact established by his own exhibits – that Hudson was only ever informed of a single, 100% owner of CSG - by pointing to three

documents.  The first is exhibit 7, which is the September 2010 Hanover Account Summary that Courtney Seed previously drafted and then provided to Hudson on June 17, 2011, that stated CSG is "also a subsidiary of OST."  In other words, Plaintiff-Relator asks this Court to ignore Ms. Seed's numerous representations to Hudson contemporaneous with the bonding requests that Gogia was the 100% owner of CGS and, instead, rely on information nearly 1-year old and initially provided to another surety.  Mot., SMF at ¶¶131-32, 156.

The second is exhibit 138, which is a September 29, 2011 email between Hudson and Courtney Seed in which Hudson states: "If Centurion is a subsidiary of OST (we were advised they are), then the OST statement should be documented/footnoted properly and even have the POC accounting." Mot., SMF at ¶162 (Hudson Non 285).  The third is exhibit 139, which is a November 8, 2011 email from Courtney Seed to Hudson stating CSG is the "construction arm of OST" but makes no reference to whether CSG is a subsidiary of OST.  Mot., SFM at ¶165. These two documents create, at most, a temporary ambiguity (but not a dispute) as to what Hudson was notified about CSG's status in a 5-week period between September 29 and November 8, 2011.  It is undisputed that Hudson had already issued 4 of the 5 sets of bonds that Hudson provided by August 1, 2011 – prior to Hudson's September 29 email stating it had been advised CSG was a subsidiary of OST. **Notably, the final performance bond issued on October 27, 2011, had a penal sum of only $77,100.00, which is under the Miller Act threshold requirement. 40 U.S.C. § 3131(b).**

Plaintiff-Relator's reliance on exhibits 138 and 139 is fatally predicated on ignoring that Hudson conducted an audit of OST and CSG's accounts at the end of November 2011 and sought any updated information from Centennial and Surety Partners.  Hudson SUMF at ¶¶45-46; Hudson Exhibit 27.  In response, on November 29, 2011, any ambiguity was finally resolved

when Michael Schendel of Centennial, as Plaintiff-Relator acknowledges, expressly informed Hudson: "<u>I thought Centurion was going to be a subsidiary of OST and it is officially not one</u>" and further described the relationship as "<u>more of a sister company</u>." Mot., SMF at ¶166, Ex. 141 (emphasis added); Mot. at 27; Hudson SUMF at ¶47. Thus, the only evidence is that prior to September 29, 2011, during the period Hudson issued 4 of the 5 sets of Hudson bonds, Hudson was notified that Gogia was 100% owner of CSG and any subsequent ambiguity as to the CSG-OST relationship was finally resolved two months later when Centennial confirmed CSG was not a subsidiary of OST.

Undeterred, Plaintiff-Relator continues to ply his unsupported theory by pointing to exhibit 142, which is a December 31, 2011 Hudson-Contract Surety Worksheet identifying CSG as a "sister company" of OST, tracking Centennial's language provided in response to Hudson's November 2011 audit. Mot., SMF at ¶167. Plaintiff-Relator also points to exhibit 143, which is a January 13, 2012 Courtney Seed email regarding a meeting with Narula, Madan, Gogia and Parekh but offers no evidence that this document was given to Hudson. *United States ex rel. Tran*, 53 F. Supp. 3d at 129 (defendant must be aware of information to recklessly disregard or willfully ignore it). In any event, these exhibits are irrelevant because Hudson had not issued any bonds since October 2011 and never issued any further bonds.

### b.    Knowing Presentment of a False Claim:  there is no evidence that Hudson had constructive knowledge of CSG's alleged fraud

Under the FCA, a party cannot avoid liability by burying its head in the sand while being the beneficiary of fraudulent behavior. A party can be found to have "constructive knowledge" of a fraud if it acts with "deliberate ignorance" or "reckless disregard" for the truth. 31 U.S.C. § 3729(b)(1)(A)(ii)-(iii). Here, Hudson thoroughly vetted CSG before agreeing to issue bonds on its behalf and that process did not reveal any alleged fraud.

> **i.  Hudson's financial review of CSG and OST did not reveal any alleged fraud and Hudson had no obligation to affirmatively audit either for fraud**

It is undisputed that when asked to provide a bonding line Hudson obtained and reviewed CSG's and OST's then current financial information during the underwriting process to analyze the potential financial risk to Hudson in issuing surety bonding to CSG and to determine the acceptable bonding limits to provide to Surety Partners to limit Hudson's financial exposure. Hudson Exhibit 3 at 15; Hudson Exhibits 25-26 (financials); Mot. Exhibit 240.  Although paragraph 184 of the SAC alleges that Hudson's "underwriting and due diligence… would reasonably have revealed that CSG did not possess the necessary… financial capabilities to carry out the scope of the contracting activity," there is no evidence that the financial information Hudson obtained was incorrect or that Hudson's financial risk analysis was flawed.  Hudson's corporate designee testified that CSG and OST's financials were "adequate for the size bonds we issued," which as noted above were in the same range as the 8 Hanover bonds.  Hudson Exhibit 3 at 15; Mot., SMF at ¶128 (Hanover) and 160 (Hudson).  Moreover, for the reasons explained above, OST's financial support through the GIAs does not establish Hudson constructively knew CSG lacked the "financial capabilities" to perform its contracts.

To escape this conclusion, the Motion asserts the "Insurance Defendants had knowledge that large amounts of money had been put into CSG and Citibuilders Solutions by individuals or entities other than the associated service- disabled veterans." Mot. at 28. The Motion's support for this argument is almost entirely based on information provided to Hanover but not Hudson or it relates to Citibuilders and, therefore, both are unavailing entirely.  *United States ex rel. Tran*, 53 F. Supp. 3d at 129 (defendant must be aware of information to recklessly disregard or willfully ignore it). The only other evidence Plaintiff-Relator attempts to rely on is the CSG

financial information referenced above.  Mot., Exhibit 240; Hudson Exhibit 25.  Plaintiff-Relator tries to manipulate discrete portions of CSG's financial information but even those characterizations are unavailing to establish Hudson had constructive knowledge of CSG's alleged fraud.

Plaintiff-Relator first points to CSG's 12/31/10 Balance Sheet (Hudson Non 691), reflecting a period ending nearly 6-months prior to any connection with Hudson, that identifies two equity members: "Member One Equity" with $18,668 and "Member Two Equity" with $210,00.  Mot., SMF at 144; Exhibit 240 (the same as Hudson Exhibit 25).  Not only does the balance sheet not further identify the equity members but, as discussed exhaustively, an SDVOSB may be owned by more than one person.  Exhibit 240.  *See* 38 C.F.R. 74.1.  Plaintiff-Relator attempts to argue the latter identified equity member was defendant Ajay Madan but only cites to Mr. Madan's deposition testimony that was not addressing Exhibit 240 and does not state Mr. Madan provided any information to Hudson.  Mot., SMF at ¶144 (citing Exhibit 5, Madan Dep. at 122).

By contrast, the Motion fails to note that CSG's 6/30/11 Balance Sheet, reflecting the period contemporaneous with Hudson's bonding, identifies only one equity member, Amar Gogia, which is consistent with the information that Surety Partners provided Hudson that Gogia was the 100% owner during the underwriting process as noted above.  Exhibit 240 (Hudson Non 697); Mot., SMF at ¶144.

