## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANDREW SCOLLICK,
*ex rel.* UNITED STATES OF AMERICA,

    *Plaintiff-Relator,*

v.

VIJAY NARULA, *et al.*,

    *Defendants.*

Case No. 1:14-cv-01339-RCL
***FILED UNDER SEAL***

*unsealed 7/29/22
Royce C. Lamberth
U.S.D.J.*

### MEMORANDUM OPINION

Plaintiff-relator Andrew Scollick brought this case under the False Claims Act ("FCA"), alleging an elaborate plot by thirteen defendants to defraud the federal government by posing as service-disabled veteran-owned small businesses ("SDVOSB") to obtain set-aside contracts.[1] Second Am. Compl., ECF No. 298. Before this Court are twelve motions for summary judgment. Plaintiff-relator moves for partial summary judgment[2] against Centurion Solutions Group, LLC ("CSG") and Amar Gogia, ECF No. 329; against Optimal Solutions and Technologies, Inc. ("OST"), Vijay Narula, and Ajay Madan, ECF No. 330; against Hanover Insurance Company ("Hanover"), Hudson Insurance Company ("Hudson"), Centennial Surety Associates, Inc. ("Centennial"), and Michael Schendel, ECF No. 331; and against Neil Parekh, ECF No. 332. OST, Narula, and Madan in response move for summary judgment against the plaintiff-relator. ECF No. 337. CSG and Gogia similarly move for summary judgment against the plaintiff-relator, ECF No.

---

[1] While plaintiff-relator's second amended complaint originally included fifteen defendants, all claims against defendant Nitin Mehta have been dismissed, ECF No. 340, and defendant Melvin Goodweather has settled claims against him, ECF No. 304.
[2] Plaintiff-relator did not move for summary judgment on the conspiracy claim; the amount of civil penalties owed; the statutory fees and costs awardable under FCA; the false claims count against Hudson, Hanover, Centennial, and Schendel; and a few specific false claims allegations (those related to OST and KGCI, Inc. and the HUBZone contracts). *See* ECF No. 329-1 at 3 n.2; ECF No. 330-1 at 3 n.2; ECF No. 331-1 at 4 n.2; ECF No. 332-1 at 4 n.2.

338, as do Parekh, ECF No. 341, and Mehta, ECF No. 342. The three insurance companies also move for summary judgment against the plaintiff-relator. *See* ECF Nos. 334 (Hanover's motion for summary judgment), 335 (Hudson's motion for summary judgment), & 328 (Centennial and Schendel's motion for summary judgment). Finally, Hudson moves for partial summary judgment on its crossclaims for indemnification against crossclaim defendants CSG, Citibuilders, LLC ("Citibuilders"), CB Construction Group, Inc. ("CB"), Gogia, and Parekh. ECF No. 336.

For the reasons explained below, the Court will **DENY** plaintiff-relator's motions for summary judgment, ECF Nos. 329, 330, 331, & 332; **DENY** OST, Narula, and Madan's motion for summary judgment against plaintiff-relator, ECF No. 337; **DENY** CSG and Gogia's motion for summary judgment against plaintiff-relator, ECF No. 338; **DENY** Parekh's motion for summary judgment against plaintiff-relator, ECF No. 341; **GRANT** Centennial and Schendel's motion for summary judgment against plaintiff-relator, ECF No. 328; **GRANT** Hanover's motion for summary judgment against plaintiff-relator, ECF No. 334; **GRANT** Hudson's motion for summary judgment against plaintiff-relator, ECF No. 335; **GRANT** Mehta's motion for summary judgment against plaintiff-relator, ECF No. 342; **DENY** Hudson's motion for partial summary judgment on its crossclaim, ECF No. 336; and **DISMISS** as moot Madan, Narula, and OST's motions to strike, ECF Nos. 366 & 367.

## I.    BACKGROUND

The parties here have different understandings of the facts at hand—or, at least, how those facts should be characterized. The Court will note the areas of disagreement.

This case features a large cast of characters. Defendant Vijay Narula is the 100% owner and chief executive officer of OST, an information-technology firm. Pl.'s Statement of Mat. Facts ("Pl.'s Facts"), ECF No. 330-2 ¶ 11. OST also employs Ajay Madan as its chief operating officer.

*Id.* ¶ 33. OST is a successful company and has experience with government contracts in the information-technology sector. *Id.* ¶ 14. Narula is not a service-disabled veteran, and OST is not a service-disabled veteran-owned small business ("SDVOSB"). *Id.* ¶ 12.

Defendant Neil Parekh was the owner of two construction companies: Citibuilders[3] and CB Construction Group, Inc. ("CB"). *Id.* ¶ 15. Like Narula, Parekh is not a service-disabled veteran. *Id.* ¶ 16. Parekh met Narula when Citibuilders renovated OST's office space, and the two companies ultimately developed a subcontracting relationship. *Id.* ¶¶ 17–18. In 2010, Parekh moved his operations into OST's Washington, D.C. office. *Id.* ¶ 18. That same year, Parekh transitioned operations from Citibuilders to CB. *Id.* ¶ 15. Plaintiff-relator Andrew Scollick was employed by Parekh's companies—first Citibuilders and then CB. *Id.* ¶ 19.

### A.  Origins of the Alleged Plan

In 2009, Parekh and Narula discussed the possibility of pursuing government construction contracts together—combining OST's contracting experience and Parekh's construction experience. *Id.* ¶ 20. They even discussed forming a construction "subsidiary of OST," run by Parekh, to bid on certain government contracts. *Id.* ¶ 26. Parekh and Narula's plan moved beyond nascent discussions, and they even reached out to bonding companies like Centennial to discuss the potential subsidiary. *Id.* ¶¶ 25–26.

Sometime in 2008, OST learned of a $125 million Federal Aviation Administration ("FAA") SDVOSB set-aside contract known as "System Operations Management and Administrative Support Service" ("SOMASS"). *Id.* ¶ 31. SDVOSB set-aside contracts are government contracts specifically set aside for companies owned by service-disabled veterans.

---

[3] Citibuilders, CB Construction's predecessor, should not be confused with Citibuilders Solutions Group, LLC, a defendant in this case. Citibuilders Solutions Group is not at issue in any of the motions dealt with here—it was a SDVOSB entity that Parekh created with defendant Goodweather, who has settled. Pl.'s Facts ¶ 226.

CSG Statement of Mat. Facts ("CSG Facts"), ECF No. 338-1 ¶ 9. To be awarded a SDVOSB set-aside contract, a company must be certified as a SDVOSB. *Id.* Because OST was not an SDVOSB, Pl.'s Facts ¶ 12, it could not bid for the contract alone. However, Narula determined that OST *could* bid on the SOMASS project if it formed a joint venture with a qualified SDVOSB. *Id.* ¶ 32. Of course, to do so, Narula needed to find an SDVOSB.

Enter Amar Gogia. Defendant Gogia is a service-disabled veteran and second cousin to Madan, OST's chief operating officer. *Id.* ¶ 33. In late November 2009, Madan emailed Narula and other OST staff Gogia's army discharge papers. *Id.* "He is an SDVO, and is willing to talk," Madan said. ECF No. 330-6 at 2. At the end of 2009, Narula and Gogia met in OST's offices to discuss contracting opportunities. Pl.'s Facts ¶ 35. But before Narula and Gogia could pursue any joint contracting venture—like the SOMASS contract—they had to establish a SDVOSB. OST's Resp. to Pl.'s Statement of Mat. Facts ("OST Fact Response"), ECF No. 370-1 ¶ 35.

**B. The Creation of Centurion Solutions Group, a "SDVOSB"**

By early 2010, Gogia was working to form the new qualifying SDVOSB, Centurion Solutions Group, LLG ("CSG"). Pl.'s Facts ¶ 37. Plaintiff-relator alleges that Madan and Narula helped form the SDVOSB: on an email thread, Gogia appears to seek significant insight from Narula, Madan, and two other members of OST's staff on the new SDVOSB's name and structure. *Id.* Madan even helped choose the name. *Id.* OST also submitted filing paperwork on Gogia's behalf. OST Fact Response ¶ 37; Pl.'s Facts ¶ 40. CSG was established as a SDVOSB in 2010. Pl.'s Facts ¶ 42. Defendants dispute the allegation that they were significantly involved in CSG's creation by arguing that the evidence fails to show that Narula, Madan, or other members of OST staff had any "decision making authority." OST Fact Response ¶ 37.

