## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. ANDREW SCOLLICK,     ) ) ) | |
|    Plaintiff-Relator,     ) ) | |
| v.     ) ) | Case No. 1:14-cv-01339 RCL |
| VIJAY NARULA, et al.,     ) ) | |
|    Defendants.     ) ) ) | |

## DEFENDANTS OST, INC., VIJAY NARULA, AND AJAY MADAN'S MOTION TO STAY CASE OR IN THE ALTERNATIVE TO BIFURCATE

Defendants OST, Inc., Vijay Narula, and Ajay Madan (hereinafter "OST Defendants") respectfully submit this motion to stay this case so that the Small Business Administration ("SBA") can review and determine the critical agency-specific issues in this case because the allegations fall within the SBA's administrative expertise and are challenging earlier administrative decisions and certifications by the Department of Veterans Affairs ("VA") that are now the purview of the SBA.  If the Court does not stay this case, alternatively the OST Defendants seek a bifurcated trial to address the dispositive issues in this case regarding the subject Service-Disabled Veteran-Owned Small Business ("SDVOSB") in this case.

## I.    Introduction

The central issues before the Court in this case are whether the SDVOSB at issue, Centurion Solutions Group ("CSG") was (1) a compliant entity; (2) was controlled by the service-disabled veteran, and (3) whether the type of assistance provided by the OST Defendants in connection with a government-approved Mentor-Protégé Agreement was proper.  These determinations should be made by the agency that has the responsibility for reviewing

1

SDVOSBs for certification, reviewing Mentor-Protégé Agreements, actions taken pursuant to those agreements, and prior certification decisions.  The VA certified CSG five times, including after the allegations in this case.  Handing a sixth review to a jury after the prior certifications is essentially attempting to usurp and overturn decisions made by those with expertise to make them.

The Court reviewed the primary jurisdiction issue during the motion to dismiss phase of the litigation, but did so without the benefit of the many significant facts gathered during discovery that were presented in the OST Defendants' Motion for Summary Judgment. ECF No. 311 at p. 23.  Based on the facts that were learned during discovery, the Court should revisit its analysis from the motion to dismiss phase and stay the case pending agency review.  In short, the Court and jury should not usurp the SBA's authority in this case and the Court should permit the agency to review the critical issues in this case.

Granting this stay will not irreparably harm the litigants.  This case has been pending for a lengthy period of time and there is no current trial date set.  This case can be reviewed and heard by the agency before any potential trial date is set in this matter and the Court and the parties can benefit from agency expertise in this matter.

Alternatively, although the primary relief sought in this motion is for the SBA to conduct a review as the agency with the requisite experience, if the Court is not inclined to grant that relief, then it should order that trial in this case be bifurcated to determine whether CSG was compliant prior to considering any False Claims Act ("FCA") allegations in the interest of judicial economy.

## II.   <u>Procedural History</u>

Primary jurisdiction of the VA/SBA was raised at the motion to dismiss stage.  *See* ECF No. 301, p. 10-12.[1]  The OST Defendants argued that the VA/SBA was better suited to determine whether CSG was a compliant entity and referenced the VA's regulations regarding the verification examination by the Center for Verification and Evaluation ("CVE") as well as termination and adjudication regulations.  *Id*. at 11.  The motion stated that: "[n]one of these regulatory steps, administrative procedures or results of any investigation are alleged in the Second Amended Complaint."  *Id*.   The motion requested that the Court refer the matter to the VA/SBA to decide the issues in this case, not the Court or a jury.  *Id*.

The Court's Order stated that the argument was premature because "at the pleading stage, the question of CSG's eligibility to bid on SDVOSB set-aside contracts need not *actually* be decided."  ECF No. 311 at p. 23 (emphasis in original).  Rather, the Court stated that the analysis was whether the Plaintiff-Relator stated a claim under the pleading standards under the Federal Rules of Civil Procedure.  *Id*.  Therefore, the Court stated that "at this posture, the primary jurisdiction doctrine is of no use to OST Defendants."  *Id*. at p. 24.

The Court then stated that even if the primary jurisdiction issue were before the Court, it would decline to stay the proceedings pending resolution by the VA.  *Id.* at 26.  However, the Court made this decision without the benefit of any facts which were later presented by the OST Defendants in their motion for summary judgment and corresponding statement of undisputed material facts ("SUMF").  *See* ECF No. 337, 337-2.  These facts require consideration before issuing a definitive ruling on the primary jurisdiction doctrine.