Plaintiff-Relator next points to CSG's 12/31/10 Statement of Income & Retained Earnings identifying "Investments" of $240,000.  Exhibit 240 (Hudson Non 692); Mot., SMF at ¶144.  Despite undertaking extensive discovery in this matter, Plaintiff-Relator concedes these

"Investments" are "unexplained" and offers no reason why this single line item should have notified Hudson of an alleged fraud.

Plaintiff-Relator finally points to CSG's 12/31/10 Statement of Operating Expenses identifying "Rent" as $50,000 under "Operating Expenses." Exhibit 240 (Hudson Non 696); Mot., SMF at ¶144. The "Rent" line item comports with Michael Schendel's representation to Hudson in November 2011 that CSG shares building space and resources with OST. Mot., Exhibit 141. Although Plaintiff-Relator asserts CSG obtained free rent from OST, the quoted testimony does not confirm that fact but that is immaterial because Plaintiff-Relator again provides no evidence Hudson was notified CSG received free rent even if that is true. Mot., SMF at ¶144. *United States ex rel. Tran*, 53 F. Supp. 3d at 129 (defendant must be aware of information to recklessly disregard or willfully ignore it). Plaintiff-Relator also fails to provide any evidence of rental expenses in CSG's 2011 financials that were contemporaneous to its bonding request. Mot., Exhibit 240.

Tellingly, Plaintiff-Relator does not assert any argument that the OST financials that Hudson obtained during underwriting and relied on in its bonding decisions should have notified Hudson of the alleged fraud. Hudson Exhibit 26.

To the extent Plaintiff-Relator asserts that Hudson had to look behind CSG's financials, such an argument is further flawed because Hudson's corporate designee testified that Hudson does not "re-underwrite audited financial statements to see whether the auditors did it correctly" and Plaintiff-Relator cannot and does not offer any legal support to impose such a duty on a surety. Hudson Exhibit 35 at 34. In this regard, courts have confirmed that surety underwriting is for the use of the surety, not for third-parties, necessarily meaning a surety has no duty to affirmatively evaluate a principal's financials for fraud on behalf of the obligee. *See, e.g., ZP*

*No. 54 Ltd. P'ship v. Fid. & Deposit Co. of Maryland*, 917 So. 2d 368, 374 (Fla. Dist. Ct. App. 2005). Moreover, courts have expressly rejected similar arguments. In *U.S. ex rel. Grynberg v. Ernst & Young LLP*, 323 F. Supp. 2d 1152, 1156 (D. Wyo. 2004), the court dismissed an FCA claim against an auditor in which the plaintiff asserted, similar to Plaintiff-Relator here, the auditor had an affirmative duty to "identify fraudulent conduct that was or should have been determined in the course of proper audits." *Id*. The court found that the plaintiff offered no support for imposing a duty on an auditor to root out fraud because an "audit of a company's financial statements does not, and is not intended to, delve into every aspect of the client's accounting practices, much less its general business practices." *Id*. at 1156-57 (quoting Statements on Auditing Standards AU § 110.01 ("The role of an auditor is to opine as to whether the financial statements 'are presented in conformity with [GAAP],' and present fairly, in material respects, the company's 'financial position, results of operations, and its cash flows ....'").

Following *ZP No. 54 Ltd. P'ship* and *Grynberg*, not only has Plaintiff-Relator not specifically identified any duty Hudson underwriters had to look behind, *e.g.*, audit, CSG's and OST's financials for fraud for the benefit of the VA or anyone else, but courts do not even impose such a duty on actual financial auditors. If Plaintiff-Relator's theory was extended to its logical conclusion, CSG's certified public accountants that provided the financials that Hudson reviewed should be liable for CSG's alleged fraud as well – but even Plaintiff-Relator does not make such an outlandish claim revealing the deficiency of applying this theory to Hudson.

ii. **Hudson had no obligation to underwrite CSG's SDVOSB verification and the VA was not entitled to rely on Hudson's underwriting to confirm its prior SDVOSB verification process**

The undisputed fact that CSG already had obtained final SDVOSB verification from the VA and was listed on the VetBiz.gov website before it ever sought bonds from Hudson is further evidence that Hudson had no constructive knowledge of any fraud. Hudson Exhibit 15. *See, e.g.*, *U.S. ex rel. K & R Ltd. P'ship*, 456 F. Supp. 2d at 63 (government "knowledge of the facts underlying false claim… may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth.").

The VA is required by federal law to undertake specific procedures to examine a potential SDVOSB entity during the verification process, including obtaining significant documentation delineated in the relevant federal regulations relating to financial statements and corporate structure documents, among others. *See* 38 C.F.R. §§74.10 – 74.12, 74.20.[4] The VA is statutorily required to establish a "database of veteran-owned businesses maintained by the [VA] Secretary" that are eligible for SDVOSB set-aside contracts and the VA, not sureties, are statutorily required to verify "that each small business concern listed in the database is owned and controlled by veterans." 38 U.S.C.A. § 8127 (f)(4). *See, e.g.*, Hudson Exhibit 15.

To escape this conclusion, Plaintiff-Relator asserts that Hudson was obligated to look behind CSG's verification during its underwriting process. Hudson's corporate designee testified that it is not the normal course of business to underwrite government-issued

---

[4]      38 C.F.R. § 74.12 (What must a concern submit to apply for VIP Verification Program?) required CSG to submit specific information to the VA that overlapped with information in Hudson's underwriting file identified above: "The documentation to be submitted to CVE includes, but is not limited to: Articles of Incorporation/Organization; corporate by-laws or **operating agreements**; shareholder agreements; voting records and voting agreements; trust agreements; franchise agreements, organizational, annual, and **board/member meeting records**; stock ledgers and certificates; State-issued Certificates of Good Standing; contract, lease and **loan agreements**; **payroll records; bank account signature cards**; **financial statements**; Federal personal and business **tax returns for up to 3 years**; and licenses." (emphasis added). The CFR provisions cited herein are current and last amended in 2018 but contain no material differences from their 2010 iteration that controls this matter.

verifications.  Hudson Exhibit 3 at 190.  Again, Plaintiff-Relator has not, because he cannot, identify any federal law or regulation that imposes a duty on a surety to investigate the legitimacy of a government-issued SDVOSB verification in the absence of any information indicating improper verification – particularly when the verifying agency is also the bond obligee and required by law to review the same financial information and corporate structure documents provided to the surety as well as much more.

Instructively, courts have previously found that third parties do not have a duty to investigate the underlying factual predicate for a government-issued verification/certification and such a decision, alone, is not reckless disregard or deliberate ignorance of fraud under the FCA:

> '[T]he FCA is not an appropriate vehicle for policing technical compliance with administrative regulations. The FCA is a fraud prevention statute; violations of ... regulations are not fraud unless the violator knowingly lies to the government about them.' *United States ex rel. Lamers v. City of Green Bay,* 168 F.3d 1013, 1020 (7th Cir.1999). Thus, the FCA is violated only by deliberate falsehoods or, at minimum, statements made with reckless disregard of their truth or falsity. [citation omitted]… Neither negligent misstatements nor innocent mistakes are sufficient to establish liability under the FCA. [citation omitted] Where the government has assured a contracting party that a certain fact is true, and the contracting party has no reason to doubt the government's assurances, it is not a reckless or deliberate falsehood to rely on those assurances in making a claim to the government. [citations omitted]

*U.S. ex rel. Burlbaw v. Orenduff*, 400 F. Supp. 2d 1276, 1285–86 (D.N.M. 2005) (declining to find FCA fraud where defendant did not investigate Department of Education issued certification), *aff'd,* 548 F.3d 931, 957 (10th Cir. 2008) ("defendants reasonably relied upon the written assurances of the governmental agency responsible for administering the program under which NMSU sought and obtained the now-contested contracts") (emphasis added).  *See also* 3 Bruner & O'Connor Construction Law § 8:66.30 (Surety exposure to False Claims Act (FCA) liability) n.3 ("Because the VA's program requires a separate verification process, it is difficult

to understand how the surety could be subject to [False Claims Act] liability for relying on status conferred upon its principal through a separate process in which it was not engaged.").