Also while Gogia was establishing CSG in 2009 and early 2010, Madan loaned Gogia $18,000. Pl.'s Facts ¶ 36. In February 23, 2010, Madan sent Gogia another payment of $5,000,

which he referred to as "seed monies"—these funds, unlike the prior $18,000 loan, were deposited in CSG's new bank account. *Id.* ¶ 44.

The newly created CSG and OST formed a joint venture to bid on the SOMASS contract, which they were ultimately awarded. *Id.* ¶ 46. Narula and Parekh also began to discuss how they could "use" an SDVOSB like CSG. *Id.* ¶ 47. Just a month after CSG's formation, Parekh forwarded Narula a list of Department of Veterans Affairs ("VA") SDVOSB set-aside contracts that he had "identified" and "would like to pursue." *Id.* ¶ 50. Narula put Parekh in touch with Gogia so that "as a team [they] could go after these opportunities." *Id.* Gogia forwarded CSG's registration materials to Narula. *Id.* ¶ 53. In March 2010, a meeting was organized with Gogia, Parekh, Narula, and plaintiff-relator Scollick. *Id.* After the meeting, plaintiff-relator Scollick told Gogia he would send him "a copy of the 1st solicitation we will be pursuing." *Id.* ¶ 55.

Gogia then moved to register in the CCR and VA's VetBiz VIP databases, databases used by SDVOSB contractors to bid on projects. *Id.* ¶¶ 54, 56. As part of this registration process, Madan electronically signed an application verifying that he owned 49% of CSG and that CSG was majority-owned and controlled by a service-disabled veteran, as required by the VA's SDVOSB regulations. *Id.* ¶ 56. A contemporaneous operating agreement shows Madan as 49% owner and Gogia as 51% owner of CSG. *Id.* ¶ 58. The VA certified CSG as SDVOSB compliant. OST Statement of Mat. Facts ("OST Facts"), ECF No. 337-2 ¶ 77.

### C. The Parties' Divergent Narratives on CSG's Operational Leadership

In 2010, CSG started bidding for SDVOSB set-aside contracts in earnest. Pl.'s Facts ¶ 60. It is here where the narrative from the defendants this Court will term the "construction

defendants" (OST, CSG, Narula, Gogia, Madan, and Parekh) sharply diverges from the plaintiff-relator's narrative.[4]

According to the construction defendants, Gogia was at all times in control of CSG. OST Facts ¶ 39. The initial Operating Agreement listed Amar Gogia as the 51% owner of CSG, and that agreement was only amended once—when Gogia became the 100% owner of CSG. *Id.* ¶¶ 6, 12. Any assistance that OST provided to CSG for bid proposals was solely in a mentorship capacity. *Id.* ¶ 56.

Plaintiff-relator contests these assertions through several avenues.

First, he points to evidence that CSG operations were directed by CB and OST. For example, email correspondence illustrates that CB and OST employees jointly tracked SDVOSB solicitations and prepared (or, at minimum, provided templates for and then reviewed) many bid proposals. Pl.'s Facts ¶ 60. Other emails from CSG's early operations indicate that Gogia was frustrated because the "Citibuilders guys" were "using my and Centurion's name" to submit bids and that he was being "blindfolded" and "shut out" of the bidding process. *Id.* ¶ 83. And neither party disputes that Parekh and CB staff were doing significant work for CSG, though the construction defendants allege that Gogia merely "delegated" certain responsibilities to Parekh. OST Facts ¶ 42.

Plaintiff-relator also points to evidence that CSG, CB, and OST were often treated as the same company with significant staff overlap. For example, CSG's bid proposals listed past projects performed by CB as evidence of *CSG's* experience. Pl.'s Facts ¶¶ 248–88. In fact, one previous project—for Mehta Medical Group, a fictitious entity apparently owned by Parekh's aunt, defendant Dr. Sobha Mehta—was repeatedly used in bid proposals, although the cost of the alleged

---

[4] A second group of defendants, titled the "insurance defendants," become relevant later in the narrative.

past project would change in each bid proposal. *Id.* ¶¶ 285, 290. CSG also never had its own office space—at all relevant times, CSG operated out of OST offices and did not pay any rent. OST Fact Resp. ¶ 124. All office support functions were carried out by CB employees who also represented that they were CSG employees, though there is no evidence that CSG paid them. Pl.'s Facts ¶ 126.

Furthermore, shortly after CSG was established in 2010, Parekh, Narula, and Madan began emailing about an "SDVOSB Operating Agreement." *Id.* ¶ 91. This potential operating agreement is much debated, as the Court will explore below: plaintiff-relator argues it is undeniable proof that Gogia was *not* the majority owner of CSG, while the construction defendants argue that this agreement was instead for a *new* SDVOSB joint entity that they never created. OST Facts ¶ 91.

### D. The Relationship Between Gogia, Parekh, and the Other Construction Defendants Breaks Down

The relationship between Parekh, Narula, Gogia and Madan soon began breaking down. Emails illustrate that Parekh was frustrated with Gogia and was "opposed" to having him "near the accounting system," Pl.'s Facts ¶ 185; Narula in response assured Parekh that "at the end of the day you are running the company/work." *Id.* ¶ 186. In the emails, Narula reminded Parekh that if they were "using [Gogia's] qual[ifications]," presumably his SDV status, he "needs to be compensated." *Id.* ¶ 187. In early 2012, Gogia emailed Narula and Madan to inform them of issues he found when reviewing CSG financial records, which were maintained by CB. *Id.* ¶ 205. He noted that the "books . . . do not correlate to CB invoices provided." *Id.* As 2011 became 2012, CSG failed to pay some of its workers as Parekh refused to approve payments. *Id.* ¶ 216. In the midst of these financial troubles, Parekh separated from CSG. *Id.* ¶ 217. Gogia remained.

From 2010 to 2015, CSG was awarded nineteen SDVOSB set-aside contracts. *Id.* ¶ 234. CSG never defaulted on any contracts for the VA, nor did they receive negative performance reviews regarding completed contracts. OST Facts ¶ 81. Even after CSG was no longer working

with Parekh and CB, CSG continued operations. *Id.* ¶ 52. The VA was notified of the allegations of fraud in this lawsuit but continued to recertify CSG as a SDVOSB at least once. *Id.* ¶ 79.

### E.  The Role of the Insurance Defendants

There is another group of defendants relevant here, who the Court will refer to as the "insurance defendants" (Centennial, Schendel, Hanover, and Hudson). The Miller Act requires government contracts over $100,000 to be bonded. *Id.* ¶ 9; *see* 40 U.S.C. § 3131(b). This requirement is for all government contracts, not just SDVOSB set-aside contracts. 40 U.S.C. § 3131(b). The bonds guarantee that the contractor will comply with the terms of the contract and perform as required. Pl.'s Facts ¶ 10. The insurance companies that issue the bonds do not interact with the government—they issue the bonds to the contractor, who then "furnishes" the required bonds to the federal government. 40 U.S.C. § 3131(b). Defendant Centennial, a company owned and run by defendant Michael Schendel, worked as a "bonding agent." Pl.'s Facts ¶ 22. Centennial would garner information from potential contractors, like CSG, seeking bonding, then assist bonding companies' during the underwriting process. *Id.* ¶ 24. Defendants Hanover and Hudson were both bonding companies that provided bonds to contractors. *Id.* ¶ 23.