---

[1] After the Court's ruling on the motion to dismiss, the VA's certification program was transferred to SBA in 2021. The Court identified this change in the Court's omnibus order regarding the parties' motions for summary judgment. ECF No. 400, n. 6. Therefore, this motion to stay seeks a referral to the SBA rather than the VA/SBA as previously requested.

III.     **Statement of Facts Developed After Motion to Dismiss**

With respect to facts that demonstrate that CSG was a compliant entity, was certified by the VA five times, and that the OST Defendants complied with the Mentor-Protégé Agreement in this case, the SUMF provided the following facts summarized below by relevant issue in this case.

A.     **VA Verification/Certification of CSG as a Compliant SDVOSB**

Regarding CSG's certification by the VA, the SUMF stated that the VA confirmed CSG's SDVOSB status and certified it as compliant.  SUMF, ¶ 77.  The SUMF also attached the VA certification letters, demonstrating that the VA approved and re-certified CSG *five times*. ECF No. 337-4, Coulter Decl. ¶¶ 2-4.  The initial approval/verification was in May 2011, and the re-certifications took place in June 2013, November 2013 (referencing an October 2013 onsite examination), July 2015 and March 2016.  *Id.*; *see also* ECF No. 338-1, ¶¶ 9-10 ("[a]t each opportunity for re-certification CSG was repeatedly re-certified by the VA as a SDVOSB and at no time relevant to this lawsuit was CSG anything other than an SDVOSB").

Furthermore, on two occasions, the VA visited the CSG office space provided by OST under the Mentor Protégé agreement.  SUMF, ECF No. 337-2, ¶ 78; ECF No. 338-1, ¶ 10.  The VA certified CSG as compliant before *and after the complaint was filed in this case*.  ECF No. 337-2, ¶ 79.  In addition to being re-certified as a verified SDVOSB by the VA, the VA also continued to award CSG new contracts *after this lawsuit* alleging CSG's misrepresentation of its status.  *Id.* ¶ 80.  (VA Purchase Order VA24515P0623, awarded June 5, 2015; Definitive Contract VA24514C0102, awarded October 8, 2014, with most recent modification issued on October 14, 2015 – published on https://www.fpds.gov/).

**B.**      **Mr. Gogia's Ownership and Control of CSG:**

- At no point did anyone other than Mr. Gogia own more than 51% of CSG, and at no point following the execution of the second Operating Agreement did anyone have any ownership stake in CSG other than Mr. Gogia. (Gogia Dep. Day 2, 36:12-14, 40:5-10, 42:12-14; Parekh, Dep. 292:19-21);

- Mr. Gogia managed multiple government projects. (Scollick Dep. Day 2, 284:8-11);

- Mr. Gogia solicited bids from subcontractors. (Scollick Dep. Day 2, 286: 4-10);

- Mr. Gogia evaluated, negotiated with, and hired subcontractors. (Scollick Dep. Day 2, 287:7-9);

- Mr. Gogia met with government contracting officers and COTRs regarding his projects. (Scollick Dep. Day 2, 290:16-291:7);

- Mr. Gogia was the primary point of contact with the government.  SUMF, ¶ 43;

- Mr. Gogia filed and submitted project progress reports, invoices, and receivables. (Scollick Dep. Day 2, 291:8-16);

- Mr. Gogia wrote the "CSG Narrative," a contemporaneously written outline regarding the operative facts in this case.  The CSG Narrative set forth the respective roles of each of the parties at issue here contemporaneously and before the Complaint was filed and demonstrates that CSG was a compliant entity controlled by Mr. Gogia.  ECF No. 388-1, p. 14 (Relator Exhibit 228);

### C.    Mr. Parekh's Delegated Back Office Role at CSG

- Regarding Neil Parekh, Mr. Gogia delegated back office work to him and CB Construction ("CB"), relying on their experience in government contracting to ensure proper compliance with government contracting rules and regulations. SUMF, ¶ 42;

- At no point did Mr. Parekh have duties at CSG beyond what was delegated to him by Mr. Gogia to support CSG's many projects. (Gogia Dep. Day 2, 39:4-12);

- Mr. Gogia reviewed project expenses, invoices, and payables both before and after the departure of Mr. Parekh. (Scollick Dep. Day 2, 291:17-292:2);

- Mr. Gogia continued to run CSG for five years after CSG ceased working with Mr. Parekh and CB.  *Id*., ¶ 52.