Even if such a duty did exist, which Hudson denies, Plaintiff-Relator does not identify any information that Hudson obtained during the underwriting process that was any different than what the VA was statutorily required to review prior to designating CSG as an SDVOSB, before the Hudson Bonds were issued.  Hudson Exhibit 12 (Hanover ATIs) at No. 3; Hudson Exhibit 16 at No. 8 (with spreadsheet).

Similarly, the allegation in paragraph 185 of the SAC that Hudson's "due diligence and underwriting reasonably led to the conclusion that OST, CSG and CB shared common ownership" also falls flat because Hudson was entitled to rely on the government's SDVOSB verification, which included determining the 51% service-disabled ownership requirement was met, and, as noted above, there is no prohibition against multiple owners of an SDVOSB entity that would have triggered a reason for Hudson to question the SDVOSB verification in the first instance.  *See also* SAC at ¶¶190-92; 38 C.F.R. 74.2 – 74.4, 74.12.

For these same reasons, paragraph 204 of the SAC alleging that the issuance of the Hudson Bonds created a false impression to the VA that CSG was properly SDVOSB verified is nonsensical. Such an argument is also barred at law because courts have determined that third parties – including the bond obligee – cannot rely on a surety's underwriting because it is only for the surety's use. *ZP No. 54 Ltd. P'ship*, 917 So. 2d at 374 ("Mountbatten's underwriting was for its own purposes. Its investigation was to minimize the risk that it would have to pay on the bonds. Zimmer [obligee] was not privileged to rely on the thoroughness or reasonability of the underwriting. If it drew conclusions about the character or honesty of its employee or of the general contractor from the issuance of the bonds, it did so at its own risk.").

### iii. Hudson continued to review the CSG account after its initial underwriting but identified no fraud and any undefined "inquiries" Plaintiff-Relator asserts Hudson should have made would not have revealed the alleged fraud

To avoid the Motion's fatal lack of evidence supporting Count I, Plaintiff-Relator asserts that the "Insurance Defendants" "chose to make no further inquiries into the legality of CSG's… conduct[.]" Mot. at 29. This argument fails in the first instance because Hudson *did* make further "inquiries" after its initial underwriting.  Hudson conducted a November 2011 audit of the CSG account and determined current financials were needed; despite requesting this information, none was provided and Hudson never issued further bonding.  Hudson SUMF at ¶¶45-49; Hudson Exhibit 1 at ¶¶26-29. Hudson Exhibits 27, 28, 29.  Moreover, in response to the audit, Michael Schendel clarified at the end of November 2011 any ambiguity in the CSG-OST relationship by confirming that CSG was not a subsidiary of OST. Hudson Exhibit 28. This final clarification comported with Courtney Seed's prior representations that Gogia was the 100% owner of CSG and CSG's most recent operating agreement, dated September 15, 2010, stating Gogia is 100% owner of CSG.  Hudson Exhibit 11; Exhibit 8A at 131-32. Mot., SMF at ¶¶154-55. These undisputed facts are fatal to Plaintiff-Relator's argument that Hudson continued to do business with CSG while engaging in "ostrich" like behavior or "willful blindness" under the FCA's reckless regard and deliberate indifference standards, upon which Plaintiff-Relator relies. *See* Mot. at 24.

The argument also fails because any additional "inquiries" Plaintiff-Relator believes Hudson had to make, although never defined, would have simply confirmed the validity of CSG's SDVOSB verification.  For example, further inquiry *before* the Hudson bonding period ended would have evidenced 8 CSG SDVOSB set-aside contracts awarded by the VA bonded by Hanover in accord with CSG's SDVOSB verification.  Hudson SUMF at ¶21; Hudson Exhibit

12.  Further inquiry *before* the Hudson bonding period ended into any complaints about CSG's SDVOSB status would have revealed the Calvary Bid Protest denial – confirming the VA's investigation into and rejection of a challenge to CSG's SDVOSB status.   Hudson SUMF at ¶¶22-25; Hudson Exhibits 13, 14, 18. *See, e.g.*, *U.S. ex rel. K & R Ltd. P'ship*, 456 F. Supp. 2d at 63 (government "knowledge of the facts underlying false claim… may show that the defendant did not submit its claim in deliberate ignorance or reckless disregard of the truth.").

Further inquiry *after* the Hudson bonding period ended would have revealed the VA re-verified CSG's SDVOSB status multiple times over several years, including after *numerous site visits to CSG's Virginia location* and *after* this lawsuit was unsealed.   Hudson SUMF at ¶¶50-56; Hudson Exhibits 30, 31, 32, 16 (CGS ATI No. 7), 8B at 126-137.   It would have also revealed that the VA awarded 8 additional SDVOSB contracts to CSG that were bonded by three different surety companies.  *Id*.

iv.    **Plaintiff-Relator's unsupported attempt to impose a duty on Hudson to conduct a legal analysis of CSG's SDVOSB status confirms Hudson had no knowledge of the alleged fraud**

Plaintiff-Relator's position that Hudson had "to take the actual knowledge [it] possessed and apply it to the ownership and control regulations applicable to all VA SDVOSB set-aside contracts" is self-defeating because it concedes the information in Hudson's possession – alone – did not create constructive (or actual) knowledge of any fraud.  Mot. at 28.  Rather, to obtain the requisite knowledge under the FCA, Plaintiff-Relator concedes Hudson had to (i) know which regulations were implicated in the CSG contracts it bonded; (ii) understand those regulations; and (iii) apply the regulations to the information it learned in the underwriting process and continue that process for the life of its bonding relationship if the regulations changed (to avoid continuing to do business with a fraudulent contractor).  This goes well beyond the underwriting

process Plaintiff-Relator alleged gave Hudson either actual or constructive knowledge and, instead, requires the very legal analysis the Court in this matter must conduct to determine if any FCA violation occurred.  Plaintiff-Relator is, essentially, arguing that even if Hudson had given its entire underwriting file to the VA that it would still be liable absent it satisfying Plaintiff-Relator's unilaterally manufactured legal analysis obligation.  This must be rejected out of hand.

This case has been pending for 6 years, over 300-docket entries have been generated and still the parties dispute the nature of CSG's SDVOSB status.  However, Plaintiff-Relator argues Hudson should have definitively identified the alleged fraud during only a 6-month bonding relationship – after the VA already conducted its own statutorily imposed verification process, in the absence of any bond claim and while in possession of only the six documents identified above. Plaintiff-Relator has not, and cannot, offer any legal support for the proposition that Hudson must review every contract that it bonds, learn every regulation at issue in the contract and undertake a legal analysis to determine whether the principal is in compliance *prior* to receipt of any bond claim – and throughout the life of the bond if the regulations are amended. To be clear, following Plaintiff-Relator's logic to its bitter end, Hudson, and all sureties, would be obligated to undertake this onerous process for every contract bonded.  The Eighth Circuit has expressly rejected imposing such a duty and held that "failing to secure a legal opinion, without more, is not the type of deliberate ignorance that can form the basis for a FCA lawsuit."  *U.S. ex rel. Quirk v. Madonna Towers, Inc.*, 278 F.3d 765, 768 (8th Cir. 2002).  Notably, the *Quirk* case addressed a Medicare *claimant* not seeking a legal opinion regarding Medicare billing requirements – not an attenuated 3rd-party, non-claimant like Hudson.