Schendel and Centennial brokered the relationships between CSG and bonding companies Hudson and Hanover. *Id.* ¶¶ 69, 149. It is undisputed that Narula and Parekh were involved with the bonding process for CSG, though all bonds were requested and issued in CSG's name. *Id.* ¶¶ 70, 73, 76 (Hanover); *id.* ¶¶ 158–159, 160 (Hudson). As a requirement to providing surety bonds for CSG's SDVOSB set-aside contracts based on OST's financial support, Hanover required an agreement to indemnify them against any loss—an indemnification agreement that OST, Narula, Narula's wife, Parekh, Gogia, CB, CSG, and Centurion-OST all signed. *Id.* ¶¶ 106–07. Hanover issued performance bonds for eight VA SDVOSB-set aside contracts. *Id.* ¶ 128. In May 2011, Hudson started issuing bonds to CSG. *Id.* ¶¶ 149–154. Like Hanover, Hudson required

indemnity agreements to issue these bonds. OST, CSG, CB, Gogia, and Gogia's wife all signed an indemnity agreement with Hudson. *Id.* ¶ 157. Hudson issued performance bonds for five VA SDVOSB set-aside contracts. *Id.* ¶ 160.

It is undisputed that certain Hanover, Hudson, and even Centennial employees (including Schendel) seemed to think that CSG was the "construction arm of OST" and that Parekh or Narula owned CSG. *Id.* ¶¶ 70–74, 164–65. Additionally, OST was the primary contact between "the bonding company" and CSG. *Id.* ¶ 78. Gogia met Schendel once, though Schendel could not recall any conversation of substance. *Id.* On the other hand, it is also undisputed that there is no evidence on the record illustrating that Schendel, Centennial, Hanover, or Hudson were aware of the *specific* requirements of VA SDVOSB set-aside contracts.

## F. Procedural History

In 2014, plaintiff-relator Scollick filed this complaint against CB, OST, CSG, Gogia, Madan, Mehta, Narula, Parekh, Hanover, Hudson, Schendel, and defendant Citibuilders Solutions Group, LLC. Compl., ECF No. 1. Five other named defendants are no longer in the case. *See, e.g.,* ECF No. 125 (dismissing Guatam Chitnis, Anita Chitnis, and KCGI, Inc); ECF No. 122 (dismissing Dilip Parekh); ECF No. 307 (granting stipulation of dismissal as to Melvin Goodweather). The second amended complaint—operative here—alleges four counts:

> Count I, submitting or causing to be submitted false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1)(A) against all defendants (the presentment claim);
>
> Count II, causing to be made or used false records to submit false or fraudulent claims to the United States in violation of 31 U.S.C. § 3729(a)(1)(B) against all defendants (the false statement claim);
>
> Count III, knowingly avoiding an obligation owed to the United States in violation of 31 U.S.C. § 3729(a)(1)(G) against defendants Hanover and Hudson (the reverse false claim); and

Count IV, conspiracy to violate the FCA in violation of 31 U.S.C.
§ 3729(a)(1)(C) against all defendants (the conspiracy claim).

*See* Second Am. Compl. ¶ 215–60, ECF No. 298. Hudson also filed a crossclaim against OST, CSG, Parekh, Gogia, CB, Citibuilders, and Centennial, invoking the above-referenced indemnification agreements. Crossclaim Compl., ECF No. 187.

Now, plaintiff-relator moves for partial summary judgment against all defendants but Citibuilders Solutions Group and Mehta, and all defendants but Citibuilders Solutions Group move for summary judgment. Hudson also moves for partial summary judgment against OST, CSG, Parekh, and Gogia on its crossclaim. ECF No. 336. Finally, Madan, Narula, and OST move to strike certain testimony from plaintiff-relator's motion for partial summary judgment. ECF Nos. 366 & 367. These fourteen motions are all ripe.

## II.   LEGAL STANDARDS

### A. Summary Judgment

When a movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," the court shall grant summary judgment. Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the nonmovant presents evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[M]erely colorable" evidence or evidence that is not sufficiently probative does not create a genuine dispute of material fact. *Id.* at 249–250. On a summary judgment motion, all inferences to be drawn from the underlying facts "must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court's role when deciding summary judgment motions is only to determine if there is a genuine dispute of material fact, not to make credibility determinations or weigh the evidence. *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113

10

(D.C. Cir. 2016). The movant is entitled to summary judgment when the nonmovant fails to make a sufficient showing of an essential element of her case for which she bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When parties file cross-motions for summary judgment, a court views each motion separately in the light most favorable to the non-movant. *Howard Town Ctr. Dev., LLC v. Howard Univ.*, 267 F. Supp. 3d 229, 236 (D.D.C. 2017).

## III.   DISCUSSION

With this sprawling cast of characters to consider, the Court will split up its major analysis into two groups of defendants. First, the Court will discuss the FCA and conspiracy claims against the construction defendants (OST, CSG, Parekh, Narula, Madan, and Gogia). Second, the Court will dispose of the claims against the insurance defendants (Schendel, Centennial, Hanover, and Hudson). After these larger discussions, the Court will decide Mehta's separate motion for summary judgment and Hudson's partial motion for summary judgment on its indemnification crossclaim.

### A. Whether The Construction Defendants Violated The FCA Is Genuinely Disputed

Plaintiff-relator brings three claims against the the construction defendants: a presentment claim, a false-statement claim, and a claim alleging conspiracy to violate the False Claims Act. Second Am. Compl. ¶¶ 215–60. Both plaintiff-relator and the construction defendants move for summary judgment on these counts.[5] Presentment claims and false statement claims contain nearly identical elements, and so this Court will analyze both claims together for the purposes of this summary judgment motion.

There are three elements to an FCA presentment claim: "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim to be false."

---

[5] Plaintiff-relator excludes certain allegations from his motion on these two counts. *See, e.g.*, ECF No. 329 at 2 n.1. The specifics of those exclusions are unnecessary because the Court will deny summary judgment on these counts.

*United States ex. rel. Scollick v. Narula* ("*Scollick I*"), 215 F. Supp. 3d 26, 35 (D.D.C. 2016) (quoting *Pencheng Si v. Laogai Rsch. Found.*, 71 F. Supp. 3d 73, 91 (D.D.C. 2014)). Although the text of the FCA explicitly prohibits only false fraudulent claims, 18 U.S.C. § 3729(a)(1)(A), a violation of the FCA occurs when a person "fraudulently induces the government to enter a contract and later submits claims for payment under that contract." *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 417 (D.C. Cir. 2021). This "initial fraudulent action" taints all future claims. *Scollick ex rel. United States v. Narula* ("*Scollick III*"), No. 14-cv-1339 (RCL), 2020 WL 6544734, at *7 (D.D.C. Nov. 6, 2020). The false statement claim has almost identical elements to the presentment claim, except that a false statement requires evidence that the defendant made a false statement "as opposed to the submission of a false claim for payment." *Scollick I*, 215 F. Supp. 3d at 35 (quoting *Pencheng Si*, 71 F. Supp. 3d at 87).

While the parties attempted to bury the issue under a mountain of paper, a simple conclusion cuts this Gordian knot: there are many genuine disputes of material fact. Both sides provide evidence about (1) whether CSG was SDVOSB eligible, (2) whether defendants had the required scienter for fraud, and (3) whether the OST defendants or Neil Parekh "caused" the false claims or statements to be made to the government. These factual disputes pit contemporaneous email evidence (supporting the fraud claims) against the alleged conspirators' deposition testimony (swearing that their actions were above-board). Because this Court cannot evaluate credibility or weigh evidence at this stage, both motions for summary judgment must be denied. *Wheeler*, 812 F.3d 1109 at 1113.

### 1.  Whether There Was A False Claim Or False Statement Is Genuinely Disputed

Plaintiff-relator argues that CSG falsely held itself out as an eligible SDVOSB when submitting claims and statements to the government when it was in truth controlled by civilians with no military background. ECF No. 329-1 at 3. Key to both his presentment claim and his false

statement claim is whether CSG was an eligible SDVOSB. If so, most of plaintiff-relator's claims fall apart—the claims and statements the construction defendants made to the government would not be false.