### D.    Allowable OST Mentoring of CSG Through a Government Approved Mentor-Protégé Program Agreement:

- In 2010, the FAA Mentor-Protégé Program was a pilot program with very broad categories of assistance permitted, specifically:

  - (a) Large and small business are encouraged to participate in the FAA pilot Mentor-Protégé program for the purpose of **providing developmental assistance** to eligible protégé entities to enhance their capabilities and increase their participation in FAA contracts;

  - (c) Mentor participation in the program means **providing technical, managerial, and financing assistance [e.g. bonding]** to aid proteges in developing requisite high-tech expertise and business systems to compete for and successfully perform FAA contracts and subcontracts.

*See* FAA Acquisition Management Clause (AMS), 3.6.1-9 (emphasis added).

- The FAA Program was amended in December 2014 to permit the following types of assistance, all of which are consistent with the types of support provided by OST to CSG in this case, which does not invalidate CSG's SDVOSB status:

  a. Management guidance related to-

     1) Financial management;

     2) Organizational management;

     3) Overall business management/planning, and

     4) Business development;

  b. Engineering and other technical assistance;

  c. Rent-free use of facilities and/or equipment; and

  d. Temporary assignment of personnel to the protégé firm for the purpose of training.

  (Mem. Supp. Exh. 1; FAA Mentor-Protégé Agreement Guide (rev. Dec. 20, 2014));

- The VA Mentor-Protégé Program was created on December 9, 2009 with an effective date of January 7, 2010.  The first twenty Mentor-Protégé partners were selected by the VA to begin their participation in the program on December 22, 2010 (*four months after the first VA award to CSG in this case*), with additional partners added every six months.  74 FR 64619 (December 8, 2009); https://news.va.gov/press-room/va-starts-mentoring-for-veteran-owned-small-businesses/ (last visited March 12, 2024);

- The VA Mentor-Protégé Program permitted the same types of developmental assistance as the FAA Mentor-Protégé Program.  *See* 48 C.F.R. § 819.7109.

- The FAA approved the Mentor-Protégé Agreement between CSG and OST. (Madan Dep. 57:2-5; Gogia Dep. Day 2, 9:13-20);

- The Mentor-Protégé Agreement authorized OST to provide mentoring to CSG without invalidating CSG's position as a SDVOSB. (Gogia Dep. Day 2, 9:21-10:6);

- In approving the Mentor-Protégé Agreement, the FAA stated that CSG was not precluded from using the mentorship assistance provided by OST in support of other contracts with other government agencies, meaning OST could mentor CSG for all government work, including VA work. (May 5, 2010 Transmittal letter approving MPA, attached as Exhibit 2 to Memorandum in Support of OST Defendants' Motion for Summary Judgment, Narula Decl. ¶ 3, ECF Nos. 337-3, 337-6);

- The MPA stated that "OST will provide assistance to Centurion Solutions Group LLC in business development to include additional contracting opportunities and proposal development in business management by providing the protégé with assistance in financial management advice and accounting system review; as well as technical support." *See Id*., Narula Decl. ¶ 2, ECF Nos. 337-3, 337-5);

- According to the CSG Narrative describing the business relationship between CSG, OST and CB, OST provided only "infrastructure, guidance, standard operating procedures, help in bonding capacity, additional development support as needed, and free office space to help with operational expenses." SUMF, ¶ 31; (Relator Ex. 228).

SUMF, ECF No. 337-2; ¶¶ 14, 27-31, 41.

These critical facts were not known to the Court when it made its prior decision regarding the primary jurisdiction doctrine.  Therefore, the OST Defendants seek to have the Court review the issue with the benefit of the facts that are now before the Court to fully consider the application of the primary jurisdiction doctrine in this case.

IV.    **ARGUMENT**

A.    **The Court Should Stay this Matter Pursuant to the Primary Jurisdiction Doctrine**

The primary jurisdiction doctrine is a "prudential doctrine," under which, in certain circumstances, "the initial decision making responsibility should be performed by the relevant agency rather than the courts."  *GCB Communications, Inc. v. U.S. South Communications, Inc.*, 650 F.3d 1257, 1263 (9th Cir. 2011).  The doctrine allows a District Court to refer a determinative issue to an administrative agency where the issue is "within the special competence of [that] administrative agency."  *In re: Bulldog Trucking Inc.*, 66 F.3d 1390, 1399-1400 (4th Cir. 1995) (quoting *Reiter v. Cooper*, 507 U.S. 258, 268-69 (1993)).  When an issue involves "technical and intricate questions of fact and policy that Congress has assigned to a specific agency," referral is appropriate.  *N.Y. State Elec. & Gas Corp. v. N.Y. Indep. Sys. Operator, Inc.*, 168 F.Supp.2d 23, 26 (N.D.N.Y. 2001).