Although the motion cites two cases purportedly in support of this debunked theory, both are inapposite because each relates to Medicare participants submitting claims for payment but

not being familiar with billing program requirements, not third-parties not participating in a government program and not seeking payment from the government.  Mot. at 28. *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 64 (1984) ("As a participant in the Medicare program, respondent had a duty to familiarize itself with the legal requirements for cost reimbursement."); *United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001) ("By failing to inform himself of those requirements, particularly when twenty percent of Asher Clinic's patients were Medicare beneficiaries, he acted in reckless disregard or in deliberate ignorance of those requirements, either of which was sufficient to charge him with knowledge of the falsity of the claims in question."). Moreover, neither imposes the expansive legal analysis obligation Plaintiff-Relator suggests and already rejected in *Quirk*.

### c. Centennial's purported knowledge of CSG's alleged fraud cannot be imputed on to Hudson to establish FCA liability as to Hudson

The SAC seemingly attempts to impute the knowledge of Centennial on to Hudson to establish Hudson's vicarious liability. SAC at ¶¶19, 22, 181. The Motion does not expressly assert an imputation argument and, instead, as discussed above, erroneously asserts Centennial actually provided knowledge of the alleged CSG fraud to Hudson. Notwithstanding, the Motion does assert Centennial was acting as Hudson's "attorney-in-fact." Mot. at 5. Mot., SFM at ¶22. To the extent the Court determines Plaintiff-Relator is asserting an imputation argument, it fails as a matter of fact and law.

Plaintiff-Relator's imputation theory can only be predicated on a fundamental misapplication of "agency" principles.  "The terms 'insurance agent' and 'insurance broker' are sometimes used interchangeably, although they are not the same." *Sadler v. Loomis Co.,* 139 Md. App. 374, 394 (2001).  The Maryland Court of Appeals has explained the difference:

> An insurance broker, is one who acts as a middle man between the assured and the insurer, and who solicits insurance from the public under no employment from any special company, but having secured an order, either places the insurance with a

company selected by the assured, or in the absence of any selection by him, then with a company selected by the broker. *Ordinarily, the relation between the insured and the broker is that between principal and agent.*

*Id.* (internal quotation marks and citations omitted) (emphasis in original); *see Richards Corp. v. McCarthy,* No. 11849., 1991 WL 834889, at *1 (Va. Cir. Ct. Mar. 27, 1991) ("An insurance broker is ordinarily an agent of the insured." (citing *Pacific Fire Ins. Co. vs. Bowers,* 163 Va. 349, 354 (1934)). *Sylvan Learning Sys., Inc. v. Gordon,* 135 F. Supp. 2d 529, 540 (D.N.J. 2000) ("As a general rule, a broker acts as the agent of the insured, not as the agent of the insurer.").

This Court has routinely applied this legal distinction. *See Chao v. Day,* 436 F.3d 234, 237 (D.C. Cir. 2006) ("Under the common law, insurance brokers . . . are the agents of the insureds . . . not the companies."); *Travelers Indem. Co. v. Bookers,* 657 F. Supp. 280, 286 (D.D.C. 1987) (holding that where brokers "are employed to procure insurance, they are the agents of the insured"). "Whether a person is a broker or an agent is determined not by what he is called but by what he does." *Sadler,* 139 Md. App. at 395.

Here, Centennial and Hudson confirm that Centennial was acting as CSG's bond broker in soliciting and obtaining bonding for CSG from Hudson. Hudson Exhibit 1 at ¶13.   Centennial Statement of Material Facts not in Dispute, Dckt. No. 328-2 at ¶41("Centennial initially placed CSG with surety Hanover[.]"); *Id.* at ¶42("Centennial later placed CSG with Hudson Insurance Company through Surety Partners of America[.]").   Mot., Exhibit 126 (5/11/11 email from C. Seed stating OST "is an existing Centennial account").[5] There is no evidence of the converse – that Centennial solicited CSG on behalf of Hudson. It is also undisputed that Centennial continued to place CSG with different sureties after Hudson ceased its bonding. Hudson Exhibit 16 (CSG bond spreadsheet).

---

[5] Notably, Plaintiff-Relator's SMF at ¶¶250-51 describes the dynamic as it explains that Centennial and Schendel were the "bonding agent" for Neil Parekh and Citibuilders. The SMF goes on to explain that Schendel started "seeking a bonding company, first turning to Hanover, which declined" and then turning to another "bonding company." Mot., SMF at ¶¶250-51.

It is well-settled that "[a]n insurance broker is ordinarily employed by a person seeking insurance, and when so employed, is to be distinguished from [the] ordinary insurance agent, who is employed by insurance companies to solicit and write insurance by, and in the company." *Sadler,* 139 Md. App. at 394.   "In contrast, 'an insurance agent, so far as the insurer is concerned, is a person expressly or impliedly authorized to represent it in dealing with third parties in matters relating to insurance.' *Id.* at 395.   *See Pac. Fire Ins. Co. v. Bowers,* 163 Va. 349, 354, 175 S.E. 763, 765 (1934) ("The insurance broker is ordinarily employed by the person seeking the insurance, and, when so employed, is to be distinguished from the ordinary insurance agent, who is commissioned and employed by the insurance company to solicit and write insurance by and in the company.").

Because Centennial was acting as CSG's broker in soliciting and obtaining bonding from Hudson (and the other sureties that bonded CSG), Centennial was CSG's agent and its fiduciary duties flowed to CSG not Hudson. 44 C.J.S. Insurance § 215 ("Where an insurance agent or broker acts as agent for insured, there is a fiduciary relationship between them, and the agent or broker has a fiduciary responsibility to insured.") (quoted by *Chao*, 436 F.3d at 237).   Therefore, Centennial's knowledge cannot be legally imputed on to Hudson to satisfy the FCA's knowledge requirement.

Any argument that Centennial was acting as Hudson's "attorney-in-fact," and therefore, its agent in the context explained above is misplaced. Mot. at 5. Mot., SFM at ¶22.  Hudson did not specifically designate Centennial as its "attorney-in-fact" but, rather, certain individuals were so designated via a "Power of Attorney," some of whom were employed by Centennial. Mot., Exhibit 3 (Hudson Non Priv 105). Moreover, the plain and unambiguous language of the "attorney-in-fact" designation was limited *solely* to executing and delivering surety bonds under a certain, defined amount *after* Hudson issued a final surety bond and merely to facilitate the

transaction. *Id*.  None of the identified individuals was permitted to issue a bond on Hudson's behalf.  *Id*.  Thus, this transactional "attorney-in-fact" designation arising only after Centennial successfully procured bonding for CSG did not convert Centennial into Hudson's "bonding agent."  *Sadler*, 139 Md. App. at 395 (broker or agent determined by actions).