To qualify as SDVOSB eligible under VA guidelines, a small business "must be unconditionally owned and controlled by one or more eligible veterans, service-disabled veterans, or surviving spouses." 38 C.F.R. § 74.2(a) (2015).[6] A service-disabled veteran "owns" a small business when at least 51% of the concern (company) is "unconditionally and directly" owned by him. 38 C.F.R. § 74.3(a) (2015). Similarly, a service-disabled veteran "controls" a small business when he conducts both "the day-to-day management and long-term decision-making authority." 38 C.F.R. § 74.4(a) (2015). To control a small business, a service-disabled veteran must "hold the highest officer position" and must have "managerial experience of the extent and complexity" needed to run the company. 38 C.F.R. § 74.4(c)(1), (2) (2015).

The construction defendants point to the initial Operating Agreement for CSG—which listed that Gogia was 51% owner—as evidence that CSG was SDVOSB eligible. *See, e.g.*, ECF No. 331-1 at 11. While plaintiff-relator acknowledges this fact, he also points to emails between the construction defendants discussing potential equity splits or profit sharing, all of which would entitle Gogia to far less than 51% of the assets. ECF No. 330-1 at 10–11.

For example, an email thread between Parekh and Narula discussed a potential "SDVOSB Operating Agreement" that would entitle Gogia to, at most, 25% of profits. Pl.'s Facts ¶ 91. Multiple defendants stated under oath that this email referred to a new, separate entity. *See* OST Facts ¶ 90–93. But additional emails sent around the time period betray this characterization and

---

[6] The eligibility regulations which were in place between 2010 and 2015 are controlling in this case. The VA and Small Business Association SDVOSB programs subsequently merged their two regulatory schemes. *See* National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, 130 Stat. 2658 (2016).

indicate that this new operating agreement was for CSG itself. For example, a week later Parekh
sent an email stating that he and Narula "really need to come to an agreement on the *CSG
operations agreement* soon." Pl.'s Facts ¶ 92 (emphasis added). That same week, Madan emailed
Gogia that he was "thinking about a comp plan" that would allow him to "get more of [Gogia's]
time" and pay Gogia a salary. *Id.* ¶ 93. Madan mentioned going over various "models." *Id.* This
context supports plaintiff-relator's contention that the potential "SDVOSB Operating Agreement,"
which included proposed compensation models, was for CSG itself.

Emails aside, plaintiff-relator provides more evidence that Gogia was not the majority-
owner of CSG. A document titled "Compiled Financial Statement for Period Ending December
31, 2010" lists two equity partners for CSG: one holding $18,668 and one holding $210,000. *Id.*
¶ 144.[7] As plaintiff-relator points out, Madan paid CSG $211,000 in August 2010 but has
repeatedly denied this was an investment and insisted it was an interest-free loan. *Id.* The financial
statement, however, again belies this statement and indicates that the $211,000 was instead an
investment.

All told, there is a material dispute as to whether CSG was majority-owned by Gogia, the
only eligible service-disabled veteran. But there is another dispute as well: whether CSG was
*controlled* by Gogia, as required by VA regulations. *See* 38 C.F.R. § 74.2(a).

The back-and-forth between the construction defendants and plaintiff-relator over who
truly controls CSG demonstrates why summary judgment is inappropriate here. As plaintiff-relator
tells it, Gogia played almost no meaningful role in CSG. ECF No. 330-1 at 8. CSG was operated

---

[7] The OST defendants argue that this document is inadmissible for lack of foundation. ECF No. 370-1 ¶ 144. The
nonmovant is not required to produce evidence that would be admissible at trial—all that is necessary is for the
evidence to be "capable of being converted into admissible evidence." *Gleklen v. Democratic Cong. Campaign
Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). The Court believes it likely that plaintiff-relator could establish
foundation at trial for this document, which was apparently provided to the bonding defendants on behalf of CSG.

out of OST's offices. Pl.'s Facts ¶ 124. Parekh and Narula primarily controlled CSG's operations.

*Id.* ¶¶ 89–93. And Gogia did not contribute to bidding on SDVOSB proposals for at least the first

few years. *Id.* In emails, Gogia complains about not being in kept in the loop:

> I am only writing this to you. This has built up. A while back, I was
> told to come meet and greet CitiBuilders—instead, at the meeting I
> was told who my new partners were. *Since then I've been
> intentionally shut out, which may have been ok if somebody had told
> me about it.* That last meeting with [Narula] caught me off guard
> and does not make me feel comfortable. *Still, I could bear being
> locked out because I was told Citibuilders had experience and knew
> what they were doing.* These are serious flaws in this bid. The only
> two things I ever heard about it were a surprise call from the VA
> contracting officer, and now this. Yet, the VA response is addressed
> to me, with Centurion's name—reflecting on the reputation we're
> trying to build. *Please forgive the tone—tell the Citibuilders guys to
> stop using my and Centurion's name if these are the results we're
> going to be receiving. I want to move forward and believe this will
> work, and apologize if I am being over the top.* Maybe I'm missing
> the big picture, but it's because I've been blindfolded. How do I
> make sure I don't get another email like this?

Pl.'s Facts ¶ 83 (emphases added). Madan, in his response, noted that "[they] ha[d] submitted some

bids already" but that Gogia "ha[d] not been maliciously shut out." *Id.* ¶ 84. Instead, Gogia was

"shut out for convenience." *Id.* Still, he reminded Gogia that "everyone has the same goals." *Id.*

Other emails cited by plaintiff-relator further support Gogia's lack of control. For example,

in one email from Parekh to Narula, Parekh appears to give orders regarding what Gogia "need[s]

his focus to be on" in 2010 and 2011. *Id.* ¶ 92. Other emails show Narula and Parekh discussing

Gogia's role in CSG, *id.* ¶¶ 185–86, with Narula telling Parekh "at the end of the day you [Parekh]

are running the company/work." *Id.* ¶ 186. While the construction defendants attempt to play these

off as "vague" statements, ECF No. 370-1 ¶ 186, this Court finds that they support plaintiff-

relator's contention that Gogia was not really in control of CSG.

Still, there is countervailing evidence indicating that Gogia did control CSG at all relevant

times, as defendants claim. ECF No. 337-1 at 14. To start, Gogia attests—under oath—that at all

times he controlled CSG. *See* OST Facts ¶¶ 39, 50. Madan similarly claims that OST was *never* involved in preparing any CSG VA bids proposals, *id.* ¶ 55, despite email evidence to the contrary, Pl.'s Facts ¶ 83. The construction defendants also cite a narrative of CSG's creation that Gogia drafted in 2012 and emailed to Narula in 2013—before any allegations of fraud. ECF No. 337-10. According to this narrative, all that Gogia did was delegate back-office management to Parekh. ECF No. 337-1 at 23. The evidence on both sides is sufficient to raise a genuine dispute of material fact as to whether Gogia controlled CSG and thus whether CSG was eligible for SDVOSB status.[8]

In a final argument, the OST defendants maintain that plaintiff-relator has failed to provide evidence that the claims were false because there is no evidence that the alleged misrepresentations were *material* to the VA's decision to *pay* claims to CSG. ECF No. 337-1 at 40–43. But, as this Court has previously explained, *Scollick III*, 2020 WL 6544734, at *9, this showing is not required. Plaintiff-relator is proceeding on a theory of fraudulent inducement—that the claims CSG submitted to the government for its work were false because CSG used fraud to enter the original contract— so he need only to prove two things: (1) that the fraud *caused* the government to enter

---

[8] The construction defendants also allege that any support OST gave to CSG was formally approved of by the government under a mentor-protégé agreement. ECF No. 337-1 at 15. This argument fails. To start, the government-approved mentor-protégé agreement between CSG and OST that the construction defendants tout was for *FAA* contracts. *See* ECF 337-5. The FAA Mentor-Protégé Program exists to encourage firms to assist SDVOSBs in performing *FAA* contracts. *See* The FAA Mentor-Protégé Program, Federal Aviation Administration, *available at* https://sbo.faa.gov/mentorprotege.cfm. But all the allegations in the current complaint relate to contracts with the *VA*, so whether the amount of support OST gave to CSG was appropriate for FAA contracts is irrelevant. The construction defendants' follow-up argument that the FAA "explicitly permitted CSG to use the mentorship assisted provided by OST in support of other contracts with other government agencies" is disingenuous. ECF No. 337-1 at 16. The cited FAA approval letter states:

> This approval does not constitute authorization to proceed with work contained in the Mentor-Protégé Agreement until the approved agreement is incorporated into an FAA contract. However, this does not preclude [OST] from mentoring to [CSG] on other government contracts."