The doctrine promotes "consistency and uniformity in the regulation of an area which Congress has entrusted to a federal agency," and enables "resolution of technical questions of facts through the agency's specialized expertise, prior to judicial consideration of the legal claims."  *U.S. ex. rel. Taylor v. Gabelli*, 345 F.Supp.2d 340, 350 (S.D.N.Y. 2004).  An additional consideration is whether the doctrine advances judicial economy.  *Id.*

Four factors are considered regarding motions to stay based on primary jurisdiction: "(1) whether the issue is within the conventional expertise of judges; (2) whether the issue lies within

the agency's discretion or requires the exercise of agency expertise; (3) whether there is a substantial danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *APCC Servs., Inc. v. WorldCom, Inc*., 305 F. Supp. 2d 1, 13 (D.D.C. 2001) (citing *Total Telecomms. Servs., Inc. v. AT & T Co.*, 919 F. Supp. 472, 478 (D.D.C.1996)).  In *Total Telecomms. Servs., Inc.*, this Court applied the test to invoke the primary jurisdiction doctrine where "[t]he resolution of [the] issues involv[ed] policy considerations concerning the public interest and technical questions relating to [plaintiff's] tariff and operating structure, that the Communications Act has vested the FCC with the mandate to determine." *Total Telecomms. Servs., Inc.,* 919 F. Supp. at 478.

An example of primary jurisdiction being applied requiring agency action before Court action is *U.S. ex rel. Windsor v. DynCorp, Inc*., 895 F. Supp. 844, 846 (E.D. Va. 1995).  In *DynCorp*, a relator brought an action against DynCorp for FCA violations.  DynCorp allegedly falsely asserted to the government that it was paying wages in compliance with the Davis-Bacon Act.  *Id.*  The Court found that the responsibility of assessing misclassification of an employee rests with the Department of Labor.  *Id.*  The Court held that "[t]o permit [Plaintiff's] claim to go to a jury would result in bypassing the carefully crafted administrative scheme for resolving Davis-Bacon Act classification disputes," and referred to the "wisdom in requiring classification disputes to be resolved in the administrative arena."  *Id*. at 850-52; *see also United States ex. rel. Lambert v. Elliott Contracting, Inc.,* 2015 WL 1097381 (S.D. WVa. 2015) (stay ordered because consideration of labor classifications do not "fall within the typical purview or conventional experience of judges," and is well-suited for Department of Labor review).

Therefore, the Court held that "it is impossible to determine whether DynCorp submitted a false claim to the government without first determining whether DynCorp actually misclassified an employee in a given instance. *And, the responsibility for resolving such disputes rests not with the courts, but with the Department of Labor*."   *DynCorp*, 895 F.Supp. at 851 (emphasis added); *see also United States ex. rel. Plumbers and Steamfitters Local Union No. 342 v. Dan Caputo Co.*, 152 F.3d 1060, 1062 (9th Cir. 1998) (affirming the District Court's decision to have the Department of Labor, in the first instance, "determine how a particular type of work is classified for the purposes of wage determinations," therefore "deferral to the Department with respect to classification determinations is proper under the doctrine of primary jurisdiction.").

Courts have deferred to agencies in matters other than in worker classification cases. *See Gisvold v. Merck & Co.,*, 62 F.Supp.3d 1198, 1204 (S.D. Cal. 2014) (holding that the "investigation of clinical benefits of drugs is particularly within the FDA's initial decision making domain," and therefore not appropriate for Court resolution; Court also noted the substantial risk of inconsistent rulings on issues presently pending before the FDA); *United States ex. rel. Qazi v. Bushwick United Housing Dev. Fund Corp.*, 977 F.Supp.2d 235, 240 (E.D.N.Y. 2013) (stating that "[b]y permitting *qui tam* plaintiffs to file suit based on the violation of regulations which may be corrected through an administrative process . . . courts unwisely shift the burden of enforcing the New York City Health Code to themselves, even though administering those regulations is '***best left to the administrators***.'") (emphasis added); *Winslow v. PepsiCo, Inc.*, 2007 WL 1584197, at *9 (S.D.N.Y. May 31, 2007) (referring import classification issue to Customs and Border protection); *U.S. ex rel. Nguyen v. City of Cleveland, Ohio*, No. 1:00-CV-208, 2005 WL 2416925, at *12 (N.D. Ohio Sept. 30, 2005)

(instructing Plaintiff to "take his regulatory issues regarding the emission factors directly to the regulatory agencies tasked with their governance—namely, the FAA and/or EPA.").

As set forth herein, in this case the four-factor primary jurisdiction test is met, therefore the Court should order a stay.