        **2.**       **Plaintiff-Relator fails to establish Hudson caused submission of a false claim**

              **a.**       **Submission of a Claim:  Plaintiff-Relator does not allege, and there is no evidence, that Hudson directly submitted any false claims to the VA**

Plaintiff-Relator has not alleged that Hudson directly presented any false claims to the federal government.  In granting Plaintiff-Relator's Motion for Leave to File Amended Complaint, this Court stated: "the Amended Complaint does not allege that insurance defendants directly presented false claims or made false statements to the government. Rather, plaintiff-relator relies on a theory of indirect presentment."  Mem. Op. at 25.  Plaintiff-Relator has not subsequently modified his claims against Hudson in this matter or offered new allegations. Similarly, the Motion is not asserting and has offered no evidence that Hudson directly presented false claims to the federal government. Mot. at 30-31

Absent presentment, mere knowledge that a fraudulent claim was submitted cannot by itself support liability under § 3729 (a)(1)(A).  *See e.g*., *See United States v. Murphy*, 937 F.2d 1032, 1039 (6th Cir. 1991) (confirming necessity of "some action by the defendant whereby the claim is presented or caused to be presented"); *U.S. ex rel. Kinney v. Hennepin Cnty. Med. Ctr.*, No. CIV.971680(RHK/JMM), 2001 WL 964011, at *7 (D. Minn. Aug. 22, 2001) (no liability under § 3729 (a)(1)(A) because complaint failed to allege defendant "itself presented a false or fraudulent claim for payment or approval, nor would the record support such a finding").

Plaintiff-Relator, therefore, cannot satisfy his burden of establishing Hudson directly presented a claim in violation of 31 U.S.C. § 3729(a)(1)(A) under Count I of the SAC.

        **b.**        **Submission of a Claim:  Plaintiff-Relator cannot establish any indirect presentment of a false claim by Hudson to the VA**

A presentment claim may be brought against a defendant when a defendant does not directly present false claims to the federal government but indirectly "causes" false claims to be made. *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011).  "Put differently, '[t]he False Claims Act extends beyond the person making a false claim to one who engages in a fraudulent course of conduct that induces payment by the government.'"  *United States ex rel. Tran*, 53 F. Supp. 3d at 126 (citation omitted).

Generally, courts require that a defendant affirmatively act in order to impose liability under the FCA, particularly when a plaintiff alleges that the defendant "caused" the submission of false claims.  *See U.S. ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 714 (10th Cir. 2006) (requiring "affirmative action on the part of a defendant before imposing liability under the FCA" because "too broad an interpretation of the 'causes to be presented' language in the FCA 'would impose liability on parties merely for failing to prevent the fraudulent acts of others'"), *abrogated on different grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019); *United States ex rel. Landis v. Tailwind Sports Corp.*, 51 F. Supp. 3d 9, 50 (D.D.C. 2014), *on reconsideration in part*, 160 F. Supp. 3d 253 (D.D.C. 2016), and *clarified on denial of reconsideration*, No. 1:10-CV-00976 (CRC), 2016 WL 3197550 (D.D.C. June 8, 2016).

Specifically, for "causation" claims, this Court has explained that the "paradigmatic case occurs when the non-submitting party takes advantage of an unwitting intermediary, thereby causing that party to submit a false claim." *United States ex rel. Tran*, 53 F. Supp. 3d at 126.

"Courts have also credited allegations that a nonsubmitting party caused false claims to be submitted in a variety of contexts where the non-submitter was the driving force behind an allegedly fraudulent scheme." *Id.* at 127 (emphasis added).  Thus, courts recognize that "a failure to act, without more, is insufficient to impose FCA liability."  *Tailwind Sports Corporation*, 51 F. Supp. 3d at 50 (citing John T. Boese, Civil False Claims § 2.01(A), at 15 (4th ed. & 2013–2 Supp.) ("Mere inaction does not constitute a violation of the False Claims Act, and the government must argue more than that a defendant was aware of an alleged fraud.")). Ultimately, this Court opined that "[a]s a whole, these cases indicate that, in examining whether a non-submitting party has 'caused' the submission of a false claim or false statement, a court must look at the degree to which that party was involved in the scheme that results in the actual submission."  *United States ex rel. Tran*, 53 F. Supp. 3d at 127.

To support an indirect presentment claim against Hudson, Plaintiff-Relator bears the burden of providing evidence showing that Hudson's conduct was 'at least a substantial factor in causing, if not the but-for cause of'" the fraud.  *Toyobo Co.*, 811 F. Supp. 2d at 48.  This matter does not present an example of the "paradigmatic case" in which a non-submitting party, *e.g.*, Hudson, "takes advantage of an unwitting intermediary, thereby causing that party to submit a false claim," *e.g.*, CSG, nor was Hudson otherwise a "driving force" behind the alleged fraudulent behavior, including the pursuit of SDVOSB status or pursuit of VA contracts.

As explained above, the undisputed facts show that almost all of the alleged actions that Plaintiff-Relator deems fraudulent – submission of documents to be verified as a SDVOSB and preparation of bids containing alleged inaccurate past performance representations – took place largely before Hudson had any business relationship with CSG or issued the Hudson Bonds. Plaintiff-Relator has presented no evidence of Hudson's involvement in these activities and the

undisputed evidence referenced above belies any argument to the contrary. *See United States ex rel. Tran*, 53 F. Supp. 3d at 126-27. Indeed, the evidence and all reasonable inferences lead to the opposite conclusion – if any alleged fraud by CSG did occur, it was Hudson that was the "unwitting" party and was simply one of the five different surety companies from whom CSG obtained surety bonding for its federal government contract work over a period of several years. Hudson Exhibit 16, CSG ATI No. 8 (spreadsheet).

In its decision granting Hudson's motion to dismiss the original complaint, the Court noted: "although bonding was a necessary step in submitting the bids at issue, no facts are alleged that would allow the inference that the insurance defendants agreed to bonding in furtherance of the fraud alleged." *Narula*, 2016 WL 6078246, at *9. Despite being given the opportunity to conduct extensive discovery on this issue, Plaintiff-Relator remains unable to provide any facts sufficient for any reasonable jury to find that Hudson provided bonds for purposes of supporting or perpetuating CSG's alleged pre-existing fraud. Indeed, Plaintiff-Relator is not even asserting in the Motion a conspiracy to violate the FCA much less *any* agreement between CSG and Hudson. Plaintiff-Relator's only argument must be that Hudson identified an ongoing fraud and decided to join in without discussion or agreement from CSG (predated by Hanover and followed by numerous other sureties), which is not only unsupported but demonstrably false for the reasons above and no reasonable jury could find to the contrary.

### 3. Falsity of the Claims: undisputed facts doom Plaintiff-Relator's attempt to assert a fraudulent inducement claim against Hudson

FCA liability may be imposed under a "fraud in the inducement" theory if <u>during the contract bid process</u> "a misrepresentation in the defendant's bid must have *caused* the government to award the defendant the contract." *Scollick ex rel. United States v. Narula*, No. 14-CV-1339 (RCL), 2020 WL 6544734, at *9 (D.D.C. Nov. 6, 2020) (emphasis in original). *See*

*also id.* ("false statements induced the government to *award the contract*") (emphasis in original); *United States v. Honeywell Int'l Inc.*, No. CV 08-0961 (PLF), 2020 WL 6940028, at *18 (D.D.C. Nov. 25, 2020) ("Once the United States has established that a defendant made a false representation or omission, the FCA also requires proof that the omitted or false information was material and that the [party] was 'induced by, or relied on, the fraudulent statement or omission when it <u>awarded</u> <u>the contract</u>.'") (emphasis added).