ECF No. 337-6. Just because parties are not *precluded* from taking certain actions does not mean they are expressly permitted to. If OST wanted to support CSG performing VA contracts, there is a separate VA Mentor-Protégé program with a separate approval process they could have applied to. See 48 C.F.R. § 819.7101. They did not do so. The FAA Mentor-Protégé agreement is irrelevant.

into the contract; and (2) that the fraud was material. *United States ex rel. Cimino v. Int'l Bus. Machines Corp.*, 3 F.4th 412, 422 (D.C. Cir. 2021). Fraud is material if it "capable of influencing the government's decision *to enter into a contract*." *Id.* at 423 (emphasis added). Because VA SDVOSB set-aside contracts can *only* be awarded to SDVOSB-eligible companies, the facts indicating that construction defendants fraudulently represented CSG as SDVOSB-eligible to receive these contracts sufficiently proves both causation and materiality. Despite defendants' argument, plaintiff-relator need not also prove that the fraud was material to the VA's later *decision to pay*.

Reviewing all the evidence cited above, this Court finds a genuine dispute exists as to whether CSG was SDVOSB eligible. Because CSG repeatedly certified itself as SDVOSB eligible when submitting VA bid proposals, a reasonable jury could find that they submitted false claims or statements to the government. This genuine dispute of fact allows the construction defendants to survive plaintiff-relator's motions for partial summary judgment against them. But because the construction defendants also move for summary judgment, which plaintiff-relator can only survive by making a sufficient showing of all essential elements for which he bears the burden of proof, *Celotex Corp.*, 477 U.S. at 323, this Court will proceed to the second element of a presentment or false statement claim—scienter.

### 2. Whether Construction Defendants Knowingly Submitted A False Claim or Statement To The Government Is Genuinely Disputed

Next, the court turns to scienter. A false statement or claim is made or submitted knowingly when a defendant (1) has actual knowledge of the claim's falsity, (2) acts in deliberate ignorance, or (3) acts in reckless disregard. *Scollick I*, 215 F. Supp. 3d at 35. Plaintiff-relator alleges that the construction defendants had actual knowledge of the falsity of the claims and statements.

Evidence supports the notion that the construction defendants had actual knowledge that CSG was not SDVOSB eligible and were fraudulently representing it as such. For example, in an email between Narula and Madan, Narula stated, "[W]e have the formalities completed with CSG. Also, who are the owners and officers *on the papers*?" Pl.'s Facts ¶ 54 (emphasis added). In another email, Gogia asked Madan and Narula to create documentation of ownership because he was "bidding on a job which requires 'evidence' of [his] 51% ownership of CSG." *Id.* ¶ 57. Gogia added these scare quotes himself. In response, the defendants immediately created a new Operating Agreement that same day to provide this "evidence." *Id.* ¶ 58. In another email, Narula emailed Parekh and asked him to "call me to discuss how *we can use the SDVO-SB*. The company name is Centurion Group, LLC." *Id.* ¶ 51 (emphasis added). And when Gogia complained about being kept out of the loop, Madan reminded him that "everyone ha[d] the same goals." *Id.* ¶ 84. Plaintiff-relator also provided evidence that the construction defendants plainly treated CSG as part of a "team" as opposed to its own country: Parekh and Narula identified SDVOSB projects to bid on and then sent them to Gogia so that "as a team [they] c[ould] go after these opportunities." *Id.* ¶ 50. Finally, there are repeated examples of the construction defendants referencing the fact that Gogia was allowing them to "use his quals." *Id.* ¶ 187; *see id.* ¶¶ 91, 94–95.

These facts, alone, are enough to raise a triable issue of fact regarding whether the construction defendants had actual knowledge of the fraud they were allegedly committing— passing off CSG as a SDVOSB-eligible company to secure prime VA projects. Because this evidence supports a theory of actual knowledge, construction defendants' argument that they merely thought OST was providing FAA-approved support to CSG is unpersuasive here.

The construction defendants also argue that because CSG was audited and recertified by the VA, plaintiff-relator cannot establish actual knowledge. ECF No. 337-1 at 33, ECF No. 338-1

at 12. This is incorrect. The allegation here is that the construction defendants worked together to *lie to the government* and falsely hold CSG out as a SDVOSB-eligible company. "[G]overnment approval or certification cannot be used as a shield from liability, especially where that approval or certification was gained through fraudulent means." *United States v. Honeywell Int'l Inc.*, 502 F. Supp. 3d 427, 459 (D.D.C. 2020), *motion to certify appeal granted*, No. 08-cv-0961 (PLF), 2021 WL 2493382 (D.D.C. June 18, 2021).

As the construction defendants point out, "scienter is often a fact-intensive matter to resolve." ECF No. 337-1 at 34. That is the case here, and summary judgment is unwarranted.

### 3. Whether The Construction Defendants Presented False Claims Or Statements To The Government Is Genuinely Disputed

Finally, plaintiff-relator must provide evidence showing that the construction defendants submitted a claim or false statement to the government. "Presentment and false statement claims can rest on a theory of direct presentment/making of false statements or indirect presentment/making of false statements." *Scollick II*, 2017 WL 3268857, at *5. Direct presentment or false statement claims are simple—all that is required is that the defendant in question actually submitted the false claims. *United States ex rel. Tran v. Comput. Scis. Corp.*, 53 F. Supp. 3d 104, 127 (D.D.C. 2014). But to succeed on a theory of indirect presentment or false statements, the defendants must have caused the submission of false claim or statement. *Scollick I*, 215 F. Supp. 3d at 39.

The Court starts with the direct-presentment claims. Defendant Gogia applied to the VA to qualify CSG as a SDVOSB, and the VA certified CSG as an SDVOSB after receiving this application. *See* ECF No. 337-8 at 2. Both Madan and Gogia signed a verification form in which they affirmed that CSG was at least 51% owned and controlled by Gogia. Pl.'s Facts ¶ 56. Because plaintiff-relator has provided sufficient evidence that CSG was *not* SDVOSB-eligible, this

representation that CSG was SDVOSB-eligible would qualify as a false statement. And because any subsequent SDVOSB contracts awarded to CSG would be "procured by fraud," any claims CSG submitted for payment would be "false or fraudulent." *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2015). CSG was awarded nineteen VA SDVOSB set-aside contracts, submitted claims for all of them, and was ultimately paid $7,003,693.11 by the United States. Pl.'s Facts ¶¶ 234–35. Parekh and Gogia both signed the claim payment requests. *Id.* ¶ 235. So, under a direct-presentment theory, plaintiff-relator's claim survives summary judgment.

Moving to a theory of indirect presentment, a defendant causes a false statement or claim to be made when his conduct was "at least a substantial factor in causing, if not the but-for cause of, submission of false claims." *United States v. Toyobo Co., Ltd.*, 811 F. Supp. 2d 37, 48 (D.D.C. 2011). Courts have recognized indirect presentment or false statement claims where a non-submitting party was the "driving force behind an allegedly fraudulent scheme" or agreed to take "certain critical actions in furtherance of the fraud." *Tran*, 53 F. Supp. 3d at 127. Ultimately, the court must evaluate the "degree to which [a party] was involved in the scheme that results in the actual submission." *Scollick I*, 215 F. Supp. at 39 (quoting *Tran*, 53 F. Supp. 3d at 127).