### 1.   The SBA Has Extensive Expertise in SDVOSB Matters

The first and second factors regarding Court expertise and agency expertise are intertwined.  Although, of course, the OST Defendants understand that the Court has vast experience, including with FCA cases, the particular questions regarding SDVOSB eligibility, including control of the entity, and the contours of the Mentor-Protégé Program take this case outside the realm of a routine FCA case and are better determined by the agency with the expertise and routine experience reviewing these matters.

### a.   The SBA Has an Extensive Regulatory Scheme Regarding Eligibility for SDVOSB Entities

The first reason why the agency expertise factor is met is because SBA administers an extensive regulatory scheme, which establishes and governs the parameters of compliance for businesses to be eligible to participate in contracting opportunities set-aside for small, disadvantaged, and SDVOSB entities.  *See e.g.*, 13 C.F.R. § 121 *et seq.* (13 C.F.R. §128 for SDVOSBs); 15 U.S.C. § 632; 15 U.S.C. § 634(b)(6); 15 U.S.C. § 636(a)(36); 15 U.S.C. § 662; 15 U.S.C. § 694a(9); Pub. L. 116-136 Sec. 1114; *see also* 48 C.F.R. § 833.103-70(b)(2) ("[c]hallenges of established size standards, ownership and control or the size status of a particular firm, and challenges of the selected standard industrial classification are for review solely by the Small Business Administration (SBA) (see 15 U.S.C. 637(b)(6); 13 CFR 121.1002)").

SBA personnel evaluate thousands of applications to the SDVOSB program and are accustomed to the nuances in organizational documents and other information affecting a concern's eligibility.  Indeed, SBA's robust eligibility regulations regarding SDVOSBs state that an "[a]pplicant's eligibility will be based on the totality of circumstances, including facts set forth in the application, supporting documentation, any information received in response to any SBA request for clarification, any independent research conducted by SBA, and any changed circumstances."  *See* 13 C.F.R. § 128.302(d).  Unlike the Court or a jury in this case, the SBA is able to utilize its extensive experience to review the documents and information provided, conduct independent research as needed (something a jury cannot do), and analyze the totality of the circumstances presented to it to render a decision.

### b.        The SBA's Multi-Step Control Analysis

Furthermore, the SBA has a multi-step process to determine whether the veteran is in control of the business, which is a critical aspect of the allegations in this case.  Specifically, the SBA must analyze ownership percentages, voting stock, managerial expertise, and that "one or more qualifying veterans controls both the long-term decision-making and the day-to-day operations of the Applicant or Participant." *Id*, § 128.203(a).  Even within those requirements there are sub-definitions and sub-analyses that have to be performed that require SBA expertise. For example, the regulations set forth a multi-layered, fact intensive analysis regarding managerial expertise: "[the veteran] must have managerial experience of the extent and complexity needed to control the concern. The qualifying veteran need not have the technical expertise or possess the required license to be found to control of the concern if the qualifying veteran can demonstrate that he or she has ultimate managerial and supervisory control over those who possess the required licenses or technical expertise." *Id*. at §128.203 (b).

In this case, as set forth above, there are numerous facts to consider and apply within a comprehensive regulatory scheme to determine Mr. Gogia's eligibility, ownership, control, managerial experience, and day-to-day work at CSG before analyzing whether there is False Claims Act liability in this case.  *See* Section III, A, *supra*.  As noted above, relevant facts include: (1) Mr. Gogia's ownership percentage; (2) the detail regarding his day-to-day management of government project; (3) his negotiation, hiring and management of subcontractors; (4) his submission of project progress reports; (4) what government officials he interacted with and the extent, nature, and detail of those interactions; (5) his delegation of back office work to Mr. Parekh, (5) the CSG-OST MPA, and (6) the summary of all of these aspects in a document that Mr. Gogia wrote, the CSG Narrative.  The jury will also have to consider Mr. Gogia's work after Mr. Parekh left, including Mr. Gogia's continued running of CSG for a five-year period.  The analysis of all of these complex factors and how they interact with the SBA's comprehensive regulatory scheme is best done by the SBA applying its extensive expertise, and permitting this case to go to a jury would improperly bypass that expertise.

Furthermore, the SBA's regulatory regime also has to analyze the impact of the approved mentor-protégé agreement and the permissible activities within that agreement will have to be balanced and considered in conjunction with SBA regulations.  For example, if the SBA's expertise is bypassed, the jury will have to be dexterous enough to balance the regulatory factors with the permissible actions in the MPA, specifically that "OST will provide assistance to Centurion Solutions Group LLC in business development to include additional contracting opportunities and proposal development in business management by providing the protégé with assistance in financial management advice and accounting system review; as well as technical support."  *See* Section III, D, *supra*.  Furthermore, the evolution of the FAA Mentor-Protégé

Program from a very broad pilot program to a more specific program that was tailored to industry experience after the pilot program and how that program intersects with the SDVOSB regulations is clearly better performed by an agency with expertise.