This Court has previously explained that all claims submitted under a theory of fraudulent inducement are a continuation of the original fraud: "Thus, under the fraud in the inducement of falsity, claims submitted pursuant to a contract procured by fraud are considered 'false or fraudulent' even without 'evidence that the claims were fraudulent in themselves.'" *Scollick*, No. 14-CV-1339 (RCL), 2020 WL 6544734, at *7 ("The Supreme Court held that the contractors presented a "fraudulent" claim to the government in violation of the False Claims Act because the 'initial fraudulent action' (procuring the contract by fraud) 'taint[ed]' all subsequent claims made under the contract.") (citing *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 543 (1943)).

The SAC survived the pleading stage based on vague and, now, demonstrably false allegations about the existence of a generic "bonding agreement" and about actions attributed to the so-called "Bonding Defendants" without identifying specific documents, individuals or companies.  At the summary judgment stage, however, Plaintiff-Relator bears the burden of proving his fraudulent inducement theory of liability as to each individual defendant and can no longer rely on the trick of conflating four separate defendants into a single entity, now referred to in the Motion as the "Insurance Defendants," to attribute the actions of any of the four to all four.

*See, e.g., United States ex rel. Westrick v. Second Chance Body Armor,* 266 F.Supp.3d 110, 126 (D.D.C. 2017).

The Motion's lack of particulars is now fatally deficient for two specific reasons.  First, the Motion fails to offer any evidence that Hudson was involved in CSG's bid proposal process for any of the contracts underlying the Hudson Bonds to support that Hudson participated in fraudulently inducing the federal government to *award* CSG those contracts and Hudson confirms it was not. Hudson Exhibit 1 at ¶19. Moreover, the Motion provides bid bond information for only three of the five contracts underlying the Hudson Bonds, none of which establish Hudson issued the bid bonds. Mot., Exs. 132-134.  The Motion's exhibits 132 and 133 contain the contract award letters confirming Hanover – not Hudson – issued the bonds:

- Exhibit 132 contains the bid bond information for the project at the Women's Clinic in Chillicothe, Ohio with a contract price of $731,910.00 and bonded by Hudson Bond no. HSAMA0208. Hudson SUMF at ¶39. Mot., Ex. 132 (Cent. 325-26). The included contract award letter states: "Your <u>bid bond from The Hanover Insurance Company</u> has been evaluated and approved." Mot., Ex. 132 (Cent. 325-26) (emphasis added).

- Exhibit 133 contains the bid bond information for the project at the East Entry Building 35 in Chillicothe, Ohio with a contract price of $167,000.00 and bonded by Hudson Bond no. HSAMA0202. Hudson SUMF at ¶39. Mot., Ex. 133 (Cent. 11073). The included contract award letter states: "Your <u>bid bond from The Hanover Insurance Company</u> has been evaluated and approved." Mot., Ex. 133 (Cent. 11073) (emphasis added). The payment and performance bonds included in this exhibit are blank bond requests that had not been executed.

The Motion's exhibit 134 contains the contract award letter for the Remodel Dom Phase II in Des Moines, Iowa with a contract price of $179,000.00 and bonded by Hudson Bond no. HSAMA0203.  Hudson SUMF at ¶39. Mot., Ex. 133 (Cent. 11073).  This contract was bid and awarded prior to execution of the GIAs. Hudson SUMF at ¶¶34-35. Hudson Exhibits 20-21. Thus, Plaintiff-Relator has not provided *any* evidence Hudson bid bonds were submitted to the federal government for any of the contracts underlying the Hudson Bonds.  To be clear, it is also

undisputed that the final Hudson Bonds were issued after the CSG contracts were awarded so there can be argument that issuance of the Hudson Bonds induced the contract awards.

Second, as explained above, Hudson had no actual or constructive knowledge of the alleged fraud at any point such that Plaintiff-Relator can establish Hudson continued to do business with CSG after learning of the alleged fraud. Mot. at 31.

### 4.     Falsity of the Claims:  Plaintiff-Relator has failed to adequately plead the required elements of a false certification claim

Liability under the FCA may be predicated on a "false certification theory," which occurs "when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not complied." *Honeywell Int'l Inc.*, 2020 WL 6940028, at *13.  *United States ex rel. Tran*, 53 F. Supp. 3d at 122 (quoting *United States v. Sci. Applications Int'l Corp.,* 626 F.3d 1257, 1266 (D.C.Cir.2010)).  The alleged false representation must be "material to the government's decision to pay." *Computer Scis. Corp.*, 53 F. Supp. 3d at 122.

In this case, to establish Hudson's liability on this basis, Plaintiff-Relator would have to produce evidence that SDVOSB status was a contractual requirement of the five CSG/VA contracts bonded by Hudson, that CSG did not validly attain such SDVOSB status (despite multiple verifications and reverifications by the VA stating the contrary), and that CSG explicitly or at least implicitly represented in its payment applications for those contracts that it met such technical requirements. In denying defendant OST's recent motion to dismiss, this Court previously determined that Plaintiff-Relator is not asserting claims based upon a false certification theory, but rather based solely on a fraud in the inducement theory.  *Scollick*, No. 14-CV-1339 (RCL), 2020 WL 6544734, at *8 ("plaintiff-relator pleads falsity under another theory: fraud in the inducement").  The Motion does not assert otherwise.

5. **Falsity of the Claims:  Plaintiff-Relator has not established that CSG's payment applications for the contracts underlying the Hudson Bonds were fraudulent as CSG performed the work for which it billed the VA**

The underlying factual basis for Plaintiff-Relator's claims against Hudson is that Hudson provided Miller Act bonds that allowed CSG to successfully receive, perform and bill the VA under certain contracts alleged to be SDVOSB set-aside contracts. Plaintiff-Relator further alleges that the payment applications submitted by CSG constitute fraudulent claims because CSG was not a valid SDVOSB despite the VA's certification of its SDVOSB status.

As to the CSG contracts bonded by Hudson, there is no evidence that the work was not performed (performance bonds) or that the laborers and materialmen were not paid (payment bonds).  The VA received valuable construction services for the payments it made to CSG.  The contract payments made to an alleged fraudulent SDVOSB did not result in a "loss" to the VA because the VA would have had to pay some contractor to perform the work.  In any event, Plaintiff-Relator fails to even offer as evidence any payment applications for the contracts underlying the Hudson Bonds.  *See, e.g.*, Mot., Exhibit 201.

B. **Hudson Is Entitled To Judgment As A Matter Of Law On Count III (reverse false claim)**

1. **Definition of a Reverse False Claim**

Section 3729(a)(1)(G) of the FCA "provides a cause of action where the defendant has made what is commonly known as a 'reverse' false claim."  *Pencheng Si*, 71 F. Supp. 3d at 88. Reverse false claim liability arises when a defendant "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals, or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]" 31 U.S.C. §

3729(a)(1)(G).  In other words, a "reverse false claim is any fraudulent conduct that results in no payment to the government when a payment is obligated." *Pencheng Si*, 71 F. Supp. 3d at 88.

The FCA defines "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).  *See also United States ex rel. Morsell v. Symantec Corp.,*130 F. Supp. 3d 106, 125-126 (D.C. 2015).  Relevant to the instant matter, this Court clarified that reverse false claim fraud must arise from a separate monetary obligation flowing to the government distinct from the obligation simply to repay the government any monies obtained through false claim or false statement fraud:

> A reverse false claim may not rest, however, on the argument 'that an obligation arose out of Defendants' concealment of their allegedly fraudulent activity,' because 'by this logic, just about any traditional false statement or presentment action would give rise to a reverse false claim action; after all, presumably any false statement action under 3729(a)(1)(A) or 3729(A)(1)(B) could theoretically trigger an obligation to repay the fraudulently obtained money.