Evidence—in addition to that discussed above, *see* Parts II.A.1 and III.A.2, *supra*— indicates that Madan, Parekh, Narula, and OST were intimately involved with the bid proposal and submittal process. Gogia, Parekh, Narula, and Madan were all on email threads regarding the "construction pipeline," identified certain SDVOSB-set-aside contracts, and asked Narula to decide on what projects to pursue. *See* ECF No. 330-7 at 15–16. Sujana Pathak, an OST employee, created a bid-proposal template for CSG to use, *id.* at 27, and met with plaintiff-relator and Gogia to assist in bid proposals, *id.* at 38–39. Other OST employees assisted with additional edits to bid

proposals, including designing cover pages. Pl.'s Facts ¶ 65. Parekh himself emailed Gogia to tell

him what types of SDVOSB-set-aside projects to look for. ECF No. 330-7 at 49. Finally, OST was

the "primary contact between" the insurance defendants, who assisted with necessary bonding, and

CSG. Pl.'s Facts ¶ 78. Based on this evidence, a reasonable jury could find that Parekh, Narula,

Madan, and OST took "critical actions in furtherance of the fraud." *Tran*, 53 F. Supp. 3d at 127.

So, in short, Plaintiff-relator has sufficiently raised a direct- and indirect- presentment

claim and a false-statement claim against these defendants. These claims must proceed to trial.

### B. The Construction Defendants' Conspiracy Claim Contains Genuine Disputes

Plaintiff-relator also alleged that the construction defendants conspired to violate the FCA.

A FCA conspiracy claim requires (1) an agreement to make false or fraudulent claims that (2) each

member of the alleged conspiracy joined where (3) at least one conspirator knowingly committed

an overt act in furtherance of the conspiracy. *Scollick I*, 215 F. Supp. 3d at 36. There must also be

an underlying violation of the FCA (which the court found was genuinely disputed in Part III.A,

*supra*).[9]

The critical issue for this conspiracy claim is whether there is evidence demonstrating that

construction defendants *agreed* to violate the FCA. The answer is plainly yes. Gogia emailed

Madan and Narula for "evidence" (scare quotes his own) of his ownership of CSG to bid on jobs.

Pl.'s Facts ¶ 57. Narula and Parekh discussed "how we can use the SDVO-SB." *Id.* ¶ 51. Narula

and Madan discussed the "formalities" they completed and who would be the "owners and officers

[of CSG] on the papers" *Id.* ¶ 54. Gogia complained to Madan about being shut out and stated to

"tell the Citibuilders guys to stop using my and Centurion's name" if they were going to receive

bad results (not to stop altogether), at which point Madan assured him that while "*we have*

---

[9] Only the construction defendants move for summary judgment on the conspiracy claim, so the Court will construe
all facts in favor of plaintiff-relator in its analysis.

submitted some bids already," presumably without Gogia's awareness, "everyone has the same goals." *Id.* ¶ 84.

There is more evidence of the construction defendants' plan, too. In November 2009, Madan emailed Gogia's army discharge papers to Narula and other OST staff, letting them know that Gogia was "SDVO" and "willing to talk." ECF No. 330-6 at 2. In late 2009, Narula and Gogia held a meeting in OST's offices to discussing SDVOSB contracting opportunities. Pl.'s Facts ¶ 35. At the same time, 2009 and early 2010, Madan suddenly loaned Gogia $18,000, *id.* ¶ 36, though Madan testified that money was for "personal expenses" and that this money was not to set up a fraudulent SDVOSB, ECF No. 370-1 ¶ 36. Whatever the reason for the payment, by January 2010 Narula, Madan, and Gogia were on an email thread with a CPA, establishing CSG and choosing a name. ECF No. 330-6 at 112–17. This evidence is sufficient to raise a triable question of whether there was an agreement to defraud the FCA that Narula, Madan, Parekh, Gogia, CSG, and OST agreed to defraud the government by submitting false claims and statements. Accordingly, this Court will not grant summary judgment to the construction defendants on the conspiracy claim.

## C. The Insurance Defendants Are Entitled To Summary Judgment On All Claims

The claims brought against the insurance defendants—Hudson, Hanover, Centennial, and Schendel—are a different story. The construction defendants could not have filed the allegedly fraudulent bid proposals without surety bonds and performance bonds, which Centennial provided as "agent and attorney-in-fact for [Hudson] and [Hanover]." *Scollick I*, 215 F. Supp. 3d at 33. This Court previously allowed plaintiff-relator to proceed with presentment and false statement claims against the insurance defendants based on a theory of indirect presentment: that while they did not *directly* present false claims or make false statements to the government, their actions led to the submission of false claims. *United States ex rel. Scollick v. Narula* ("*Scollick II*"), No. 14-cv-1339 (RCL), 2017 WL 3268857, at *14 (D.D.C. July 31, 2017). The Court also allowed plaintiff-relator

to proceed with a reverse false-claim and conspiracy claim against the insurance defendants. *Id.* at *15. Now, with the benefit of a summary judgment record, the Court concludes that no reasonable jury could find for the plaintiff-relator on these claims.

Plaintiff-relator brings presentment and false statement claims against Centennial, Schendel (Centennial's president), Hudson, and Hanover relating to government contracts awarded to defendant CSG. Second Am. Compl. ¶¶ 215–242. Plaintiff-relator brings two further claims: a conspiracy claim against all defendants, *id.* ¶¶ 245–260, and a reverse false claim violation, pursuant to 31 U.S.C. § 3729(a)(1)(C), against defendants Hudson and Hanover, Second Am. Compl. ¶¶ 241–244. A reverse false claim is "any fraudulent conduct that results in no payment to the government when a payment is obligated." *Pencheng Si*, 71 F. Supp. 3d at 88 (quoting *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 63 n.1 (D.C. Cir. 2008) (internal quotation marks omitted). It occurs whenever a person "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G).

As plaintiff-relator points out, the "most important issue running through all [these claims] is the knowledge possessed by the [i]nsurance [d]efendants." ECF No. 331-1 at 24. But plaintiff-relator has produced no evidence permitting a reasonable jury to find that the insurance defendants had knowledge of the construction defendants' fraud—"that they were fraudulently asserting status as SDVOSBs." *Scollick II*, 2017 WL 3268857, at *14. Because such knowledge is an essential element of *all* of the claims brought against the insurance defendants, the Court must grant summary judgment in their favor. *See Celotex Corp.*, 477 U.S. at 323.

In the context of the FCA, "knowledge" requires either "actual knowledge," "acting in deliberate ignorance," or "act[ing] in reckless disregard." *United States ex rel. K & R Ltd. P'ship v. Mass. Hous. Fin. Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008) (citing 31 U.S.C. § 3729(b)). Actual knowledge is "subjective knowledge," while deliberate ignorance is "the kind of willful blindness from which subjective intent can be inferred" and reckless disregard is "an extension of gross negligence, or gross-negligence-plus." *United States v. Speqtrum, Inc.*, 113 F. Supp. 3d 238, 249 (D.D.C. 2015) (quoting *United States ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 57 (D.D.C. 2007)). Again, while scienter is "often a fact-bound inquiry," summary judgment is appropriate when plaintiff provides *no* evidence to support a finding of knowledge on an FCA claim, since knowledge is an essential element of the claim. *Hockett*, 113 F. Supp. 3d at 57-8.

In his complaint, plaintiff-relator alleged that the insurance defendants "obtained facts that [they] knew or should have known violated the government's contracting requirements" and "concealed those facts" from the government. Second Am. Compl. ¶ 204. He alleges that the insurance defendants, after touring OST's offices, knew that CSG was a "shell company." *Id.* ¶¶ 182-83. Plaintiff-relator argued that if the insurance defendants had done their due diligence, must have known that Citibuilders and CSG were fraudulently asserting statuses as SDVOSBs. *Id.* ¶ 194.

At the summary judgment stage, however, plaintiff-relator's evidence of knowledge falters. No evidence suggests that the insurance *knew* the bids were fraudulent. *Accord Scollick I*, 215 F. Supp. 3d at 33-34. There is only evidence that the insurance defendants knew the details of the bid proposals and some details of the ownership of CSG. *See, e.g.*, Pl.'s Facts ¶¶ 70, 102, 105, 259. This is insufficient to proceed on a theory of actual knowledge.