All of these analyses are best done by a trained, experienced agency – a jury cannot be expected to understand where the appropriate line would be for what level of assistance by a non-veteran per an MPA is acceptable with reference to SBA's regulations concerning control of an entity.  *See United States v. Medeiros,* 2022 WL 17819698, *6-7 (D.N.M. December 20, 2022) (noting that the determination of whether an entity is a proper SDVOSB is "based on a complex regulatory scheme.").

### c.   The SBA's Comprehensive Program Examination Regulations

Furthermore, after the complex eligibility and control regulations are satisfied, the SBA also has a comprehensive program examination regulation, which requires the SBA to conduct an investigation by SBA officials to verify the accuracy of the information provided by the participant, and the examination may be conducted on a "random, unannounced basis."  13 C.F.R. § 128.308 (a).  The SBA may review "any information related to the concern's eligibility," and can also make information requests during the examination with the ability to draw an adverse interest if the party fails to cooperate with a program examination.  *Id*., § 128.308 (b).

Similarly, the VA certification program is the product of extensive experience by the VA and its inspectors and that process should not be overruled by the jury in this case.  There will be significant debate over the certification program and the permissible activities under a Mentor-Protégé Program, including most likely by experts on both sides, and *DynCorp* stated that the use of such experts "underscores the wisdom in requiring [administrative] disputes to be resolved in

the administrative arena." *DynCorp, Inc.*, 895 F. Supp. at 852 (E.D. Va. 1995).

In this case, the VA had a detailed CVE process to review and certify SDVOSBs, and CSG was certified and re-certified five times, including in-person site visits. *See* SUMF, ¶¶ 77-90; ECF No. 337-4, Coulter Decl. ¶¶ 2-4. Permitting a jury to make a sixth review in the face of the prior five essentially invalidates the prior approvals and renders a lay juror the ultimate authority over trained industry professionals. Therefore, CSG's status as a compliant SDVOSB entity and the contours of the Mentor-Protégé Program require the exercise of agency expertise rather than the Court or the jury.

**d.      The SBA's Adjudicatory Process**

In addition to these detailed eligibility, control, and examination regulations, the SBA also hears and adjudicates cases related to size, status, and ownership and control challenges under the VA Veterans First Contracting Program (see 38 U.S.C. 8127(f)(8)). Specifically, 13 C.F.R. § 134.102(q) vests the SBA's Office of Hearings and Appeals ("OHA") with jurisdiction over appeals of the "ownership and control status" of SDVOSBs. OHA has single-handedly rendered and published thousands of decisions regarding the regulatory status of SDVOSBs and regarding Mentor-Protégé agreements. OHA has original jurisdiction over SDVOSB status appeals, and because decisions by OHA are deemed final pursuant to 13 C.F.R. § 134.227, the *vast* majority of those appeals are resolved at OHA and *not* in the courts.

Two recent federal criminal cases, *Medeiros* and *United States v. Simmons,* 441 F.Supp.3d 1196, 1199 (D. Kan. 2020), are instructive. In *Medeiros*, the Court referenced SBA's OHA decisions regarding a specific factual issue in that case, and granted a judgment of acquittal on a false statement count because "[i]n light of the ambiguity and the reasonableness of Defendants' interpretation based on administrative decisions in related contexts, fair warning

16

principles apply." *Id*., *7.

*Medeiros* states the issue before this Court plainly:

> The affirmative false statements charged, however, were statements that were made in the context of a complex regulatory scheme, in which the determination of falsity and criminal intent depended upon Defendants' understanding of the regulatory environment and the flexibility of contract terms. The manner in which the case was charged required the jury to determine whether Defendants should have known that NJM was not a SDVOSB, *a determination that the agencies themselves had yet to make based on multiple regulations and factors*.

*Id*. at *2 (emphasis added).  In fact, the Court noted that the day after the indictment in the case, CVE sent an e-mail inquiring whether the subject company was going to re-up with CVE, demonstrating that the agency, not the Court, should be the body responsible for reviewing the case.  *Id*., n.2.