*Scollick*, 2016 WL 6078246, at *9 (quoting *Pencheng Si*, 71 F. Supp. 3d at 97).

> **2.      Hudson's obligations under the Hudson Bonds have not been triggered but, even if its obligations were triggered, Hudson did not knowingly make any false statements or conceal any obligation to pay or transmit money to the federal government**

The SAC alleges as the basis for its reverse false claim the Hudson Bonds "were separate instruments entered into [sic] between the United States government and although submitted with the contract, did separately obligate [Hudson] to compensate the government for losses sustained if the specifications found in the contract, including the specification that the construction activity be paid [to] a service-disabled veteran-owned small business entity" were not satisfied and that Hudson failed to notify the federal government that CSG fraudulently

obtained its SDVOSB verification.  SAC at ¶242-244.  The Motion continues Plaintiff-Relator's misunderstanding of performance bonds by asserting that "[b]y the terms of the performance bond, Hanover and Hudson were obligated to pay the entire amount of each performance bond after the contracts were neither awarded to nor performed by an SDVOSB."  Mot. at 32.

Count III is unavailing under Plaintiff-Relator's theory. A surety's obligation to perform under a bond does not arise until its principal has materially defaulted under the terms of its underlying contract with the obligee.   *See* L.R. Moelmann & J.T. Harris, *The Law of Performance Bonds*, p.37 (1999).  *See also* E.G. Gallagher, *The Law of Suretyship* at 82 (2nd ed. 2000) ("If the principal on the project defaults on the underlying contract, the surety has a contractual obligation to the obligee with regard to completion of the project.").

Depending upon the terms of the bond, upon the principal's default on a performance bond, the surety may have the option of: "either completing the project itself, or of assuming liability for the government's excess costs in completing the contract." *Ins. Co. of the West,* 243 F.3d 1367, 1370 (Fed. Cir. 2001); *Aetna Cas. & Sur. Co. v. United States,* 845 F.2d 971, 975 (Fed.Cir.1988).  *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 300 (2004) ("Upon default of the principal, the surety may pay the money and proceed against the principal for indemnity.") (citing *Dixon v. Spencer,* 59 Md. 246, 248 (1883)).  A third alternative is to provide the "funds to an insolvent contractor to complete performance." *Id. See also Int'l Fidelity Ins. Co. v. County of Rockland,* 98 F. Supp. 2d 400, 423 (S.D.N.Y. 2000).  Plaintiff-Relator offers zero support for the proposition that a performance bond obligates the surety to make a monetary payment in amount of the penal sum of the bond upon a principal's default.

It is undisputed that the obligee for each of the Hudson Bonds was the VA.  Further, it is undisputed that: (i) the VA never made a performance bond claim on any of the Hudson Bonds;

and (ii) the VA, even as of the date of the filing of the Motion, has never notified Hudson that CSG failed to meet, or even potentially failed to meet, all requirements of the relevant contracts, including SDVOSB status, despite this lawsuit being unsealed several years ago.   Hudson Exhibit 1 at ¶24.  Accordingly, Hudson's obligations under the Hudson Bonds have never been triggered and Hudson did not and does not owe any obligation under the Hudson Bonds to the VA that can serve as the predicate for a Section 3729(a)(1)(G) claim.

Assuming *arguendo* the Court finds that CSG's alleged fraud triggered Hudson's obligations under the Hudson Bonds, Plaintiff-Relator has offered no evidence that Hudson ever made or caused to be made "a false record" regarding, or a "statement material" to, its obligations to the VA under the Hudson Bonds, much less that such a record or statement caused it to avoid or decrease any obligation under the Hudson Bonds.  *See* 31 U.S.C. § 3729(a)(1)(G). As a matter of undisputed fact, Hudson never communicated with the VA regarding the Hudson Bonds at all.  *Celotex Corp.*, 477 U.S. at 325 ("the burden on the moving party may be discharged by 'showing' – that is pointing out to the … court – that there is an absence of evidence to support the nonmoving party's case").  Similarly, as explained above, because Hudson had no knowledge of the alleged fraud, it had nothing to knowingly conceal from the federal government. *Id*.  For these additional reasons, the Motion must be denied and the Hudson Motion granted as to Count III.

**C.**   **The Motion Must Be Denied Because The Public Disclosure Bar Is A Complete Prohibition of Plaintiff-Relator's Claims**

Hudson incorporates herein by reference its Public Disclosure Bar argument set forth in its Motion for Summary Judgment on the Second Amended Complaint in section V.A.

Hudson acknowledges the Notice of the United States' Opposition to Dismissal on the Basis of the Public Disclosure Bar ("Notice"). Dckt. No. 350.  Although the Notice asserts that

Hudson mischaracterized the United States' previously docketed February 9, 2015, "NOTICE of Election Not to Intervene," Hudson was simply *directly* quoting the docket. Dckt. No. 6. Hudson's "characterization" also comports with this Court's statement in its October 17, 2016, Memorandum Opinion dismissing the original Complaint in which the Court stated in the second sentence that "<u>The United States has declined to intervene in this matter. See Notice, ECF No. 6</u>." Dckt. No. 123 at 1 (emphasis added). The United States' position is likely predicated on its self-styled caption in that document: "NOTICE OF THE UNITED STATES THAT IT IS NOT INTERVENING <u>AT THIS TIME</u>." *Id*. (emphasis added).  The United States' February 9, 2015, filing – 6 years before the Notice – recognized it was outside of its statutorily permitted time to intervene, that the Court denied any further extensions to intervene and it stated only that "the Government's investigation of this matter is ongoing" but failed to offer any statutory authority for its position.

Next, although the Notice asserts the United States "has closely monitored the matter and remains an interested party," it is undisputed it has not filed a Notice of Intervention in this matter as of this date.  There can be no legitimate argument the United States' "investigation" is not still "ongoing."  To avoid its undisputed lack of intervention, the Notice cites to 7-docket entries purporting to support that it has "monitored" this matter.  The first is on March 18, 2019, Dckt. No. 258, which was Mr. Valdez's entry of appearance – over four years after its February 2015 notice. The remaining 6-docket entries encompass two voluntary dismissals of Melvin Goodweather and four status reports from the defendants. Dckt. Nos. 261, 287, 288, 291, 293, 304. *Cf. U.S. ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1233 (D.C. Cir. 2012) (government need not intervene to dismiss).  It is also important to note the United States was not involved in any of the numerous motions to dismiss filed in this matter and never intervened even after the

original complaint was *dismissed* or after Plaintiff-Relator filed *two* amended complaints. The United States' total lack of substantive participation in this matter, including never intervening, stands in stark contrast to its intervention in *United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. CV 10-1094 (BAH), 2017 WL 1422364, at *1 (D.D.C. Apr. 19, 2017), which is the sole District of Columbia case cited in the Notice as authority for its Public Disclosure Bar veto.