Actual knowledge is not required to maintain an FCA claim, however—deliberate indifference or reckless disregard also suffice. *United States ex rel. K & R Ltd. P'ship*, 530 F.3d at 983. Plaintiff-relator argues that the insurance defendants recklessly disregarded the truth about the construction defendants' fraud, averring that "[a]ll that was required to have full knowledge of the fraud was for the [i]nsurance [d]efendants to take the actual knowledge they possessed and apply it to the ownership and control regulations applicable to all VA SDVOSB set-aside contracts." ECF No. 331-1 at 29. But this no "simple step," *id.*, for the insurance defendants. This would impose a significant duty on third party insurers to familiarize themselves with VA regulations before bonding companies. It is a significant leap in terms of liability. Without facts indicating that the insurance defendants *knew* of the specific SDVOSB requirements, this Court will not impose an affirmative duty on insurance and bonding companies to double-check the government's verification.

Plaintiff-relator argues that the insurance defendants *did* have a duty to familiarize themselves with the VA SDVOSB requirements. ECF No. 331-1 at 29. But the cases he cites are inapplicable. In the first, *Heckler v. Community Health Services*, the Supreme Court broadly stated that participants in Medicare have a duty to "familiarize [themselves] with the legal requirements for cost reimbursements" because of the general rule that those who "deal with the Government are expected to know the law." 467 U.S. 51, 63 (1984). But *Heckler* did not involve questions of fraud—the government in that case was allowed to recover funds improperly paid because of defendant's misunderstanding of federal regulations, but the Supreme Court did not impute fraudulent intent on the defendants based on their error. *Id.* at 63–64.

And while there is no doubt that participants in federal programs must familiarize themselves with the requirements, the insurance defendants are not "participants" in the federal

VA SDVOSB program—the construction defendants are. It is the *construction defendants* who are obligated to familiarize themselves with the SDVOSB regulations, because they are dealing with and seeking payment from the federal government. For when a defendant is "responsible for day-to-day operations, long-term planning, lease and build-out negotiations, personnel, and legal and accounting oversight" of a company, he has a duty to "be familiar with the legal requirements for obtaining reimbursement . . . [from the government], and to ensure that the [company] was run in accordance with all laws*." United States v. Mackby*, 261 F.3d 821, 828 (9th Cir. 2001). This duty has always been on the company dealing with the federal government.

Plaintiff-relator has cited no cases—and the Court can find none—that place this obligation on a third-party insurer or bond underwriter. *Cf. United States v. Speqtrum, Inc.*, 113 F. Supp. 3d 238, 240 (D.D.C. 2015) (holding that a company that submitted Medicaid claims could be liable because its *owner* was either aware of the fraud or acted with "reckless disregard); *United States ex rel. Ervin & Assocs., Inc. v. Hamilton Sec. Grp., Inc.*, 370 F. Supp. 2d 18, 41 (D.D.C. 2005) (holding that a contractor which submitted false statements related to a note sale had a duty to discover potential errors before submitting to the government).

Plaintiff-relator repeatedly references insurance defendants' "FCA-imposed duty" to make additional inquiries when they encounter "red flags of . . . possible fraud." *See, e.g.*, ECF No. 359 at 15–16; ECF No. 360 at 4, 13. But plaintiff-relator fails to acknowledge that without affirmative knowledge of SDVOSB regulations or requirements, the facts in question would not raise red flags. And while plaintiff-relator argues that the SDVOSB regulations are "simplistic," ECF No. 359 at 15, the purported simplicity of the regulations are irrelevant. Plaintiff-relator has tried to construct a duty out of thin air: that it "*should* be incumbent on [the insurance defendants] . . . to have a basic familiarity with the concepts behind the SDVOSB regulations." ECF No. 359 at 16. But plaintiff-

relator cannot point to any court recognizing this third-party burden for bonding companies, which ensure *all* federal contracts—not just SDVOSB-eligible ones.

When this Court allowed the claims against the insurance defendants to proceed in *Scollick II*, plaintiff-relator had alleged that the insurance defendants "concealed . . . facts from the government" that would have revealed the fraud and conducted a tour of OST's offices which should have revealed that CSG "was a shell company." *Scollick II*, 2017 WL 3268857, at *14. But plaintiff-relator's facts now include no mention of this tour or an awareness that CSG or Centennial were "shell" companies. Instead, the facts are closer to what this Court originally dismissed in *Scollick I*. The fact that the insurance defendants "knew the content of the bid proposals" does not mean the insurance defendants "knew the content" was fraudulent. *Scollick II*, 2017 WL 3268857, at *14 (quoting *Scollick I*, 215 F. Supp. 3d at 41).

In sum, plaintiff-relator has failed to proffer evidence that the insurance defendants knew of the SDVOSB requirements nor any support for the notion that they had a duty to familiarize themselves with those requirements. Because knowledge is a required element of every claim against the insurance defendants, this Court will **GRANT** summary judgment for the insurance defendants on all claims.[10]

### D. Shobha Mehta Is Entitled To Summary Judgment

Defendant Dr. Shobha Mehta represents a small part of the purported conspiracy. Plaintiff-relator alleges that she assisted CSG when it falsified parts of CB's past performance as its own. Dr. Mehta allegedly asserted in "satisfaction surveys and phone calls that [the] work had been done

---

[10] Because the Court is granting summary judgment for the insurance defendants, it will only briefly address the argument that the public disclosure bar prohibits plaintiff-relator's claims against the insurance defendants. ECF No. 335-1 at *23. A court shall dismiss an action if the same allegations or transactions in the claim were publicly disclosed, "*unless opposed by the [g]overnment.*" 31 U.S.C. § 3730(e)(4)(A). The government here opposed any dismissal based on the public disclosure bar. *See* ECF No. 350. Accordingly, the public disclosure bar does not warrant dismissal here. *See United States ex rel. Scutellaro v. Capitol Supply, Inc.*, No. 10-cv-1094 (BAH), 2017 WL 1422364, at *12 (D.D.C. Apr. 19, 2017)

[by CSG] and was 'exceptional' or 'outstanding.'" *Scollick II*, 2017 WL 3268857, at *9. Because CSG had not done work at Dr. Mehta's office (instead, CB had performed work), this statement was allegedly false. Beyond the false statement claim, plaintiff-relator also maintained a conspiracy claim against Dr. Mehta, alleging that one of the CSG conspirators approached her and convinced her to submit materially false performance questionnaires. *Id.*

Now, Dr. Mehta moves for summary judgment. ECF No. 342. Though she moves *pro se*, the crux of her argument is clear: there were never any phone calls with government contractors verifying CSG's work. *Id.* at 5; ECF No. 392 at 2. She never received a VA performance survey questionnaire from any government officer. ECF No. 392 at 2. She never verified any false information provided in any CSG bid proposals. *Id.*

Plaintiff-relator points to two pieces of evidence as proof that Dr. Mehta either made false statements or caused false statements to be submitted. Both are far too scrawny to shoulder the heavy weight he places on them. First, plaintiff-relator argues that because Dr. Mehta's phone number was listed as a reference on one bid proposal, the Court could infer that government contracting officers did, in fact, contact Dr. Mehta. ECF No. 361 at 9. But this argument piles inference on inference—the Court would need to infer that the government contractor chose to call references, that the contractor called Dr. Mehta, that Dr. Mehta picked up the phone, and that Dr. Mehta gave false statements to the government contractor.   This kind of conjecture is impermissible. *See United States v. Ross*, 92 U.S. 281, 283 (1875) (terming "inferences from inferences" to be "nothing more than conjectures").

Second, plaintiff-relator points to the fact that Dr. Mehta admitted she "authorized Parekh to fill out a performance questionnaire, which she then signed and returned to Parekh." ECF No. 361 at 8. That much is true—as Dr. Mehta explained, and plaintiff-relator does not dispute, Parekh

asked Dr. Mehta certain questions about her satisfaction with him and his workers over the phone, then filled out a questionnaire and sent it to her to sign. ECF No. 361 ¶ 10. The questionnaire was in fact a VA performance questionnaire that referenced CSG, not CB. *Id.* To plaintiff-relator, this is enough to prove not only that Dr. Mehta caused false statements to be submitted to the government, but that she was involved in a conspiracy to violate the FCA. But the facts on the record illustrate that Dr. Mehta was unaware that this performance questionnaire was for the VA. ECF No. 361-1 at 30–31. She believed that "Neil and his workers" were "survey[ing] how happy [she] was with the work." *Id.* One signature on a form that all parties agree Dr. Mehta did not fill out personally is not sufficient to establish liability.