In *Simmons*, the defendant was charged with making false representations and wire fraud regarding contracts that were set aside for small businesses.  441 F.Supp.3d at 1196.  The issue of affiliation between the defendant's company, Millennial, and another company, Figeac, was critical, and the government "after conceding that the SBA never determined that Millennial and Figeac are affiliated, proposed that the question of affiliation should be submitted to the jury, which would determine affiliation weighing the same factors used by the SBA."  *Id*. at 1196.  The Court held the "Government's proposal to be entirely inconsistent with our system of criminal justice," because the SBA's standards "expressly govern how the ***SBA*** determines affiliation," and "[t]he Court gleans nothing from the regulation suggesting that those standards may be used for any purpose ***other than for the SBA to make its determination***."  *Id*.  (emphasis added).  Furthermore, the Court stated that under the government's proposal "Simmons should be held criminally liable for failing to disclose an affiliation that had never been found to exist by the authoritative body responsible for making that determination."  *Id*.  The Court then

summarized the inherent danger in the proposal:

> Perhaps, based on the evidence the Government presented at trial, the SBA would conclude that Millennial and Figeac are affiliated. And perhaps, if challenged, the SBA's decision would be upheld on appeal by the OHA and the courts. But that is not sufficient to convict Simmons on these charges. Indeed, to expose a person to criminal jeopardy because an administrative body *might* determine that two entities are affiliated, when nobody has made that determination, is an affront to our system of justice. ***No rational juror could find that Simmons made a misrepresentation by failing to disclose an affiliation that had not yet been deemed to exist by any appropriate authority***.

*Id*. at 1200 (emphasis added).

Although *Medeiros* and *Simmons* are criminal cases, the same analysis regarding the jury's ability to determine the complex SDVOSB standards and how they apply to liability under the False Claims Act – having a jury decide that SDVOSB was not a compliant entity when the SBA has not made such a finding is inconsistent with the proper administration of justice. Unlike when this Court was bound by the evidentiary limitations of the Rule 12 stage of litigation, the underlying factors that the SBA would analyze auger in favor of a stay. Therefore, this Court should defer to the SBA, which is best equipped to interpret and apply the subject regulations – like in *Medeiros* and *Simmons* the SBA has not determined that CSG was not a compliant SDVOSB, and that review needs to take place at the agency level with its requisite expertise before this Court makes any decisions on the issue.

## 2. There is a Substantial Danger of Inconsistent Rulings

Regarding the third factor, whether there is a substantial danger of inconsistent rulings, permitting the jury to make a determination regarding whether CSG was a compliant entity would usurp the previously conducted VA review and certification process. The VA's CVE process that existed in this case would be rendered meaningless if the VA certified CSG multiple times but then a jury decided that the certifications were not valid even though the jury was not

18

involved in the deliberative process regarding the certifications.

For the same reasons, with respect to the Mentor-Protégé Program, applicable FAA regulations at the time of the approved MPA with the initial pilot program in 2010 and the 2014 amendments regarding the permissible mentoring that a mentor can provide are exactly what is at issue in this case.  *See* FAA Acquisition Management Clause (AMS), 3.6.1-9; FAA Mentor-Protégé Program, 1.12 (12/2014); *see* https://sbo.faa.gov/MentorProtege.cfm.  The agency that reviews this Program and how these types of support are analyzed is best suited to determine whether the support provided in this case was proper and how that support relates to the entity's certification.  A jury should not be permitted to determine what level of support goes beyond the parameters of the Mentor-Protégé Program.  Indeed, an adverse jury verdict would effectively chill a SDVOSB and a Mentor-Protégé participant because the entity cannot rely on the VA inspector who approved and certified the entity; rather, they are subject to the whims and caprices of a civil jury in federal court.

Furthermore, the consequences of inconsistent rulings could be serious to the extent they create conflicts between the courts and well-established administrative schemes, which would be detrimental to the same type of program Plaintiff-Relator contends was harmed in this case.  Such a finding by a court would also wreak havoc on the SBA's extensive body of law regarding what constitutes a compliant entity, by forcing the SBA to consider and address court determinations that may or may not comport with its precedent, and derailing the SBA's mission to develop consistent standards upon which government contractors can rely to conduct business with the government.  Therefore, this case has significant policy considerations regarding the potential impact on small business programs in this country that must be considered by the Court.