Thus, there can be no legitimate dispute that the United States is *still* declining to intervene "at this time" but nonetheless seeking to prohibit dismissal under the Public Disclosure Bar on behalf of Plaintiff-Relator in order for this matter to proceed.  The Notice fails to explain how the United States can decline to intervene "at this time" in February 2015 (or ever) but unilaterally make substantive filings 6-years later in an effort to deny a defense entirely because 31 U.S.C.A. § 3730(b)(4) permits the United States to *either* "proceed with the action" or "notify the court that it declines to take over the action."  It is well-settled that "Intervention is necessary 'only if the government wishes to 'proceed with the action.'" *U.S. ex rel. Schweizer*, 677 F.3d at 1233.  The United States Court of Appeals for the District of Columbia has explained that in order for the United States to "proceed" with the action it must intervene under § 3730(b):

> Section 3730(b)(2) gives the government sixty days, plus any court-ordered extensions, 'to elect to intervene and proceed with the action' after receiving the complaint and being informed of the material evidence. At the end of the sixty-day period (unless extended), the government 'shall proceed with the action ... or notify the court that it declines to take over the action.' 31 U.S.C. § 3730(b)(4). Swift views § 3730(b)(4) as giving the government but two options: intervene or do not intervene. This is correct, but she misses the point that § 3730(b)(2) makes intervention necessary only if the government wishes to 'proceed with the action.' Ending the case by dismissing it is not proceeding with the action; to 'proceed with the action' means, in the False Claims Act, that the case will go forward with the government running the litigation.

*Swift v. United States*, 318 F.3d 250, 251 (D.C. Cir. 2003) (emphasis added).  The United States has taken no action to "proceed" under § 3730(b) in this matter but yet seeks that very result. The United States offers no authority for its attempt to proverbially have its cake and eat it too.

Further, the FCA states that when "a person proceeds with the action, the court, without limiting the status and rights of the person initiating the action, may nevertheless permit the Government to intervene at a later date <u>upon a showing of good cause</u>."   31 U.S.C.A. § 3730(c)(3) (emphasis added).  The United States has not offered any reason it should now be permitted to intervene – over 6-years after its statutory deadline and various extensions passed – much less the requisite good cause.  It should also be noted that Hudson's Interrogatories to Plaintiff-Relator and his Answers dated April 15, 2019, specifically addressed the Public Disclosure Bar.  Plaintiff-Relator ATI no.5 to Hudson attached as **Exhibit 36**.  Thus, to the extent the United States "monitored" this action it has been on notice of the Public Disclosure Bar defense for nearly two-years but, again, purposefully declined to intervene.

At this juncture, 6-years after its statutory deadline to intervene, 5-years after this Court noted it declined to intervene and 2-years after it was notified of the applicability of the Public Disclosure Bar in this matter, the United States cannot establish good cause to intervene and now object to Hudson's Public Disclosure Bar defense.  Moreover, permitting Hudson to rely on this Court's October 2017 statement that the United States declined to intervene, permitting Hudson to conduct discovery on the Public Disclosure Bar and rely on it as a complete defense in summary judgment and *then* filing the Notice without ever intervening is unduly prejudicial not only to Hudson but all defendants because the Public Disclosure Bar would equally benefit all defendants. For these same reasons, the United States has waived its Public Disclosure Bar veto.

Finally, Hudson notes that the Notice does not identify any Opinion from a Circuit Court, and Hudson is not aware of any, holding that the United States can unilaterally preclude a district court from dismissing a *qui tam* under 31 U.S.C. § 3730(e)(4).

**D.    Plaintiff-Relator Has Failed To Produce Evidence Of The Government's Entitlement To Recovery Of Actual Damages Related To Any CSG Contracts**

Hudson incorporates herein by reference the arguments raised by Hanover in its Motion for Summary Judgment, Dckt. 334-1, and its Opposition to Plaintiff-Relator's Motion for Partial Summary Judgment regarding Plaintiff-Relator's failure to produce evidence that the VA has suffered any actual damages arising from any SDVOSB contracts awarded to CSG or evidence identifying the amount of such damages.  To the extent applicable to the claims asserted against Hudson in the SAC, Hudson incorporates by reference all arguments of the other defendants in this matter contained in any summary judgment motion as if fully set forth herein.

## IV.    CONCLUSION

For the reasons set forth herein and in the Hudson Motion, Plaintiff-Relator's Motion must be denied and the Hudson Motion must be granted.

Respectfully submitted,

_____/s/ *Cynthia E. Rodgers-Waire*_____
Cynthia E. Rodgers-Waire (Bar No. 444095)
Marc A. Campsen (Bar No. 989796)
Wright, Constable & Skeen, LLP
7 Saint Paul Street, 18th Floor
Baltimore, Maryland 21202
crodgers-waire@wcslaw.com
mcampsen@wcslaw.com
Telephone: 410-659-1300
Fax: 410-659-1350
*Attorneys for Hudson Insurance Company*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of March, 2021, copies of foregoing were

served via the court's electronic filing system on the following individuals:

David K. Colapinto
Michael David Kohn
Todd M. Yoder
Kohn, Kohn & Colapinto, LLP
3233 P Street, NW
Washington, DC  20007
*Attorneys for Andrew Scollick*

Thomas A. Coulter
Whiteford, Taylor & Preston L.L.P.
Two James Center
1021 East Cary Street, Suite 1700
Richmond, VA  23219

and

Brian W. Stolarz
Fox Rothschild, LLP
1030 15th Street, N.W., Ste. 380
Washington, DC  20005
*Attorneys for Optimal Solutions and Technologies, Inc.,*
*Vijay Narula, and Ajay Madan*

Aaron L. Handleman
Laura M.K. Hassler
Eccleston & Wolf, P.C.
1629 K Street NW, Suite 260
Washington, DC  20006
*Attorneys for Michael Schendel and Centennial Surety Associates, Inc.*

Robert G. Barbour (admitted *pro hac vice*)
Matthew D. Baker
Watt, Tieder, Hoffar & Fitzgerald, LLP
1765 Greensboro Station Place
Suite 1000
McLean, VA  22102

and

Rebecca S. Glos (admitted *pro hac vice*)
Watt, Tieder, Hoffar & Fitzgerald, LLP
2040 Main Street
Suite 300, Irvine, CA  92614
*Attorneys for Defendant Hanover Insurance Co.*

Darrell C. Valdez, Esquire
Assistant United States Attorney
Theodore L. Radway, Esquire
Kerry Brainard Verdi, Esquire
Judiciary Center Building, Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
*Attorneys for United States of America and Interested Party Melvin G. Goodweather*

Paul W. Mengel III
Law Offices of Paul W. Mengel III, PLLC
P.O. Box 2943 Alexandria, VA  22305
*Attorneys for Centurion Solutions Group, LLC and Amar Gogia*

Alan Robert Kabat
Bernabei & Kabat, PLLC
1400 - 16th Street NW
Suite 500
Washington, DC  20036-2223

and

Wilmer Parker , III (*pro hac vice*)
Maloy Jenkins Parker
1360 Peachtree Street
Suite 910
Atlanta, GA  30309
*Attorneys for Nitin R. Metha*

Shoshana E. Rothman
Shannon J. Briglia
Smith, Currie & Hancock LLP
1950 Old Gallows Rd., Ste. 750
Tysons, VA  22182
*Attorneys for The Surety & Fidelity Association of America, Amicus*

And by first-class mail on the following:

Neil Parekh
1615 North Queen Street
Unit 306
Arlington, VA  22209

Shobha Metha
8618 Cushman Place
Alexandria, VA  22308

　　　　　/s/ *Cynthia E. Rodgers-Waire*
Cynthia E. Rodgers-Waire