In sum, despite plaintiff-relator's protests to the contrary, ECF No. 361 at 7, Dr. Mehta is right: there is no evidence that Mehta knowingly submitted false statements. Because plaintiff-relator has failed to make a sufficient showing of an essential element of his case—namely, whether Dr. Mehta knowingly submitted a false performance questionnaire or gave false verification of CSG's work to a government officer when called—Dr. Mehta's motion for summary judgment will be **GRANTED**. *Celotex Corp.*, 477 U.S. at 323.

### E. Hudson's Partial Motion For Summary Judgment Will Be Denied

At last, the Court will turn to Hudson's crossclaim for indemnification. As a condition of issuing surety bonds on CSG's behalf, Hudson required CSG, Citibuilders, CB, OST, Gogia, and Parekh to indemnify Hudson against losses, costs, and expenses incurred by Hudson as a result of issuing any bonds. ECF No. 336-1 at 2. Now, Hudson moves for partial summary judgment against OST, CSG, Gogia, and Parekh to enforce that agreement with respect to the losses and costs incurred here. *Id.* at 9. CSG and Gogia opposed, ECF No. 369, as did OST, ECF No. 365, and Hudson replied, ECF No. 376. Parekh did not respond.

In the General Indemnity Agreement ("GIA") at issue, crossclaim defendants CSG, OST, Gogia, and Parekh agreed to pay Hudson for costs "incurred by [Hudson] by reason of having executed any Bond." ECF No. 336-5 at 2. In Hudson's view, its claim turns purely on interpretation of this phrase. ECF No. 336-1 at 9. Because CSG, OST, Gogia, and Parekh executed the GIA, and because Hudson's argues its liability here "arises from its issuance of the Hudson Bonds," Hudson demands indemnification. *Id.* at 10. This Court disagrees.

Parties in the District of Columbia[11] are free to enter indemnification contracts like the GIA. *Parker v. John Moriarty & Assocs.*, 189 F. Supp. 3d 38, 43 (D.D.C. 2016). But that is not the end of the inquiry: the D.C. Court of Appeals has explained that an indemnity provision should "not be construed to permit an indemnitee to recover for his [or her] own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties." *W.M. Schlosser Co. v. Md. Drywall Co.*, 673 A.2d 647, 653 (D.C. 1996) (quoting *United States v. Seckinger*, 397 U.S. 203, 211 (1970) (alteration in original)). If a party expects to "shift responsibility for its negligence" then the "mutual intention of the parties to this effect should appear with clarity from the face of the contract." *Id.* The question a court must ask is whether the contract provision in question "clearly reflects such a purpose." *Id.* If there is ambiguity as to whether the contract intended to provide the type of protection in question, the standard is not satisfied. *Parker*, 189 F. Supp. 3d at 43.

The alleged scienter in this case is greater—Hudson is accused not of negligence but of willfully contributing to a fraudulent conspiracy. Accordingly, to grant Hudson's summary judgment motion here, the Court must determine that the GIA unambiguously and clearly reflects the parties' intent to shift liability for Hudson's *own* knowing and willful acts. If the contract is "at

---

[11] While the GIA lacks a choice of law provision, parties agree that District of Columbia law applies. *See* ECF No. 365 at 4 n.1.

all ambiguous" on this point, "this standard is not satisfied." *Rivers & Bryan, Inc. v. HBE Corp.*, 628 A.2d 631, 635 (D.C. 1993). And if the standard is not satisfied, summary judgment must be denied.

The GIA here indemnifies Hudson for all costs "incurred by [Hudson] *by reason of having executed any Bond.*" ECF No. 336-5 at 2 (emphasis added). The Court finds that this language does not clearly represent an intent to indemnify Hudson for *any and all* actions, even the knowing illegal acts alleged in plaintiff-relator's complaint. Costs incurred for allegedly committing illegal acts are arguably not costs incurred by "reason" of having executed a bond. To put it another way, it is Hudson's allegedly fraudulent acts *beyond* the bond, not the execution of the bond itself, that incurred costs in that scenario. Though this Court is ultimately dismissing the claims against Hudson, plaintiff-relator alleged that Hudson was an *active participant* in the fraud and knowingly continued to issue bonds despite being aware that CSG was not SDVOSB-eligible. Given this ambiguity regarding whether these acts are covered by the GIA, the Court cannot say there is no genuine dispute that the contract provision "clearly reflects such a purpose." *W.M. Schlosser Co.*, 673 A.2d at 653.

In deciding this, the Court rejects the argument Hudson raises in its reply—that OST, CSG, and Gogia's express denial of the existence of fraud in their motions for summary judgment cannot be reconciled with their argument that Hudson cannot seek indemnity here. ECF No. 376 at 4. This misstates the crossclaim defendants' arguments. Crossclaim defendants do not argue that Hudson actually committed any illegal acts. Instead, they argue that the costs incurred in this litigation came "by reason of" plaintiff-relator's accusations of Hudson's *own* willful fraud, not the act of executing the CSG bond, and the GIA is ambiguous as to whether such costs are covered. ECF

No. 365 at 3. This Court agrees. Accordingly, Hudson's motion for partial summary judgment will be **DENIED**.

### F. Madan, Narula, And OST's Motions To Strike Portions Of Plaintiff-Relator's Motion For Partial Summary Judgment Will Be Dismissed As Moot

Madan, Narula, and OST finally move to strike portions of plaintiff-relator's motion for partial summary judgment, ECF Nos. 366 & 367. Specifically, they move to strike the declaration of Benjamin Ward. ECF No. 366 at 1. Plaintiff-relator opposes this motion. ECF No. 385. Because this Court's analysis that there is a genuine dispute of material fact regarding the construction defendants is not altered by the inclusion or exclusion of Ward's testimony, the Court will **DISMISS** this motion to strike **AS MOOT**.

## IV. CONCLUSION

Plaintiff-relator and the construction defendants present a tangled web of facts and conflicting characterizations that can only be resolved by a jury. Accordingly, this Court will:

- **GRANT** Centennial and Schendel's motion, ECF No. 328, for summary judgment against plaintiff-relator and **DISMISS** all claims against Centennial and Schendel;

- **DENY** plaintiff-relator's motion, ECF No. 329, for partial summary judgment against CSG and Gogia;

- **DENY** plaintiff-relator's motion, ECF No. 330, for partial summary judgment against OST, Narula, and Madan;

- **DENY** plaintiff-relator's motion, ECF No. 331, for partial summary judgment against Centennial, Schendel, Hanover, and Hudson;

- **DENY** plaintiff-relator's motion, ECF No. 332, for partial summary judgment against Parekh;

- **GRANT** Hanover's motion, ECF No. 334, for summary judgment against plaintiff-relator and **DISMISS** all claims against Hanover;

- **GRANT** Hudson's motion, ECF No. 335, for summary judgment against plaintiff-relator and **DISMISS** all claims against Hudson;

- **DENY** Hudson's motion, ECF No. 336, for partial summary judgment on its crossclaims for indemnification;

- **DENY** OST, Narula, and Madan's motion, ECF No. 337, for summary judgment against plaintiff-relator;

- **DENY** CSG and Gogia's motion, ECF No. 338, for summary judgment, against plaintiff-relator;

- **DENY** Parekh's motion, ECF No. 341, for summary judgment against plaintiff-relator;

- **GRANT** Mehta's motion, ECF No. 342, for summary judgment against plaintiff-relator and **DISMISS** all claims against Mehta; and

- **DISMISS AS MOOT** Madan, Narula, and OST's motion, ECF Nos. 366 & 367, to strike portions of the record.

A separate Order will be filed with this memorandum opinion.

Date: July 19, 2022

Hon. Royce C. Lamberth
United States District Judge