**3**.     **The Prior Agency Application Approved CSG and Re-Certified It Five Times**

Finally, regarding the fourth factor, whether a prior application to the agency has been made, the Second Amended Complaint indicates that "[a] SDVOSB prospective contractor must complete an application package consisting of representations, certifications, and personal documents … [which] [t]he VA reviews … and determine [sic] whether the prospective contractor qualifies for SDVOSB status."  ECF No. 298 ¶ 29.  In addition, the Second Amended Complaint alleges that "CSG … [was] registered and certified [] as a SDVOSB entity for obtaining government contracts."  *Id*. at ¶ 37.  Furthermore, the Second Amended Complaint alleges that "[t]hese representations and certifications were obtained …."  *Id*.  Thus, it appears from Plaintiff's allegations, that CSG did, in fact, make a prior application to the agency to request a determination regarding its status and as set forth in detail in the SUMF, ***was certified by the agency multiple times***.  Accordingly, the Court and jury risk delivering a ruling inconsistent with the agency's prior determination.  As noted herein, giving a jury the sixth review after five prior certifications would usurp the agency function in this case.

The three goals of the primary jurisdiction doctrine – uniformity, consistency, and judicial economy – are all met by a stay in this case.  Particularly due to the fact that there is no trial date set in this matter and it has been pending for a lengthy period of time, judicial economy would be well-served to have an agency review this case prior to a trial as the review could streamline the trial or obviate the need for a trial altogether, if it were to determine that CSG was a compliant entity, consistent with VA's prior certifications.  Therefore, based on the specific questions at issue regarding CSG and its status as a SDVOSB and the contours of the Mentor-Protégé Program, this Court should stay the action for the SBA to exercise preliminary jurisdiction in this case to issue a ruling regarding the relevant issues prior to decisions by this

20

Court or a jury.

### B.   <u>Alternatively Bifurcation is Appropriate to Determine CSG's Validity</u>

The primary relief sought in this case is to stay this matter so that the SBA can determine whether CSG was a compliant SDVOSB – a fact that the agency has not decided as of yet. Although the SBA has the required experience and expertise to address the issue, if the Court is not inclined to grant such relief, alternatively, the OST Defendants seek a bifurcated trial for the jury to determine whether CSG was a compliant SDVOSB.

Rule 42(b) of the Federal Rules of Civil Procedure states that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims."  Fed.R.Civ.P 42(b). Under Rule 42(b), a court may bifurcate claims or issues for separate trials "to advance judicial economy, to avoid the possibilities of confusion, to further convenience, to avoid delay and prejudice, and to serve the ends of justice."  *American Nat'l Red Cross v. Travelers Indem. Co. of Rhode Island*, 924 F.Supp. 304, 306 (D.D.C. 1996) (bifurcating case to address the defendant's affirmative defenses first and then the Plaintiff's waiver and estoppel and bad faith claims).  A court has broad discretion to choose whether to bifurcate claims in a case for a separate trial, and may grant bifurcation even if only one criterion from Rule 42(b) is satisfied. *Id.*  (citations omitted).

Furthermore, "[i]f a single issue could be dispositive of the case, and resolution of it might make it unnecessary to try the other issues, separate trial of that issue may be desirable to save to the time of the court and reduce the expenses of the parties."  *Webb v. Hyman*, 861 F.Supp. 1094, 1120 (D.D.C. 1994)  (citing 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2388 (1971)).

The single issue to be determined in this case – whether CSG was a compliant entity – disposes of the entire case.  Therefore, if the stay is not granted, this alternative would serve the Court's interest and judicial economy.  If the jury were to decide that CSG was a compliant entity, then the case would be resolved as a compliant SDVOSB would not support Plaintiff-Relator's alleged basis for an FCA violation and there could be no conspiracy with a compliant, legal entity and, thus, no resulting FCA liability.  Although the OST Defendants would, of course, prefer the SBA to make that determination, the determination should be made before FCA liability is decided, based on the factors supporting bifurcation.

## IV.    CONCLUSION

Wherefore, based on the foregoing, the OST Defendants respectfully request that the Court stay the case so that the SBA can properly exercise its jurisdiction in this matter prior to the trial in this case or, alternatively, bifurcate the jury's review in this case and grant the OST Defendants all other relief to which they may be entitled.

Dated: March 13, 2024                           Respectfully submitted,


By: */s/ Brian W. Stolarz*
    Thomas A. Coulter (D.C. Bar No. 436423)
    Brian W. Stolarz (D.C Bar No. 466160)
    Norton Rose Fulbright US LLP
    799 9th Street NW, Suite 1000,
    Washington, DC 20001-4501
    Tel:  (202) 662-4765
    Fax:  (202) 662-4643
    tom.coulter@nortonrosefulbright.com
    brian.stolarz@nortonrosefulbright.com

    *Counsel for Defendants OST, Inc., Vijay*
    *Narula and Ajay Madan*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that this document filed through the CM/ECF system on March 13, 2024, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

<u>*/s/ Brian W. Stolarz*</u>
Brian W. Stolarz